CHRISTOPHER J. COX (BAR NO. 151650)
Email: chris.cox@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3029
Facsimile: (650) 802-3100

DAVID C. RADULESCU, PH.D.
(*pro hac vice*)
Email: david@radulescullp.com
TIGRAN VARDANIAN (*pro hac vice*)
Email: tigran@radulescullp.com
ROBIN M. DAVIS (*pro hac vice*)
Email: robin@radulescullp.com
RADULESCU LLP
136 Madison Avenue, 6th Floor
New York, NY 10016
Telephone: (646) 502-5950
Facsimile: (646) 502-5959

*Attorneys for Plaintiff*
*FINISAR CORPORATION*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| FINISAR CORPORATION, a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> NISTICA INC., a Delaware corporation, <br><br> Defendant. | No. 5:13-cv-03345-BLF <br><br> **PLAINTIFF FINISAR CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT L.R. 4-5(a)** <br><br> Date:  August 8, 2014 <br> Time:  9:00 a.m. <br> Place:  San Jose Courthouse, Courtroom #3 <br> Judge:  Hon. Beth Labson Freeman |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ...........................................................................................................1

II.  LEGAL STANDARDS ..................................................................................................1

   A.   General Principles Of Claim Construction.........................................................2

   B.   Construction of Means-Plus-Function Limitations Under 35 U.S.C. § 112(6)...................2

III. THE '328 PATENT .......................................................................................................3

   A.   "displaceable reflectors"....................................................................................4

     i.   The '328 Patent Discloses Different Types And Directions Of Motion Of Reflectors .....4

     ii.  Nistica's Proposed Construction Improperly Turns Features Of Certain Embodiments Into Claim Limitations ...................5

IV.  THE '687 PATENT .......................................................................................................6

   A.   "scattered light from a dropped signal is directed onto the micromirror device to reflect away from the return path"........................7

     i.   The Plain And Ordinary Meaning Of The "Scattered Light . . ." Term Is Clear And Known To One Of Ordinary Skill In The Art ...................7

     ii.  Nistica's Proposed Construction Rewrites Clear Claim Language To Include Unnecessary Limitations ...................8

V.   THE '740 PATENT .....................................................................................................10

   A.   "the spatial light modulator having a first set of micromirrors programmed to perform a first overall optical function on the first optical input signal, and having a second set of micromirrors programmed to perform a second overall optical function on the second optical signal"...................11

     i.   "The Spatial Light Modulator . . ." Has A Clear Plain And Ordinary Meaning To Those Of Skill In The Art, In Accord With Finisar's Proposal ...................11

     ii.  Nistica Proposes To Add Three Separate Limitations Through Its Construction Of "The Spatial Light Modulator . . .".......................12

VI.  THE '980 PATENT .....................................................................................................13

   A.   "spatial separating means for simultaneously spatially separating at least a first and a second group of light from said series of optical signals" ...................14

     i.   Finisar's Construction Accurately Captures The Many Corresponding Structural Components For "Spatial Separating Means"...................15

     ii.  Nistica Improperly Excludes Corresponding Structure Based On Finisar's Compliance With An Administrative Request By The PTO ...................16

     iii. Even If The Corresponding Structure Is Limited As Nistica Alleges (It Is Not), Nistica's Proposed Construction Is Too Narrow...................19

B.   "wavelength processing means for separately processing each of the separated wavelengths of said first and second group" ................................................................22

i.   Finisar's Proposed Function Is True To The Claim Language, Whereas Nistica's Proposal Imports Unnecessary, Redundant Words ................................................22

ii.   Finisar's Proposed Corresponding Structure Captures The Full Scope Of The '980 Patent's Disclosure ................................................................23

iii.   Nistica Suggests Omitting Clearly Disclosed Corresponding Structure From Its Proposal Due To Improper Reliance On An "Election/Restriction" Requirement During Prosecution ................................................................23

iv.   Nistica's Identification Of Corresponding Structure Is Fatally Flawed Because It Is Nonsensical And Renders Subsequent Claim Language Redundant ....................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acco Brands, Inc. v. Am. Power Conversion Corp.*,
No. 2:02-cv-113, 2003 WL 25782757 (E.D. Tex. July 16, 2003) ..............................17, 19, 24

*Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*,
No. C 97-CV-4203, 2000 WL 34204509 (N.D. Cal. Feb. 28, 2000) ................................19, 24

*B. Braun Med. Inc. v. Abbott Labs.*,
124 F.3d 1419 (Fed. Cir. 1997) ...................................................................................3

*Baran v. Medical Device Technologies, Inc.*,
616 F.3d 1309 (Fed. Cir. 2010) ..............................................................................3, 15

*Bd. of Regents v. BENQ Am. Corp.*,
533 F.3d 1362 (Fed. Cir. 2008) ..................................................................................25

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
388 F.3d 858 (Fed. Cir. 2004) ....................................................................................16

*Cardiac Science, Inc. v. Koninklijke Phillips Elecs., N.V.*,
466 F. Supp. 2d. 1150 (D. Minn. 2006) .......................................................................19

*Competitive Techs. v. Fujitsu Ltd.*,
286 F. Supp. 2d 1161 (N.D. Cal. 2003)........................................................................25

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008) ....................................................................................2

*Cordis Corp. v. Medtronic AVE, Inc.*,
511 F.3d 1157 (Fed. Cir. 2008) ..................................................................................18

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722 (2002) ..................................................................................................18

*Finisar Corp. v. DirecTV Grp., Inc.*,
523 F.3d 1323 (Fed. Cir. 2008) ....................................................................................2

*Frans Nooren Afdichtingssystemen B.V. v. Stopaq Amcorr Inc.*,
744 F.3d 715 (Fed. Cir. 2014)........................................................................12, 13, 23

*Kemco Sales, Inc. v. Control Papers Co., Inc.*,
208 F.3d 1352 (Fed. Cir. 2000) ....................................................................................3

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004), *aff'd* 481 F.3d 1371 (Fed. Cir. 2007) .....................................20

*Liquid Dynamics Corp. v. Vaughan Co., Inc.,*
  355 F.3d 1361 (Fed. Cir. 2004) .................................................................. 2

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.,*
  324 F.3d 1308 (Fed. Cir. 2003) ................................................................ 22

*Mangosoft, Inc. v. Oracle Corp.,*
  525 F.3d 1327 ............................................................................................ 25

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) .......... 2

*Multiform Desiccants, Inc. v. Medzam, Ltd.,*
  133 F.3d 1473 (Fed. Cir. 1998) ................................................................ 18

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
  521 F.3d 1352 (Fed. Cir. 2008) ........................................................ 7, 8, 11

*Pacific Coast Marine Windshields Ltd. v. Malibu Boats, LLC,*
  739 F.3d 694 (Fed. Cir. 2014) .................................................................. 18

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) .................................................................. 2

*Signtech USA, Ltd. v. Vutek, Inc.,*
  174 F.3d 1352 (Fed. Cir. 1999) ................................................................ 16

*Trebro Mfg., Inc. v. Firefly Equip., LLC,*
  748 F.3d 1159 (Fed. Cir. 2014) .................................................................. 5

*Warner-Jenkinson v. Hilton Davis Chem. Co.,*
  520 U.S. 17 (1997) ...................................................................................... 3

*Welker Bearing Co. v. PHD, Inc.,*
  550 F.3d 1090 (Fed. Cir. 2008) ................................................................ 16

**Statutes**

35 U.S.C. § 101 .......................................................................................... 18

35 U.S.C. § 112(6).......................................................................... 2, 3, 14, 22

35 U.S.C. § 112, ¶ 6 .................................................................................... 3

35 U.S.C. § 121 .......................................................................................... 17

**Other Authorities**

37 C.F.R. § 1.153(a) .................................................................................... 18

MPEP §803(I)(B) (8th ed., Rev. 4, Oct. 2005) ........................................ 17

## I.       INTRODUCTION

Finisar Corporation ("Finisar") is a leader in the area of optical telecommunications and a pioneering innovator in the field of optical telecommunication networks, such as the fiber optics networks that provide Internet, telephone, and cable service to much of the United States.  Finisar owns many important patents on the operation of optical networking components, including the patents asserted by Finisar in this action.  Wavelength selective switch ("WSS") technology, that is, optical switches that enable control over important features of optical networks, such as the routing and controlling the propagation of certain data that is encoded in a particular wavelength of light and transmitted along optical fibers, is at the core of Finisar's asserted patents.[1]

Nistica, Inc. ("Nistica") competes with Finisar in the telecommunications space.  Unable to offer anything unique yet eager to boost its market share, Nistica has been infringing on Finisar's patented technology to offer competing products to Finisar's customers.  Nistica's egregious commercial undercutting has negatively impacted Finisar's sales and harmed its market position, and is possible only because Nistica is offering products that infringe Finisar's patented technology.  As a typical infringer, Nistica now attempts to improperly narrow and read limitations into the asserted claims.[2]  In contrast, Finisar asks that the Court preserve the true scope of the asserted claims granted by the U.S. Patent and Trademark Office ("PTO").  Applying the established law of claim construction, this Court will find that Nistica's efforts to restrict the scope of the asserted claims are legally and factually unsupported, while Finisar's proposed constructions align with the evidence and precedent.

## II.      LEGAL STANDARDS

---

[1] The descriptions in this Brief give only a glimpse into the complex technical subject matter described in Finisar's asserted patents.  To explain this subject matter in more detail, Finisar will provide the Court with a Technology Tutorial on July 21, 2014.  Also, Finisar has attached hereto as Exs. 13-18 several excerpts of textbooks and other introductory materials on optics and optical communication networks, which Finisar believes provide useful background information for any readers unfamiliar with optics and optical networking components.  (Exhibits supporting Finisar's Opening Claim Construction Brief are appended to the Declaration of Robin M. Davis and referenced herein as "Ex.")

[2] Finisar alleges that Nistica infringes six of Finisar's patents.  However the claim terms disputed by the Parties appear in only four of Finisar's asserted patents—specifically, U.S. Patent Nos. 6,430,328 (the "'328 patent"), 6,956,687 (the "'687 patent"), 7,126,740 (the "'740 patent"), and 7,397,980 (the "'980 patent").  (Exs. 1-4.)  The Parties do not dispute any claim terms in the remaining two asserted patents, U.S. Patent Nos. 7,092,599 (the "'599 patent") and 7,123,833 (the "'833 patent).  Consequently, the '599 and '833 patents are not the subject of Finisar's Brief.

---

### A.    General Principles Of Claim Construction

Claim construction is a matter of law to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history.  Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004) (quoting *Vitrionics Corp. v. Conceptronic Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  In particular, claim construction begins with the language of the claim and asks "how a person of ordinary skill in the art understands a claim term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).  Intrinsic evidence is particularly important because "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Philips*, 415 F.3d at 1313.  The prosecution history is the public record of the patentee's application to the PTO for the patent and part of the intrinsic evidence, along with the patent claims and specification.  *See Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008).

In addition to intrinsic evidence, a court may rely on extrinsic evidence, such as dictionaries or expert testimony, to provide background on the technology at issue, to explain how an invention works, or to explain the meaning of a term as it would have been understood by a person of ordinary skill in the art at the time of the invention.  *See Phillips*, 415 F.3d at 1317-18.  However, extrinsic evidence is considered "less significant than the intrinsic record" and "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.  Also, extrinsic evidence cannot be used to contradict the intrinsic evidence.  *See Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1328 (Fed. Cir. 2008).

### B.    Construction of Means-Plus-Function Limitations Under 35 U.S.C. § 112(6)

A patentee may use functional language, rather than a specific identification of structure, to claim her invention by taking advantage of the statutory provision set forth at 35 U.S.C. §

112(6).  *See Warner-Jenkinson v. Hilton Davis Chem. Co.*, 520 U.S. 17, 27 (1997).  Section

112(6) describes the requirements and the construction framework for functional claim terms:

> An element in a claim for a combination may be expressed as a means for step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, materials, or acts described in the specification and equivalents thereof.

Claim terms that contain the words "means for" are presumed to be means-plus-function

terms and to fall within the scope of 35 U.S.C. § 112(6).  *Kemco Sales, Inc. v. Control Papers*

*Co., Inc.*, 208 F.3d 1352, 1361 (Fed. Cir. 2000).  To construe such "means-plus-function" claim

terms, a court must include both the function and the corresponding structure for the claim

element in its construction.  *See Baran v. Medical Device Technologies, Inc.*, 616 F.3d 1309,

1316 (Fed. Cir. 2010).  The structure included in the construction may only be the corresponding

structure described in the patent specification and equivalents thereof.  *See* 35 U.S.C. § 112, ¶ 6;

*see also B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).  Accordingly,

when faced with means-plus-function limitations, courts "must turn to the written description of

the patent to find the structure that corresponds to the means recited in the ... limitation." *Id*. at

1424.  "[S]tructure disclosed in the specification is 'corresponding' structure only if the

specification or prosecution history clearly links or associates that structure to the function

recited in the claim." *Id*.

## III.   THE '328 PATENT

The '328 patent, titled "Optical

Switch," describes an inventive apparatus for

use in optical communications networks.

The inventive optical switch taught in the

'328 patent is designed "to perform optical



switching for an optical network by changing the relative phase of individual portions of the

cross section of a wave front of a beam."  ('328 patent at 1:33-36.)  One example of the '328

patent's optical switch is depicted in Figure 3, where light enters the switch through a fiber (78),

passes through a lens (76) or lens array (77) and an optional field lens (79) before striking a

reflective SLM (80).  (*See id*. at 4:13-19.)  In Figure 3, the resulting reflected beam of light (82) is directed onto another reflective SLM (84) before it is passed on through the optical switch to the output fiber channel (86).  (*See id*. at 4:19-28.)  A reflective SLM ("spatial light modulator") according to the '328 patent can be composed of a matrix of reflective pixel elements, such as micromirrors, also known as MEMS.   (*See id*. at 2:17-49.)  The '328 patent invention provides that, by controlling the relative positions of the individual micromirrors on a reflective SLM, portions or the entirety of the light beam can be routed or switched.  (*See id*. at 1:51-54.)

### A.  "displaceable reflectors"

| Finisar's Proposed Construction: | Nistica's Proposed Construction: |
|---|---|
| moveable reflectors | reflectors of a spatial light modulator array that move substantially perpendicular to the plane of the reflective surface of the reflective element |

The parties agree that the term "reflectors" in the phrase "displaceable reflectors" requires no construction.  Curiously, Nistica also does not dispute that the term "displaceable" refers to physical motion, as both parties have the word "move" or its derivative in their proposed constructions.  In fact, both parties construe the words of this term that actually appear in the claim the same way—Finisar proposes "moveable reflectors," Nistica suggests "reflectors . . . that move."  The difference between the parties' positions is that Finisar only construes words that actually appear in the claim, while Nistica attempts to improperly import several limitations from specific embodiments into the claim.  Even though there are no restrictions in the claims or in the specification to the type and the direction of motion of the reflectors, Nistica urges the Court to limit the broad phrase "displaceable reflectors" to only one type of motion.  Nistica's attempt to severely narrow the scope of the claimed invention should be rejected.

### i.  The '328 Patent Discloses Different Types And Directions Of Motion Of Reflectors

The '328 patent is clear that a wide variety of movements can be made by the reflectors of the claimed invention and places no limitation on the type of movement.  For example, the '328 patent states that "[a]ny decrease of motion or wave front phase modulation allowed by dividing up the deflector into separate pixels is within the spirit of the invention." ('328 patent at 3:64-66.)

1    The '328 patent specifically discusses at least two examples that identify certain directions of

2    reflector motion.  For example, the Summary of the Invention describes that "[e]ach deflector

3    changes the direction of the light beam by changing the phase of the beam wave front by

4    displacing the pixel reflectors in a direction *essentially perpendicular to the beam axis and*

5    *relative to each other*."  (*Id*. at 1:60-64 (emphasis added).)  In connection with a preferred

6    embodiment, the '328 patent describes movement of the pixels in a different direction, relative to

7    the reflective surface of the element.  (*See id*. at 2:57-58 ("Each pixel reflector is moved in a

8    direction that is *generally perpendicular to the reflective surface of the element*.") (emphasis

9    added).)  The orientation of the perpendicular movement in these examples is different.

10        The patent also makes clear that different types of reflector motion are contemplated by

11    the claimed inventions.  While perpendicular, piston-like motion is certainly disclosed in some

12    embodiments, the '328 patent makes clear to a person of ordinary skill in the art that reflectors

13    may also rotate.  (*See* D.I. 98-2 at ¶ 20; Ex. 5 (Hall Dep. Tr.) at 94:6-95:1.)  This can be inferred,

14    for example, from the patent's multiple references to MEMS devices.  (*See* '328 patent at 2:33-

15    38; 8:46-49; 8:55-61.)  It would be well understood by a person of ordinary skill in the art at the

16    time of the invention that reflectors in a MEMS device could rotate or tilt.  (*See* Ex. 5 (Hall Dep.

17    Tr.) at 88:15-95:1.)  Indeed, the '328 patent expressly references "rotating mirrors" in one of the

18    embodiments.  (*See* '328 patent at 3:18-22 ("an edge of a rotating mirror is moved").)  Moreover,

19    nothing in the '328 patent suggests that reflector motion should be limited to any of the examples

20    provided in the specification and exclude other directions or types of reflector motion.  Thus, the

21    intrinsic record fully supports Finisar's construction, which does not limit the scope of the claim

22    to a particular type or direction of reflector motion.

23        **ii.    Nistica's Proposed Construction Improperly Turns Features Of**
           **Certain Embodiments Into Claim Limitations**

24

25        Nistica's proposed construction for "displaceable reflectors" must be rejected because it

26    improperly attempts to turn a feature discussed in the '328 patent in connection with an

27    embodiment into a requirement of the claims.  *See Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748

28    F.3d 1159, 1166 (Fed. Cir. 2014) (holding that a district court erred by adopting a claim

1 construction that improperly imported a limitation from a preferred embodiment into the claims)

2 (citing *Phillips*, 415 F.3d at 1323).  Nistica's construction restricts the "displaceable reflectors" to

3 only "move substantially perpendicular to the plane of the reflective surface of the reflective

4 element."  It appears that Nistica's position is based on the disclosure in connection with Figure 1

5 of the patent that "[e]ach pixel reflector is moved in a direction that is generally perpendicular to

6 the reflective surface of the element."  ('328 patent at 2:57-58.)  However, the '328 patent is not

7 limited to the specific type of motion discussed in connection with Figure 1—indeed, as

8 discussed in Section III.A.i. above, other types and directions of motion of the reflectors in the

9 '328 patent are both specifically discussed and generally referenced as falling within the scope of

10 the claimed invention.  Nistica also cannot argue that there was any prosecution history

11 disclaimer affecting the meaning of "displaceable reflectors" because the '328 patent was

12 allowed without any rejections from the PTO or amendments by the applicant.  (*See* Ex. 6 ('328

13 Prosecution History).)  Thus, Nistica's confusing proposed construction, which is in conflict with

14 basic claim construction law, should be rejected.

## IV.    THE '687 PATENT

16        The '687 patent, titled "Optical Blocking Filter Having An Array Of Micro-Mirrors,"

17 describes an innovative reconfigurable blocking filter for use in optical communications

18 networks.  The inventive tunable optical filter is designed to take advantage of a multi-

19 dimensional array of micromirrors "to selectively delete individual channels within a wavelength

20 division multiplexed (WDM) optical signal."  ('687 patent at 1:28-31.)  One example of the

21 '687's reconfigurable blocking filter is depicted in Figure 24; light from a circulator (18) is sent



through a free optics assembly including a collimator (22), a diffraction grating (24), a mirror (26), and a bulk lens (28), resulting in the light being separated into its different wavelengths, and focused onto a micromirror device (30).  (*Id.* at 12:26-37.) The filter operates by directing "deleted"

Fig. 24

channels away from the return path of the non-deleted channels twice – once when light is first directed onto the micromirror device, and once after reflection off a mirror (606).  (*Id.* at 12:45-60.)  The invention allows elimination of a selected channel or channels by deflecting those channels away from the return path, without affecting the remaining channels.  (*Id.* at 2:24-41.)

     **A.**    **"scattered light from a dropped signal is directed onto the micromirror device to reflect away from the return path"**

| Finisar's Proposed Construction: | Nistica's Proposed Construction: |
|---|---|
| plain and ordinary meaning | Light from the dropped signal that is scattered from the edges of the micro-mirrors used to block that signal is directed onto micro-mirrors of the spatial light modulator so that the scattered light is reflected away from the output path |

The phrase in dispute is essentially one fourth of claim 1 of the '687 patent.  Nistica seeks to rewrite this portion of the claim to insert multiple limitations without any basis for doing so. In contrast, Finisar proposes that the words in this phrase be given their plain and ordinary meaning as they would be understood by one of ordinary skill in the art at the time of the invention.  Nistica's efforts to force limitations into clear claim language should not be condoned, and its proposed construction should be rejected.

     **i.**    **The Plain And Ordinary Meaning Of The "Scattered Light . . ." Term Is Clear And Known To One Of Ordinary Skill In The Art**

The term "scattered light from a dropped signal is directed onto the micromirror device to reflect away from the return path" in claim 1 of the '687 patent does not require construction. The meaning of this claim term would have been clear to one of ordinary skill in the art at the time of the invention.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1352, 1360 (Fed. Cir. 2008).  Moreover, each part of this phrase unambiguously refers back to preceding language in claim 1, which provides clear context for the scope and meaning of the phrase.  For example, "light from a dropped signal" clearly refers to light that the claimed "optical blocking filter" "eliminate[d]," as the elimination of "a selected band or channel or a specified selection of bands or channels" is recited earlier in the claim.  ('687 patent at cl. 1.) The language "is directed onto the micromirror device" clearly refers back to the "micro-mirror device with an array of micro-mirrors" described earlier in the claim.  (*Id.*)  And "to reflect away

---

1    from the return path" clearly refers back to the "optical return path" described earlier in the claim.

2    (*Id*.)  The only term in the disputed phrase that that does not appear in the preceding claim

3    language is "scattered light."  However, "scattered light" is a common term that was known to a

4    person of ordinary skill in the art at the time of the invention.  (Ex. 5 (Hall Dep. Tr.) at 33:13-

5    34:10.)  Indeed, by importing "scattered light" into its own proposed construction, Nistica does

6    not dispute that this term is clear on its face.  Specifically, Nistica construes "**scattered light**

7    **from a dropped signal**" as "**light** from the dropped signal that is **scattered**."  (*See* D.I. 98-1 at 10

8    (emphasis added).)  Nistica also does not dispute that the language in claim 1 preceding

9    "scattered light" is clear and requires no construction.  Because the disputed phrase uses the same

10   terminology as the rest of the claim, no construction of this phrase is needed.

11                        **ii.      Nistica's Proposed Construction Rewrites Clear Claim Language To**
                                     **Include Unnecessary Limitations**
12
13          Nistica proposes to limit the term "scattered light" to only the light "scattered from the

14   edges of the micromirrors."  However, nowhere in claim 1 is there a requirement that scattered

15   light must come from the "edges of the micro-mirrors used to block that signal"—in fact, the

16   claim does not limit scattered light to the mirrors at all, nor does it limit scattered light to light

17   scattered at the edge of an element.  Instead, claim 1 refers to all scattered light of a dropped

18   signal, and does not discriminate based on the source of the scattering.

19          Of course, included in the scope of "scattered light," as used in claim 1 of the '687 patent,

20   is light scattered from the edges of the micro-mirrors.  But the intrinsic evidence does not limit

21   scattered light to only this source, as Nistica's proposal requires.  Nistica appears to derive its

22   unnecessary limitation from a single discussion of Fig. 24, which the specification calls "another

23   exemplary embodiment of a blocking filter."  ('687 patent at 12:13-15.)  This particular

24   embodiment teaches a way to deal with one type of scattered light from a dropped signal, mainly

25   "edge scattering from the micro-mirrors."  (*Id*. at 12:55-58.)  However, if edge scattering were

26   limited to micro-mirrors the concern with scattered light in the specification and file history

27   would be redundant.  (*Id*.; Ex. 7 ('687 Prosecution History, Dec. 12, 2004) at 7.)  Instead, it is

28   clear that this embodiment is discussing one particular type of scattering—edge scattering from

1   the micro-mirrors—whereas the problem of scattered light discussed in the file history is broader.

2   (Ex. 7 ('687 Prosecution History, Dec. 12, 2004) at 7-8.)  Thus, Nistica lacks basis for limiting

3   "scattered light" to only the light "scattered from the edges of the micromirrors."

4          Nistica also tries to narrow to the term "the micromirror device" in the disputed phrase.

5   In Nistica's proposed construction, the broad term "the micromirror device" is improperly

6   substituted for "micromirrors of the spatial light modulator."  Yet, again, the plain language of

7   claim 1, which makes clear that "the micromirror device" has "an array of micro-mirrors," and

8   does not limit the micro-mirror device to only that array, does not support this added limitation.

9   Indeed, Figure 12 illustrates a portion of a micro-mirror device similar to the micro-mirror device

10  of Figures 1-3 (*see* '687 patent at 8:65-9:23), and includes in addition to the array of micro-

11  mirrors a hinge, a yoke, a landing tip, and a CMOS substrate.  (*See id.* at Fig. 12.)  Thus,

12  Nistica's restrictive construction is unwarranted and not supported by the intrinsic record.

13         Nistica's proposed construction also has several other defects.  For instance, Nistica

14  merely rearranges the words of the disputed phrase, which does not in any way clarify the phrase

15  or explain it to the fact finder.  (*See, e.g.,* D.I. 98-1 at 10 ("scattered light from a dropped signal"

16  is swapped for "light from the dropped signal that is scattered").)  Also, Nistica's proposed

17  addition of the word "the" before "dropped signal" incorrectly implies that there can be only one

18  dropped signal.  However, the preceding language in claim 1—"to eliminate a selected band or

19  channel **or a specified selection of bands or channels**"—makes clear that there can be a number

20  of dropped signals.  ('687 patent at cl. 1 (emphasis added).)  Furthermore, the specification shows

21  that the invention is not limited to only dropping a single signal, but can eliminate multiple

22  signals at once.  (*See id.* at 11:18-20 ("the groups of micromirrors 370, 372 of shaded micro-

23  mirrors 84 delete the optical input channels at $\lambda_2$ and $\lambda_5$ of the input signal 12").)  Nistica's own

24  expert witness opined that a different construction was appropriate for this term (D.I. 98-3 at ¶

25  43), and testified at deposition that the portion of Nistica's proposal containing "the scattered

26  light is reflected away from the output path" is not clear.  (Ex. 8 (Ford Dep. Tr.) at 128:2-130:9.)

27         Another example of imprecise and erroneous construction is Nistica's definition of the

28  phrase "to reflect away from the ***return*** path," which Nistica proposes to substitute for "is

1    reflected away from the **output** path." Nistica's swapping of "return path" for "output path" is

2    unwarranted because these terms do not mean the same thing in view of the intrinsic record. In

3    fact, the specification makes clear that "return path" is different from "output path." (*See* '687

4    patent at 12:7-13 ("the micromirrors 84 of the spatial light modulator are tilted to reflect all the

5    **deleted input channels** 14 of the input signal 12 back **along the return path** 94…the **through**

6    **optical channels** are reflected **along the output optical path** 542 to provide the output signal

7    544 at pigtail 520") (emphasis added).) The specification is replete with evidence that the

8    micromirror device sends wanted light along a return path, not an output path, and blocked light

9    *away from the return path*. (*See, e.g.*, *id.* at 6:15-19; 7:49-53; 8:4-7; 8:16-17; 8:54-58.) Thus,

10   Nistica's proposed construction is inconsistent with the intrinsic record. It should be rejected.

11   **V.    THE '740 PATENT**

12        The '740 patent, titled "Multifunctional

13   Optical Device Having A Spatial Light Modulator

14   With An Array Of Micromirrors," describes an

15   innovative apparatus for use in optical



Fig. 1

16   communications networks. The inventive tunable optical device taught in the '740 patent is

17   designed to use a single spatial light modulator "to selectively attenuate, condition and/or redirect

18   at least one optical channel of a wavelength division multiplexing (WDM) optical signal." ('740

19   patent at 1:61-67.) One example of the '740 patent's optical device is depicted in Figure 1,

20   where a three-port circulator (18) directs light to a pigtail (20) with a capillary tube (36) attached,

21   and upon exiting the tube the light enters free space, where in turn it travels through a collimator

22   (22) which collimates the signal, a dispersion element (24) which spatially separates the channels

23   of the collimated signal, a mirror (26) which reflects the separated light to a lens (28), which

24   focuses the light onto the spatial light modulator (30) for processing. (*Id.* at 6:23-63.)

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A.    **"the spatial light modulator having a first set of micromirrors programmed to perform a first overall optical function on the first optical input signal, and having a second set of micromirrors programmed to perform a second overall optical function on the second optical signal"**

| **Finisar's Proposed Construction:** plain and ordinary meaning | **Nistica's Proposed Construction:** the spatial light modulator having a first set of micromirrors programmed to perform a first set of one or more optical function(s) on a first optical input signal as it transits the reconfigurable multifunctional optical device, and a second set of micromirrors programmed to perform a second set of one or more optical function(s) on the second optical signal as it transits the reconfigurable multifunctional optical device, wherein the first set of optical function(s) and the second set of optical function(s) are different. |
|---|---|

The parties' dispute regarding the "spatial light modulator . . ." term revolves around whether this term is clear on its face, as Finisar proposes, or whether it call for substantial modification, as Nistica suggests.  Nistica's proposal violates central precepts of claim construction by replacing the "overall optical function" with a fabricated alternative concept, in hopes of escaping infringement.  Under these circumstances, where the plain meaning of the disputed term is clear, Finisar's proposal should be adopted.

i.    **"The Spatial Light Modulator . . ." Has A Clear Plain And Ordinary Meaning To Those Of Skill In The Art, In Accord With Finisar's Proposal**

Finisar asserts that the phrase "the spatial light modulator . . ." in claim 1 of the '740 patent does not require construction.  This claim term would have been, and is today, understandable to one of ordinary skill in the art based on its plain meaning in the context of claim 1 and the specification of the '740 patent.  *O2 Micro Int'l Ltd.*, 521 F.3d at 1360.  Indeed, Nistica's own construction suggests that the phrase in dispute would be understood by a person of ordinary skill in the art—Nistica uses *every* word of the claim term in its proposed construction, except for the word "overall":

> **the spatial light modulator having a first set of micromirrors programmed to perform a first** set of one or more **optical function**(s) **on** a **first optical input signal** as it transits the reconfigurable multifunctional optical device, **and a second set of micromirrors programmed to perform a second** set of one or more **optical function**(s) **on the second optical signal** as it transits the reconfigurable multifunctional optical device, wherein the first set of optical function(s) and the second set of optical function(s) are different.

1    (Nistica's Proposed Construction (D.I. 98-1 at 13)) (emphasis added).  By using virtually all of

2    the same language as the disputed term itself (the emphasized text above), Nistica tacitly admits

3    that the "spatial light modulator . . ." term is clear on its face, and therefore requires no further

4    construction.  Because this disputed term has a clear, ordinary meaning to one of skill in the art

5    and Nistica's proposal seeks to add limitations to this term, Finisar's proposal should be adopted.

6              ii.    **Nistica Proposes To Add Three Separate Limitations Through Its
                     Construction Of "The Spatial Light Modulator . . ."**

7    
8            This Court should not accept Nistica's attempt to add three distinct limitations that do not

9    appear in claim 1 of the '740 patent through its proposed construction for the "spatial light

10   modulator . . ." term.  First, Nistica improperly seeks to add the limitation "wherein the first set

11   of optical function(s) and the second set of optical function(s) are different."  This additional

12   limitation is erroneous as essentially the same phrase appears directly after the disputed term in

13   claim 1.  Thus, if the proposed construction were inserted into the claim instead of the phrase in

14   dispute, the last part of the claim would read, absurdly:

15           **wherein** the first set of optical function(s) and the second set of optical
             function(s) are different, **wherein** the first overall optical function and second
16           overall optical function are different.

17   Importing this limitation into the disputed claim term would render the wherein clause redundant,

18   and there is a "presumptive need to avoid redundancy" between elements of a claim.  *Frans*

19   *Nooren Afdichtingssystemen B.V. v. Stopaq Amcorr Inc.*, 744 F.3d 715, 723 (Fed. Cir. 2014).

20           Second, Nistica improperly seeks to add "as it transits the reconfigurable multifunctional

21   optical device" as a limitation through its proposed construction of this term.  Such a limitation

22   changes the scope of the claim entirely and is not supported by the claim language, the

23   specification, or the prosecution history of the '740 patent.  Indeed, the ordinary meaning of this

24   disputed term and a review of claim 1 as a whole makes clear that it is the spatial light modulator

25   that performs an overall optical function on the first and second input signals.  In particular, the

26   disputed term itself states that "the spatial light modulator [is] programmed to perform a first

27   overall optical function on the first optical input signal," indicating that it is the ***spatial light***

28   ***modulator*** that performs the optical function on the input signal, not the reconfigurable

---

1  multifunctional optical device as a whole, as Nistica proposes.  ('740 patent at cl. 1.)

2  There is no support for Nistica's proposed construction in the intrinsic record.  The '740

3  patent specification confirms that it is the spatial light modulator, not the reconfigurable

4  multifunctional optical device as a whole, that is programmed to perform overall optical

5  functions.  For example, the abstract states "[t]he optical arrangement features a free optics

6  configuration with a light dispersion element for spreading each optical signal into one or more

7  respective optical bands or channels for performing separate optical functions on each optical

8  signal."  (*Id*. at Abstract.)  If the "overall optical function" in the disputed "spatial light

9  modulator . . ." term were meant to encompass the signal as it transits the entire device, it would

10  include the light dispersion element.  However the Abstract makes clear that dispersion is a

11  prerequisite for optical functions to occur.  The prosecution history also shows that the patent

12  uses the spatial light modulator to perform the optical functions.  In the prosecution that led to the

13  '740 patent, the patentee explained to the examiner that:

14  [C]laim 1 also recites that the optical arrangement has a free optics configuration
   with a light dispersion element for spreading each optical input signal into
15  respective optical bands or channels on a separate portion of **the spatial light
   modulator that performs separate optical functions on each optical signal**.
16

17  (Ex. 9 ('740 Prosecution History, Sept. 8, 2005) at 2 (emphasis added).)  Again, it is clear that it

18  is the spatial light modulator performs optical functions on each optical signal, not the transversal

19  through the entire reconfigurable optical device.

20  Third, Nistica improperly seeks to replace the word "overall" with the phrase "set of one

21  or more."  It is unclear what Nistica means by "set of one or more," causing Nistica's proposed

22  construction to introduce ambiguity rather than clarifying the meaning of the claim term.  Indeed,

23  nowhere in the claims, specification, or prosecution history is there any discussion about a "set of

24  optical functions," or what may be included in such a set.  Nistica's attempts to rewrite claim 1 of

25  the '740 patent should be rejected.

26  **VI.    THE '980 PATENT**

27  The '980 patent, titled "Dual-Source Optical Wavelength Processor," describes a

28  reconfigurable system for manipulating optical signals in an optical communication network



FIG. 6

where individual wavelengths of light from two distinct sources can be processed independently.  (*See* '980 patent at 4:52-57.)  For example, Figure 6 of the '980 patent shows a schematic of one of the preferred embodiments of the invention where light enters the system through fibers associated with two different reconfigurable optical add/drop multiplexer ("ROADM") devices (201-208), then passes through a series of optical power elements (210, 240, 260) and polarization manipulation elements (215, 220) that, together, function as a spatial separation means to spatially separate the groups of light entering the system.  (*See id.* at 13:47-15:15.)  The two groups of light are then each dispersed into multiple channels according to their wavelength by a dispersion element, such as a grating, and directed onto a wavelength processing means, such as a liquid crystal on silicon ("LCOS") SLM for further processing.  (*See id.* at 15:16-42.)  Thus, the '980 patent invention allows a single device to separately process two groups of light that contain overlapping wavelength ranges at the same time.  (*See id.* at 4:61-5:3.)

    A.    **"spatial separating means for simultaneously spatially separating at least a first and a second group of light from said series of optical signals"**

| Finisar's Proposed Construction: § 112(6) | Nistica's Proposed Construction: § 112(6) |
|---|---|
| **Function**:  simultaneously spatially separating at least a first and a second group of light from said series of optical signals | **Function**:  simultaneously spatially separating at least a first and a second group of light from said series of optical signals |
| **Corresponding Structure**:  polarization manipulation element and/or series of optical power elements as described in '980 patent at 5:4-14, and equivalents thereto, and as further described in intrinsic record listed in the Joint Claim Construction Statement (D.I. 98-1 at 5-6). | **Corresponding Structure**:  Compensating birefringent wedge (CBRW). |

    The parties agree that the "spatial separating means" term in the '980 patent is subject to construction as a means-plus-function limitation in accordance with the requirements of 35 U.S.C. § 112(6).  Additionally, the Parties agree that the proper function for the "spatial separating means" term is precisely the function set forth in the language of claim 1 of the '980

1  patent, that is, "simultaneously spatially separating at least a first and a second group of light

2  from said series of optical signals."  ('980 patent at cl. 1.)  The Parties' sole dispute regarding this

3  term involves the identification of the corresponding structure disclosed in the specification.

4  Simply stated, the issue to be decided by the Court concerning this term is whether, as

5  Finisar proposes, this means-plus-function limitation should be construed to include ***all*** of the

6  corresponding structure explicitly set forth in the '980 patent, or, as Nistica suggests, whether the

7  corresponding structure should be limited to a ***single component***, despite the extensive

8  specification disclosure of many other structural elements for performing the claimed function.

9  ### i.  Finisar's Construction Accurately Captures The Many Corresponding Structural Components For "Spatial Separating Means"

10  The '980 patent specification provides a clear identification of the corresponding

11  structural components that may serve as "spatial separating means" to perform the agreed-to

12  claimed function, that is "simultaneously spatially separating at least a first and a second group of

13  light from said series of optical signals."  Indeed, the '980 patent states in the "Summary of the

14  Invention" that

15  

16  > [t]he spatial separating means preferably can include *a polarization manipulation element* separating a first and second series of predetermined polarisations from predetermined ones of the ports and projecting the first series in a first angular direction and the second series in a second angular direction. **The spatial separating means preferably can also include** *a series of optical power elements* offset from the ports separating at least a first and second series of predetermined optical signals from predetermined ones of the ports and projecting the first series in a first angular direction and the second series in a second angular direction.

17  

18  

19  

20  

21  ('980 patent at 5:4-14 (emphasis added).)  Thus, the '980 patent explains that the "spatial

22  separating means" intended to be captured by the claimed invention includes a ***polarization***

23  ***manipulation element*** and/or a ***series of optical power elements***—precisely captured by Finisar's

24  proposed construction.  *See Baran*, 616 F.3d at 1316.

25  The '980 patent further discusses the specific corresponding structure that may serve as

26  the polarization manipulation element and series of optical power elements explicitly referenced

27  in the "Summary of the Invention."  For instance, the '980 patent gives numerous disclosures of

28  polarization manipulation elements that may perform the function of the claimed "spatial

separating means," such as birefringent walk-off crystals, walk-off crystals, composite waveplates, compensating birefringent wedges, and birefringent wedges.  ('980 patent at 5:64-6:7; 6:67-7:3; 8:24-27; 10:65-11:30; 14:1-15:3; Figs. 3-4; Figs. 6-10.)  Additionally, the '980 patent specification sets forth many, specific examples of series of optical power elements that may perform the function of the claimed "spatial separating means," such as microlens arrays, cylindrical mirrors, cylindrical lenses, reflective mirror surfaces, and lenses with optical power. (*Id*. at 6:8-23; 6:65-67; 8:12-22; 10:56-64; 11:31-35; 11:48-50; 14:1-5; 15:4-19; Figs. 3-4; Figs. 6-7.)  Indeed, the '980 patent details the use of both polarization manipulation elements ***and*** series of optical power elements together to serve as "spatial separating means" in Figures 3-4 and 6-7.  (*Id*. at Figs. 3-4 and 6-7.)

Finisar's proposed construction adopts the specific identification of structure to perform the agreed-to claimed function of "simultaneously spatially separating at least a first and a second group of light from said series of optical signals" assigned in the "Summary of the Invention." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements [in the Summary of the Invention] that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term.").  Indeed, Finisar has taken care to capture all of the structure disclosed and specifically tied to performance of the claimed function in the '980 patent in its construction.  And, because Finisar did not relinquish its entitlement to equivalents at any point during the prosecution before the PTO, Finisar's proposed construction also properly includes "equivalents" to the structures specifically tied to the claimed function in the '980 patent.  *See Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1097 (Fed. Cir. 2008); *Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1357 (Fed. Cir. 1999) ("By choosing means-plus-function language to recite the "ink delivery means" claim element, the patentee necessarily restricted the scope of this element to the structure disclosed in the specification and its equivalents").  Accordingly, Finisar's proposed construction is true to the corresponding structure disclosed in the '980 patent and should be adopted by the Court.

      **ii.**    **Nistica Improperly Excludes Corresponding Structure Based On Finisar's Compliance With An Administrative Request By The PTO**

1      Nistica's proposed construction would improperly limit the corresponding structure to

2  only one of the many structural components identified in the '980 patent as capable of

3  performing the agreed-to function of the "spatial separating means."  Nistica apparently will

4  attempt to justify its incredibly narrow claim construction by arguing that Finisar's compliance

5  with an "Election/Restriction" administrative requirement imposed by the PTO during

6  prosecution amounted to an express disclaimer of all corresponding structure disclosed in the

7  '980 patent for the "spatial separating means," except for the compensating birefringent wedge

8  ("CBRW").  (*See* D.I. 98-3 at ¶ 36.)

9      The PTO's first action during prosecution of the '980 patent was to issue an "Election/

10  Restriction" requirement.  *See* Ex. 10 (2/28/2006 Office Action).  At the time, the PTO procedure

11  was to issue election/restriction requirements if the examiner believes that (a) there are multiple

12  patentably distinct inventions claimed in one filed application and (b) "[t]here would be a serious

13  burden on the examiner if restriction is not required."  MPEP §803(I)(B) (8th ed., Rev. 4, Oct.

14  2005) (Ex. 11); *see also* 35 U.S.C. § 121.  Thus, in situations where an Examiner determines that

15  it would be burdensome to examine all claims in an application together, he may request that the

16  applicant split a single application into multiple sets of claims for examination and, subsequently,

17  pay additional fees before the PTO will examine each distinct set of claims.  *See Acco Brands,*

18  *Inc. v. Am. Power Conversion Corp.*, No. 2:02-cv-113, 2003 WL 25782757, at *4 (E.D. Tex. July

19  16, 2003) (*citing R2 Med. Sys., Inc. v. Katecho, Inc.*, 931 F. Supp. 1397, 1436 (N.D. Ill. 1996) &

20  *Application of Weber*, 580 F.2d 455, 458 (C.C.P.A. 1978)).  This administrative requirement

21  separates claims into groups for further examination, but each set of claims remains accompanied

22  by the complete specification provided with the originally filed application.  In the case of the

23  '980 patent, the applicant abided the Examiner's request to elect a particular group of claims for

24  examination with traverse before the Examiner made any decision regarding patentability.  (*See*

25  Ex. 12 (3/24/2006 Amendment).)  Specifically, the Applicant elected to proceed with "Species

26  C," identified by the Examiner as incorporating the invention set forth in Figures 6-7 and

27  corresponding portions of the specification.  (*See id.*)

28      Based on the parties' meet and confer discussions, Nistica may attempt to equate Finisar's

1   compliance with an administrative "Election/Restriction" requirement to prosecution history

2   estoppel.  To the extent Nistica's proposal relies on the Federal Circuit's recent decision in

3   *Pacific Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694 (Fed. Cir. 2014), it is

4   misplaced.  *Pacific Coast* holds that compliance with an election/restriction requirement during

5   prosecution of a *design patent* limited the scope of the design patent's claims because design

6   patents are only permitted to have one claim,[3] and "in design patents, *unlike utility patents*,

7   restriction requirements cannot be a mere matter of administrative convenience."  *Id*. at 703

8   (emphasis added).  Consequently, the Federal Circuit determined that compliance with an

9   election/restriction requirement during prosecution of design patent was necessary "to secure the

10   patent" and determined that prosecution history estoppel attached.  *Id*. at 703-04.  However, the

11   Federal Circuit stated that it "express[ed] no opinion as to whether the same rule should apply

12   with respect to utility patents, an issue not resolved by [the Federal Circuit's] prior cases," while

13   citing its own precedent stating that "limiting the claims [of a utility patent] because of a

14   restriction requirement, as occurred here, would not necessarily invoke file history estoppel."  *Id*.

15   at 704 & n.5 (citing *Bayer Aktiengesellschaft v. Duphar Int'l Research*, 738 F.2d 1237, 1243

16   (Fed. Cir. 1984)).

17          In the context of utility patents, such as the '980 patent, prosecution history estoppel

18   attaches only when a patent applicant makes a clear disavowal of claim scope to overcome an

19   objection based on prior art or other statutory requirements for patentability and it is a limitation

20   on the doctrine of equivalents pertinent to an infringement analysis, which is distinct from the

21   legal framework governing construction of a means-plus-function claim.  *Compare Festo Corp.*

22   *v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002), *with Cordis Corp. v.*

23   *Medtronic AVE, Inc.*, 511 F.3d 1157, 1177-78 (Fed. Cir. 2008) ("an applicant can make a binding

24

25          [3] The single claim of a design patent is defined by a drawing, optionally accompanied by a
26   description of the claimed ornamental design.  37 C.F.R. § 1.153(a).  In contrast, utility patents protect the
     invention of a process, machine, article of manufacture, or composition of matter, 35 U.S.C. § 101, and
27   may include multiple claims defining the scope of exclusionary rights of the patentholder.  *See, e.g.,*
     *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1476 (Fed. Cir. 1998) ("The claims [of a
28   utility patent] are concise statements of the subject matter for which the statutory right to exclude is
     secured by the grant of the patent.").

disavowal of claim scope in the course of prosecuting the patent, through arguments made to distinguish prior art references. Such argument-based disavowals will be found, however, only if they constitute clear and unmistakable surrenders of subject matter").  Because Finisar's election of the claims associated with "Species C" was made in response to an administrative requirement of the PTO only and there is no indication that the "Election/Restriction" requirement was related to the patentability of the elected claims, Nistica's effort to use Finisar's acquiescence to an administrative requirement as a basis for limiting the corresponding structure for the "spatial separating means" limitation must be rejected.  *See, e.g., Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, No. C 97-CV-4203, 2000 WL 34204509, at *15-16 (N.D. Cal. Feb. 28, 2000) (holding that compliance with election restriction requirement was "purely administrative" and did not inform the process of claim construction); *Acco Brands, Inc. v. Am. Power Conversion Corp.*, No. 2:02-cv-113, 2003 WL 25782757, at *4 (E.D. Tex. July 16, 2003) ("There is no indication in this record, however, that the applicant's election in response to the examiner's restriction requirement served the purpose of surrendering corresponding structure disclosed in any portion of the specification. The court therefore holds that the usual rules of claim construction applicable to means-plus-function limitations apply.").  *See also Cardiac Science, Inc. v. Koninklijke Phillips Elecs., N.V.*, 466 F. Supp. 2d 1150, 1165-66 (D. Minn. 2006) (declining to equate a restriction to a rejection and finding no prosecution history estoppel resulting from compliance with election restriction requirement).

### iii. Even If The Corresponding Structure Is Limited As Nistica Alleges (It Is Not), Nistica's Proposed Construction Is Too Narrow

Even if Nistica were successful in showing that Finisar's election of certain claims in response to the Examiner's "Election/Restriction" requirement restricted the corresponding structure for "spatial separating means," Nistica's proposed construction must still be rejected because it improperly excludes corresponding structure for the "spatial separation means" specifically identified in the specification in connection with Figures 6 and 7.  In response to the "Election/Restriction" requirement, the '980 patent applicant elected to proceed with prosecution of the "Species C" invention—specifically defined by the Examiner as "Fig. 6 and 7 drawn to a

1    second embodiment of the front end polarization tagging mechanism, wherein the odd-number

2    ports (201, 203, 205, and 207) are tagged with the v-polarization state and the even-number ports

3    (202, 204, 206, and 208) are tagged with the h-polarization state. (See Specification from page 20

4    spanning to page 21.)"  (*See* Ex. 10 (2/28/2006 Office Action) at 2.)  However, an examination of

5    Figures 6 and 7 and the referenced portion of the specification (*see* '980 patent at 13:45-14:57)

6    reveals that many corresponding structure components are disclosed in these figures and passages

7    *in addition to* the CBRW included in Nistica's proposed construction.  Indeed, a review of Figure

8    6 reveals disclosure of spherical microlens array (210), walk-off crystal (215), polarization

9    diversity element (220), cylindrical mirror (240), and cylindrical lens (260), and Figure 7 further

10   discloses optical power microlens array (210), birefringent walk-off element (215), composite

11   waveplate (220), and CBRW (230).  (*See id.* at 13:45-14:57; Figs. 6-7.)

12           Thus, even if Nistica were correct that the corresponding structure for "spatial separating

13   means" should be limited to the disclosure provided by Figures 6 and 7 (it should not), Nistica's

14   identification of solely a CBRW as corresponding structure is wholly deficient.  *See Liebel-*

15   *Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification

16   describes only a single embodiment, the claims of the patent will not be read restrictively unless

17   the patentee has demonstrated a clear intention to limit the claim scope using words or

18   expressions of manifest exclusion or restriction") (internal quotations omitted), *aff'd* 481 F.3d

19   1371 (Fed. Cir. 2007).  As discussed above, the "Summary of the Invention" section of the '980

20   patent clearly explains that the structure corresponding to the "spatial separating means" should

21   include a polarization manipulation element and/or a series of optical power elements.  *See*

22   Section VI.A.i. *supra*.  Each of the additional corresponding structural components specifically

23   disclosed in Figures 6 and 7 for "spatial separating means" (*e.g.*, spherical microlens array (210),

24   walk-off crystal (215), polarization diversity element (220), cylindrical mirror (240), and

25   cylindrical lens (260), birefringent walk-off element (215), composite waveplate (220)) is either a

26   polarization manipulation element or an optical power element.  Each of these elements should

27   be considered corresponding structure for "spatial separation means," regardless of whether

28   Nistica's improper limitation to only the structure associated with Figures 6 and 7 is adopted.

1    Indeed, even Nistica's expert admitted that optical power elements were properly disclosed as

2    structure for "spatial separating means" and acknowledged that limiting corresponding structure

3    for this term to a CBRW is overly restrictive.  (*See* Ex. 8 (Ford Dep. Tr.) at 114:6-23.)

4         Moreover, Nistica wholly ignores the '980 patent specification's discussion of Figure 6

5    which clearly states that the elements disclosed in connection with Figure 3 ***are equivalents to***

6    the corresponding structural elements disclosed in Figure 6.  (*See* '980 patent at 13:46-49 ("A

7    second embodiment 200 is shown in schematic perspective view in FIG. 6 wherein the operation

8    of all the elements with similar numbers as elements in FIG. 3 (eg. 130 and 230) is equivalent.").)

9    Consequently, all disclosure of "spatial separating means" in connection with Figure 3 of the

10   '980 patent, such as microlens array (110), walk off crystal (115), birefringent wedge element

11   (130), cylindrical mirror (140), and cylindrical lens (160), must be considered corresponding

12   structure even under Nistica's scheme to limit the '980 patent claims to Figures 6 and 7.

13   Likewise, Nistica surely has no explanation for why the other corresponding structure for "spatial

14   separating means" disclosed in the '980 patent's "Summary of the Invention" section, such as a

15   spherical microlens array, cylindrical lenses, cylindrical mirrors, birefringent walk-off crystals,

16   and composite $\lambda/2$ waveplates, should not be corresponding structure.  (*See id*. at 8:12-27.)

17        Clearly, Nistica wishes to narrow the corresponding structure for the "spatial separating

18   means" so that it may avoid infringing this limitation.  Nistica's insists that a CBRW ***only*** is the

19   disclosed corresponding structure for the "spatial separating means," despite the extensive

20   disclosure of other corresponding structure in connection both with Figures 6 and 7 and in the

21   Summary of the Invention.  Nistica's efforts to create a non-infringement position for itself are

22   without basis in the law or facts.  Consequently, the Court should reject Nistica's proposed

23   construction for "spatial separating means" and adopt Finisar's proposal.

24

25

26

27

28

**B.** **"wavelength processing means for separately processing each of the separated wavelengths of said first and second group"**

| Finisar's Proposed Construction: § 112(6) | Nistica's Proposed Construction: § 112(6) |
|---|---|
| **Function:** separately processing each of the separated wavelengths of said first and second group [of light] <br><br> **Corresponding Structure:** a spatial light modulator having a plurality of independently addressable pixels as described in the '980 patent at 5:26-30, and equivalents thereto, and as further described in intrinsic record listed in the Joint Claim Construction Statement (D.I. 98-1 at 1-2). | **Function:** separately processing each of the separated wavelengths of the first and second group of light from the series of optical signals <br><br> **Corresponding Structure:** a liquid crystal on silicon Optical Phased Matrix Coupling device having two groups of spatially separated wavelength channels. |

While the parties agree that the "wavelength processing means" term should be construed as a means-plus-function term, they dispute both the claimed function and the corresponding structure. Consequently, there are two issues for the Court to resolve in connection with this term. First, should the "wavelength processing means" be construed, as Finisar suggests, to have the function expressly and clearly set forth by the claim or, as Nistica proposes, should the function include additional, extraneous words? And, second, should the Court adopt Finisar's proposed corresponding structure that captures the full range of corresponding structure disclosed in the '980 patent specification, or should Nistica's proposal, which incompletely captures the corresponding structure and adds technically infeasible, redundant limitations be adopted?

**i.** **Finisar's Proposed Function Is True To The Claim Language, Whereas Nistica's Proposal Imports Unnecessary, Redundant Words**

Finisar's proposed function for the "wavelength processing means" term comes directly from the language of claim 1. *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003) ("In identifying the function of a means-plus-function claim, a claimed function may not be improperly narrowed or limited beyond the scope of the claim language."). On the other hand, Nistica's proposed function for this term adds redundant language—"of light from the series of optical signals" to the function set forth in claim 1. It is unnecessary to add this additional language, which does nothing to clarify the meaning of the claimed function and merely repeats elements previously cited in the claim in a superfluous

fashion.  *See Frans*, 744 F.3d at 723.  Consequently, the Court should adopt Finisar's proposal

for the function of the "wavelength processing means" limitation.

### ii.   Finisar's Proposed Corresponding Structure Captures The Full Scope Of The '980 Patent's Disclosure

Finisar's identification of corresponding structure captures the full range of structure

disclosed to perform the function of the "wavelength processing means" set forth in the '980

patent.  In the "Summary of the Invention" section, the '980 patent provides that "[t]he

wavelength processing means can comprise a spatial light modulator having a plurality of

independently addressable pixels with the pixels being manipulated in a predetermined manner so

as to manipulate the phase front striking a corresponding zone."  ('980 patent at 5:26-30.)  The

'980 patent goes on to elaborate regarding the nature of the structure sufficient to perform the

function of the "wavelength processing means," including a further description in the "Summary

of the Invention," that "[i]n one embodiment, the wavelength processing means can comprise a

liquid crystal display device having a series of light modulating pixels formed thereon," (*Id*. at

5:53-55), and further explaining that the "wavelength processing means" may be "an optical

phased matrix coupling (OPMC) means providing 2-dimensional optical phase only or phase and

optical amplitude such as can be provided by a liquid crystal on silicon (LCOS) spatial light

modulator (SLM)."  (*Id*. at 8:31-35.)  Thus, Finisar's identification of the corresponding structure

for this term as "a spatial light modulator having a plurality of independently addressable pixels

as described in the '980 patent at 5:26-30, and equivalents thereto," and as further described in

the patent, is true to the '980 patent's disclosures.

### iii.   Nistica Suggests Omitting Clearly Disclosed Corresponding Structure From Its Proposal Due To Improper Reliance On An "Election/Restriction" Requirement During Prosecution

Nistica repeats the same error that afflicted its proposed corresponding structure for

"spatial separating means" again in connection with its proposal for corresponding structure for

"wavelength processing means."  Nistica asserts that the '980 patent applicant somehow

relinquished its full scope of disclosed corresponding structure and equivalents thereto by

complying with a PTO administrative requirement, specifically an "Election/Restriction"

1    requirement.  As explained in Section VI.A.ii. above, the applicant complied with the Examiner's

2    "Election/Restriction" requirement by electing to prosecute those claims corresponding to

3    "Species C."  (*See* Ex. 10 (3/24/2006 Amendment).)  However, the applicant's compliance with

4    this administrative requirement, aimed at moderating the amount of work an Examiner must do in

5    connection with a single filing fee, does not reflect on the proper scope of corresponding

6    structure or equivalents to which the issued claims of the '980 patent are entitled.  *See, e.g.,*

7    *Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, 2000 WL 34204509 at *15-16; *Acco*

8    *Brands, Inc. v. Am. Power Conversion Corp.*, 2003 WL 25782757 at *4.

9         Nistica appears to be improperly relying on the '980 patent applicant's election of

10   "Species C," which was associated with Figures 6-7 of the '980 patent, to restrict its proposed

11   corresponding structure to "a liquid crystal on silicon Optical Phased Matrix Coupling device

12   having two groups of spatially separated wavelength channels."  *See* D.I. 98-3 at ¶ 32.  Indeed,

13   Nistica's expert cites only to descriptions of the particular "wavelength processing means"

14   depicted in Figure 6 and described in the '980 patent at 16:50-64 as an "OPMC compris[ing] two

15   groups of spatially separated wavelength channels, one group 285 being on the upper half (in the

16   x-dimension) of the OPMC corresponding to beams from the input fiber ports of ROADM1, and

17   the second group 286 being on the lower half of the OPMC corresponding to beams from the

18   input fibre ports of ROADM2."  (*See id.*; '980 patent at 16:50-56.)  Notably, Nistica admits this

19   description of an LCOS SLM functioning as an OPMC is structure for the "wavelength

20   processing means."  *See* D.I. 98-1 at 1 (citing Col. 15, line 50- Co. 20, line 4 as intrinsic

21   evidence).  An LCOS SLM serving as "wavelength processing means" is described in multiple

22   other sections of the '980 patent that Nistica would have this Court ignore, such as in connection

23   with Figure 3 and in the section titled "Description of the Optical Phased Matrix Coupling

24   Device" at 17:50-20:4 of the '980 patent.  All of these further, detailed descriptions in the

25   specification provide corresponding structure for the "wavelength processing means" that should

26   be included in the proper construction of this limitation, along with their equivalents.  Only

27   Finisar's proposed construction captures the full breadth of the corresponding structure for

28   "wavelength processing means" and its equivalents—Nistica excludes critical scope both by

1    omitting reliance on other sections of the specification and omitting scope of equivalents.

2            **iv.    Nistica's Identification Of Corresponding Structure Is Fatally Flawed**
             **Because It Is Nonsensical And Renders Subsequent Claim Language**
3            **Redundant**

4            Nistica errs again by seeking to incorporate the requirement that an OPMC device serving

5    as "wavelength processing means" must have "two groups of spatially separated wavelength

6    channels" as part of the corresponding structure.  First, this requirement is confusing—a

7    switching component, such as an LCOS OPMC that Nistica believes would be corresponding

8    structure for "wavelength processing means" cannot *have*  "two groups of spatially separated

9    wavelength channels."  Claim 1 clearly discusses the creation of "spatially separated wavelength

10   channels" as channels derived from the spatially separated groups of light after passing through

11   the "wavelength dispersion element."  (*See* '980 patent at cl. 1.)  Because "wavelength channels"

12   are clearly subcomponents of a beam of light and not subcomponents of a "wavelength

13   processing means" according to claim 1, it is nonsensical for Nistica to force this requirement

14   into the corresponding structure for "wavelength processing means."  *See Bd. of Regents v.*

15   *BENQ Am. Corp.*, 533 F.3d 1362, 1370 (Fed. Cir. 2008) (refusing to adopt a claim construction

16   that "would effect [a] nonsensical result").

17           Moreover, the requirement that the "wavelength processing means" should have "separate

18   wavelength processing elements simultaneously processing the wavelength channels" is already

19   present in claim 1 of the '980 patent.  (*See* '980 patent at cl. 1; 20:31-33.)  Cardinal rules of claim

20   construction dictate that no claim limitation should be assigned a construction that renders other

21   words of the claim superfluous.  *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330 (rejecting

22   construction proposed by plaintiff that would render a claim term superfluous).  The rules of

23   claim construction for means-plus-function limitation do not differ in this respect.  *See*

24   *Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1161, 1198 (N.D. Cal. 2003) (holding that

25   means plus function claim constructions must not render claims superfluous).  Consequently,

26   Nistica's proposed corresponding structure for "wavelength processing means" is afflicted by

27   substantial defects and should be rejected in favor of Finisar's proposal.

28   Dated:  June 13, 2014                              Respectfully Submitted,

1           _/s/ *David C. Radulescu*_____

2           David C. Radulescu, Ph.D. (*pro hac vice*)
            david@radulescullp.com
3           Tigran Vardanian (*pro hac vice*)
            tigran@radulescullp.com
4           Robin M. Davis (*pro hac vice*)
            robin@radulescullp.com
5           RADULESCU LLP
            136 Madison Avenue, 6th Floor
6           New York, NY 10016
            Telephone: (646) 502-5950
7           Facsimile: (646) 502-5959

8
            Christopher J. Cox (151650)
9           chris.cox@weil.com
            WEIL GOTSHAL & MANGES LLP
10          201 Redwood Shores Parkway
            Redwood Shores, CA 94065
11          Telephone: (650) 802-3029
            Facsimile: (650) 802-3100
12

13
            **Attorneys for Plaintiff**
14          **FINISAR CORPORATION**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2
   I, Lyndsey Przybylski, hereby declare:

3
   I am over the age of eighteen years and not a party to the within action.  My business
4
address is Radulescu LLP, 136 Madison Avenue, 6th Floor, New York, New York 10016.

5
   On June 13, 2014, I caused the following documents, described as:

6
   **PLAINTIFF FINISAR CORPORATION'S OPENING CLAIM
   CONSTRUCTION BRIEF PURSUANT TO PATENT L.R. 4-5(a)**
7
to be served via e-mail upon all counsel of record in the above captioned matter.
8
   I declare under penalty of perjury that the above is true and correct.  Executed on June 13,
9
2014, in New York, New York.

10

11
                                   */s/ Lyndsey Przybylski*
                                   Lyndsey Przybylski

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28