1   ROBERT F. KRAMER (Bar No. 181706)
    Email: robert.kramer@dentons.com
2   RUSSELL TONKOVICH (Bar No. 233280)
    Email: russell.tonkovich@dentons.com
3   C. GIDEON KORRELL (Bar No. 284890)
    Email: gideon.korrell@dentons.com
4   DENTONS US LLP
    1530 Page Mill Road, Suite 200
5   Palo Alto, CA  94304-1125
    Telephone:  (650) 798-0300
6   Facsimile:   (650) 798-0310

7   SHAILENDRA MAHESHWARI (*Pro Hac Vice*)
    Email: shailendra.maheshwari@dentons.com
8   DENTONS US LLP
    1301 K Street, NW
9   Suite 600, East Tower
    Washington, D.C.  20005-3364
10  Telephone:  (202) 408-6400
    Facsimile:   (202) 408-6399

11

12  JOEL N. BOCK (*Pro Hac Vice*)
    Email: joel.bock@dentons.com
    DENTONS US LLP
13  1221 Avenue of the Americas
    New York, NY  10020-1089
14  Telephone:  (212) 768 6700
    Facsimile:   (212) 768 6800

15

16  Attorneys for Defendant
    NISTICA, INC.

17              **IN THE UNITED STATES DISTRICT COURT**
                 **FOR THE DISTRICT OF CALIFORNIA**
18                      **SAN JOSE DIVISION**

19  FINISAR CORPORATION, a Delaware          Case No.  5:13-cv-03345-BLF
    corporation,
20                                           **DEFENDANT NISTICA, INC.'S**
                    Plaintiff,               **RESPONSIVE CLAIM**
21                                           **CONSTRUCTION BRIEF PURSUANT**
         vs.                                 **TO PATENT L.R. 4-5(b)**
22
    NISTICA, INC., a Delaware corporation,   Date:      August 8, 2014
23                                           Time:      9:00 a.m.
                    Defendant.               Place:     San Jose Courthouse,
24                                                      Courtroom #3
                                             Judge:     Hon.  Beth Labson Freeman
25

26

27

28

# TABLE OF CONTENTS

I. Introduction .................................................................................................... 1

II. Legal Standard ............................................................................................... 1

III. U.S. Patent No. 6,430,328 ............................................................................. 2

    A. Overview of U.S. Patent No. 6,430,328 ................................................ 2

    B. "Displaceable Reflectors" ...................................................................... 3

        1. Nistica's Construction of "Displaceable Reflectors" Is Strongly Supported by the Intrinsic Evidence ................................................ 3

        2. Finisar's Criticism of Nistica's Construction of "Displaceable Reflectors" Is Baseless ............................................................................ 4

        3. Finisar's Construction of "Displaceable Reflectors" Is Contrary to the Intrinsic Evidence ................................................................................. 5

IV. U.S. Patent No. 6,956,687 ............................................................................. 7

    A. Overview of U.S. Patent No. 6,956,687 ................................................ 7

    B. "Scattered Light from a Dropped Signal Is Directed onto the Micromirror Device to Reflect Away from the Return Path" ........................................ 8

        1. Nistica's Construction Is Strongly Supported by the Intrinsic Evidence..... 8

        2. Finisar's Construction Is Contrary to the Intrinsic Evidence and Its Criticism of Nistica's Construction Is Baseless ......................................... 11

V. U.S. Patent No. 7,126,740 ........................................................................... 12

    A. Overview of U.S. Patent No. 7,126,740 .............................................. 12

    B. "The Spatial Light Modulator Having a First Set of Micromirrors Programmed to Perform a First Overall Optical Function on the First Optical Input Signal, and Having a Second Set of Micromirrors Programmed to Perform a Second Overall Optical Function on the Second Optical Signal" ........................ 12

        1. Nistica's Construction Is Strongly Supported by the Intrinsic Evidence... 13

        2. Finisar's Criticism of Nistica's Construction Is Baseless ....................... 15

        3. Finisar Fails to Propose a Construction .................................................. 15

VI. U.S. Patent No. 7,397,980 ........................................................................... 16

    A. Overview of U.S. Patent No. 7,397,980 .............................................. 16

    B. "Spatial Separating Means for Simultaneously Spatially Separating at Least a First and a Second Group of Light from Said Series of Optical Signals" ...................... 16

1.   Nistica's Construction of "Spatial Separating Means . . ." Is Mandated by the Specification ........................................................................... 17

2.   Finisar's Criticisms of Nistica's Construction of "Spatial Separating Means . . ." Is Baseless ............................................................................. 18

3.   Finisar's Construction of "Spatial Separating Means" Is Not Supported by the Specification ........................................................................................ 19

C.   "Wavelength Processing Means for Separately Processing Each of the Separated Wavelengths of Said First and Second Group" ............................................ 21

1.   Dispute over the Claimed Function ........................................................ 21

2.   Nistica's Corresponding Structure for "Wavelength Processing Means . . ." Is Mandated by the Specification of the '980 Patent ............................. 22

3.   Finisar's Criticism of Nistica's Construction of "Wavelength Processing Means . . ." Is Baseless ........................................................................... 23

4.   Finisar's Construction of "Wavelength Processing Means . . ." Is Not Supported by the Specification and Is Contrary to Federal Circuit Precedent ................................................................................................. 24

VII.   Conclusion ................................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Blackboard, Inc. v. Desire2Learn, Inc.*,
574 F.3d 1371 (Fed. Cir. 2009) ............................................................. 21

*Ecolab, Inc. v. Envirochem, Inc.*,
264 F.3d 1358 (Fed. Cir. 2001) ...................................................... passim

*Function Media, LLC v. Google, Inc.*,
708 F.3d 1310 (Fed. Cir. 2013) ............................................................. 21

*Mas-Hamilton Group v. LaGard, Inc.*,
156 F.3d 1206 (Fed. Cir. 1998) ............................................................. 20

*Mass. Instit. of Tech. v. Abacus Software*,
462 F.3d 1344 (Fed. Cir. 2006) ............................................................. 20

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......................................................... 1, 2

*Saffran v. Johnson & Johnson*,
712 F.3d 549 (Fed. Cir. 2013) ........................................................ passim

*SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ............................................................... 4

*Seachange Int'l, Inc. v. C-Cor Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) ........................................... 9, 11, 14, 15

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 157 (Fed. Cir. 1996) ................................................................... 1

*Wang Labs., Inc. v. America Online, Inc.*,
197 F.3d 1377 (Fed. Cir. 1999) .......................................................... 4, 5

## STATUTES

35 U.S.C. § 112 ................................................................................. passim

1

## I.      INTRODUCTION

2          The technology at issue in this case relates to optical networking devices, which allow

3 data to be sent to remote locations using light signals rather than electrical signals.  Both Finisar

4 Corp. ("Finisar") and Nistica Inc. ("Nistica") manufacture components for optical networking

5 devices.  Whereas Finisar has been in the optical networking industry for decades, Nistica is a

6 more recent entrant into the market.  In an attempt to impede Nistica's success in the market,

7 Finisar filed this suit alleging infringement of six patents.

8          The parties dispute the proper construction of five terms from four of the asserted patents.

9 The parties agree that two terms need to be construed pursuant to 35 U.S.C. § 112 ¶ 6.  Whereas

10 Nistica's constructions for the means-plus-function terms are consistent with the law, Finisar's

11 proposed constructions are contrary to well-established Federal Circuit precedent.  For the three

12 remaining terms, Nistica proposes constructions that are rooted in the intrinsic evidence whereas

13 Finisar's constructions ignore the explicit disclosures of the specification and prosecution history.

14

## II.     LEGAL STANDARD

15         "[I]ntrinsic evidence is the most significant source of the legally operative meaning of

16 disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.

17 1996).  Intrinsic evidence includes the claim language, specification, and prosecution history.  *Id.*

18 The Federal Circuit has explained that the specification is the "single best guide" to the meaning

19 of the claims.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005).  The first paragraph

20 of section 112 of the Patent Act, 35 U.S.C. § 112, states that the specification "shall contain a

21 written description of the invention, and of the manner and process of making and using it, in

22 such full, clear, concise, and exact terms as to enable any person skilled in the art to which it

23 pertains to make and use the same . . . ."  The second paragraph of Section 112 provides that the

24 specification "shall conclude with one or more claims particularly pointing out and distinctly

25 claiming the subject matter which the applicant regards as his invention."  Those two paragraphs

26 of section 112 frame the issue of claim interpretation to ascertain the proper scope of the claims.

27 *Phillips*, 415 F.3d at 1311-1312.  The "objective baseline" for construing patent claims is

28

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

1  determining "how a person of ordinary skill in the art understands a claim term." *Id*. at 1313.

2  The claims must be read in view of the patent specification for appropriate context. *Id*. at

3  1315. "[A]ll express representations made by or on behalf of the applicant to the examiner to

4  induce a patent grant limit the interpretation of the claims so as to exclude any interpretation that

5  may have been disclaimed or disavowed during prosecution in order to obtain claim allowance."

6  *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1368 (Fed. Cir. 2001).

7  Although the Federal Circuit emphasizes the importance of intrinsic evidence in claim

8  construction, it has also authorized district courts to rely on extrinsic evidence, which "consists of

9  all evidence external to the patent and prosecution history, including expert and inventor

10  testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. However, while

11  extrinsic evidence "can shed useful light on the relevant art," the Federal Circuit has explained

12  that it is "less significant than the intrinsic record in determining 'the legally operative meaning of

13  claim language.'" *Id*.

14  "Under § 112, ¶ 6, a means-plus-function claim 'shall be construed to cover the

15  corresponding structure, material, or acts described in the specification or equivalents thereof.'"

16  *Saffran v. Johnson & Johnson*, 712 F.3d 549, 561-62 (Fed. Cir. 2013). Further, the Federal

17  Circuit has held that "structure disclosed in the specification is ***'corresponding' structure only if***

18  ***the specification or prosecution history clearly links or associates that structure to the function***

19  ***recited in the claim***." *Id*. at 562 (emphasis added). "This duty to link or associate structure to

20  function is the *quid pro quo* for the convenience of employing § 112, ¶ 6." *Id*. "Under § 112, ¶ 6,

21  the question is not what structures a person of ordinary skill in the art would know are capable of

22  performing a given function, but what ***structures are specifically disclosed and tied to that***

23  ***function in the specification***." *Id*. at 563 (emphasis added).

24  **III.   U.S. PATENT NO. 6,430,328**

25  **A.   Overview of U.S. Patent No. 6,430,328**

26  U.S. Patent No. 6,430,328 (the "'328 patent") is directed to an optical network

27  communications device that uses one or more spatial light modulators ("SLMs") having an array

28

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

of small pixel reflectors that can independently move perpendicular to their reflective surface to change the direction of the light beam by changing the phase of portions of the beam wave front. '328 patent, col. 1:6-10, 1:33-39, 2:27-49, 3:27-34.  For context, claim 17 of the '328 patent is shown below with the disputed term in bold.[1]

> 17.  An optical switch, comprising: an array of **displaceable reflectors**, each reflector displacing a portion of a wave front of an optical beam.

**B.     "Displaceable Reflectors"**

| Claim Term | Nistica's Proposed Construction | Finisar's Proposed Construction |
|---|---|---|
| "displaceable reflectors" | reflectors of a spatial light modulator array that move substantially perpendicular to the plane of the reflective surface of the reflective element | moveable reflectors |

**1.     Nistica's Construction of "Displaceable Reflectors" Is Strongly Supported by the Intrinsic Evidence**

The parties dispute whether "displaceable reflectors" can move in any direction or must move substantially perpendicular to their reflective surface.  Nistica's construction of "displaceable reflectors" as "reflectors of a spatial light modulator array that move substantially perpendicular to the plane of the reflective surface of the reflective element" is based in the intrinsic evidence.  The specification describes "displaceable reflectors" in the following manner:



A portion of a *reflective SLM*, as depicted in cross section in FIG. 1, changes the phase of a beam 12 wave front by *changing the positions of small plate shaped reflectors 14-24* in the path of the beam 12.  The beam 12 is "divided" into or by

---

[1] Finisar asserts claim 19, which is dependent on claims 17  and 18.

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

a series of pixels that correspond to these reflectors. Each pixel or pixel reflector has width d and is positioned a varying distance from a reference position 25. ***Each pixel reflector is moved in a direction that is generally perpendicular [sic] the reflective surface of the element***.

'328 patent, Fig. 1, col. 2:50-3:5 (emphasis added); *see also id*. at Figs. 2-4. In the specification, the reflectors are **only** described as moving perpendicular to their reflective surface. The reflectors must move in this manner to achieve the benefits of the invention (e.g., faster switching of the light beams). *Id*. at col. 3:18-34. Because the specification **only** describes the reflectors as moving perpendicular to their reflective surface, the Court should adopt Nistica's construction of "displaceable reflectors." *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1381-83 (Fed. Cir. 1999) (holding that construction of "frame," which " in general usage be applied to bit-mapped display systems as well as to character-based systems," was limited to character-based systems because they are the "only system that is described and enabled in the [patent] specification and drawings."); *see also SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341-46 (Fed. Cir. 2001).

> ### 2.     Finisar's Criticism of Nistica's Construction of "Displaceable Reflectors" Is Baseless

Finisar incorrectly alleges that Nistica's construction is limited to a preferred embodiment. Finisar Br. at 5-6. Under similar circumstances, the Federal Circuit rejected such arguments by patentees. In *Wang Labs.*, the Federal Circuit held that term "frame" was limited to a character-based system because it is the "only system that is described and enabled in the [patent] specification and drawings." 197 F.3d at1382-83. The Federal Circuit rejected plaintiff's argument that the term "frame" was limited to the character-based systems described in the specification because they were just a preferred embodiment as follows:

> Wang states that the character-based protocol is simply a "preferred embodiment," and that the embodiment described in the specification does not set the boundaries of the claims . . . . The ***usage "preferred" does not of itself broaden the claims beyond their support in the specification*** . . . . The ***only embodiment described in the '669 patent specification is the character-based protocol, and the claims were correctly interpreted as limited thereto***.

*Id*. at 1383 (emphasis added).  The facts here are analogous to *Wang Labs.*  Just as there was only one embodiment of "frame" described and enabled in the patent at issue in *Wang Labs.*, there is only one embodiment of reflectors in the '328 patent that is described and enabled by the specification (i.e., reflectors moving substantially perpendicular to their reflective surface). Therefore, the Court should reject Finisar's argument regarding preferred embodiments as the Federal Circuit did in *Wang Labs.* and adopt Nistica's construction.

### 3. Finisar's Construction of "Displaceable Reflectors" Is Contrary to the Intrinsic Evidence

Finisar's proposed construction of "moveable reflectors" is contrary to the intrinsic evidence.  Finisar misrepresents the disclosure of the '328 patent in arguing that the specification discloses reflectors moving in different directions.  ***First***, Finisar cites the following statement out of context: "[a]ny decrease of motion or wave front phase modulation allowed by dividing up the deflector into separate pixels is within the spirit of the invention."  Finisar Br. at 4-5.  This sentence appears at the end of the discussion of Figures 1 and 2, which both show reflectors that move perpendicular to the plane of the reflective surface.  '328 patent, Figs. 1, 2, col. 2:50-3:67. In context, the "decrease in motion" merely refers to the reduction in the displacement of the pixel reflectors resulting from moving the reflectors perpendicular to the reflective surface.



***Each pixel reflector is moved in a direction that is generally perpendicular [sic] the reflective surface of the element*** . . . . When the reflector displacement 60 of successive pixels, for example pixels 62 (see FIG. 2) cumulatively exceeds λ/2,

where λ is the wavelength of the light, the ***displacement for the nth element, such as pixel 64, is reduced by λ/2***, that is to nδ modulo(λ/2).

*Id*. at Fig. 2, col. 2:57-3:10 (emphasis added).  Thus, the statement cited by Finisar does not describe any movement by the reflector other than perpendicular to the reflective surface.

**Second**, Finisar incorrectly asserts that the following sentence describes the pixels moving perpendicular to the beam axis and not perpendicular to the reflective surface: "Each deflector changes the direction of the light beam by changing the phase of the beam wave front by displacing pixel reflectors in a direction essentially perpendicular to the beam axis and relative to each other." Finisar Br. at 5.  Such a reading is inconsistent with the remainder of the specification.  In context, this sentence is describing the deflector changing the phase of the beam wave front in a direction perpendicular to the beam axis by displacing the pixel reflectors. '328 patent, col. 1:55-64.  Thus, it is the beam wave front that is changed in a direction perpendicular to the beam axis and ***not*** the pixel reflectors, which is the purpose of the deflector in the '328 patent.  Other portions of the specification describe the same concept confirming that it is the beam wave front that is changed in a direction essentially perpendicular to the beam axis.

> Each deflector is a phase spatial modulator which changes the direction of the light beam by changing the phase of the beam wave front.  The wave front is two dimensionally subdivided into pixels and ***pixel reflectors are used*** [to] ***displace portions of the wave front in a direction generally perpendicular to the beam axis and relative to each other***.

*Id*. at Abstract (emphasis added).  Thus, in view of the whole specification, it is clear that it is the beam wave front and ***not*** the reflectors that change in a direction perpendicular to the beam axis.

**Third**, Finisar misleadingly argues that the specification discloses a rotating mirror as part of an embodiment.  Finisar Br. at 15. The passage that Finisar relies upon shows this to be wrong:

> In this figure the incoming beam 66 arrives via direction 68 and results in an outgoing beam 70 being reflected in an exit direction 72 and again creating a virtual mirror 74 depicted by the dashed line in FIG. 2.  That is, with this approach ***a pixel reflector must be moved at most the λ/2 distance which is a fraction of the distance or virtual displacement VD that an edge of a rotating mirror is moved to produce the same angle of reflection***.

*Id*. at col. 3:15-22 (emphasis added).  In context, the specification merely explains the benefits of the invention using displaceable reflectors by comparing it to moving "an edge rotating mirror" to

1  achieve the same result.  Since the rotating mirror is not part of the disclosed invention, Finisar's

2  reliance on this disclosure is misplaced and improper.

3       **Fourth**, Finisar argues that the rotational movement of reflectors is "implied" by reference

4  to MEMS devices in the specification because one of ordinary skill in the art would know that

5  MEMS devices could rotate.  Finisar Br. at 5.  Finisar thus admits that there is no express

6  disclosure of rotational movement in relation to the MEMS.  Further, two of the three mentions of

7  "MEMS" in the specification are in reference to a company, MEMS Optical, Inc.  *Id*. at col. 2:33-

8  38, 8:46-49.  The remaining reference to "MEMS" is found in the following sentence providing

9  background information:  "As is known in the operation of MEMS devices, controlling the

10  voltage to cause deflection of a pixel mirror introduces instability in the mirror positioning." *Id*. at

11  8:55-57.  None of these mentions of "MEMS" discusses the movement of reflectors in the clamed

12  invention.  Therefore, there is no description of the reflectors of the invention of the '328 patent

13  moving in any direction other than perpendicular to the plane of the reflective surface.

14       For the aforementioned reasons, the Court should adopt Nistica's construction.

15  **IV.    U.S. PATENT NO. 6,956,687**

16       **A.    Overview of U.S. Patent No. 6,956,687**

17       U.S. Patent No. 6,956,687 (the "'687 patent") is directed to an optical blocking filter in an

18  optical networking device having a spatial light modulator ("SLM") with a multi-dimensional

19  array of micromirrors that can tilt between a first and second position in response to a control

20  signal.  '687 patent, Abstract, col. 1:26-31.  The micromirrors of the SLM can be tilted in a first

21  position to delete a desired optical channel from the input signal and a second position to reflect

22  the desired light channels from the input signal along the return path to provide an output signal.

23  *Id*. at col. 12:45-65.  However, some light from the dropped signal is scattered from the edges of

24  the micromirrors ("edge scattering").  *Id*.  This scattered light can be directed back onto the

25  micromirrors of the SLM and reflected away from the return path.  *Id*. at col. 19:29-42.  For

26  context, claim 1 of the '687 patent is shown below with the disputed term in bold.[2]

27  

28  [2] Finisar asserts several claims dependent on claim 1.

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

1. An optical blocking filter for receiving an optical signal having one or more optical bands or channels, characterized in that

the optical blocking filter comprises a spatial light modulator having a micro-mirror device with an array of micro-mirrors for selectively deflecting the one or more optical bands or channels so that each optical band or channel is reflected off a respective plurality of micro-mirrors to eliminate a selected band or channel or a specified selection of bands or channels from the optical signal provided along an optical return path, wherein **scattered light from a dropped signal is directed onto the micromirror device to reflect away from the return path**.

**B.    "Scattered Light from a Dropped Signal Is Directed onto the Micromirror Device to Reflect Away from the Return Path"**

| Claim Term | Nistica's Proposed Construction | Finisar's Proposed Construction |
|---|---|---|
| "scattered light from a dropped signal is directed onto the micromirror device to reflect away from the return path" | light from a dropped signal that is scattered from the edges of the micromirrors used to block that signal is directed onto the micromirror device to reflect away from the return path[3] | plain and ordinary meaning |

**1.    Nistica's Construction Is Strongly Supported by the Intrinsic Evidence**

The key dispute between the parties is whether "scattered light" refers to light scattered from the edges of the micromirrors.  Nistica's construction of "scattered light from a dropped signal is directed onto the micromirror device to reflect away from the return path" is "light from a dropped signal that is scattered from the edges of the micro-mirrors used to block that signal is directed onto the micromirror device to reflect away from the return path."  Nistica's construction is strongly supported by the specification and prosecution history of the '687 patent.  In the specification, the ***only*** written description of "scattered light" is the following:

> While the ***blocked or deleted channels*** are directed along the optical path 610, some ***scattered light*** of the blocked optical channels propagate along the first optical path 92.  ***This edge scattering from the micro-mirrors*** limits the extinction of the blocked channel that can be achieved.  By properly choosing the angle of incidence of the signal light onto the spatial light modulator, the coherent ***scattering from the blocked channel mirrors can be directed away from the return path*** 94 and provide the highest blocked channel extinction.

---

[3] Nistica has made minor modifications to its construction to focus the claim construction disputes in this case.

'687 patent, col. 12:55-65 (emphasis added).  Because "edge scattering" from the edges of the micromirrors is the *only* description of "scattered light" in the specification, "scattered light" should be construed as "light . . . that is scattered from the edges of the micromirrors."[4]  A broader construction, as Finisar proposes, lacks written description support in the '687 patent.

Furthermore, during prosecution, the applicants represented to the examiner that "scattered light" was limited to light scattered from the edges of the micromirrors to overcome a prior art rejection and thus disclaimed any broader construction. *Ecolab*, 264 F.3d at 1368 ("[A]ll express representations made by or on behalf of the applicant to the examiner to induce a patent grant limit the interpretation of the claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance."); *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1373 (Fed. Cir. 2005) ("[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection.").  During prosecution, the examiner rejected all pending claims based on two prior art references, the Aksyuk and Riza references.  (Korrell Decl., Ex. A at FinNIST00000900 - FinNIST00000910).  The applicants distinguished the claims from this prior art on the basis of solving the problem of light scattering from the edges of the micromirrors.

*First*, the applicants explained that "edge scattering" was a problem in the prior art:

> When dropping bands or channels from an optical signal using a micromirror device, *some of the light from the dropped bands or channels may be scattered along the edge of the micromirrors and reflected back* with the remaining bands or channels along an optical return path.  *This problem in the art is known as "back scattering" or "edge scattering"*, which in turn limits the extinction of the blocked bands or channel that can be achieved.

(Korrell Decl., Ex. B at FinNIST00000924) (emphasis added).  The applicants thus explicitly defined "back scattering" or "edge scattering" as the problem resulting from light from dropped bands or channels that is scattered along the edge of the micromirrors and reflected back.[5]

---

[4] A person of ordinary skill in the art would understand that light from a dropped signal must be scattered by the edges of the micro-mirrors (i.e., edge scattering) because light bouncing off the surfaces of the micro-mirrors would reflect and not scatter.

[5] "Edge scattering" and "back scattering" refer to the same issue.

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

1    *Second*, the applicants explained the invention solved the "edge scattering" problem.

2    **The present invention provides a solution to this so-called "back or edge
     scattering" problem** by providing an optical blocking filter featuring a new and
3    unique double bounce technique for blocking one or more optical bands or
     channels in an optical signal.

4                    *        *        *        *

5    Figure 24 of the patent application shows such an optical blocking filter…In
     Figure 24, while the blocked or deleted bands or channels are directed along the
6    optical path 610, some scattered light of the blocked optical bands or channels may
     propagate along the first optical path 92, and **this edge scattering from the
7    micromirrors limits the extinction of the blocked channel that can be achieved**,
     as described on page 32, lines 18-23. **The claimed blocking filter 600
8    substantially eliminates or reduces this edge scattering effect,** because as the
     scattered light reflects off the micromirrors for a second time, only a fraction of the
9    scattered light is reflected off along the return path 94.

10   *Id*. at 3-4. **Third**, to overcome the prior art rejection, the applicants argued that the claimed "edge

11   scattering" invention was distinguishable from the prior art because the prior art lacked a solution

12   to the "edge scattering" problem.

13   Moreover, neither Aksyuk et al., Riza nor the proposed combination thereof either
     recognizes the "back scattering or edge scattering" problem in the art, or suggests
14   a solution to this problem.

15                   *        *        *        *
     Moreover, Aksyuk et al. neither recognizes the "back or edge scattering" problem
16   in the prior art, nor provides a hint or suggestion of a solution to the same.

17                   *        *        *        *
     Further, it is respectfully submitted that, similar to Aksyuk et al., Riza also not
18   recognize the "back or edge scattering" problem in the prior art, or provide a
     solution thereto.

19   *Id*. at 1, 5, and 7.

20   In response, the examiner issued an Advisory Action stating, "[I]n **response to applicant's**

21   **argument that the references fail to recognize the 'back or edge scattering' problems, and**

22   **elimination therefore, of applicant's invention, it is noted that the features upon which the**

23   **applicant relies are not recited in the rejected claim(s)**."  (Korrell Decl., Ex. C at

24   FinNIST00000932) (emphasis added).  The applicants then amended the claims to add "wherein

25   scattered light from a dropped signal is directed onto the micromirror device to reflect away from

26   the return path" to specifically incorporate the solution to the "edge scattering" problem into the

27   claim language as requested by the examiner.  (Korrell Decl., Ex. D at FinNIST00000934,

28

- 10 -

1  FinNIST00000946).  Based on the clear representations above and the specific amendment

2  adding the limitation at issue, the claims were allowed.

3         Therefore, because the applicants through argument and amendment distinguished the

4  prior art on the basis that the claims solved the problem of light scattered from the edges of the

5  micromirrors, "scattered light" should be construed as "light . . . that is scattered from the edges

6  of the micromirrors" as the applicants have expressly disclaimed or disavowed any other

7  interpretation of "scattered light." *Ecolab*, 264 F.3d at 1368 ("[A]ll express representations made

8  by or on behalf of the applicant to the examiner to induce a patent grant limit the interpretation of

9  the claims so as to exclude any interpretation that may have been disclaimed or disavowed during

10  prosecution in order to obtain claim allowance."); *Seachange*, 413 F.3d at 1373  ("[B]y

11  distinguishing the claimed invention over the prior art, an applicant is indicating what the claims

12  do not cover, he is by implication surrendering such protection.").

13         Nistica's construction should thus be adopted as it is consistent with both the specification

14  and prosecution history.

15                    **2.      Finisar's Construction Is Contrary to the Intrinsic Evidence and Its
                              Criticism of Nistica's Construction Is Baseless**

16

17         While Finisar proposes "plain and ordinary meaning," it puts forth a construction for

18  "scattered light," which is "all scattered light from a dropped signal" regardless of the source of

19  the scattering.  Finisar Br. at 8.  Finisar's broad definition of "scattered light" is not supported by

20  the written description in the specification, which only describes light scattered from the edges of

21  the micromirrors, and is contrary to the affirmative representations that the applicants made to the

22  examiner during prosecution to overcome a prior art rejection as explained above.  Finisar's

23  construction is thus contrary to the specification and prosecution history and should be rejected.

24         Finisar's criticisms of Nistica's construction are moot as a result of Nistica's minor edits

25  to its construction.[6]

26

_____

27  [6] Finisar objected to "micromirror device" being construed as "micromirrors of the spatial light
    modulator" despite the clear antecedent basis in the claim.  Finisar also objected to the use of

28  "the" before "dropped signal."  Finally, Finisar objected to "output path" being used instead of

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

1    **V.      U.S. PATENT NO. 7,126,740**

2           **A.      Overview of U.S. Patent No. 7,126,740**

3           U.S. Patent No. 7,126,740 (the "'740 patent") is directed to an optical network

4    communications device that includes a SLM to selectively attenuate, condition, and/or redirect at

5    least one wavelength of a light beam.  '740 patent, col. 1:62-67.  The SLM can perform separate

6    combinations of optical functions on different optical signals.  *Id*. at 2:66-3:14.  For context,

7    claim 1 of the '740 patent is shown below with the disputed term in bold.

8           1.  A reconfigurable multifunctional optical device comprising:

9    an optical arrangement for receiving a first optical input signal and a second
     optical input signal, each of the first and second optical input signals having
     optical bands or channels, the optical arrangement having a free optics
10   configuration with a light dispersion element for spreading each of the first and
     second optical input signals into respective optical bands or channels on separate
11   portions of a spatial light modulator having an array of micromirrors and being
     programmable to perform separate optical functions on each of the first and second
12   optical signals;

13   **the spatial light modulator having a first set of micromirrors programmed to
     perform a first overall optical function on the first optical input signal, and
14   having a second set of micromirrors programmed to perform a second overall
     optical function on the second optical input signal**, wherein the first overall
15   optical function and second overall optical function are different.

16          **B.      "The Spatial Light Modulator Having a First Set of Micromirrors
               Programmed to Perform a First Overall Optical Function on the First
17             Optical Input Signal, and Having a Second Set of Micromirrors
               Programmed to Perform a Second Overall Optical Function on the
18             Second Optical Signal"**

19   ///

20

21

22

23

24

25

26

27   "return path."  While Nistica believes that its previous construction clarified these terms, Nistica
28   amended its construction to focus the claim construction issues for the Court.

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

| Claim Term | Nistica's Proposed Construction | Finisar's Proposed Construction |
|---|---|---|
| "the spatial light modulator having a first set of micromirrors programmed to perform a first overall optical function on the first optical input signal, and having a second set of micromirrors programmed to perform a second overall optical function on the second optical signal [wherein the first overall optical function and second overall optical function are different]" | the spatial light modulator having a first set of micromirrors programmed to perform a first set of one or more optical function(s) on a first optical input signal as it transits the reconfigurable multifunctional optical device, and a second set of micromirrors programmed to perform a second set of one or more optical function(s) on the second optical signal as it transits the reconfigurable multifunctional optical device, [wherein the first set of optical function(s) and the second set of optical function(s) are different] | plain and ordinary meaning |

### 1.    Nistica's Construction Is Strongly Supported by the Intrinsic Evidence

The key dispute between the parties relates to the proper construction of "overall optical function."  In light of the intrinsic evidence, "overall optical function" should be construed as the "set of one or more optical function(s)" performed on a signal "as it transits the reconfigurable multifunctional optical device."  In other words, the "overall optical function" encompasses all of the optical functions performed on a particular signal.

Nistica's construction is consistent with the specification.  The '740 specification describes performing a set of one or more optical functions (e.g., a combination of optical functions) on each optical signal as shown below.

> The separate optical functions reflect off separate non-overlapping areas on the spatial light modulator and may include different optical functions.  The separate optical functions include optical switching, conditioning or monitoring functions such as either an optical add/drop multiplexer (OADM) function, an optical channel monitor (OCM) function, an optical cross-connect (CC) function, an optical interleaver/deinterleaver (INT/DEINT), a dynamic gain equalization filter (DGEF) or dynamic spectral equalizer (DSE), or *some combination thereof*.  The at least one optical signal typically includes two or more optical input signals, on which a respective function is performed.  ***The scope of the invention is also intended to include performing an optical function on one optical input signal, and performing a second optical function on the output signal from the first optical function.***

'740 patent, col. 2:66-3:14 (emphasis added).

Nistica's construction is also mandated by the prosecution history where the applicants used "overall optical function" to distinguish the claims from the prior art.  *Ecolab*, 264 F.3d at

- 13 -

1   1368 ("[A]ll express representations made by or on behalf of the applicant to the examiner to

2   induce a patent grant limit the interpretation of the claims so as to exclude any interpretation that

3   may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.");

4   *Seachange*, 413 F.3d at 1373 ("[B]y distinguishing the claimed invention over the prior art, an

5   applicant is indicating what the claims do not cover, he is by implication surrendering such

6   protection.").

7          The term "overall optical function," which does not appear in the specification, was added

8   to the claims by amendment to overcome a rejection over prior art.  (Korrell Decl., Ex. E at

9   FinNIST00002059).  The examiner found that the prior art reference ("Aksyuk") disclosed a

10  spatial light modulator for performing separate optical functions on each optical signal.  (Korrell

11  Decl., Ex. F at FinNIST00002007 - FinNIST00002008).  In response, the applicants amended the

12  claims to add the entire "spatial light modulator" limitation being construed here and further

13  distinguished the prior art as shown below:

14          *Claim 1 is amended to recite a reconfigurable multifunctional optical device* in
        which different overall optical functions are performed on different/separate
15      portions of micromirror spatial modulator . . . .  Further, the reasoning in the Final
        Rejection states that *Aksyuk shows 'separate and different optical functions'*
16      (col. 1, line 56 and col. 3, lines 17-20).  However, *Aksyuk merely discloses a
        single overall function of a WDM add/drop device*.

17

18  (Korrell Decl., Ex. E at FinNIST00002077) (emphasis added).  Thus, the applicants distinguished

19  "separate and different optical functions" from "a single overall function" clarifying that an

20  "overall function" is different from an "optical function."  Further, the applicants asserted that,

21  while Aksyuk discloses performing separate and different optical functions, it only performs a

22  "single overall function" of an add/drop device indicating that "overall" optical function refers to

23  the set of optical functions performed on a signal in the device (i.e., add/drop is single overall

24  optical function despite separate and different add/drop optical functions being performed on the

25  signals).  *Id.*  The applicants then stated that the claimed invention performed different overall

26  optical functions.  Therefore, to distinguish over the prior art, the applicants interpreted "overall

27  optical function" to mean the total set of optical functions performed on a signal in the device.

28

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

1    Based on the applicants' representations to the examiner to distinguish the prior art, "overall

2    optical function" should be construed as a "set of one or more optical function(s)" performed on a

3    signal "as it transits the reconfigurable multifunctional optical device." *Ecolab*, 264 F.3d at 1368;

4    *Seachange*, 413 F.3d at 1373.

5            Nistica's construction should thus be adopted based on the intrinsic evidence.

6                 **2.      Finisar's Criticism of Nistica's Construction Is Baseless**

7            Finisar's criticisms of Nistica's construction are baseless.  Finisar's first criticism is that

8    the phrase "wherein the first set of optical function(s) and second set of optical function(s) are

9    different" in Nistica's construction is redundant.  Finisar Br. at 12.  When the parties initially

10   exchanged proposed claim terms, the entire phrase from the claim, which included "wherein the

11   first overall optical function and second overall optical function are different," was part of the

12   term to be construed.  Nistica's construction merely adds the construction of "overall optical

13   function" into this final part of the claim for consistency.

14           Finisar's second criticism appears to be that Nistica's construction requires something

15   other than the spatial light modulator to perform the "overall optical function."  This argument

16   makes no sense.  Nistica's construction clearly states "the ***spatial light modulator having a first***

17   ***set of micromirrors programmed to perform a first set of one or more optical function(s)*** . . . ."

18   A correct grammatical reading of Nistica's construction makes it clear that the spatial light

19   modulator is programmed to perform the set of one or more optical function(s).

20           Finally, Finisar argues that the phrase "set of one or more" introduces ambiguity into the

21   claims.  This argument lacks merit.  The phrase "set of one or more" is easily understandable by a

22   jury.  Furthermore, the specification discloses that one or more optical functions (i.e., a set of one

23   or more) can be performed on a signal as discussed above.  '740 patent, col. 2:66-3:14.

24                 **3.      Finisar Fails to Propose a Construction**

25           In its brief, Finisar makes no attempt to define what the plain and ordinary meaning of

26   "overall optical function" is.  If "overall optical function" has a plain meaning, Finisar should

27   have articulated it in its brief so that the Court and Nistica understand what Finisar believes to be

28

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

the plain meaning.  Rather, by proposing "plain and ordinary meaning," Finisar is attempting to "hide the ball" so that it can ambush Nistica with new interpretations of this term at a later point in this case, which is unfair and prejudicial to Nistica.  To resolve the dispute, the Court should provide an articulation of what "overall optical function" means, and adopt Nistica's proposed construction.

## VI.   U.S. PATENT NO. 7,397,980

### A.   Overview of U.S. Patent No. 7,397,980

U.S. Patent No. 7,397,980 (the "'980 patent") is directed to optical communications devices that operate independently on the individual components of light (e.g., different wavelengths) contained in the optical signals from different input sources (e.g., different polarization states or different signals).  '980 patent, Abstract.  For context, claim 1 is shown below with disputed terms in bold:

1.  An optical signal manipulation system including:

a series of ports for carrying a series of optical signals to be manipulated;

**a spatial separating means for simultaneously spatially separating at least a first and a second group of light from said series of optical signals**, each of said first and second group including a multiplicity of independent wavelength channels, with the wavelength channels of the first group having overlapping wavelength ranges of the wavelength channels of the second group;

a wavelength dispersion element subsequently spatially separating the multiplicity of wavelength channels of said first and second group and projecting them onto a wavelength processing means; and

**wavelength processing means for separately processing each of the separated wavelengths of said first and second group**, with each of wavelength channels of the first and second group being processed independently at a separated spatial location, said wavelength processing means having a series of independent wavelength processing elements, with separate wavelength processing elements simultaneously processing the wavelength channels having overlapping wavelength ranges of the first and second group.

### B.   "Spatial Separating Means for Simultaneously Spatially Separating at Least a First and a Second Group of Light from Said Series of Optical Signals"

///

///

| Claim Term | Nistica's Proposed Construction | Finisar's Proposed Construction |
|---|---|---|
| "spatial separating means for simultaneously spatially separating at least a first and a second group of light from said series of optical signals" | **Function:** simultaneously spatially separating at least a first and a second group of light from said series of optical signals<br><br>**Structure:** compensating birefringent wedge (CBRW) | **Function:** simultaneously spatially separating at least a first and a second group of light from said series of optical signals<br><br>**Structure:** polarization manipulation element and/or series of optical power elements as described in '980 patent at 5:4- 14, and equivalents thereto, and as further described in intrinsic record listed in Joint Claim Construction Statement (D.I. 98-1 at 5-6.) |

1.    **Nistica's Construction of "Spatial Separating Means . . ." Is Mandated by the Specification**

The parties agree that "spatial separating means" should be construed pursuant to 35 U.S.C. § 112, ¶ 6 and agree on the claimed function. However, the parties disagree on what the corresponding structure is for the "spatial separating means." For a means-plus-function term, the corresponding structure is the structure disclosed in the specification and clearly linked to the claimed function. *Saffran*, 712 F.3d at 561-62. In the specification, the compensating birefringent wedge ("CBRW") is the only structure that is clearly linked to the claimed function of "simultaneously spatially separating at least a first and a second group of light from said series of optical signals." As shown below, the specification describes the CBRW as spatially separating a first and a second group of light by providing an angular offset to the beams causing the beams to go at different angles away from each other.



FIG. 3

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

1

2

3

4

5

6

7

8

9

10

11



FIG. 6

12    The now polarisation tagged beams enter the **CBRW 130 which imparts an**
     **angular offset on the beams** in one polarisation state with respect to the other.
13    This **angular offset** is in the vertical or x-dimension and propagates through the
     optical train **to result in a spatial separation between beams** of different
14    polarisations at the OPMC as will be seen . . . . A second embodiment 200 is
     shown in schematic perspective view in FIG. 6 wherein the operation of all the
15    elements with similar numbers as elements in FIG. 3 (**e.g., 130 and 230) is**
     **equivalent**… The now polarisation tagged beams **enter the CBRW 230 to impart**
16    **an angular offset on the beams** in one polarisation state with respect to the other.

17    '980 patent, Figs. 3 and 6, cols. 11:23-30; 13:47-50; 14:48-51 (emphasis added).  Therefore, the

18    CBRW, which is described as causing "a spatial separation between the beams," is clearly linked

19    to the claimed function of "simultaneously spatially separating at least a first and a second group

20    of light from said series of optical signals."  *Id.*

21        The Court should adopt Nistica's construction of the corresponding structure as the

22    CBRW is the only structure that is clearly linked to the claimed function.

23              **2.     Finisar's Criticisms of Nistica's Construction of "Spatial Separating**
                         **Means . . ." Is Baseless**
24

25        Finisar's criticisms of Nistica's proposed construction lack merit.  ***First***, Finisar argues

26    that Nistica's construction is based on a theory of prosecution history estoppel.  Finisar Br. at 17-

27    19.  This is incorrect.  As shown above, Nistica's construction is based on the intrinsic evidence.

28

                                            NISTICA'S RESPONSIVE CLAIM
                                            CONSTRUCTION BRIEF
                                            CASE NO. 5:13-CV-03345-BLF

1    Furthermore, prosecution history estoppel, which relates to the scope of infringement under the

2    doctrine of equivalents, is not relevant to claim construction.

3        **Second**, Finisar argues that the corresponding structure should include five structures

4    from Figure 6 and four structures from Figure 7 if the claims were limited to these embodiments.[7]

5    Finisar Br. at 20.  However, none of these alleged structures are included in the text of Finisar's

6    construction of "spatial separating means."  Moreover, Finisar does not, and cannot, cite a single

7    portion of the specification specifically tying these alleged corresponding structures from Figures

8    6 and 7 to the claimed function.  As discussed above, the **only** corresponding structure disclosed

9    in the specification and tied to the claimed function is the CBRW.  *Saffran*, 712 F.3d at 563.

10       **Third**, Finisar alleges that Nistica ignores the disclosure regarding Figure 3.  Finisar Br. at

11   21.  This is false.  In fact, Nistica relies on the disclosure of the CBRW in Figure 3 to support its

12   construction as discussed above.  *Id*.  Finisar then argues that five elements from Figure 3 are

13   corresponding structure.[8]  Again, Finisar does not include any of these alleged structures in its

14   construction of "spatial separating means."  As with the structures that it cites for Figures 6 and 7,

15   Finisar does not, and cannot, cite to anything in the specification clearly linking those structures

16   to the claimed function as required under the law.  *Saffran*, 712 F.3d at 561-63.

17                        **3.    Finisar's Construction of "Spatial Separating Means" Is Not
                                 Supported by the Specification**

18

19       Finisar's corresponding structure for the "spatial separating means" should be rejected.

20   **First**, Finisar's construction is unworkable as a practical matter.  Finisar's construction states

21   "and as further described in intrinsic record listed in Joint Claim Construction Statement," which

22   includes citations to over 250 lines of text from the patent.  Since claim construction is a matter of

23

------

24   [7] From Figure 6, Finisar lists the following elements as corresponding structure: spherical
     microlens array (210); walk-off crystal (215); polarization diversity element (220); cylindrical
25   mirror (240); and cylindrical lens (260).  Finisar Br. at 20.  From Figure 7, Finisar lists the
     following elements as corresponding structure:  optical power microlens array (210); birefringent
26   walk-off element (215); composite waveplate (220); and CBRW (230).  *Id*.
27   [8] Finisar identifies the following elements of Figure 3 as corresponding structure:  microlens array
     (110); walk off crystal (115); birefringent wedge element (130); cylindrical mirror (140); and
28   cylindrical lens (160).

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

1 law, Finisar's construction is improper as it incorporates a document by reference and would

2 require the jury to read through the cited passages of the patent to determine for themselves the

3 corresponding structure.  Rather than clarifying the meaning of "spatial separating means" for the

4 jury, Finisar's construction would render the corresponding structure unclear and confusing.

5    ***Second***, Finisar's construction contains insufficient structure to satisfy 35 U.S.C. § 112,

6 ¶ 6.  A "polarization manipulation element" and "optical power elements" are the only structures

7 explicitly stated in Finisar's construction.  However, neither of these are sufficiently definite

8 structure under 35 U.S.C. § 112, ¶ 6.  "Polarization manipulation" and "optical power" are

9 functional and not structural descriptions.  Further, the term "element" does not state sufficient

10 structure in the context of 35 U.S.C. § 112, ¶ 6.  *See Mass. Instit. of Tech. v. Abacus Software*,

11 462 F.3d 1344, 1354 (Fed. Cir. 2006) ("The generic terms 'mechanism,' 'means,' 'element,' and

12 'device,' typically do not connote sufficiently definite structure.").  The Federal Circuit has stated

13 that, in an apparatus claim, generic structural terms such as "element" are not sufficient structure;

14 and such terms require construction under 35 U.S.C. § 112, ¶ 6.  *Id.* at 1354; *see also Mas-*

15 *Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1214 (Fed. Cir. 1998) (holding that "lever

16 moving element for moving the lever" requires construction under 35 U.S.C. § 112, ¶ 6.).  If use

17 of the term "element" in the claim language is insufficient structure in an apparatus claim thereby

18 requiring construction under 35 U.S.C. § 112, ¶ 6 to determine the corresponding structure, then it

19 logically follows that "polarization manipulation element" and "optical power element" are

20 likewise insufficient corresponding structures.

21    ***Third***, as discussed above, Finisar asserts that numerous structures from Figures 3, 6, and

22 7 of the '980 patent are corresponding structure.  Finisar Br. at 20-21.  However, none of these

23 structures appear in Finisar's construction.  Finisar, as it has with other terms, appears to be trying

24 to "hide the ball" by proposing generic terms like "polarization manipulation element" and

25 "optical power element" that allow it to argue that virtually any structure falls under these vague,

26 undefined terms.  Finisar's attempt to claim all possible structures for achieving the claimed

27 function is exactly what 35 U.S.C. § 112, ¶ 6 forbids.  *Blackboard, Inc. v. Desire2Learn, Inc.*, 574

28

F.3d 1371, 1385 (Fed. Cir. 2009) ("[Patentee] has attempted to capture any possible means for achieving [the claimed function].  Section 112, paragraph 6, is intended to prevent such pure functional claiming."); *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013) ("To allow that form of claiming under section 112, paragraph 6, would allow the patentee to claim all possible means of achieving a function . . . . Section 112, paragraph 6, is intended to prevent such pure functional claiming.").  Finisar is required under 35 U.S.C. § 112, ¶ 6 to list in its construction each and every specific structure that it contends is disclosed in the specification and clearly linked to the claim function.  35 U.S.C. § 112, ¶ 6; *Saffran*, 712 F.3d at 561-3.  Finisar fails to do so because there is no specific structure disclosed in the specification and clearly linked to the claimed function other than the CBRW.

For aforementioned reasons, Nistica's construction should be adopted.

### C. "Wavelength Processing Means for Separately Processing Each of the Separated Wavelengths of Said First and Second Group"

| Claim Term | Nistica's Proposed Construction | Finisar's Proposed Construction |
|---|---|---|
| "wavelength processing means for separately processing each of the separated wavelengths of said first and second group" | **Function:** separately processing each of the separated wavelengths of the first and second group of light from the series of optical signals<br><br>**Structure:** a liquid crystal on silicon Optical Phased Matrix Coupling device having two series of elongated cell regions[9] | **Function:** separately processing each of the separated wavelengths of said first and second group [of light]<br><br>**Structure:** a spatial light modulator having a plurality of independently addressable pixels as described in the '980 patent at 5:26-30, and equivalents thereto, and as further described in intrinsic record listed in the Joint Claim Construction Statement (D.I. 98-1 at 1-2) |

### 1. Dispute over the Claimed Function

Finisar alleges that Nistica is trying to import limitations into the function by including the phrase "of light from the series of optical signals."  Such an allegation is misleading and baseless.  In claim 1, "of light from the series of optical signals" is merely the antecedent basis for "first and

---

[9] Finisar asserts that "wavelength channels" is not the appropriate term to describe the "two series of elongated cell regions."  To focus the issues, Nistica has amended its construction to replace "wavelength channels" with "elongated cell regions."  *See, e.g.,* '980 patent, col. 18:32-42.

1  second group" in the claimed function.

2         1. An optical signal manipulation system including . . .

3         a spatial separating means for simultaneously spatially separating at least *a first
          and a second group of light from said series of optical signals* . . .

4

5         *wavelength processing means for separately processing each of the separated
          wavelengths of said first and second group*…

6  Nistica included "of light from the series of optical signals" to clarify for the jury what "first and

7  second group" referred to in the construction.  If the Court finds that this additional language is

8  not helpful to the jury, Nistica would agree to the claimed function being "separately processing

9  each of the separated wavelengths of the first and second group of light."

10        **2.    Nistica's Corresponding Structure for "Wavelength Processing
               Means . . ." Is Mandated by the Specification of the '980 Patent**

11

12        The corresponding structure for "wavelength processing means" is "a liquid crystal on

13 silicon ("LCOS") Optical Phased Matrix Coupling device ("OPMC") having two series of

14 elongated cell regions."  The specification specifically ties this structure to the claimed function

15 of "separately processing each of the separated wavelengths of the first and second group of light

16 from the series of optical signals" as shown below.



27        *The OPMC 280 is able to direct the image of any one wavelength channel
          independently or all the wavelength channels from the input fibres between the*

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

*drop ports, either fibre ports 207 or 208, or the express ports, either fibre ports 205 or 207, for either of ROADM1 or ROADM2 respectively.*

The optical phased array coupling (OPMC) element in the preferred implementations is *a liquid crystal on silicon (LCOS) device*.

Due to the individually addressable nature of the *LCOS pixels*, the *individual wavelength channels* from either group of beams can be *accessed by the OPMC 180 or 280* independently of any of the other channels.  The *OPMC device is divided into two series' of elongated cell regions substantially matching the elongated spatially separated wavelength bands*.  The cell regions each can include a plurality of drivable cells and wherein, in use, the cells are preferably driven so as to provide a selective driving structure which *projects a corresponding optical signal falling on the cell region substantially into one of a series of output order modes*.

'980 patent, Fig. 6, col. 17:26-30, 17:51-53, 18:32-42 (emphases added).[10]  Thus, the *only* structure disclosed in the specification for performing the claimed function is a LCOS OPMC having two series of elongated cell regions.

### 3. Finisar's Criticism of Nistica's Construction of "Wavelength Processing Means . . ." Is Baseless

Finisar's criticisms of Nistica's construction lacks merit.  *First*, Finisar argues that Nistica's construction is based on the applicants' election to pursue claims only to Figures 6 and 7 during prosecution.  This is not true.  As discussed above, Nistica's construction is based on the entire intrinsic evidence and includes the *only* structure disclosed in the specification for performing the claimed function.

*Second*, Finisar alleges that Nistica ignores the disclosures regarding Figure 3.  This is again false.  As explained in footnote 10, Nistica relies on the disclosure of the "wavelength processing means" in Figure 3, which is similar to the disclosure regarding Figure 6.

*Third*, Finisar alleges that Nistica is trying exclude equivalents from the construction of "wavelength processing means."  Nistica does not dispute that the means-plus-function terms are entitled to the statutory equivalents under 35 U.S.C. § 112, ¶ 6.  However, that issue is better addressed by a jury instruction and not claim construction.  Courts regularly construe the

---

[10] The specification states that the similarly numbered structures in Figures 3 and 6 are equivalent.  '980 patent, col. 13:47-50.  In the description of Figure 3, the specification similarly describes the OPMC as an LCOS device having two series of elongated cell regions that receive spatially separated wavelength channels and processes them.  *Id.* at col. 12:43-13:44, 18:32-42.

NISTICA'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
CASE NO. 5:13-CV-03345-BLF

corresponding structure without adding the superfluous "and their equivalents" language to the construction. *See, e.g.*, *Saffran*, 712 F.3d at 563 (construing "release means" as "hydrolyzable bonds").

**Fourth,** Finisar incorrectly argues that Nistica is ignoring the disclosure of a liquid crystal on silicon spatial light modulator (LCOS SLM). Finisar Br. at 23. A LCOS SLM having two series of elongated cell regions, such as that described in Figure 3, falls within Nistica's corresponding structure of "a liquid crystal on silicon Optical Phased Matrix Coupling device having two series of elongated cell regions." '980 patent, col. 12:43-13:44, 18:32-42.

> **4.    Finisar's Construction of "Wavelength Processing Means . . ." Is Not Supported by the Specification and Is Contrary to Federal Circuit Precedent**

Finisar's construction for the "wavelength processing means" should be rejected. ***First***, as with "spatial separating means," Finisar's construction is unclear and not helpful to a jury as it includes the language "and as further described in intrinsic record listed in Joint Claim Construction Statement," which includes citations to more than 275 lines of text from the '980 patent. Since claim construction is a matter of law, Finisar's construction is improper as it would require the jury to read through cited passages of the patent to determine for themselves the corresponding structure. Rather than clarifying the meaning of this term for the jury, Finisar's construction would render the term ambiguous.

***Second***, Finisar's construction is contrary to Federal Circuit precedent. The Federal Circuit has held that "structure disclosed in the specification is 'corresponding' structure ***only*** if the specification or prosecution history ***clearly links or associates that structure to the function*** recited in the claim." *Saffran*, 712 F.3d at 561-2 (emphasis added). Finisar has proposed "a spatial light modulator having a plurality of independently addressable pixels" as the corresponding structure. Finisar relies on the following passage for its construction:

> The wavelength processing means can comprise a spatial light modulator having a plurality of independently addressable pixels with the pixels being manipulated in a predetermined manner so as to manipulate the phase front striking a corresponding zone.

1  '980 patent, col. 5:26-30.  However, this passage does not even mention the claimed function of

2  "*separately processing each of the separated wavelengths* of said first and second group" and

3  thus does not clearly link a structure to the claimed function.  *Saffran*, 712 F.3d at 561-62

4  ("[S]tructure disclosed in the specification is 'corresponding' structure *only* if the specification or

5  prosecution history *clearly links or associates that structure to the function* recited in the claim.")

6  (emphasis added).  Therefore, "a spatial light modulator having a plurality of independently

7  addressable pixels" cannot be corresponding structure under the law.  *Id*.

8  **VII.    Conclusion**

9        For the foregoing reasons, Nistica requests that the Court adopt its proposed constructions

10  and reject Finisar's constructions.

11  Dated:        June 26, 2014                    DENTONS US LLP

12

13                                                 By:  */s/ Robert F. Kramer*

14

15                                                 Attorneys for Defendant
                                                   NISTICA, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

I, Robert F. Kramer, hereby declare:

3

1.      I am an attorney licensed to practice law in the state of California.  I am employed by Dentons US LLP, counsel for Defendant Nistica, Inc..

4

2.      On June 26, 2014, I caused to be electronically filed and served the attached document via the United States District Court's website, described as follows:

5

6

**DEFENDANT NISTICA, INC.'S  RESPONSIVE CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT L.R. 4-5(b)**

7

8

on at least one member of each firm designated on the Transaction Receipt located on the Court's ECF website.

9

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

10

11

Executed on June 26, 2014 at Palo Alto, CA.

12

_____/s/ Robert F. Kramer_____

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE