1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5

   FINISAR CORPORATION, A DELAWARE   )  C-13-03345 BLF
6  CORPORATION,                      )
                                     )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,            )
                                     )  AUGUST 8, 2014
8          VS.                       )
                                     )  PAGES 1-263
9  NISTICA INC., A DELAWARE          )
   CORPORATION,                      )
10                                   )
              DEFENDANT.
11 _____

12         TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE BETH LABSON FREEMAN
13         UNITED STATES DISTRICT JUDGE

14 A P P E A R A N C E S:

15 FOR THE PLAINTIFF:   RADULESCU LLP
                        BY:  DAVID C. RADULESCU
16                           ROBIN M. DAVIS
                             TIGRAN VARDANIAN
17                           DANIEL KESACK
                        136 MADISON AVENUE, 6TH FLOOR
18                      NEW YORK, NEW YORK  10016

19                      WEIL, GOTSHAL & MANGES
                        BY:  CHRISTOPHER J. COX
20                      201 REDWOOD SHORES PARKWAY
                        REDWOOD SHORES, CALIFORNIA  94065
21

22         APPEARANCES CONTINUED ON NEXT PAGE

23 OFFICIAL COURT REPORTER:   LEE-ANNE SHORTRIDGE, CSR, CRR
                              CERTIFICATE NUMBER 9595
24

25     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
           TRANSCRIPT PRODUCED WITH COMPUTER

```
 1

 2        APPEARANCES (CONTINUED)

 3

          FOR THE DEFENDANT:      DENTONS US LLP
 4                                BY:  RUSSELL TONKOVICH
                                       ROBERT F. KRAMER
 5                                     C. GIDEON KORRELL
                                  1530 PAGE MILL ROAD, SUITE 200
 6                                PALO ALTO, CALIFORNIA  94304

 7

 8        ALSO PRESENT:           CHRIS BROWN
                                  ASHISH VENGSARKAN
 9                                THOMAS STRASSER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    SAN JOSE, CALIFORNIA                    AUGUST 8, 2014

 2                   P R O C E E D I N G S

 3        (COURT CONVENED AT 9:01 A.M.)

 4            THE COURT:  GOOD MORNING.  I APPRECIATE ALL OF YOU

 5    BEING HERE ON A FRIDAY.

 6            PLEASE BE SEATED.

 7            WE'LL CALL THE CASE AND GET ALL OF YOUR APPEARANCES AND

 8    THEN I THINK WE'LL GET DOWN TO WORK.

 9            THE CLERK:  CALLING CASE 13-3345, FINISAR CORPORATION

10    VERSUS NISTICA, INC.

11            COUNSEL, PLEASE STATE YOUR APPEARANCES.

12            MR. RADULESCU:  GOOD MORNING, YOUR HONOR.

13    DAVID RADULESCU WITH ROBIN DAVIS, TIGRAN VARDANIAN, AND

14    DAN KESACK FROM MY FIRM REPRESENTING FINISAR, ALONG WITH

15    CHRIS COX FROM WEIL GOTSHAL.

16        AND WE HAVE OUR GENERAL COUNSEL HERE TODAY,

17    MR. CHRIS BROWN.

18            THE COURT:  GOOD MORNING.  THANK YOU, MR. RADELESCU.

19            MR. KRAMER:  GOOD MORNING, YOUR HONOR.  ROBERT KRAMER

20    FROM THE DENTONS FIRM REPRESENTING DEFENDANT NISTICA.  ALONG

21    WITH ME ARE MY COLLEAGUES, RUSSELL TONKOVICH AND

22    GIDEON KORRELL, ALSO FROM THE DENTONS FIRM.

23        AND WE HAVE FROM THE COMPANY, AS WERE HERE AT THE

24    TUTORIAL, OUR CEO, DR. ASHISH VENGARKAN, AND OUR CTO,

25    DR. THOMAS STRASSER.
```

```
1              THE COURT:  WELCOME TO ALL OF YOU.

2         I KNOW SOME OF YOU HAVE TRAVELED ON THIS SUMMER WEEK AND

3    WE APPRECIATE YOUR FAMILIES GIVING UP THE TIME AS WELL.

4         I THINK WE HAVE A FAIRLY BIG DAY TODAY, AND NO DOUBT YOU

5    PUT AN EXTRAORDINARY AMOUNT OF TIME INTO BEING PREPARED.

6         BEFORE WE GET STARTED, THE FIRST THING I WANTED TO ASK,

7    AND I HOPE THIS IS COMMON FOR YOU, IT SEEMED TO ME THAT RATHER

8    THAN HAVING EACH OF YOU PROVIDE TO ME A TWO HOUR PRESENTATION,

9    THAT IT WOULD BE BETTER IF WE TOOK IT TERM-BY-TERM.  I IMAGINE

10   THAT'S COMMON.

11        I HOPE -- AND IT DIDN'T OCCUR TO ME TO SEND SOMETHING OUT

12   TO CLUE YOU IN, BUT YOU ALL SEEM SO FACILE WITH THE MATERIALS

13   THAT I HOPE THAT IT DOESN'T PRESENT ANY PROBLEMS WITH THE WAY

14   YOU'VE QUEUED UP YOUR SLIDES AND HOW WE CAN MANAGE THAT.

15        I KNOW THERE'S SOMETIMES TECHNOLOGY ISSUES.  IS THAT GOING

16   TO BE ANY PROBLEM?

17             MR. KRAMER:  NO PROBLEM, YOUR HONOR.  IN FACT, WE

18    DISCUSSED IT AND I THINK THAT WOULD MAKE GOOD SENSE.

19             THE COURT:  GOOD.

20             MR. KRAMER:  TERM-BY-TERM, YOUR HONOR.

21             THE COURT:  GOOD.

22             MR. RADULESCU:  AND THE ONE OTHER SUGGESTION THAT WE

23    HAVE --

24             THE COURT:  YES.

25             MR. RADULESCU:  -- IS THAT IN TERMS OF THE ORDER, IN
```

1     TERMS OF WHAT TERM IS FIRST, IT TURNS OUT THAT ALL THE

2     BRIEFING, I THINK ON BOTH SIDES, WERE DONE IN A VERY SPECIFIC

3     ORDER, AND AT LEAST WE PREPARED OUR SLIDES TO GO IN THAT SAME

4     ORDER, WHICH TURNS OUT TO BE SLIGHTLY DIFFERENT THAN THE ORDER

5     IN THE JOINT CHART WHICH WAS DONE VERY FIRST IN THE CASE BEFORE

6     THERE WAS ANY BRIEFING, AND IT WOULD SIMPLY REQUIRE TAKING THE

7     FIRST TWO '980 TERMS AND JUST MOVING THEM TO THE BACK OF THE

8     PRESENTATION.

9               THE COURT:  AND I -- THANK YOU.

10         MR. KRAMER?

11              MR. KRAMER:  HOWEVER YOU WANT TO DO IT, YOUR HONOR.

12     YOU FOCUSSED ON THE CHART.  WE DID THAT AS WELL.  WE'RE READY

13     TO USE THE CHART OR DO IT THE OTHER WAY.

14              THE COURT:  I FOCUSSED ON THE BRIEFING, AS YOU DID,

15     AND SO I ENDED UP ANNOTATING MY CHART, TABBING IT SO THAT I

16     COULD FIND THINGS, AND IT SEEMED LIKE IT WAS SOMETHING LIKE

17     THAT THAT HAD OCCURRED.

18          BUT, YES, I FOLLOWED YOUR BRIEFING, AND FRANKLY, I THOUGHT

19     THE '980 WAS SO MUCH MORE COMPLEX THAT I'D RATHER DO IT AT THE

20     END, SORT OF EASE INTO THIS, IF THERE'S SUCH A THING IN THESE

21     PATENTS, WHICH WERE REALLY VERY, VERY CHALLENGING.

22          SO -- AND I THINK YOU ALL ACKNOWLEDGE THAT AS WELL, AND

23     I'M DOING MY BEST TO BE A GOOD STUDENT OF THIS TECHNOLOGY AND

24     SCIENCE, BUT I ANTICIPATE THAT TODAY YOU WILL HELP ME EVEN

25     FURTHER IN UNDERSTANDING IT.  WE'LL HAVE A LITTLE MORE CONTEXT

1    THAN THE TUTORIAL PROVIDED TO ME.

2        SO GOOD.  I'M GLAD WE CAN PROCEED THAT WAY.

3        BEFORE WE GET STARTED, I ALSO HAVE A COUPLE OF VERY

4    GENERAL QUESTIONS THAT I DIDN'T SEE IN THE BRIEFING.

5        IT'S NOT CLEAR TO ME WHAT THE RELEVANT TIME PERIOD IS FOR

6    ME TO UNDERSTAND ONE SCHOOLED IN THE ART.  SO I DIDN'T KNOW IF

7    THERE'S ONE TIME PERIOD FOR ALL THE PATENTS THAT'S AN UMBRELLA

8    TIME PERIOD, OR SPECIFIC TIME PERIODS THAT YOU ARE ASKING ME TO

9    LOOK AT, OR WHETHER IT MAKES A DIFFERENCE.

10        MR. RADULESCU:  IT -- NORMALLY IT'S DICTATED BY THE

11    PARTICULAR PATENT THAT YOU'RE LOOKING AT, AND SPECIFICALLY THE

12    FILING DATE OF THE PATENT --

13        THE COURT:  YES.

14        MR. RADULESCU:  -- OR THE TIME OF THE INVENTIONS.

15        AND, THEREFORE, WE HAVE, I THINK, FOUR PATENTS AT ISSUE

16    TODAY --

17        THE COURT:  YES.

18        MR. RADULESCU:  -- ALL OF WHICH WERE, YOU KNOW, FILED

19    ON DIFFERENT DAYS, SOME OF WHICH SORT OF OVERLAP IN THE TIME

20    PERIOD, SO YOU REALLY HAVE TO LOOK AT IT ON A PATENT-BY-PATENT

21    BASIS, THE RELEVANT MONTHS THAT WE'RE TALKING ABOUT.

22        MR. KRAMER:  SO, YOUR HONOR, WE AGREE WITH THAT.  ALL

23    OF THE PATENTS, I BELIEVE, WERE APPLIED -- SO THE RULE OF LAW

24    IS THAT THE COURT LOOKS AT HOW A PERSON OF ORDINARY SKILL IN

25    THE ART WOULD UNDERSTAND THE TERMS IN THE PATENTS AT THE TIME

1    OF THE INVENTION --

2              THE COURT:  YES.

3              MR. KRAMER:  -- WHICH IS PRESUMED TO BE WHEN THE

4    PATENT APPLICATIONS WERE FILED UNLESS THERE'S SOME EVIDENCE

5    OTHERWISE.

6              THE COURT:  GOOD, AND I CERTAINLY UNDERSTAND THAT,

7    AND I JUST WANTED TO CONFIRM THAT THAT IS THE TIME PERIOD

8    YOU'RE ASKING ME TO CONSIDER.

9              MR. KRAMER:  YES, YOUR HONOR.  AND I DON'T THINK, FOR

10   THESE PARTICULAR CLAIMS AND THE ISSUES WE'VE PRESENTED, THAT

11   THAT'S AN ISSUE THAT IS IN DISPUTE.

12             THE COURT:  GREAT, GOOD.

13             MR. KRAMER:  IT'S ALL THE 2000S TIMEFRAME, 2000,

14   2002, ET CETERA.

15             THE COURT:  THAT'S WHAT I NOTED AS WELL.

16        YOU KNOW, I JUST WANT TO CLARIFY THAT, AND IT'S THE KIND

17   OF THING THAT, BECAUSE YOU AGREE, WE MIGHT NOT HAVE IT, BUT MY

18   ORDER SHOULD CERTAINLY SPECIFY THAT UNDERSTANDING, AND I'D HATE

19   TO MAKE AN ASSUMPTION THAT WAS WRONG.  SO THANK YOU.

20             MR. RADULESCU:  YOU'RE WELCOME.

21             THE COURT:  I'M CERTAINLY IN ACCORD WITH THAT.

22        THE NEXT THING I DON'T KNOW WHETHER YOU WERE PLANNING TO

23   PRESENT, BUT, AGAIN, ANOTHER ISSUE THAT I FOUND IN THE

24   DECLARATIONS OF YOUR EXPERTS HAD TO DO WITH THE DEFINITION OF

25   ONE OF ORDINARY SKILL IN THE ART.

1        YOU SEEM PRETTY CLOSE AND I'M WONDERING IF WE, FOR THE

2    PURPOSES OF THESE MATTERS, IF WE COULD AGREE THAT IT WOULD BE

3    AN UNDERGRADUATE DEGREE IN ENGINEERING OR A DISCIPLINE IN AN

4    ENGINEERING DISCIPLINE OR SCIENCE AND FIVE YEARS OF RELEVANT

5    EXPERIENCE IN OPTICAL CELL COMMUNICATIONS.

6        MR. KRAMER:  YOUR HONOR, I SEE BOTH SIDES ARE

7    SCRAMBLING TO FIND IT.

8        THE COURT:  I NOTICE.  AND, YOU KNOW, I DON'T HAVE

9    THE DECLARATIONS ON MY BENCH HERE.  I MADE NOTES FROM THEM

10   BECAUSE THERE WAS ONLY SO MUCH PAPER THAT I COULD ARRANGE IN

11   FRONT OF ME.

12       MR. KRAMER:  CERTAINLY.  COULD I SUGGEST COUNSEL CAN

13   CONFER ON A BREAK AND WE CAN ANSWER THAT QUESTION FOR YOU?

14       THE COURT:  WE CAN GO ON.  I DON'T THINK IT'S

15   RELEVANT NOW.

16       AGAIN, OF COURSE, I ALWAYS LOOK FOR COMMON GROUND.  I

17   TRIED TO EXTRACT WHAT I THOUGHT WAS AN INTERSECTION OF YOUR

18   AFFIDAVITS.

19       BUT I CERTAINLY KNOW THAT, MR. RADULESCU, YOU SUGGEST,

20   PRIMARILY IN THE DECLARATION, A POST-GRADUATE DEGREE.

21       MR. RADULESCU:  YEAH, TYPICALLY BECAUSE MOST OF THE

22   PEOPLE WORKING IN THE FIELD, IF YOU LOOK AT THE AUTHORS OF THE

23   CITED PRIOR ART AND THE, THE PUBLICATIONS, THE PEOPLE TYPICALLY

24   WORKING HAVE THIS ADVANCED DEGREE.

25       AND IT'S COMPLICATED SUBJECT MATTER.  IT'S STUFF THAT YOU

1    PROBABLY WOULDN'T BE LEARNING AS AN UNDERGRAD, AND AS A RESULT,

2    THAT IS ONE OF THE CONDITIONS ON WHICH WE WOULD PROPOSE A

3    PERSON OF ORDINARY SKILL IN THE ART WOULD HAVE TO HAVE THIS

4    POST-GRADUATE DEGREE, BUT RECOGNIZING, OF COURSE, THAT THERE

5    ARE UNDERGRADS THAT MAY HAVE ADDITIONAL EXPERIENCE IN ADDITION

6    TO JUST THE FOUR YEARS OF SCHOOLING AND, THEREFORE, THIS IS

7    THIS ALTERNATIVE --

8            THE COURT:  ALL RIGHT.

9            MR. RADULESCU:  -- THAT WE'RE SPECIFYING THAT IT'S

10   EITHER A POST-GRADUATE DEGREE WITH AT LEAST THREE YEARS OF

11   EXPERIENCE, OR AN UNDERGRADUATE DEGREE WITH AT LEAST FIVE.

12           THE COURT:  ALL RIGHT.  I THINK PERHAPS AT A BREAK,

13   IF THE TWO OF YOU COULD TALK ABOUT IT, I THINK YOU'RE NOT FAR

14   APART.  AND, AGAIN, THIS MAY BE AN ISSUE THAT YOU CAN COME TO

15   AN AGREEMENT ON AND WE CAN MOVE FORWARD RATHER THAN -- FRANKLY,

16   YOU OR THE SIGNATORS TO YOUR AFFIDAVITS KNOW THESE PEOPLE, AS

17   MR. RADULESCU SUGGESTS, AND I DON'T.  AND SO IT WOULD BE FAR

18   BETTER IF YOU COULD WORK OUT A COMMON GROUND SO THAT WE HAVE

19   THAT FOUNDATION TO GO FORWARD ON.

20       AGAIN, IT'S UNLIKELY TO BE AN ISSUE THAT WILL BE

21   DETERMINATIVE IN THE PROCEEDINGS.

22           MR. KRAMER:  CERTAINLY, YOUR HONOR.

23           THE COURT:  GOOD.  ALL RIGHT.

24       THE -- WHEN I REVIEWED THESE MATERIALS, IT WAS PERHAPS IN

25   THE DESIRED VACUUM OF NOT KNOWING WHAT THE DISPUTED CLAIMS ARE,

1    AND SO I JUST MAKE THAT COMMENT.  I BELIEVE YOU FILED MASSIVE

2    AMOUNTS OF DOCUMENTS IN THE CLAIMS.  I BELIEVE SOME OF THAT IS

3    STILL IN FLUX IN A MATTER BEFORE JUDGE GREWAL, I BELIEVE.  IS

4    THAT CORRECT?

5              MR. KRAMER:  JUDGE GONZALEZ ROGERS, YOUR HONOR, HAD

6    THE CASE.

7              THE COURT:  SO WHO IS THE MAGISTRATE THAT'S --

8              MR. KRAMER:  OH, PARDON ME.  MAGISTRATE JUDGE CORLEY.

9              THE COURT:  ALL RIGHT.  SO -- BUT I DON'T HAVE THE

10   CLAIMS BEFORE ME.  I DON'T THINK IT'S ACTUALLY DESIRABLE

11   BECAUSE I'M NOT GOING FORWARD ON THE DISPUTED INFRINGEMENT

12   CONTENTIONS.

13             MR. RADULESCU:  YES.

14             THE COURT:  I SAID CLAIMS AND I MEANT CONTENTIONS.

15   I'M SORRY.

16             MR. RADULESCU:  SO JUST TO CLARIFY, THE PARTIES HAVE

17   STIPULATED TO A PROCESS BY WHICH THERE WILL BE NARROWING, WHERE

18   THE ASSERTED CLAIMS START OUT WITH MANY --

19             THE COURT:  YES.

20             MR. RADULESCU:  -- AND YOU LOOK AT WHAT THE ISSUES

21   ARE ON THE TABLE ON BOTH THE INFRINGEMENT SIDE AND THE VALIDITY

22   SIDE, AND WE PROGRESSIVELY NARROW.

23             THE COURT:  I LIKE TO HEAR THAT.

24             MR. RADULESCU:  SO THAT'S A WAY THAT THE CASE IS

25   GETTING WHITTLED DOWN.

```
1              THE COURT:  GOOD.

2              MR. RADULESCU:  SO THAT EVENTUALLY THERE'S NOT TOO

3     MANY CLAIMS THAT HAVE TO BE TRIED.

4              THE COURT:  THANK YOU.

5              MR. RADULESCU:  ON THE ISSUE OF THE ASSERTED CLAIMS,

6     I MEAN, OBVIOUSLY WE SHOULD BE LOOKING AT THE CLAIM IN WHICH

7     THESE DISPUTED TERMS ARE APPEARING.

8              THE COURT:  AND YOU'VE BRIEFED THAT FOR ME.

9              MR. RADULESCU:  WE'VE BRIEFED THAT.

10             THE COURT:  YES.

11             MR. RADULESCU:  AND THE TUTORIAL TOUCHED ON IT A

12    LITTLE AND YOU'LL SEE MORE OF IT TODAY, TERM-BY-TERM.

13             THE COURT:  YES.

14             MR. RADULESCU:  WHEN WE LOOK AT EACH OF THE DISPUTES,

15    YOU'LL SEE THE WHOLE CLAIM THERE, SO THAT NOW WE CAN PUT THE

16    WHOLE CLAIM IN THE BIG PICTURE.

17             THE COURT:  ABSOLUTELY.  AND THE FIRST THING I DID

18    WAS TO LOCATE THESE TERMS IN THE CLAIM SO THAT I COULD SEE THEM

19    IN CONTEXT.  SO THAT I CERTAINLY HAVE.

20             WHAT I'M REALLY REFERRING TO IS THE ULTIMATE ISSUES BEFORE

21    THE COURT ON THE INFRINGEMENT CONTENTIONS.  I'M UNAWARE OF

22    ACTUALLY -- AND I JUST WANT TO MENTION THAT THAT, I THINK

23    THAT'S ACTUALLY PREFERRED --

24             MR. KRAMER:  YES.

25             THE COURT:  -- THAT THIS IS A -- IT WOULD BE TOO MUCH
```

1    OF A BACKWARDS WAY OF LOOKING AT THE INTERPRETATION HERE, I

2    THINK, IF I WERE TO BE TRYING TO SOLVE THE RIDDLE OF THE CASE

3    THROUGH THIS CONTENTION.

4            MR. KRAMER:  THAT'S CORRECT, YOUR HONOR.

5            THE COURT:  ALL RIGHT.

6            MR. KRAMER:  THAT'S THE WAY IT'S TO BE DONE.

7            THE COURT:  OKAY.

8            MR. KRAMER:  THERE IS AN ISSUE ABOUT NARROWING DOWN

9    THE CLAIMS WHEN WE GET TO SCHEDULING AND SO FORTH.  WE'RE

10   INTERESTED IN NARROWING DOWN THE CLAIMS AND WE'RE A LONG WAY

11   AWAY FROM THAT.  THERE'S STILL MANY, MANY CLAIMS BEING

12   ASSERTED, AND THAT'S AN ISSUE THAT, WHEN WE GET TO SCHEDULING,

13   WHETHER THAT'S TODAY OR ANOTHER DAY, THAT WE WOULD LIKE TO

14   ADDRESS.

15           THE COURT:  I DID NOTE THAT YOU FILED SOMETHING ON

16   THE SCHEDULING.  AT THE END OF TODAY, LET'S ADDRESS THAT,

17   BECAUSE ALTHOUGH I DOUBT WE'LL MAKE ANY HEADWAY THERE, AT LEAST

18   I CAN UNDERSTAND THE PARAMETERS OF THAT ISSUE.

19           ALL RIGHT.  THE LAST THING I WANTED TO TALK TO YOU ABOUT,

20   AND THIS IS REALLY MORE TO HAVE YOU THINK ABOUT IT AS YOU MAKE

21   YOUR PRESENTATIONS, OVERALL IN REVIEWING THESE FIVE CLAIMS, IT

22   APPEARED AS THOUGH THE DISPUTE HAD TO DO WITH SCOPE AS OPPOSED

23   TO YOUR ASSERTED POSITIONS BEING MUTUALLY EXCLUSIVE TO EACH

24   OTHER.  IS THAT A FAIR -- YOU CAN LET ME KNOW AS WE GO THROUGH

25   THEM.  IT APPEARED IN EVERY CASE AS THOUGH IT WAS NARROW VERSUS

 1        BROAD SCOPE.

 2                  MR. KRAMER:  YES.

 3                  THE COURT:  BUT IF ONE WOULD EXCLUDE THE OTHER, I

 4        DIDN'T SEE THAT IN THEM.  SO YOU CAN THINK ABOUT THAT AS WE

 5        APPROACH THEM BECAUSE A SCOPE DIFFERENTIAL GIVES ME A DIFFERENT

 6        WAY OF LOOKING AT THINGS THAN IF I HAVE TO CHOOSE ONE OR THE

 7        OTHER AND CAN'T DO SOMETHING.

 8                  MR. KRAMER:  I BELIEVE THAT'S CORRECT.  WE'LL ADDRESS

 9        THAT ON EACH TERM.  I BELIEVE THAT'S CORRECT.  THERE'S AN

10        AGREEMENT ON SOME ASPECT OF SCOPE.  FINISAR IS SEEKING A

11        BROADER SCOPE, AND NISTICA IS SEEKING A NARROWER SCOPE.

12                  THE COURT:  OKAY.  AGAIN, AS I SAY, YOU CAN ADDRESS

13        THAT AS WE GET TO EACH CLAIM.  I DON'T NEED YOU TO GIVE ME A

14        PROMISE ON IT NOW.  THAT'S WHAT I WAS NOTING.

15             SO THOSE WERE SOME OF MY OVERALL QUESTIONS.

16             I ALSO HAVE -- I WANT TO JUST ASK YOU, BEFORE WE GET

17        STARTED AS WELL, OF COURSE I HAVE A NUMBER OF QUESTIONS THAT I

18        FOUND FROM READING YOUR PAPERS AND READING THE EVIDENCE.  SOME

19        OF THE QUESTIONS WILL GO TO DETERMINING WHETHER I UNDERSTAND

20        WHAT YOU'VE GIVEN ME.  I PRESUME A LOT OF THAT WILL BE

21        CLARIFIED BY YOUR PRESENTATION.

22             TYPICALLY I WOULD WAIT TO ASK QUESTIONS UNTIL AFTER YOU

23        MAKE YOUR PRESENTATION.  HOPEFULLY THE LIGHT WILL GO ON FOR

24        SOME OF THESE THINGS FOR ME.

25             I JUST WANT TO MAKE SURE THAT THAT'S YOUR PREFERRED

1    PRACTICE AS OPPOSED TO HEARING SOME OF MY QUESTIONS BEFORE YOU

2    START.

3              MR. KRAMER:  YOUR HONOR, WHICHEVER WAY YOU'D LIKE TO

4    DO IT, WHICHEVER WAY YOU THINK WOULD BE MOST USEFUL TO YOU.

5              THE COURT:  I APPRECIATE THAT.

6              MR. KRAMER:  WE'RE GOING TO KEEP WITHIN THE TIME

7    LIMITS.  I THINK -- DID YOUR HONOR SAY TWO HOURS PER SIDE, KEEP

8    IT A LITTLE UNDER THAT?  WAS THAT THE --

9              THE COURT:  THE OUTER LIMIT WAS TWO HOURS, AND I

10   THINK YOU HAD BOTH SAID THAT YOU THOUGHT AN HOUR AND A HALF

11   WOULD BE SUFFICIENT.

12             MR. KRAMER:  YES.

13             THE COURT:  YOU DID SUCH A WONDERFUL JOB TEN DAYS

14   AGO, OR TWO WEEKS AGO, IN KEEPING TO YOUR TIME, I HAVE EVERY

15   CONFIDENCE THAT YOU'VE PLANNED THIS AND HAVE THAT INNATE SENSE

16   OF HOW YOUR TIME IS GOING, SO I APPRECIATE THAT.

17             MR. RADULESCU:  GOOD.

18             THE COURT:  BUT I'M NOT EXPECTING WE'LL FINISH BY

19   NOON.  YOU COULD REALLY SURPRISE AND PLEASE ME IF WE DID.

20         AND IF YOU HAVE PLANES TO CATCH, THEN YOU'LL JUST MOVE IT

21   ALONG FOR US.

22         ALL RIGHT.  THEN I THINK WE'RE READY TO GET STARTED.

23         AND I -- LET'S SEE.  I WILL INTERRUPT IF I HAVEN'T

24   UNDERSTOOD SOMETHING OR IF I'M TRYING TO -- I ASSUME YOU'LL BE

25   SHOWING ME THINGS ON SLIDES.  I WON'T NEED TO BE RUFFLING

1    THROUGH MY OWN PAPERS UNLESS I FIND -- UNLESS THERE'S SOMETHING

2    I NEED TO FIND IN THEM.  I CERTAINLY HAVE THE PATENTS-IN-SUIT

3    THAT YOU PROVIDED TO ME.  I HAVE YOUR -- I HAVE SOME OF THE

4    EXHIBITS.  I HAVE --

5           MR. RADULESCU:  THERE ARE TWO SLIDE BOOKS THAT BOTH

6    SIDES HAVE SUBMITTED, YOUR HONOR.

7           THE COURT:  LET ME GET -- THESE ARE YOUR BRIEFS,

8    WHICH HAVE SOME OF MY NOTES.

9       SO THESE ARE TODAY'S -- OH, THIS IS GREAT.  IT IS HELPFUL

10   FOR ME TO TAKE NOTES ON THEM.

11         MR. KRAMER:  THOSE ARE EACH SIDE'S SLIDES, YOUR

12   HONOR.

13         THE COURT:  SO THESE ARE THE TWO SPIRALS THAT YOU'VE

14   PROVIDED TO ME TODAY?

15         MR. RADULESCU:  YES, YOUR HONOR.

16         THE COURT:  OKAY.  THAT'S VERY HELPFUL.

17         MR. RADULESCU:  OKAY.

18         THE COURT:  ALL RIGHT.

19         MR. RADULESCU:  SO LET ME FIRST TELL YOU WHAT WE HAVE

20   IN THE SPIRAL HAND UP, AND I'M GOING TO INITIALLY START WITH

21   SORT OF SUMMARIZING HOPEFULLY THE FIVE DISPUTES UP FRONT.  I'M

22   GOING TO TAKE EIGHT TO TEN MINUTES, I'M GOING TO SUMMARIZE AND

23   SORT OF STEP BACK AND LOOK AT THESE FIVE DISPUTES, INTRODUCE

24   THEM.

25        IN ADDITION, I'LL SPEND A LITTLE TIME JUST GOING BACK OVER

1    THE FOUR PATENTS IN TERMS OF PUTTING UP THE RELEVANT CLAIMS,

2    PUTTING UP THE RELEVANT FIGURES.  I THINK I CAN DO IT IN EIGHT

3    TO TEN MINUTES AND I'LL TRY TO DO THAT.

4        FROM THERE WE GO TERM-BY-TERM.  THERE'S FIVE OF THEM.

5    WELL, FOR FOUR PATENTS.

6        I'LL BE DOING THE FIRST TERM, AND THEN MS. DAVIS WILL BE

7    DOING THE SECOND AND THIRD TERM -- WE'VE SPLIT THE PATENTS --

8    AND THEN THE FOURTH AND FIFTH TERMS ARE FROM A SINGLE PATENT

9    AND I'LL SORT OF END THE DAY WITH THOSE DISPUTES.

10        THE COURT:  OKAY.

11        MR. RADULESCU:  SO WITH THAT AS AN INTRO, THE BOOK

12   THAT YOU HAVE STARTS OUT WITH AN INTRODUCTION, HAS FIVE TABS,

13   TERM-BY-TERM, AND THEN AT THE VERY END, WE DO HAVE ANOTHER COPY

14   OF THE AMENDED JOINT CLAIM CONSTRUCTION STATEMENT FOR YOU.  SO

15   IT'S ALL HANDY AND YOU HAVE IT THERE.  OKAY?

16        THE COURT:  YES.

17        MR. RADULESCU:  SO LET'S START WITH AN OVERVIEW.

18   WE'RE GOING TO -- I'M GOING TO START WITH SUMMARIZING THE

19   DISPUTED CLAIM TERMS; I'M GOING TO SPEND A LITTLE TIME ON JUST

20   LOOKING AT THE PARTIES' DIFFERENT RESPECTIVE APPROACHES TO

21   CLAIM CONSTRUCTION.

22        AND YOU DID MENTION THAT YOUR SENSE WAS IT'S, IT'S BROAD

23   VERSUS NARROW, AND I THINK THAT'S PROBABLY THE CASE WITH

24   RESPECT TO FOUR OUT OF FIVE OF THE DISPUTES.  I THINK ONE OF

25   THE DISPUTES, IT'S SOMETHING DIFFERENT.

1          THE COURT:  OKAY.

2          MR. RADULESCU:  AND I'LL INTRODUCE THAT.

3       AND THEN WE'LL GO THROUGH THE TERM-BY-TERM ANALYSIS.

4       SO WE START WITH THE FIVE TERMS IN DISPUTE.

5       AT SLIDE 3, FROM THE '328 PATENT, THE ISSUE IS WHAT DOES

6  "DISPLACEABLE" MEAN?

7       SECOND DISPUTE IS FROM THE '687 PATENT, "SCATTERED LIGHT."

8  WHAT DOES "SCATTERED LIGHT" MEAN?  WHAT DOES IT REFER TO?

9       THE THIRD DISPUTE IS FROM THE '740 PATENT, AND THIS IS NOT

10 SO MUCH AN ISSUE OF WHAT DOES THIS TERM OR SPECIFIC PHRASE

11 MEAN, BROAD OR NARROW, IT'S ACTUALLY A LONG PHRASE THAT

12 PROBABLY HAS 15 TO 20 WORDS IN IT, AND THERE'S ACTUALLY TWO

13 DIFFERENT WAYS THAT IT'S BEING INTERPRETED.

14      AND SO ON THIS ONE, IT'S UNIQUE BECAUSE I THINK THE

15 PARTIES HAVE A DIFFERENT INTERPRETATION OF THIS LENGTHY CLAIM

16 LANGUAGE.

17      AND THEN THE FOURTH AND FIFTH DISPUTES ARE FROM THE '980

18 PATENT, BOTH OF THEM ARE MEANS-PLUS-FUNCTION CLAIMS.

19      THE FOURTH DISPUTE DEALS WITH THE SEPARATING, "SPATIAL

20 SEPARATING MEANS;" AND THE FIFTH DISPUTE DEALS WITH THE

21 "WAVELENGTH PROCESSING MEANS," AND, IN FACT, THESE TWO PATENTS

22 ARE THE ONES THAT ARE MORE COMPLICATED AND, IN FACT, THAT'S WHY

23 THEY WERE BRIEFED THAT WAY IN TERMS OF THE SENSE WAS TO START

24 OFF WITH THE DISPUTES WHERE IT'S VERY SORT OF NARROW.

25          THE COURT:  UM-HUM.

1        MR. RADULESCU:  AND AS THE TIME AND DAYS GO ON, YOU

2   ACTUALLY, YOU KNOW, AFTER SPENDING FOUR OR FIVE HOURS ON THIS,

3   YOU KNOW, YOU'LL HAVE ENOUGH BACKGROUND TO ACTUALLY HOPEFULLY

4   TACKLE THE MORE CHALLENGING ISSUES, AND THAT'S THE WAY IT'S

5   DONE TO TRY TO PRESENT THIS IN AN ORGANIZED WAY THAT ALLOWS

6   CLEAR UNDERSTANDING OF THE PARTIES' RESPECTIVE POSITIONS.

7   OKAY?

8        SO THOSE ARE THE FIVE DISPUTES.

9        NOW LET'S LOOK AT EACH INDIVIDUALLY.  THESE ARE SO-CALLED

10  THREE-COLUMN CHARTS THAT START OUT FOR EACH SECTION, AND WE

11  START WITH THE CLAIM LANGUAGE ON THE LEFT, THIS IS THE CLAIM

12  TERM IN DISPUTE, "DISPLACEABLE REFLECTORS," AND WE IDENTIFY

13  WHERE IN THE CLAIMS YOU CAN GO FIND IT, BECAUSE OBVIOUSLY YOU

14  NEED TO LOOK AT THE CLAIM TO PUT IT IN CONTEXT.

15        THE COURT:  YES.

16        MR. RADULESCU:  AND THEN WE HAVE THE TWO POSITIONS.

17  WITH RESPECT TO FINISAR, IT'S SIMPLY "MOVEABLE REFLECTORS."

18  AND THEN WITH RESPECT TO NISTICA, IT'S A LONGER PHRASE AND THE

19  ISSUE IS GOING TO BE -- AND IT'S NISTICA'S POSITION THAT THIS

20  SHOULD BE LIMITED TO ONLY ONE TYPE OF MOTION, PERPENDICULAR.

21        FINISAR'S POSITION IS, NO, THERE SHOULD BE NO SUCH

22  LIMITATION.  IT SAYS "DISPLACEABLE."  IT TYPICALLY MEANS

23  MOVEABLE.  WE'RE GOING TO USE THE PLAIN LANGUAGE HERE OF THIS

24  CLAIM.  THERE'S NOTHING IN THE SPEC THAT'S GOING TO DICTATE

25  TRUMPING WHAT THIS PLAIN AND ORDINARY WORD "DISPLACEABLE"

1     MEANS.

2          THAT'S THE NATURE OF THE FIRST DISPUTE.  WE'LL BE LOOKING

3     AT THE SPEC, AND YOU'RE GOING TO HAVE TO LOOK AT THE SUPPORT

4     FOR EACH OF THE PARTIES' RESPECTIVE POSITIONS AND MAKE A

5     DETERMINATION AS TO WHETHER OR NOT THERE'S A CLEAR INTENT TO

6     TRY TO RESTRICT THIS OTHERWISE GENERIC, OR THIS OTHERWISE

7     GENERAL TERM "DISPLACEABLE."

8          THAT'S BROAD AND NARROW, RIGHT?

9          THE SECOND DISPUTE DEALS AGAIN WITH ANOTHER, YOU KNOW,

10    TERM OR PHRASE, AND IT DEALS WITH THE SCATTERED LIGHT FROM A

11    DROPPED SIGNAL THAT IS DIRECTED ONTO THIS MICRO-MIRROR DEVICE

12    TO REFLECT AWAY FROM THE RETURN PATH.

13         AND THE ISSUE HERE IS NISTICA'S POSITION IS SHOULD WE

14    LIMIT IT TO ONLY ONE TYPE OF SCATTERING AND, IN FACT, REFERS

15    SPECIFICALLY TO EDGE SCATTERING OFF MIRRORS.

16         AND FINISAR'S POSITION IS WE'RE GOING TO STICK TO THIS

17    CLAIM LANGUAGE.  THERE'S NO RESTRICTION IN THE CLAIM LANGUAGE

18    ITSELF.  THERE'S NOTHING IN THE SPEC THAT SAYS WE'RE INTENDING

19    TO LIMIT THIS TO ONLY A PARTICULAR TYPE OF SCATTERED LIGHT AND,

20    THEREFORE, THE CLAIM SHOULD JUST BE INTERPRETED USING PLAIN AND

21    ORDINARY ENGLISH WORDS.  THERE'S NOT MUCH COMPLICATED IN THIS

22    CLAIM TERM AND, THEREFORE, WE'RE GOING TO STICK WITH THE CLAIM

23    TERM, STICK WITH THOSE WORDS, NOTHING EXTRA, NOTHING SPECIAL IS

24    GOING TO BE INSERTED.

25         IN CONTRAST, NISTICA WANTS TO NOW LIMIT IT TO EDGE

1    SCATTERING.  OKAY?

2         THAT'S THE SECOND DISPUTE.  THAT'S, AGAIN, I THINK BROAD

3    AND NARROW.

4         THE THIRD DISPUTE IS THE ONE THAT I REFERENCED EARLIER

5    THAT THERE MAY BE AN EXCEPTION ON THIS WITH RESPECT TO WHAT'S

6    AT ISSUE, AND IT PRIMARILY IS THIS LONG PHRASE WITH PROBABLY 30

7    WORDS IT LOOKS LIKE, AND THE PARTIES DON'T HAVE A PROBLEM WITH

8    CONSTRUING AND USING THE TERM "SPACIAL LIGHT MODULATOR" IN

9    THEIR -- THEY DON'T HAVE A DISPUTE OVER, OH, THAT NEEDS TO BE

10   SOMEHOW CLARIFIED.

11        THERE IS NO DISPUTE THAT THE JURY NEEDS TO BE INSTRUCTED

12   ON WHAT ARE THESE MICRO-MIRRORS?  WHAT IS PROGRAMMING?  BECAUSE

13   NISTICA'S PROPOSED CONSTRUCTION USES ALL THOSE TERMS.

14        AND, AS A RESULT, I THINK THE DISPUTE IS REALLY TRYING TO

15   LOOK AT THIS TERM AS A WHOLE AND LIMIT IT TO ONLY SETS OF

16   SO-CALLED OPTICAL FUNCTIONS PERFORMED BY THE ENTIRE OPTICAL

17   DEVICE.

18        AND THIS IS AN ISSUE WHERE, IF YOU LOOK AT ALL THE

19   LANGUAGE, THE QUESTION IS, WHAT IS IT DIRECTED TO?  IS IT

20   LIMITED TO ONLY THESE SETS OF OPTICAL FUNCTIONS PERFORMED BY

21   THE ENTIRE OPTICAL DEVICE WHICH WORKS ITS WAY IN THROUGH THIS

22   CLAIM LANGUAGE THAT'S HIGHLIGHTED IN RED AT THE BOTTOM OF

23   NISTICA'S COLUMN WHERE IT SAYS "AS IT TRANSITS THE

24   RECONFIGURABLE MULTIFUNCTIONAL OPTICAL DEVICE"?  THAT IS THE

25   LANGUAGE THAT'S NOW BEING INSERTED TO REDIRECT THIS CLAIM TERM

1    TO BE REFERRING TO THAT OPTICAL DEVICE AS OPPOSED TO THIS

2    MICRO-MIRROR SPATIAL MODULATOR, WHICH IS THE FOCUS OF THE

3    ELEMENT.

4         SO HERE IT PROBABLY IS A REDIRECTION OF THE CLAIM AND NOT

5    JUST SIMPLY A BROAD VERSUS NARROW INTERPRETATION.  THERE'S NO

6    SPECIFIC WORDS YOU WILL SEE THAT THE PARTIES HAVE AN EXPLICIT

7    DISPUTE ON THAT THERE'S A BROAD INTERPRETATION AND A NARROW

8    INTERPRETATION AND, THEREFORE, IT WOULD BE A DISPUTE THAT'S

9    SIMILAR TO THE OTHER FOUR.  THIS IS UNIQUE.  OKAY?

10        THE FOURTH DISPUTE IS OVER THE "SPATIAL SEPARATOR MEANS"

11   AND NISTICA'S PROPOSAL TO LIMIT IT TO ONLY ONE TYPE OF SPATIAL

12   SEPARATING STRUCTURE, WHICH IS SOMETHING CALLED A COMPENSATING

13   BIREFRINGENT WEDGE, THIS CBRW.  THAT'S THE ONLY STRUCTURE THAT

14   NISTICA WANTS THIS CLAIM TO REFER TO OR CORRESPOND TO.

15        FINISAR'S POSITION IS, NO, YOU'VE GOT TO GO LOOK AT THE

16   SPEC AND YOU'VE GOT TO GO LOOK AT THE REST OF THE STUFF IN THE

17   SPEC THAT PERFORMS THIS SAME FUNCTION THAT'S DESCRIBED AS

18   PERFORMING THIS FUNCTION AND THAT SHOULD ALSO BE INCORPORATED

19   INTO THE CORRESPONDING STRUCTURE FOR THIS TERM.

20        SO HERE AGAIN IT'S SCOPE.  IT'S BROAD VERSUS NARROW.  IS

21   IT LIMITED TO JUST ONE PARTICULAR TYPE OF SPATIAL SEPARATING

22   STRUCTURE, AS NISTICA PROPOSES, OR NOT?

23        OKAY.  THAT'S FOUR.

24        AND NUMBER FIVE IS A SIMILAR DISPUTE.  IT'S IN THE SAME

25   CLAIM, THE SAME PATENT, ANOTHER MEANS-PLUS-FUNCTION CLAIM, HERE

1    A "WAVELENGTH PROCESSING MEANS."

2         AND NISTICA'S POSITION IS THAT IT SHOULD BE LIMITED TO

3    ONLY ONE TYPE OF PROCESSING USING A PARTICULAR TYPE OF DEVICE

4    CONFIGURATION, WHICH THEY CALL AN OPMC DEVICE, OR AN OPTICAL

5    PHASE MATRIX COUPLING DEVICE THAT'S REQUIRED TO BE MADE OF

6    LIQUID CRYSTAL ON SILICON AND THAT IS REQUIRED TO HAVE TWO

7    GROUPS OF SPATIALLY SEPARATED WAVELENGTH CHANNELS.  VERY

8    SPECIFIC STRUCTURE, AND NISTICA WANTS TO LIMIT IT TO JUST THAT

9    STRUCTURE.

10        FINISAR'S POSITION IS, NO, THERE'S OTHER TYPES OF

11   STRUCTURE THAT'S DESCRIBED IN THE SPECIFICATION THAT ISN'T SO

12   LIMITING.

13        SO THOSE ARE AN INTRODUCTION TO THE FIVE DISPUTES.

14        AND I HAVE A SLIDE ON JUST GENERAL SUMMARY, WHAT IS

15   FINISAR'S APPROACH TO CLAIM CONSTRUCTION, AND THEN WE'LL DO A

16   SIMILAR SLIDE FOR NISTICA'S APPROACH TO CLAIM CONSTRUCTION.

17        AND I'LL REMIND THE COURT THAT WE WERE HERE A COUPLE WEEKS

18   AGO PRESENTING A, A FAIRLY NEUTRAL PRESENTATION FOCUSSED SOLELY

19   ON THE TECHNOLOGY, AND TODAY WE'RE ARGUING IT.  TODAY WE GET TO

20   ARGUE.  TODAY WE GET TO CHARACTERIZE NISTICA'S POSITION AND BE

21   LAWYERS IN TERMS OF TRYING TO EXPLAIN WHY THE POSITIONS THAT AT

22   LEAST FINISAR ARE PROPOSING, ALL FIVE OF THEM, ARE THE RIGHT

23   POSITIONS.  THEY ARE THE RIGHT WAY THAT THESE CLAIMS SHOULD BE

24   CONSTRUED.

25        AND IT'S BECAUSE, FIRST OF ALL, YOU'LL SEE OUT OF THE FIVE

1    DISPUTES, WE'RE THE ONES STAYING TRUE TO THE CLAIM LANGUAGE,

2    TRUE TO THE PLAIN MEANING OF THESE CLAIMS.  WE'RE NOT ADDING

3    TERMS, LIKE "PERPENDICULAR DIRECTION" OR "EDGE."  WE'RE STAYING

4    TRUE TO THE PLAIN MEANING OF THE CLAIMS.

5         WE ARE PROPOSING CONSTRUCTIONS THAT ACTUALLY COVER ALL OF

6    THE EMBODIMENTS IN THE SPEC.  WHEN THERE'S MULTIPLE EMBODIMENTS

7    DESCRIBED, YOU WOULD HOPE THAT YOU'RE CONSTRUING THE CLAIMS TO

8    COVER ALL THOSE, AND THAT'S IMPORTANT WITH RESPECT TO THE

9    MEANS-PLUS-FUNCTION CLAIMS WHERE WE'RE SIMPLY LOOKING AT WHAT

10   STRUCTURE IS DESCRIBED TO PERFORM THOSE FUNCTIONS.

11        AND THEN, THIRD, WITH RESPECT TO THE FILE HISTORY THAT

12   COMES INTO PLAY FOR AT LEAST ONE OF THESE TERMS, WE -- FINISAR

13   IS THE ONE THAT'S READING IT IN PROPER CONTEXT, AND WE'LL GO

14   THAT.  THAT'S ONE OF MS. DAVIS'S TERMS.

15        AND THEN WITH RESPECT TO THE MEANS-PLUS-FUNCTION, WE'RE

16   IDENTIFYING ALL OF THE CORRESPONDING STRUCTURE.  WE'RE NOT

17   CHERRY PICKING ONE PARTICULAR DEVICE, A COMPENSATING

18   BIREFRINGENT WEDGE, AND TRYING TO LIMIT THE CLAIM TO JUST THAT

19   ONE PARTICULAR STRUCTURE SO THAT IF YOU'RE NOT USING IT, YOU

20   MAY HAVE A NON-INFRINGEMENT POSITION.  OKAY?

21        SO THAT'S FINISAR'S APPROACH.

22        IN SUMMARY, NISTICA'S APPROACH IS TO DO WHATEVER IT CAN TO

23   LIMIT THESE CLAIMS, AND THEY'RE DOING IT IN THREE DIFFERENT

24   WAYS:  THEY'RE ADDING LIMITATIONS, THAT'S NUMBER ONE, BY ADDING

25   "PERPENDICULAR" TO THIS MOTION REQUIREMENT; THEY'RE ADDING

1    "EDGE" TO THE SCATTERED REQUIREMENT; AND THEY'RE ALSO ADDING

2    THIS LANGUAGE OF "SET OF ONE OR MORE OPTICAL FUNCTIONS" IN THAT

3    THIRD TERM THAT I REFERRED TO EARLIER.

4         SIMILARLY, IT ALSO CAN BE LOOKED AT FROM THE PERSPECTIVE

5    THAT THEY'RE ACTUALLY JUST REDRAFTING THAT 30 WORD CLAUSE.

6    THEY'RE REDRAFTING IT.  THEY'RE REFOCUSSING IT NOT ON THE

7    SPACIAL LIGHT MODULATOR, WHICH IS THE ACTUAL PHRASE THAT WE'RE

8    CONSTRUING, BUT TRYING TO REFOCUS IT ON THIS SO-CALLED

9    RECONFIGURABLE OPTICAL DEVICE.  THAT'S A REDRAFTING EXERCISE

10   AND THAT'S HOW THEY'RE LIMITING THAT TERM.

11        AND THEN WITH RESPECT TO THE MEANS-PLUS-FUNCTION CLAIMS,

12   THEY'RE MISREADING THE SPEC.  THEY'RE NOT LOOKING AT ALL THE

13   STRUCTURE FOR SEPARATING OPTICAL SIGNALS.  WE'LL GO THROUGH THE

14   FIGURE AND GO THROUGH THE WRITTEN PORTION TO SHOW THAT.

15        AND THEN SIMILARLY, THEY'RE NOT LOOKING AT ALL THE

16   STRUCTURE FOR SEPARATELY PROCESSING.

17        SO THAT'S THE INTRO, AND NOW I'M GOING TO MOVE ON TO THE,

18   THE FOUR PATENTS.  THESE ARE SLIDES THAT WERE PRIMARILY TAKEN

19   FROM THE TUTORIAL.

20        AND JUST AS A REMINDER, THE '328 PATENT IS THIS OPTICAL

21   SWITCH THAT INCLUDES THESE -- THE SPACIAL LIGHT MODULATOR THAT

22   HAS THESE SMALL PIXELS IN IT THAT END UP -- WHEN THEY'RE SHRUNK

23   DOWN AND REDUCED IN SIZE, THERE ARE SOME BENEFITS TO BEING ABLE

24   TO OPTICALLY SWITCH LIGHT AS A RESULT OF THIS TYPE OF

25   CONFIGURATION, AND THE MOTIVATION, OF COURSE, WAS TO, TO DO

```
 1    THIS IN A GEOMETRY WHERE YOU WOULDN'T HAVE TO CONVERT TO

 2    ELECTRICAL SIGNALS.  IT'S ALL OPTICAL.  OPTICAL LIGHT COMES IN,

 3    HITS A SPACIAL LIGHT MODULATOR OR TWO, AND THEN HITS LENSES AND

 4    GOES OUT, AND THEN IT'S AN ALL OPTICAL SWITCH.

 5        THE CLAIM, OR CLAIMS, THAT ARE RELEVANT HERE ARE 17 AND

 6    19, AND 17 IS SHOWN ON SLIDE 13, AND IT'S "AN OPTICAL SWITCH

 7    COMPRISING," AND IT SETS FORTH THIS ARRAY OF DISPLACEABLE

 8    REFLECTORS, AND THEN "EACH OF A REFLECTOR DISPLACING A WAVE

 9    FRONT OF AN OPTICAL BEAM."

10        VERY SHORT PHRASE.  IT'S NOT LONG AND COMPLICATED.  IT'S

11    FAIRLY FUNDAMENTAL IN TERMS OF WHAT THIS PATENT TEACHES IN

12    TERMS OF HAVING THESE ARRAYS OF REFLECTORS THAT ARE SHRUNK DOWN

13    IN SIZE AND NOW ACTUALLY DISPLACING A PORTION OF A WAVE FRONT

14    TO BE ABLE TO BEAM STEER IN CONTRAST TO USING ONE BIG, BULKY

15    MIRROR.

16        FIGURE 5A SHOWS THESE DISPLACEABLE REFLECTORS.  IT'S ONE

17    PARTICULAR EMBODIMENT.  IT SHOWS THEM AS CIRCULAR AND IT SHOWS

18    THEM AS HAVING, I THINK, FOUR SPRINGS LABELED 96 AND 94.  AND

19    IT'S ONE PARTICULAR EMBODIMENT, AND THE ISSUE HERE IS GOING TO

20    BE WHETHER, AGAIN, THE REFERENCE TO "DISPLACEABLE" IN CLAIM 17

21    SHOULD BE LIMITED TO ONLY ONE TYPE OF MOTION.  OKAY?

22        THAT'S THE '328 PATENT.

23        THE '687 PATENT IS DIRECTED TO AN OPTICAL BLOCKING FILTER.

24    THIS IS A DEVICE THAT WILL TAKE ONE OF THE COLORS OF THE LIGHT

25    OR ONE OF THE CHANNELS IN THE SIGNAL AND ACTUALLY GET RID OF IT
```

1    AND DON'T PASS IT ON DOWN THE SYSTEM.  DON'T SEND IT TO A

2    PARTICULAR HOME -- IT MAY BE SOME MOVIE -- OR DON'T SEND THOSE

3    SIGNALS TO A PARTICULAR NEIGHBORHOOD.

4         BUT IT BLOCKS PARTICULAR CHANNELS, AND IT'S SPECIFICALLY

5    DESIGNED TO ALLOW FOR THAT TYPE OF BLOCKING.

6         THE CLAIM AT ISSUE IS ON SLIDE 15.  AGAIN, IT'S "AN

7    OPTICAL BLOCKING FILTER FOR RECEIVING AN OPTICAL SIGNAL," AND

8    THE TERM IN DISPUTE IS IN THE LAST THREE LINES OF THE CLAIM

9    REFERENCING "SCATTERED LIGHT FROM A DROPPED SIGNAL IS DIRECTED

10   ONTO A MICRO-MIRROR DEVICE TO REFLECT AWAY FROM A RETURN PATH."

11        OKAY.  SO THAT'S A FILTER.

12        THE THIRD PATENT IS ANOTHER OPTICAL DEVICE.  IT'S A

13   SO-CALLED RECONFIGURABLE OPTICAL DEVICE THAT ACTUALLY ALLOWS

14   YOU TO CHANGE THE FUNCTION OF THIS PARTICULAR SLM THAT'S

15   ILLUSTRATED IN FIGURE 18 ON SLIDE 19.  IT INVOLVES MULTIPLE

16   FUNCTIONS AS SHOWN HERE AS FUNCTION 1 AND FUNCTION 2.

17        THE CLAIM ITSELF IS "A RECONFIGURABLE MULTIFUNCTIONAL

18   OPTICAL DEVICE" SHOWN ON SLIDE 17 HAVING THESE TWO COMPONENTS,

19   THIS OPTICAL ARRANGEMENT FIRST, AND THEN THE SECOND PART IS

20   HAVING THIS SPECIAL SPACIAL LIGHT MODULATOR, AND THE

21   HIGHLIGHTED LANGUAGE IS THE LANGUAGE THAT NEEDS TO BE CONSTRUED

22   AND INTERPRETED.  IT'S THE LANGUAGE THAT'S DESCRIBING THE

23   SPACIAL LIGHT MODULATOR.

24        NOTICE IT'S NOT DESCRIBING THE RECONFIGURABLE OPTICAL

25   DEVICE.  THIS IS THE REFOCUSSING, OR THE REINTERPRETATION THAT

1    I BELIEVE NISTICA IS USING TO CHANGE THE SCOPE OF THE CLAIM TO

2    PRESUMABLY NARROW IT TO PRESUMABLY TRY TO CREATE A

3    NON-INFRINGEMENT POSITION.

4         AND THEN THE LAST PATENT HAS TWO TERMS.  THIS IS THE '980

5    PATENT.  AND HERE AGAIN IT IS ANOTHER TYPE OF OPTICAL SWITCH,

6    AND IT -- IT IS DIRECTED TO ONE OF THESE SO-CALLED DUAL-SOURCE

7    OPTICAL WAVELENGTH PROCESSORS, AND IT HAS THE ABILITY TO TAKE

8    TWO SOURCES, TWO INPUTS AND, IN FACT, USE A COMMON SET OF

9    OPTICS TO PROCESS THESE TWO SOURCES SEPARATELY USING A COMMON

10   SET OF OPTICS.  INSTEAD OF HAVING TWO DUPLICATIVE SETS OF

11   OPTICS, IT HAS IT MERGED INTO ONE.

12        AND THAT HAS TREMENDOUS BENEFIT IF YOU'RE TRYING TO REDUCE

13   THE SIZE OF THESE BOXES THAT YOU HAVE THESE SWITCHES IN.  IT

14   WOULD BE USEFUL IF YOU COULD PUT TOGETHER SOME OPTICS THAT

15   ALLOW SEPARATELY PROCESSING SIGNALS.  AND THAT'S WHAT WAS

16   FUNDAMENTAL ABOUT THIS DESIGN AS ILLUSTRATED IN -- ON THAT

17   FIGURE.

18        AND THE CLAIM ITSELF IS SHOWN ON SLIDE 19.  IT'S CLAIM 1

19   THAT HAS BOTH TERMS IN DISPUTE.  ONE OF THE TERMS IS "A SPATIAL

20   SEPARATING MEANS FOR SIMULTANEOUSLY SPATIALLY SEPARATING," AND

21   THEN THE SECOND TERM IN DISPUTE IS THIS "WAVELENGTH PROCESSING

22   MEANS."

23        AFTER YOU SEPARATE THOSE SIGNALS, YOU NEED TO PROCESS

24   THEM, AND THERE'S A SPECIFIC RECITATION OF STRUCTURE ON HOW DO

25   YOU DO THAT.  OKAY?

```
 1          SO I BELIEVE THAT'S THE SUMMARY THAT I WANTED TO DO OF THE

 2     PATENTS, AND UNLESS YOU HAVE ANY ADDITIONAL QUESTIONS, I WILL

 3     JUST MOVE INTO THE FIRST TERM IN DISPUTE --

 4               THE COURT:  ALL RIGHT.

 5               MR. RADULESCU:  -- WHICH IS THE --

 6               THE COURT:  SO YOU WILL DISCUSS THE FIRST TERM AND

 7     THEN WE'LL TURN TO MR. KRAMER TO PROVIDE HIS.

 8          I GUESS THE ONLY THING I WOULD ASK IS IF MR. KRAMER HAD AN

 9     INTRODUCTION HE WANTED TO MAKE, OR IF YOU WERE JUST GOING TO

10     PRESENT ON THE CLAIMS THEMSELVES.

11               MR. KRAMER:  I DO HAVE AN INTRODUCTION, YOUR HONOR.

12               THE COURT:  WOULD YOU LIKE TO PROVIDE THAT TO ME NOW?

13               MR. KRAMER:  CERTAINLY.

14               THE COURT:  MR. RADULESCU, NO --

15               MR. RADULESCU:  NO PROBLEM.

16               THE COURT:  -- OBJECTION?  GOOD, THANK YOU.

17               MR. KRAMER:  PARDON ME.  COULD WE TURN ON THE ELMO?

18     DO I DO THAT FROM HERE?

19               THE COURT:  OH, WE HAVE THE ELMO, YES.  IS IT SET UP?

20               THE CLERK:  SORRY, YES.  THERE YOU GO.

21               THE COURT:  GOOD THING IT'S ON MY DESK.  GOOD.

22               MR. KRAMER:  OKAY.  ALL RIGHT.

23               THE COURT:  AND THESE ARE NOT IN THE SPIRAL YOU GAVE

24     ME?

25               MR. KRAMER:  NO, YOUR HONOR.
```

1        THE COURT:  THAT'S FINE.

2        MR. KRAMER:  THIS IS -- THIS IS PAGE 1 OF NISTICA'S

3    CLAIM CONSTRUCTION BRIEF.

4        SO, YOUR HONOR, THERE ARE -- THERE IS A THEME THROUGHOUT

5    THE DISPUTES REGARDING THESE PATENTS, AND WHAT I WANT TO DO IS

6    EXPLAIN THAT WE HAVE TWO TYPES OF PATENT CLAIMS THAT WE'LL BE

7    LOOKING AT TODAY.

8        WE HAVE CLAIMS IN WHICH THE APPLICANT PUT STRUCTURE INTO

9    THE CLAIMS, WHICH IS THE NORMAL WAY OF CLAIMING, AND ONE LOOKS

10   AT EACH OF THOSE STRUCTURES, AND ON SOME OF THEM THERE'S A

11   DISPUTE AS TO WHAT IT WOULD MEAN TO A PERSON OF ORDINARY SKILL

12   IN THE ART.  SOME OF THE PATENTS, LIKE THE ONE WE'RE GOING TO

13   LOOK AT FIRST, THE '328, FIT INTO THAT CATEGORY.

14       THE '980 PATENT, WE'RE GOING TO LOOK AT IT TODAY, AND

15   THAT'S A MEANS-PLUS-FUNCTION, A DIFFERENT TYPE OF CLAIMING.

16   THAT'S UNDER A SECTION OF THE PATENT STATUTE, SECTION 112(6),

17   AND IT GIVES A PATENT APPLICANT THE OPTION OF CONVENIENTLY

18   CLAIMING BY ONLY STATING STRUCTURE -- BY ONLY STATING FUNCTION

19   WITHOUT SPECIFYING WHAT STRUCTURE WILL BE USED TO PERFORM THE

20   FUNCTION.  OKAY?

21       AND THERE'S A COST FOR DOING THAT.  I'M GOING TO COME TO

22   THAT IN A MOMENT, OKAY?  AND IT BEARS ON WHAT WE'RE TALKING

23   ABOUT TODAY.

24       SO FIRST FOCUSSING ON THE NORMAL TYPE OF CLAIMS, NOT

25   MEANS-PLUS-FUNCTION CLAIMS, I WAS HEARING A THEME ABOUT FINISAR

1      STAYING TRUE TO THE LANGUAGE OF THE CLAIMS AND NOT ADDING CLAIM

2      LIMITATIONS.

3           BUT WHAT WE HAVE TO DO, WHAT WE'RE REQUIRED TO DO BY

4      SUPREME COURT, BY FEDERAL CIRCUIT PRECEDENT, IS WE MUST READ

5      THE CLAIMS IN THE CONTEXT OF THE SPECIFICATION, BECAUSE IF WE

6      LOOK AT THE CLAIMS THEMSELVES IN A VACUUM -- THOSE ARE

7      ULTIMATELY WHAT YOUR HONOR NEEDS TO FOCUS ON AND DECIDE WHAT

8      THEY MEAN.

9           BUT IF WE LOOK AT THAT IN A VACUUM, WE CAN VERY READILY

10     HAVE A MISCARRIAGE OF JUSTICE WHERE THE APPLICANT TOLD THE

11     PUBLIC, IN THE SPECIFICATION, WHAT THE INVENTION IS; TOLD THE

12     PATENT OFFICE WHAT THE CLAIM CONSISTS OF, WHAT THE INVENTION

13     IS; AND THEN IN THE LANGUAGE OF THE CLAIM ITSELF, IF THAT'S NOT

14     LITERALLY REFLECTED, THEN THE APPLICANT GETS HIS PATENT OR HER

15     PATENT ISSUED AND COMES TO COURT ONE DAY AND SAYS, "VOILA, I'VE

16     GOT THIS REALLY BROAD CLAIM THAT COVERS MUCH MORE THAN WHAT A

17     PERSON OF ORDINARY SKILL IN THE ART READING THIS SPECIFICATION,

18     THE PROSECUTION HISTORY, WOULD UNDERSTAND IT ACTUALLY COVERS."

19          NOW, I PUT PAGE 1 OF NISTICA'S BRIEF ON THE SCREEN.  THE

20     FEDERAL CIRCUIT HAS TOLD US, AT LINE 18, THAT THE SPECIFICATION

21     IS THE SINGLE BEST GUIDE TO THE MEANING OF THE CLAIMS.  THAT'S

22     IN THE PHILLIPS CASE.  IT'S THE LEADING -- IT'S THE BIBLE ON

23     CLAIM CONSTRUCTION.

24          AND WHAT THE COURT EXPLAINS IN PHILLIPS, AND COURTS REPEAT

25     THIS LANGUAGE THROUGHOUT, IS THAT THE FIRST PARAGRAPH OF

```
 1    SECTION 112 OF THE PATENT STATUTE FRAMES THE CLAIM CONSTRUCTION
 2    ANALYSIS.
 3         SECTION 112 OF THE PATENT STATUTE STATES THAT THE
 4    SPECIFICATION "SHALL CONTAIN A WRITTEN DESCRIPTION OF THE
 5    INVENTION," NOT OPTIONAL.
 6         THAT'S THE TRADEOFF HERE UNDER THE PATENT SYSTEM.  ONE
 7    DISCLOSES THEIR STUFF, THEIR INVENTION TO THE PUBLIC AND THEY
 8    GET THE EXCLUSIVE RIGHT TO BLOCK OTHERS FROM USING IT.  THEY
 9    MUST FULLY DESCRIBE THEIR INVENTION.
10         THERE'S REALLY THREE REQUIREMENTS TO SATISFY THE 112.
11    FIRST, THE PATENT SPECIFICATION MUST PROVIDE AN ENABLING
12    DISCLOSURE.  THAT MEANS A DISCLOSURE OF THE INVENTION THAT'S
13    BEING CLAIMED WITH SUFFICIENT CLARITY THAT A PERSON OF ORDINARY
14    SKILL IN THE ART WILL KNOW HOW TO USE AND MAKE THE INVENTION
15    WITHOUT UNDUE EXPERIMENTATION.
16         IN OTHER WORDS, YOU CAN'T JUST TELL A LITTLE BIT ABOUT THE
17    INVENTION.  YOU HAVE TO TELL SOMEONE HOW TO MAKE AND USE IT.
18         SO THAT'S THE REASON WHY THE COURT IN PHILLIPS AND THE
19    OTHER COURT DECISIONS SAY LOOK CAREFULLY AT THAT SPECIFICATION
20    TO MAKE SURE WE UNDERSTAND WHAT THE INVENTION IS WHEN WE'RE
21    INTERPRETING THE CLAIMS.
22         THE OTHER REQUIREMENT IN SECTION 112 IS WRITTEN
23    DESCRIPTION.  IT'S A SEPARATE REQUIREMENT FROM ENABLEMENT.
24    IT'S CALLED OUT IN SECTION 112, "SHALL CONTAIN A WRITTEN
25    DESCRIPTION OF THE INVENTION," AND THAT REQUIREMENT IS THAT BY
```

1    LOOKING AT THE PATENT ITSELF, A PERSON OF ORDINARY SKILL IN THE

2    ART WOULD KNOW WHAT THE INVENTOR -- WHAT INVENTION THE INVENTOR

3    WAS IN POSSESSION OF TO MAKE SURE WE DON'T GET A PROBLEM, OR A

4    MISCARRIAGE OF JUSTICE WHERE THE CLAIM LOOKS, ON ITS FACE,

5    BROAD, BUT A PERSON OF ORDINARY SKILL IN THE ART LOOKING AT THE

6    SPECIFICATION WOULD KNOW THAT'S NOT WHAT WAS BEING CLAIMED

7    THERE.

8         SO WE HAVE THAT REQUIREMENT AS WELL.

9         AND THE THIRD REQUIREMENT IS DEFINITENESS.  THE CLAIMS

10   THEMSELVES MUST BE SUFFICIENTLY DEFINITE THAT A PERSON OF

11   ORDINARY SKILL IN THE ART WOULD KNOW WHAT'S COVERED BY THEM,

12   WHAT'S NOT, THAT KIND OF THING.  OKAY?

13        THESE ARE IMPORTANT REQUIREMENTS AND THAT'S THE REASON WHY

14   WE'RE LOOKING AT THE SPECIFICATION.

15        AND IN THE PATENT WE'RE ABOUT TO LOOK AT, THE '328, I

16   THINK YOUR HONOR WILL SEE WHEN YOU LOOK AT OUR PRESENTATION AS

17   TO WHY WHAT WE'RE PROPOSING MAKES SENSE.

18        THERE THERE'S A DISCUSSION OF ROTATING MIRRORS BEING

19   DISCUSSED AS THE PRIOR ART AND NOT SATISFYING THE PROBLEM OF

20   FAST SWITCHING AND, INSTEAD, SHOWING WHAT CAN BE DONE AS AN

21   IMPROVEMENT OVER THE ROTATING MIRRORS, THE TILTING MIRRORS THAT

22   DR. FORD DESCRIBED.

23        YOU KNOW, FINISAR IS GOING TO ARGUE THAT EVEN THOUGH THE

24   PATENT SAYS THE ROTATING MIRRORS ARE NOT FAST ENOUGH, HERE'S MY

25   SOLUTION, THAT THE ROTATING MIRROR SHOULD NOW BE IN THE CLAIM.

1      AND THAT I'M USING AS AN EXAMPLE OF READING THE

2   SPECIFICATION TO UNDERSTAND, BECAUSE THEY'RE CORRECT, THE

3   PATENT CLAIM DOESN'T LITERALLY -- IT DOESN'T SAY THE WORDS

4   "PERPENDICULAR MOVEMENT" IN IT.

5      SO THIS EXERCISE IS ABOUT FIGURING OUT WHETHER THAT'S WHAT

6   A PERSON OF ORDINARY SKILL IN THE ART WOULD UNDERSTAND WHEN

7   THEY SEE IN THE SPECIFICATION SOMETHING THAT SAYS THAT ROTATING

8   MIRRORS ARE KNOWN, BUT THEY'RE NOT OPERATING FAST ENOUGH TO

9   ROTATE THE DIRECTION -- TO CHANGE THE DIRECTION OF A BEAM, SO

10  LET'S LOOK AT A SOLUTION TO THAT.

11      TURNING THEN TO THE MEANS-PLUS-FUNCTION CLAIMS, A WHOLE

12  DIFFERENT ANIMAL THAN THE OTHER CLAIMS.  IN THE

13  MEANS-PLUS-FUNCTION, SECTION 112 AGAIN, PARAGRAPH 6, IT

14  PROVIDES THAT ONE CAN CLAIM, BY STATING A MEANS FOR PERFORMING

15  SOME FUNCTION, WITHOUT STATING WHAT STRUCTURE WILL BE USED FOR

16  THAT.

17      NOW, THINK ABOUT IT.  THAT OPENS UP THE POSSIBILITY THAT A

18  PATENT CLAIM COULD COVER EVERYTHING, A MEANS FOR ATTACHING TWO

19  THINGS TOGETHER.  THE CLAIM COULD SAY THAT, A MEANS FOR

20  ATTACHING TWO PIECES OF WOOD TOGETHER.  ALL RIGHT?

21      AND THEN IF WE SAID, OKAY, WELL, THERE'S NO LIMIT ON THAT,

22  THEN ANY WAY OF ATTACHING TWO PIECES OF WOOD TOGETHER, GLUE,

23  NAILS, ANYTHING WE CAN THINK OF WOULD BE COVERED.

24      SO THE REQUIREMENT OF SECTION 112(6) IS THAT THE PATENTEE

25  CAN CLAIM BY SAYING A MEANS FOR, IN THIS EXAMPLE, ATTACHING TWO

1    PIECES OF WOOD TOGETHER.

2         BUT THEN -- AND SO WHAT THE COURT WILL DO IN CLAIM

3    CONSTRUCTION IS DETERMINE WHAT IS THE CLAIMED FUNCTION -- IN MY

4    EXAMPLE, THE CLAIMED FUNCTION IS ATTACHING TWO PIECES OF WOOD

5    TOGETHER -- AND THEN THE COURT LOOKS INTO THE SPECIFICATION AND

6    IT LOOKS FOR AND IT IDENTIFIES THE CORRESPONDING STRUCTURE THAT

7    THE SPECIFICATION CALLS OUT AND SAYS THIS IS THE STRUCTURE THAT

8    PERFORMS THE CLAIMED FUNCTION.

9         I DIDN'T HEAR AT ALL -- I HEARD ABOUT CHERRY PICKING ONE

10   PARTICULAR STRUCTURE, THE BIREFRINGENT WEDGE AND SO FORTH.

11        THERE'S A REASON FOR PICKING THE STRUCTURE.  IT IS

12   REQUIRED AS A MATTER OF MEANS-PLUS-FUNCTION CLAIM CONSTRUCTION.

13   WHAT MUST BE DONE IS WE MUST IDENTIFY THE CORRESPONDING

14   STRUCTURE THAT THE PATENT SPECIFICATION STATES PERFORMS THE

15   CLAIMED FUNCTION.  IT'S CALLED LINKAGE.  I DIDN'T HEAR ANY

16   OTHER WORD -- THERE MUST BE A LINKING OF THE STRUCTURE.

17        SO WHAT WE DO IS WE LOOK FOR THE STRUCTURE IN THE

18   SPECIFICATION THAT THE PATENTEE TOLD THE PATENT OFFICE THE

19   STRUCTURE -- THAT THE PATENTEE TOLD THE PATENT OFFICE, THIS IS

20   THE STRUCTURE THAT PERFORMS THE CLAIMED FUNCTION.

21        AND THE CLAIM, IN A MEANS-PLUS-FUNCTION CLAIM, IS THEN

22   INTERPRETED TO COVER THAT STRUCTURE AND STATUTORY EQUIVALENTS.

23        AND WE TALKED ABOUT THE STATUTORY EQUIVALENTS A LITTLE BIT

24   LAST TIME.  THE COURT DOES NOT HAVE TO DETERMINE AT THIS STAGE

25   WHAT ARE THE STATUTORY EQUIVALENTS.  THAT WILL BE DONE BY THE

1    JURY AS A MATTER OF THE INFRINGEMENT ANALYSIS.

2         YOUR HONOR, AS A MATTER OF CLAIM CONSTRUCTION, IDENTIFIES

3    WHAT IS THE CORRESPONDING STRUCTURE, AND KEY TO THIS, REALLY

4    THE KEY TO MEANS-PLUS-FUNCTION, TO DETERMINING WHAT'S THE

5    CORRESPONDING STRUCTURE, IS THAT THE CORRESPONDING STRUCTURE IS

6    NOT SIMPLY ANY STRUCTURE THAT IS IN THE SPECIFICATION THAT ONE

7    OF ORDINARY SKILL IN THE ART WOULD KNOW COULD PERFORM THAT

8    FUNCTION.

9         WE SAY, HUH-UH.  THAT'S TOO BROAD.  THAT TAKES

10   MEANS-PLUS-FUNCTION CLAIMING TOO FAR.  THAT'S NOT PERMITTED.

11   THAT'S NOT THE LAW FOR MEANS-PLUS-FUNCTION CLAIMING.

12        IT'S, RATHER, WHICH STRUCTURE IN THE SPECIFICATION THE

13   PATENTEE STATED PERFORMS THE CLAIMED FUNCTION.  OKAY?  THAT'S

14   THE LINKAGE THAT'S REQUIRED.

15        AND YOUR HONOR IS GOING TO SEE THAT, AS WE GO THROUGH

16   THESE PRESENTATIONS, IN THE EXAMPLE COUNSEL GAVE ABOUT THE

17   WEDGE, WE'RE GOING TO BE LOOKING FOR WHICH COMPONENT IN THE

18   SPECIFICATION IS CALLED OUT AS PERFORMING THE CLAIMED FUNCTION

19   OF SPATIALLY SEPARATING TWO BEAMS OF LIGHT, AND THAT'S THE

20   STRUCTURE THAT PERFORMS IT AND THAT'S THE REASON WHY NISTICA IS

21   IDENTIFYING THAT STRUCTURE, BECAUSE IT'S REQUIRED.

22        SO THAT'S WHAT'S DONE IN CLAIM CONSTRUCTION ON

23   MEANS-PLUS-FUNCTION CLAIMS.

24        SO, YOUR HONOR, I'M GOING TO ADDRESS SOME OF THESE CLAIM

25   TERMS.  I'LL BE ADDRESSING THE '328.  MR. TONKOVICH WILL BE

 1    ADDRESSING OTHER CLAIM TERMS AS WELL.

 2         AND SO THAT WOULD CONCLUDE OUR INTRODUCTION.

 3         THE COURT:  GOOD.  THANK YOU, MR. KRAMER.  I

 4    APPRECIATE THAT.

 5         ALL RIGHT.  MR. RADULESCU, ARE YOU READY TO PROVIDE YOUR

 6    ARGUMENT ON THE '328 PATENT?

 7         MR. RADULESCU:  YES, WE ARE, YOUR HONOR.

 8         OKAY.  FIRST TERM, "DISPLACEABLE REFLECTORS" IN THE '328

 9    PATENT, AND THE FIRST POINT IS THAT THERE'S NO DISPUTE OVER

10    "REFLECTORS."  BOTH CONSTRUCTIONS, BOTH PROPOSALS HAVE THE WORD

11    "REFLECTORS" IN IT.

12         SECOND POINT IS THERE'S NO DISPUTE THAT "DISPLACEABLE"

13    REFERS TO MOTION.  FINISAR'S CONSTRUCTION CONSTRUES IT AS

14    "MOVEABLE REFLECTORS."  NISTICA'S PROPOSED CONSTRUCTION REFERS

15    TO THIS ARRAY THAT MOVE.  SO IT'S NOT A MOTION ISSUE.

16         THE DISPUTE IS WHETHER OR NOT THIS TERM SHOULD BE GIVEN

17    ITS FULL MEANING THAT'S GOING TO ENCOMPASS ALL OF THE

18    EMBODIMENTS IN THE SPEC, WHICH IS WHAT FINISAR PROPOSES; OR

19    WHETHER IT SHOULD BE LIMITED TO MOTION OF THE REFLECTORS TO

20    ONLY ONE PARTICULAR TYPE DESCRIBED IN A SINGLE EMBODIMENT,

21    RIGHT?  THAT'S THE DISPUTE.  THAT'S HOW IT'S BEEN

22    CHARACTERIZED.  I THINK WE BOTH AGREE WHAT THE DISPUTE IS.

23         WE'LL START, OF COURSE, WITH THE CLAIM LANGUAGE.  WE'RE

24    GOING TO BE MARCHING THROUGH, FOR ALL OF THESE TERMS, CLAIM

25    LANGUAGE SUPPORT FOR THE CONSTRUCTIONS, AND FROM THERE WE'LL GO

1      TO THE SPECIFICATION.

2           ALTHOUGH THE SPECIFICATION IS THE SINGLE BEST GUIDE, IT'S

3      THE CLAIMS THAT ACTUALLY DESCRIBE WHAT THE INVENTION IS, AND SO

4      IT'S THE CLAIMS IS WHERE YOU START AND YOU'VE GOT TO STICK TO

5      THE WORDS AND INTERPRET THE WORDS.

6           AND FROM THERE YOU GO TO THE SPECIFICATION TO SEE IF

7      THERE'S ANY REASON WHY WE SHOULD BE DEVIATING FROM THE PLAIN

8      AND ORDINARY LANGUAGE SET FORTH IN THE CLAIMS.

9           FOR THIS DISPUTE, WE ALSO LOOK AT, YOU KNOW, CLAIM 19, AND

10     WE LOOK AT THAT CLAIM AND IT SAYS "THE OPTICAL SWITCH AS

11     RECITED IN CLAIM 18," WHICH DEPENDS ON 17, "WHEREIN THE

12     DISPLACEABLE REFLECTORS ARE DISPLACED RELATIVE TO THE ADJOINING

13     REFLECTOR."

14          SO HERE'S A CLAIM THAT'S ACTUALLY ALSO TALKING ABOUT

15     DEFLECTION RELATIVE TO AN ADJOINING REFLECTOR BY SOME DISTANCE.

16          AND THE POINT IS WHEN YOU LOOK AT THESE CLAIMS TOGETHER,

17     THERE'S NO LIMITATION ON THE TYPE OF MOVEMENT.

18          AND SIMILARLY, THERE'S NO LIMITATION AS TO THE DIRECTION

19     OF THE MOVEMENT, PERPENDICULAR, FOR EXAMPLE.

20          AND SO WHEN YOU LOOK AT THESE CLAIMS, WE SAY THAT IS

21     SUPPORT FOR INTERPRETING "DISPLACEABLE REFLECTORS" AS "MOVEABLE

22     REFLECTORS" BECAUSE THERE'S NOTHING IN THESE CLAIMS THAT ARE

23     SUGGESTING OTHERWISE.

24          FROM HERE WE GO TO, OF COURSE, THE BASIC LAW FROM THE

25     FEDERAL CIRCUIT THAT SAYS THAT THESE PATENT TERMS SHOULD BE

1    CONSTRUED TO ENCOMPASS THE FULL SCOPE OF WHAT THEY CLAIM,

2    MOVEABLE REFLECTORS.

3         AND THERE IS A BASIC PRINCIPLE HERE AGAIN THAT WE

4    SHOULDN'T BE IMPORTING LIMITATIONS FROM THE SPECIFICATION, AND

5    WE QUOTE FROM THE <u>INNOVA/PURE WATER VERSUS SAFARI WATER</u> CASE,

6    FEDERAL CIRCUIT FROM 2004, WHERE IT GIVES US THE GUIDANCE FOR

7    FULL SCOPE INTERPRETATION OF THE CLAIM TERMS, AND I'M GOING TO

8    READ IT.  IT'S FROM PAGE 1117.

9         "EVEN WHEN THE SPECIFICATION DESCRIBES ONLY A SINGLE

10   EMBODIMENT," RIGHT, THERE'S SOME PATENTS THAT DO, IN THOSE

11   PATENTS "THE CLAIMS OF THE PATENT WILL NOT BE READ

12   RESTRICTIVELY UNLESS THE PATENTEE HAS DEMONSTRATED A CLEAR

13   INTENTION TO LIMIT THE SCOPE USING WORDS OR EXPRESSIONS OF

14   MANIFEST EXCLUSION OR RESTRICTION."

15        AND SO THE SINGLE BEST GUIDE, IF YOU WANT TO USE THAT

16   PHRASE, IN THE SPECIFICATION SHOULD BE DEMONSTRATING A CLEAR

17   INTENTION TO LIMIT THIS TERM "MOVEABLE" OR "DISPLACEABLE

18   REFLECTORS" USING WORDS OR EXPRESSIONS OF MANIFEST EXCLUSION OR

19   RESTRICTION.

20        YOU'LL FIND NOTHING LIKE THAT IN THE SPECIFICATION OR IN

21   THE PROSECUTION HISTORY WITH RESPECT TO THIS DISPUTE.  THERE IS

22   NOTHING.

23        WE'LL WALK THROUGH IT.  I'LL WALK THROUGH THE SPEC.  WE'LL

24   LOOK AT THE PARTS OF THE SPEC THAT BOTH PARTIES HAVE CITED, AND

25   WE'LL TALK ABOUT IT AND WE'LL EVALUATE WHETHER OR NOT THIS IS,

1   OR THESE ARE MANIFEST EXCLUSIONS OR RESTRICTIONS TO WHAT THE

2   TERM "DISPLACEABLE REFLECTOR" OR "DISPLACEABLE REFLECTORS" ARE.

3          OKAY.  THE CLAIMS DON'T HAVE IT.  THE SPEC DOESN'T HAVE

4   IT.  THE PROSECUTION HISTORY DOESN'T USE WORDS OR EXPRESSIONS

5   OF MANIFEST EXCLUSION AND, THEREFORE, "DISPLACEABLE" SHOULD BE

6   INTERPRETED TO SIMPLY MEAN "MOVEABLE."

7              THE COURT:  MAY I JUST INTERRUPT?  IN CLAIM 19 WHERE

8    IT INDICATES THAT THE DISPLACEMENT IS RELATIVE TO THE ADJOINING

9    REFLECTOR, IT MEANS THAT THIS SERIES OF REFLECTORS ARE ALL ON A

10   PARALLEL PLANE WITH EACH OTHER OR A SIMILAR PLANE SO THAT THEIR

11   MOVEMENT -- I GUESS IT WOULD BE PARALLEL PLANES.

12             MR. RADULESCU:  THIS IS SPECIFYING THE -- REMEMBER

13   THE INVENTION WAS TAKING THIS BIG MIRROR IN THE OLD DAYS, AND

14   NOW WE'RE GOING TO MAKE THESE SMALL, PIXELATED DISPLACEABLE

15   REFLECTORS, WE'RE GOING TO MAKE THEM REALLY SMALL AND NOW WE'RE

16   GOING TO HAVE TO HAVE SOME CONDITION UNDER WHICH IT'S GOING TO

17   DO THE OPTICAL SWITCHING.

18             THE COURT:  DOES IT HAVE TO DO WITH PHASING?

19             MR. RADULESCU:  IT HAS TO DO WITH PHASING.

20             THE COURT:  SO IF ONE REFLECT OF THESE PIXELS IS

21   TILTED, THEY'RE ALL TILTED?

22             MR. RADULESCU:  IF ONE IS TILTED -- THERE ARE DESIGNS

23   WHERE THEY MAY NOT BE TILTED.  THERE'S DESIGNS WHERE THEY ARE

24   TILTED.

25             THE COURT:  BUT IN ONE DESIGN FOR ONE APPLICATION,

```
1     THEY'RE EITHER TILTED OR THEY'RE NOT?  THEY CAN'T HAVE SOME OF

2     THESE PIXELS TILTED WHILE OTHERS ARE NOT?

3               MR. RADULESCU:  THEY'RE GENERALLY INDIVIDUALLY

4     MOVEABLE AND, IN FACT --

5               THE COURT:  I'M JUST NOT ARTICULATING AND I

6     APOLOGIZE.

7               MR. RADULESCU:  YES.

8               THE COURT:  I UNDERSTAND THEY'RE INDIVIDUALLY

9     MOVEABLE.  BUT IF YOU CHOOSE TO TILT ONE OF THESE PIXELS AT AN

10    ANGLE, THEY'RE ALL GOING TO -- EVERY ONE OF THE PIXELS WILL BE

11    TILTED AT THE SAME ANGLE DISPLACED RELATIVE TO EACH OTHER?

12              MR. RADULESCU:  NO.

13              THE COURT:  NO?

14              MR. RADULESCU:  EACH OF THESE PIXELS ARE

15    INDEPENDENTLY ADJUSTABLE, INDEPENDENTLY MOVEABLE.

16              THE COURT:  I KNOW THEY'RE CAPABLE OF THE INDEPENDENT

17    ADJUSTABILITY.  BUT WOULD THEY, IN THE APPLICATION, BE ADJUSTED

18    DIFFERENTLY?  IS THE DISPLACEMENT AN -- SO THE TILTING PROVIDES

19    A DIFFERENT ANGLE OF THE PIXEL; CORRECT?

20              MR. RADULESCU:  YES.

21              THE COURT:  AND COULD ONE BE TILTED LIKE THIS AND

22    ANOTHER TILTED LIKE THIS (INDICATING)?

23              MR. RADULESCU:  YES.

24              THE COURT:  IN THE SAME APPLICATION?

25              MR. RADULESCU:  THEY -- IT'S -- THEY'RE REQUIRED --
```

1    IF THEY'RE ALL ALIGNED PERFECTLY, IF THEY'RE ALL ALIGNED THE

2    SAME, IT'S JUST LIKE A BIG MIRROR.

3           THE COURT:  WELL, I'M TRYING TO GET AT THE

4    PERPENDICULAR MOVEMENT, WHICH WOULD BE THE MOVEMENT IF

5    THEY'RE -- IF THEY CAN ALL BE AT THE SAME ANGLE, BUT AT

6    DIFFERENT LOCATIONS, THIS IS THE PISTON-TYPE MOTION THAT THE --

7    THAT NISTICA TALKED ABOUT.

8        I'M JUST TRYING TO UNDERSTAND.  YOU'RE TALKING ABOUT THEM

9    BEING DISPLACED RELATIVE TO EACH OTHER.

10           MR. RADULESCU:  IN THIS -- IN THIS CLAIM --

11           THE COURT:  UH-HUH.

12           MR. RADULESCU:  -- THIS CLAIM 19, AND THIS IS WHAT'S

13    TAUGHT IN THE SPEC, OF COURSE THE -- ONE PIXEL HAS TO BE AT A

14    DIFFERENT POSITION THAN THE ADJOINING PIXEL IN ORDER TO AFFECT

15    THE PHASE --

16           THE COURT:  CORRECT, YES.

17           MR. RADULESCU:  -- AS REQUIRED.  SO EACH OF THESE

18    PIXELS HAVE TO BE SPECIFICALLY ADJUSTED RELATIVE TO ITS

19    NEIGHBOR.

20        THAT'S WHAT THIS CLAIM SAYS.  THAT'S THIS TYPE OF MOTION.

21    IT SAYS "DISPLACED RELATIVE TO THE ADJOINING REFLECTOR," SO NOW

22    IT'S TALKING ABOUT DISPLACEMENT BETWEEN TWO REFLECTORS IN THIS

23    CLAIM.

24           THE COURT:  YES.

25           MR. RADULESCU:  THE NISTICA PROPOSAL IS LIMITING THE

1    MOTION TO MOTION IN THE DIRECTION OF THE SURFACE OF THE

2    REFLECTOR, SO IT'S LIKE A SECOND TYPE OF -- IT'S A SECOND TYPE

3    OF RESTRICTION.  IT'S A RESTRICTION ON MOTION IN THE DIRECTION

4    OF THE SURFACE OF THAT REFLECTOR, AND THEY COULD PROPOSE IT AS

5    FOR ONE PARTICULAR EMBODIMENT, BUT I'M ALSO NOTING THAT IN

6    CLAIM 19, THERE'S OTHER REQUIREMENTS ON THE MOTION.  THERE'S

7    OTHER REQUIREMENTS OF ONE PIXEL BEING DISPLACED RELATIVE TO THE

8    ADJACENT PIXEL.

9         AND THIS -- THESE CLAIMS DON'T SAY THAT THIS IS ONLY GOING

10   TO WORK IF YOU HAVE, YOU KNOW, A PISTON-LIKE MOTION.

11            THE COURT:  WELL, BUT IN THE CLAIM IT DOES TALK ABOUT

12   ADVANCING THE PIXEL MIRRORS, AND I'M NOT SURE WHAT "ADVANCING"

13   MEANS, WHETHER THAT IS THAT PERPENDICULAR MOTION.

14            MR. RADULESCU:  SO THE IDEA IS TO HAVE A VERY SMALL

15   MIRROR AND MAKE IT SMALL ENOUGH TO INDIVIDUALLY AFFECT THE

16   PHASE.

17            THE COURT:  I UNDERSTAND THAT.  I'M JUST TRYING TO

18   UNDERSTAND WHAT'S DESCRIBED AND WHAT THE RELATIVE DISPLACEMENT

19   IS, WHETHER IT IS ADVANCING FROM THE BASE OF THE DEVICE, WHICH

20   WOULD SUPPORT NISTICA'S POSITION, OR IF IT IS SOMETHING ELSE.

21            MR. RADULESCU:  I BELIEVE THE REFERENCE TO THE MEMS

22   DEVICES IN HERE, THERE ARE REFERENCE TO MEMS DEVICES --

23            THE COURT:  UM-HUM.

24            MR. RADULESCU:  -- AND I BELIEVE THE INTERPRETATION

25   OF THESE REFERENCES TO MEMS DEVICES ALSO INTERPRET THEM TO BE

```
 1          DESCRIBING TILTING DEVICES --

 2                  THE COURT:  OKAY.

 3                  MR. RADULESCU:  -- WHERE THERE'S TILTING -- THERE'S

 4     MEMS DEVICES THAT TILT, THERE'S MEMS DEVICES THAT PRESUMABLY GO

 5     UP AND DOWN, THERE'S MEMS DEVICES WHERE IT'S GOING TO BE TILTED

 6     AND IT WILL STILL GO UP AND DOWN.  THERE'S ALL DIFFERENT TYPES

 7     OF MEMS DEVICES.

 8          AND AT THE TIME, THERE WAS NO SPECIFIC LIMITATION ON WHY

 9     ONE PARTICULAR TYPE OF MOTION.  WHY ISN'T THE IDEA YOU MAKE

10     THIS THING SMALL ENOUGH, YOU ADJUST ONE RELATIVE TO ITS

11     NEIGHBOR, AND NOW INFLUENCE THE PHASE FRONT TO REDIRECT THE

12     BEAM.

13          THE KEY CONCEPT HAS BEEN TO SHRINK DOWN THIS REFLECTIVE

14     SURFACE TO MAKE A DISPLACEABLE REFLECTOR, MAKE IT SMALL ENOUGH,

15     MAKE AN ARRAY OF THEM, AND MAGIC HAPPENS, AND THE MAGIC IS THIS

16     ACTUAL REDIRECTION OF THE LIGHT BEAM USING VERY SMALL AMOUNTS

17     OF MOTION.

18          AND THE MAGIC ISN'T LIMITED TO ONLY HAVING ONE PISTON-TYPE

19     OF MOTION.  THERE'S NO REASON WHY YOU CAN'T HAVE MAGIC WITH A

20     TILTED MIRROR OR A MIRROR THAT TILTS.

21          AS LONG AS YOU MAKE IT SMALL ENOUGH, IT WILL BE FAST

22     ENOUGH, AND AS LONG AS YOU MAKE ENOUGH OF THESE THINGS, YOU CAN

23     AFFECT THE PHASE FRONT OF THE LIGHT AS A WHOLE AND GET THE

24     MAGIC TO OCCUR.

25          AND THE POINT IS THAT WHEN YOU LOOK AT THE SPECIFICATION,
```

```
1     THERE IS NO STATEMENT IN HERE THAT SAYS THIS THING ONLY WORKS

2     IF THESE, IF THESE REFLECTORS DISPLACE PERPENDICULAR TO THE

3     SURFACE.

4          IF THERE WAS, IT WOULD BE A DIFFERENT ISSUE.  IF THERE

5     WAS, WE'D BE LOOKING AT THAT SENTENCE AND ASKING WHY ISN'T THAT

6     AN EXPLICIT STATEMENT THAT SAYS CLEAR INTENTION, MANIFEST

7     INTENTION TO LIMIT THE INVENTION TO ONLY ONE PARTICULAR TYPE OF

8     MOTION, AND THAT SENTENCE DOESN'T EXIST.

9          I'M GOING TO MARCH THROUGH THE SPEC, EVERY PLACE THAT

10    THEY'VE CITED AND THAT WE'VE CITED, AND WE'LL GO THROUGH AND BE

11    COMFORTABLE THAT THERE IS NO MANIFEST INTENTION TO LIMIT THE

12    MOTION TO ONLY A PARTICULAR TYPE OF MOTION.

13              THE COURT:  ALL RIGHT.  THANK YOU.

14              MR. RADULESCU:  OKAY.  SO WE START WITH THE

15    SPECIFICATION AND WE NOTE THAT IT DISCLOSES DIFFERENT TYPES OF

16    MOTIONS OF REFLECTORS.  THERE IS THE SENTENCE THAT REFERS TO

17    ROTATING MIRRORS, AND CLEARLY THERE IS NO DISCLAIMER IN THAT

18    SENTENCE THAT THIS ROTATING MIRROR IS NOT, IS NOT WHAT THIS

19    PATENT COVERS.  THERE'S NO CLEAR INTENTION TO DISCLAIM THE

20    ROTATION OF MIRRORS.

21          SIMILARLY, THERE ARE PARAGRAPHS HERE THAT CHARACTERIZE THE

22    SPIRIT OF THE INVENTION, AND WHAT'S QUOTED HERE IN THE MIDDLE

23    OF SLIDE 29 IS A REFERENCE TO, AFTER DESCRIBING THE

24    EMBODIMENTS, SAYING THAT THERE'S -- "ANY DECREASE OF MOTION OR

25    WAVE FRONT PHASE MODULATION ALLOWED BY DIVIDING UP THE
```

1    DEFLECTOR INTO SEPARATE PIXELS," RIGHT, TAKE THAT DEFLECTOR,

2    DIVIDE IT UP INTO SMALL PIXELS, AND IT SAYS "ANY DECREASE OF

3    MOTION ALLOWED BY DIVIDING UP" -- IN OTHER WORDS, WE'RE NOW --

4    WE DON'T HAVE THE BIG MIRROR WE HAVE TO ROTATE, WE'RE GOING TO

5    TAKE SMALL ONES TO ALLOW FOR "DIVIDING UP THE DEFLECTOR INTO

6    SEPARATE PIXELS IS WITHIN THE SPIRIT OF THIS INVENTION."

7        THIS IS THE OPPOSITE OF THE MANIFEST INTENTION TO LIMIT.

8    THIS IS THE MANIFEST INTENTION TO EXPLAIN THAT THE IDEA HERE IS

9    TO ALLOW FOR ANY DECREASE OF MOTION, AND IT'S NOT LIMITED TO

10   ONE PARTICULAR TYPE.

11       AND IT'S BECAUSE, OF COURSE, YOU INCREASE THE SWITCHING

12   SPEED WHEN YOU'RE MOVING A VERY SMALL PIXEL, AND WHY SHOULD IT

13   MATTER WHICH PARTICULAR DIRECTION THE MOTION IS, SO LONG AS

14   YOU'RE ABLE TO INCREASE THE SWITCHING SPEED AND IT'S ABLE TO

15   AFFECT THAT PHASE FRONT TO REDIRECT THE BEAM.  SO IT'S THE

16   OPPOSITE OF THE MANIFEST INTENTION TO DISCLAIM.

17       THEN WE GO TO THE ONLY EXPERT TESTIMONY FOR PURPOSES OF

18   THIS DISPUTE, BECAUSE THE DR. FORD DECLARATION IS NO LONGER

19   BEING RELIED UPON.  AFTER DR. FORD WENT THROUGH PROBABLY AT

20   LEAST 30 MINUTES OF CROSS-EXAMINATION ON HIS POSITIONS, THE

21   DECLARATION IS OUT.

22       WE'RE NOT LOOKING AT IT FOR THE INTERPRETATION OF THE

23   VARIOUS EMBODIMENTS IN THIS PATENT.  WE'RE NOT LOOKING AT THAT

24   DECLARATION FOR WHAT THIS PATENT DISCLOSES AND DOESN'T

25   DISCLOSE.  IT'S OUT.  IT'S BEEN EXPLICITLY PULLED FROM THE

1    EVIDENCE THAT WE'RE TO CONSIDER.

2         AND NOW WE'VE GOT DR. HALL EXPLAINING, EXPLAINING HER

3    OPINION ABOUT HOW TO CONSTRUE THE TERM "DISPLACEABLE

4    REFLECTORS" AND TO SIMPLY HAVE IT MEAN, AS FINISAR IS

5    PROPOSING, "MOVEABLE REFLECTORS."

6         AND SHE WENT THROUGH, AND SHE WAS ALSO DEPOSED, AND SHE

7    SURVIVED.

8         AND SO WE HAVE THE QUESTIONS AND WE HAVE THE ANSWERS HERE.

9         AND SO NOW WE'VE GOT TWO POSITIONS, A FINISAR POSITION

10   THAT'S SUPPORTED BY AN EXPERT WHO HAS GONE THROUGH AND

11   EXPLAINED WHY FINISAR'S POSITION IS CORRECT, VERSUS THE NISTICA

12   POSITION THAT'S NOT SUPPORTED BY ANY EXPERT.  IT'S ALL LAWYER

13   ARGUMENT, AND PARTICULARLY THE TUTORIAL SLIDES THAT YOU'RE

14   GOING TO SEE IN THEIR PRESENTATION IS ALL LAWYER ARGUMENT AT

15   THIS TIME.

16        THOSE SLIDES, TO THE EXTENT THAT THEY WERE PROVIDED BY

17   DR. FORD DURING THE TUTORIAL, WERE NOT PART OF ANY REPORT, WERE

18   NOT PART OF ANY DECLARATION.  IF THEY WERE INCLUDED IN A

19   DECLARATION, I COULD HAVE QUESTIONED HIM ON THOSE.  RIGHT?  AND

20   I WOULD HAVE HAD THE ABILITY TO ACTUALLY GET THEM RID FROM THE

21   RECORD IF I HAD THE OPPORTUNITY TO QUESTION HIM.

22        SO AT THIS POINT WE'RE TALKING ABOUT FINISAR'S POSITION.

23   WE'RE GOING THROUGH THE SPEC AND EXPLAINING WHY WE'RE RIGHT,

24   AND WE HAVE DR. HALL CONFIRMING IT, VERSUS THE LAWYER ARGUMENT

25   BY NISTICA.

1          AND ANOTHER SIMPLE SLIDE THAT GETS THIS POINT ACROSS ABOUT

2     THE PATENT TEACHING TWO EMBODIMENTS WITH DIFFERENT TYPES OF

3     MOTION IS SLIDE 31 WITH TWO QUOTES, ONE FROM COLUMN 1 REFERRING

4     TO MOTION PERPENDICULAR TO THE BEAM AXIS, AND THIS IS A VERY

5     IMPORTANT QUOTE BECAUSE IT REFERS TO "A DIRECTION ESSENTIALLY

6     PERPENDICULAR TO THE BEAM AXIS AND RELATIVE TO EACH OTHER."

7     IT'S COLUMN 1, LINES 60 TO 64.

8          AND IT'S IMPORTANT BECAUSE IT'S ANOTHER TYPE OF MOTION

9     THAT THE NISTICA PROPOSAL DOES NOT COVER, THAT THE NISTICA

10    PROPOSAL HAS TO IGNORE.  THEY HAVE TO IGNORE THIS EMBODIMENT.

11    THEY HAVE TO HAVE SOME OTHER EXPLANATION, AND WE'LL HEAR FROM

12    MR. KRAMER AS TO WHAT IT IS.

13         BUT THAT'S PERPENDICULAR MOTION TO THE BEAM AXIS.

14         AND THEN THE SENTENCE THAT NISTICA HAS BEEN HANGING ITS

15    HAT ON IS THE ONE AT COLUMN 2, LINES 57 TO 58 WHERE IT REFERS

16    TO "A DIRECTION THAT IS GENERALLY PERPENDICULAR TO THE

17    REFLECTIVE SURFACE OF THE ELEMENT."

18         THE COURT:  AND SO TILTING IS ESSENTIAL TO

19    MAINTAINING THE PERPENDICULAR APPROACH TO THE BEAM AXIS?  IS

20    THAT WHAT YOU'RE SAYING?

21         MR. RADULESCU:  THE POINT IS THAT THIS IS DESCRIBING

22    A DIRECTION THAT'S DICTATED BY WHERE THE LIGHT IS.

23         THE COURT:  YES.

24         MR. RADULESCU:  WHAT TYPE OF MOTION RELATIVE TO WHERE

25    THE LIGHT IS COMING IN, IN CONTRAST -- WHICH COULD COME IN AT

1    ANGLES.

2          THE COURT:  THAT'S MY -- I APOLOGIZE FOR NOT BEING

3    ABLE TO ARTICULATE IT.

4        BUT IF -- I'M GATHERING THAT WHAT YOU'RE SAYING IS THAT IF

5    NISTICA'S POSITION WERE CORRECT, THEN THE PIXELS COULD NOT

6    ADJUST TO REMAIN PERPENDICULAR TO THE BEAM WHICH IS GOING TO

7    COME FROM MANY DIRECTIONS.

8          MR. RADULESCU:  I THINK SO.

9          THE COURT:  OKAY.

10          MR. RADULESCU:  SO THESE ARE THE TWO TYPES OF MOTIONS

11    THAT ARE DESCRIBED IN THE SPEC.

12        WE CAN GO ON TO THE DISCUSSION OF THE MEMS DEVICES.

13        THERE ARE MULTIPLE REFERENCES TO MEMS DEVICES IN THE

14    SPECIFICATION, AND YOU'LL NOTE THAT WHEN IT'S DESCRIBING THIS,

15    THIS SWITCH, IT'S TALKING ABOUT USING CERTAIN TYPES OF MEMS

16    DEVICES OUT THERE, THAT THERE ARE CERTAIN TYPES OF MEMS

17    DEVICES, AND WHAT THE IDEA HERE IS IS TO MAKE THOSE PIXELS

18    SMALL ENOUGH TO ACTUALLY DO THIS OPTICAL REDIRECTION, IN

19    CONTRAST TO THOSE TYPES OF DEVICES THAT WERE USED, FOR EXAMPLE,

20    IN TV'S FOR PROJECTION DISPLAYS AT TIMES.

21        THIS IS NOW THE IDEA THAT WE'RE GOING TO USE THIS

22    PIXELATED STRUCTURE TO REDIRECT A SINGLE COLOR OR CHANNEL OF

23    LIGHT.  IT'S REFERRING TO THOSE DEVICES AS IF THEY WERE

24    AVAILABLE.  THEY WERE AVAILABLE.  IT'S DESCRIBING THEM AS BEING

25    IN THE PRIOR ART, AND IT'S PRETTY CLEAR THAT ONE OF ORDINARY

1    SKILL IN THE ART WOULD KNOW THAT THOSE MEMS DEVICES AT THAT

2    TIME, WHICH WAS BACK IN 2000 OR SO, THAT THOSE INCLUDED BOTH

3    TILTING MIRRORS AND ROTATING MIRRORS.

4         AND WE QUOTE FROM DR. HALL'S DEPOSITION TRANSCRIPT ON

5    SLIDE 32.  THIS IS AN ANSWER THAT WAS PROVIDED IN RESPONSE TO

6    NISTICA'S ATTEMPT TO TRY TO POKE HOLES IN THE OPINION AND THEY

7    WERE UNSUCCESSFUL.

8         SO THAT'S WHAT DR. HALL SAID.

9         AND AS AN ASIDE, ON SLIDE 33 WE ACTUALLY -- IF YOU GO TO

10   DR. FORD'S DECLARATION THAT WAS SUBMITTED, OR HIS C.V. THAT WAS

11   SUBMITTED IN CONNECTION WITH HIS DECLARATION, HE REFERENCES ONE

12   OF HIS OWN PAPERS FROM MAY OF 1999 THAT'S ENTITLED "WAVELENGTH

13   ADD/DROP SWITCHING USING TILTING MICROMIRRORS."

14        AND THE POINT OF THIS SLIDE -- WE TRACKED DOWN THAT PAPER.

15   HERE'S A FIGURE FROM IT.  THE POINT OF THE SLIDE IS THAT EVEN

16   BACK IN 1999, NISTICA'S OWN EXPERT DESCRIBES THE USE OF TILTING

17   MIRRORS FOR OPTICAL COMMUNICATION APPLICATIONS.

18        SO IT'S NO SURPRISE THAT WHEN YOU SEE REFERENCES TO MEMS

19   DEVICES IN THE SPECIFICATION OF THE '328 PATENT THAT PEOPLE ARE

20   ALSO THINKING OF TILTING MIRRORS TO IMPLEMENT THE CONCEPTS.

21        THAT WAS AN ASIDE.

22        LET'S COME BACK NOW TO NISTICA'S CONSTRUCTION, AND WE HAVE

23   ON THE LEFT HERE NISTICA'S PROPOSED CONSTRUCTION AND THERE'S

24   THREE POINTS TO NOTE ABOUT WHAT THEY'RE SAYING.

25        THE FIRST POINT IS -- AND THEY PRIMARILY RELY ON, AND IT'S

1    SHOWN HERE AT THE BOTTOM OF SLIDE 34, THIS SENTENCE FROM THE

2    SPECIFICATION AT COLUMN 2, LINES 57 TO 58, WHERE IT SAYS "EACH

3    PIXEL REFLECTOR IS MOVED IN A DIRECTION THAT IS GENERALLY

4    PERPENDICULAR THE REFLECTIVE SURFACE OF THE EQUIPMENT."  I

5    GUESS IT SHOULD SAY "TO THE REFLECTIVE SURFACE OF THE ELEMENT."

6         THAT'S WHAT THEY PRIMARILY RELY ON FOR THEIR CONSTRUCTION.

7         THE FIRST POINT IS THEIR CONSTRUCTION USES THE WORD

8    "SUBSTANTIALLY," NOT "GENERALLY," SO THEY'VE ADDED THIS, THIS

9    ADDITIONAL TERM THAT'S NOT EVEN SET FORTH IN THE PASSAGE THAT

10   THEY'RE RELYING ON.

11        THEY'VE ALSO ADDED THIS REFERENCE TO PLANE, LIKE WHAT'S A

12   PLANE?  PLANE OF THE REFLECTIVE SURFACE, I GUESS.  BUT THEY'RE

13   ADDING THAT REFERENCE.  IT'S NOT PRESENT IN THE, IN THE

14   SENTENCE THAT THEY'RE RELYING ON.

15        AND THEN THEY'VE GOT THIS NEW REFERENCE TO THIS REFLECTIVE

16   ELEMENT, AND THE QUESTION IS, LIKE, WHAT IS THIS REFLECTIVE

17   ELEMENT?  THE CLAIM, OF COURSE, REFERS TO DISPLACEABLE

18   REFLECTORS.

19        SO WHEN YOU LOOK AT THE CLAIM BY ITSELF AND THE PROPOSAL

20   BY ITSELF, THERE'S PROBLEMS ON ITS FACE.  IT'S FACIALLY, WE

21   WOULD SAY, NONSENSICAL.  THAT'S THE FIRST INDICATION THAT

22   THERE'S A PROBLEM WITH THIS PROPOSED CONSTRUCTION.

23        OF COURSE, NISTICA GOES ON AND THEY ARGUE FOR THEIR

24   POSITION AND THEY ACTUALLY -- IN THE BRIEFING, THERE ARE SIX

25   DIFFERENT ARGUMENTS THAT THEY ARE PROPOSING, AND THIS IS A

1    SUMMARY OF THEM.  I'M GOING TO GO THROUGH EACH OF THEM, I'M NOT

2    GOING TO TAKE LONG, AND I'LL CONCLUDE AT THAT POINT.

3         THEIR FIRST ARGUMENT IS THAT, OH, THE SPEC DISCLOSES ONLY

4    ONE TYPE OF DISPLACEMENT OF REFLECTORS.  THAT'S -- THAT'S WHAT

5    THEY SAY.

6         I BELIEVE NOW THAT'S LAWYER ARGUMENT.  I DON'T THINK THEY

7    HAVE AN EXPERT TO SAY THAT.  THEY'RE ARGUING THAT THIS SPEC

8    DISCLOSES ONLY ONE TYPE OF DISPLACEMENT OF REFLECTORS WITH NO

9    SUPPORT BY AN EXPERT.

10        FINISAR, ON THE OTHER HAND, HAS AN EXPERT.  THERE'S A

11   DECLARATION.  SHE'S BEEN CROSS-EXAMINED.  HER POSITIONS SUPPORT

12   WHAT FINISAR IS SAYING.

13        SO WE CAN STAND HERE NOW AND SAY THAT NISTICA IS

14   INCORRECTLY ARGUING THAT THIS SPEC DISCLOSES ONLY ONE TYPE OF

15   DISPLACEMENT OF REFLECTORS.  THAT'S THE FIRST PROBLEM.

16        THE SECOND PROBLEM IS THEY ASSERT THAT THE PATENT

17   DISCLOSES ONLY ONE EMBODIMENT AND, THEREFORE, THE CLAIMS SHOULD

18   BE LIMITED TO THAT EMBODIMENT.

19        THAT'S SORT OF A -- THERE'S BOTH A FACTUAL QUESTION AND A

20   LEGAL QUESTION IN THERE BECAUSE THE SPEC DOESN'T DISCLOSE ONLY

21   ONE EMBODIMENT.  THE SPEC DISCLOSES MULTIPLE EMBODIMENTS,

22   REFERS TO MULTIPLE TYPES OF MOTION, AND SO THAT IS A

23   MISCHARACTERIZATION.

24        AND THEN WITH RESPECT TO THIS ISSUE THAT THE CLAIMS SHOULD

25   BE LIMITED TO THAT EMBODIMENT, THAT'S THE ISSUE OF THE WANG

```
 1         CASE THAT THEY RELY ON.

 2              THIRD PROBLEM IS THEY ACCUSE US OF MISREADING THE SPEC.

 3              AND, AGAIN, WE HAVE AN EXPERT SUPPORTING WHAT WE'RE

 4         SAYING, SO WE WOULD PROPOSE THAT WE SHOULD TAKE THE LEAD OF THE

 5         EXPERT BEFORE WE START TALKING ABOUT WHO'S MISREADING THE

 6         SPECIFICATION.

 7              AND THEN THERE'S A REFERENCE HERE TO -- THEY'RE ADVOCATING

 8         IGNORING EMBODIMENTS IN THE SPEC.  I SAID THAT THERE WERE -- I

 9         HAD ONE SLIDE THAT DISCUSSED THE TWO TYPES OF MOTION AND WE

10         WOULD SAY TWO DIFFERENT EMBODIMENTS AND THEY'RE IGNORING THE

11         EMBODIMENT THAT REFERS TO THE MOTION RELATIVE TO THE BEAM AXIS.

12              AND THEY'RE INSISTING THAT THE SPECIFICATION DOESN'T

13         DISCLOSE ROTATING MIRRORS INCORRECTLY, AND THEY'RE ALSO --

14              THE COURT:  WELL, WHEN YOU SAY IT DISCLOSES ROTATING

15         MIRRORS, IT ONLY DISCUSSES THE EXISTENCE OF ROTATING MIRRORS IN

16         A DISCUSSION OF THE PRIOR ART, DOESN'T IT?

17              MR. RADULESCU:  BUT THERE ARE ALSO SMALL REFLECTORS

18         THAT ARE PIXELS THAT ARE DISCUSSED THROUGHOUT THE SPEC AND

19         AS -- AND IN CONNECTION WITH THOSE SMALL PIXELS, THOSE ARE

20         MIRRORS.  THOSE ARE SMALL MIRRORS.

21              THERE'S A REFERENCE TO THE MEMS DEVICES AS WELL.

22              THE INTERPRETATION OF THE SPECIFICATION IS THAT WHENEVER

23         THOSE SMALL MIRRORS, THOSE PIXELS ARE DISCUSSED AS MOVING, THE

24         INTERPRETATION IS THAT THEY WILL BE MOVING AS IN THE PRIOR ART

25         MEMS DEVICES, EITHER ROTATING OR TILTING.
```

```
1              THE COURT:  OKAY.

2              MR. RADULESCU:  AND THEN -- AND SO THIS REFERENCE TO

3    ROTATING MIRRORS, IT'S NOT THE BULK MIRROR.  OF COURSE THERE'S

4    A ROTATING BULK MIRROR.  BUT EVERYTHING ELSE IS SHRINKING DOWN

5    TO SMALL PIXELS.

6              THE COURT:  SURE.

7              MR. RADULESCU:  AND THEN THEY'RE ALSO DENYING THAT

8    THESE ROTATIONAL MEMS WERE KNOWN TO THOSE OF SKILL IN THE ART.

9         THE ROTATIONAL MEMS WERE ACTUALLY THE MORE POPULAR ONE.

10             THE COURT:  AND THE FORD --

11             MR. RADULESCU:  THE FORD PAPER --

12             THE COURT:  -- PAPER WOULD DISPROVE THAT AS WELL?

13             MR. RADULESCU:  YEAH.  AND I GUESS THE COMMENT FROM

14   ONE OF MY COLLEAGUES IS THAT THE DISCLOSURE OF THE MOTION

15   RELATIVE TO THE BEAM AXIS ACTUALLY IS SUGGESTING TILTING IN

16   ORDER TO GET THERE.

17             THE COURT:  WELL, FRANKLY, THAT SEEMS TO BE KEY HERE

18   AND WAS A CONCERN I HAD IN READING THIS IS THAT IT APPEARED TO

19   ME THAT THE BEAMS COULD COME FROM ANY LOCATION, MEANING THAT

20   THE PIXEL WOULD HAVE TO BE TILTED TO ADDRESS THAT BEAM.

21             MR. RADULESCU:  TO DO THAT.  THAT'S THE SUGGESTION.

22   IT'S VERY COMPLICATED AND, IN FACT, WE DEBATED ABOUT WHETHER WE

23   SHOULD BE PUTTING UP A COUPLE SLIDES TO GO INTO IT AND WE

24   DECIDED IT WAS JUST WAY TOO COMPLICATED.

25             THE COURT:  I DREW A PICTURE OF IT TRYING TO PUZZLE
```

1      IT OUT MYSELF AND TRYING TO UNDERSTAND WHAT WAS GOING ON.

2          (LAUGHTER.)

3              MR. RADULESCU:  OKAY.  SO THOSE ARE THE ARGUMENTS AND

4      I'M JUST GOING TO MARCH THROUGH THEM QUICKLY.

5          THE FIRST ARGUMENT IS THERE'S MORE THAN ONE TYPE OF

6      DISPLACEMENT OF REFLECTORS, NOT JUST ONE TYPE AS NISTICA IS

7      PROPOSING.  THIS IS THE REFERENCE TO MOTION PERPENDICULAR TO

8      THE BEAM AXIS, AND THEN ALSO MOTION PERPENDICULAR TO THE

9      REFLECTIVE AXIS.  IT'S EXPLICIT.  IT'S IN COLUMN 1 AND COLUMN 2

10     OF THE SPECIFICATION.

11         SECOND POINT IS THAT, AGAIN, NISTICA IS ARGUING THAT THE

12     CLAIMS SHOULD BE LIMITED TO THAT ONE DISCLOSED EMBODIMENT, AND

13     HERE AGAIN, IT'S THE INNOVA/PURE WATER CASE THAT SAYS, NO, IT'S

14     NOT -- THESE CLAIMS SHOULDN'T BE LIMITED OR READ RESTRICTIVELY

15     UNLESS THE PATENTEE HAS DEMONSTRATED A CLEAR INTENTION TO LIMIT

16     THE SCOPE -- THE CLAIM SCOPE USING WORDS OR EXPRESSIONS OF

17     MANIFEST EXCLUSION OR RESTRICTION.

18         HERE AGAIN, IF THERE WAS SUCH A STATEMENT, IT WOULD BE

19     PROVIDED BY DR. FORD FRONT AND CENTER AND IT'S NON-EXISTENT IN

20     TERMS OF ANY TYPE OF CLEAR INTENTION.

21         THIRD ARGUMENT, OR I SHOULD SAY -- I GUESS TIED TO THE

22     SECOND ARGUMENT IS NISTICA'S RELIANCE ON THE WANG LABORATORY

23     CASE VERSUS AMERICA ONLINE, A 15 YEAR OLD CASE, AND CLEARLY IF

24     YOU END UP SHEPARDIZING THIS CASE, YOU WILL FIND TREMENDOUS

25     DISTINCTION OVER WHAT IT STANDS FOR IN TERMS OF THIS IDEA THAT

1    WE'RE GOING TO LIMIT THE CLAIMS TO ONE PARTICULAR EMBODIMENT.

2         PEOPLE HAVE CITED IT, YOU KNOW, TIME AND TIME AGAIN AND

3    THE FEDERAL CIRCUIT HAS CLEARLY REJECTED THAT LINE OF CASES --

4    OR I WON'T SAY THAT LINE OF CASES.  THEY'VE REJECTED RELYING ON

5    WANG FOR THAT PURPOSE, THAT WAS NOT THE INTENT OF THE CASE, AND

6    IT'S NOT WHAT THE FEDERAL CIRCUIT DOES WITH RESPECT TO CASES

7    WHERE THERE IS A SINGLE EMBODIMENT DISCLOSED IN THE

8    SPECIFICATION.  THE CLAIMS ARE NOT GOING TO BE LIMITED TO THAT

9    SINGLE EMBODIMENT.

10        HERE IS ONE EXAMPLE, THE LIEBEL-FLARSHEIM CASE FROM, I

11   THINK, TEN YEARS AGO AT SLIDE 38.

12        AND THEN THE THIRD ARGUMENT IS THIS ARGUMENT THAT WE'RE

13   MISREADING, FINISAR IS MISREADING THE SPECIFICATION WHEN, AT

14   COLUMN 3, LINES 64 TO 67, I TALKED ABOUT "THE SPIRIT OF THIS

15   INVENTION" SENTENCE, "THE SPIRIT OF THE INVENTION" SENTENCE.

16        AND CLEARLY IT'S DISCUSSING THE SPIRIT OF THE INVENTION.

17   IT'S NOT DISCUSSING ONE SPECIFIC EMBODIMENT.

18        YOU KNOW, IF YOU'RE DISCUSSING ONE SPECIFIC EMBODIMENT, I

19   GUESS YOU WOULD BE TALKING ABOUT THAT EMBODIMENT.  YOU WOULD BE

20   TALKING ABOUT SORT OF MODIFICATIONS TO THAT EMBODIMENT.

21        WHY WOULD YOU BE TALKING ABOUT THE SPIRIT OF THE

22   EMBODIMENT IF IT WAS BEING USED TO TALK ABOUT A SPECIFIC

23   EMBODIMENT?

24        AND AS A RESULT, WE BELIEVE IT'S NISTICA THAT, AGAIN, HAS

25   TO TAKE THESE INDIVIDUAL SENTENCES AND COME UP WITH SOME

1     ARGUMENT TO TRY TO DISTINGUISH THEM.

2          BUT IT'S TALKING ABOUT THE SPIRIT OF THE INVENTION, AND

3     CLEARLY ANY DECREASE OF THE MOTION IS WITHIN THE SPIRIT OF THE

4     INVENTION AND SHOULDN'T BE LIMITED TO ONLY A PARTICULAR WAY OF

5     DECREASING THAT MOTION.  THAT'S ARGUMENT THREE.

6          ARGUMENT FOUR IS THESE, AGAIN, ARE THE -- AT SLIDE 40,

7     THERE'S THOSE TWO DIFFERENT QUOTES THAT TALK ABOUT

8     PERPENDICULAR TO THE BEAM AXIS AND PERPENDICULAR TO EACH OTHER.

9          AND HERE AGAIN THE -- OUR READING OF IT IS THAT THESE ARE

10    DIFFERENT QUOTES THAT DESCRIBE DIFFERENT EMBODIMENTS.

11         NISTICA IS ARGUING THAT THEY DESCRIBE THE SAME EMBODIMENT,

12    BUT THEY'RE, YOU KNOW, EFFECTIVELY NOT ABLE TO EXPLAIN WHY THE

13    DISCLOSURE IN COLUMN 1 AT LINE 60 REFERS TO ESSENTIALLY

14    PERPENDICULAR TO THE BEAM AXIS.  THERE'S NO EXPLANATION FOR

15    THAT EMBODIMENT.  THEY'RE SIMPLY SAYING, OH, IT'S THE SAME

16    OTHER EMBODIMENT THAT REFERS TO THE PERPENDICULAR MOTION

17    RELATIVE TO THE REFLECTOR SURFACE.

18         AND THEN THE FIFTH ARGUMENT IS THE ROTATING MIRROR ISSUE

19    THAT I DISCUSSED A FEW MINUTES AGO.

20         AND THE SIXTH AND FINAL ARGUMENT IS THIS ISSUE ABOUT MEMS

21    DEVICES.  THEY WERE WELL KNOWN AT THE TIME.  THE ORDINARY --

22    THE PERSON OF ORDINARY SKILL IN THE ART READING THE

23    SPECIFICATION WOULD UNDERSTAND THAT THE REFERENCE TO MEMS

24    DEVICES WERE OTHER DISCLOSURES OF THE USE OF MIRRORS THAT TILT

25    AS OPPOSED TO MIRRORS THAT ARE JUST ON PISTONS.

1            AND WITH THAT, I'M DONE.

2                 THE COURT:  THANK YOU.

3                 MR. RADULESCU:  YOU'RE WELCOME.

4                 THE COURT:  ALL RIGHT.  WHY DON'T WE HEAR FROM --

5       MR. KRAMER, YOU'RE GOING TO DO THE FIRST ONE, THE '328?

6                 MR. KRAMER:  I AM, YOUR HONOR.

7             SHOULD I GO RIGHT TO IT, OR IS THIS A GOOD TIME FOR A

8       BREAK?

9                 THE COURT:  THAT'S A GOOD QUESTION.  HOW LONG DO YOU

10      ANTICIPATE YOUR PRESENTATION WILL BE?

11                MR. KRAMER:  PERHAPS 15 MINUTES.

12                THE COURT:  LET'S DO THIS AND THEN TAKE A BREAK.

13      WOULD THAT BE ALL RIGHT?

14                MR. KRAMER:  CERTAINLY.

15                THE COURT:  THANK YOU.

16                MR. KRAMER:  ALL RIGHT.  YOUR HONOR, I HAVE A

17      PRESENTATION PREPARED WHICH ADDRESSES THE ISSUES THAT FINISAR'S

18      COUNSEL RAISED, AND I HEARD YOUR QUESTIONS AND I WOULD LIKE TO

19      ADDRESS THOSE, TOO, AND I'D LIKE TO INSERT THAT RIGHT INTO THE

20      PRESENTATION AS I'M AT THE POINT WHERE I'M DISCUSSING THE

21      ISSUE, IF THAT'S OKAY.

22                THE COURT:  PLEASE DO.

23                MR. KRAMER:  SO I THINK THAT CONTEXT WILL BE HELPFUL.

24           ALL RIGHT.  OKAY.  WE ARE LOOKING AT THE '328 PATENT.

25      THIS WAS FILED IN 2000, ISSUED A FEW YEARS LATER.  IT WAS FILED

```
1    BY SEVERAL INVENTORS, MR. CULVER, ET CETERA.  FINISAR ACQUIRED

2    THIS PATENT AT THE END OF 2012.

3         THE CLAIM THAT WE'RE LOOKING AT THAT HAS THE DISPUTED TERM

4    IN IT IS CLAIM 17, AND I WILL ADDRESS CLAIM 19 AS WELL BECAUSE

5    I THINK YOUR HONOR RAISED A GOOD POINT AND 19 DOES SHOW EXACTLY

6    WHAT NISTICA IS PROPOSING THE CONSTRUCTION SHOULD BE, AS I WILL

7    SHOW.

8         THE TERM IS "DISPLACEABLE REFLECTORS," "AN OPTICAL SWITCH,

9    AN ARRAY OF DISPLACEABLE REFLECTORS, EACH REFLECTOR DISPLACING

10   A PORTION OF A WAVE FRONT OF AN OPTICAL BEAM."

11        THE DISPUTE IS WHETHER "DISPLACEABLE REFLECTORS" IN

12   CLAIM 17 MEANS REFLECTORS MOVING SUBSTANTIALLY PERPENDICULAR TO

13   THEIR REFLECTIVE SURFACE OR REFLECTORS THAT CAN MOVE IN ANY

14   WAY, SUCH AS ROTATING AND TILTING.

15        AND I THINK, YOUR HONOR, WE REALLY SHOULD FOCUS RIGHT ON

16   THAT.  THIS NOTION OF MOVING ANY WAY IS NOT REALLY WHAT'S

17   HAPPENING HERE.  NO ONE IN THE ART, THEN OR NOW, WOULD KNOW

18   OTHER WAYS.  WE'RE TALKING ABOUT WHETHER IT IS PERPENDICULAR

19   MOVEMENT OR ROTATING, WHICH IS ANOTHER WORD FOR SAYING TILTING.

20        AND IF WE LOOK AT -- WE'LL LOOK AT DR. FORD'S PAPER FROM

21   1999.  THAT'S SLIDE 33 OF FINISAR'S PRESENTATION.

22             THE COURT:  UM-HUM.

23             MR. KRAMER:  DR. FORD SHOWED THAT.  THAT'S WHERE YOU

24   HAVE A MULTI -- A MIRROR THAT IS TILTING INTO TWO POSITIONS,

25   IT'S BINARY, THIS WAY OR THAT WAY.  IT DOESN'T HAVE THE -- THEY
```

1    MOVE TOO FAST.  IT CANNOT BE MOVED TO DIFFERENT ANGLES OR

2    POSITIONS.  IT'S EITHER UP OR DOWN.  THAT'S THE WAY THOSE

3    MIRRORS WORK.

4          THE COURT:  SO THERE'S ONE TILT POSITION?  IS THAT

5    WHAT YOU'RE SAYING?

6          MR. KRAMER:  RIGHT, YES.  THAT'S RIGHT.  IN OTHER

7    WORDS, THESE ARE TINY MIRRORS AND WHAT HAPPENS IS THEY ARE --

8    AN ELECTRIC CHARGE IS APPLIED TO THEM AND THEY'RE EITHER MOVED

9    FROM A POSITION WHERE THEY'RE SITTING PERPENDICULAR TO THE BACK

10   PLANE, OR THEY'RE MOVED THIS WAY OR THAT WAY.  THAT'S WHAT'S

11   HAPPENING.

12         WE DON'T HAVE THE ABILITY, AND THAT'S SOMETHING I'LL TALK

13   ABOUT, TO, WITH PRECISION, MOVE TO DIFFERENT POINTS ALONG THAT

14   ANGLE, AND THAT'S ONE OF THE ADVANTAGES.  THE ANGULAR

15   DEPENDENCY IS ONE OF THE ADVANTAGES THAT'S DISCUSSED IN THE

16   PATENT, AND WE'LL TALK ABOUT THAT A BIT.

17         AND BY THE WAY, I'LL SAY THAT, SO WE CAN JUST DISPENSE

18   WITH IT RIGHT AWAY, THERE'S NO ARGUMENT HERE -- SO FINISAR IS

19   MAKING AN ARGUMENT THAT MEMS DEVICES WERE KNOWN IN THE ART AND

20   THAT MEMS DEVICES ROTATED, THEY TILTED, LIKE DR. FORD'S PAPER.

21   ABSOLUTELY.  THAT'S RIGHT.

22         WHAT I'M GOING TO FOCUS ON NOW IS SOME LANGUAGE IN THE

23   PATENT WHERE THE APPLICANT SAYS ROTATING MIRRORS ARE KNOWN, BUT

24   THEY ARE NOT FAST ENOUGH TO CHANGE THE DIRECTION OF THE BEAM.

25   MY INVENTION IS GOING TO BE TO ACHIEVE CHANGING THE DIRECTION

1    OF THE BEAM MORE RAPIDLY THAN COULD BE DONE WITH ROTATING

2    MIRRORS.

3         SO WE'RE GOING TO TAKE A LOOK AT THAT BECAUSE THAT'S A KEY

4    PHRASE IN THE PATENT, IT'S THE INVENTOR TELLING US WHAT THE

5    PATENT IS ALL ABOUT, WHAT THE INVENTION IS ALL ABOUT, AND I

6    DIDN'T HEAR THAT MENTIONED AT ALL IN HIS PRESENTATION.

7         THE COURT:  I GUESS I'M ONLY CONCERNED THAT -- I

8    UNDERSTAND WHAT YOU'RE SAYING, THAT THE TILTING, IT'S AN ON/OFF

9    TILT.  IF THE TILT FUNCTION IS ACTIVATED, THERE'S ONE ANGLE OF

10   THE TILT.

11        MR. KRAMER:  RIGHT.

12        THE COURT:  THAT'S WHAT YOU'RE SAYING?

13        MR. KRAMER:  YES.

14        THE COURT:  AND THAT WOULD THEN BE CONTRARY TO WHAT I

15   THOUGHT I UNDERSTOOD FROM TALKING WITH MR. RADULESCU, THAT THE

16   TILTING COULD BE ADJUSTED TO MEET THE PRECISE ANGLE OF THE BEAM

17   TO RETAIN EXACT PERPENDICULAR CONNECTION TO THE BEAM.

18        MR. KRAMER:  RIGHT.  IT IS CONTRARY.

19        WHAT -- BY THE WAY, YOUR HONOR POINTED OUT -- IF YOU LOOK

20   AT THE FIGURE FROM THE PATENT, FIGURE 1, YOUR HONOR HAD A

21   CONCERN THAT NISTICA'S PROPOSAL, "PERPENDICULAR MOVEMENT," THAT

22   WITH "PERPENDICULAR MOVEMENT," THAT WOULD NOT TAKE INTO ACCOUNT

23   THE DIRECTION THAT THE BEAM -- IT'S SLIDE 10 THAT I ADVANCED

24   FORWARD TO -- THAT I THINK YOUR HONOR ASKED THE QUESTION ABOUT

25   WHETHER, UNDER NISTICA'S PROPOSAL --

1          THE COURT:  FIGURE 1 IS WHAT WE'RE LOOKING AT?

2          MR. KRAMER:  YES.  YES, YOUR HONOR.

3      I THINK YOUR HONOR ASKED WHETHER NISTICA'S PROPOSAL,

4   WHETHER "PERPENDICULAR MOVEMENT" WOULD NOT TAKE INTO ACCOUNT

5   THE INPUT DIRECTION OF THE BEAM, RIGHT?  IT'S SHOWN HERE.  THE

6   INPUT DIRECTION IS COMING RIGHT DOWN THE MIDDLE --

7          THE COURT:  YEAH.

8          MR. KRAMER:  -- IN 32.

9      BUT YOUR HONOR WAS ASKING, WELL, WHAT IF THE BEAM IS

10  COMING AT A DIFFERENT ANGLE?

11         THE COURT:  YES.

12         MR. KRAMER:  THAT DOES GET TAKEN INTO ACCOUNT BY HOW

13   THE MIRRORS ARE POSITIONED.  IN OTHER WORDS, THEY WOULD BE

14   POSITIONED IN SUCH A WAY AS TO DEAL WITH EXACTLY THAT.

15      IN OTHER WORDS, THE BEAM IS STRUCTURED -- THE BEAM ITSELF

16  IS SHOWN IN FIGURE 1 AS THE UPPER AND THE BOTTOM LINE HERE,

17  RIGHT?  IT'S -- IN FIGURE 1, THE BEAM IS COMING IN, IT IS

18  COMING IN -- AN EASIER WAY, IF WE LOOK AT FIGURE 2 -- PARDON

19  ME, FIGURE 1 WILL DO IT.

20      THE BEAM IS COMING IN FROM THE RIGHT SIDE OF THE PAGE AND

21  IT'S THE DISTANCE 12.  THAT'S THE WIDTH OF THE BEAM COMING IN,

22  THE INPUT BEAM COMING IN IN THE DIRECTION 38.

23         THE COURT:  YES.

24         MR. KRAMER:  RIGHT?  SO THAT'S GOING TO BE -- THIS

25   IS -- WHAT HAPPENS IN THIS DEVICE IS THAT FIRST THERE'S

1       FUNCTIONALITY TO DIRECT THE BEAM SO THAT IT WILL COME IN IN

2       THAT DIRECTION, RIGHT?  WE DON'T HAVE ANY SHOWING OF THE BEAM

3       COMING IN IN A DIFFERENT DIRECTION.

4            BUT IF IT DID, THEN WHAT WOULD HAPPEN IS THIS INVENTION

5       WOULD USE THE PLACEMENT OF THE MIRRORS TO CREATE THE VIRTUAL

6       MIRROR, JUST AS WE WOULD WITH A VIRTUAL MIRROR IF WE HAD ONE,

7       WHICH IS SHOWN AS LINE 42, THE DASHED LINE ON THE LEFT SIDE OF

8       THE FIGURE, AND I'LL GET INTO THAT SOME AS WE GO INTO THE

9       PRESENTATION.

10           THE COURT:  SO FIGURE 1 CLEARLY SHOWS THE PIXELS

11      PARALLEL TO THE REFLECTOR DEVICE, TO ITS BASE, IF YOU WILL.

12           MR. KRAMER:  YES.

13           THE COURT:  AND YOU CAN'T DISPUTE THAT.  THAT'S WHAT

14      IT SHOWS.

15           MR. KRAMER:  RIGHT.

16           THE COURT:  AND WHAT MR. RADULESCU ARGUES IS THAT

17      THAT'S ONLY -- YES, IT CAN DO THAT, BUT EACH OF THESE CAN TILT

18      AS WELL.

19           MR. KRAMER:  THAT'S HIS THEORY, YES.

20           THE COURT:  THAT'S HIS THEORY.

21        AND THIS IS A WAVE FRONT WE'RE TALKING ABOUT HERE?

22           MR. KRAMER:  YES.

23           THE COURT:  AND THIS LINE 38 IS ONLY SHOWING THE

24      DIRECTION OF THE WAVE FRONT, WHICH IS 12?

25           MR. KRAMER:  YES, YOUR HONOR.

1          THE COURT:  ALL RIGHT.  BUT IF THAT WAVE FRONT WAS

2     COMING FROM A DIFFERENT LOCATION THAN THIS NUMBER 12, DOES THE

3     PERPENDICULAR -- I'M SORRY -- YEAH, THE PERPENDICULAR

4     DISPLACEMENT ADDRESS THIS, A WAVE FRONT COMING FROM A DIFFERENT

5     DIRECTION?

6          MR. KRAMER:  YES, IT WOULD, YOUR HONOR.

7       NOW, THERE'S NOT DISCLOSURE IN THE PATENT, I DON'T

8     BELIEVE, OF THAT, AND I THINK THAT'S WHY YOUR HONOR IS ASKING

9     ABOUT THAT, BECAUSE IT'S NOT SHOWN THAT WAY.

10         BUT IT WOULD BECAUSE THE MIRRORS WOULD BE POSITIONED --

11    WHAT IS HAPPENING IS THE MIRRORS ARE BEING POSITIONED IN

12    ESSENTIALLY A STAIRCASE, RIGHT?  THE STAIRCASE IS BEING USED,

13    AND I'M GOING TO GO THROUGH SOME SLIDES THAT SHOW THAT, THAT IS

14    USED TO DISPLACE THE, THE WAVE FRONT OF THE WAVE, OF THE BEAM.

15         AND THEY'RE POSITIONED THAT WAY SO THAT WE CAN SELECTIVELY

16    CHOOSE THE ANGLE.  IN FIGURE 1, WE SEE THE OUTPUT DIRECTION 40

17    THERE.

18         WELL, WHAT HAPPENS, ONE OF THE ADVANTAGES OF THIS

19    INVENTION IS THAT WE CAN SELECT THE ANGLE VERY PRECISELY AS TO

20    HOW THE OUTPUT -- HOW THE REDIRECTED DIRECTION OF THE BEAM WILL

21    BE.  IT'S SHOWN IN 40 WITH ONE PARTICULAR ANGLE.  YOU CAN

22    CONSTRUCT THE STAIRCASE THAT'S, IN EFFECT, BEING CREATED THERE

23    BY HOW FAR WE DISPLACE EACH OF THE REFLECTORS TO CONTROL THAT

24    ANGLE AT WHICH WE'LL OUTPUT THE BEAM.

25          THE COURT:  DOES PHASING HAVE TO BE LIMITED TO THIS

1     PISTON-LIKE MOVEMENT?  TO ACHIEVE PHASING IS WHAT I SHOULD SAY.

2     BECAUSE PHASING IS KEY HERE, THAT'S THE POINT OF THESE PIXELS,

3     ISN'T IT?

4              MR. KRAMER:  IT IS, YOUR HONOR.

5              THE COURT:  TO REDIRECT THE WAVE FRONT THROUGH

6     PHASING?

7              MR. KRAMER:  THAT'S RIGHT.  ONE COULD DIRECT -- AND I

8     HAVE A SLIDE TO SHOW THAT -- ONE COULD USE A MIRROR, EITHER A

9     LARGE MIRROR OR SMALLER MIRRORS, THAT ARE PUT AT AN ANGLE SUCH

10    THAT THE BEAM WILL COME IN AND BE REFLECTED OFF OF THEM, BUT

11    THAT'S A DIFFERENT -- THAT'S USING THE GEOMETRY OF THE

12    DEVICE --

13             THE COURT:  SURE.

14             MR. KRAMER:  -- RATHER THAN CONTROLLING THE WAVE

15    FRONT, THE PHASING OF THE WAVE FRONT.

16        WHEN WE TALK ABOUT PHASING, WE'RE LOOKING AT THIS

17    STAIRCASE.  THE CONCEPT, AND YOU'LL RECALL THAT DR. FORD

18    EXPLAINED IT, IS SIMPLY THAT THE MIRROR AT THE BOTTOM IN

19    FIGURE 1, MIRROR 24, IT'S OUT FURTHER.  IT'S CLOSER TO THE BEAM

20    AS IT COMES IN.

21             THE COURT:  SURE.

22             MR. KRAMER:  SO A WAVE FRONT -- THE BEAM HITS 24 AND

23    STARTS TO SPREAD OUT.

24             THE COURT:  SURE.

25             MR. KRAMER:  AND THAT'S PHASING THAT HAPPENS BEFORE

1      IT HITS 22 BECAUSE 24 IS FURTHER TO THE RIGHT.  IT'S CLOSER.

2          AND SO WE HAVE THAT BEAM SPREADING OUT AND THEN 22

3      SPREADING OUT, AND I'LL SHOW YOU IN A GRAPHIC, BASED ON WHAT'S

4      HAPPENING IS WE'RE SIMULATING A VIRTUAL MIRROR THAT COULD BE

5      INSTEAD USED BY PUTTING IT AT 42.

6          THE COURT:  I GUESS WHAT I'M TRYING TO FIGURE OUT IS

7      WHETHER THE TILTING IS SEPARATE AND DISTINCT FROM THE PHASING,

8      AS OPPOSED TO PHASING BEING ACHIEVED THROUGH TILTING, OR IF

9      THAT'S EVEN RELEVANT.

10         MR. KRAMER:  RIGHT.  THE PHASING IS ACHIEVED BY THE

11     POSITION, BECAUSE IF YOU THINK ABOUT IT, IT'S A TIMING ISSUE --

12         THE COURT:  YES.

13         MR. KRAMER:  -- AS TO HAVING A MIRROR THAT WILL BE

14     DISPLACED, MOVED IN THIS FIGURE FURTHER AWAY FROM THE BASE SO

15     THAT WHEN THE LIGHT BEAM APPROACHES AND HITS THAT MIRROR, THE

16     PHASE THAT THE WAVE FRONT THAT'S CREATED WILL FIRST BE -- YOU

17     KNOW, WILL START BEFORE A MIRROR THAT'S FURTHER AWAY.

18         SO THAT'S RIGHT.  YOU'RE NOT GOING TO ACHIEVE THAT BY THE

19     TILT.  YOU'RE GOING TO ACHIEVE THAT BY THE PHYSICAL POSITION OF

20     THE MIRROR AND PUSHING THE MIRROR OUT FURTHER SO THAT ONE OF

21     THE -- LIKE IN FIGURE 1, THE MIRROR AT THE BOTTOM WILL FIRST

22     RECEIVE THE LIGHT.

23         THE COURT:  AND SO THEN THE ULTIMATE QUESTION IS THAT

24     IF THE MIRRORS WERE TILTED -- OR CAN THE -- MUST THESE PIXELS

25     REMAIN PARALLEL TO THEIR BASE IN THIS INVENTION?

1          MR. KRAMER:  MUST THEY?  IN THIS INVENTION, YES.

2          THE COURT:  YOU'RE SAYING THEY MUST?

3          MR. KRAMER:  YES, AND I'LL SHOW WHY.

4          THE COURT:  OKAY.  LET'S DO THAT.  I'M SORRY TO

5     DISTRACT YOU.

6          MR. KRAMER:  NO, IT'S OKAY.  AND MY COLLEAGUE JUST

7     GAVE ME A SIGN HERE SAYING WE HAVE FIVE MINUTES, SO I'M GOING

8     TO FOCUS ON THAT AND SOME OF THE OTHER ISSUES.

9          IF WE LOOK AT THE '328 PATENT IN COLUMN 1, AND I HAVE IT

10    HIGHLIGHTED ON THE SCREEN ON THE LEFT, WE HAVE AN EXPLANATION

11    OF WHAT'S BEING DONE.  "TODAY'S PACKET SWITCHED COMMUNICATION

12    NETWORKS, SUCH AS THE INTERNET, ARE IMPLEMENTED USING FIBER

13    OPTIC TECHNOLOGY WHERE A MODULATED LASER BEAM IS TRANSMITTED

14    DOWN AN OPTICAL FIBER OR GLASS WAVE GUIDE."

15         SO THIS IS TELLING US WHAT THE BACKGROUND, WHAT NEEDS TO

16    BE DONE.

17         IT TELLS US THAT "SWITCHING BETWEEN FIBERS WITHIN THE

18    NETWORK IS TYPICALLY PERFORMED BY CONVERTING THE LIGHT SIGNAL

19    INTO AN ELECTRICAL SIGNAL, PERFORMING THE SWITCHING FUNCTION ON

20    THE ELECTRICAL SIGNAL, AND THEN CONVERTING THE ELECTRICAL

21    SIGNAL INTO A LIGHT SIGNAL.  THESE CONVERSION OPERATIONS ARE

22    SLOW AND EXPENSIVE."

23         HERE'S A REALLY IMPORTANT PARAGRAPH.  IT SAYS, "A

24    DIRECTION OF A LASER BEAM CAN BE CHANGED VIA A NUMBER OF

25    DIFFERENT TECHNIQUES, INCLUDING REFLECTING THE BEAM FROM A

1    MIRROR THAT CAN BE ROTATED.  HOWEVER, ROTATING A MIRROR IS

2    SLOW, SLOWER THAN DESIRED FOR MANY SWITCHING OPERATIONS.

3         "WHAT IS NEEDED IS AN OPTICAL SWITCH THAT WILL SWITCH BEAM

4    DIRECTIONS FASTER."

5         THIS IS REALLY IMPORTANT LANGUAGE.  IT WASN'T MENTIONED AT

6    ALL IN FINISAR'S PRESENTATION.  THIS IS TELLING US THAT IT'S

7    KNOWN IN THE ART TO CHANGE THE DIRECTION OF THE LASER BEAM, AS

8    WE SAW IN FIGURE 1, THE BEAM THAT COMES IN, USING THE ROTATING

9    MIRRORS AND SAYING THE ROTATING MIRRORS ARE NOT FAST ENOUGH.

10   WE HAVE A BETTER WAY OF DOING IT.  WE'RE GOING TO DO IT BY, AND

11   WE THEN LOOK AT NOW THE SOLUTION.

12        AS HE DESCRIBES, THE INVENTOR IS DESCRIBING IN THIS

13   PARAGRAPH IN COLUMN 2, LINES 50 THROUGH 67, AND THE THRUST, THE

14   GIST THROUGHOUT THIS ENTIRE PATENT IS THAT WE'RE GOING TO

15   ACHIEVE A BENEFIT, WE'RE GOING TO SOLVE THE PROBLEM OF THE

16   ROTATING MIRRORS BEING MOVED TOO SLOWLY BY INSTEAD HAVING EACH

17   PIXEL REFLECTOR MOVED IN A DIRECTION THAT IS GENERALLY

18   PERPENDICULAR TO THE REFLECTIVE SURFACE OF THE ELEMENT.

19        SO WE'VE SEEN THIS FIGURE THAT I HAVE ON THE SCREEN ON

20   SLIDE 11 WHERE WHAT THE INVENTION IS IS WE TAKE EACH OF THE

21   REFLECTIVE ELEMENTS AND WE MOVE THEM SOME DISTANCE FROM WHAT

22   YOUR HONOR WAS REFERRING TO AS THE BACK PLANE, 25.

23        AND BY DOING SO WE HAVE, AS SHOWN ON THE SCREEN, THE WAVE

24   FRONT COMING DOWN, IT APPROACHES THE BOTTOM REFLECTOR FIRST,

25   THE NEXT ONE UP NEXT, AND IT GENERATES A WAVE FRONT FROM EACH

```
 1      WHERE WE'RE SIMULATING A -- WHAT WE COULD HAVE DONE BY ROTATING

 2      THE MIRROR.

 3           AND --

 4                THE COURT:  THE WHOLE MIRROR AS ONE?

 5                MR. KRAMER:  RIGHT.  RIGHT.

 6           OR, YOUR HONOR, FOR THAT MATTER, WE COULD HAVE -- ASSUMING

 7      THAT, WE COULD HAVE -- AN ALTERNATIVE EMBODIMENT, BUT THE

 8      PATENT TOLD US IS SLOW, WOULD BE TO ROTATE EACH ONE

 9      INDIVIDUALLY BY NOT MOVING THEM PHYSICALLY TO THE RIGHT AWAY

10      FROM THE BACK PLANE, BUT INSTEAD BY TILTING THEM.  WE COULD

11      HAVE DONE THAT.

12                THE COURT:  WHERE DOES IT EXCLUDE THE POSSIBILITY OF

13       TILTING ALL OF THE PIXELS?

14                MR. KRAMER:  WELL, IT TELLS US THAT TILT -- THAT

15       ROTATING, WHICH I THINK THE PARTIES AGREE IS -- TILTING AND

16       ROTATING MEAN THE SAME THING.  IT'S TOO SLOW.  IT'S TELLING US

17       THAT --

18                THE COURT:  IT ONLY SAYS IT'S TOO SLOW IN THE BIG

19       ELEMENT, NOT IN THE PIXELS.  IT DOESN'T DESCRIBE THE PIXELS

20       BEING TOO SLOW IN THE TILTING.

21                MR. KRAMER:  IN THE DISCUSSION OF THE -- IN THE

22       DISCUSSION IN PARAGRAPH 3, WE'RE TALKING ABOUT A -- I

23       UNDERSTAND YOUR POINT, YOUR HONOR.  IT'S FOCUSSED ON THAT.

24           BUT I READ THAT AS MEANING THAT ROTATING -- IT DOESN'T SAY

25       ROTATING ONLY A LARGE MIRROR.  IT'S TELLING US ROTATING
```

1    MIRRORS, WHICH I READ AS EITHER ONE LARGE MIRROR OR, FOR THAT

2    MATTER, SMALLER MIRRORS.

3              THE COURT:  IT'S DESCRIBING THE PRIOR ART, ISN'T IT?

4              MR. KRAMER:  IT IS.

5              THE COURT:  AND WHAT WAS THE PRIOR ART?

6              MR. KRAMER:  THE PRIOR ART WAS BOTH USING LARGE

7    MIRRORS AND USING SMALL MIRRORS LIKE WE SAW IN FINISAR'S

8    PRESENTATION AT SLIDE 33 WHERE WE WOULD HAVE SMALLER MIRRORS.

9         THIS PATENT DOESN'T INVENT THE IDEA OF FIRST PUTTING

10   SMALLER MIRRORS INTO A DEVICE, RIGHT?  IT'S NOT -- IT'S TELLING

11   US THAT -- IT'S SHOWING US THAT WE'RE GOING TO HAVE MOTION

12   THERE IF WE USE A LARGE MIRROR.  WE HAVE -- WE'RE NOT -- IT

13   DOESN'T TELL US WE'RE SOLVING THE PROBLEM BY THEN USING SMALLER

14   MIRRORS.

15        WHAT'S HAPPENING, IF WE LOOK AT SLIDE 12, WE SEE THAT'S

16   FIGURE -- THE NEXT FIGURE IN THE PATENT, THAT'S FIGURE 2 WITH

17   SOME ANIMATION ON IT TO SHOW WHAT'S HAPPENING.

18        IT TELLS US THAT IN THIS FIGURE, THE INCOMING BEAM 66

19   ARRIVES VIA DIRECTION 68 AND RESULTS IN AN OUTGOING BEAM BEING

20   REFLECTED IN AN EXIT DIRECTION 72 CREATING A VIRTUAL MIRROR.

21        SO WHAT WE SEE IS HAPPENING HERE -- AND THE INVENTION IN

22   THIS PATENT -- AND I'D LIKE TO LOOK AT CLAIM 19 FOR A MOMENT.

23   YOUR HONOR ASKED ABOUT THAT.

24        WHAT'S HAPPENING HERE, AND I REFERRED TO IT AS THE

25   STAIRCASE, WE SEE THAT EACH OF THE REFLECTIVE ELEMENTS IS

1    INDIVIDUALLY MOVEABLE, AND THEY'RE MOVED SUCH THAT WE CAN

2    DECREASE THE AMOUNT OF MOVEMENT THAT WOULD BE REQUIRED.

3              THE COURT:  UM-HUM.

4              MR. KRAMER:  WE CAN -- ACROSS THE BEAM FRONT, WE CAN

5    SIMULATE WHAT WOULD OTHERWISE BE A MIRROR 74, AND WE'LL CALL

6    IT -- THE PATENT CALLS IT A VIRTUAL MIRROR -- BY ACROSS THE

7    BEAM, ACROSS THE BEAM FRONT MOVING EACH OF THE TINY REFLECTIVE

8    ELEMENTS A CERTAIN DISTANCE FROM THE BACK PLANE RELATIVE TO

9    EACH OTHER.

10             AND THAT'S THE LANGUAGE THAT YOUR HONOR LOOKED AT WHEN WE

11   LOOKED AT CLAIM 19 OF THE PATENT.  IN CLAIM 19, WE LOOKED AT A

12   DISCUSSION OF DISPLACEABLE REFLECTOR -- THE DISPLACEABLE

13   REFLECTORS ARE DISPLACED RELATIVE TO THE ADJOINING REFLECTOR BY

14   A DISTANCE MODULO LAMBDA OVER 2.

15             WHAT THAT IS TELLING US, IF WE LOOK ON THE RIGHT-HAND SIDE

16   OF SLIDE 12, OR ANYWHERE ALONG HERE, WHAT WE'RE TALKING ABOUT

17   IS RELATIVE MOVEMENT OF EACH OF THE REFLECTIVE ELEMENTS, UP OR

18   DOWN, PISTON-LIKE RELATIVE TO EACH OTHER, WHAT DISTANCE THEY

19   WILL BE MOVED.

20             THE COURT:  DOES THIS ACTUALLY SIMULATE A TILTING BY

21   BEING THIS PERPENDICULAR MOVEMENT?  I MEAN, IT LOOKS -- THAT'S

22   WHAT I'M TRYING TO UNDERSTAND IN THIS DIAGRAM.

23             MR. KRAMER:  YES.

24             THE COURT:  YOU SHOW THE RED LINE BEING THE ELEMENT.

25             MR. KRAMER:  YES.

1          THE COURT:  AND EACH OF THESE STEPS WOULD BE A, A

2     PIXEL, I PRESUME.

3          MR. KRAMER:  RIGHT.

4          THE COURT:  AND YOU'VE GOT WHAT IS VIRTUALLY ANY --

5     IT LOOKS LIKE IT IS SIMILAR TO THREE TILTED MIRRORS BUT, IN

6     FACT, IT'S ONLY A PISTON-LIKE MOVEMENT OF EACH OF THE TINY

7     ONES.  AM I READING IT RIGHT?

8          MR. KRAMER:  YOU ARE, YOUR HONOR.

9          THE COURT:  ALL RIGHT.

10         MR. KRAMER:  THAT IS WHAT IS HAPPENING.

11        NOW, TO BE ACCURATE, COLLECTIVELY WHAT IS HAPPENING, AS WE

12    SEE IN ONE OF THE SIMULATIONS OF THIS OCCURRING, IF WE LOOK AT

13    14, WE SEE THAT -- WE BACK THAT UP -- IF WE LOOK AT WHAT'S

14    HAPPENING HERE, WE DON'T NEED TO MOVE THE MIRRORS.  IF YOU

15    NOTICE THE VIRTUAL MIRROR 74, THE UPPER RIGHT-HAND SIDE IS

16    REALLY HIGH UP.  THAT WOULD REQUIRE A LOT OF MOTION ALL THE WAY

17    UP, RIGHT, WHICH WOULD BE SLOW.

18         THE COURT:  UM-HUM.

19         MR. KRAMER:  WHAT THIS INVENTION IS TELLING US IS

20    THAT WE CAN SIMULATE THAT BY CREATING A STAIRCASE,

21    UNDERSTANDING WHAT THE PHASING IS, AND HAVING MINIMAL MOTION.

22        SO WE DON'T HAVE TO MOVE THE MIRROR ON THE RIGHT, THE

23    REFLECTIVE ELEMENT ON THE RIGHT, WE DON'T HAVE TO MOVE THAT ALL

24    THE WAY UP TO WHAT WOULD BE AT THE TOP OF VD.  THAT WOULD BE A

25    LOT OF MOTION.

1        AND WHAT'S BEING ACHIEVED HERE IS TO NOT HAVE TO DO THAT

2    BY INSTEAD MOVING THE -- BY MOVING EACH OF THE PIXELS IN A WAY

3    WHERE WE UNDERSTAND THE PHASING AND SIMULATING WHAT WOULD BE A

4    LARGE DISTANCE OF VIRTUAL MOVEMENT.

5            THE COURT:  SO WHAT IF THE BEAM, THE INPUT BEAM OF

6    THE WAVE WAS COMING FROM A DIFFERENT DIRECTION?  HOW DOES THE

7    PISTON-LIKE MOVEMENT ADDRESS IT?

8            MR. KRAMER:  BECAUSE THE -- WELL, FIRST, THERE'S NOT

9    A DISCUSSION OF THAT HERE, RIGHT?

10        BUT THE ANGULAR REQUIREMENT HERE WOULD BE SUCH THAT ONE

11   WOULD KNOW HOW AND -- ESSENTIALLY WHAT FORM OF STAIRCASE TO

12   CREATE TO KNOW WHERE THE BEAM IS GOING TO COME IN AND AT WHAT

13   TIMING IT'S GOING TO HIT EACH OF THE REFLECTIVE ELEMENTS, AND

14   THEN DO ESSENTIALLY WHAT WE HAVE HERE BY CONTROLLING THE TIMING

15   OF WHEN EACH OF THE LIGHT BEAMS -- EACH POINT WHEN THE LIGHT

16   BEAM APPROACHES A REFLECTIVE ELEMENT.

17            THE COURT:  OKAY.

18            MR. KRAMER:  WHAT WE HAVE HERE IS THAT THE PATENT

19   TEACHES PERPENDICULAR MIRROR DISPLACEMENT, MOVEMENT, THROUGHOUT

20   THE PATENT.

21        LET'S LOOK AT SOME OF THE ARGUMENTS THAT FINISAR IS MAKING

22   ABOUT ROTATING MIRRORS.

23        SO FINISAR IS ARGUING THAT THE '328 PATENT EXPRESSLY

24   REFERENCES ROTATING MIRRORS IN ONE OF THE EMBODIMENTS, AND

25   THAT'S NOT WHAT IS HAPPENING HERE.

1          I THINK YOUR HONOR MAY HAVE POINTED OUT WHAT IS HAPPENING

2     HERE IS THAT THE PATENT, IN THE PHRASE THAT FINISAR RELIES ON,

3     IS DISCUSSING ROTATING MIRRORS, BUT IT'S DISCUSSING THEM TO

4     EXPLAIN THAT THOSE DON'T WORK AS WELL AS THE INVENTION.  IT'S

5     ACTUALLY DISTINGUISHING THEM.

6          THE COURT:  UM-HUM.

7          MR. KRAMER:  IT'S TELLING US THAT WITH THE ROTATING

8     MIRROR, WE HAVE A LOT OF MOVEMENT THAT'S GOING TO BE REQUIRED,

9     AND AS A RESULT, WE'RE GOING TO HAVE TO HAVE A MUCH SLOWER

10    DEVICE, RATHER THAN IN THE INVENTION, THE ANGLE OF THE BEAM CAN

11    BE CHANGED MUST FASTER USING AN SLM THAN WHEN USING A ROTATING

12    MIRROR.

13          SO THIS IS NOT AN EXAMPLE, AS FINISAR SAYS, OF THE

14    INVENTION BEING USED TO BE SHOWN WITH A ROTATING MIRROR.  IT'S

15    THE EXACT OPPOSITE.  IT'S ACTUALLY SAYING THE INVENTION WORKS

16    BETTER THAN A ROTATING MIRROR AND GIVES AN EXPLANATION OF THAT.

17          FINISAR ALSO MAKES AN ARGUMENT THAT ROTATING MIRRORS CAN

18    BE INFERRED BY REFERENCE TO MEMS DEVICES, AND THEY -- THIS IS A

19    QUOTE FROM FINISAR'S BRIEF.  "THIS CAN BE INFERRED, FOR

20    EXAMPLE, FROM THE PATENT'S MULTIPLE REFERENCES TO MEMS

21    DEVICES."

22          SO FINISAR SEEMS TO BE ARGUING, AT LEAST IN THIS PORTION

23    OF THEIR BRIEF, THAT THE ROTATING MIRRORS CAN BE INFERRED

24    RATHER THAN ARE EXPLICITLY SHOWN IN THE PATENT.

25          LET'S LOOK AT THE ACTUAL REFERENCES TO MEMS THAT FINISAR

1    SAYS SUPPORTS ITS POSITION.  TWO OF THOSE REFERENCES ARE

2    ACTUALLY TO A COMPANY'S NAME, MEMS OPTICAL, HUNTSVILLE,

3    ALABAMA.  NOTHING IN THERE TELLING US THAT THERE'S ROTATIONAL

4    MOVEMENT OF MIRRORS IN A MEMS DEVICE.

5         THE THIRD CITE THAT FINISAR RELIES ON TO SUPPORT ITS

6    ARGUMENT TALKS ABOUT MEMS DEVICES, BUT, AGAIN, NOTHING IN IT

7    TALKING ABOUT ROTATIONAL MOVEMENT.

8         THE OVERARCHING POINT ABOUT FINISAR'S ARGUMENT THAT MEMS

9    ARE SHOWN IS SIMPLY THAT THEY ARE SHOWN.  THEY WERE KNOWN IN

10   THE ART.

11        THE POINT IS THAT USING ROTATING MIRRORS THAT WERE BEING

12   DONE IN MEMS DEVICES, THE PATENTEE TOLD US, IS TOO SLOW AND

13   THAT THE INVENTIVE ASPECT OF THIS PATENT IS USING MIRRORS THAT

14   ARE DISPLACED, MOVED IN A PERPENDICULAR DIRECTION RATHER THAN

15   USING ROTATING MIRRORS.

16        FINISAR RELIES ON THIS SENTENCE THAT'S IN SLIDE 20, AND

17   I'D LIKE TO TALK ABOUT THAT FOR A MOMENT.

18             THE COURT:  YES, I THINK THAT'S PRETTY IMPORTANT.

19             MR. KRAMER:  YEAH.

20        SO WHAT'S HAPPENING HERE IS THE SENTENCE SAYS, "EACH

21   DEFLECTOR," AND WE KNOW EACH OF THE DEFLECTORS IS ONE OF THE,

22   YOU KNOW, THE REFLECTIVE ELEMENTS THAT WE LOOKED AT, "EACH

23   DEFLECTOR CHANGES THE DIRECTION OF THE LIGHT BEAM BY CHANGING

24   THE PHASE OF THE BEAM WAVE FRONT," BY CHANGING THE PHASE OF THE

25   BEAM WAVE FRONT.  HOW DOES IT DO IT?  "BY DISPLACING PIXEL

1    REFLECTORS IN A DIRECTION ESSENTIALLY PERPENDICULAR TO THE BEAM

2    AND RELATIVE TO EACH OTHER."

3         THIS IS NOT -- THE SENTENCE, FRANKLY, IS UNCLEAR.  IT

4    PROBABLY COULD HAVE BETTER GRAMMAR.  BUT WHAT IT'S SHOWING US

5    IS THAT THE BEAM WAVE -- WHAT'S BEING TOLD HERE IS THAT THE

6    BEAM WAVE FRONT IS BEING CHANGED IN A DIRECTION PERPENDICULAR

7    TO THE BEAM AXIS, NOT THAT THE REFLECTORS THEMSELVES -- AND,

8    YOUR HONOR, IF YOU THINK ABOUT IT, THIS IS NOT -- WHAT WOULD

9    THIS MEAN?  IF THIS WERE SAYING THAT THE, THAT THE PIXEL

10   REFLECTORS THEMSELVES ARE BEING MOVED PERPENDICULAR TO EACH

11   OTHER, WHAT WOULD THAT MEAN?  THAT THEY'RE EACH BEING MOVED

12   SIDEWAYS, SIDE TO SIDE?

13        NOBODY IS ARGUING FOR THAT IN THIS CASE.  NOBODY IS SAYING

14   THAT WOULD ACHIEVE THE BENEFIT OR THAT THAT WOULD WORK.  THAT

15   WOULD MAKE NO SENSE TO READ IT THAT WAY.

16        THIS IS A SLOPPY SENTENCE BECAUSE WHERE THE VERB IS

17   PLACED, IT LOOKS AS THOUGH IT'S SAYING THAT THE PIXEL

18   DEFLECTORS ARE BEING MOVED PERPENDICULAR.

19        WHAT'S HAPPENING HERE IS WHEN YOU READ THE ENTIRE

20   PARAGRAPH THIS IS IN, IT'S TELLING US THAT WE'RE CHANGING THE

21   PHASE OF THE BEAM FRONT, AND WE'RE DOING THAT IN A DIRECTION

22   ESSENTIALLY PERPENDICULAR TO THE BEAM AXIS AND RELATIVE TO --

23   AND, SEPARATELY, IT'S SAYING THE PIXEL REFLECTORS ARE BEING

24   MOVED RELATIVE TO EACH OTHER.

25        AND, YOUR HONOR, WHEN WE SAY "RELATIVE TO EACH OTHER," IF

 1    WE LOOK AT THE STAIRCASE IN FIGURE 2, THAT'S WHAT WE'RE TALKING

 2    ABOUT.  WE HAVE TWO PIXEL ELEMENTS THERE THAT ARE BEING MOVED

 3    RELATIVE TO EACH OTHER, AND THERE'S LOTS OF DISCUSSION IN THE

 4    PATENT ABOUT THE DISTANCE.

 5         IN OTHER WORDS, WHEN WE TALK ABOUT THE STAIRCASE, WE'RE

 6    TALKING ABOUT STAIR 1, STAIR 2, THE RELATIVE DISTANCE THAT THIS

 7    ONE IS MOVED RELATIVE TO THAT ONE.

 8         IN FACT, MY COLLEAGUE JUST POINTED OUT, AS YOUR HONOR

 9    ASKED ABOUT, CLAIM 19 IS ACTUALLY A GOOD EXAMPLE OF THAT

10    BECAUSE IT'S SHOWING US DISPLACEABLE REFLECTORS ARE DISPLACED

11    RELATIVE TO THE ADJOINING REFLECTOR, DEFLECTOR, AND IT TELLS US

12    A DISTANCE, BY A DISTANCE MODULO LAMBDA OVER 2.

13         SO IT'S ACTUALLY GIVING AN EXAMPLE IN CLAIM 19 OF SHOWING

14    US THAT THE REFLECTORS ARE MOVED, ONE OF THEM IN A DISTANCE

15    RELATIVE TO THE OTHER, NOT TELLING US SOMETHING ABOUT HOW THIS

16    COULD BE DONE FOR ROTATIONAL MOVEMENT.

17         IN FACT, THIS WOULDN'T WORK FOR ROTATIONAL MOVEMENT.  IT

18    WOULD HAVE NO APPLICABILITY.  WHAT WOULD THAT MEAN, A DISTANCE

19    OF LAMBDA OVER 2?  IT'S TALKING ABOUT THE DISTANCE OF ONE PIXEL

20    REFLECTOR BEING MOVED RELATIVE TO THE OTHER ONE.  WE'RE NOT

21    TALKING -- IT WOULDN'T MAKE ANY -- IT WOULD HAVE NO

22    APPLICABILITY IF WE WERE TALKING ABOUT TILTING AND ROTATING.

23              THE COURT:  OKAY.

24              MR. KRAMER:  I THINK THAT WE SHOULD TALK FOR A

25    MOMENT, YOUR HONOR, ABOUT THE -- ABOUT THE SLIDE THAT FINISAR

1    POINTED OUT, WHICH IS SLIDE 39 OF FINISAR'S MATERIALS.  THIS IS

2    SORT OF THE -- COUNSEL REFERRED TO IT AS THE SPIRIT OF THE

3    INVENTION.

4         I WANT TO DEBUNK THAT, AND I THINK THAT CAN EASILY BE

5    DONE.  IF WE LOOK AT FINISAR'S SLIDE 39, THAT'S A REFERENCE TO

6    THE SPECIFICATION, AND IT SAYS, "ANY DECREASE OF MOTION OR WAVE

7    FRONT PHASE MODULATION ALLOWED BY DIVIDING UP THE DEFLECTOR

8    INTO SEPARATE PIXELS IS WITHIN THE SPIRIT OF THIS INVENTION."

9         SO WHAT'S WITHIN THE SPIRIT OF THE INVENTION?  ANY

10   DECREASE OF MOTION OR WAVE FRONT PHASE MODULATION.

11        THAT'S NOT TELLING US THAT IT'S WITHIN THE SPIRIT OF THE

12   INVENTION TO HAVE ROTATING MIRRORS, TILTING MIRRORS.

13        THAT'S SIMPLY TELLING US THAT WHAT IS SHOWN IN THE PATENT

14   ARE EMBODIMENTS OF PERPENDICULAR MOVEMENT OF A CERTAIN AMOUNT,

15   OF THE PIXEL ELEMENTS BEING MOVED OUT RELATIVE TO EACH OTHER,

16   AND IT'S TELLING US ANY DECREASE OF MOTION.  SO IT'S TELLING US

17   THAT WE HAVE A RANGE THERE.  IT'S TELLING US WE CAN MOVE THE

18   PIXEL ELEMENTS A SHORTER DISTANCE.

19        IT'S CERTAINLY NOT IN ANY WAY TELLING US THAT THIS SOMEHOW

20   SAYS THAT WE CAN ALSO HAVE ROTATING MOTION OR SOME OTHER MOTION

21   THAT'S ANYTHING BUT PERPENDICULAR MOTION HERE.

22        I'D LIKE TO ADDRESS FOR A MOMENT THE ISSUE ABOUT

23   WHETHER -- FINISAR IS ARGUING THAT NISTICA SAYS IF THERE'S ONLY

24   ONE EMBODIMENT IN THE PATENT, THAT'S IT, YOU'RE LOCKED INTO

25   THAT ONE EMBODIMENT.

1          THAT IS NOT OUR ARGUMENT, YOUR HONOR.  THAT IS NOT --

2     THAT'S A MISCHARACTERIZATION OF IT.

3          WHAT WANG LABS TELLS US, AND THIS GOES BACK TO THE ISSUE

4     OF SECTION 112, THE FEDERAL CIRCUIT SAYING THAT IT'S IMPORTANT

5     THAT WE LOOK AND MAKE SURE THAT THE INVENTION IS ENABLED IN THE

6     SPECIFICATION, THAT THERE'S WRITTEN DESCRIPTION FOR IT, WHAT

7     WANG LABS TOLD US.  AND THE REASONING THERE WAS THAT YOU HAD A

8     PARTY COME IN AND SAY INTERPRET THIS CLAIM ELEMENT, AND THERE

9     WERE TWO WAYS IT COULD BE INTERPRETED, TWO EMBODIMENTS, ONE OF

10    WHICH WAS ENABLED.

11         THE OTHER, THERE WAS NOTHING IN IT SHOWING THAT THE

12    INVENTION COULD WORK IN THAT WAY, AND JUDGE NEWMAN SAID THERE'S

13    NO ENABLEMENT.  SHE DIDN'T PUT FORTH THAT THERE'S ONLY ONE

14    EMBODIMENT AND, THEREFORE, WE'RE DONE, RIGHT?

15         WHAT IS SAID IS THAT THERE HAS TO BE ENABLEMENT FOR THE

16    SCOPE THAT ONE IS ASKING FOR.

17         AND WHAT WE HAVE HERE IS THE SAME THING.  THIS IS

18    NISTICA'S BRIEF ON PAGE 4 WHERE WE TALK ABOUT WANG LABS.

19         AND FINISAR'S ARGUMENT, TO BE PERFECTLY CLEAR ABOUT IT, IS

20    THAT THERE HAS TO BE WRITTEN DESCRIPTION AND ENABLEMENT, AND

21    THE QUOTE FROM WANG LABS THERE IS THAT THE LIMITED CHARACTER

22    SYSTEM, BECAUSE THEY'RE THE ONLY SYSTEM THAT IS DESCRIBED AND

23    ENABLED IN THE PATENT SPECIFICATION AND DRAWINGS.

24         AND THEN LIEBEL AND THE OTHER CASES SAY THE RULE HERE IS

25    WE DON'T LIMIT A PATENT CLAIM SCOPE, IF THERE'S ONLY ONE

1    EMBODIMENT, TO THAT ONE EMBODIMENT SIMPLY BECAUSE THERE'S ONE,

2    AND WE AGREE WITH THAT.  THAT'S NOT OUR ARGUMENT.

3         BUT IN THE CASE LAW, IT SAYS WHAT WE HAVE TO HAVE IS

4    ENABLEMENT -- IF SOMEONE IS GOING TO ARGUE FOR A BROADER SCOPE

5    OF THE CLAIM, THERE HAS TO BE ENABLEMENT, WRITTEN DESCRIPTION

6    TO SUPPORT IT SO THAT WE DON'T HAVE KIND OF AN IMBALANCE WHERE

7    SOMEONE ONLY DESCRIBES THEIR INVENTION BEING DONE THIS WAY,

8    THEY GO AND THEY CLAIM IT, AND THEN LATER THEY COME INTO COURT

9    AND THEY SAY, "MY INVENTION COVERS ALL KINDS OF THINGS THAT A

10   PERSON OF ORDINARY SKILL IN THE ART WOULDN'T UNDERSTAND HOW TO

11   USE THE INVENTION TO ACCOMPLISH THOSE THINGS."

12        SO THAT'S WHAT WE'RE ARGUING HERE.  THE PATENT ITSELF IS

13   SHOWING HOW TO CHANGE THE WAVE FRONT OF THE BEAM SO THAT I DO

14   IT USING PERPENDICULAR MOTION.  IT TELLS US THAT ROTATIONAL

15   MOTION OF THE MIRRORS WAS TOO SLOW.

16        AND FINISAR IS ARGUING THAT WE SHOULD IGNORE THE

17   STATEMENTS ABOUT ROTATIONAL MOTION BEING TOO SLOW AND WE SHOULD

18   ALLOW THE CLAIM TO COVER ROTATIONAL MOTION, AGAIN, WHICH WOULD

19   NOT EVEN BE USING THE BENEFITS OF THE INVENTION OF ADJUSTING

20   THE WAVE FRONT OF THE BEAM.

21        SO THOSE ARE OUR COMMENTS.  IF YOUR HONOR HAS ANY

22   QUESTIONS, I'D BE GLAD TO ADDRESS THEM, BUT OTHERWISE PERHAPS

23   WE MOVE TO OUR NEXT VICTIM, OR PATENT.

24             THE COURT:  I THINK WE'LL TAKE OUR BREAK BEFORE WE DO

25    THAT.

```
 1          YES, MR. RADULESCU?

 2               MR. RADULESCU:  I HAVE FOUR SENTENCES OF REBUTTAL --

 3               THE COURT:  OKAY.

 4               MR. RADULESCU:  -- IF YOU WANT TO DO THAT, YOUR

 5     HONOR.

 6               THE COURT:  WE'LL DO THAT BEFORE OUR BREAK.

 7               MR. RADULESCU:  AND THE FIRST POINT IS WE DON'T

 8     DISPUTE THAT THE PRIMARY DESCRIBED EMBODIMENT IN THIS

 9     SPECIFICATION IS THIS DESIGN WHERE THE MIRRORS ARE SHOWN TO

10     MOVE IN VERY SIMPLISTIC PISTON-LIKE FASHION.  THAT'S THE FIRST

11     POINT.

12          THE SECOND POINT IS WE HAVEN'T HEARD FROM NISTICA YET ON

13     ANY PLACE IN THE CLAIMS, THE SPEC, OR THE PROSECUTION HISTORY

14     THAT'S MANIFESTING THIS CLEAR INTENTION TO LIMIT THE SCOPE OF

15     THE CLAIMS TO THE EXCLUSION OF GENERIC MOTION, RIGHT?  AND

16     THAT'S THE KEY POINT HERE IS THAT WE STILL HAVE TO CONSTRUE THE

17     TERM "DISPLACEABLE."

18          WE HAVEN'T HEARD IT.

19          AND THE SPIRIT OF THE INVENTION, THE INVENTION, OF COURSE,

20     IS MAKING VERY, VERY SMALL MIRRORS, MOVING THEM, MOVING THEM,

21     DISPLACING THEM, AND ACTUALLY CAUSING SWITCHING BY MODIFYING

22     THE PHASE FRONT.

23          SO IT'S A CONCEPT OF MAKING THEM SMALL AND, AS A RESULT,

24     MOVING THESE MUCH SMALLER MIRRORS.

25          IT DOESN'T MATTER HOW YOU MOVE THEM, ROTATING,
```

1    PISTON-LIKE, TILTING.

2         AND THE POINT IS THE INVENTION IS THE SMALL MIRRORS AND

3    DISPLACING THEM.

4         AND THEN I'LL END WITH WE DON'T HAVE THE BURDEN HERE TO

5    ESTABLISH EXPLICIT DISCLOSURE OF A ROTATING TILTING MIRROR

6    DESIGN.  THAT'S NOT THE INQUIRY.

7         THE INQUIRY HERE IS NOT HOW MUCH DISCLOSURE IS THERE?  HOW

8    MANY FIGURES ARE THERE?  WHAT DOES IT SAY ABOUT THIS ROTATING

9    MIRROR DESIGN, THIS OTHER TYPE OF MOTION?

10        AND THAT'S BECAUSE, OF COURSE, THE CLAIMS SAY

11   DISPLACEABLE, DISPLACING.  THERE'S AN EMBODIMENT THAT SUPPORTS

12   IT.  THERE'S NO EXPLICIT, YOU KNOW, INDICATION THAT THERE'S ANY

13   INTENT TO GIVE UP ON THE PLAIN AND ORDINARY MEANING OF

14   DISPLACEABLE REFLECTORS.

15        THAT'S ALL I HAVE.

16             THE COURT:  THANK YOU.  ALL RIGHT.

17        MR. KRAMER?

18             MR. KRAMER:  YOUR HONOR, IF I MAY HAVE 30 SECONDS?

19             THE COURT:  OKAY.

20             MR. KRAMER:  WHAT WE STILL HAVE NOT HEARD FROM

21   FINISAR IS HOW WE DEAL WITH THE STATEMENT IN THE SPECIFICATION

22   WHICH TELLS US THAT ROTATING MIRRORS IS KNOWN AND IS SLOW AND

23   IS SLOWER THAN DESIRED FOR THE MANY SWITCHING OPERATIONS THAT

24   ARE CONTEMPLATED BEING DONE BY THIS PATENT.

25             WHAT IS NEEDED IS AN OPTICAL SWITCH THAT WILL SWITCH BEAM

1    DIRECTIONS FASTER.

2         AND THEN THE PATENT GOES THROUGH EXHAUSTIVELY SHOWING

3    PERPENDICULAR MOTION ONLY THAT DOES THAT, AND FINISAR IS STILL

4    SAYING THAT IN LIGHT OF THIS SENTENCE, THEY SHOULD BE

5    ENTITLED -- THE PUBLIC -- THERE'S A PUBLIC -- YOU KNOW, THERE'S

6    A PUBLIC -- THERE'S A FACT THAT THE PUBLIC SHOULD BE ABLE TO

7    RELY ON WHAT'S IN THE PUBLIC DOCUMENT IN THE PATENT, IN THE

8    FILE HISTORY, TO KNOW.

9         AND WHEN YOU SEE A STATEMENT LIKE THIS, A PERSON OF

10   ORDINARY SKILL IN THE ART SAYS, AH, THIS IS TELLING ME THAT

11   ROTATIONAL MOTION OF THE MIRRORS IS TOO SLOW, LET'S SEE WHAT

12   THE SOLUTION IS, AND THE ONLY SOLUTION SHOWN IS PERPENDICULAR.

13        THANK YOU, YOUR HONOR.

14             THE COURT:  OKAY.  WHY DON'T WE COME BACK AT 11:15?

15             THE CLERK:  THIS COURT IS IN RECESS.

16        (RECESS FROM 10:52 A.M. UNTIL 11:14 A.M.)

17             THE COURT:  ALL RIGHT.  WE'RE BACK IN SESSION.

18        BEFORE WE MOVE ON, ALTHOUGH I KNOW I'VE GOTTEN YOU WAY

19    BEHIND SCHEDULE, I JUST WANT TO ASK ONE QUESTION THAT I'M

20    HOPING WILL CLARIFY THINGS FOR ME.

21        MR. RADULESCU, I JUST WANT TO BE SURE I UNDERSTAND, IS IT

22   YOUR PROPOSITION THAT YOU CAN USE THE TILTED MIRRORS TO CAUSE

23   PHASE MODULATION?

24             MR. RADULESCU:  YES.

25             THE COURT:  OKAY.

1          MR. RADULESCU:  THE IDEA IS TO HAVE VERY SMALL

2     MIRRORS, AND ONCE YOU HAVE SMALL MIRRORS AND PUT THEM IN THE

3     RIGHT PLACE, WHETHER IT'S THROUGH TILTING OR THROUGH

4     PISTON-LIKE MOTION, ONCE THEY GET THERE, IT'S THE ARRANGEMENT

5     OF THOSE MIRRORS THAT CAUSE THE SWITCH -- CAUSE THE

6     REDIRECTION.  IT'S -- ONCE THE MIRRORS GET IN PLACE -- IT

7     DOESN'T REALLY MATTER HOW THEY GOT THERE, RIGHT, THEY'RE SMALL

8     MIRRORS THAT NEED TO BE ALIGNED IN A CERTAIN WAY, AND THE

9     PATENT TEACHES WHAT THAT ALIGNMENT IS -- AND THEN YOU'LL GET

10    THIS PHASE FRONT MODULATION BECAUSE YOU'VE GOT ALL THESE SMALL

11    THINGS THAT ACT LIKE A GRATING.

12         THE COURT:  OKAY.  BECAUSE I WANT TO DISTINGUISH --

13    I'M NOT TALKING ABOUT REDIRECTION OF THE WAVE FRONT.  I'M

14    TALKING ABOUT PHASE MODULATION, BECAUSE THAT'S WHAT THE PATENT

15    IS ABOUT.

16         MR. RADULESCU:  YEAH, AN INDIVIDUAL MIRROR, A SMALL

17    MIRROR.  ONCE YOU HAVE A SMALL MIRROR, ALIGN IT NEXT TO ANOTHER

18    SMALL MIRROR AND HAVE AN ARRAY OF THESE SMALL MIRRORS, EACH

19    MIRROR IS A REFLECTING SURFACE FOR THE LIGHT, AND IF THEY'RE

20    ARRANGED CORRECTLY, YOU HAVE PHASE MODULATION.  THAT'S WHAT IT

21    IS.

22         IT'S A CONCEPT OF MAKING THEM REALLY SMALL THAT ALLOWS YOU

23    TO HAVE PHASE MODULATION, IN CONTRAST TO WHEN YOU HAVE A BIG

24    SINGLE ROTATING MIRROR, THERE'S NO PHASE MODULATION.  IT'S

25    SIMPLY JUST A REFLECTING SURFACE.

1          THE PRIOR ART WAS ONE BIG, FAT MIRROR, AND WHAT THIS

2     PATENT TEACHES IS MAKING AN ARRAY OF A LOT OF SMALL ONES.

3          AND, AGAIN, ONCE YOU GET THEM TO THE RIGHT LOCATION

4     THROUGH MOTION, WHETHER IT'S TILTING OR PISTON-LIKE MOTION, IF

5     THEY'RE ARRANGED IN THE RIGHT WAY, YOU WILL GET PHASE

6     MODULATION.

7          THE COURT:  AND YOU AGREE THAT TILT IS -- THERE'S

8     ONLY ONE TILT?  IT'S NOT AN INFINITE DEGREE OF TILTS THAT ARE

9     ACHIEVABLE?

10          MR. RADULESCU:  THE IDEA IS TO HAVE A VERY SMALL

11     MIRROR AND HAVE LIGHT REFLECTED.

12          THE COURT:  NO, I'M SORRY.  BUT THE VERY SMALL -- ONE

13     OF THESE VERY SMALL MIRRORS THAT TILTS IS, IT'S EITHER -- WHEN

14     WE SAY "TILT," THERE'S ONLY ONE POSITION FOR EACH ONE?

15          MR. RADULESCU:  NO.  THAT REFERENCE --

16          THE COURT:  SO YOU DISAGREE WITH --

17          MR. RADULESCU:  THAT REFERENCE FROM 1999 WAS ONE

18     PARTICULAR DESIGN WHERE IT WAS DESIGNED TO HAVE A MIRROR THAT

19     GOES THIS WAY OR THIS WAY.  BOOM, BOOM.

20     THE IDEA -- THE IDEA OF THE PATENT IS TO HAVE A, A

21     DISPLACEABLE SMALL MIRROR THAT'S ARRANGED IN THOSE TYPE OF

22     PATTERNS.

23          THE COURT:  SO CAN EACH MIRROR HAVE INFINITE

24     POSITIONS IN THE TILT?

25          MR. RADULESCU:  THE TEACHING OF THE PATENT -- THE

1    TEACHING OF THE PATENT IS TO GET THOSE MIRRORS IN THE RIGHT

2    PLACE WITH THE RIGHT AMOUNT OF DISPLACEMENT.

3        THE EXAMPLE IT HAS IS PISTON-LIKE, BUT THERE'S NO REASON

4    WHY -- AND BACK AT THAT TIME, THESE MEMS-BASED GRATINGS HAD NOT

5    JUST TWO, TWO POSITIONS.  OF COURSE, THAT'S OLDER TECHNOLOGY.

6        BUT AS TIME GOES ON, AS TIME WENT ON, THE ABILITY TO

7    CONTROL THE TILTING CAME INTO NATURAL BEING.

8        THE COURT:  SO PHASING IS CAUSED BY DIFFERENT DEGREE

9    OF TILT IN DIFFERENT MIRRORS?

10       MR. RADULESCU:  THE PHASING IS CAUSED BY TWO -- BY AN

11   ARRAY OF DIFFERENT REFLECTIVE SMALL SURFACES, AND WHETHER IT'S

12   TILTED RELATIVE TO THE LIGHT OR FLAT RELATIVE TO THE LIGHT, THE

13   POINT IS THE LIGHT IS COMING IN AT ONE PARTICULAR LOCATION AND

14   WHEN THE LIGHT HITS THE ADJACENT, THE ADJACENT PIXEL, IT'S

15   GOING TO BE IN A DIFFERENT LOCATION.

16       THE COURT:  SURE.

17       MR. RADULESCU:  AND IF THEY'RE SPACED RELATIVE TO

18   EACH OTHER, THEN YOU'RE GOING TO GET THE BOUNCING OFF AND

19   YOU'RE GOING TO GET THE PHASING.

20       THE COURT:  AND PLEASE FEEL COMFORTABLE TELLING ME IF

21   MY QUESTION IS IN THE WRONG DIRECTION, BUT I'M ASKING A

22   DIFFERENT QUESTION THAN YOU'RE ANSWERING.

23       IF WE FOCUS ON ONE OF THESE MICRO-MIRRORS, DOES IT HAVE

24   THE CAPACITY TO TILT MORE THAN ONE WAY?

25       MR. RADULESCU:  YES.

```
 1              THE COURT:  OKAY.

 2              MR. RADULESCU:  YES.

 3              THE COURT:  AND SO THAT'S DIFFERENT THAN WHAT

 4    MR. KRAMER TOLD ME.

 5              MR. RADULESCU:  HE SAID --

 6              THE COURT:  HE SAID IT TILTS -- WHEN YOU SAY "TILT,"

 7    IT GOES TO ONE STOP AND THAT'S IT.

 8              MR. RADULESCU:  LET ME BE CLEAR.  HE'S TALKING ABOUT

 9    A 1999 ARTICLE --

10              THE COURT:  OKAY.

11              MR. RADULESCU:  -- FROM DR. FORD THAT WE PULLED OUT

12    SIMPLY JUST TO SHOW THE TILTING EFFECT.

13              THE COURT:  ALL RIGHT.

14              MR. RADULESCU:  AND THAT'S -- THAT'S ONE TILTING, AND

15    IT'S ONE PARTICULAR REFERENCE.  IT'S JUST TILTING MIRRORS, AND

16    IN THAT PARTICULAR DESIGN, THEY WANTED THE LIGHT TO GO EITHER

17    THERE OR THERE.  IT'S LIKE A SWITCH.

18              THE COURT:  OKAY.  SO IN YOUR INVENTION, YOUR

19    MICRO-MIRRORS CAN TILT IN DIFFERENT -- I DON'T KNOW WHETHER THE

20    DEGREE --

21              MR. RADULESCU:  AMOUNTS.

22              THE COURT:  AMOUNTS?

23              MR. RADULESCU:  YES.

24              THE COURT:  RELATIVE TO EACH OTHER?

25              MR. RADULESCU:  YES.
```

```
1              THE COURT:  AND THAT ITSELF IS A TYPE OF PHASING?

2              MR. RADULESCU:  YES, TO BE COMPLETELY CONTRASTED WITH

3     THE BULK, FAT MIRROR THAT'S REFERENCED AS A ROTATING MIRROR IN

4     THE PRIOR ART WHERE YOU HAVE ONE -- A ROTATING MIRROR, ONE BIG

5     MIRROR.

6              WE'RE TALKING ABOUT A BUNCH OF LITTLE SMALL ONES, AND IT'S

7     TEACHING SMALL MIRRORS.  YOU DON'T HAVE TO MOVE THEM AS FAR IF

8     THEY'RE ARRANGED IN A PARTICULAR WAY.

9              THE COURT:  OKAY.

10             MR. KRAMER:  YOUR HONOR, MAY I VERY BRIEFLY?

11             THE COURT:  PLEASE.

12             MR. KRAMER:  THIS IS NOT ANYWHERE SHOWN IN THE

13    PATENT.  THIS IS MR. RADULESCU SAYING IT.  THIS IS NOT SHOWN IN

14    THE PATENT.

15             WHAT YOUR HONOR ASKED THE INITIAL QUESTION WAS WHETHER ONE

16    COULD CHANGE THE WAVE FRONT OF THE BEAM BY TILTING EACH OF THE

17    INDIVIDUAL MIRRORS, AND THE ANSWER TO THAT IS NO.

18             AND I THINK, AS YOU WERE ASKING THE QUESTION, I SAW HIS

19    HAND MOVING TO THE RIGHT AS HE WAS SAYING AS LONG AS WE MOVE

20    THE MIRRORS INTO A POSITION.

21             THE BEAM -- WHAT PHASING IS ABOUT IS ABOUT THE TIMING, AND

22    IT'S BASED ON THE POSITION OF THE MIRRORS RELATIVE TO EACH

23    OTHER, THE DISTANCE OF THE MIRRORS RELATIVE TO EACH OTHER.

24             TO CHANGE THE WAVE FRONT OF THE BEAM, WHAT ONE MUST DO IS

25    MOVE THE PHYSICAL POSITION OF THE MIRRORS IN RELATION TO THE
```

1    BEAM AXIS, MOVE SOME OF THE MIRRORS FURTHER -- CLOSER TO THE

2    BEAM COMING IN THAN OTHER MIRRORS AS WE SAW IN THE

3    PERPENDICULAR MOVEMENT.

4         YOU DO NOT ACHIEVE THAT BY KEEPING ALL OF THE SMALL

5    MIRRORS IN THE SAME PLACE AND TILTING THEM.  YOU DO NOT.

6         WHAT HAPPENS IS YOU HAVE A REFLECTION RATHER THAN USING

7    THE CHANGING BEAM.

8              THE COURT:  AND THAT'S WHAT I'M TRYING TO DETERMINE,

9     AND YOU DISAGREE ON IT, BUT I'M TRYING TO DETERMINE WHETHER THE

10    TILTING IS ACTUALLY SEPARATE AND DISTINCT FROM THE PHASE

11    MODULATION.

12             MR. KRAMER:  YES, THAT'S RIGHT.

13             THE COURT:  BECAUSE THIS PATENT IS ABOUT PHASE

14    MODULATION.

15             MR. KRAMER:  RIGHT.  THAT'S RIGHT.

16             THE COURT:  AND THAT'S THE DESCRIPTION OF THIS

17    PATENT, AND I DON'T THINK ANYONE DISAGREES WITH THAT.  AND I'M

18    STILL STRUGGLING WITH WHETHER YOU CAN ACHIEVE PHASE MODULATION

19    WITH TILTING.

20             MR. KRAMER:  THIS PATENT DESCRIBES -- WHEN YOUR HONOR

21    LOOKS AT IT, YOU'LL SEE IT IN OUR SLIDES.  THIS PATENT

22    DESCRIBES ONE OF THE BENEFITS OF THE INVENTION IS SUPPOSEDLY

23    THAT YOU CAN CONTROL THE ANGLE AT WHICH THE BEAM IS SENT OUT --

24             THE COURT:  YES, SURE.

25             MR. KRAMER:  -- WITH MORE -- WITH GREATER PRECISION

```
1      THAN A TILTING MIRROR, BECAUSE A TILTING MIRROR --

2              THE COURT:  THAN A SINGLE TILTING MIRROR?

3              MR. KRAMER:  RIGHT.  RIGHT.

4              THE COURT:  YEAH.

5              MR. KRAMER:  AT THAT TIME -- AND THERE'S NO EVIDENCE

6      ANYWHERE IN THE SPECIFICATION BECAUSE IT'S NOT DONE THAT WAY

7      WITH THESE TILTING MIRRORS TO BE ABLE TO CONTROL IT VERY

8      PRECISELY WHERE YOU WOULD BE ABLE TO MAKE SMALL MOVEMENTS.

9          IT'S MOVED THIS WAY OR IT'S MOVED THAT WAY.  YOU SET IT

10     THAT WAY.  THERE'S NO TEACHING IN THE PATENT OTHERWISE.

11             THE COURT:  OKAY.  THANK YOU.

12         I SUPPOSE WE COULD SPEND HOURS ON EACH ONE OF THESE,

13     COULDN'T WE?  ALL RIGHT.  THANK YOU BOTH.

14         ALL RIGHT.  LET'S MOVE ON THEN TO OUR NEXT PATENT, AND

15     MR. TONKOVICH -- OH, MS. DAVIS, WE'RE GOING TO START WITH YOU,

16     OF COURSE.

17         MS. DAVIS, WHICH ONE ARE WE GOING TO NEXT?

18             MS. DAVIS:  NEXT IS THE "SCATTERED LIGHT FROM A

19     DROPPED SIGNAL IS DIRECTED ONTO THE MICRO-MIRROR DEVICE TO

20     REFLECT AWAY FROM THE RETURN PATH."  THAT IS THE END OF CLAIM 1

21     IN THE '687 PATENT.

22         IT STARTS ON SLIDE -- LET'S START WITH SLIDE 44 OF

23     FINISAR'S SLIDE DECK.

24             THE COURT:  YES, I'M THERE.  THANK YOU.

25             MS. DAVIS:  ALL RIGHT.  SO ON SLIDE 44 OF FINISAR'S
```

1     SLIDE DECK, WE START OFF AT THE TOP WITH A THREE-COLUMN CHART

2     FOR THIS TERM PUTTING FORTH THE CLAIM TERM ITSELF ON THE LEFT;

3     FINISAR'S PROPOSAL, WHICH FOR THIS TERM IS THAT THE CLAIM

4     LANGUAGE SHOULD HAVE ITS PLAIN AND ORDINARY MEANING; AND ON THE

5     RIGHT WE SEE NISTICA'S LONGER PROPOSAL.

6         NOW, YOUR HONOR, I'M SURE, HAS NOTED OVER THE COURSE OF

7     THE BRIEFING THAT A NUMBER OF THE DISPUTES ON THIS PARTICULAR

8     TERM HAVE GONE BY THE WAYSIDE AND NISTICA HAS STIPULATED TO

9     CERTAIN ASPECTS OF FINISAR'S CONSTRUCTION, AND SO THERE'S NOW

10    ONLY ONE DISPUTE LEFT IN CONNECTION WITH THIS TERM.

11        AND THAT DISPUTE IS -- PARDON ME.  BEFORE I GET TO THAT

12    DISPUTE, WHICH CENTERS ON THE ACTUAL WORDS "SCATTERED LIGHT" IN

13    THE CLAIM TERM, IT'S IMPORTANT TO NOTE THAT NEITHER PARTY IS

14    PROPOSING A DEFINITION OF "SCATTERED LIGHT."

15            THE COURT:  THAT WASN'T LOST ON ME.

16            MS. DAVIS:  RIGHT.  THERE'S NO ACTUAL DISAGREEMENT

17    OVER WHAT "SCATTERED LIGHT" MEANS.

18        WHAT THERE IS A DISAGREEMENT OVER IS WHAT IS THE SCATTERED

19    LIGHT AS IT'S USED IN THE CLAIM TERM, AND THERE FINISAR

20    BELIEVES THAT "SCATTERED LIGHT" SHOULD HAVE ITS REGULAR,

21    ORDINARY MEANING, WHICH WOULD INCLUDE ANY TYPE OF SCATTERED

22    LIGHT, WHEREAS NISTICA ARGUES THAT IT SHOULD BE LIMITED TO ONLY

23    A SUBSET OF SCATTERED LIGHT.

24        SPECIFICALLY, AS YOU CAN SEE IN RED ON SLIDE 47, NISTICA

25    ARGUES THAT THE WORDS "SCATTERED LIGHT" SHOULD BE LIMITED TO

1    "LIGHT FROM A DROPPED SIGNAL THAT IS SCATTERED FROM THE EDGES

2    OF THE MICRO-MIRRORS USED TO BLOCK THAT SIGNAL."

3         AND FOR SHORTHAND, WE'RE GOING TO TALK ABOUT THAT AS EDGE

4    SCATTERING.

5              THE COURT:  GOOD.

6              MS. DAVIS:  SO, FIRST, LET'S LOOK AT THE

7    SPECIFICATION TO SEE HOW IT'S DISCUSSING SCATTERED LIGHT AND TO

8    NOTE THAT IT SUPPORTS FINISAR'S POSITION.

9         YOU CAN SEE IN THE, ON COLUMN 12 OF THE PATENT, WHICH

10   WE'VE EXCERPTED HERE, THAT THERE'S A DISCUSSION OF SCATTERED

11   LIGHT.  THIS IS ACTUALLY THE ONLY PART OF THE PATENT WHERE

12   SCATTERED LIGHT IS SPECIFICALLY DISCUSSED, AND IT'S IN

13   CONNECTION WITH FIGURE 24, ONE OF THE EMBODIMENTS DISCLOSED IN

14   THE PATENT.

15        AND YOU'LL NOTE THAT THROUGH THE HIGHLIGHTING, THERE'S A

16   DISCUSSION OF SOME SCATTERED LIGHT OF THE BLOCKED OPTICAL

17   CHANNELS THAT PROPAGATES ALONG THE FIRST OPTICAL PATH 92.

18        NOW, THE GOAL OF THE DEVICE HERE IS A BLOCKING FILTER,

19   WHICH MEANS WE WANT TO DROP ONE PARTICULAR CHANNEL OF LIGHT.

20   FOR THE CASE OF ARGUMENT, LET'S SAY THE RED LIGHT IS WHAT WE'RE

21   LOOKING TO DROP HERE.

22             THE COURT:  UM-HUM.

23             MS. DAVIS:  AND THE PURPOSE OF THE INVENTION IS THAT

24   THIS LIGHT WOULD GET SENT AWAY FROM THE RETURN PATH, NOT

25   FROM -- AND BE SENT OFF AWAY FROM WHERE IT WOULD CONTINUE ALONG

1    THE NETWORK.

2         ONE OF THE PROBLEMS IS THAT YOU GET SCATTERED LIGHT THAT

3    WOULD CONTINUE ALONG THE CHANNEL, MORE RED LIGHT THAT WOULD

4    CONTINUE, AND WE WOULD LIKE TO EXTINGUISH AS MUCH OF IT AS

5    POSSIBLE.

6         WE CAN SEE HERE IN COLUMN 12, THERE'S A REFERENCE TO EDGE

7    SCATTERING FROM THE MICRO-MIRRORS.  THAT COULD LIMIT THE

8    EXTINCTION OF A BLOCKED CHANNEL.

9         AND THEN THE PATENT CONTINUES TO EXPLAIN THAT BY PROPERLY

10   CHOOSING THE ANGLE OF INCIDENCE ON THE SPACIAL LIGHT MODULATOR,

11   COHERENT SCATTERING FROM THOSE BLOCK CHANNELS CAN ALSO BE

12   DIRECTED AWAY.

13            THE COURT:  AND WHAT AM I TO UNDERSTAND "COHERENT

14   SCATTERING" TO MEAN?

15            MS. DAVIS:  SO THAT'S ACTUALLY EXACTLY THE NEXT SLIDE

16   THAT I'LL GET TO IN A LITTLE BIT.

17            THE COURT:  THANK YOU.

18            MS. DAVIS:  SO NEXT SLIDE, WE'VE GOT FIGURE 24, AND

19   WE HAVE AN ANIMATION THAT WALKS THROUGH FIGURE 24, SO I'M GOING

20   TO SPEED UP HERE SO WE CAN GET TO THE IMPORTANT BITS.

21        SO THERE'S MANY COMPONENTS HERE IN THE SYSTEM, AND WE'VE

22   GOT FIRST PASS AT THE SPACIAL LIGHT MODULATOR, THE LIGHT COMES

23   IN, SOME OF IT CONTINUES THROUGH THE SYSTEM ON THE RETURN PATH,

24   AND SOME OF IT, THIS RED LIGHT, FOR THE SAKE OF ARGUMENT, IS

25   DROPPED, AND THEN THE LIGHT COMES BACK AND DOES A SECOND PASS

1    OF THE SPACIAL LIGHT MODULATOR, THE RED LIGHT IS DROPPED AGAIN.

2        SO WHAT IS EDGE SCATTERING AND WHAT IS COHERENT

3    SCATTERING?

4        BASICALLY EVERY ELEMENT THAT LIGHT INTERACTS WITH CAN

5    SCATTER IT AND WILL SCATTER SOME OF IT.  SOME ELEMENTS SCATTER

6    LIGHT IN PREDICTABLE DIRECTIONS.  ONE TYPE OF PREDICTABLE

7    SCATTERING IS EDGE SCATTERING, FROM THE EDGE OF AN ELEMENT.

8        OTHER TYPES OF PREDICTABLE SCATTERING CAN INCLUDE BACK

9    SCATTERING, CAN INCLUDE SCATTERING THAT HAPPENS WHEN LIGHT

10   PASSES THROUGH A GRATING IF THE LIGHT INTERACTS WITH, AS YOU

11   CAN THINK OF IT, THE SOLID PORTIONS BETWEEN THE SLITS IN THE

12   GRATING.

13           THE COURT:  SO YOU'RE TELLING ME EDGE SCATTERING AND

14   BACK SCATTERING ARE DISTINCT?

15           MS. DAVIS:  EDGE SCATTERING AND BACK SCATTERING CAN

16   BE -- ARE DISTINCT.  EDGE SCATTERING COMES FROM EDGES.

17       AND I WOULD SAY RIGHT THERE I WAS TALKING ABOUT WHAT

18   COHERENT SCATTERING IS.  COHERENT SCATTERING IS LIGHT THAT'S

19   GOING TO COME -- REGARDLESS OF ITS SOURCE, THAT'S GOING TO BE

20   SCATTERED IN A PREDICTABLE WAY.  SO IT'S GOING TO BE TOGETHER

21   AND YOU CAN UNDERTAKE EFFORTS IN THE DESIGN OF YOUR DEVICE TO,

22   FOR INSTANCE, IN THIS BLOCKING FILTER, MAKE SURE THAT IT GETS

23   REALLY BLOCKED.

24           THE COURT:  OKAY.  IN THE PATENT, IN ONE PLACE, AND

25   IT MAY BE IN THE HISTORY, THEY TALKED ABOUT EDGE AND BACK

1    SCATTERING PROBLEMS, PLURAL.

2         MS. DAVIS:  RIGHT.

3         THE COURT:  AND IN ANOTHER PLACE THEY TALKED ABOUT

4    EDGE AND BACK SCATTERING PROBLEM, SINGULAR, SO IT WAS UNCLEAR

5    TO ME WHETHER THEY WERE THE DIFFERENT OR THE SAME.

6         MS. DAVIS:  SO THEY ARE DIFFERENT, BUT THEY'RE

7    RELATED, AND THAT'S PART OF WHY I THINK THERE IS SOME LOOSENESS

8    WITH WHETHER THERE'S A PLURAL OR A SINGULAR.  WE'LL GET TO SOME

9    SLIDES WHERE WE LOOK AT EXACTLY THAT LANGUAGE.

10         THE COURT:  OKAY.

11         MS. DAVIS:  BUT BACK SCATTERING, FOR INSTANCE, IF YOU

12    CAN THINK OF LOOKING OUT A MIRROR, WHICH IS GENERALLY SUPPOSED

13    TO BE TRANSLUCENT, YOU'RE SUPPOSED TO SEE OUTSIDE, BUT

14    SOMETIMES YOU SEE A BIT OF A REFLECTION OF YOURSELF, THAT WOULD

15    BE LIGHT SCATTERING BACK TO YOU THAT'S NOT INTENDED.

16         AND EDGE SCATTERING, AS WE DISCUSSED, CAN BE EDGE EFFECTS

17    FROM THE EDGE OF A MIRROR, THE EDGE OF ANY OTHER TYPE OF LENS,

18    OTHER OPTICAL ELEMENT.

19         SO, FOR INSTANCE, FIGURE 24, THIS IS THE FIGURE THAT'S

20    DISCUSSED IN THE SECTION OF THE SPEC WE JUST LOOKED AT, AND THE

21    LIGHT, YOU KNOW, PASSES BY THE MEMS SLM A SECOND TIME -- AND

22    SLM IS SHORTHAND FOR SPACIAL LIGHT MODULATOR -- AND THEN WHEN

23    IT GOES BY THE MEMS SLM A SECOND TIME, THE PREDICTABLY

24    SCATTERED LIGHT CAN BE REDIRECTED OFF AGAIN, SO IT'S DROPPED A

25    SECOND TIME.  YOU GET BETTER EXTINCTION OF THE CHANNEL YOU WANT

1    TO DROP.

2         AND THERE'S ANOTHER EMBODIMENT IN THE '687 PATENT THAT

3    DISCLOSES ANOTHER DOUBLE PASS EMBODIMENT LIKE WHAT WE TALKED

4    ABOUT WHERE THE LIGHT GOES BY THE SLM TWICE, AND THIS IS

5    FIGURE 21.  WE HAVE A LITTLE ANIMATION OF IT, TOO, WHICH I'LL

6    SPEED UP BECAUSE THERE'S LOTS OF PARTS.

7         BUT THE IDEA IS THAT THE FIRST TIME THE LIGHT HITS THE

8    SLM, SOME SIGNAL IS DROPPED.  THEN IT RETURNS AND GETS SENT

9    BACK -- ALL THE LIGHT GOES BACK THROUGH THE GRATING, IT'S

10   CONSOLIDATED AGAIN, IT COMES BACK FOR A SECOND PASS HERE

11   THROUGH THE SLM AGAIN, AND ANY OF THAT REMAINING SCATTERED

12   LIGHT, BE IT EDGE SCATTERING OR COHERENT SCATTERING, CAN BE

13   ROUTED OFF AGAIN BEFORE THE REMAINING SIGNALS ARE OUTPUT FROM

14   THE LIGHT, OR FROM THE DEVICE.

15        AND SO HERE ARE TWO EXAMPLES OF HOW THIS DOUBLE PASS OF

16   THE SLM ARCHITECTURE IS WORKING TO ACTUALLY IMPROVE THE

17   FUNCTIONING OF THE DEVICE HERE.

18             THE COURT:  UM-HUM.

19             MS. DAVIS:  AND THIS IS IN ACCORD WITH WHAT WE SEE IN

20   THE FILE HISTORY, WHICH IS BROADER THAN JUST EDGE SCATTERING AS

21   YOUR HONOR NOTED AND HAS READ THE FILE HISTORY SECTIONS HERE.

22        THE APPLICANT IS EXPLAINING THAT ONE OF THE ADVANTAGES OF

23   ITS INVENTION IS THAT IT CAN HELP IN SOLVING THE PROBLEMS OF

24   EDGE SCATTERING AND BACK SCATTERING, AND THAT'S A GOAL HERE OF

25   THE INVENTION.

1          AND IT'S CLEAR --

2              THE COURT:  WELL, YOU KNOW, I READ THE FILE HISTORY

3      AND I WAS LOOKING AT THE KORRELL DECLARATION, EXHIBIT B, AND

4      THAT WAS PAGE 925, I BELIEVE, OF THE HISTORY, THAT THE PRESENT

5      INVENTION PROVIDES A SOLUTION TO EDGE SCATTERING PROBLEM.  IT

6      SEEMED VERY LIMITED.

7              MS. DAVIS:  WELL, I MUST ADMIT, THE SPECIFICATION

8      DOES SEEM TO BE A LITTLE BIT LOOSE WITH THE USE OF EDGE

9      SCATTERING AND BACK SCATTERING.

10             THE COURT:  I THINK IT SEEMED VERY TIGHT AND

11     INTENTIONAL, THOUGH, IS ANOTHER WAY OF LOOKING AT IT.

12         IT'S HARD TO BELIEVE THAT, THAT IT WAS LOOSE.  I MEAN, IT

13     JUST GIVES ME TOO MUCH DISCRETION TO CHANGE THE INVENTION.

14             MS. DAVIS:  WELL, SO I DON'T WANT TO SAY "LOOSE"

15     THEN.  THAT'S PROBABLY NOT THE RIGHT WORD.

16         THEY REFER TO EDGE SCATTERING AND BACK SCATTERING, BUT

17     IT'S ESSENTIALLY THE SAME SCATTERED LIGHT PROBLEM.

18         WHEN THE APPLICANT, IN THE SAME OFFICE ACTION, IS

19     DISCUSSING, YOU KNOW, WHAT IT IS THAT THEY DO TO, YOU KNOW,

20     SOLVE THEIR SCATTERED LIGHT PROBLEMS, THEY'RE TALKING ABOUT

21     FIGURES 21 AND 24 ESPECIALLY.

22             THE COURT:  UM-HUM.

23             MS. DAVIS:  ESPECIALLY IN SOME OF THE LATER OFFICE

24     ACTIONS, TOO, THE REMARKS CENTER AROUND THESE, AND THEY

25     HIGHLIGHT HOW THEY ARE ABLE TO -- THAT THERE'S SCATTERING FROM,

1    YOU KNOW, MULTIPLE SOURCES.  THEY MENTION EDGE SCATTERING, THEY

2    MENTION THE BACK SCATTERING.

3         AND THE DESCRIPTION IN THE SPECIFICATION OF FIGURE 24 THAT

4    WE JUST LOOKED AT TALKS ABOUT COHERENT SCATTERING, WHICH IS A

5    BROADER TERM THAT ENCOMPASSES THAT PREDICTABLE SCATTERING THAT

6    CAN OCCUR FROM VARIOUS DIFFERENT ELEMENTS, NOT JUST NECESSARILY

7    THE EDGES OF A MIRROR.

8         THE COURT:  AND SO, OF COURSE, THAT'S ONE OF MY

9    QUESTIONS, WHAT OTHER SOURCES OF SCATTERING ARE THERE?

10        MS. DAVIS:  THE REALITY IS THAT PRETTY MUCH ANY

11   ELEMENT IN A FREE OPTICS ARRANGEMENT IN A DEVICE LIKE THIS IS

12   GOING TO HAVE SOME AMOUNT OF SCATTERING THAT IT CAUSES.  SOME

13   OF IT IS NOT PREDICTABLE, SUCH AS IF YOU GET DUST ON YOUR LENS.

14        THE COURT:  YOU CAN'T ADDRESS THAT.

15        MS. DAVIS:  YOU CAN'T ADDRESS THAT WITH THIS KIND OF

16   INVENTION.

17        BUT A LOT OF IT IS PREDICTABLE, AND THAT'S THE COHERENT

18   SCATTERING.

19        THE COURT:  AND SO WHAT YOU'RE SAYING IS THAT THIS

20   INVENTION WOULD ONLY ADDRESS PREDICTABLE SCATTERING, WHICH

21   YOU'RE SAYING WOULD BE -- IS "COHERENT SCATTERING" THE UMBRELLA

22   TERM THAT WOULD INCLUDE EDGE AND BACK SCATTERING, OR AM I

23   INCORRECT?

24        MS. DAVIS:  IT'S OKAY TO THINK OF IT AS AN UMBRELLA

25   TERM.  I THINK THAT THE KEY IS THAT THERE'S A DISTINCTION THERE

1    BETWEEN EDGE SCATTERING AND COHERENT SCATTERING.

2         THE COURT:  THERE IS A DISTINCTION BETWEEN THEM?

3         MS. DAVIS:  YES.

4         THE COURT:  WHAT IS THE COHERENT SCATTERING?  YOU SAY

5    IT HAS THE PROPERTY OF BEING PREDICTABLE.

6      BUT WHEN YOU SAY EDGE SCATTERING, YOU'RE TELLING ME THAT

7    THE SOURCE OF THE SCATTERING IS THE EDGE OF THE MIRROR.

8      SO WHAT IS THE SOURCE OF THE COHERENT SCATTERING?

9         MS. DAVIS:  IT MAY VARY.  THE PATENT IS NOT SPECIFIC

10   AS TO ALL OF THOSE SOURCES.

11        THE COURT:  CAN YOU GIVE ME AN EXAMPLE THAT'S KNOWN?

12        MS. DAVIS:  SURE.  FOR INSTANCE, IN A GRATING, IF YOU

13   CAN THINK OF A GRATING, THERE'S SLITS IN AN OTHERWISE SOLID

14   PIECE.

15     SO IT SPLITS -- THE LIGHT THAT ACTUALLY HITS THE SLIT

16   ITSELF IS GOING TO INTERACT WITH IT AND CREATE SOME AMOUNT OF

17   SCATTERING.  THAT WOULD BE PREDICTABLE.

18        THE COURT:  SO THAT SCATTERING IS OCCURRING AT A

19   DIFFERENT LOCATION ALONG THE PATH OF THE -- THAN WHERE THE EDGE

20   SCATTERING OCCURS, BY DEFINITION?

21        MS. DAVIS:  YES AND NO.

22        THE COURT:  BECAUSE IF I'M LOOKING AT THE DIFFRACTION

23   GRATING IN FIGURE 21 --

24        MS. DAVIS:  YES.

25        THE COURT:  -- IT'S PHYSICALLY SEPARATE FROM THE

```
 1      SPACIAL LIGHT MODULATOR.

 2              MS. DAVIS:  CORRECT.

 3              THE COURT:  AND THE EDGE SCATTERING IS OCCURRING WHEN

 4      THE BEAM HITS THE SPACIAL LIGHT MODULATOR; CORRECT?

 5              MS. DAVIS:  THAT'S RIGHT.  THAT'S WHERE SOME EDGE

 6      SCATTERING OCCURS.

 7              THE COURT:  OKAY.  AND IF THERE'S SCATTERING CAUSED

 8      BY INTERFERENCE OF THE DIFFRACTION GRATING, THE EDGE SCATTERING

 9      OCCURS AT THE POINT OF THAT INTERSECTION?

10              MS. DAVIS:  RIGHT.  THAT'S WHEN THE SCATTERING WOULD

11      BE CREATED.

12              THE COURT:  OKAY.  AND THIS INVENTION DOESN'T APPEAR

13      TO ADDRESS ANYTHING THAT'S GOING ON AT THAT OTHER LOCATION, AT

14      THE GRATING ITSELF.  IT MAY BE COHERENT SCATTERING, AND IT --

15      YOU KNOW, I'LL -- I CAN'T SAY THAT IT WOULDN'T OCCUR, BUT I

16      DON'T SEE ANYTHING IN THE PATENT THAT SAYS YOU'RE ADDRESSING

17      THAT BECAUSE YOU'RE ADDRESSING THE EDGE SCATTERING IN A

18      DIFFERENT -- IN A DIFFERENT WAY.  IT'S BY -- YOU HAVE TO

19      POSITION CERTAIN MICRO-MIRRORS TO, TO REDIRECT THE EDGE

20      SCATTERING AWAY FROM THE PATH OF THE RETURNING BEAM; CORRECT?

21              MS. DAVIS:  I SEE.  SO YOU'RE LOOKING AT --

22              THE COURT:  I MAY BE WRONG ON THIS.

23              MS. DAVIS:  SO I'M LOOKING AT COLUMN 12 OF THE

24      SPECIFICATION WHERE THEY TALK ABOUT THIS.  IT'S ON PAGE 4 -- OR

25      SLIDE 48, SO I'LL -- I'LL TALK ABOUT THAT.
```

1              IT IS GOING TO TAKE A LONG TIME TO POP BACK.  I CAN'T DO

2       THAT.

3              BUT SLIDE 48, AT KIND OF THE TAIL END OF THE FIRST

4       PARAGRAPH, THEY SAY, "WHILE BLOCKED OR DELETED CHANNELS ARE

5       DIRECTED ALONG THE OPTICAL PATH 610, SOME SCATTERED LIGHT OF

6       THE BLOCKED OPTICAL CHANNELS PROPAGATES ALONG THE FIRST OPTICAL

7       PATH 92."

8              SO THAT'S A BROAD UMBRELLA TERM OF SCATTERED LIGHT.

9              THE COURT:  WELL, I DON'T THINK SO, BECAUSE IT GOES

10      ON TO SAY "THIS EDGE SCATTERING."  I MEAN, IT LIMITS IT.  IT

11      SEEMS AS THOUGH IT'S NOT MEANT TO BE BROAD.  IT SEEMS LIKE THE

12      NEXT SENTENCE DEFINES IT AS EDGE SCATTERING.

13             MS. DAVIS:  I SEE WHAT YOU'RE SAYING.  I SEE WHAT

14      YOU'RE SAYING.

15             AND THEN THE EDGE --

16             THE COURT:  THE NEXT PARAGRAPH TALKS ABOUT COHERENT

17      SCATTERING, I'LL GRANT YOU THAT.  I MARKED THAT IN MY -- IN

18      COLUMN 12.

19             MS. DAVIS:  RIGHT.  AND I THINK THAT -- I THINK THAT,

20      YOU KNOW, OUR UNDERSTANDING AND OUR READING HERE IS THAT THE

21      SCATTERED LIGHT THAT'S BEING HANDLED IN THIS SAME INVENTION, AS

22      THERE'S THE DISCUSSION OF THE SCATTERED LIGHT WHICH THEY THEN

23      REFER BACK TO AS EDGE SCATTERING, THEY CONTINUE TALKING ABOUT

24      THE SAME -- THEY'RE TALKING ABOUT THE SAME EMBODIMENT HERE WHEN

25      THEY'RE REFERENCING THAT THE COHERENT SCATTERING FROM THE BLOCK

1    CHANNEL MIRRORS CAN BE DIRECTED AWAY FROM THE RETURN PATH TO

2    PROVIDE THE BEST -- OR THE HIGHEST BLOCKED CHANNEL DISTINCTION.

3          THE COURT:  AND YOU'RE SUGGESTING THAT COHERENT

4    SCATTERING COULD -- WOULD ALSO ENCOMPASS SCATTERING THAT COULD

5    HAPPEN AT THE GRATING?

6          MS. DAVIS:  IT COULD.  AND I THINK -- YOU KNOW --

7          THE COURT:  BECAUSE WHAT I UNDERSTOOD FROM THE

8    TUTORIAL IS THAT IF THE -- THE RED LINES IN FIGURE 21 ARE OUR

9    DROPPED SIGNAL; IS THAT CORRECT?

10         MS. DAVIS:  CORRECT.

11         THE COURT:  IT'S THAT WAY?

12         MS. DAVIS:  YES.

13         THE COURT:  THAT THE EDGE SCATTERING CAUSES LIGHT TO

14   GO IN OTHER DIRECTIONS AND INTERFERE WITH THE DESIRED SIGNAL?

15         MS. DAVIS:  AND THAT IS DEFINITELY AN EFFECT THAT

16   THIS INVENTION IS TRYING TO SOLVE AS WELL.

17         THE COURT:  OKAY.  AND SO THIS INVENTION DEALS WITH

18   MICRO-MIRRORS AT THE -- ON THE SPACIAL LIGHT MODULATOR TO

19   REDIRECT THOSE UNDESIRED -- THE NUISANCE SCATTERING; RIGHT?

20         MS. DAVIS:  RIGHT.

21         THE COURT:  SO IF YOU HAVE COHERENT SCATTERING AT THE

22   DIFFRACTION GRATING, THOSE MIRRORS ON THE SPACIAL LIGHT

23   MODULATOR DON'T ADDRESS THE COHERENT SCATTERING THAT OCCURS

24   FROM -- THAT IS CAUSED BY THE GRATING, DO THEY?

25         MS. DAVIS:  I THINK THEY CAN.  AND WHAT HAPPENS IS

1    THAT -- WHAT BECOMES ADDRESSABLE IS WHEN THERE'S -- ON THE

2    FIRST TIME IT'S ENTERING THE SYSTEM, THERE'S -- THE RED SIGNAL

3    IS STILL THERE, AND AFTER IT HITS THE SPACIAL LIGHT MODULATOR

4    THE FIRST TIME, AS MUCH OF THE RED SIGNAL AS POSSIBLE IS THEN

5    DROPPED, BUT THERE'S GOING TO BE SOME THAT STILL REMAINS.

6            THE COURT:  SURE.

7            MS. DAVIS:  BECAUSE THE LIGHT GOES THROUGH THE WHOLE

8    SYSTEM AS A SECOND PASS, TO THE EXTENT THAT GRATING MAY

9    GENERATE ADDITIONAL SCATTERED LIGHT, IT MAY LET RED SCATTERED

10   LIGHT OR HAVE -- BE CONTINUED THROUGH THE SYSTEM, THAT IS GOING

11   TO BE ADDITIONAL LIGHT ON THE CHANNEL THAT'S SUPPOSED TO BE

12   BLOCKED THAT'S GOING TO TRY TO BE DROPPED WHEN IT COMES BACK TO

13   THE SLM FOR THE SECOND TIME, SIMILAR TO HOW ANY EDGE SCATTERING

14   THAT WAS CREATED THE FIRST TIME AT THE SLM IS GOING TO BE IN A

15   PREDICTABLE LOCATION SO THEY CAN TRY TO ARRANGE THE MIRRORS ON

16   THE SLM TO DROP IT THE SECOND TIME.

17           THE COURT:  SO LET ME ASK YOU ANOTHER QUESTION.  AS

18   THE SIGNAL GOES THROUGH THE FIRST PASS, THROUGH THE GRATING,

19   THERE IS NO -- THERE'S NO EFFECT FROM BLOCKED CHANNEL MIRRORS.

20   THERE ARE NO BLOCKED CHANNEL MIRRORS THERE.  THAT'S THE SPACIAL

21   LIGHT MODULATOR.

22           MS. DAVIS:  RIGHT.

23           THE COURT:  AND SO IT LOOKS AS THOUGH -- AND, AGAIN,

24   I'M ONLY LOOKING AT COLUMN 12 HERE, AND MAYBE THAT'S TOO

25   NARROW -- THAT THE WORD "COHERENT SCATTERING" ACTUALLY IS NOT

1      USED TO ADDRESS DIFFERENT SCATTERING THAN -- DIFFERENT TYPE OF

2      SCATTERING THAN EDGE SCATTERING.

3              MS. DAVIS:  WELL, I THINK WHAT WE WERE TALKING ABOUT

4      BEFORE, I THINK COHERENT SCATTERING IS MEANT TO BE MORE OF AN

5      UMBRELLA TERM HERE THAT'S SUPPOSED TO CAPTURE THAT IN

6      CONNECTION WITH THE INVENTION SHOWN IN FIGURE 24.

7              AND I THINK, YOU KNOW, HOPEFULLY, BECAUSE THE ACTUAL CLAIM

8      LANGUAGE THAT WE'RE DISPUTING HERE --

9              THE COURT:  YEAH.

10             MS. DAVIS:  -- WAS ADDED DURING PROSECUTION AS PART

11     OF AN AMENDMENT --

12             THE COURT:  UM-HUM.

13             MS. DAVIS:  -- SOME USEFUL LANGUAGE COMES ACTUALLY

14     FROM OTHER ASPECTS OF THE FILE HISTORY WHERE THEY'RE

15     EXPLAINING, YOU KNOW, WHY IS THIS LANGUAGE BEING ADDED?  WHAT

16     IS ITS ADDITION DISCLAIMING AND CLARIFICATION OF EXACTLY WHAT

17     THEY MEAN TO CAPTURE HERE?

18             SO IN ADDITION TO DISCUSSING AND BASICALLY PRAISING WHAT

19     WE SEE HERE AS, YOU KNOW, THE BACK SCATTERING OR EDGE

20     SCATTERING PROBLEM, THEY ALSO TALK ABOUT HOW ADDING THIS

21     LANGUAGE HIGHLIGHTS THE NEW AND UNIQUE DOUBLE BOUNCE TECHNIQUE

22     THAT THIS INVENTION CAPTURES AND THAT THIS -- YOU KNOW, THAT

23     THEY INTEND TO CLARIFY IS PART OF THE INVENTION THROUGH THE

24     ADDITION OF THIS LANGUAGE.

25             AND THAT DOUBLE PASS IS, YOU KNOW -- - ACTUALLY, YOU KNOW,

```
1     THE DISCLAIMER IS OF A SINGLE PASS SYSTEM.

2            THE COURT:  SURE.  ALL RIGHT.  THANK YOU.

3            MS. DAVIS:  LET'S SEE.

4       SO WE'RE LOOKING AT THE FILE HISTORY HERE, AND I THINK

5     RIGHT BEFORE WE WERE DISCUSSING EDGE SCATTERING AND BACK

6     SCATTERING, ARE THEY THE SAME?

7            WHILE BOTH TYPES OF SCATTERING, THEY'RE DIFFERENT, AND WE

8     CAN SEE THAT THE EXAMINER ACTUALLY APPRECIATED THEM AS TWO

9     DIFFERENT PROBLEMS IN HIS NOTICE AFTER ALLOWANCE.

10       SO THIS IS ACTUALLY REFLECTING WHAT THE EXAMINER

11    UNDERSTOOD AT THE TIME HE WAS -- HE LET IT -- HE WAS, YOU KNOW,

12    LETTING THE PATENT GO TO ISSUE.

13           THE COURT:  WELL, BUT I THOUGHT THAT WHERE THE WORD

14    "PROBLEM" WAS SINGULAR WAS BY THE APPLICANT, AND THIS IS THE

15    EXAMINER REFLECTING BACK THE APPLICANT'S ARGUMENT.

16           MS. DAVIS:  CORRECT, THAT IS WHAT'S HAPPENING HERE.

17           THE COURT:  SO I HAVE A TYPO HERE IS WHAT I'M -- I'M

18    SERIOUS -- THAT CAUSES ME SOME CONCERN BECAUSE THE WORD "OR"

19    WOULD SUGGEST TO ME THAT IT'S A SINGLE PROBLEM EXPRESSED WITH

20    TWO DIFFERENT WORDS, AS OPPOSED TO USING THE WORDS "THE BACK

21    AND EDGE SCATTERING PROBLEMS," AND THIS IS THE EXAMINER

22    REFLECTING BACK.  HE SAYS, "IN RESPONSE TO THE APPLICANT'S

23    ARGUMENT."

24       WELL, THE APPLICANT USED A SINGULAR PROBLEM, DIDN'T --

25    ISN'T THAT CORRECT?
```

```
 1            MS. DAVIS:  RIGHT.  THERE ARE PLACES WHERE THEY USE

 2    SINGULAR PROBLEM.  I THINK -- I'M NOT SURE THEY'RE COMPLETELY

 3    CONSISTENT, BUT THEY CERTAINLY DO IN SEVERAL SPACES.

 4            AND I THINK THE WAY TO THINK OF IT IS THAT THE SCATTERED

 5    LIGHT IS A COMMON PROBLEM.  SCATTERED LIGHT IS A -- IS A LARGER

 6    TERM, NOT SPECIFICALLY TO ANY OF ITS FLAVORS OF BACK SCATTERING

 7    OR EDGE SCATTERING IS REALLY THE PROBLEM HERE.  AND THESE ARE

 8    TYPES OF SCATTERED LIGHT THAT THEY CAN DO SOMETHING ABOUT.

 9            SO TO THE EXTENT THAT SCATTERED LIGHT MORE BROADLY --

10    SCATTERED LIGHT IN ITS PLAIN AND ORDINARY MEANING IS THE

11    PROBLEM, AND THAT'S WHAT THEY'RE TRYING TO RESOLVE HERE.

12            THE COURT:  EXCEPT IT'S NOT COMPLETELY BROAD BECAUSE

13    YOU TOLD ME IT HAS TO BE THE PREDICTABLE TYPE.

14            MS. DAVIS:  RIGHT.  WELL, THERE'S PHYSICAL

15    LIMITATIONS TO WHAT WE CAN DO.

16            THE COURT:  SURE, UNDERSTOOD.  BUT SCATTERED LIGHT

17    CAN ALSO INVOLVE THE DUST AND THOSE NUISANCES, WHICH I

18    UNDERSTAND FROM THE TUTORIAL IS VERY, VERY MINOR.

19            MS. DAVIS:  RIGHT.

20            THE COURT:  BUT IT IS NOT -- YOU WOULD AGREE THAT

21    WE'RE ONLY DEALING, IN THIS PATENT, WITH PREDICTABLE

22    SCATTERING?

23            MS. DAVIS:  THAT'S RIGHT.  I DON'T THINK THERE'S A

24    WAY TO DEAL WITH THE UNPREDICTABLE SCATTERING WITH THIS

25    INVENTION.
```

```
 1              THE COURT:  I THINK THAT'S RIGHT.

 2              MS. DAVIS:  RIGHT.

 3              THE COURT:  OKAY.

 4              MS. DAVIS:  RIGHT.

 5              THE COURT:  OKAY.

 6              MS. DAVIS:  RIGHT, YES.  SO, PERHAPS TO CLARIFY A

 7       BIT, MY COLLEAGUES ARE HELPING ME.

 8              THE COURT:  THAT'S ALWAYS NICE.

 9              MS. DAVIS:  YES.  THE PROBLEM IS THE SAME, BACK

10       SCATTERING AND EDGE SCATTERING.  IT'S JUST THAT THE SOURCES OF

11       THE PROBLEM ARE DIFFERENT, WHETHER IT BE THE EDGES OF THE

12       MIRRORS OR THE ELEMENT ITSELF HAVING SOME DEGREE OF BACK

13       SCATTERING.

14              THE COURT:  UM-HUM.

15              MS. DAVIS:  SO LET'S LOOK AT HOW NISTICA ARGUES IN

16       FAVOR OF THEIR LIMITATION THAT THE SCATTERED LIGHT SHOULD ONLY

17       BE THAT COMING FROM THE EDGES OF THE MICRO-MIRRORS.

18          I'M GOING TO GO THROUGH THE THREE MAIN ARGUMENTS THAT

19       NISTICA MAKES.

20          THEY ARGUE THAT SCATTERED LIGHT SHOULD BE LIMITED TO JUST

21       THE EDGE SCATTERING; THEY ARGUE THAT THE FILE HISTORY SUPPORTS

22       THAT LIMITATION; AND THEY ALSO CONTEND THAT FINISAR'S

23       CONSTRUCTION CONTRADICTS INTRINSIC EVIDENCE.

24          SO WE'LL LOOK AT ALL THREE OF THOSE AND WHY WE CONTEND

25       THEY'RE WRONG.
```

1        SO IN THE FIRST INSTANCE, NISTICA'S ARGUMENT IS THAT

2   SCATTERED LIGHT SHOULD BE LIMITED TO EDGE SCATTERING FROM THE

3   EDGES OF THE MICRO-MIRRORS, BUT YOU'LL NOTE THAT THE CLAIM

4   LANGUAGE USES SCATTERED LIGHT GENERALLY, AND THE CLAIM LANGUAGE

5   IS OUR FIRST SOURCE.

6        THE COURT:  UM-HUM.

7        MS. DAVIS:  AND, MOREOVER, OUR ARGUABLE SECOND

8   SOURCE, THE GUIDE PROVIDED BY THE SPECIFICATION WOULD NEED TO

9   HAVE AN ACTUAL WORD, EXPRESSIONS OF MANIFEST EXCLUSION OR

10  RESTRICTION IN ORDER FOR THERE TO BE A NARROWING OF THE

11  ORDINARY UNDERSTANDING OF THE WORDS IN THE CLAIM.

12       AND NISTICA DOESN'T POINT TO, AND CAN'T POINT TO, ANYTHING

13  IN THE FILE HISTORY THAT INDICATES THAT THEY INTENDED -- THAT

14  THE DRAFTERS OF THE APPLICATION INTENDED TO EXCLUDE ANY OF THAT

15  TYPICAL SCATTERED LIGHT FROM THE CLAIM SCOPE.

16       ADDITIONALLY --

17       THE COURT:  WELL, YOU SAY THAT, AND I THINK YOU'RE --

18  I AGREE WITH YOU.  THERE'S NO EXPRESS STATEMENT THAT THIS

19  INVENTION EXCLUDES OTHER TYPES OF SCATTERING.

20       BUT WHERE THE PROSECUTION HISTORY STATES THAT THE PRESENT

21  INVENTION PROVIDES A SOLUTION TO EDGE SCATTERING, HOW CAN IT BE

22  PROVIDING A SOLUTION TO OTHER THINGS AS WELL THAT ARE NOT

23  DISCLOSED?

24       MS. DAVIS:  WELL, LET'S GET TO THE PROSECUTION

25  HISTORY.  THAT'S THE NEXT ONE ACTUALLY.

```
 1              THE COURT:  OKAY.

 2              MS. DAVIS:  SO I'M GOING TO HOP OVER HERE THAT

 3     NISTICA WAS IGNORING IN THEIR BRIEF, THE COHERENT SCATTERING,

 4     WHICH I THINK WE'VE DISCUSSED.

 5              THE COURT:  UM-HUM.

 6              MS. DAVIS:  SO LET'S LOOK AT THE ACTUAL PROSECUTION

 7     HISTORY.

 8          YOU'RE RIGHT THAT THE PROSECUTION HISTORY, THE APPLICANT

 9     MAKES SEVERAL ARGUMENTS ABOUT WHY THEIR INVENTION IS UNIQUE

10     OVER THE PRIOR ART AND WHY IT SHOULD BE ALLOWABLE, AND ONE OF

11     THEM IS THAT THEY'RE SOLVING THIS EDGE SCATTERING OR BACK

12     SCATTERING PROBLEM, A COMMON PROBLEM WITH TWO DIFFERENT

13     SOURCES.

14          BUT THEY ALSO MAKE A STATEMENT, AND THEY ACTUALLY AMEND

15     THE CLAIMS, IN ORDER TO CAPTURE THIS IDEA OF THE DOUBLE BOUNCE

16     TECHNIQUE.  THAT -- THAT SECOND PASS THAT THE LIGHT MAKES AT

17     THE SPACIAL LIGHT MODULATOR, THAT IS THEIR -- THAT IS THE

18     LIMITATION THAT THEY PUT INTO THE CLAIMS WHEN THEY AMEND THEM

19     TO ADD THE DISPUTED TERM.

20          IT DOES NOT HAVE ANYTHING TO DO WITH THE SOURCE OF THE

21     SCATTERED LIGHT THAT THE INVENTION IS HOPING TO EXTINGUISH FROM

22     THE DROPPED CHANNEL PATH.  IT HAS TO DO WITH THE ACTUAL

23     ARCHITECTURE OF THE DEVICE, THAT THE LIGHT WOULD NEED TO HIT

24     THE SLM TWICE BEFORE EXITING TO IMPROVE THE EXTINCTION OF THE

25     DROPPED CHANNEL.
```

1      AND YOU CAN SEE THAT ON SLIDE 58 WHEN THE APPLICANT

2   HIGHLIGHTS THAT FIGURE 24 HAS THE NEW AND UNIQUE DOUBLE BOUNCE

3   TECHNIQUE THAT THEY'VE AMENDED THE CLAIMS TO INCORPORATE.

4      SO THERE WAS -- THIS IS A CASE WHERE, DURING PROSECUTION,

5   THE APPLICANT MADE AN AMENDMENT THAT DID DISCLAIM SOME OF THE

6   SCOPE OF THE ORIGINAL CLAIM, AND THIS CAPTURES, THIS IS -- THAT

7   LANGUAGE THAT WE'RE CONSTRUING NOW, THIS IS WHAT IT WAS

8   INTENDED TO DO.  IT WAS INTENDED TO DISCLOSE THE SINGLE

9   BOUNCE -- THE CLAIM, PARDON ME -- THE SINGLE BOUNCE

10  ARCHITECTURE AND REQUIRE THIS SECOND PASS, AND THEY'RE VERY

11  CLEAR ABOUT THAT.

12     AND THE EXAMINER DOES APPRECIATE THAT THE EDGE SCATTERING

13  AND BACK SCATTERING PROBLEMS ARE, YOU KNOW, ADDRESSED BY THIS

14  INVENTION, BUT THEY DO NOT APPEAR TO BE WHAT MOTIVATED HIM TO

15  ACTUALLY ALLOW IT.

16     IT'S WHEN THEY MADE THE AMENDMENT AND LIMITED THEMSELVES

17  TO THE DOUBLE BOUNCE TECHNIQUE WHICH ONLY -- WHICH DOESN'T

18  REFER TO SCATTERED LIGHT AT ALL WHEN HE'S MAKING THAT

19  DISTINCTION THAT HE WAS PERSUADED.

20          THE COURT:  SO DO I NEED TO KNOW WHAT A PERSON OF

21   ORDINARY SKILL IN THE ART WOULD INTERPRET EDGE AND BACK

22   SCATTERING TO MEAN?

23          MS. DAVIS:  WELL, I THINK -- THOSE AREN'T WORDS IN

24   THE CLAIM, BUT THEY ARE HELPFUL TO KNOW BECAUSE THEY ARE

25   COMPONENTS OF SCATTERED LIGHT.

1    THE COURT:  NO, THEY'RE NOT IN THE CLAIM, JUST

2 SCATTERED LIGHT, AND YOU WANT ME TO INCLUDE ALL SOURCES OF

3 SCATTERED LIGHT THAT AREN'T PREDICTABLE.

4    MS. DAVIS:  RIGHT.  I THINK WHAT -- THE SCATTERED --

5 A PERSON OF ORDINARY SKILL IN THE ART READING THE CLAIM WOULD

6 SEE SCATTERED LIGHT THAT CAN BE ELIMINATED THROUGH A, THROUGH A

7 TWO PASS AT THE SPACIAL LIGHT MODULATOR, AND THAT PERSON WOULD

8 UNDERSTAND THAT -- WHAT ARE THE SOURCES OF SCATTERED LIGHT IN

9 THIS KIND OF SYSTEM AND WHICH ARE THE TYPES OF SCATTERED LIGHT

10 THAT COULD BE ELIMINATED?

11    THE COURT:  I GUESS WHAT I'M WONDERING, THOUGH, IF

12 THE SCATTERED LIGHT OCCURS IN A DIFFERENT LOCATION THAN THE

13 EDGES OF THE MICRO-MIRROR, IS IT GOING TO GET TO THE SPACIAL

14 LIGHT MODULATOR?  I DON'T THINK IT ALL DOES.

15    MS. DAVIS:  SOME OF IT WON'T.  IT'S PART OF -- BY

16 VIRTUE OF SCATTERING, RIGHT, THERE'S MANY DIRECTIONS --

17    THE COURT:  RIGHT.

18    MS. DAVIS:  -- AND NOT ALL OF THEM CAN YOU DO

19 ANYTHING ABOUT.

20   ALSO, NOT ALL OF THEM DO YOU CARE ABOUT, RIGHT?  IF LIGHT

21 SCATTERS, IT MAY BE UNDESIRABLE BECAUSE IT CREATES NOISE IN

22 YOUR DEVICE, BUT IF IT GOES IN -- IF YOU'RE TRYING TO DROP THE

23 SIGNAL AND IT GOES OFF IN THE WRONG DIRECTION ANYWAY, THAT'S

24 KIND OF FINE.

25    THE COURT:  SURE, OKAY.

1          MS. DAVIS:  SO NISTICA ARGUES THAT THE EDGE OR THE

2     BACK SCATTERING PROBLEMS WERE THE MOTIVATION FOR ADDING THIS,

3     ADDING THE ACTUAL TERM HERE.

4          AND, IN FACT, IT WASN'T.  THE CLEAR MOTIVATION WAS TO

5     CAPTURE THIS DOUBLE BOUNCE TECHNIQUE.  THAT'S WHY THE CLAIM WAS

6     AMENDED TO ADD THIS TERM.  AND THERE WAS NO REFERENCE TO TRYING

7     TO EXCLUDE ANY PARTICULAR TYPE OF SCATTERED LIGHT THROUGH THAT

8     AMENDMENT.

9          AND, FINALLY, NISTICA CRITICIZES FINISAR FOR CONTRADICTING

10    THE INTRINSIC EVIDENCE.  BUT WE -- FINISAR'S POSITION IS THAT

11    THAT IS INCORRECT, THAT BOTH EDGE SCATTERING AND COHERENT

12    SCATTERING ARE PART OF THE SPECIFICATION HERE, AND THAT

13    THEY'RE -- SINCE THESE TERMS ARE NOT SYNONYMOUS, THE SCATTERED

14    LIGHT DESCRIBED IN THE CLAIM SHOULD INCLUDE BOTH OF THEM, AND

15    THAT THE CLAIM -- AS WE KNOW, THE CLAIMS HAVE THEIR ORDINARY

16    AND CUSTOMARY MEANINGS UNLESS THERE'S EVIDENCE THAT DICTATES

17    OTHERWISE.

18         ADDITIONALLY, YOU KNOW, LOOKING HERE AGAIN AT THE FILE

19    HISTORY, THE REASON FOR THE AMENDMENT WAS TO DISCLAIM THIS

20    SINGLE BOUNCE TECHNIQUE, THIS SINGLE PASS OF THE LIGHT AT THE

21    SLM AND TO REQUIRE THAT A DOUBLE PASS, A DOUBLE BOUNCE OCCUR,

22    AND THAT'S WHY THIS CLAIM LANGUAGE WAS ADDED, AND IT WAS THIS

23    LIMITATION THAT MOTIVATED THE CLAIMS TO BE ALLOWED AND

24    DISTINGUISHED THEM OVER THE PRIOR ART.

25         IT WASN'T ANY SCATTERED LIGHT RELATED DISCLAIMER.

1          AND, CONSEQUENTLY, THERE WAS NO LIMITATION OF THE WORD

2     "SCATTERED LIGHT" AS IT WAS USED IN THE CLAIM.

3          AND THAT'S WHAT I HAVE ON THIS TERM UNLESS THERE'S ANY

4     OTHER QUESTIONS.

5               THE COURT:  NO.  YOU'VE BEEN VERY CLEAR IN YOUR

6     RESPONSES.  THANK YOU.

7               MS. DAVIS:  THANK YOU.

8               THE COURT:  MR. KRAMER, IS THIS YOURS IN RESPONSE?

9               MR. KRAMER:  YES, YOUR HONOR.

10              THE COURT:  OKAY.  WHAT I'D LIKE TO DO IS HEAR YOUR

11    RESPONSES ON THIS, AND THEN WE'LL TAKE OUR LUNCH BREAK.

12              MR. KRAMER:  CERTAINLY.

13              THE COURT:  THANK YOU.

14              MR. KRAMER:  I'M GOING TO BE BRIEFER ON THIS ONE SO

15    THAT WE CAN TAKE OUR LUNCH BREAK AT A REASONABLE TIME, AND ALSO

16    SO THAT WE HAVE ENOUGH TIME FOR SOME OF THE OTHER PATENTS

17    BECAUSE I THINK THIS ONE IS A RELATIVELY SIMPLE ONE.

18              THE COURT:  THANK YOU.

19              MR. KRAMER:  AND I THINK YOUR HONOR HIT THE NAIL

20    RIGHT ON THE HEAD HERE.

21          CAN WE SWITCH TO THE TELEVISION, PLEASE, TO THE NISTICA

22    SLIDES?  OKAY.

23          OKAY.  THIS IS THE CLASSIC CASE WHERE AN APPLICANT TELLS

24    THE WORLD, TELLS THE EXAMINER EXACTLY WHAT PROBLEM IS BEING

25    SOLVED AND IT TELLS THEM WHAT BACK AND EDGE SCATTERING IS.

1    AND AS I'LL GET INTO, YOUR HONOR, YOU ASKED -- YOU HAVE TO

2    KNOW WHAT IT MEANS, AND THE APPLICANT TOLD US WHAT IT MEANS FOR

3    PURPOSES OF THIS INVENTION, AND I'M GOING TO SHOW YOU THAT.

4    LET'S TAKE A LOOK AT THAT.

5    SO THIS PATENT, VERY QUICKLY, AGAIN, IN THE 2000 TIMEFRAME

6    ORIGINALLY, THIS WAS DEVELOPED BY ANOTHER COMPANY, CIDRA

7    CORPORATION.  FINISAR WENT OUT AND BOUGHT IT IN 2012.

8    THE CLAIM WE'RE LOOKING AT, CLAIM 1, WE'VE LOOKED AT THIS

9    ALREADY.

10   LET'S LOOK AND WALK THROUGH THE PROSECUTION HISTORY

11   BRIEFLY.  THIS IS THE EXHIBIT, YOUR HONOR, THAT YOU POINTED

12   OUT.

13   SO WHAT WE HAVE HERE IS THE APPLICANT IDENTIFYING

14   BACK/EDGE SCATTERING AS THE PROBLEM IN THE ART.  IT SAYS, "THE

15   PROBLEM IN THE ART."  THAT'S THE TITLE.  "WHEN DROPPING BANDS

16   OR CHANNELS FROM AN OPTICAL SIGNAL USING A MICRO-MIRROR DEVICE,

17   SOME OF THE LIGHT FROM THE DROPPED BANDS OR CHANNELS MAY BE

18   SCATTERED ALONG THE EDGE OF THE MICRO-MIRRORS AND REFLECTED

19   BACK WITH THE REMAINING BANDS OR CHANNELS ALONG AN OPTICAL

20   RETURN PATH.  THIS PROBLEM IN THE ART IS KNOWN AS 'BACK

21   SCATTERING' OR 'EDGE SCATTERING.'"

22   AND YOUR HONOR WAS PERFECTLY CORRECT, THE APPLICANT

23   IDENTIFIES THIS AS A SINGULAR PROBLEM, THE PROBLEM.  AND WE'RE

24   GOING TO SEE THAT THROUGHOUT.  THE PROBLEM IN THE ART IS KNOWN

25   AS BACK SCATTERING OR EDGE SCATTERING, AND THE APPLICANT

1    EXPLAINS WHAT OCCURS WHICH, IN TURN, LIMITS THE EXTINCTION OF

2    THE BLOCKED BANDS OR CHANNELS THAT CAN BE ACHIEVED.

3          AND IT SAYS, "IN VIEW OF THIS, THERE IS A NEED IN THE ART

4    FOR A TECHNIQUE TO MORE EFFECTIVELY BLOCK THE LIGHT," SO THAT

5    WE DON'T ELIMINATE THE PROBLEM IN THE ART KNOWN AS BACK

6    SCATTERING OR EDGE SCATTERING.

7          AND THEN THE APPLICANT IDENTIFIES THE INVENTION TO SOLVE

8    THE PROBLEM.  IT SAID -- THE APPLICANT SAYS TO THE EXAMINER,

9    "THE PRESENT INVENTION PROVIDES A SOLUTION TO THIS SO-CALLED

10   'BACK OR EDGE SCATTERING' PROBLEM BY PROVIDING," AND THEN HE

11   EXPLAINS HIS, OR THEIR -- THERE'S MORE THAN ONE INVENTOR --

12   THEIR SOLUTION OF HAVING A DOUBLE BOUNCE.

13         THE APPLICANT REPRESENTED TO THE PATENT OFFICE, TO THE

14   EXAMINER, THAT THE DISCLOSED INVENTION SOLVES THE BACK OR EDGE

15   SCATTERING PROBLEM.  THE APPLICANT SAID, "THIS EDGE SCATTERING

16   FROM THE MICRO-MIRRORS LIMITS THE EXTINCTION OF THE BLOCKED

17   CHANNEL THAT CAN BE ACHIEVED, AS DESCRIBED" IN PAGES SO AND SO.

18         "THE CLAIMED BLOCKING FILTER 600 SUBSTANTIALLY ELIMINATES

19   OR REDUCES THIS EDGE SCATTERING EFFECT."

20         "THE WHOLE THRUST OF THE CLAIMED INVENTION" -- LET ME

21   REPEAT THAT -- "THE WHOLE THRUST OF THE CLAIMED INVENTION IS TO

22   'DOUBLE BOUNCE' THE ONE OR MORE OPTICAL BANDS OR CHANNELS BEING

23   PROVIDED ALONG THE OPTICAL RETURN PATH TO SUBSTANTIALLY

24   ELIMINATE AND/OR REDUCE THE AMOUNT OF BACK SCATTER FROM DELETED

25   BANDS OR CHANNELS."

1     SO THE APPLICANT IS BEING VERY CLEAR HERE AS TO THE

2    PROBLEM BEING SOLVED, AND THAT'S WHY I SAID THIS IS A CLASSIC

3    CASE THAT WE HAVE.  I, FRANKLY, HAVEN'T HAD ONE BEFORE WHERE I

4    COULD STAND IN FRONT OF A COURT AND QUOTE WHERE IT SAYS "THE

5    WHOLE THRUST OF THE CLAIMED INVENTION."  THAT'S A FIRST FOR ME.

6     SO THE APPLICANT DISTINGUISHED THE PRIOR ART SPECIFICALLY

7    ON SOLVING THE EDGE/BACK SCATTERING PROBLEM, AND THE APPLICANT

8    DISTINGUISHED PRIOR ART.  THE APPLICANT TOLD THE PATENT OFFICE

9    THE PUBLIC'S ENTITLED TO RELY ON THESE STATEMENTS.

10     "MOREOVER, NEITHER AKSYUK, RIZA, NOR THE PROPOSED

11    COMBINATION THEREOF EITHER RECOGNIZES THE 'BACK SCATTERING OR

12    EDGE SCATTERING' PROBLEM IN THE ART, OR SUGGESTS A SOLUTION."

13     THE APPLICANT FURTHER TOLD THE PATENT OFFICE, TO GET THE

14    CLAIMS ALLOWED TO DISTINGUISH THIS PRIOR ART AND SAY THAT THE

15    INVENTION IS DIFFERENT, THE APPLICANT SAID, "MOREOVER, AKSYUK

16    ET AL NEITHER RECOGNIZES THE 'BACK OR EDGE SCATTERING' PROBLEM

17    IN THE PRIOR ART, NOR PROVIDES A HINT OR SUGGESTION OF A

18    SOLUTION TO THE SAME."

19     THE APPLICANT FURTHER SAID, "FURTHER, IT IS RESPECTFULLY

20    SUBMITTED THAT, SIMILAR TO AKSYUK, RIZA ALSO NOT RECOGNIZE THE

21    'BACK OR EDGE SCATTERING' PROBLEM IN THE PRIOR ART."

22     SO WHAT HAPPENED NEXT?  THE PATENT EXAMINER STATED THAT

23    THE PROPOSED CLAIMS THAT THE APPLICANT WAS SEEKING TO HAVE

24    ALLOWED AS PATENTED CLAIMS DID NOT COVER, THERE WAS NO MENTION

25    IN THEM OF THE EDGE/BACK SCATTERING PROBLEM THAT THE APPLICANT

1      WAS ARGUING, AS WE JUST SAW, WAS SOLVED BY THE PATENT.

2           THE EXAMINER SAID, IN THE JANUARY 19TH ACTION,

3      "FURTHERMORE, IN RESPONSE TO APPLICANT'S ARGUMENT THAT THE

4      REFERENCES FAIL TO RECOGNIZE THE 'BACK OR EDGE SCATTERING'

5      PROBLEMS" -- THAT'S THE S, THE TYPO THAT I THINK YOUR HONOR

6      NOTED -- "AND ELIMINATION THEREFORE, OF APPLICANT'S INVENTION,

7      IT IS NOTED THAT THE FEATURES UPON WHICH APPLICANT RELIES ARE

8      NOT RECITED IN THE REJECTED CLAIMS."

9           SO THE EXAMINER IS POINTING OUT TO THE APPLICANT, YOU'VE

10     TOLD ME YOUR SOLUTION IS TO THE BACK/EDGE SCATTERING PROBLEMS.

11     I DON'T SEE IT IN YOUR CLAIMS.

12          WHAT HAPPENS NEXT IN RESPONSE TO THAT JANUARY 2005 OFFICE

13     ACTION?  THE APPLICANT RESPONDS IN FEBRUARY OF 2005.  THE

14     APPLICANT AMENDS THE CLAIMS TO SPECIFICALLY COVER THE

15     SCATTERING PROBLEM NOT ADDRESSED -- THAT IT SAYS IS NOT

16     ADDRESSED IN THE PRIOR ART.

17          AND THE APPLICANT ADDS THE LANGUAGE THAT WE'RE NOW LOOKING

18     AT IN THE CLAIM, AND THE APPLICANT ADDS, "WHEREIN SCATTERED

19     LIGHT FROM A DROPPED SIGNAL IS DIRECTED ONTO THE MICRO-MIRROR

20     DEVICE TO REFLECT AWAY FROM THE RETURN PATH."

21          NOW, SHOULD THAT HAVE BEEN CLEARER?  I MEAN, THAT

22     PROBABLY -- APPLICANT -- WE WOULDN'T BE HERE, AT LEAST ON THIS

23     DISPUTE, IF THE APPLICANT SAID "THE SCATTERED LIGHT" -- IF HE

24     REPEATED THE LANGUAGE THAT HAD BEEN THERE.

25          BUT I THINK IT'S PERFECTLY CLEAR, TO A PERSON OF SKILL IN

1    THE ART, LOOKING AT THIS FILE HISTORY, THAT THE APPLICANT IS

2    AMENDING THE CLAIM TO SOLVE THE PROBLEM THAT THE APPLICANT VERY

3    CLEARLY LAID OUT.

4        SO WHAT DO WE HAVE?  WE HAVE APPLICANT ADDED LANGUAGE TO

5    THE CLAIMS TO INCLUDE REFLECTING AWAY SCATTERED LIGHT;

6    APPLICANT DESCRIBED THE INVENTION AS SOLVING THE EDGE/BACK

7    SCATTERING LIGHT PROBLEM; APPLICANT DISTINGUISHED THE PRIOR ART

8    AS NOT SOLVING THE EDGE, OR NOT EVEN RECOGNIZING, LET ALONE

9    SOLVING, THE EDGE/BACK SCATTERING LIGHT PROBLEM.

10       THE EXAMINER UNDERSTOOD IT THAT WAY.  THE PUBLIC IS

11   ENTITLED TO RELY ON IT.

12       THERE'S SOME CASE LAW THAT WE PUT IN THERE THAT IS USEFUL.

13   IT'S IN THE PARTIES' BRIEFS.

14       THE CONCEPT THAT THE PROSECUTION HISTORY THAT WE WERE JUST

15   LOOKING AT, YOU KNOW, THE PROCESS OF APPLYING FOR THE PATENT,

16   THE BACK AND FORTH BETWEEN THE APPLICANT AND THE EXAMINER

17   CONSTITUTES A PUBLIC RECORD OF THE PATENTEE'S REPRESENTATIONS

18   CONCERNING THE SCOPE AND MEANING OF THE CLAIMS AND COMPETITORS

19   ARE ENTITLED TO RELY ON THOSE REPRESENTATIONS WHEN ASCERTAINING

20   THE DEGREE -- WHAT WILL BE COVERED BY THE CLAIMS.

21       THE -- THIS GETS US BACK TO THE ENABLEMENT/WRITTEN

22   DESCRIPTION ISSUES, WHICH ARE CRITICAL.  THEY FORM THE TEMPLATE

23   FOR CLAIM CONSTRUCTION.

24       FINISAR IS ASKING THAT THE CLAIM BE READ LITERALLY.  LOOK

25   ONLY AT THE CLAIM.  IT SAYS "SCATTERED LIGHT."  IT DOESN'T SAY

1      "EDGE SCATTERING."

2          THAT'S TRUE.

3          THEY'RE ASKING TO NOT READ THE CLAIM IN THE CONTEXT OF THE

4      FILE HISTORY AND THE SPECIFICATION, BECAUSE IF WE TAKE THE

5      PLAIN AND ORDINARY MEANING, WHICH IS THEIR PROPOSAL, IT SAYS

6      "SCATTERED LIGHT."

7          IT DOESN'T -- NOW, I THINK IN THE ARGUMENT TODAY, I THINK

8      I HEARD FINISAR AGREEING WITH YOUR HONOR THAT THE CLAIM,

9      ALTHOUGH IT SAYS "SCATTERED LIGHT," IT'S NOT GOING TO COVER ALL

10     FORMS OF SCATTERED LIGHT.  IT'S NOT GOING TO COVER THOSE TYPES

11     OF SCATTERED LIGHT THAT ARE NOT COHERENT AND, THEREFORE, CANNOT

12     BE ADDRESSED USING THIS INVENTION.

13         SO I THINK WE KNOW THERE'S GOING TO BE SOME -- THERE

14     SHOULD BE SOME QUALIFICATION TO SCATTERED LIGHT.  THE QUESTION

15     IS HOW MUCH?  RIGHT?

16         AND FINISAR -- AND NISTICA ARGUES THAT WE SHOULD -- THIS

17     IS THE CLASSIC CASE WHERE WE SHOULD TAKE THE INVENTORS AT THEIR

18     WORD -- THERE'S MORE THAN ONE INVENTOR -- AND SEE WHAT PROBLEM

19     THEY WERE SOLVING.

20         AND THE REASON I MENTION ENABLEMENT AND WRITTEN

21     DESCRIPTION IS BECAUSE -- AND I THINK YOUR HONOR HIT IT RIGHT

22     ON THE HEAD -- THERE'S NO DISCUSSION HERE IN THIS PATENT OR --

23     WE WERE LOOKING AT FIGURE 24 AND YOUR HONOR WAS ASKING THE

24     QUESTION OF SOLVING A PROBLEM OF SCATTERED LIGHT FROM ANYWHERE

25     AND ANYTHING.

1      THAT'S NOT WHAT THIS IS ABOUT.  THAT'S NOT WHAT THE

2   APPLICANT SAID TO THE EXAMINER.  WE'RE LOOKING AT THE SCATTERED

3   LIGHT THAT'S COMING FROM THE REFLECTORS AND THAT'S THE

4   SCATTERED LIGHT THAT IS FROM THE EDGES OF THE MICRO-MIRRORS.

5      SO IF WE LOOK ON THIS SLIDE 39 ON THE LEFT-HAND SIDE, WE

6   HAVE A -- WE HAVE AN IMAGE OF MICRO-MIRRORS, AND WE SEE THAT

7   THERE'S A UNIFORM PATTERN TO THE EDGES.  THE MICRO-MIRRORS ARE

8   ALL THE SAME SIZE; THEREFORE, WE HAVE UNIFORMITY IN THE SPACING

9   AND WE'RE ABLE TO ADDRESS THAT PROBLEM.

10      IT'S THE LIGHT THAT SCATTERS FROM THE EDGES OF THESE

11   MICRO-MIRRORS THAT THE APPLICANT TOLD THE EXAMINER WAS BEING

12   SOLVED BY THIS PROBLEM.

13      AND WHEN WE GET TO THE COHERENCY IN COLUMN 12, WE SHOULD

14   TALK ABOUT THAT.

15      THE COHERENCY IS -- COHERENCY IS SCATTERED LIGHT THAT'S

16   BEING GENERATED FROM SOME COHERENT SOURCE, SO WE'RE TALKING

17   ABOUT -- THE APPLICANT IS TALKING ABOUT, IN THE PROSECUTION

18   HISTORY AND IN COLUMN 12, IN COLUMN 12 AT PARAGRAPH LINES 45 TO

19   60, IT'S TALKING ABOUT SCATTERED LIGHT FROM THE EDGES OF THE

20   MICRO-MIRROR; RIGHT?  WE SEE THAT IN -- IN LINES 56 OR SO WHERE

21   IT SAYS, "THE EDGE SCATTERING FROM THE MICRO-MIRRORS LIMITS THE

22   EXTINCTION OF THE BLOCKED CHANNEL THAT CAN BE ACHIEVED."

23      THE COURT:  UM-HUM.

24      MR. KRAMER:  AND WE SEE THE MICRO -- I MEAN, IT'S

25    KNOWN IN THE ART THAT MICRO-MIRRORS ARE SPACED EVENLY APART.

1    THERE'S GOING TO BE A COHERENT SCATTERING FROM THE EDGE OF THE

2    MICRO-MIRRORS.

3        AND THE SPECIFICATION GOES ON IN THE NEXT PARAGRAPH, LINE

4    60, "BY PROPERLY CHOOSING THE ANGLE OF INCIDENCE OF THE SIGNAL

5    LIGHT ONTO THE SPACIAL LIGHT MODULATOR, THE COHERENT SCATTERING

6    FROM THE BLOCKED CHANNEL MIRRORS CAN BE DIRECTED AWAY."

7        THERE'S A COHERENCY BECAUSE THERE'S A UNIFORMITY OF THE

8    MIRRORS, AND THAT'S WHAT'S BEING SOLVED HERE, NOT IN BROAD

9    TERMS, THIS CONCEPT THAT ANY COHERENCY OF SCATTERED LIGHT, IF

10   IT'S CREATED SOMEWHERE ELSE IN THE DEVICE, SUCH AS AT THE

11   DIFFRACTION GRATING THAT YOUR HONOR POINTED OUT, THAT'S NOT

12   WHAT'S BEING SOLVED HERE.

13        THE COURT:  AND SO THE LANGUAGE FROM THE BLOCKED

14   CHANNEL MIRRORS WOULD LIMIT THE DEFINITION OF THE COHERENT

15   SCATTERING THAT PRECEDES IT?

16        MR. KRAMER:  YES, YOUR HONOR, EXACTLY.

17        THE COURT:  AND THAT HAS TO JUST BE THE EDGE

18   SCATTERING?

19        MR. KRAMER:  THAT'S RIGHT.  THAT'S THE PROBLEM BEING

20   SOLVED.

21        THE COURT:  AND YOUR ARGUMENT IS THAT THE APPLICANT

22   DEFINED EDGE AND BACK TO BE THE SAME?

23        MR. KRAMER:  RIGHT, THE PROBLEM, THE EDGE AND BACK.

24        THE COURT:  OKAY.

25        MR. KRAMER:  THAT'S ALL WE HAVE ON THIS ONE.

1      THERE WAS A MENTION OF NISTICA STIPULATING TO FINISAR'S

2   PROPOSAL.  I DON'T UNDERSTAND THAT.  FINISAR'S PROPOSAL IS

3   PLAIN AND ORDINARY MEANING.  THERE IS NO PROPOSAL.

4      AND I THINK, AS MR. TONKOVICH MAY ADDRESS, YOU KNOW, THIS

5   CONCEPT OF PLAIN AND ORDINARY MEANING INSTEAD OF PROPOSING A

6   DEFINITION, THAT'S JUST KICKING THE CAN DOWN THE ROAD FOR THE

7   JURY TO HAVE TO FIGURE OUT WHAT THIS MEANS.

8      THE COURT:  YES, IT IS.

9      MR. KRAMER:  SOME JUDGES -- THE CHIEF JUDGE OF THE

10   DISTRICT COURT IN DELAWARE, JUDGE LEONARD STARK, AND

11   JUDGE SUE ROBINSON THERE, A LONG-TIME PATENT JUDGE IN DELAWARE,

12   THEY ACTUALLY HAVE RULES ADDRESSING THIS.

13      JUDGE ROBINSON SAYS "DON'T PROPOSE" -- HER STANDING ORDER

14   SAYS "DON'T PROPOSE" -- AND I MENTION THIS JUST IN TERMS OF HER

15   PRACTICE, NOT EVEN NECESSARILY IN THIS CASE -- TELLS THE

16   PARTIES "DON'T PROPOSE PLAIN AND ORDINARY MEANING TO ME.  I

17   DON'T WANT TO HEAR THAT."

18      JUDGE STARK SAYS, "I'M NOT GOING TO GO THAT FAR," BUT HE

19   SAYS EXPLICITLY IN HIS STANDING ORDER, "THAT'S NOT HELPFUL TO

20   ME.  THAT DOESN'T HELP ME SOLVE THE PROBLEM HERE."

21      THE COURT:  SOMETIMES IT'S HELPFUL, AND SOMETIMES

22   IT'S NOT.

23      MR. KRAMER:  THANK YOU, YOUR HONOR.

24      THE COURT:  MS. DAVIS, WOULD YOU LIKE A BRIEF

25   REBUTTAL?

1          MS. DAVIS:  YES, THANK YOU.

2          AND ACTUALLY, I THINK -- BRIEFLY, IF I COULD DIRECT YOUR

3     HONOR'S ATTENTION TO NISTICA'S SLIDE DECK, THEIR SLIDE NUMBER

4     33.

5          THE COURT:  33?

6          MS. DAVIS:  33.

7          THE COURT:  YES.

8          MS. DAVIS:  ALL RIGHT.  SO THIS -- HERE THERE --

9     NISTICA HAS AN EXCERPT OF SOME OF THE APPLICANT'S RESPONSE

10    AFTER AN OBJECTION, AND THEY'VE HIGHLIGHTED THE PORTION AT THE

11    BOTTOM WHERE THEY TALK ABOUT THE WHOLE THRUST OF THE CLAIMED

12    INVENTION.

13         AND IT'S IMPORTANT TO READ THIS SENTENCE CLEARLY BECAUSE

14    IT IS A PRETTY CLEAR STATEMENT, AS MR. KRAMER EMPHASIZED.

15         "THE WHOLE THRUST OF THE CLAIMED INVENTION IS TO 'DOUBLE

16    BOUNCE' THE ONE OR MORE OPTICAL BANDS OR CHANNELS BEING

17    PROVIDED ALONG THE OPTICAL RETURN PATH TO SUBSTANTIALLY

18    ELIMINATE AND/OR REDUCE THE AMOUNT OF BACK SCATTER FROM DELETED

19    BANDS OR CHANNELS OR OTHERWISE DEFLECTED OFF THE SPACIAL LIGHT

20    MODULATOR."

21         THIS EXCERPT MAKES THE POINT THAT, FIRST OF ALL, IT IS

22    INDEED -- THE LIMITATION THAT WAS BEING ADDED WAS TO CAPTURE

23    THIS DOUBLE BOUNCE ARCHITECTURE.

24         AND, MOREOVER, THE GOAL OF THIS OPTICAL FILTER WAS TO

25    ELIMINATE LIGHT THAT SHOULD NOT -- FROM THE DROPPED SIGNAL THAT

1    SHOULD NOT BE GOING ALONG THE RETURN PATH, INCLUDING, AS IT

2    SAYS HERE, BACK SCATTER FROM DELETED BANDS OR CHANNELS, NOT

3    TIED SPECIFICALLY TO THE EDGES OF THE MICRO-MIRRORS.

4         THE COURT:  NO, BUT IT'S THOSE THAT ARE DEFLECTED OFF

5    THE SPACIAL LIGHT MODULATOR THOUGH.

6         MS. DAVIS:  TRUE.  AND THERE'S BOTH BACK SCATTERING

7    AND EDGE SCATTERING THAT WILL COME FROM THE SPACIAL LIGHT

8    MODULATOR.

9         THE COURT:  IF I PRESUME THEY HAVE DIFFERENT

10   MEANINGS, AND THAT'S A DIFFICULT ONE HERE.

11        MS. DAVIS:  RIGHT, WHICH IS WHY, I SUBMIT, THAT

12   FINISAR'S PROPOSAL THAT WE USE THE PLAIN AND ORDINARY MEANING

13   OF THE TERM IS ACTUALLY WHAT THE APPLICANT DID INTEND TO

14   CAPTURE HERE.

15        THERE IS NOT, OBVIOUSLY, A LOT OF BICKERING OVER HERE AND

16   PRECISION ABOUT EXACTLY WHAT BACK SCATTERING AND EDGE

17   SCATTERING AND DIFFERENT TYPES OF SCATTERED LIGHT MEANS IN THE

18   FILE HISTORY, UNFORTUNATELY.

19        AND ONE OF THE REASONS IS THAT THE AMENDMENT BEING MADE

20   WAS INTENDED TO CAPTURE A PARTICULAR ARCHITECTURE OF THE SYSTEM

21   AND NOT TO EXCLUDE ANY TYPE OF SCATTERED LIGHT THAT MIGHT

22   ACTUALLY BE ABLE TO BE DESIRABLY ELIMINATED BY USING THEIR

23   INVENTIVE ARCHITECTURE.

24        SO WHAT NISTICA IS DOING IS PUTTING A LIMITATION ONTO THE

25   CLAIM THAT FINISAR'S POSITION IS UNNECESSARY AND WAS NOT

```
1       INTENDED BY THE APPLICANT.

2                    THE COURT:  ALL RIGHT.  THANK YOU.

3                    MS. DAVIS:  THANK YOU.

4                    THE COURT:  MR. KRAMER, A LAST --

5                    MR. KRAMER:  VERY BRIEFLY.

6           THAT IS AN IMPORTANT SENTENCE TO READ.  IT'S CLEAR IN THE

7       CONTEXT OF EXHIBIT B TO THE KORRELL DECLARATION WHERE THIS

8       LANGUAGE IS.  IT'S CLEAR THAT THE APPLICANT IS TELLING THE

9       PATENT OFFICE ABOUT THE BACK/EDGE SCATTERING PROBLEM.

10          ARE THOSE TWO DIFFERENT THINGS?  I DON'T KNOW.  MAYBE THEY

11      ARE.

12          APPLICANT TOLD THE EXAMINER THAT THEY'RE GOING TO BE

13      TREATED AS THE SAME FOR PURPOSES OF THIS INVENTION.

14                   THE COURT:  UM-HUM.

15                   MR. KRAMER:  THAT'S THE KEY, BECAUSE THE PUBLIC IS

16      ENTITLED TO RELY ON THAT.

17          APPLICANT SAID, I'M SOLVING THAT PROBLEM.

18          NOW --

19                   THE COURT:  WELL, THEN, IS A SOLUTION HERE TO

20      CONSTRUE THIS AS A SIGNAL THAT IS SCATTERED FROM THE BACK OR

21      EDGE OF THE MICRO-MIRRORS?

22                   MR. KRAMER:  RIGHT.  SO I -- NO, I DON'T THINK IT IS,

23      YOUR HONOR.

24          I HAVE TO BE CLEAR THAT I THINK WHAT'S ACTUALLY HAPPENING

25      THERE WITH BACK AND EDGE SCATTERING IS THAT EDGE SCATTERING IS,
```

```
1       OF COURSE, AT THE EDGES OF THE MIRRORS.

2            BACK -- AND I ASKED THE SAME QUESTION TO OUR TECHNICAL

3       PEOPLE TO UNDERSTAND, WHAT ARE WE TALKING ABOUT?  THE BACK OF

4       THE SOMETHING?  THE BACK OF THE MIRROR?

5            NO.

6            WHAT IS IT?

7            IT'S TALKING ABOUT A SCATTERING METHOD THAT'S GOING BACK

8       TOWARD THE SOURCE FROM WHICH IT'S EMITTED.  IT'S SCATTERED BACK

9       TOWARDS WHERE THE LIGHT --

10              THE COURT:  SO IT'S DIRECTIONAL, NOT LOCATIONAL?

11              MR. KRAMER:  RIGHT.  I WANTED TO KNOW THE SAME THING.

12      IS THIS SOMETHING WE'RE TALKING ABOUT A DIFFERENT PART OF THE

13      MIRROR AND SO FORTH?  AND WE'RE NOT.

14           SO IT'S -- AND IF YOU THINK ABOUT IT, THAT KIND OF MAKES

15      SENSE BECAUSE THAT'S THE LIGHT THAT'S GOING TO GET SCATTERED

16      BACK TO THE RETURN PATH.

17           THE APPLICANT --

18              THE COURT:  THAT DOESN'T MAKE SENSE IN THE CONTEXT OF

19      THE STATED PROBLEM BY THE APPLICANT WHERE HE SAYS EDGE OR BACK

20      SCATTERING PROBLEM.  THAT'S NOT --

21              MR. KRAMER:  WELL, THE LIGHT -- SO THERE'S TWO THINGS

22      GOING ON.  ONE IS THE SOURCE OF WHERE THE SCATTERING IS

23      OCCURRING FROM.

24              THE COURT:  UM-HUM.

25              MR. KRAMER:  IT'S OCCURRING FROM THE EDGES OF THE
```

1      MICRO-MIRRORS.

2                  THE COURT:  AND IT'S SCATTERING BACK.

3                  MR. KRAMER:  RIGHT.

4                  THE COURT:  AND YOU'RE SAYING IT'S A DIRECTION.

5          BUT I -- YOU KNOW, I UNDERSTAND WHAT YOU'RE TELLING ME,

6      BUT WHEN I READ THE PORTIONS OF THE HISTORY WHERE THE WORD

7      "BACK" IS USED, THAT DOESN'T MAKE SENSE.

8                  MR. KRAMER:  I THINK THERE'S SOME AMBIGUITY THERE AS

9      WELL.

10                  THE COURT:  OKAY.

11                  MR. KRAMER:  I'M NOT FULLY GETTING THAT.

12          BUT THAT'S WHAT THE APPLICANT TOLD THE EXAMINER WAS THE

13      PROBLEM BEING SOLVED.

14                  THE COURT:  I GUESS THAT'S WHY I ASKED IF THERE WAS

15      AN EXPERT OPINION ON WHAT ONE OF ORDINARY KNOWLEDGE AND SKILL

16      IN THE ART, BECAUSE FROM -- I CAN'T GUESS.  I MEAN, WE'RE

17      JUST -- I'M WORRIED THAT I'M GUESSING TOO MUCH ABOUT THOSE TWO.

18                  MR. KRAMER:  WE HAVE TO LIVE WITH WHAT'S IN THE --

19      WITH THE INTRINSIC EVIDENCE.

20                  THE COURT:  THAT PART I CAN --

21                  MR. KRAMER:  UNFORTUNATELY, THAT'S THE LIMITATIONS OF

22      PATENT LAW.

23                  THE COURT:  SURE.

24                  MR. KRAMER:  BUT VERY BRIEFLY -- AND THE EXPERT

25      OPINION IS GIVEN VERY LITTLE WEIGHT.  THAT'S EXTRINSIC

1    EVIDENCE.  WE CAN HIRE AN EXPERT TO COME IN AND GIVE YOU THE

2    RIGHT ANSWER.

3              THE COURT:  TO TELL ME WHAT YOU WANT ME TO KNOW.

4              MR. KRAMER:  RIGHT.  THAT'S WHY WE'RE NOT DOING THAT.

5              THE COURT:  I APPRECIATE THAT.

6              MR. KRAMER:  YOUR HONOR, THERE'S A STATEMENT THAT WAS

7    MADE THAT I'D LIKE TO ADDRESS VERY BRIEFLY --

8              THE COURT:  SURE.

9              MR. KRAMER:  -- BECAUSE IN LOOKING AT THE STATEMENT

10   ABOUT THE WHOLE THRUST OF THE CLAIMED INVENTION, I THINK THERE

11   WAS A SUGGESTION THAT THERE WAS THEN AN AMENDMENT TO ADD THE

12   DOUBLE BOUNCE.

13        THAT'S NOT WHAT WAS HAPPENING.  THAT WAS IN THERE.

14        THE AMENDMENT WAS TO ADD THE SCATTERED LIGHT, NOT TO SAY

15   I'M GOING TO NOW AMEND AND PUT IN AND ADD A DOUBLE BOUNCE.

16             THE COURT:  WILL I FIND THAT IN THE CLAIMS HISTORY?

17             MR. KRAMER:  YES, YOU'LL FIND THAT IN WHERE I READ

18   FROM, WHERE I SHOWED THE AMENDMENT -- THE EXAMINER'S STATEMENT

19   AND THEN THE APPLICANT'S AMENDMENT.

20             THE COURT:  OKAY.  THAT'S VERY HELPFUL.

21             MS. DAVIS:  YOUR HONOR, IF I MAY JUST HAVE A MOMENT

22   VERY BRIEFLY?

23             THE COURT:  SURE.

24             MS. DAVIS:  YOUR HONOR COMMENTED THAT IT WOULD BE

25   HELPFUL TO HAVE EXPERT TESTIMONY ON THIS TOPIC AND WE DO, IN

```
1    FACT.

2              THE COURT:  EXCELLENT.  OKAY.

3              MS. DAVIS:  IF YOU LOOK AT DR. HALL'S DEPOSITION

4    TRANSCRIPT, IT -- A SECTION OF IT IS EXHIBIT 5 TO FINISAR'S

5    OPENING BRIEF ON THIS ISSUE, AND I WILL NOT READ YOU --

6              THE COURT:  CAN YOU TELL ME THE PAGE NUMBER?

7              MS. DAVIS:  OH, SURE.  IF YOU -- IT IS -- I BELIEVE

8    OUR -- OKAY.  IT IS BEGINNING ON PAGE, I BELIEVE, 35.

9              THE COURT:  THAT'S 35 OF THE DEPOSITION?

10             MS. DAVIS:  PAGE 35 OF THE DEPOSITION TRANSCRIPT.

11   ACTUALLY --

12             MR. RADULESCU:  33 AND 34.

13             MS. DAVIS:  -- 33 THROUGH 37.

14             THE COURT:  OKAY.  I CAN CERTAINLY READ THAT.

15             MS. DAVIS:  OKAY.  THANK YOU.

16             THE COURT:  ALL RIGHT.  WELL, THANK YOU.

17        WHY DON'T WE TAKE OUR LUNCH BREAK UNTIL 1:30, AND THAT

18   WILL GIVE YOU SOME TIME TO THINK ABOUT HOW WE CAN MOVE ALONG A

19   LITTLE QUICKER.  I KNOW I'M SLOWING YOU DOWN.

20        THANK YOU.

21             THE CLERK:  THIS COURT IS IN RECESS.

22        (THE LUNCH RECESS WAS TAKEN FROM 12:12 P.M. TO 1:30 P.M.)

23

24

25
```

1                      **AFTERNOON SESSION**

2          THE COURT:  GOOD AFTERNOON.

3        BEFORE WE MOVE ON, I JUST WANTED TO ASK ONE FOLLOW-UP

4   QUESTION NOW THAT I'VE HAD A CHANCE TO THINK A LITTLE BIT ABOUT

5   WHAT YOU'RE SAYING IN YOUR ARGUMENTS ON SCATTERED LIGHT.

6        I THINK I WAS A LITTLE BIT CONCERNED ABOUT, MS. DAVIS,

7   YOUR DISCUSSION ABOUT LIGHT SCATTERING THROUGHOUT THE SEQUENCE,

8   AND I'M WONDERING IF WE CAN DEFINE "SCATTERED LIGHT" AS "THAT

9   WHICH OCCURS WHEN THE SIGNAL IS DROPPED AT THE SLM."

10        MS. DAVIS:  SO IT WOULD BE THE SCATTERED LIGHT THAT

11   OCCURS WHEN THE SIGNAL --

12        THE COURT:  THAT WOULD INCLUDE --

13        MR. RADULESCU:  -- INTERACTS WITH THE SLM?

14        THE COURT:  WHEN IT INTERACTS WITH THE SLM.  THAT

15   WOULD INCLUDE ALL OF YOUR CATEGORIES OF SCATTERED LIGHT AS

16   YOU'VE DISCUSSED THEM, OF COHERENT SCATTERED LIGHT,

17   PREDICTABLE.

18        WHETHER EDGE AND BACK ARE DIFFERENT OR NOT IS MAYBE NOT

19   SOMETHING WE NEED TO ADDRESS.

20        AND, OF COURSE, MR. KRAMER, I DON'T KNOW WHETHER THAT --

21   IT'S A LITTLE BROADER THAN WHAT YOU HAD SUGGESTED, JUST EDGE

22   SCATTERING, BUT IT REALLY SEEMS THAT WHAT WE'RE TALKING ABOUT

23   IN THIS PATENT IS THE SCATTERING THAT OCCURS AT ONE LOCATION.

24        MR. KRAMER:  YOUR HONOR, CAN YOU REPEAT THE PROPOSED

25   LANGUAGE?

1          THE COURT:  REPEAT IT?

2          MR. KRAMER:  YEAH, PLEASE.  I'M SORRY.

3          THE COURT:  AND, OF COURSE, WE CAN WORDSMITH THIS AND

4     OFTEN YOU'RE THE BEST ONES TO WORDSMITH IT.

5          "SCATTERED LIGHT IS THAT WHICH OCCURS, OR THE SCATTERING

6     WHICH OCCURS WHEN THE SIGNAL IS DROPPED AT THE SLM."

7          MS. DAVIS:  I THINK, AS AN INITIAL WORDSMITH

8     SUGGESTION, YOUR HONOR, WE'D LIKE TO SAY "WHEN THE SIGNAL

9     INTERACTS WITH THE SLM."  I THINK THAT MIGHT GET US CLOSER.

10         THE COURT:  THANK YOU.  NOT WHEN THE SIGNAL IS

11    DROPPED BUT WHEN IT INTERACTS?

12         MS. DAVIS:  RIGHT, BECAUSE IDEALLY IT'S BEING

13    DROPPED, BUT IT MAY NOT BE, SO IT'S JUST SOME KIND OF

14    INTERACTION.

15         THE COURT:  I THINK I TOOK "WHEN THE SIGNAL IS

16    DROPPED AT THE SLM" RIGHT OUT OF THE PATENT AND, OF COURSE, I

17    DIDN'T MAKE A NOTE OF WHERE THAT WAS.

18         MS. DAVIS:  AH.  THE CLAIM LANGUAGE ITSELF SAYS "FROM

19    A DROPPED SIGNAL."

20         THE COURT:  YES, THAT'S WHERE I WAS GETTING IT, YEAH,

21    THE CLAIM.  YES, OF COURSE, THAT'S WHERE WE SHOULD BE; RIGHT?

22         MS. DAVIS:  RIGHT.  SO I THINK IF WE'RE JUST DEFINING

23    THE SCATTERED LIGHT PART OF IT, WE PROBABLY DON'T NEED THE

24    DROPPED SIGNAL IN THERE.

25         I'M SORRY.  MAYBE WE NEED A MINUTE TO WORK THROUGH IT.

1          MR. KRAMER:  YES.  AND, YOUR HONOR, I DON'T KNOW THAT

2     THE CONCEPT OF COHERENT LIGHT IS INCLUDED IN THAT.

3          THE COURT:  WELL, I WOULD -- YOU KNOW, WHAT I'M

4     TRYING TO DO IS TO -- WELL, I'M JUST TRYING TO SEE IF THERE'S

5     AN ALTERNATIVE THAT YOU CAN BOTH AGREE TO, AND IF I WERE TO

6     ACCEPT MS. DAVIS'S ARGUMENT OF THERE BEING NO LIMITATIONS IN

7     THE PATENT, BUT NEEDING TO INTERPRET THE WORDS OF THE CLAIM,

8     WE'D ONLY BE TALKING ABOUT SCATTERING THAT DOES OCCUR EITHER

9     WHEN THE SIGNAL IS DROPPED, WHICH I BELIEVE IS IN -- THE

10    DROPPING OCCURS WHEN THERE'S INTERACTION WITH THE SLM, SO I

11    ACTUALLY THINK THOSE ARE THE SAME THING IN THIS PATENT.  I

12    DON'T THINK THERE'S A DIFFERENCE.

13         AND I STICK TO THE LANGUAGE OF THE CLAIM IF -- UNLESS

14    THERE'S A REASON TO DIVERGE FROM IT.

15         MR. KRAMER:  YEAH.  SO, YOUR HONOR, I AGREE.  IT IS

16    THE -- THE PATENT CLAIM ITSELF SAYS WHERE IT'S SCATTERED LIGHT

17    FROM A DROPPED SIGNAL, SO WE'RE TALKING ABOUT -- THAT'S THE

18    CLAIM ITSELF.  SO I DON'T THINK WE'RE TALKING ABOUT SCATTERED

19    LIGHT OR ANYTHING ELSE, SCATTERED LIGHT FROM THE DROPPED

20    SIGNAL.

21         I THINK THAT THIS IS NOT TAKING INTO ACCOUNT, THOUGH, THE

22    CONCEPT OF COHERENCE, AND IT MAY BE A SUGGESTION THAT THE

23    PARTIES CONSIDER YOUR HONOR'S PROPOSAL AND SEE IF WE CAN COME

24    BACK TO YOU WITH SOMETHING.

25         THE COURT:  THAT MAY BE THE BEST THING, TO NOT -- I

1      DON'T -- I CERTAINLY DON'T WANT YOU TO AGREE TO SOMETHING OR

2      DISAGREE AND THEN WALK OUT AND CHANGE YOUR MIND AND I'M LEFT --

3      SO THAT MAKES SENSE.

4           AND MAYBE WE SHOULD MOVE ON.

5                MR. KRAMER:  OKAY.

6                THE COURT:  YOU KNOW WHAT MY THINKING IS ON THIS

7      WHERE I'M TRYING TO LOOK FOR SOMETHING ELSE.

8           OKAY.  ALL RIGHT.  LET'S MOVE ON.

9           MS. DAVIS, I THINK YOU'RE UP AGAIN.  IS THAT CORRECT?

10               MS. DAVIS:  THAT'S CORRECT.

11               THE COURT:  OKAY.  AND WE ARE NOW GOING TO MOVE --

12     ARE WE GOING TO MOVE TO THE '740?

13               MS. DAVIS:  YES.

14               THE COURT:  ALL RIGHT.  LET ME GET YOUR PAPERWORK

15     OUT.

16               MS. DAVIS:  I THINK WE'RE AT -- THERE'S A TAB 3, AND

17     THAT'S WHERE WE ARE.

18               THE COURT:  YES, THANK YOU.  THAT MAKES IT EASY.

19     OKAY.

20               MS. DAVIS:  OKAY.  SO WE'RE NOW ON TO THE THIRD

21     PATENT, THE '740 PATENT, WHERE WE HAVE ONE TERM IN DISPUTE.

22     THIS TERM IS LONG.  IT IS QUITE A MOUTHFUL.

23               THE COURT:  YEP.

24               MS. DAVIS:  AND IT IS -- AND I WILL -- I'LL GIVE IT

25     IN FULL, AT LEAST THIS ONE TIME.  SO THE DISPUTED TERM IS "THE

1       SPACIAL LIGHT MODULATOR HAVING A FIRST SET OF MICRO-MIRRORS

2       PROGRAMMED TO PERFORM A FIRST OVERALL OPTICAL FUNCTION ON THE

3       FIRST OPTICAL INPUT SIGNAL, AND HAVING A SECOND SET OF

4       MICRO-MIRRORS PROGRAMMED TO PERFORM A SECOND OVERALL OPTICAL

5       FUNCTION ON THE SECOND OPTICAL SIGNAL."

6            AND WHILE THIS TERM HAS PROBABLY, YOU KNOW, 20 WORDS IN

7       IT, THERE'S -- FINISAR SEES AND THEIR PROPOSAL -- OUR PROPOSAL

8       IS THAT IT SHOULD HAVE ITS PLAIN AND ORDINARY MEANING.

9            THE COURT:  AND CAN YOU TELL ME WHAT THAT WOULD BE?

10           MS. DAVIS:  CERTAINLY.  SO THE PLAIN AND ORDINARY

11      MEANING HERE, I THINK WE'RE GOING TO STEP THROUGH IT, BUT THE

12      KEY POINTS HERE FOR THIS PARTICULAR DISPUTE ARE, FIRST OF ALL,

13      THAT AS THE CLAIM LANGUAGE SAYS, THE OVERALL OPTICAL FUNCTIONS

14      ARE BEING PERFORMED BY THE SPACIAL LIGHT MODULATOR.

15           THERE ARE TWO OF THEM DISCUSSED IN THIS CLAIM TERM, A

16      FIRST ONE BEING PERFORMED ON THE FIRST SIGNAL AND A SECOND ONE

17      BEING PERFORMED ON THE SECOND SIGNAL, AND BOTH OF THOSE OVERALL

18      OPTICAL FUNCTIONS ARE BEING PERFORMED AT THE SPACIAL LIGHT

19      MODULATOR.

20           IN CONTRAST, NISTICA'S PROPOSAL WOULD HAVE THOSE FUNCTIONS

21      BEING PERFORMED AS THE SIGNAL TRANSITS THE ENTIRE DEVICE.  SO

22      THAT IS ONE OF THE DISPUTES THAT YOU'LL SEE HERE AT THE BOTTOM

23      OF THIS SLIDE NUMBER 63.

24           AND SLIDE NUMBER 64 HIGHLIGHTS THE OTHER KEY DISPUTE AREA,

25      WHICH IS WHETHER THE WORD "OVERALL" AS USED IN THIS TERM SHOULD

1   HAVE ITS PLAIN AND ORDINARY MEANING, OR WHETHER "OVERALL"

2   SHOULD ACTUALLY BE CONSTRUED AS "A SET OF ONE OR MORE."

3          SO FROM OUR PERSPECTIVE, THERE'S TWO DISPUTES HERE, AND

4   THIS IS A DIFFERENT TYPE OF CLAIM TERM AND DISPUTE FOR YOUR

5   HONOR TO RESOLVE THAN THE OTHERS THAT WE'VE DISCUSSED SO FAR

6   TODAY.

7          THE COURT:  YES.

8          MS. DAVIS:  THE FIRST TWO WERE REALLY MORE ABOUT

9   WHETHER A LIMITATION SHOULD BE ADDED TO A CLAIM TERM THAT WAS

10  IN DISPUTE, WHEREAS HERE WE -- FINISAR ARGUES THAT THIS IS A

11  CLAIM TERM THAT, WHILE IT USES TECHNICAL LANGUAGE, IS ACTUALLY

12  CLEAR ON ITS FACE AND SHOULD HAVE ITS PLAIN AND ORDINARY

13  MEANING.

14         THE COURT:  SO MY FIRST QUESTION ON THIS, AS I WAS

15  REVIEWING IT, IS CAN YOU ARTICULATE THE DIFFERENCE BETWEEN THE

16  OVERALL OPTICAL FUNCTION AND THE LANGUAGE THAT NISTICA IS

17  OFFERING?  CAN YOU TELL ME WHAT THE DIFFERENCE IS?

18         MS. DAVIS:  SURE.  SO HERE ACTUALLY -- AND IF YOU'LL

19  LOOK ON THE SCREEN AT HOW WE'VE MARKED UP SLIDE 64 --

20         THE COURT:  OKAY.

21         MS. DAVIS:  -- IT'S GOT SOME RED BOLDING OF LANGUAGE

22  THAT NISTICA IS ADDING WHICH I THINK MAKES IT A LITTLE BIT

23  CLEARER.  WE DID THAT OVER THE BREAK TO HELP YOUR HONOR.  I'M

24  SORRY.

25         THE COURT:  THANK YOU.  I APPRECIATE IT.

1          MS. DAVIS:  BUT WHAT YOU CAN SEE HERE IS THAT IT

2     LOOKS -- NISTICA IS -- ALL OF THE LANGUAGE THAT IS IN BLACK IS

3     FROM THE CLAIM TERM.

4          THE COURT:  SURE.

5          MS. DAVIS:  AND SO WE WOULD AGREE THAT THAT LANGUAGE

6     SHOULD BE USED.

7          THE COURT:  YEAH.

8          MS. DAVIS:  AND THE RED LANGUAGE IS IN ADDITION.  AND

9     IT APPEARS THAT, FROM OUR READING OF THIS, THAT NISTICA IS

10    BASICALLY TAKING OUT THE WORDS "OVERALL OPTICAL FUNCTION" AND

11    INSERTING ALL OF THIS RED LANGUAGE.

12        SO WHAT THEY WOULD HAVE ADDED AND WHAT THEY WOULD WRITE

13    INTO THE CLAIM IS THAT THE SPATIAL -- THE IDEA THAT "THE

14    SPACIAL LIGHT MODULATOR PERFORMS A FIRST SET OF ONE OR MORE

15    OPTICAL FUNCTIONS ON A FIRST OPTICAL SIGNAL AS IT TRANSITS THE

16    RECONFIGURABLE MULTIFUNCTIONAL OPTICAL DEVICE."

17        AND THEN THEY WOULD MAKE THE SIMILAR CHANGE IN CONNECTION

18    WITH THE SECOND OVERALL OPTICAL FUNCTIONS.

19        THE COURT:  YEAH.

20        MS. DAVIS:  SO MY UNDERSTANDING IS THAT THOSE TWO

21    SETS OF RED LANGUAGE ARE WHAT NISTICA IS SEEKING TO WRITE INTO

22    THE CLAIM BY VIRTUE OF REMOVING THE WORDS "OVERALL OPTICAL

23    FUNCTION," ALTHOUGH OPTICAL FUNCTION IS, TO SOME DEGREE, STILL

24    THERE, SO PERHAPS THIS ALL COMES FROM "OVERALL."

25        BUT THIS IS A SIGNIFICANT CHANGE TO THE MEANING OF THE

1    CLAIM AND A DEPARTURE FROM WHAT THE CLAIM LANGUAGE ITSELF IS,

2    AND IS CERTAINLY WHAT THE PROSECUTION HISTORY INDICATES THAT

3    THIS CLAIM LANGUAGE SHOULD MEAN.

4         AND SO I GUESS DEPARTING FROM SLIDE 64, WHICH IS A NICE

5    REFERENCE SLIDE --

6              THE COURT:  YEAH.

7              MS. DAVIS:  -- I WOULD LIKE TO GET INTO, AT THE

8    OUTSET, WHAT IS FINISAR'S PROPOSAL AND WHY WE UNDERSTAND THAT

9    IT IS ACCURATE, AND THEN WE WILL LOOK AT A FEW SLIDES ON SOME

10   OF NISTICA'S ARGUMENTS AND WHY WE THINK THEY ARE INCORRECT

11   GIVEN THE INTRINSIC EVIDENCE.

12             THE COURT:  OKAY.

13             MS. DAVIS:  SO FIRST OFF, AS I SAID, THESE -- THESE

14   CLAIMS USE TECHNICAL WORDS, BUT THEY ARE USED IN A GRAMMATICAL,

15   CLEAR MANNER AND THEY ARE CLEAR ON THEIR FACE AND THEY WOULD BE

16   TO ONE OF ORDINARY SKILL IN THE ART.

17        AND WE HAVE HERE THE CLAIM TERM, OR THE SECOND WHOLE

18   PARAGRAPH OF CLAIM 1 OF THE '740 PATENT ON SLIDE 65 AND IT'S

19   CLEAR, ESPECIALLY WHEN ONE LOOKS AT THE RED UNDERLINED WORDS,

20   THAT THE SLM, THE SPACIAL LIGHT MODULATOR, IS PERFORMING THE

21   OVERALL OPTICAL FUNCTIONS.

22        AND THIS CLAIM AS A WHOLE, CLAIM 1 OF THE '740 PATENT,

23   DESCRIBES A RECONFIGURABLE OPTICAL DEVICE THAT COMPRISES, AND

24   THEN LISTS MULTIPLE ELEMENTS.

25        THIS SPACIAL LIGHT MODULATOR HAVING THESE CERTAIN

1    ATTRIBUTES, AS ARTICULATED HERE IN THE DISPUTED TERM, IS ONE OF

2    THOSE ELEMENTS.  SO THE SPACIAL LIGHT MODULATOR HERE IS A

3    COMPONENT, SMALLER THAN, THE ENTIRE DEVICE.

4        AND THE CLAIM LANGUAGE IS CLEAR THAT THAT'S WHAT'S

5    PERFORMING, THE SLM IS PERFORMING THE OVERALL OPTICAL

6    FUNCTIONS.

7        NOW, THIS CLAIM LANGUAGE, INCLUDING "OVERALL OPTICAL

8    FUNCTION," WAS ADDED DURING THE PROSECUTION AS PART OF AN

9    AMENDMENT, AND THE FILE HISTORY IS CLEAR THAT THE SPACIAL LIGHT

10   MODULATOR IS THE, IS THE COMPONENT THAT ACTUALLY PERFORMS THE

11   OVERALL OPTICAL FUNCTIONS ON TWO SEPARATE INPUT SIGNALS.

12       ON PAGE 66, WE LOOK AT AN EXCERPT FROM THE FILE HISTORY,

13   ACTUALLY AS NISTICA HAS CONVENIENTLY SHORTENED IN ITS BRIEF,

14   AND THROUGH THE HIGHLIGHTED LANGUAGE IT'S CLEAR THAT DIFFERENT

15   PORTIONS OF THE MICRO-MIRROR SPATIAL MODULATOR ARE THOSE THAT

16   ARE PERFORMING THE OVERALL OPTICAL FUNCTIONS.

17       ADDITIONALLY, IT'S CLEAR FROM THIS PARTICULAR EXCERPT THAT

18   AS THE APPLICANT IS EXPLAINING THIS, THEY ARE DISTINGUISHING

19   OVER A PRIOR ART REFERENCE THAT THEY HAD BEEN REJECTED BY, AND

20   THAT REFERENCE IS CALLED AKSYUK, AND THEY CLARIFY THAT AKSYUK

21   SHOWS SEPARATE -- THEY SAY THAT AKSYUK SHOWS -- THE EXAMINER

22   SAID AKSYUK SHOWED SEPARATE AND DIFFERENT OPTICAL FUNCTIONS,

23   BUT THE APPLICANT COMES BACK AND SAYS, BUT AKSYUK MERELY

24   DISCLOSES A SINGLE OVERALL FUNCTION OF A WDM ADD/DROP DEVICE.

25       THIS IS IMPORTANT LANGUAGE, BUT IT'S INCOMPLETE TO JUST

1    LOOK AT IT HERE AS IT'S WRITTEN IN THIS EXCERPT, SO WE HAVE

2    ACTUALLY PULLED UP THE AKSYUK REFERENCE AND TRIED TO LOOK AT IT

3    IN A HELPFUL WAY TO EXPLAIN EXACTLY WHAT THE APPLICANT MEANT

4    WHEN THEY WERE MAKING THOSE DISTINCTIONS.

5         SO SLIDE 67 ACTUALLY PULLS OUT AN IMPORTANT PARAGRAPH FROM

6    THE PRIOR ART REFERENCE THAT WAS REFERENCED BEFORE THE AKSYUK

7    REFERENCE.

8         SO IN THE AKSYUK REFERENCE, THERE ARE TWO OPTICAL INPUT

9    SIGNALS THAT ARE INCIDENT ON A SPACIAL LIGHT MODULATOR, AND

10   THESE TWO OPTICAL INPUT SIGNALS UNDERGO ONE OVERALL OPTICAL

11   FUNCTION.  THEY UNDERGO EXACTLY THE SAME OPTICAL FUNCTION.  IT

12   HAPPENS TO BE THAT THESE SIGNALS ARE ADDED.

13        AND SO TO CONTRAST WITH WHAT DIFFERENT OVERALL OPTICAL

14   FUNCTIONS MIGHT LOOK LIKE, HERE IN AKSYUK, THE PIXELS OF THE

15   SPACIAL LIGHT MODULATOR THAT THESE TWO OPTICAL INPUT BEAMS ARE

16   INCIDENT ON ARE ARRANGED TO PERFORM EXACTLY THE SAME FUNCTION,

17   PRECISELY THE SAME ADD/DROP FUNCTION, AND SO THEIR ADDITION IS

18   A SINGLE OVERALL OPTICAL FUNCTION.

19        WHAT THE APPLICANT IS SAYING IS THAT IN OUR DEVICE, THERE

20   ARE DIFFERENT OVERALL OPTICAL FUNCTIONS, SO THE PIXELS OF THE

21   SLM CAN BE ARRANGED DIFFERENTLY TO CAUSE A SIGNAL TO BE

22   MODULATED, HOWEVER IT IS THAT IS NECESSARY, TO PERFORM THE

23   DESIRED OVERALL OPTICAL FUNCTION FOR THAT PARTICULAR SIGNAL.

24        AND THE SIGNAL COULD BE ROUTED, IT COULD BE AN ADD/DROP,

25   IT COULD BE ATTENUATED, HOWEVER THE SLM IS PROGRAMMED FOR THAT

```
 1        SIGNAL TO BE MADE.

 2                THE COURT:  HOW IS THAT DIFFERENT THAN "ONE OR MORE"?

 3                MS. DAVIS:  SO "ONE OR MORE" SUGGESTS -- I GUESS

 4        THERE'S TWO ANSWERS TO THAT.

 5            SO "ONE OR MORE" SUGGESTS THAT WHAT WE'RE LOOKING AT IS,

 6        IN COMBINATION WITH THEIR REQUIREMENT THAT IT BE OVER THE

 7        DEVICE, THAT WE MIGHT BE LOOKING AT FUNCTIONS THAT ARE

 8        PERFORMED AT -- BY COMPONENTS OTHER THAN THE SLM.

 9                THE COURT:  WELL --

10                MS. DAVIS:  AND THAT --

11                THE COURT:  I MEAN, I'LL CERTAINLY LET NISTICA ARGUE

12        IT, BUT I WASN'T PARTICULARLY PERSUADED BY THE SECOND PART.

13                MS. DAVIS:  OKAY.

14                THE COURT:  SO TO ME, THIS -- I WAS TRYING TO LOOK AT

15        YOUR PROPOSAL AND NISTICA'S, PRESUMING THAT I WASN'T GOING TO

16        BUY THE SECOND PART.  SO COULD YOU --

17                MS. DAVIS:  OKAY.  SO CONCENTRATE ON THE OTHER PART?

18                THE COURT:  I MIGHT CHANGE MY MIND.  I HAVEN'T HEARD

19        FROM NISTICA YET ON THAT.

20            BUT -- SO WITH THAT IN MIND, IS THERE A DIFFERENCE BETWEEN

21        "ONE OR MORE" VERSUS "DIFFERENT OPTICAL FUNCTIONS"?

22                MS. DAVIS:  RIGHT.  SO WE'RE LOOKING AT THE SLM

23        ITSELF.  IN THIS CASE IT'S A -- IT'S A MEMS SLM, SO IT'S AN

24        ARRAY OF MICRO-MIRRORS THAT ARE PERFORMING TWO DIFFERENT

25        FUNCTIONS ON TWO DIFFERENT INPUT SIGNALS.
```

1      SO THE -- AN OPTICAL FUNCTION COULD BE DESCRIBED AT A HIGH

2  LEVEL AS ADD/DROP.

3      BUT THE REALITY IS THAT WHEN YOU ACTUALLY LOOK AT HOW THAT

4  FUNCTION IS PERFORMED ON THE SLM, NOT ALL ADD/DROPS ARE

5  IDENTICAL.  THE MIRRORS THEMSELVES MAY BE ORIENTED DIFFERENTLY.

6      IF YOU WANT TO, SAY, TAKE THE RED LIGHT AND ROUTE IT OUT

7  PORT 2, THEN YOU WANT TO TAKE BLUE LIGHT AND DROP IT.

8      SO WHAT WE'RE ACTUALLY LOOKING AT HERE TO SEE WHETHER

9  THESE FUNCTIONS ARE DIFFERENT IS THE VERY MICRO LEVEL KIND OF

10  ORIENTATION OF THE MICRO-MIRRORS ON THE SLM.  SO THAT'S HOW WE

11  WOULD KNOW IF THESE FUNCTIONS ARE THE SAME OR THEY'RE

12  DIFFERENT.

13      BY CALLING THEM "A SET OF ONE OR MORE OPTICAL FUNCTIONS,"

14  THAT KIND OF SUGGESTS THAT ONE WOULD BE LOOKING AT THIS AT TOO

15  HIGH OF A LEVEL, THAT ONE WOULD HAVE STEPPED BACK SO FAR THAT

16  YOU'D SAY, OH, WELL, ALL ADD/DROPS ARE CREATED EQUAL.

17      BUT THE REALITY IS, BECAUSE THIS CLAIM FOCUSES US TO LOOK

18  AT WHAT THE SLM IS DOING AND THE PARTICULAR MICRO-MIRRORS ON

19  THE SLM AND HOW THEY'RE PROGRAMMED, DIFFERENT ADD/DROPS ARE

20  ACTUALLY GOING TO REQUIRE DIFFERENT ORIENTATIONS OF THOSE

21  MICRO-MIRRORS AND THEY'RE GOING TO BE DIFFERENT ON THE LEVEL OF

22  THE SLM WHERE THE CLAIM TELLS US WE SHOULD BE ANALYZING THEM.

23          THE COURT:  HMM.  I GUESS ON THIS ONE I'M ACTUALLY

24  STRUGGLING TO EVEN UNDERSTAND WHAT THE DIFFERENCE IS.  I'M

25  STRUGGLING ON THIS ONE.

1          ON THE OTHER ONES, I FELT I COULD SEE WHAT THE DIFFERENCE

2     WAS.  I JUST WAS LOOKING FOR THE EVIDENCE TO SUPPORT THEM.

3          AND ON THIS ONE --

4          MS. DAVIS:  RIGHT.

5          THE COURT:  -- I'M NOT GRASPING IT, SO I DON'T WANT

6     TO LET YOU MOVE ON UNTIL I HAVE IT.

7          MS. DAVIS:  LET ME TRY AGAIN.

8          THE COURT:  AND IT'S NOT THAT YOU AREN'T ARTICULATING

9     IT.  I'M HAVING A HARD TIME GRASPING IT.

10         MS. DAVIS:  THIS IS PROBABLY -- FRANKLY, AS WE'VE

11    BEEN WORKING ON THIS SLIDE DECK AND PREPARING THIS, THIS IS

12    EASILY THE MOST COMPLICATED ISSUE.

13         SO THE IDEA IS THAT WE HAVE -- AND ACTUALLY, IF I CAN

14    REFER YOU BACK TO EARLIER IN THE SLIDE DECK, IT MIGHT BE

15    HELPFUL TO LOOK AT SLIDE 16 OF OUR SLIDES WHERE THERE'S -- WE

16    HAVE AN EXCERPT OF FIGURE 18 FROM THE '740 PATENT.

17         THE COURT:  OKAY.  I HAVE THAT.

18         MS. DAVIS:  OKAY.  SO HERE WE CAN SEE THIS IS, YOU

19    KNOW, AN IMAGE OF THE SLM THAT'S INVOLVED IN PRACTICING THE

20    CLAIMED INVENTION.

21         AND IT'S AN ARRAY OF MICRO-MIRRORS, AND WE HAVE HERE THE

22    SHADOW OUTLINE ON THE TOP ROW, SOME ELONGATED LIGHT BEAMS

23    INCIDENT, AND ON THE BOTTOM ROW WE'VE GOT SOME, I GUESS,

24    CIRCULAR LIGHT BEAMS INCIDENT.

25         AND THE TOP ROW WE COULD SAY IS THE FIRST OPTICAL SIGNAL,

1    AND WE COULD SAY THE BOTTOM ROW IS THE SECOND OPTICAL SIGNAL.

2              THE COURT:  OKAY.

3              MS. DAVIS:  AND YOU CAN SEE ON THE RIGHT THERE, IN

4    SMALL HANDWRITTEN TEXT, THERE'S FUNCTION 1 BEING PERFORMED ON

5    THE TOP ROW, FUNCTION 2 PERFORMED ON THE BOTTOM.

6         SO THE IDEA IS THAT AN OVERALL OPTICAL FUNCTION WOULD

7    CAPTURE THE BEHAVIOR OF THE MICRO-MIRRORS AND HOW THEY'RE

8    PROGRAMMED TO ACT IN ORDER TO HAVE EACH OF THOSE TWO FUNCTIONS

9    PERFORMED PROPERLY, WHETHER IT BE ROUTING OR ANY OTHER

10   PARTICULAR FUNCTION THAT ONE MAY WISH TO DO.

11        THERE'S -- SLM'S ARE QUITE FLEXIBLE SO THEY CAN DO ALL

12   DIFFERENT KINDS OF THINGS, ROUTING, ATTENUATION, BOTH OF THOSE

13   TOGETHER AT THE SAME TIME, ADD/DROP.

14        AND THE IDEA IS THAT IN ORDER TO KNOW WHETHER -- THE POINT

15   OF THIS -- WHAT WE'RE TRYING TO CLARIFY IN THIS CLAIM IS TO BE

16   ABLE TO COMPARE THE TWO OVERALL OPTICAL FUNCTIONS TO EACH OTHER

17   TO KNOW IF THEY'RE DIFFERENT OR NOT, TO SEE IF THEY

18   ULTIMATELY --

19              THE COURT:  SO IN TERMS OF THE TWO PROPOSALS, YOU

20   BOTH AGREE THAT THERE'S A DIFFERENT OPTICAL FUNCTION ON EACH OF

21   THE INPUT SIGNALS THAT'S OCCURRING AT THE SAME TIME.  IS THAT

22   CORRECT?

23              MS. DAVIS:  RIGHT, AT THE SLM.  THAT'S REQUIRED BY

24   THE CLAIM.

25              THE COURT:  AT THE SLM.  SO YOU BOTH AGREE ON THAT.

1        AND SO IT'S REALLY, IT'S DOWN TO -- THIS IS A QUESTION OF

2    WHETHER "AN OVERALL OPTICAL FUNCTION" IS DIFFERENT AND HOW IT'S

3    DIFFERENT FROM "ONE OR MORE OPTICAL FUNCTIONS."

4            MS. DAVIS:  WELL, I --

5            THE COURT:  IS THAT --

6            MS. DAVIS:  THAT'S AN EXCELLENT QUESTION, AND I CAN

7    TELL YOU WHAT -- THAT WE UNDERSTAND THE OVERALL OPTICAL

8    FUNCTION TO BE THE NET MODULATION THAT THE SLM IS APPLYING TO

9    THAT SIGNAL, AND THAT'S WHAT WE UNDERSTAND IT TO BE.

10            THE COURT:  IT'S THE NET MODULATION?

11            MS. DAVIS:  RIGHT.  AND I THINK THAT'S ACTUALLY ON A

12    SLIDE THAT'S COMING UP.

13            THE COURT:  OKAY.

14            MS. DAVIS:  SO THAT'S WHAT -- THAT'S WHAT WE

15    UNDERSTAND IT TO BE AS THE PLAIN AND ORDINARY MEANING.

16        AND NISTICA IS DESCRIBING IT AS "A SET OF ONE OR MORE."

17    FRANKLY, THAT INTRODUCES AMBIGUITY HERE.  IT'S NOT SOMETHING

18    THAT'S EASILY UNDERSTOOD WHEN ONE IS DEALING WITH, YOU KNOW,

19    BASICALLY AN ARRAY OF MICRO-MIRRORS AND HOW THEY ARE ORIENTED

20    IN ORDER TO ACHIEVE A CERTAIN FUNCTION FOR THE DEVICE AS A

21    WHOLE.

22            THE COURT:  OKAY.

23            MS. DAVIS:  I HOPE THAT WAS HELPFUL.

24        SO --

25        (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFF'S COUNSEL.)

1        MS. DAVIS:  SO I GUESS TO CLARIFY A LITTLE BIT ABOUT

2    THE NET MODULATION -- MY COLLEAGUES ARE WORDSMITHING FOR ME.

3        SO IT'S NOT NECESSARILY THAT IT'S A SUM OF DIFFERENT

4    FUNCTIONS, THE NET MODULATION EFFECT, OR THE OVERALL OPTICAL

5    FUNCTION.  IT'S THAT IT'S THE TOTAL EFFECT.  YOU KNOW, AFTER

6    ALL OF THESE -- AFTER THE SLM IS ORIENTED PROPERLY, AS IT WOULD

7    NEED TO BE TO ACHIEVE WHATEVER THE GOAL OF THE DEVICE IS FOR

8    THAT PARTICULAR SIGNAL.

9        BUT WE'VE GOT SOME MORE SLIDES THAT HIT ON EXACTLY THIS

10   ISSUE, IN FACT.

11            THE COURT:  OKAY.

12            MS. DAVIS:  WE'RE GOING TO WALK THROUGH THE TWO

13   DISPUTES.  THE FIRST ONE I THINK WE'VE COVERED A BIT, WHICH IS

14   THE IDEA OF WHETHER THE OVERALL OPTICAL FUNCTION SHOULD BE

15   PERFORMED BY THE SLM OR THE WHOLE DEVICE.

16            THE COURT:  I'LL LET YOU COME BACK TO THAT ON

17   REBUTTAL BECAUSE RIGHT NOW I DON'T NEED --

18            MS. DAVIS:  YEAH.

19            THE COURT:  BECAUSE I WAS PRETTY PERSUADED, BUT I MAY

20   CHANGE MY MIND WHEN I HEAR THE ARGUMENT.  I'LL GIVE YOU THAT

21   CHANCE.

22        BUT IN THE INTERESTS OF TIME --

23            MR. KRAMER:  WE'RE NOT EVEN MAKING THAT ARGUMENT.

24            THE COURT:  OH, YOU'RE DROPPING THAT?

25            MR. KRAMER:  YEAH.  THAT'S A MISCHARACTERIZATION OF

1    THAT.  WE'VE NEVER MADE THAT ARGUMENT.

2            MS. DAVIS:  OKAY.  I THINK WE DISAGREE, BUT IF YOU'RE

3    DROPPING IT, THAT'S GREAT.

4            THE COURT:  WE'LL FIND OUT WHAT THEY DROP IN A

5    MOMENT.

6        GO AHEAD.  LET'S LOOK AT WHAT YOU LABEL DISPUTE 2 ON

7    SLIDE 68.

8            MS. DAVIS:  SO LET'S ACTUALLY GO TO SLIDE 71 WHERE WE

9    LOOK AT IT MORE CLOSELY.

10           THE COURT:  OKAY.

11           MS. DAVIS:  SO AS WE WERE JUST TALKING ABOUT, IT'S

12   FINISAR'S POSITION THAT OVERALL, IN THE CONTEXT OF THE CLAIM

13   LANGUAGE, IS THE PLAIN AND ORDINARY MEANING TO ONE OF SKILL IN

14   THE ART.  PART OF WHAT MAKES THIS DISPUTE TRICKY IS THAT

15   "OVERALL OPTICAL FUNCTION" DOES NOT APPEAR IN THE

16   SPECIFICATION.

17       SO ON SLIDE 72 WE CAN SEE THAT NISTICA IS TRYING TO RELY

18   ON THE SPECIFICATION TO CHARACTERIZE WHAT AN OVERALL OPTICAL

19   FUNCTION IS, BUT, YET, THEY'RE CITING TO SECTIONS THAT

20   CONSIDER, FIRST OF ALL, NOT AN OVERALL OPTICAL FUNCTION AS THEY

21   CONCEDE THAT THAT LANGUAGE IS NOT ACTUALLY ANYWHERE IN THE

22   SPECIFICATION; AND, ALSO, THEY DON'T SEEM TO BE LOOKING AT THE

23   SLM AS WOULD BE REQUIRED UNDER THE CLEAR LANGUAGE OF THE CLAIM

24   ITSELF.

25       SO THIS BRINGS US BACK, ON SLIDE 73, TO WHAT WAS THE

1    APPLICANT DISTINGUISHING OVER IN AKSYUK WHEN THEY WERE TALKING

2    ABOUT WHAT IS AN OVERALL OPTICAL FUNCTION?

3        THE AKSYUK REFERENCE THAT THE APPLICANTS DISTINGUISHED

4    OVER SAID -- SHOWED A CASE WHERE THE EXACT SAME ADDING FUNCTION

5    WAS BEING PERFORMED ON TWO INPUT SIGNALS.

6        IN THE FILE HISTORY, IT ACTUALLY EXPLAINS THAT

7    DIFFERENT -- THAT THIS CLAIM IS REQUIRING DIFFERENT OPTICAL

8    SIGNALS TO BE -- DIFFERENT OVERALL OPTICAL SIGNALS TO BE

9    PERFORMED ON THE DIFFERENT INPUT SIGNALS.

10        ANYWAY, AND THEN -- I'M SORRY.

11        AND THEN "OVERALL," AS WE TRIED TO DISCUSS, MEANS THE NET

12    MODULATION ON THE SIGNAL AS A WHOLE AND NOT A SET OF FUNCTIONS.

13        THE REALITY IS THAT, YOU KNOW, ONE CAN, FOR INSTANCE,

14    ATTENUATE AND ROUTE SIGNALS AT THE SAME TIME, AND WHAT HAPPENS

15    IS THAT THE ACTUAL MODULATION APPLIES, APPLIED WOULD BE

16    DIFFERENT.  IT'S NOT RIGHT TO THINK OF IT AS A SET OF

17    FUNCTIONS.  IT'S NOT A SERIES OF FUNCTIONS.

18        BUT IT'S A PROPER MODULATION FOR THE DESIRED OUTCOME

19    THAT'S APPLIED BECAUSE THE MICRO-MIRRORS ARE ARRANGED IN --

20    ACCORDINGLY TO HAVE THAT RESULT.

21        AND I GUESS THEN FINALLY WE -- YOU KNOW, NISTICA

22    CRITICIZES FINISAR'S PROPOSAL AS BEING UNCLEAR, WHEREAS IN

23    CONTRAST, WE WOULD SUBMIT THAT ADDING SUBSTANTIAL LANGUAGE

24    HERE, AS IS HIGHLIGHTED -- OR AS IS IN BLACK ON THIS SLIDE, IS

25    ACTUALLY MUCH MORE CONFUSING AND ADDING -- AND USING ALL OF THE

1    WORDS OF THE CLAIM TERM, BASICALLY SUGGESTING THAT THEY'RE

2    CLEAR ENOUGH, BUT THEN ADDING IN LOTS OF EXTRANEOUS WORDS.

3            AND NISTICA DOES NOT CITE SUPPORT IN THE SPECIFICATION OR

4    THE FILE HISTORY FOR THESE LIMITATIONS.

5            AND, MOREOVER, AS SOME OF MY COLLEAGUES HAVE SUGGESTED, IF

6    PARTS OF NISTICA'S PROPOSED CONSTRUCTION ARE BEING DROPPED,

7    SUCH AS A REFERENCE TO THE SIGNAL TRANSITING THE ENTIRETY OF

8    THE RECONFIGURABLE OPTICAL DEVICE, THAT OBVIOUSLY INDICATES

9    THAT IT SHOULD BE REJECTED AND SO WE WOULD, I GUESS, AWAIT TO

10   HEAR THEIR ARGUMENT ON THAT POINT.

11           THE COURT:  SO LET ME JUST -- SO -- THIS IS WHAT

12    STILL SLIPS A LITTLE, AND I'M NOT SURE I'VE GOT IT YET, AND I

13    DO APPRECIATE ALL YOUR EFFORTS TO HELP ME.

14         AN OVERALL OPTICAL FUNCTION IS A SINGLE, WHAT?  IT'S A --

15   I MEAN, IT'S A --

16           MS. DAVIS:  IT'S A SINGLE MODULATION.  IT'S A NET

17   MODULATION.

18           THE COURT:  OKAY.  AND A SERIES -- AND A -- IT'S NOT

19    FOR YOU TO DEFINE WHAT THEY SAY, BUT A SET OF ONE OR MORE

20    FUNCTIONS WOULD -- COULD BE SEVERAL MODULATIONS, SEPARATE

21    MODULATIONS?

22           MS. DAVIS:  YOU KNOW WHAT, YOUR HONOR?  HONESTLY,

23    IT'S DIFFICULT TO FIGURE OUT EXACTLY WHAT THAT LANGUAGE MEANS.

24           THE COURT:  OKAY.  I KNOW IT'S NOT YOUR JOB TO DO

25    THAT.

1           BUT YOUR OVERALL OPTICAL FUNCTION WOULD BE KNOWN IN THE --

2    OR SOMEONE SKILLED IN THE ART WOULD UNDERSTAND THAT TO BE A

3    SINGLE MODULATION?

4           MS. DAVIS:  I THINK THEY WOULD UNDERSTAND IT AS THE

5    NET MODULATION.

6           THE COURT:  A SINGLE NET MODULATION?  OR JUST A NET

7    MODULATION?

8           MS. DAVIS:  A NET MODULATION.

9           THE COURT:  A NET MODULATION.  CAN YOU HELP ME OUT

10   WITH WHAT A NET MODULATION IS?

11          MS. DAVIS:  SURE.  IT'S ALL THE MODULATIONS BEING

12   PERFORMED ON ALL THE DIFFERENT CHANNELS OF THAT SIGNAL, BECAUSE

13   EACH SIGNAL WILL HAVE, YOU KNOW, MANY DIFFERENT COLORS IN IT.

14          THE COURT:  OKAY.  ALL RIGHT.

15          MS. DAVIS:  THANK YOU.

16          THE COURT:  THANK YOU.

17       ALL RIGHT.  LET'S MOVE ON TO NISTICA.

18       AND, MR. TONKOVICH, THIS IS YOUR -- YOU GOT THE TOUGH ONE

19   HERE.

20          MR. TONKOVICH:  THIS WAS MY LUCKY DRAW.

21          THE COURT:  OKAY.  AND YOU KNOW WHAT I'M STRUGGLING

22   WITH HERE AND YOU KNOW WHAT I'M LESS INCLINED TO PURSUE, SO

23   THAT HELPS YOU OUT.

24          MR. TONKOVICH:  YEAH.  BUT I DO WANT TO REVIEW,

25   BECAUSE I DO THINK THERE'S A LOT OF CONFUSION AROUND WHAT WE'RE

```
1          SAYING, THAT IT WAS NOT ACCURATELY PORTRAYED.

2               THE COURT:  OKAY, GOOD.  I MAY HAVE A MISCONCEPTION.

3          LET ME GET TO THE RIGHT SLIDE.

4               MR. TONKOVICH:  I WANT TO WALK THROUGH IT.

5               THE COURT:  SO YOU'RE ON SLIDE 70 -- THAT'S THE WRONG

6     SLIDE.

7               MR. TONKOVICH:  I THINK WE NEED IT SWITCHED OVER.

8               THE CLERK:  OH, SORRY.

9               MR. TONKOVICH:  NO, THAT'S FINE.

10              THE COURT:  AND WE'RE ON 41?

11              MR. TONKOVICH:  WE ARE.

12              THE COURT:  GOOD.  THANK YOU.

13              MR. TONKOVICH:  SO OUR PROPOSED CONSTRUCTION COVERS

14    THE FULL CLAUSE OF THE -- WHICH INCLUDES THE FINAL PHRASE OF

15    CLAUSE, WHICH IS "WHEREIN THE FIRST OVERALL OPTICAL FUNCTION

16    AND THE SECOND OVERALL OPTICAL FUNCTION ARE DIFFERENT."

17              AND, YOU KNOW, AS HAS BEEN NOTED, NISTICA'S CONSTRUCTION

18    FOCUSES ON THE OVERALL FUNCTION PORTION OF THIS.

19              NOW, TO US THE DISPUTE IS SIMPLE.  IT'S JUST WHAT DOES

20    "OVERALL OPTICAL FUNCTION" MEAN?  OUR PROPOSAL IS THAT IT MEANS

21    "A SET OF ONE OR MORE OPTICAL FUNCTIONS PERFORMED ON A

22    SIGNAL" -- PERFORMED ON A SIGNAL -- "AS IT TRANSITS THE

23    RECONFIGURABLE MULTIFUNCTION AL OPTICAL DEVICE."

24              SO THE IDEA IS THAT IT WOULD ENCOMPASS WHATEVER FUNCTION

25    IT PERFORMED ON SIGNAL 1 AND WHATEVER FUNCTION IT PERFORMED ON
```

1    SIGNAL 2, AND THE CLAIMS REQUIRE THOSE TO BE DIFFERENT.

2         AND THIS IS REALLY SUPPORTED BY THE APPLICANT'S STATEMENTS

3    TO THE PTO, SO WE'RE GOING TO SPEND SOME TIME TALKING ABOUT THE

4    FILE HISTORY.

5         AND BEFORE I DO THAT, I DO WANT TO LOOK AT THE

6    SPECIFICATION.  WHILE IT'S TRUE THAT "OVERALL OPTICAL FUNCTION"

7    DOESN'T APPEAR IN THE SPECIFICATION, IT DOES PROVIDE A

8    DESCRIPTION OF OPTICAL FUNCTIONS AND PERFORMING SETS OF OPTICAL

9    FUNCTIONS ON SIGNALS.

10        AND SO IF WE LOOK AT THE SPECIFICATION, HERE'S THE SECTION

11   WHERE IT DESCRIBES DIFFERENT OPTICAL SIGNALS, AND THERE WAS A

12   NEW ARGUMENT RAISED ON WHETHER AN OPTICAL FUNCTION -- WHETHER

13   ADD/DROP IS AN OPTICAL FUNCTION OR INDIVIDUAL DROPPING OF

14   SIGNALS IS AN OPTICAL FUNCTION.

15        SO THE WAY THE SPECIFICATION DESCRIBES OPTICAL FUNCTION IS

16   AT A HIGH LEVEL.  IT TALKS ABOUT ADD/DROP MULTIPLEXER, OPTICAL

17   CHANNEL MONITOR, OPTICAL CROSS-CONNECT FUNCTION,

18   INTERLEAVER/DEINTERLEAVER FUNCTION.  IT TALKS ABOUT THESE

19   FUNCTIONS AS TYPES OF OPTICAL FUNCTIONS.  THAT'S THE WAY THE

20   SPECIFICATION DISCUSSES OPTICAL FUNCTION.

21        AND IT DISCLOSES PERFORMING A SET OF OPTICAL FUNCTIONS ON

22   A SIGNAL.  I'VE HIGHLIGHTED THAT LANGUAGE HERE IN YELLOW WHERE

23   IT TALKS ABOUT ALL THE DIFFERENT OPTICAL FUNCTIONS AND SAYS "OR

24   SOME COMBINATION THEREOF," INDICATING YOU CAN PERFORM A SET OF

25   OPTICAL SIGNALS, OR A SET OF OPTICAL FUNCTIONS, ON A SINGLE

1     SIGNAL.

2              THE COURT:  WHERE ARE YOU LOOKING?  WHAT COLOR?  THE

3     YELLOW?

4              MR. TONKOVICH:  YES.  SO AFTER --

5              THE COURT:  AT THE BOTTOM OF THIS HIGHLIGHTED AREA?

6              MR. TONKOVICH:  I'M FOCUSSING ON THE TOP WHERE IT

7     SAYS "OR SOME COMBINATION THEREOF."

8              THE COURT:  I SEE.

9              MR. TONKOVICH:  SO IT SAYS "THE SEPARATE OPTICAL

10    FUNCTIONS INCLUDE" ALL OF THE FOLLOWING, "OR SOME COMBINATION

11    THEREOF."

12         AND THEN AT THE BOTTOM, IT TALKS ABOUT PERFORMING OPTICAL

13    FUNCTIONS IN SERIES, ONE AFTER THE OTHER, ON THE SAME SIGNAL.

14         IT SAYS, "THE SCOPE OF THE INVENTION IS ALSO INTENDED TO

15    INCLUDE PERFORMING AN OPTICAL FUNCTION ON ONE OPTICAL INPUT

16    SIGNAL, AND PERFORMING A SECOND OPTICAL FUNCTION ON THE OUTPUT

17    SIGNAL FROM THE FIRST OPTICAL FUNCTION."

18         SO WHAT THIS IS DESCRIBING IS ESSENTIALLY PERFORMING

19    MULTIPLE OPTICAL FUNCTIONS ON THE SAME SIGNAL IN A SERIES, ONE

20    AFTER THE OTHER.

21              THE COURT:  IT DOES -- ALL RIGHT.  AND THIS IS FROM

22    THE SPEC?

23              MR. TONKOVICH:  THIS IS FROM THE SPECIFICATION, YES.

24         NOW, DURING THE PROSECUTION, THE APPLICANTS DISTINGUISHED

25    THEIR CLAIMS FROM THE PRIOR ART BY DOING TWO THINGS:  THEY

1    AMENDED THEIR CLAIMS TO INCLUDE THE "OVERALL OPTICAL FUNCTION"

2    PHRASE THAT WE'RE CONSTRUING; AND THEY ARGUED THAT THEIR CLAIMS

3    WERE PATENTABLE OVER AKSYUK.

4        THIS IS IMPORTANT BECAUSE THE REPRESENTATIONS MADE TO THE

5    EXAMINER DO TELL US A LOT ABOUT HOW THE TERMS ARE DEFINED, AND

6    THE ONLY PLACE THAT "OVERALL OPTICAL FUNCTION" IS DISCUSSED IS

7    IN THE FILE HISTORY.

8        SO, FOR INSTANCE, THE FEDERAL CIRCUIT SAID, "BY

9    DISTINGUISHING THE CLAIMED INVENTION OVER THE PRIOR ART, AN

10   APPLICANT IS INDICATING WHAT THE CLAIMS DO NOT COVER, HE IS BY

11   IMPLICATION SURRENDERING SUCH PROTECTION.

12       THE COURT:  SO WHERE ARE YOU SHOWING ME THE

13   DISPUTED -- WHERE IT'S DISTINGUISHED IN THE PRIOR ART?  IS THAT

14   COMING UP?

15       MR. TONKOVICH:  THAT'S COMING UP.  I'M GOING TO WALK

16   SLIDE BY SLIDE THROUGH THE FILE HISTORY.

17       THE COURT:  OKAY.

18       MR. TONKOVICH:  SO DURING THE PROSECUTION, ALL

19   PENDING CLAIMS WERE REJECTED OVER THE PRIOR ART, AND IN

20   REJECTING CLAIM 1, THE PTO NOTED, AS WE SEE HERE HIGHLIGHTED IN

21   YELLOW AT THE BOTTOM OF THE SCREEN, THAT AKSYUK TOOK "A

22   SEPARATE PORTION OF A SPACIAL LIGHT MODULATOR THAT PERFORMS

23   SEPARATE OPTICAL FUNCTIONS ON EACH OPTICAL SIGNAL."

24       NOW, MY READ OF AKSYUK IS MAYBE, PERHAPS, A LITTLE BIT

25   DIFFERENT THAN FINISAR'S, BUT WE WILL GET TO THAT IN A SECOND.

1          SO THE NEXT SLIDE IS SHOWING THE AMENDMENT THAT THEY MADE.

2     IN RESPONSE TO THAT OBJECTION OVER AKSYUK, THEY AMENDED IT TO

3     ADD THE ENTIRE SPACIAL LIGHT MODULATOR TERM WHICH YOU SEE

4     HIGHLIGHTED IN YELLOW.

5          THEN IN RESPONSE TO THAT REJECTION, THEY DISTINGUISHED

6     AKSYUK ON THE BASIS THAT IT DOESN'T TEACH PERFORMING SEPARATE

7     OVERALL OPTICAL FUNCTIONS.  AS THEY SAY HERE, "HOWEVER, IT IS

8     RESPECTFULLY SUBMITTED THAT AKSYUK DOES NOT TEACH OR SUGGEST

9     THAT FIRST AND SECOND SETS OF MICRO-MIRRORS PERFORMS SEPARATE

10    OVERALL OPTICAL FUNCTIONS."

11         SO AS THEY NOTE HERE IN THE FILE HISTORY, THE REASONING IN

12    THE FINAL REJECTION STATES THAT AKSYUK SHOWS SEPARATE AND

13    DIFFERENT OPTICAL FUNCTIONS.

14         NOW, THE APPLICANTS DON'T CONTEST THAT, BECAUSE WHAT

15    HAPPENS IN AKSYUK IS THEY DO USE DIFFERENT PORTIONS OF THE

16    SPACIAL LIGHT MODULATOR TO PERFORM DIFFERENT ADD/DROP FUNCTIONS

17    ON THE SIGNALS.

18         IN OTHER WORDS, YOU MAY ADD A FROM ONE SIGNAL AND DROP B

19    FROM THE OTHER SIGNAL.

20              THE COURT:  UM-HUM.

21              MR. TONKOVICH:  AND WHAT THE APPLICANTS SAID IS,

22    QUOTE, "HOWEVER, AKSYUK MERELY DISCLOSES A SINGLE OVERALL

23    FUNCTION OF A WDM ADD/DROP DEVICE."  IT'S A WAVELENGTH DIVISION

24    MULTIPLEXING ADD/DROP DEVICE.

25         SO WHAT THEY'RE SAYING HERE IS, YOU KNOW, ALTHOUGH IT MAY

1      PERFORM DIFFERENT TYPES OF ADD/DROP FUNCTIONS, IT'S ONLY A

2      SINGLE TYPE OF FUNCTION, IT'S ONLY AN ADD/DROP.

3           AND THEY GO ON TO STATE THAT AKSYUK "MERELY DESCRIBES THE

4      OPERATION OF THE MIRRORS BETWEEN A REFLECTIVE AND TRANSMISSIVE

5      STATE, WHICH ENABLES THE DEVICE TO FUNCTION AS AN ADD/DROP

6      DEVICE AND ONLY AS AN ADD/DROP DEVICE."

7           SO THAT'S A LITTLE BIT DIFFERENT THAN WHAT I HEARD FINISAR

8      SAY TODAY WHERE IT SOUNDED LIKE -- AND THIS IS THE FIRST TIME

9      THAT I THINK WE'VE HEARD THIS -- THAT THEY INTEND THE CLAIMS TO

10     COVER THAT SCENARIO WHERE YOU'RE DOING TWO DIFFERENT ADD/DROP

11     FUNCTIONS, ONE ON ONE SIGNAL AND ONE ON ANOTHER SIGNAL.

12          THAT THEY SEEM TO HAVE CLEARLY GIVEN UP IN DISTINGUISHING

13     THEIR INVENTION OVER AKSYUK BY SAYING THAT ADD/DROP IS JUST ONE

14     SINGLE OVERALL OPTICAL FUNCTION AND THAT THESE DIFFERENT

15     ADD/DROP TYPES OF FUNCTIONS ARE NOT AN OVERALL OPTICAL FUNCTION

16     AND THAT'S WHY THEIR CLAIMS ARE DIFFERENT THAN AKSYUK.  THEY

17     SEEM -- THE FILE HISTORY CLEARLY DISCLAIMS THAT, AND WHAT

18     THEY'RE TALKING ABOUT IS PERFORMING DIFFERENT OVERALL TYPES OF

19     FUNCTIONS ON THE TWO DIFFERENT OPTICAL SIGNALS.  SO YOU MIGHT

20     DO ADD/DROP ON ONE AND YOU MIGHT DO EQUALIZATION ON ANOTHER.

21          THE COURT:  UM-HUM.

22          MR. TONKOVICH:  WHAT THEY'RE NOT TALKING ABOUT IS

23     ADDING, YOU KNOW, WAVELENGTH A TO SIGNAL 1 AND TAKING

24     WAVELENGTH B OUT OF SIGNAL 2.  THAT'S WHAT AKSYUK SAID.  THAT'S

25     WHAT THEY SAY THEY'RE NOT DOING.  THEY'RE SAYING THAT'S ONLY

1    ADD/DROP AND OUR DEVICE CAN DO SOMETHING DIFFERENT.

2         AND THIS IS AN IMPORTANT DISTINCTION TO UNDERSTAND IN THE

3    FILE HISTORY.

4              THE COURT:  OKAY.

5              MR. TONKOVICH:  SO THE IDEA WITH THE SET OF ONE OR

6    MORE IS THEY'RE TRYING TO CAPTURE THE IDEA OF YOU -- OF

7    PERFORMING ONE, ONE OR MORE TYPES OF OPTICAL FUNCTIONS ON

8    SIGNAL 1 AND ONE OR MORE TYPES OF OPTICAL FUNCTIONS ON SIGNAL

9    2.

10        IN OTHER WORDS, YOU MIGHT PERFORM ADD/DROP ON ONE OR

11   EQUALIZATION ON ANOTHER, YOU MIGHT DO ADD/DROP EQUALIZATION,

12   BUT MONITOR EQUALIZATION ON ANOTHER.  AND THAT'S REALLY WHAT

13   THE CLAIMS ARE DIRECTED TO.  THERE WAS SOME HINT THAT THAT WAS

14   TOO HIGH LEVEL.

15        BUT AS WE SAW WHEN WE LOOKED AT THE SPECIFICATION, THAT'S

16   THE LEVEL AT WHICH THEY DESCRIBED OPTICAL FUNCTION, AND INDEED,

17   OVERALL OPTICAL FUNCTION, AND THAT'S HOW THEY DISTINGUISH IT

18   FROM THE PRIOR ART WHICH COULD ONLY PERFORM ONE TYPE OF OPTICAL

19   FUNCTION, ADD/DROP TYPE OPTICAL FUNCTIONS ON SIGNALS.

20        SO I'M GOING TO SKIP AHEAD TO -- THEY DIDN'T MAKE THE

21   FIRST ARGUMENT, SO I'LL SKIP AHEAD TO THE SECOND ONE HERE ON

22   SLIDE 55.

23        NOW, THEY SEEM TO KEEP REPEATING THIS IDEA THAT SOMEHOW,

24   UNDER OUR CONSTRUCTION, THE SPACIAL LIGHT MODULATOR DOESN'T

25   PERFORM THE OPTICAL FUNCTIONS, OR THE OVERALL OPTICAL

1    FUNCTIONS.

2         PERSONALLY, I DON'T UNDERSTAND THAT ARGUMENT AT ALL

3    BECAUSE WHEN I READ THE CONSTRUCTION, IT LITERALLY SAYS "A

4    SPACIAL LIGHT MODULATOR HAVING A FIRST SET OF MICRO-MIRRORS

5    PROGRAMMED TO PERFORM A FIRST SET OF ONE OR MORE OPTICAL

6    FUNCTIONS," WHICH IS OUR DEFINITION OF OVERALL OPTICAL

7    FUNCTION.

8         I MEAN, THE -- IS -- I MEAN, I THINK THAT'S CLEAR THAT

9    SPACIAL LIGHT MODULATOR IS PERFORMING THE OPTICAL FUNCTIONS.

10        THE COURT:  SO I THINK MS. DAVIS WOULD AGREE WITH

11   YOU, SO WHAT'S THE POINT OF THIS OTHER LANGUAGE AS IT TRANSITS

12   THE -- I CAN PICK UP THE LANGUAGE HERE -- TO BE CONFIGURABLE?

13        MR. TONKOVICH:  SO I WILL GET TO THAT.

14        SO, I MEAN, THE IDEA HERE IS REALLY SIMPLE AND NOT MEANT

15   TO BE NEARLY AS COMPLEX AS, PERHAPS, IT'S BEING MADE OUT TO BE.

16        THE IDEA IS SIMPLY THE SLM, AS WE ALL KNOW, IS IN THE

17   OPTICAL DEVICE.

18        THE COURT:  SURE.

19        MR. TONKOVICH:  AND WE CAN SEE THAT IN THE CLAIM.

20        THE COURT:  IT'S ONE OF THE COMPONENTS.

21        MR. TONKOVICH:  IT'S ONE OF THE COMPONENTS, SO IT

22   MUST NECESSARILY OPERATE ON THE SIGNAL IN THE DEVICE.

23        THE COURT:  ALL RIGHT.

24        MR. TONKOVICH:  AND THAT IS IT RIGHT THERE.  IT'S

25   OPERATING ON THE SIGNAL IN THE DEVICE.

1        YOU SEE IT'S -- THE CLAIM IS DIRECTED TO A RECONFIGURABLE

2   MULTIFUNCTIONAL OPTICAL DEVICE COMPROMISING A SPACIAL LIGHT

3   MODULATOR, WHICH IS THE WAY THE CLAIM IS WRITTEN.

4        THE COURT:  SURE.

5        MR. TONKOVICH:  AND IN THE PRIOR ART, OR IN THE FILE

6   HISTORY, IT ALSO SAYS CLAIM 1 RECITES "A RECONFIGURABLE

7   MULTIFUNCTIONAL OPTICAL DEVICE IN WHICH" -- "CLAIM 1 IS AMENDED

8   TO RECITE A RECONFIGURABLE MULTIFUNCTIONAL OPTICAL DEVICE IN

9   WHICH DIFFERENT OVERALL OPTICAL FUNCTIONS ARE PERFORMED ON

10  DIFFERENT/SEPARATE PORTIONS OF A MICRO-MIRROR SPATIAL

11  MODULATOR."

12       IN OTHER WORDS, THIS IS JUST ALERTING TO THE FACT THAT A

13  PARTICULAR MODULATOR IN THE DEVICE IS PERFORMING THE FUNCTIONS

14  IN THE DEVICE.

15       THE COURT:  RIGHT.  THIS JUST SAYS A COMPONENT IN THE

16  RECONFIGURABLE MULTIFUNCTIONAL DEVICE IS PERFORMING IT.  IT

17  DOESN'T SAY AS IT TRANSITS.  I THINK IT'S THE "AS IT TRANSITS,"

18  MEANING OTHER COMPONENTS COULD AFFECT THE FUNCTIONS.

19       MR. TONKOVICH:  WE'VE NEVER HAD ANY INDICATION IT'S

20  OTHER COMPONENTS.  IT'S ALWAYS BEEN THE SPACIAL LIGHT

21  MODULATOR.

22       THE COURT:  THEN I THINK THIS NEEDS TO BE DROPPED.

23  I'M NOT SURE WHAT YOU'RE ADDING.  I DON'T KNOW WHAT THE POINT

24  IS THEN.  WITH ALL THAT YOU'RE TELLING ME -- I APPRECIATE

25  THAT -- WHAT DOES YOUR LANGUAGE -- HOW DOES THAT BELONG?  I

1      MEAN, FRANKLY, IT CONFUSES THE -- WHAT I THOUGHT MS. DAVIS

2      SHOWED WAS A CLARITY OF THE OPTICAL FUNCTION OCCURRING AT THE

3      SPACIAL LIGHT MODULATOR.  SO HELP ME OUT.

4           MR. TONKOVICH:  WE THOUGHT THAT IT DID CLEAR IT UP,

5      BUT, YOU KNOW, IF YOU FEEL THAT'S NOT CLARIFYING LANGUAGE,

6      THAT'S FINE, TOO, BECAUSE WE'RE NOT MEANING TO APPLY IT TO HOW

7      OTHER COMPONENTS ARE FUNCTIONING HERE.  IT'S REALLY JUST THE

8      SPACIAL LIGHT MODULATOR.

9           THE COURT:  I THINK, THEN, WE MIGHT HAVE SOME

10     AGREEMENT THAT WE CAN JUST DROP THAT LANGUAGE.

11          MR. TONKOVICH:  ALL RIGHT.

12          THE COURT:  OKAY.  THAT'S HELPFUL.  THANK YOU.

13          MR. TONKOVICH:  THE LAST THING I WOULD SAY ABOUT

14     FINISAR'S PLAIN AND ORDINARY MEANING, WHEN YOU ASKED WHAT THAT

15     WAS, WE STRUGGLED A LITTLE BIT WITH ARTICULATING THAT,

16     SOMETHING ALONG THE LINES OF "NET MODULATION" OR "TOTAL EFFECT

17     FOR THE SIGNAL," "ALL MODULATION," I HEARD SEVERAL

18     ARTICULATIONS OF WHAT THE PLAIN AND ORDINARY MEANING WOULD BE.

19          THE ISSUE HERE IS THAT "OVERALL OPTICAL FUNCTION" IS A

20     TECHNICAL TERM WITHIN THE CONTEXT OF THIS PATENT.  IT'S A

21     PHRASE THAT WAS SPECIFICALLY ADDED TO OVERCOME PRIOR ART AND

22     USED IN A VERY SPECIFIC WAY IN THE FILE HISTORY THAT WE'VE

23     DISCUSSED.

24          SO TO SAY IT'S PLAIN AND ORDINARY MEANING IMPLIES THAT WE

25     SHOULD JUST LOOK AT THAT LANGUAGE IN A VACUUM, NOT IN

1      CONSIDERATION OF THE FILE HISTORY, THE WAY IT'S DISCUSSED, AND

2      HOW THE APPLICANTS DISTINGUISHED THE PRIOR ART BASED ON THAT

3      TERM.

4           AND BECAUSE OF THAT, YOU KNOW, WE DON'T BELIEVE THE PLAIN

5      AND ORDINARY MEANING IS APPROPRIATE IN THIS CONTEXT.

6           THE COURT:  WELL, IF -- I THINK THAT THE POINT IS

7      APPEALING, BUT WHETHER YOUR PROPOSED LANGUAGE IS THE RIGHT

8      CONSTRUCTION IS REALLY MY PROBLEM HERE.

9           SO I -- YOU KNOW, I THINK THAT'S A GOOD POINT.  BUT -- SO

10     IF I DON'T USE -- YOU'RE SAYING THE TERM WAS USED IN A VERY

11     SPECIFIC WAY AND YOU NEED TO CONSTRUE THE CLAIM TO REFLECT HOW

12     IT WAS USED, AND SO I'M NOT SURE MS. DAVIS WOULD DISAGREE WITH

13     THAT AS A GENERAL PROPOSITION, BUT WHAT SHE'S SAYING IS WHAT

14     YOU'VE -- WHAT YOU'VE ADDED OR WHAT YOU SUGGEST IS INCORRECT.

15          SO THEN THE QUESTION IS, SHOW ME HOW WHAT YOU SAY IS THE

16     PROPER ARTICULATION OF WHAT THE APPLICANT DID TO ADDRESS THE

17     PRIOR ART.

18          MR. TONKOVICH:  OKAY.  SO IN ADDRESSING -- WELL,

19     THERE'S REALLY TWO POINTS THERE.  YOU KNOW, ONE IS WE DIDN'T

20     KNOW IT WAS A DISPUTE, WHICH IS THE FACT THAT IT SOUNDS LIKE

21     FINISAR IS ATTEMPTING TO READ THE CLAIMS TO COVER DIFFERENT

22     FUNCTIONS AT THE SAME TIME.

23          IN OTHER WORDS, TWO DIFFERENT ADD/DROP FUNCTIONS.  THAT'S

24     A NEW ONE, AND THAT'S SOMETHING THAT NEEDS TO BE, I THINK,

25     DEFINITELY CLARIFIED IN ANY CLAIM CONSTRUCTION ORDER.  SO WE

1       BELIEVE THAT'S IMPROPER AND THAT HAS NOT BEEN BROUGHT TO OUR

2       ATTENTION BEFORE TODAY.

3               THE COURT:  OKAY.

4               MR. TONKOVICH:  SO THAT'S ONE THING.

5           BUT IN TERMS OF A SET OF ONE OR MORE, THE CLAIM REQUIRES

6       THAT YOU PERFORM TWO DIFFERENT OVERALL OPTICAL FUNCTIONS, ONE

7       ON SIGNAL 1 AND ONE ON SIGNAL 2.

8               THE COURT:  UM-HUM, SURE.

9               MR. TONKOVICH:  NOW, WE DIDN'T LIMIT THEM TO JUST ONE

10      FUNCTION.  THE IDEA WAS -- IS THAT THOSE NEED TO BE TWO

11      DIFFERENT TYPES OF FUNCTIONS.  THEY CAN'T BE ADD/DROP ON BOTH.

12          WHETHER IT'S JUST ONE FUNCTION AND WHETHER YOU WANT TO

13      INTERPRET A FIRST OVERALL FUNCTION AS ONE, YOU KNOW, OUR

14      GENERAL -- OUR INCLINATION WAS TO GIVE THE BENEFIT OF THE

15      DOUBT, BECAUSE THERE IS SOME CASE LAW THAT WHEN YOU USE THE

16      ARTICLE "A" IN A CLAIM, IT CAN MEAN ONE OR MORE.

17              THE COURT:  OKAY.  AS OPPOSED TO THE --

18              MR. TONKOVICH:  AS OPPOSED TO LIMITING IT TO ONE.  WE

19      WEREN'T GOING TO LIMIT IT TO ONE.  IF THEY WANT IT JUST TO BE

20      ONE FUNCTION, I MEAN, THAT'S FINE.

21          BUT, YOU KNOW, WE JUST DID "ONE OR MORE" IN ORDER TO GIVE

22      THE CLAIMS THE BENEFIT OF THE DOUBT IN THAT RESPECT.

23          BUT THE IDEA WE'RE TRYING TO CAPTURE IS THE IDEA OF HOW

24      THEY USED OVERALL FUNCTION TO DISTINGUISH THE PRIOR ART, WHICH

25      IS REALLY TO SAY YOU NEED TO DO TWO DIFFERENT TYPES OF OPTICAL

1    FUNCTIONS ON THE TWO DIFFERENT SIGNALS SO THAT THE OVERALL SET

2    OF FUNCTIONS YOU'RE PERFORMING IS DIFFERENT THAN THE OVERALL

3    SET OF FUNCTIONS YOU'RE PERFORMING ON THE SECOND SIGNAL.

4         THE COURT:  SO I GUESS I ASKED -- I PRESSED MS. DAVIS

5    ON THIS.  TELL ME HOW "OVERALL OPTICAL FUNCTION," IN YOUR MIND,

6    IS DIFFERENT THAN "A SET OF ONE OR MORE OPTICAL FUNCTIONS,"

7    PLURAL.  HOW IS IT DIFFERENT?  WHAT'S -- I'M TRYING TO MAKE

8    THIS CONCRETE AND IT'S WAY TOO ABSTRACT FOR ME.

9         MR. TONKOVICH:  YOU MEAN IN TERMS OF THE LANGUAGE?

10         THE COURT:  YEAH.

11         MR. TONKOVICH:  BECAUSE THAT'S HOW WE CONSTRUE IT, SO

12    WE DON'T THINK IT'S DIFFERENT.

13         BUT IN TERMS OF THE LANGUAGE, I THINK "OVERALL OPTICAL

14    FUNCTION" DOESN'T PROVIDE THE CLARITY AS TO HOW IT'S BEEN

15    DISTINGUISHED FROM IN THE FILE HISTORY, BECAUSE "OVERALL

16    OPTICAL FUNCTION" DOESN'T, IN AND OF ITSELF, HAVE, YOU KNOW, A

17    PLAIN MEANING I WOULD SAY.

18         IF YOU LOOK AT IT IN THE CONTEXT OF THE FILE HISTORY, WHAT

19    THEY'RE REALLY TRYING TO SAY IS THAT THEIR INVENTION CAN

20    PERFORM ONE TYPE OF OPTICAL FUNCTION ON SIGNAL 1 AND ONE TYPE

21    OF OPTICAL FUNCTION ON SIGNAL 2.

22         SO WHAT WE'RE SAYING IS "OVERALL OPTICAL FUNCTION" COVERS

23    ALL OF THE PROCESSING YOU DO TO SIGNAL 1, OR TO A SIGNAL, IF

24    YOU WILL.  SO THAT INCLUDES THE SET OF ONE OR MORE OPTICAL

25    FUNCTIONS YOU CAN PERFORM ON THAT SIGNAL.  THAT'S THE OVERALL

1    OPTICAL FUNCTION YOU'RE PERFORMING ON IT, KIND OF THE NET

2    EFFECT ON THAT SIGNAL.

3          THE COURT:  I GUESS WHAT I'M STRUGGLING WITH IS JUST

4    THIS PLAIN MEANING FROM MY PERSPECTIVE, NOT ONE SKILLED IN THE

5    ART, IS THAT "ONE OR MORE FUNCTIONS" ARE DISTINCT FUNCTIONS,

6    AND THEN "OVERALL OPTICAL FUNCTION" IS A SINGULAR FUNCTION.  SO

7    THOSE ARE DIFFERENT TO ME.  I -- THAT'S -- AND IF I REVEAL HOW

8    SIMPLISTIC I'M LOOKING AT THIS, IT'S PROBABLY BETTER NOW THAN

9    WHEN YOU GET MY ORDER.

10          BUT THAT'S -- THAT'S WHAT I'M STRUGGLING WITH.  AND

11    HOPEFULLY I'M A LITTLE BIT MORE ATTUNED THAN OUR JURY WILL BE

12    ULTIMATELY.

13          BUT MS. DAVIS SEEMS TO BE ARGUING FOR A SINGLE -- SINGULAR

14    OVERALL OPTICAL FUNCTION ON THE FIRST SET, AND YOU WANT A SET

15    OF ONE OR MORE, WHICH MEANS THEY COULD BE SERIATIM, THEY COULD

16    BE SIMULTANEOUS.  I DON'T KNOW WHAT YOU MEAN BY IT.  I DON'T

17    KNOW THE CLARITY.

18          I'M TRYING TO UNDERSTAND WHAT'S THE PRACTICAL DIFFERENCE

19    BETWEEN THE TWO.  I CAN'T GRASP THAT, EITHER.

20          MR. TONKOVICH:  WELL, I GUESS -- WELL, SO THE

21    PRACTICAL DIFFERENCE WOULD BE THIS:  IF YOU ONLY PERFORMED ONE

22    FUNCTION ON EACH ONE, THE OVERALL OPTICAL FUNCTION WOULD BE

23    THAT FUNCTION.

24          HOWEVER, IF YOU WERE DOING -- IF YOU WERE DOING MULTIPLE

25    FUNCTIONS ON A SINGLE SIGNAL, THE OVERALL OPTICAL FUNCTION

1    WOULD BE THE OVERALL NET EFFECT OF WHAT YOU DID TO THAT

2    SIGNAL --

3            THE COURT:  UM-HUM, YES.

4            MR. TONKOVICH:  -- WHICH WOULD BE A SET OF FUNCTIONS

5    THAT YOU DID TO THAT SIGNAL.

6            THE COURT:  SO IT COULD INCLUDE A SET.

7        WELL, I GUESS MAYBE WE'RE GETTING DOWN TO THE MINUTIA OF

8    WHAT DO YOU MEAN BY A SET OF FUNCTIONS VERSUS WHAT MS. DAVIS

9    MEANS BY A SET OF FUNCTIONS AND WHAT IS A SET OF FUNCTIONS.

10           MR. TONKOVICH:  OKAY.  WHAT I MEAN BY A SET OF

11   FUNCTIONS IS IN ACCORDANCE WITH WHAT THE FILE HISTORY IS

12   SHOWING AS OPTICAL FUNCTIONS, WHICH I THINK MAY BE A LITTLE BIT

13   DIFFERENT THAN WHAT MS. DAVIS'S IS.

14       SO THIS IS CONSISTENT WITH A LOT OF WHAT'S BEEN FILED.

15   THE ADD/DROP IS A FUNCTION.  CHANNEL NODE MONITOR IS A

16   FUNCTION.  CROSS-CONNECT IS A FUNCTION.

17   INTERLEAVER/DEINTERLEAVER IS A FUNCTION.

18       THIS IS WHAT I WOULD SAY IS AN OPTICAL FUNCTION.  IT'S THE

19   TYPE OF NET FUNCTION THAT YOU'RE PERFORMING ON A SIGNAL.

20           THE COURT:  HMM.  WHAT'S HARD FOR ME IS THAT THESE

21   WORDS ARE INDISTINGUISHABLE TO ME BECAUSE I CAN'T GRASP A

22   PRACTICAL DIFFERENCE.  I SEE THESE WORDS HERE, THAT THESE ARE A

23   VARIETY -- THESE ARE LISTED OPTICAL FUNCTIONS.  I SEE THAT.

24       AND YOU'RE CALLING THE COMBINATION OF THEM A SET --

25           MR. TONKOVICH:  YES.

1          THE COURT:  -- OF OPTICAL -- OF ONE OR MORE.

2          MR. TONKOVICH:  YES.

3          THE COURT:  THAT'S WHAT YOU'RE CALLING A SET OF ONE

4    OR MORE, THOSE -- THAT COMPILATION, THAT LIST OF DIFFERENT

5    OPTICAL FUNCTIONS WOULD BE A SET OF ONE OR MORE?

6          MR. TONKOVICH:  AS AN EXAMPLE, YES.

7          THE COURT:  OKAY.

8          MR. TONKOVICH:  YOU COULD DO ADD/DROP AND YOU COULD

9    DO CHANNEL MONITORING, THAT WOULD BE A SET.

10          THE COURT:  OKAY.  AND "OVERALL OPTICAL FUNCTION,"

11   YOU SAY, COULD NOT INCLUDE THE LISTING OF ALL OF THOSE ITEMS?

12          MR. TONKOVICH:  WHAT DO YOU MEAN IT COULD NOT

13   INCLUDE?

14          THE COURT:  I'M TRYING TO GRASP IT.

15          MR. TONKOVICH:  NO, NO.  IT CAN.  IF YOU WANT TO

16   PERFORM ALL OF THOSE FUNCTIONS ON A SIGNAL, THAT COULD BE

17   INCLUDED IN A SET AS WELL.

18          THE COURT:  SO WHY CAN'T AN OVERALL OPTICAL

19   FUNCTION -- WHY DON'T THEY MEAN THE SAME THING?  THAT'S REALLY

20   WHAT I'M GETTING AT.  I STILL DON'T UNDERSTAND WHAT THE

21   DIFFERENCE IN YOUR TWO TERMS ARE.

22          MR. TONKOVICH:  WELL, I MEAN, I THINK THE DIFFERENCE

23   IS THAT -- I MEAN, THAT'S WHAT WE MEAN BY OUR DEFINITION.

24      BUT APPARENTLY FINISAR DISAGREES THAT THAT'S WHAT "OVERALL

25   OPTICAL FUNCTION" MEANS BECAUSE THEY'RE OPPOSING THAT

1    CONSTRUCTION, SO CLEARLY THEY HAVE A DIFFERENT SET.

2         AND I THINK "OVERALL" IMPLIES KIND OF THE NET EFFECT, THE

3    OVERALL --

4              THE COURT:  THAT'S WHAT YOU SAID, NET MODULATION,

5    YES.

6              MR. TONKOVICH:  YEAH.  SO I THINK THAT THAT'S ONE

7    IDEA.

8         AND MAYBE WE'RE DRIVING THE SAME IDEA WITH THAT.  I THINK

9    THE OTHER PART OF THE DISPUTE HERE, WHICH I WANT TO MAKE SURE

10   DOES NOT GET LOST, IS WHAT LEVEL WE'RE TALKING ABOUT THAT.

11        IN TERMS OF THEY DISTINGUISH THE PRIOR ART, WHICH DID, YOU

12   KNOW, DIFFERENT TYPES OF ADD/DROP FUNCTIONS AND SAID, NO,

13   THAT'S ONLY A SINGLE OVERALL FUNCTION.  THAT'S ONLY AN

14   ADD/DROP.  THAT'S ALL THAT DEVICE DOES.  IT'S ONLY ONE OVERALL

15   FUNCTION IN THE DEVICE.

16        I WANT TO MAKE -- YOU KNOW, IT'S IMPORTANT TO NOTE, BASED

17   ON THAT, THAT THE CLAIMS ARE NOT GOING TO BE CONSTRUED TO

18   COVER, FOR INSTANCE, ADDING, YOU KNOW, A WAVELENGTH TO DO ONE

19   ADD/DROP FUNCTION ON ONE SIGNAL AND ONE ADD/DROP FUNCTION ON

20   ANOTHER SIGNAL, WHICH IS PRETTY MUCH HOW THEY DISTINGUISH THEIR

21   CLAIM FROM THE PRIOR ART.  SOME OF IT IS AT WHAT LEVEL WE TALK

22   ABOUT OPTICAL FUNCTION, AND THEN THERE'S THE CONCEPT OF

23   OVERALL.

24              THE COURT:  BUT YOU ALLOW ONE -- BUT YOU ALLOW HERE

25    PERFORMING A FIRST SET -- YOU COULD HAVE ONE OPTICAL FUNCTION.

1    YOU ALLOW FOR ONE OPTICAL FUNCTION --

2              MR. TONKOVICH:  YES.

3              THE COURT:  -- WHICH WOULD BE THE SAME AS AN OVERALL

4    OPTICAL FUNCTION, AND THEN YOU GO ON TO MAKE IT ACTUALLY

5    POTENTIALLY BROADER THAN WHAT MS. DAVIS SAYS TO SAY IT COULD BE

6    OR MORE OPTICAL FUNCTIONS.

7              MR. TONKOVICH:  OUR INCLINATION WAS JUST TO GIVE IT,

8    YOU KNOW, THE BENEFIT OF THE DOUBT BECAUSE GENERALLY THE CLAIMS

9    ARE READ, THE ARTICLE "A" COULD BE ONE OR MORE.

10         SO, YOU KNOW, BECAUSE WE THOUGHT -- I MEAN, IF WE WANT TO

11   LIMIT IT TO ONE, THAT THIS DEVICE IS ONLY ABOUT PERFORMING ONE

12   FUNCTION, YOU KNOW, WE CAN DEFINITELY TALK ABOUT THAT.

13         BUT WE DIDN'T THINK THAT WOULD BE ANY MORE AGREEABLE TO

14   THEM THAN "A SET," BECAUSE WE THOUGHT "A SET" MIGHT ACTUALLY BE

15   MORE AGREEABLE.

16         BUT APPARENTLY IF THEY'RE ARGUING THAT THAT'S ONE

17   FUNCTION, THEN WE CAN DEFINITELY TAKE THAT UNDER ADVISEMENT.

18              THE COURT:  OKAY.  THANK YOU.

19              MS. DAVIS:  MAY I HAVE A MOMENT, YOUR HONOR?

20              THE COURT:  ABSOLUTELY.

21              MS. DAVIS:  SO I GUESS IT ELIMINATES SOME OF OUR

22   ISSUES NOT TO HAVE -- IF NISTICA IS CONCEDING THAT THE LANGUAGE

23   THAT IT "TRANSITS THE RECONFIGURABLE DEVICE" IS NOT NECESSARY.

24              THE COURT:  WE CAN MOVE ON FROM THAT, UM-HUM.

25              MS. DAVIS:  SO FOCUSSING ON THE "OVERALL OPTICAL

1      FUNCTIONS" ISSUE, IT SOUNDS -- THERE'S STILL SOME CONFUSION

2      HERE, I THINK, WITH US UNDERSTANDING NISTICA'S POSITION, BUT

3      FROM OUR PERSPECTIVE, OUR POSITION IS THAT THE PLAIN AND

4      ORDINARY MEANING HERE IS RELATIVELY CLEAR.

5          "OPTICAL FUNCTION" IS A PHRASE THAT BOTH PARTIES AGREE HAS

6      AN ORDINARY MEANING, AND THE WORD "OVERALL" IS, FRANKLY, AN

7      ORDINARY ENGLISH WORD BEING APPLIED TO FORM THE PHRASE "OVERALL

8      OPTICAL FUNCTION."

9          APPARENTLY NISTICA IS CONSTRUING "OVERALL" TO MEAN "SET OF

10     ONE OR MORE."  THIS IS CONFUSING BECAUSE WHAT'S REQUIRED BY THE

11     CLAIM IS THAT THE FIRST OPTICAL FUNCTION, OVERALL OPTICAL

12     FUNCTION IS COMPARED TO THE SECOND OVERALL OPTICAL FUNCTION TO

13     SEE IF THEY'RE DIFFERENT OR NOT.

14         TO KNOW IF ONE SET IS DIFFERENT FROM ANOTHER SET IS A

15     DIFFERENT, A MORE DIFFICULT TASK THAN COMPARING TWO THINGS,

16     THING ONE AND THING TWO, TO EACH OTHER.

17         SO WHAT THIS LANGUAGE MEANS, AND WE WOULD SUBMIT UNDER THE

18     CLEAR, PLAIN, AND ORDINARY MEANING, IS BASICALLY TO LOOK AT --

19     LOOK AT HOW THE MICRO-MIRRORS ON THE SLM FOR THE -- WHERE THE

20     FIRST OVERALL OPTICAL FUNCTION IS BEING PERFORMED, THESE

21     MICRO-MIRRORS ARE PRECISELY CONTROLLED.

22         HOW THEY ARE ORIENTED TO ACT ON THAT SIGNAL, THAT IS

23     THE -- THAT IS THEIR OVERALL OPTICAL FUNCTION.  THEY ARE GIVING

24     A NET MODULATION TO THE LIGHT.  THAT IS A SINGLE OVERALL

25     OPTICAL FUNCTION.

```
 1              AND THE SAME IS TRUE FOR THE SECOND SIGNAL WITH THE SECOND

 2      OVERALL OPTICAL FUNCTION.

 3              AND FINISAR BELIEVES THAT'S THE PLAIN AND ORDINARY MEANING

 4      OF THIS LANGUAGE AND NISTICA IS APPARENTLY TRYING TO ADD A

 5      RELATIVELY AMBIGUOUS ALTERNATIVE DEFINITION HERE WHICH WOULD

 6      NOT BE APPROPRIATE GIVEN THE CLARITY OF THE CLAIM LANGUAGE.

 7              THE COURT:  AND YOU'RE SATISFIED THAT YOUR DEFINITION

 8      DOES DISTINGUISH THE INVENTION FROM THE PRIOR ART?

 9              MS. DAVIS:  YES, YOUR HONOR.  I THINK -- WELL, OUR

10      SLIDES AREN'T UP, BUT IF YOU ACTUALLY -- IN OUR SLIDE DECK, WE

11      HAVE A SLIDE ON PAGE 67 WHERE WE ACTUALLY LOOK MORE CLOSELY AT

12      THE AKSYUK REFERENCE, NOT JUST THE SINGLE SENTENCE THAT NISTICA

13      IS LOOKING AT IN THE PROSECUTION HISTORY, BUT THE ACTUAL

14      REFERENCE ITSELF THAT THEY'RE TALKING ABOUT.

15              AND YOU CAN SEE THAT THE -- WHILE IT'S AN ADD/DROP DEVICE,

16      WHAT'S BEING -- THE TWO OVERALL OPTICAL FUNCTIONS ARE THE

17      IDENTICAL ADD FUNCTION BEING PERFORMED ON TWO SIGNALS IN

18      AKSYUK.

19              SO WHAT WE HAVE THERE IS THE IDENTICAL -- IS THE FIRST

20      OVERALL OPTICAL FUNCTION AND THE SECOND OVERALL OPTICAL

21      FUNCTION ARE BEING COMPARED AND THEY'RE THE SAME.

22              HERE OUR INVENTION HAS ACHIEVED THE LEAP OF ALLOWING THEM

23      TO BE DIFFERENT, AND THAT IS -- THAT IS WHAT THE CLAIM LANGUAGE

24      IS INTENDED TO COVER AND THE DISTINCTION.

25              THE COURT:  OKAY.  THANK YOU.
```

```
1              MS. DAVIS:  THANK YOU.

2              THE COURT:  MR. TONKOVICH, OF COURSE I -- BRIEFLY.

3              MR. TONKOVICH:  THIRTY SECONDS, REAL QUICK.

4          FIRST OF ALL, ON THE IDEA OF "SET" BEING HARD TO

5    UNDERSTAND, THIS IS EASY.  EITHER THE SET OF OPTICAL FUNCTIONS

6    IS THE SAME OR IT'S DIFFERENT.  THAT'S A VERY EASY COMPARISON

7    FOR A JURY TO MAKE.

8          SECOND, WE KEEP ON HEARING THAT THE PLAIN MEANING OF

9    OVERALL FUNCTION IS NET MODULATION.  "NET" IMPLIES THE SUM

10   TOTAL OF WHAT'S DONE TO THE SIGNAL WHICH, AGAIN, GOES ALONG

11   WITH ONE OR MORE.

12         THE FINAL THING IS, YOU KNOW, THEY'VE SHOWN ONE PART OF

13   AKSYUK, WHICH IS NOT THE PORTION THAT THE EXAMINER CITES IN HIS

14   REJECTION.  THERE'S FAR MORE TO AKSYUK THAN JUST THE ONE

15   EXCERPT THAT IS BEING SHOWN HERE.

16             THE COURT:  OKAY, AND I WILL LOOK AT THAT.

17             MR. TONKOVICH:  ALL RIGHT.

18             THE COURT:  OKAY.  WE'VE BEATEN THE '740 PATENT TO

19    DEATH HERE.

20             MR. RADULESCU:  ONE LAST PATENT WITH TWO TERMS, THE

21    '980 PATENT.

22             THE COURT:  SO, MR. RADULESCU, SINCE WE'VE BEEN AT

23   THIS FOR A WHILE NOW, I'LL JUMP RIGHT IN.  IT'S A CONCERN I

24   HAVE WITH BOTH.  I'M SURE YOU'RE PREPARED TO ADDRESS THIS, I

25    HAVE NO DOUBT.
```

```
 1          BUT A -- A CONSTRUCTION THAT WOULD REQUIRE A JURY TO READ
 2     ESSENTIALLY THE ENTIRE PATENT, WHICH IS WHAT YOU'VE DONE ON
 3     BOTH OF THESE STRUCTURE CONSTRUCTIONS, WAS MIND NUMBING TO ME,
 4     AND I HAVE SOME SUGGESTIONS FOR HOW -- FOR WHAT MIGHT WORK FOR
 5     YOU.
 6          BUT I WAS -- I MEAN, IT WAS POINTED OUT BY NISTICA AS,
 7     WELL, I DIDN'T SEE ANY CONSTRUCTION TO BASICALLY SAY IT'S
 8     THE -- IT'S THE PATENT.
 9              MR. RADULESCU:  YEAH.  SO THIS IS ALL DICTATED BY
10     WHAT IS ACTUALLY DISCLOSED IN THE PATENT IN TERMS OF WHAT IS
11     THE LIST OF THE STRUCTURES THAT ARE DESCRIBED AS PERFORMING THE
12     RECITED FUNCTION.
13          I MEAN, WE REALLY DON'T HAVE AN OPTION WITH RESPECT TO
14     IDENTIFYING THAT STRUCTURE.  IT TURNS OUT THAT THERE'S A LOT OF
15     DIFFERENT STRUCTURE THAT IS, YOU KNOW, IDENTIFIED IN THIS
16     PATENT AND, AS A RESULT, THE LIST IS LONG.
17          I THINK, FOR PURPOSES OF THE JURY, AT SOME POINT WE WILL
18     KNOW WHAT NISTICA IS USING.  THERE WILL BE -- YOU KNOW, THERE
19     WILL BE DISCOVERY.  WE PROBABLY HAVE IT ALREADY.  ONCE YOU KNOW
20     WHAT THEY'RE USING, THEN IT MAY TURN OUT THAT A LOT OF THE
21     STRUCTURE THAT'S DESCRIBED IN THE PATENTS WILL ALL BE A MOOT
22     ISSUE BECAUSE IT LINES UP.
23          AND SO FOR PURPOSES OF THE ANALYTICS OF THE CLAIM
24     CONSTRUCTION --
25              THE COURT:  UM-HUM.
```

```
 1            MR. RADULESCU:  -- WE REALLY DON'T HAVE MUCH OF AN
 2     OPTION BUT IDENTIFYING THE STRUCTURE.
 3            AND I WILL SAY THAT WITH RESPECT TO THE STRUCTURE THAT IS
 4     DISCLOSED FOR BOTH OF THESE TERMS IN THE PATENT, IT'S CLEARLY
 5     NOT LIMITED TO ONE PARTICULAR -- FOR EXAMPLE, ON THE SPATIAL
 6     SEPARATING MEANS -- ONE PARTICULAR TYPE OF WEDGE.
 7            THE COURT:  YOU KNOW, I WOULD AGREE WITH YOU
 8     ENTIRELY, AND I ACTUALLY SPENT AN EXTRAORDINARY AMOUNT OF TIME,
 9     HOPEFULLY IT WAS WORTH MY TIME, ON FIGURES 3 AND 6 --
10            MR. RADULESCU:  YES.
11            THE COURT:  -- OF THIS PATENT.
12            AND I GUESS FOR THIS ONE, MY FIRST CONCERN WAS, IS THERE
13     ANY SPATIAL SEPARATING GOING ON BEYOND THE POINT THAT THE BEAMS
14     LEAVE THE WEDGE?  IT LOOKED TO ME THAT THAT IS -- THAT'S WHERE
15     IT ALL HAPPENS.
16            MR. RADULESCU:  SO THE SPECIFICATION MAKES IT CLEAR
17     THAT THERE'S SEPARATION BEFORE THEY LEAVE THE WEDGE IN ACTUALLY
18     TWO PLACES.
19            THE COURT:  WELL, THERE'S SEPARATION BEFORE THEY
20     ENTER THE WEDGE.  I THINK THAT'S CLEAR.
21            MR. RADULESCU:  ABSOLUTELY.  AND THEN THERE'S
22     SEPARATION IN THE WEDGE.
23            THE COURT:  IN THE WEDGE.
24            MR. RADULESCU:  AND THEN THE SPEC DESCRIBES THESE
25     OTHER OPTICAL COMPONENTS.
```

1          THE COURT:  BUT THEY DON'T INCLUDE SEPARATION, DO

2     THEY?

3          MR. RADULESCU:  PARDON?

4          THE COURT:  DO THEY -- BEYOND THE WEDGE, WHERE IS

5     THERE SEPARATION?  AND IF YOU'VE GOT IT IN YOUR SLIDES, WE'LL

6     GET THERE.

7          MR. RADULESCU:  YEAH.  THE IDEA IS THAT ONCE YOU HAVE

8     LENSES AND ONCE YOU HAVE OTHER TYPES OF COMPONENTS INVOLVED

9     WHERE THERE ARE OPTICAL POWER ELEMENTS WHERE THEY'RE BENDING

10    THE LIGHT -- WHAT A LENS DOES IS BEND THE LIGHT OR FOCUS THE

11    LIGHT.  THESE ARE THE COMPONENTS.  A CYLINDRICAL LENS, THE

12    WEDGE PRISM, AND THEN THE CYLINDRICAL MIRROR ARE OPTICAL POWER

13    ELEMENTS.

14         THE COURT:  YES.

15         MR. RADULESCU:  THEY'RE DESCRIBED AS BEING PART OF

16    THE SEPARATION MEANS BECAUSE THEY ARE ALSO USED TO REDIRECT THE

17    LIGHT TO HIT EITHER THE TOP HALF OR BOTTOM HALF OF THE SLM.

18         YOU NEED LENSES IN ORDER TO GET THAT LIGHT TO HIT EITHER

19    THE TOP HALF OR BOTTOM HALF.  THEY HAVE FOCAL LENSES, AND AS A

20    RESULT, THAT'S WHY I BELIEVE THE SPEC IS WRITTEN TO SWEEP THOSE

21    TYPE OF COMPONENTS INTO THIS SPATIAL SEPARATING MEANS, BECAUSE

22    THE WHOLE IDEA, OF COURSE, IS THAT COMING OUT OF THE FIBER IS A

23    SIGNAL WITH TWO -- FOR EXAMPLE, THIS EMBODIMENT IN FIGURE 3

24    THAT'S SHOWN HERE ON SLIDE 80, YOU HAVE A SINGLE -- YOU HAVE A

25    SIGNAL COMING OUT OF ONE FIBER WITH TWO POLARIZATIONS.

1          THE COURT:  YES.

2          MR. RADULESCU:  THE TEACHING IN THIS PATENT IS I'M

3    GOING TO SPLIT THOSE POLARIZATIONS, OR SEPARATE THEM, AND I'M

4    GOING TO PROCESS THEM SEPARATELY ON THE TOP AND BOTTOM HALF OF

5    THE LCOS SLM ON THE BOTTOM OF THE SCREEN.

6          THE COURT:  UM-HUM.

7          MR. RADULESCU:  AND THAT'S THE IDEA.  I'VE GOT TO

8    SEPARATE THOSE TWO POLARIZATIONS, AND THIS SPEC DESCRIBES

9    NUMEROUS ELEMENTS IN THIS COMPLICATED OPTICAL CHAIN TO DO IT.

10   IT STARTS --

11         THE COURT:  BUT IT LOOKED TO ME AS THOUGH THE

12   SEPARATION WAS COMPLETE WHEN, WHEN -- THROUGH THE POLARIZATION

13   MANIPULATION ELEMENT.

14      AND I DON'T SEE ANYTHING SHOWING THAT THE OPTICAL POWER

15   ELEMENT IS PART OF THE SPATIAL -- THE SPATIAL SEPARATING.

16         MR. RADULESCU:  YEAH.  SO THE WAY THE SPEC IS

17   WRITTEN, YOU TAKE OUT THESE MIRRORS AND TAKE OUT THESE LENSES.

18   ONCE THE LIGHT COMES OUT OF THE WEDGE, HOW ARE YOU GOING TO GET

19   THIS LIGHT SO THAT IT ACTUALLY IS CONCENTRATED AND FOCUSSED

20   ONTO THIS SLM?

21      YOU KNOW THAT BEAMS OF LIGHT SPREAD OUT, RIGHT?

22         THE COURT:  UM-HUM, SURE.

23         MR. RADULESCU:  BEAMS OF LIGHT LIKE TO SPREAD OUT

24   LIKE THIS (INDICATING).

25         THE COURT:  YEAH.

1      MR. RADULESCU:  WHAT THEN HAPPENS IF YOU'VE GOT ONE

2  BEAM OF LIGHT SPREADING OUT OVER HERE, AND EVEN THOUGH IT'S

3  SEPARATED, YOU HAVE A SECOND BEAM OVER HERE SPREADING OUT, AND

4  EVENTUALLY THEY'RE OVERLAPPING.  THEY'RE NO LONGER SEPARATED.

5      SO YOU DO NEED COMPONENTS IN THAT CHAIN TO FOCUS THE

6  LIGHT SO IT'S GOING TO SEPARATE PLACES.

7      AND THAT'S THE WAY THE SPEC IS WRITTEN.  IT'S VERY CLEAR,

8  AND THERE'S ALL KINDS OF LINKING LANGUAGE -- AND WE CAN GO TO

9  IT -- WITH RESPECT TO THE OPTICAL POWER ELEMENTS.

10     BUT YOU NEED THE LENSES IN ORDER TO KEEP THE SEPARATION

11 AND TO KEEP --

12         THE COURT:  IN ORDER TO KEEP THE SEPARATION?

13         MR. RADULESCU:  IN ORDER TO KEEP THE SEPARATION.

14         THE COURT:  OKAY.

15         MR. RADULESCU:  IF -- OR TO PROVIDE THE CONTINUED

16 SEPARATION.  IT IS ONE ELEMENT THAT IS USEFUL TO HELP TO DO

17 THAT.

18     THE BASIC CONCEPT, OF COURSE, IS TO JUST SEPARATE, AND YOU

19 CAN TALK ABOUT SEPARATING BY USING EITHER THIS WALK-OFF CRYSTAL

20 THAT DOES SOME SEPARATION --

21         THE COURT:  UM-HUM.

22         MR. RADULESCU:  -- OR THIS WEDGE THAT DOES ANOTHER

23 TYPE OF SEPARATION.

24         THE COURT:  SURE.

25         MR. RADULESCU:  AND THEN WITH RESPECT TO THE LENSES,

1       YOU NEED THEM IN ORDER TO KEEP THAT SEPARATION AND MAINTAIN

2       THAT SEPARATION.  OTHERWISE YOU GET THE OVERLAPPING.

3             SO TO SOME EXTENT, THEY DO SEPARATE, BECAUSE WITHOUT THEM,

4       THE LIGHT WILL OVERLAP.  AS I GAVE IN MY EXAMPLE OF TWO, TWO

5       SEPARATED LIGHTS, YOU NEED THE LENSES TO KEEP THEM SEPARATED.

6             SO THEY ARE SEPARATING MEANS.  IT'S A WAY TO KEEP THIS

7       LIGHT SEPARATED.

8             THE COURT:  OH.  SEE, I MISSED THAT ENTIRELY.  I WAS

9       LOOKING AT THE MECHANISM OF SEPARATION, AND THEN PRESUMING THAT

10      ONCE YOU HAD ACHIEVED THAT, WE WERE DONE WITH THAT MEANS, OR

11      THAT FUNCTION.

12            MR. RADULESCU:  YEAH.  AND I THINK THAT, YOU KNOW,

13      THE -- THE HARD PART ABOUT THESE MEANS-PLUS-FUNCTION, THESE

14      MEANS-PLUS-FUNCTION ELEMENTS IS THAT THERE IS THIS LEGAL ASPECT

15      TO WHAT IS THE MEANS?  WHAT IS THE FUNCTION?

16            AND AS MY COLLEAGUES ARE NOW POINTING OUT, AGAIN, THIS IS

17      GOING TO BE ONE EMBODIMENT.  THERE'S GOING TO BE OTHER

18      EMBODIMENTS WHERE THERE MAY BE LENSES THAT ARE MORE DIRECTLY

19      SHOWING THE SEPARATION.

20            THE COURT:  OKAY.  BUT I WAS POINTED TO 3 AND 6, AND

21      THEN THERE ARE SUBPARTS OF 4 AND 7.

22            MR. RADULESCU:  YES.

23            THE COURT:  AND I GUESS I READ IT NARROWLY AS THE ACT

24      OF CREATING THE FIRST -- THE SEPARATION.

25            AND SINCE NISTICA IDENTIFIED IT OCCURRING IN THE WEDGE, I

```
1    ACCEPTED THAT IT WAS THAT.

2              MR. RADULESCU:  YEAH.

3              THE COURT:  AND YOU AGREE WITH THAT AS WELL, THAT THE

4    WEDGE IS PART OF IT.

5              MR. RADULESCU:  IT --

6              THE COURT:  AND THEN I COULD CLEARLY SEE THAT

7    ELEMENTS PRIOR TO THE LIGHT REACHING THE WEDGE WERE RESPONSIBLE

8    FOR SEPARATION.

9              MR. RADULESCU:  YES.

10             THE COURT:  THE WAVEPLATE AND THE WALK-OFF CRYSTAL

11   CLEARLY.

12             MR. RADULESCU:  YES.

13             THE COURT:  WHAT I DIDN'T SEE ANYWHERE IN THE

14   SPECIFICATION WAS THE MAINTENANCE OF THE SEPARATION.

15             MR. RADULESCU:  YES.  SO LIGHTS ARE

16   THREE-DIMENSIONAL --

17             THE COURT:  AND MAYBE I MIGHT NEED TO KNOW MORE ABOUT

18   PHYSICS.

19             MR. RADULESCU:  LIGHT IS THREE-DIMENSIONAL, YOU KNOW,

20   IT'S GOING TO GO IN ALL THREE DIMENSIONS.  AND IF YOU START

21   WITH THE SEPARATION THAT EXISTS COMING OUT OF THE WEDGE, AGAIN,

22   I WOULD SAY THAT IT'S GOING TO GO IN ALL DIRECTIONS UNLESS YOU

23   SOMEHOW KEEP THEM SEPARATED, UNLESS YOU FORCE, FORCE --

24             THE COURT:  AND CAN YOU SHOW ME SOMEWHERE IN THE

25   SPECIFICATION WHERE IT TALKS ABOUT THAT?  OR IS THAT JUST
```

1       SOMETHING THAT SOMEONE SKILLED IN THE ART IS GOING TO KNOW?

2            MR. RADULESCU:  NO.  I THINK THAT ONCE WE GO INTO THE

3       LANGUAGE IN THE SPEC THAT IDENTIFIES THE OPTICAL ELEMENTS,

4       WE'LL SEE THAT IT DESCRIBES THEM AS SEPARATING AS WELL.

5            THE COURT:  SO I'VE INTERRUPTED YOU, BUT YOU'VE

6       HELPED ME TREMENDOUSLY.  I'LL LET YOU GET BACK ON TRACK.

7            MR. RADULESCU:  THAT'S FINE.

8       SO WE'RE GOING TO START WITH THE THREE-COLUMN CHART, AND

9       EVERYONE AGREES WHAT THE FUNCTION IS FOR A SPATIAL SEPARATING

10      MEANS.  IT'S TO SIMULTANEOUSLY SEPARATE AT LEAST A FIRST AND

11      SECOND GROUP OF LIGHT FROM SAID SERIES OF OPTICAL SIGNALS.  WE

12      HAVE AGREEMENT THERE.

13           AND WE ALSO HAVE AGREEMENT THAT THERE'S NO EQUIVALENT TO

14      THIS, THE CORRESPONDING STRUCTURES THAT WERE DISCLAIMED DURING

15      PROSECUTION.  THERE'S NO PROSECUTION HISTORY THAT SOMEONE IS

16      ARGUING SOMEHOW LIMITS WHAT THE CORRESPONDING STRUCTURE IS

17      DISCLOSED IN THE SPEC.

18           AND THEN THE DISPUTE IS WHETHER, YOU KNOW, FROM FINISAR'S

19      PERSPECTIVE, WHETHER IT SHOULD INCLUDE ALL OF THESE STRUCTURES

20      THAT ARE EXPLICITLY DISCLOSED IN THE SPECIFICATION AS

21      PERFORMING THE CLAIMED FUNCTION, OR WHETHER THE CORRESPONDING

22      STRUCTURE SHOULD ONLY INCLUDE ONE OF THE STRUCTURES, THIS CBRW

23      ELEMENT THAT NISTICA IS SAYING PERFORMS THE FUNCTION.  OKAY?

24           AND BEFORE I GO TO THE SPECIFICATION AND THE SUPPORT,

25      LET'S REMEMBER, AGAIN, THERE'S TWO STEPS HERE.  WE'VE GOT TO

1    IDENTIFY THE CLAIM FUNCTION, AND THEN WE HAVE TO IDENTIFY THE

2    CORRESPONDING STRUCTURE FOR THIS MEANS-PLUS-FUNCTION TERM

3    THAT'S EITHER -- THAT'S CLEARLY LINKED OR ASSOCIATED WITH THE

4    CLAIMED FUNCTION IN THE PATENT SPECIFICATION.

5            THE COURT:  UM-HUM.

6            MR. RADULESCU:  AND WE'LL SEE THAT THERE'S CLEAR

7    LINKAGE LANGUAGE AND ASSOCIATION LANGUAGE ALL OVER THE SPEC

8    WITH RESPECT TO THE STRUCTURE THAT FINISAR HAS IDENTIFIED.

9            SO JUST AS A BRIEF REVIEW, I'M GOING TO TALK ABOUT

10   FIGURE 3 AND THEN WE'LL TALK ABOUT FIGURE 6.

11           FIGURE 3 HAS A SINGLE, ON THE LEFT-HAND SIDE, A SINGLE

12   FIBER OUTPUT WITH LIGHT COMING OUT OF IT THAT THEN GOES THROUGH

13   A LENS; RIGHT?

14           COMING OUT OF THAT LENS, IT THEN GOES INTO A WALK-OFF

15   CRYSTAL.  NOTICE THAT IT'S ONE BEAM THAT'S ILLUSTRATED AS GOING

16   INTO THAT WALK-OFF CRYSTAL.

17           THAT ONE BEAM HAS TWO POLARIZATIONS, HORIZONTAL AND

18   VERTICAL.  THEY'RE OVERLAPPING.  THEY'RE STUCK TOGETHER.

19   THEY'RE NOT SEPARATED.  IT'S A PROBLEM WITH RESPECT TO THE

20   DESIGN OF THIS, THIS -- I PROBABLY SHOULDN'T SAY IT'S A

21   PROBLEM.  IT'S ACTUALLY SOMETHING THAT THIS INVENTION IS MEANT

22   TO ADDRESS.

23           IT'S NOW GOING TO SEPARATE THOSE TWO POLARIZATIONS, THE H

24   FROM THE V, AND THAT IS, IN FACT, WHAT THIS WALK-OFF CRYSTAL

25   DOES.

1        IT ACTUALLY PUTS A SMALL SEPARATION BETWEEN THOSE TWO

2    BEAMS SO THAT WHEN YOU LOOK BACK THROUGH THAT WALK-OFF CRYSTAL

3    AND BACK INTO THE FIBER, YOU NOW SEE TWO LIGHTS, TWO DOTS THAT

4    ARE SEPARATED BY SOME CERTAIN DISTANCE.

5        THE LIGHT COMING OUT OF THAT WALK-OFF CRYSTAL IS GENERALLY

6    PARALLEL, SEPARATED BY A CERTAIN AMOUNT, AND THAT'S WHAT THE

7    SPEC TEACHES.

8             THE COURT:  A VERY SMALL AMOUNT, I GUESS.

9             MR. RADULESCU:  A VERY SMALL AMOUNT IS TOO SMALL.

10            THE COURT:  YEAH.

11            MR. RADULESCU:  AND OBVIOUSLY IF YOU LOOK AT THE SLM

12   IN THE CENTER BOTTOM OF THIS FIGURE, THIS IS ACTUALLY SOMETHING

13   THAT'S USUALLY MUCH BIGGER, IT'S THE SIZE OF A THUMBNAIL, AND

14   YOU'VE GOT TO BE ABLE TO SEPARATE THE LIGHT EVEN FURTHER, SO

15   THERE IS ADDITIONAL SEPARATION MEANS THAT ARE TAUGHT, AND THAT

16   IS -- THE FIRST COMPONENT IS THIS WEDGE.

17            THE COURT:  UM-HUM.

18            MR. RADULESCU:  AND IT GOES THROUGH THE WEDGE, AND

19   ONE OF THE PURPOSES OF THE WEDGE IS TO NOW GIVE SOME ANGULAR

20   SEPARATION; RIGHT?

21            THE COURT:  UM-HUM.

22            MR. RADULESCU:  THE WALK-OFF CRYSTAL GAVE SOME SORT

23   OF LINEAR, SORT OF, YOU KNOW, BASIC SEPARATION.  THE LIGHT

24   STILL EXITS PARALLEL FOR THE WALK-OFF CRYSTAL.

25        WHEN IT LEAVES THE WEDGE, IT'S NOW ANGULAR.  THERE'S

1    ANGULAR SEPARATION TO IT, AND WE WANT TO AND WE HAVE TO BE ABLE

2    TO CONTROL THAT SEPARATION AND OPTIMIZE THE SEPARATION AND

3    ACTUALLY FOCUS THAT LIGHT COMING OUT ONTO THAT, THAT SLM.

4        AND IT HAS TO BE FOCUSSED, JUST LIKE A SET OF GLASSES ARE

5    ACTUALLY ADJUSTED SO THAT WHAT IS IN FOCUS IS PERFECTLY MATCHED

6    UP TO YOUR EYES.

7        YOU NEED THESE LENSES, THESE OPTICAL POWER ELEMENTS, TO

8    FOCUS THE LIGHT ONTO THE SLM, AND THEN THAT'S THE PURPOSE OF

9    THESE OTHER COMPONENTS.  IT HITS THE CYLINDRICAL MIRROR, IT

10   BOUNCES OFF, WE HAVE THE TWO SEPARATE -- THE TWO POLARIZATIONS,

11   ONE ON TOP AND ONE ON THE BOTTOM, AND WHAT THIS COMPOSITE HALF

12   WAVEPLATE DOES IS ACTUALLY TAKES ONE OF THE POLARIZATIONS AND

13   FLIPS IT INTO THE OTHER SO THAT THEY'RE BOTH THE SAME

14   POLARIZATION BECAUSE THAT'S THE POLARIZATION THAT THE SPACIAL

15   LIGHT MODULATOR CAN WORK WITH.  IT CAN'T DEAL WITH THE OTHER

16   ONE.

17        THE COURT:  UM-HUM, YEAH.

18        MR. RADULESCU:  SO THE CORE WAVEPLATE FLIPS THEM AND

19   THEN, AGAIN, THE REST GOES THROUGH A LENS; IT THEN HITS A WEDGE

20   AND A DIFFRACTION GRATING WHICH NOW TAKES THAT BEAM OF LIGHT,

21   ONE OF THEM IS POLARIZED IN ONE DIRECTION, AND SPREADS IT INTO

22   ITS MULTIPLE COLORS.  THAT'S WHAT THE GRATING DOES.  IT SPREADS

23   IT INTO ITS MULTIPLE COLORS.

24        IT THEN GOES THROUGH THE CYLINDRICAL LENS, HITS THE

25   CYLINDRICAL MIRROR, AND NOW IS SPREAD OUT OVER THAT SLM.  IT

1    GOES FROM A SINGLE BEAM THAT CAME FROM THE FIBER OPTIC AND IS

2    NOW ACTUALLY SPREAD OUT IN A BAND ACROSS THE SLM.

3        THE TOP HALF OF THAT SLM HAS ONE POLARIZATION.  THE BOTTOM

4    HALF HAS THE SAME POLARIZATION, BUT IT USED TO BE THE OTHER

5    ONE, BUT IT'S OF THE SAME BRIGHTNESS.

6        IN OTHER WORDS, REMEMBER WE FLIPPED ONE OF THE

7    POLARIZATIONS --

8            THE COURT:  YEAH.

9            MR. RADULESCU:  -- TO JUST CHANGE IT.  THE BRIGHTNESS

10   IS THE SAME.

11       SO NOW WE'VE GOT TWO SIGNALS, ONE THAT CORRESPONDS TO THE

12   ORIGINAL, FOR EXAMPLE, HORIZONTAL POLARIZATION, THE OTHER THAT

13   CORRESPONDS TO THE CONVERTED VERTICAL.

14       AND NOW WE CAN SEPARATELY PROCESS THESE TWO SIGNALS.

15           THE COURT:  IS A CONVERTED VERTICAL DIFFERENT THAN AN

16   ORIGINAL HORIZONTAL, OR ARE THEY REALLY THE SAME ONCE IT'S

17   CONVERTED?

18           MR. RADULESCU:  ONCE IT'S CONVERTED, IT'S JUST

19   CONVERTED.

20           THE COURT:  OKAY.

21           MR. RADULESCU:  IT'S REALLY JUST A DIRECTION OF THE

22   FIELD.

23           THE COURT:  SO THEY DON'T HAVE DIFFERENT

24   CHARACTERISTICS?

25           MR. RADULESCU:  NO.

```
1              THE COURT:  OKAY.

2              MR. RADULESCU:  ONE OF THEM CAN BE PROCESSED BY THE

3      SLM.  THE OTHER CAN'T BECAUSE OF THE WAY THAT THESE ARE MADE.

4          SO I GUESS MY, MY COLLEAGUES ARE POINTING OUT TO ME NOW

5      THAT THE SPECIFICATION IDENTIFIES THESE OPTICAL POWER ELEMENTS

6      AS INCLUDING THESE LENSES AND THESE MIRRORS --

7              THE COURT:  WELL, I THINK CLEARLY --

8              MR. RADULESCU:  -- BUT ARE EXCLUDING THE GRATING, THE

9      PRISM, AND THE HALF WAVEPLATE AS NOT BEING SWEPT INTO THAT,

10     BECAUSE THE PURPOSE OF THE HALF WAVEPLATE IS SOMETHING

11     DIFFERENT.  IT'S JUST TO FLIP THE POLARIZATION.  SO IT'S NOT

12     GOING TO BE PART OF ANY SPATIAL SEPARATING MEANS.

13             THE COURT:  AND YOU DID NOT INCLUDE THAT IN YOUR LIST

14     OF --

15             MR. RADULESCU:  NO.

16             THE COURT:  -- ELEMENTS?

17             MR. RADULESCU:  I DON'T BELIEVE WE HAVE.

18             THE COURT:  OKAY.

19             MR. RADULESCU:  SO THE BRIEFING WAS ACCURATE.  THE

20     SLIDES ARE ALL ACCURATE.  IT SOUNDS LIKE I MISSPOKE AND RAN TOO

21     MANY OPTICAL COMPONENTS TOGETHER.

22             THE COURT:  OKAY.  BECAUSE ONE OF MY PROBLEMS HERE, I

23     MEAN, WHAT I -- IF I ACCEPT WHAT YOU SAY ABOUT THE PURPOSE OF

24     THESE LENSES AS THE BEAMS TRAVEL THROUGH THIS DEVICE IS THAT I

25     DON'T HAVE A WORKABLE CONSTRUCTION, THOUGH.  THAT IS SO LONG.
```

1          WHAT YOU'RE REALLY SAYING TO ME IS THAT THIS IS AN INTERIM

2     CONSTRUCTION, MUCH OF WHICH MAY BE MODIFIED GIVEN -- PRETRIAL

3     WHEN YOU SEE WHAT'S IN DISPUTE.

4          MR. RADULESCU:  YEAH.  BUT A LOT OF THESE -- A LOT OF

5     THE CLAIM CONSTRUCTION ORDERS THAT ARE DEALING WITH

6     MEANS-PLUS-FUNCTION FORMAT -- AND I THINK WE CITED AT LEAST ONE

7     OF THEM -- IT'S A LONG LIST.  IT'S A LONG LIST AND WE'RE SORT

8     OF STUCK WITH IT UNLESS WE CAN -- AND WE TRIED TO SIMPLIFY IT,

9     AS YOU SEE, FOR PURPOSES OF THE THREE-COLUMN CHART.  WE

10    ABBREVIATED IT.

11         THE COURT:  I DON'T THINK IT'S SIMPLIFIED.  IT'S

12    ABBREVIATED.

13         MR. RADULESCU:  IT'S ABBREVIATED, RIGHT.

14         THE COURT:  YEAH.

15         MR. RADULESCU:  SO WE'RE STUCK WITH IT.  WE'RE STUCK

16    WITH IT BECAUSE THIS IS THE STRUCTURE.

17         SO THAT WAS THE FUNCTION OF -- THAT'S FIGURE 3.

18         AND THEN FIGURE 4 -- AND SO, REMEMBER, FIGURE 3 TAKES A

19    SINGLE FIBER AND NOW PROCESSES SEPARATELY THE TWO

20    POLARIZATIONS.

21         FIGURE 6 TEACHES THAT WE NOW HAVE TWO SEPARATE FIBERS WITH

22    TWO SEPARATE, TWO SEPARATE SIGNALS, BOTH OF WHICH HAVE TWO

23    SEPARATE POLARIZATIONS, AND IT'S SEPARATELY PROCESSING TWO

24    GROUPS OF THOSE SIGNALS.

25         SO IT'S A DIFFERENT EMBODIMENT BECAUSE NOW IT'S LOOKING AT

1      TWO SEPARATE FIBER INPUTS AND PROCESSING BOTH OF THESE FIBER

2      INPUTS WHICH BOTH HAVE TWO POLARIZATIONS.

3                  THE COURT:  SURE.

4                  MR. RADULESCU:  OKAY.  THAT'S FIGURE 6.

5            AND SO NOW I WANT TO GO BACK TO THE SUPPORT FOR FINISAR'S

6      PROPOSED CONSTRUCTION, AND WE'RE GOING TO START WITH SOME

7      ADDITIONAL CLAIMS.

8            SO ON SLIDE 82, WE'RE LOOKING AT CLAIMS 2 AND 3 THAT

9      ACTUALLY SAY THAT THE SPATIAL SEPARATING MEANS INCLUDES A

10     POLARIZATION MANIPULATION ELEMENT.  RIGHT?

11                 THE COURT:  YES.

12                 MR. TONKOVICH:  YOUR HONOR, I HATE TO INTERRUPT, BUT

13     I JUST WANT TO NOTE FOR THE RECORD THIS IS AN ENTIRELY NEW

14     ARGUMENT THAT'S NOT IN THE BRIEFING.  THIS IS THE FIRST TIME

15     WE'RE HEARING ANY CITATION TO CLAIMS 2 AND 3.

16                 MR. RADULESCU:  OKAY.

17                 THE COURT:  I GUESS THAT'S LIKE GETTING AN AMENDMENT

18     TO THE JOINT CLAIMS CONSTRUCTION CHART.

19                 MR. RADULESCU:  AND I WOULD BE SURPRISED IF IT'S NOT

20     ACTUALLY CITED SOMEWHERE IN ONE OF OUR CHARTS.

21                 THE COURT:  OKAY.

22                 MR. RADULESCU:  BUT IN ANY EVENT, WE HAVE -- YOU HAVE

23     TO START WITH THE CLAIMS.

24                 THE COURT:  I CERTAINLY DO.

25                 MR. RADULESCU:  YOU HAVE TO START WITH THE CLAIMS, SO

1    IF WE MISSED PUTTING INTO OUR LIST OF EVIDENCE CLAIM 2 AND

2    CLAIM 3, WE APOLOGIZE, AND LET'S NOW EXPLAIN WHY THEY'RE

3    RELEVANT TO THIS ISSUE.

4        IT IDENTIFIES THE SPATIAL SEPARATING MEANS AS INCLUDING A

5    POLARIZATION MANIPULATION ELEMENT.  SO HERE'S THE LINKING

6    LANGUAGE.  HERE'S THE STRUCTURE:  "THE SPATIAL SEPARATING MEANS

7    INCLUDES POLARIZATION MANIPULATION ELEMENT."  THAT'S SUPPORT

8    FOR OUR PROPOSED CONSTRUCTION.

9        SIMILARLY, CLAIM 3 IDENTIFIES THE SPATIAL SEPARATING MEANS

10   AS INCLUDING A SERIES OF OPTICAL POWER ELEMENTS.

11          THE COURT:  AND THEN -- SO IT'S YOUR ARGUMENT THAT

12   THE POLARIZATION MANIPULATION ELEMENT IS THE UMBRELLA TERM FOR

13   ALL OF THE INDIVIDUAL COMPONENTS?

14          MR. RADULESCU:  FOR POLARIZATION MANIPULATION.

15   THAT'S WHAT IT'S USING.

16          THE COURT:  AND FOR THE OPTICAL POWER ELEMENT, ALL OF

17   THE INDIVIDUAL --

18          MR. RADULESCU:  YES.

19          THE COURT:  -- I CALL THEM COMPONENTS.  I DON'T KNOW

20   IF THAT'S THE RIGHT WORD --

21          MR. RADULESCU:  YES.

22          THE COURT:  -- ARE WHAT THAT UMBRELLA TERM

23   INCLUDES --

24          MR. RADULESCU:  YES.

25          THE COURT:  -- AND YOU'VE GIVEN ME JUST THE ROADMAP

```
1          OF WHERE I FIND ALL OF THOSE?

2                    MR. RADULESCU:  RIGHT.  THESE ARE THE --

3                    THE COURT:  AND I DON'T THINK THERE'S ANY

4          DISAGREEMENT THAT A POLARIZATION MANIPULATION ELEMENT, THOSE

5          ARE ALL PART OF IT.  IT'S JUST WHETHER THIS CLAIM INCLUDES IT

6          OR WHETHER THIS PATENT DOES.

7               SO THIS IS CLAIM --

8                    MR. RADULESCU:  2 AND --

9                    THE COURT:  -- 2 AND 3.

10                   MR. RADULESCU:  2 AND 3.

11                   THE COURT:  OKAY.

12                   MR. RADULESCU:  AND THE LINKING LANGUAGE, RIGHT AFTER

13         IT IDENTIFIES THE POLARIZATION MANIPULATION ELEMENT, IT SAYS

14         SEPARATING.  SO IT'S NOW SEPARATING THE FIRST AND SECOND SERIES

15         OF POLARIZATIONS, AND THAT'S THE SEPARATING FUNCTION THAT

16         CLEARLY IS, IS BEING IDENTIFIED --

17                   THE COURT:  RIGHT.

18                   MR. RADULESCU:  -- EVEN IN THE CLAIMS THEMSELVES FOR

19         PURPOSES OF THIS ANALYSIS.  OKAY.  SO THOSE ARE THE CLAIM

20         SUPPORT.

21              AND THEN WE CAN GO AND START AT THE FRONT END OF THE

22         SUMMARY OF THE INVENTION, OR IN THE SUMMARY OF THE INVENTION

23         WHERE HERE AGAIN WE SEE CONSISTENTLY THE FIRST SENTENCE IN THIS

24         PARAGRAPH AT COLUMN 5, LINE -- COLUMN 4, LINE 59 IS "THE

25         SPATIAL SEPARATING MEANS PREFERABLY CAN INCLUDE A POLARIZATION
```

1     MANIPULATION ELEMENT."

2              THE COURT:  UM-HUM.

3              MR. RADULESCU:  AND, IN FACT, THERE IS LINKING

4     LANGUAGE, "SEPARATING," RIGHT AFTER THAT.  THIS STRUCTURE, THIS

5     POLARIZATION MANIPULATION ELEMENT, IS PERFORMING A SEPARATION

6     FUNCTION.  SO IT'S CLEARLY LINKING THE STRUCTURE TO THE

7     FUNCTION OF SEPARATING THE FIRST AND SECOND SERIES OF

8     PREDETERMINED POLARIZATIONS.

9         AND THEN FARTHER DOWN IN THIS PARAGRAPH, "THE SPATIAL

10    SEPARATING MEANS PREFERABLY CAN ALSO INCLUDE A SERIES OF

11    OPTICAL POWER ELEMENTS OFFSET FROM THE PORTS SEPARATING,"

12    AGAIN, MORE LINKING --

13             THE COURT:  YEAH.

14             MR. RADULESCU:  -- AND ASSOCIATION LANGUAGE IN THE

15    VERY PARAGRAPH THAT SETS FORTH WHAT THE SPATIAL SEPARATING

16    MEANS INCLUDES.

17             THE COURT:  AND I RELIED ON -- I MEAN, I CERTAINLY

18    FOUND THE LANGUAGE IN CLAIM 1.  I DON'T KNOW THAT I ACTUALLY

19    REVIEWED -- I CERTAINLY DIDN'T HIGHLIGHT CLAIMS 2 OR 3, SO

20    THAT'S INTERESTING.

21             MR. RADULESCU:  YES.  AND IT'S DUPLICATIVE OF WHAT'S

22    DESCRIBED IN THE SPECIFICATION.

23             THE COURT:  YES.

24             MR. RADULESCU:  BUT SINCE WE'RE OBLIGATED TO START

25    WITH THE CLAIMS, WE DID IT.

1          THE COURT:  SURE.

2          MR. RADULESCU:  AND THEN WE HAVE EXAMPLES.  SO WE CAN

3    NOW GO TO, FOR EXAMPLE, THE POLARIZATION DIVERSITY ELEMENTS AT

4    COLUMN 8, LINES 24 TO 27, AND WE HAVE A LIST, A LAUNDRY LIST --

5    AND UNFORTUNATELY IT'S LONG -- OF ELEMENTS.

6          AND IT STARTS WITH THIS BIREFRINGENT WALK-OFF CRYSTAL,

7    WHICH IS -- WALK-OFF CRYSTAL, THAT'S THAT PART THAT WE'VE

8    ALREADY GONE THROUGH IN FIGURES 3 AND 6; AND THEN THERE'S A

9    COMPENSATING BIREFRINGENT WEDGE, WHICH WE DISCUSSED AS WELL;

10   AND THEN THERE'S ALSO REFERENCES TO SOME OTHER TYPES OF

11   POLARIZATION MANIPULATION ELEMENTS.  A FARADAY ROTATOR IS

12   ANOTHER EXAMPLE, A FARADAY ROTATOR.

13         THE COURT:  AS IF SOMEONE HAS EVER HEARD THAT WORD

14   BEFORE.

15       (LAUGHTER.)

16         MR. RADULESCU:  OKAY.  SO THAT WAS THE POLARIZATION

17   MANIPULATION ELEMENT.

18         AND NOW WE HAVE THE OPTICAL POWER ELEMENT.  WE CAN ALSO

19   LOOK VERY SPECIFICALLY AT WHAT ARE THE EXAMPLES OF THESE IN

20   COLUMN 8, LINES 12 TO 17, AND IT SAYS THAT THESE CAN INCLUDE

21   SPHERICAL MICRO ARRAYS.  IT GOES ON TO SAY THAT THE OPTICAL

22   POWER ELEMENTS, INCLUDING CYLINDRICAL LENSES WITH FIRST FOCAL

23   LENGTH -- AND I TALKED ABOUT THE IMPORTANCE OF THE FOCAL

24   LENGTH -- AND THEN CYLINDRICAL MIRRORS WITH A SECOND FOCAL

25   LENGTH.

1          AND AS MY COLLEAGUES POINTED OUT, YOU DON'T SEE THE

2     GRATINGS, THE PRISM, OR THE WAVEPLATE LISTED AS THESE EXAMPLES

3     BECAUSE THEY PERFORM DIFFERENT FUNCTIONS.  OKAY?

4          SO THAT'S THE SPEC SUPPORT.  WE THINK IT'S PRETTY CLEAR.

5     WE BELIEVE THAT EACH OF THESE STRUCTURES ARE LINKED TO THE

6     SEPARATING FUNCTIONS.

7          AND WE HAVE NISTICA WITH, I BELIEVE, FIVE ARGUMENTS IN, IN

8     RESPONSE, AND THE FIRST IS THAT THEY'RE DISPUTING THE RELEVANCE

9     OF THE SUMMARY OF THE INVENTION, AND OUR POSITION IS YOU CAN

10    LOOK AT THE SUMMARY OF THE INVENTION TO UNDERSTAND WHAT

11    STRUCTURE IS DESCRIBED AS PERFORMING THAT SEPARATING FUNCTION.

12         THEY ALSO CRITICIZE OUR USE OF THE WORD "ELEMENT" IN THE

13    CORRESPONDING STRUCTURE.  THAT'S IN THE SPECIFICATION.  IT'S

14    DESCRIBED IN THE SPECIFICATION.

15         THEY CITE TO SOME CASE LAW.  I'LL DISCUSS THAT BRIEFLY.

16    IT'S THE WRONG CASE LAW FOR THIS ISSUE.

17         AND THEN THEY ARGUE THAT MUCH OF THE EXEMPLARY DISCLOSURES

18    IN FIGURES 3 AND 6 SHOULD BE IGNORED.  THEY'RE PICKING OUT ONE

19    WEDGE AND MOST OF THE OTHER STUFF IS BEING IGNORED IN THOSE

20    FIGURES.  I'LL ADDRESS THAT.

21         THEY'RE ASSERTING THAT IT'S ONLY THIS CBRW ALONE THAT

22    PERFORMS THE SEPARATING FUNCTION, EVEN THOUGH THE FIGURES

23    THEMSELVES SHOW THAT THE, THE WALK-OFF CRYSTAL STARTS TO

24    SEPARATE RIGHT FROM THE GET-GO.

25         AND THEN THERE'S THIS COMMENT ABOUT US SORT OF HIDING THE

1    BALL, AND THIS IS THE ISSUE OF HOW LONG THE CONSTRUCTION IS

2    THAT MATCHES THE, THE DISCLOSURE IN THE SPECIFICATION AND I'LL

3    ADDRESS THAT.

4        WE START WITH THE SUMMARY OF THE INVENTION, WE LOOKED AT

5    IT BEFORE, AND WE BELIEVE IT'S RELEVANT TO IDENTIFYING THE

6    STRUCTURE.  WE BELIEVE THAT IT CAN BE USED AS A WAY TO, YOU

7    KNOW, IDENTIFY AND UNDERSTAND WHAT THE SCOPE OF THE STRUCTURE

8    IS THAT CORRESPONDS TO THE FUNCTION.

9        THE WORD "SEPARATING" IS ACTUALLY PRESENT IN THIS

10   PARAGRAPH, AS I MENTIONED BEFORE.  SO YOU'VE GOT THE LINKING OR

11   THE ASSOCIATION LANGUAGE, SO IT'S PRETTY CLEAR THAT YOU CAN'T

12   IGNORE THIS SUMMARY OF THE INVENTION.

13       THE SECOND ARGUMENT IS OUR USE OF THE WORD "ELEMENT" IN,

14   IN THE IDENTIFICATION OF THE CORRESPONDING STRUCTURE, AND

15   THERE'S A CITATION AND THERE'S SOME RELIANCE ON THE -- ON THIS

16   M.I.T., OR MASSACHUSETTS INSTITUTE OF TECHNOLOGY CASE AND THE

17   MAS-HAMILTON CASE THAT NISTICA IS INTERPRETING IN A WAY THAT WE

18   BELIEVE IS INCONSISTENT WITH THEIR ACTUAL HOLDINGS.

19       AND JUST VERY BRIEFLY, THOSE CASES DEAL WITH THE ISSUE

20   OF -- THERE ARE CLAIMS, SOMETIMES, THAT DON'T USE THE WORD

21   "MEANS" IN THE ELEMENT.  WE GOT PAST THAT HERE BECAUSE THE WORD

22   "MEANS" APPEARS IN THE CLAIM ITSELF.

23           THE COURT:  RIGHT.

24           MR. RADULESCU:  AND IT DOESN'T NECESSARILY TRIGGER

25      THIS, THIS SECTION 112, PARAGRAPH 6 MEANS-PLUS-FUNCTION

1    INTERPRETATION.  MOST OF THE TIME IT DOES.

2         BUT SOMETIMES CLAIMS ARE WRITTEN WHERE THE WORD "MEANS" IS

3    NOT INCLUDED, AND NOW YOU'RE FIGHTING OVER IS IT A

4    MEANS-PLUS-FUNCTION --

5              THE COURT:  RIGHT.

6              MR. RADULESCU:  -- YOU KNOW, TERM?

7         AND THOSE CASES STAND FOR THE PROPOSITION THAT THE WORD

8    "ELEMENT" IN THE CLAIM LANGUAGE CAN SOMETIMES SUGGEST THAT THEY

9    SHOULD BE CONSTRUED UNDER THIS, THIS PARAGRAPH 112.

10             THE COURT:  I THINK FOR ME, THE WORD "ELEMENT" JUST

11   DOESN'T HAVE ANY MEANING.

12        AND SO YOU GIVE IT MEANING AS JUST AN INTRODUCTION TO THE

13   LAUNDRY LIST OF ITEMS THAT ARE FOUND IN THE CLAIMS, OR IN THE

14   PATENT.

15             MR. RADULESCU:  YES.  SOMETIMES THEY'RE DRAFTED IN

16   CLAIMS, THE WORD "ELEMENT" IS INCLUDED TO ACTUALLY NOT HAVE

17   MUCH OF A MEANING.  I MEAN, SOMETIMES IT'S A FASTENING ELEMENT

18   WHERE THE PURPOSE IS IT'S FASTENING AND THE WORD "ELEMENT," IT

19   MAYBE SHOULD HAVE SAID "FASTENING MEANS" AND THAT WOULD TRIGGER

20   SECTION 112.

21        SOMETIMES SOMEONE MAY USE "FASTENING ELEMENT," AND THE

22   QUESTION BECOMES, IS THAT PURELY STRUCTURE OR IS THAT

23   FUNCTIONAL?  AND THAT'S WHAT THOSE TWO CASES ARE ABOUT.

24        THAT'S NOT THE ISSUE HERE BECAUSE WE'RE ALL AGREEING THESE

25   ARE MEANS-PLUS-FUNCTION ELEMENTS.

```
1              THE COURT:  SURE.

2              MR. RADULESCU:  AND THE ONLY ISSUE IS WHAT'S

3    DESCRIBED IN THE SPECIFICATION AS PERFORMING THESE FUNCTIONS?

4              AND WE'RE STUCK WITH THE FACT THAT IN THIS -- IN THIS

5    TECHNOLOGY, THEY ARE USING THE, THE OPTICAL POWER ELEMENTS AS A

6    GENERIC TERM TO DESCRIBE THE POWER ELEMENTS.

7              THE POWER ELEMENTS ARE THE ONES THAT, YOU KNOW, ARE THE

8    MIRRORS AND ARE THE LENSES AND THEY'RE CALLED OPTICAL POWER

9    ELEMENTS AND THAT'S WHY WE USE IT.

10             THE ARGUMENT THAT THE M.I.T AND THE MAS-HAMILTON CASES

11   SOMEHOW SAY, NO, WE CAN'T HAVE IN OUR LIST OF CORRESPONDING

12   STRUCTURE A REFERENCE TO THE WORD "ELEMENT" THAT THE

13   SPECIFICATION ITSELF USES IS NOT WHAT THOSE CASES STAND FOR.

14             SO IT'S JUST SIMPLY, WE WOULD SAY, ATTORNEY ARGUMENT THAT

15   SHOULD BE DISREGARDED WITH RESPECT TO FINISAR'S USE OF THE SPEC

16   LANGUAGE OF OPTICAL POWER ELEMENT IN THE PROPOSED LIST OF

17   STRUCTURES.

18             SO SLIDE 91 I THINK SUMMARIZES THAT POINT AS WELL.  IT

19   CITES TO THE SPECIFICATION ITSELF WHERE IT'S LISTING THE SERIES

20   OF OPTICAL POWER ELEMENTS, AND, YOU KNOW, WE THINK THAT THAT'S

21   ADEQUATE FOR PURPOSES OF IDENTIFYING THE CORRESPONDING

22   STRUCTURE AND, AS I SAID, THE M.I.T. AND THE MAS-HAMILTON CASES

23   DON'T HELP.

24             SO THEN THE THIRD ARGUMENT IS THE ARGUMENT ABOUT THIS IS

25   THE -- THIS IS NISTICA'S FIGURES THAT ARE INCLUDED IN THEIR
```

1    RESPONSIVE BRIEFS AT PAGES 17 AND 18 THAT THEY HAVE DRAWN IN

2    RED THE CBRW AND THEN HAVE IDENTIFIED THE SIMULTANEOUS SPATIAL

3    SEPARATION OF LIGHT.  IT'S THEIR ANIMATED -- IT'S THEIR

4    ANNOTATIONS, NOT OURS.

5         OF COURSE, IF WE BLOW UP AND FOCUS IN MORE DETAIL ON, FOR

6    EXAMPLE, FIGURE 3, WE HAVE A GREEN ARROW SHOWING THE WALK-OFF

7    CRYSTAL AND, IN FACT, YOU SEE --

8              THE COURT:  YEAH.

9              MR. RADULESCU:  -- THE LIGHT GOING FROM A SINGLE LINE

10   TO TWO LINES EXITING THE WALK-OFF CRYSTAL.

11             THE COURT:  THAT WAS PRETTY CLEAR.

12             MR. RADULESCU:  SO IT'S PRETTY CLEAR THAT IT'S ALSO

13   PERFORMING THE SPATIAL SEPARATION FUNCTION.

14        SIMILARLY WITH RESPECT TO FIGURE 6, IT'S THE SAME --

15             THE COURT:  THE INTERESTING THING IS, THOUGH, NOW

16   THAT I UNDERSTAND YOUR ARGUMENT, IS NISTICA IDENTIFIES THE

17   WEDGE.  THE WEDGE DOESN'T INITIATE SEPARATION.

18             MR. RADULESCU:  IT PROVIDES ANGULAR SEPARATION.

19             THE COURT:  AND SO BY NISTICA IDENTIFYING THE WEDGE,

20   IT ACTUALLY LENDS SUPPORT TO ALL OF THE OTHER ELEMENTS OF THE

21   FIGURE ALSO CONTRIBUTING TO THE SPATIAL SEPARATION AS YOU

22   ARGUE.

23        HAD THEY IDENTIFIED THE WALK-OFF CRYSTAL, WHICH IS WHAT

24   INITIATES THE SEPARATION, I WOULD HAVE HAD A HARDER TIME SEEING

25   THAT.

 1          BUT THEY ARE TAKING WHAT WOULD BE THE SECOND, MAYBE EVEN

 2     THE THIRD ELEMENT INVOLVED IN THE SEPARATION PROCESS AS THE

 3     SOLE ELEMENT.  SO THAT'S INTERESTING TO ME.

 4          MR. RADULESCU:  YEAH.  AND IT ACTUALLY GETS A LITTLE

 5      MORE INTERESTING WITH RESPECT TO PART OF THE SPEC THAT THEY

 6      RELY ON FOR THIS ISSUE, AND I'LL GET TO THAT SHORTLY.

 7          THE COURT:  OKAY.

 8          MR. RADULESCU:  SO THAT'S THE THIRD ARGUMENT.

 9          AND SLIDE 95 HAS WHAT WE'VE PROPERLY ANNOTATED AS TWO OF

10     THE STRUCTURES TO PERFORM SPATIAL SEPARATION IN THESE EXAMPLES.

11          AND THEN WE COME TO 96 WHERE NISTICA ASSERTS THAT IT'S

12     ONLY THE CBRW ALONE THAT PERFORMS THE SEPARATION.

13          WE CAN GO TO THE SPEC.  WE CAN SEE THE DISCUSSION OF THE

14     WALK-OFF CRYSTALS AT COLUMNS 11 AND 14, AND WE SEE THE

15     REFERENCE TO SEPARATION BY 125 UNITS IN BOTH CASES.

16          SO CLEARLY THERE'S LINKING BETWEEN THAT COMPONENT AND THE

17     CREATION OF THESE, OF THESE SEPARATED BEAMS.

18          AND THEN THE OTHER -- THE OTHER POINT THAT I WANTED TO

19     MAKE ON THIS ISSUE IS WE'VE HEARD A LOT ABOUT, OH, LINKING

20     LANGUAGE.  YOU NEED TO FIND THE LINKING LANGUAGE.  YOU NEED TO

21     FIND THE ASSOCIATION LANGUAGE.  WE HEARD IT TODAY FROM

22     MR. KRAMER, AND WE HEARD IT AT THE TECH TUTORIAL, VERY

23     IMPORTANT TO SHOW THE LINKING, THAT THIS STRUCTURE ACTUALLY IS

24     LINKED TO THE FUNCTION.

25          AND AS I DID THROUGHOUT THIS PRESENTATION, I IDENTIFIED

1    EXACTLY WHERE THAT LINKING WAS.  HE USED THE VERB "SEPARATE" TO

2    ASSOCIATE THAT, THAT COMPONENT WITH THE FUNCTION.

3         AND CURIOUSLY ENOUGH, WHEN YOU LOOK AT, FOR EXAMPLE, THE

4    DISCUSSION OF THIS CBRW 230 AT COLUMN 14, LINES 48 TO 51, AND

5    THIS IS THEIR, ONE OF THEIR INTERPRETATIONS OF THE SPATIAL

6    SEPARATING MEANS, WHERE IS THE WORD "SEPARATE"?  YOU ACTUALLY

7    DON'T SEE IT IN THEIRS.

8         SO CLEARLY THAT -- YOU KNOW, CLEARLY THIS ISSUE OF, YOU

9    KNOW, I'M GOING TO SAY CHERRY PICKING ONE COMPONENT TO LIMIT

10   THE SPATIAL SEPARATING MEANS TO -- BASED ON AN ARGUMENT THAT

11   THERE NEEDS TO BE LINKING OR ASSOCIATION, THIS WORD "SEPARATE"

12   ISN'T EVEN PRESENT IN WHAT THEY'RE CHERRY PICKING FROM.  YOU

13   HAVE TO LOOK AT THE FIGURE, I GUESS, TO SEE THAT IT'S

14   SEPARATING.  IT DOESN'T REFER TO SEPARATION IN THIS PARAGRAPH.

15        AND THEN THE LAST SLIDE, THE LAST TWO SLIDES, AN ARGUMENT

16   THAT WE'RE TRYING TO CAPTURE ALL THE POSSIBLE STRUCTURES FOR

17   SPATIAL SEPARATING MEANS, WE'RE TRYING TO STAY TRUE TO THE

18   SPECIFICATION, AND THE FACT THAT IT'S LENGTHY IS JUST A

19   FUNCTION OF WHAT'S DESCRIBED IN THE SPECIFICATION ITSELF.

20   WE'RE SORT OF STUCK DOING IT AND WE'RE TRYING TO MAKE SURE THAT

21   ALL THE STRUCTURES THAT ARE DESCRIBED WITH THAT VERB "SEPARATE"

22   OR THAT PERFORMS THAT SEPARATING FUNCTION ARE LISTED IN THE

23   PROPOSED CONSTRUCTION.

24        AND THEN THE OTHER POINT IS THAT, YOU KNOW, THE FACT THAT

25   IT IS SO LONG MEANS THAT WE'RE REALLY TRYING TO STAY TOO

1    CLOSELY TO THE SPECIFICATION -- TYING OURSELVES TOO CLOSELY TO

2    THE SPECIFICATION BECAUSE IT'S CAPTURING ALL OF THE DISCLOSED

3    ALTERNATIVES.  AND THAT'S JUST, AGAIN, THIS CLOSE TIE BETWEEN

4    THE -- OUR LIST OF STRUCTURE AND THE DESCRIPTION OF THE

5    STRUCTURES IN THE SPEC IS DICTATED BY THE SPECIFICATION ITSELF.

6         AND AS THE FEDERAL CIRCUIT IS POINTING OUT, YOU KNOW, IT'S

7    THIS WRITTEN DESCRIPTION THAT "MAY DISCLOSE DISTINCT AND

8    ALTERNATIVE STRUCTURES FOR PERFORMING THE CLAIMED FUNCTION AND

9    THAT THE PERFORMANCE OF ANY ONE OF WHICH (OR THEIR EQUIVALENTS)

10   WOULD FALL WITHIN THE SCOPE OF THE CLAIM WHERE NOTHING IN THE

11   PATENT REQUIRES A SINGLE STRUCTURAL EMBODIMENT CORRESPONDING TO

12   THE [MEANS AT ISSUE]."  THAT'S THE DEALERTRACK CASE FROM 2012.

13        AND THAT'S ALL I HAD ON THIS TERM.

14        THE COURT:  OKAY.  I THINK IT WOULD BE BETTER FOR US

15   TO TAKE A BREAK BEFORE I HEAR NISTICA'S RESPONSE ON THIS ONE.

16   I THINK WE'VE BEEN GOING FOR A WHILE.  OKAY?

17        MR. RADULESCU:  THANK YOU, YOUR HONOR.

18        THE COURT:  THANK YOU, MR. RADULESCU.

19   (RECESS FROM 3:00 P.M. UNTIL 3:18 P.M.)

20        THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

21        LET'S SEE.  BEFORE WE BEGIN THE RESPONSE, MR. TONKOVICH,

22   LET ME -- I GUESS I'M STRUGGLING WITH SOMETHING THAT IS MAYBE

23   AT THE HEART OF MY FIRST QUESTION TO MR. RADULESCU, AND MAYBE

24   THIS WILL HELP YOU AND MAYBE I'M OFF BASE.  YOU CAN TELL ME AND

25   I'LL PUT IT AWAY.

1           BUT YOU AGREED ON THE FUNCTION.

2               MR. TONKOVICH:  YES.

3               THE COURT:  BUT IT OCCURS TO ME THAT ONE OF MY -- I'M

4       NOT SURE THAT YOU ACTUALLY AGREE ON THE FUNCTION BECAUSE I'M

5       NOT SURE, WHEN YOU SAY THE SPATIAL SEPARATING MEANS, ARE WE

6       TALKING ABOUT THE CREATION OF THE SPATIAL SEPARATION OR THE

7       CREATION AND MAINTENANCE OF THE SPATIAL SEPARATION?

8           AND ARE THEY DIFFERENT AND DOES THAT MATTER?

9           BECAUSE, MR. TONKOVICH, WHAT YOU SHOW APPEARS TO BE

10      LIMITED TO THE CREATION OF THE SEPARATION, AND I MAY DISAGREE

11      WITH YOU ON WHETHER YOU HAVE EVERYTHING THERE, BUT THAT WOULD

12      BE THE LIMITED -- IT WOULD OCCUR AT NO LATER THAN THE POINT OF

13      THE WEDGE.

14          AND MR. RADULESCU DISCUSSED THE CREATION AND MAINTENANCE,

15      AND CERTAINLY THAT'S IMPORTANT TO MAINTAIN IT.

16          BUT I'M NOT SURE YOU HAVE THE SAME FUNCTIONS IN MIND.

17      I'LL LET YOU RESPOND TO THAT, OF COURSE.

18              MR. TONKOVICH:  SURE.

19              THE COURT:  AND MAYBE THAT'S OFF BASE AND MAYBE I

20      DON'T NEED -- I SHOULD JUST ACCEPT THAT YOU AGREE ON THE

21      FUNCTION AND NOT TRY TO DRAW THIS DISTINCTION.

22              MR. TONKOVICH:  SO I THINK WE DO AGREE ON THE

23      FUNCTION.  IT'S THE SIMULTANEOUSLY SPATIALLY SEPARATING THE

24      FIRST AND SECOND LIGHT, AND IF WE LOOK AT THAT IN THE CONTEXT

25      OF THE CLAIM LANGUAGE -- IN OTHER WORDS, WHAT IS THE END RESULT

1    OF THIS?  AND IF YOU LOOK DOWN TO WHERE -- I'M GOING TO TRY

2    IT --

3              THE COURT:  LET ME GET YOUR SLIDE OUT.  I'M SORRY.

4    I'M ON THE WRONG ONE.  I APOLOGIZE.

5              MR. TONKOVICH:  I'M SORRY, NO PROBLEM.  IT'S SLIDE

6    64, WHICH IS JUST CLAIM 1.

7        SO YOU'RE SPATIALLY SEPARATING THE FIRST CLAUSE AND IT

8    MOVES ITS WAY THROUGH THE SYSTEM, AND WHEN YOU GET TO THE

9    WAVELENGTH PROCESSING MEANS, IT SAYS, "WITH EACH OF THE

10   WAVELENGTH CHANNELS OF THE FIRST AND SECOND GROUP BEING

11   PROCESSED INDEPENDENTLY AT A SEPARATED SPATIAL LOCATION."

12       SO WHEN WE'RE LOOKING AT SPATIALLY SEPARATING IN THE

13   CONTEXT OF THE CLAIM, IT'S GOT TO SPATIALLY SEPARATE ENOUGH SO

14   THAT WHEN IT GETS TO THE OPMC AT THE END, IT'S SEPARATELY

15   SEPARATED ENOUGH THAT IT GETS --

16             THE COURT:  RIGHT.  THAT I UNDERSTAND.

17       AND SO TO ME, THAT WOULD BE THE FUNCTION OF CREATING THE

18   SPATIAL SEPARATION.

19             MR. TONKOVICH:  YES, THAT WAS WHAT WE UNDERSTOOD IT

20   TO BE.

21       THE MEANS FOR CREATING --

22             THE COURT:  OKAY.  BUT MR. RADULESCU GOES ON TO THEN

23   MAINTAINING IT THROUGHOUT THE DEVICE.

24             MR. TONKOVICH:  SO I'M A LITTLE BIT CONFUSED ABOUT

25   THEIR POSITION BECAUSE ON ONE HAND, THEY'RE NOT -- THEIR

1    CONSTRUCTION IS NOT SAYING ALL OF THESE STRUCTURES ARE THE

2    SPATIAL SEPARATING STRUCTURE.

3         MY UNDERSTANDING IS --

4              THE COURT:  THEY'RE NOT?  I THOUGHT THEY WERE.

5              MR. TONKOVICH:  IS THAT TRUE?  BECAUSE IT'S NOT CLEAR

6    FROM THEIR CONSTRUCTION.  WHAT THEIR CONSTRUCTION ACTUALLY SAYS

7    IS JUST POLARIZATION MANIPULATION ELEMENT AND A SERIES OF

8    OPTICAL POWER ELEMENTS.

9              THE COURT:  WHICH IS ALL OF THESE SPECIFIC THINGS.

10             MR. TONKOVICH:  I INTERPRETED IT AS THEY WERE SAYING

11   IT'S ANY ONE OF THOSE THINGS.

12             THE COURT:  THAT'S AN INTERESTING THING BECAUSE --

13             MR. TONKOVICH:  I ACTUALLY HAVE A SLIDE ON THIS

14   LATER.

15             THE COURT:  YOU KNOW, THAT'S AN INTERESTING ISSUE AS

16   TO WHETHER IT'S A SERIES THAT INCLUDES ONE OR MORE.  I MEAN, IT

17   MAY -- BECAUSE, I MEAN, ONE OF THE PROBLEMS WITH THAT STRUCTURE

18   IS THAT IT MAY CLAIM TOO MUCH.  BUT THAT'S DOWN THE ROAD FOR

19   ME.  I'M NOT DEALING WITH THAT NOW.

20             MR. TONKOVICH:  SO --

21             THE COURT:  IT OPENS ANOTHER DOOR FOR NISTICA.

22             MR. TONKOVICH:  I PLANNED TO GET TO THIS LATER.  MY

23   UNDERSTANDING FROM THEIR BRIEF IS THAT THEY'RE CLAIMING EACH

24   AND EVERY ONE OF THE HIGHLIGHTED STRUCTURES ARE INDEPENDENT

25   FROM THE OTHERS IN THE SPACIAL SEPARATING MEANS.

```
1            THE COURT:  SO IT COULD BE THIS ONE?

2            MR. TONKOVICH:  YES.

3            THE COURT:  OR IT COULD BE THIS ONE?

4            MR. TONKOVICH:  YES.

5            THE COURT:  OR IT COULD BE ALL OF THEM TOGETHER?

6            MR. TONKOVICH:  FOR INSTANCE, MY UNDERSTANDING IS

7    THAT THEY'RE ALLEGING THAT THE CYLINDRICAL LENS 260, WHICH IS

8    FARTHER DOWN THE ROAD THAN YOU SEE THERE, THAT IT IS, BY

9    ITSELF, INDEPENDENTLY OF EVERYTHING ELSE, A SPACIAL SEPARATING

10   MEANS.

11        NOW, IT WOULD BE ONE THING IF THEY WERE SAYING ALL OF

12   THESE TOGETHER CONTRIBUTE AND ARE A SPATIAL SEPARATING MEANS.

13        BUT MY UNDERSTANDING IS THAT'S NOT WHAT THEY'RE ALLEGING

14   WITH THEIR CONSTRUCTION, AND IT'S SURELY NOT CLEARLY STATED IN

15   THE WAY THEY'VE WORDED THEIR CONSTRUCTION.

16           THE COURT:  SO YOU THINK THEY'RE SAYING THEY'RE ALL

17   IN GROUPS?

18           MR. TONKOVICH:  NO.  I THINK THEY'RE SAYING EACH ONE

19   INDIVIDUALLY, WHICH IS WHAT WE OPPOSED.

20        IF YOU'RE GOING TO BREAK IT DOWN TO THAT LEVEL, WE BELIEVE

21   THE CBRW IS A KEY COMPONENT AND GIVES YOU THE ANGULAR

22   SEPARATION THAT RESULTS IN THE BEAMS LANDING IN THE SEPARATED

23   LOCATIONS ON THE OPMC, WHICH IS LABELED AS 280 IN FIGURE 6.

24           THE COURT:  WELL, I UNDERSTOOD WHAT MR. RADULESCU

25   SAID WAS THAT THE GOAL WAS TO MAINTAIN THE SEPARATION THROUGH
```

1    THE LCOS AT THE END HERE.

2            MR. TONKOVICH:  YES.

3            THE COURT:  AND SO IT DOESN'T -- THE -- THIS DIAGRAM,

4    THIS FIGURE WHICH IS, I KNOW, NOT EVERYTHING, BUT THIS FIGURE

5    WOULD SHOW IT'S THE SERIES OF ALL OF THESE THINGS, NOT ANY ONE

6    OF THEM.

7        I HAVE NO EVIDENCE THAT ANY ONE OF THESE ITEMS WOULD DO

8    ANYTHING TO MAINTAIN THE SEPARATION IN THE ABSENCE OF THE OTHER

9    COMPONENTS, DO I?

10            MR. TONKOVICH:  WELL --

11            THE COURT:  IT'S NOT YOUR ARGUMENT TO MAKE, BUT --

12            MR. TONKOVICH:  THEY ALL OBVIOUSLY SERVE A FUNCTION

13    WITHIN THE DEVICE.

14            THE COURT:  SURE.

15            MR. TONKOVICH:  BUT OUR POSITION IS THE CBRW IS KIND

16    OF THE KEY COMPONENT.  WITHOUT IT, YOU WOULDN'T GET THE SPATIAL

17    SEPARATION IN ORDER FOR THE BEAMS TO LAND AT TWO SEPARATE

18    LOCATIONS.

19            THE COURT:  OKAY.  SO LET'S SAY I AGREE WITH YOU ON

20    THAT.  I MEAN, IN FACT, I THINK THAT'S A REASONABLE ARGUMENT,

21    THAT THAT'S THE KEY COMPONENT THAT CREATES SUFFICIENT

22    SEPARATION TO ALLOW THE REST OF THIS TO OCCUR.

23        BUT IF THAT WAS THE LAST ACT OF SEPARATION, WE WOULD NOT

24    GET DOWN TO THE LCOS.  IT JUST -- WE WOULDN'T GET THERE BECAUSE

25    YOU HAVE TO MAINTAIN THE SEPARATION.  THAT'S WHAT MR. RADULESCU

1    TOLD ME.

2         MR. TONKOVICH:  WELL, I MEAN, THERE'S LENSES AND

3    OTHER -- ONCE YOU ANGULARLY SEPARATE, THEY'RE GOING TO BE

4    SEPARATED.  THE LENSES DO FOCUSSING OR DIRECTING.  YOU KNOW,

5    THEY DO PLAY SOME ROLE AS IT GOES THROUGHOUT THIS.

6         I THINK WHERE WE DIFFER IS WE DON'T THINK THAT, FOR

7    INSTANCE, CYLINDRICAL LENS 260 IS, BY ITSELF, A SPATIAL

8    SEPARATING MEANS.  WE BELIEVE IT HAS TO AT LEAST INCLUDE THE

9    CBRW AS KIND OF THE KEY LINCHPIN COMPONENT IN CAUSING THE

10   SPATIAL SEPARATION.

11        THE COURT:  BUT THERE'S NOTHING IN FINISAR'S ARGUMENT

12   THAT EXCLUDES COMBINATIONS.  THERE'S NOTHING IN THEIR ARGUMENT

13   THAT EXCLUDES COMBINATIONS.  I DIDN'T HEAR THEM ONCE SAY IT'S

14   ANY ONE OF THESE STANDING IN ISOLATION.

15        MR. TONKOVICH:  UM --

16        THE COURT:  I DIDN'T HEAR THAT.

17        MR. TONKOVICH:  OH, WELL, I'VE READ THAT IN THEIR

18   BRIEFS.

19        THE COURT:  REALLY?

20        MR. TONKOVICH:  YES.

21        THE COURT:  I'M SORRY.  I'LL BE GLAD TO LOOK AT THAT.

22        MR. TONKOVICH:  AND I BELIEVE IN THEIR JOINT

23   STATEMENT THAT THEY'RE PROPOSING THEM AS AN "OR," NOT AN "AND"

24   BETWEEN THE DIFFERENT STRUCTURES.

25        I'M SURE THEY CAN CLARIFY.  PART OF THE PROBLEM IS THEIR

1    CONSTRUCTION DOESN'T SAY WHAT SPECIFIC STRUCTURES THEY'RE

2    TALKING ABOUT.

3        THIS IDEA THAT THEY'LL DEFINE THE CONSTRUCTION MORE WHEN

4    THEY FIND OUT MORE ABOUT THE ACCUSED PRODUCTS IS CONTRARY TO

5    HOW CLAIM CONSTRUCTION IS SUPPOSED TO WORK.  CLAIM CONSTRUCTION

6    IS SUPPOSED TO OPERATE WITHOUT REFERENCE TO THE ACCUSED

7    PRODUCTS.

8        SO, YOU KNOW, PART OF THE PROBLEM HERE IS IT'S VERY

9    UNCLEAR WHAT THEY'RE ALLEGING THE STRUCTURE IS, FRANKLY.

10       BUT IN THEIR BRIEF THEY ALLEGE, I THINK AS I SHOW IN THIS

11   SLIDE -- NOT TO GET TOO FAR AHEAD OF MYSELF -- THEY ALLEGE THAT

12   ALL OF THESE DIFFERENT THINGS ARE INDEPENDENTLY AND BY

13   THEMSELVES CORRESPONDING STRUCTURE IN THEIR BRIEFS FROM WHAT I

14   READ.

15           THE COURT:  WOW.

16           MR. TONKOVICH:  SO MY UNDERSTANDING OF THEIR

17   CONSTRUCTION IS VERY DIFFERENT AND VERY BROAD.

18           THE COURT:  SO IT'S INTERESTING BECAUSE THEY USE,

19   SINGULAR, A POLARIZATION MANIPULATION ELEMENT AND/OR SERIES OF

20   OPTICAL POWER ELEMENTS.

21       SO FOR THE OPTICAL POWER ELEMENTS, I THINK YOU'RE MISTAKEN

22   JUST ON WHAT MY READING OF THEIR PROPOSAL IS.

23       BUT ON THE POLARIZATION MANIPULATION, THEY CALL IT AN

24   ELEMENT, BUT AN ELEMENT IS AN UMBRELLA TERM THAT INCLUDES ALL

25   THE SPECIFICS.

1    THEY DON'T HAVE ANYTHING HERE THAT SAYS ANY ONE IN

2    ISOLATION.

3         BUT IF IT'S IN THEIR BRIEF, AND PERHAPS SOMEONE ELSE

4    SITTING HERE WILL HAVE A MOMENT TO LOOK AND DIRECT ME TO THAT

5    IN THE BRIEF, THAT JUST -- I DIDN'T SEE THAT AT ALL.

6         MR. TONKOVICH:  OKAY.  YOU KNOW, I MEAN, THAT'S --

7    THAT'S AT LEAST WHAT MY UNDERSTANDING COMING AWAY FROM THE

8    BRIEFING IS.

9         THE COURT:  OKAY.  BUT I DO THINK THAT YOUR PROPOSAL

10    IGNORES THE INITIAL SEPARATION, AND I WANT TO HEAR YOUR -- I

11    WOULD LIKE YOU TO ADDRESS THAT.

12         MR. TONKOVICH:  OKAY.

13         THE COURT:  BUT I ALSO WANT YOU TO GET BACK ON TRACK

14    AND MAKE YOUR OWN PRESENTATION.

15         MR. TONKOVICH:  OKAY.  CAN I ADDRESS IT IN DUE TIME?

16         THE COURT:  YES, YOU MAY, ABSOLUTELY.

17         MR. TONKOVICH:  THANK YOU.

18    SO I KNOW THIS HAS BEEN SAID BEFORE, BUT I'M GOING TO GO

19    BACK TO THE LAW ON INTERPRETING THE MEANS-PLUS-FUNCTION, AND

20    I'M QUOTING THE SAFFRAN CASE.

21         UNDER SECTION 112, PARAGRAPH 6, "THE QUESTION IS NOT WHAT

22    STRUCTURES A PERSON OF ORDINARY SKILL IN THE ART WOULD KNOW ARE

23    CAPABLE OF PERFORMING A GIVEN FUNCTION, BUT WHAT STRUCTURES ARE

24    SPECIFICALLY DISCLOSED AND TIED TO THAT FUNCTION IN THE

25    SPECIFICATION."

1       THE IDEA HERE IS THAT THE -- IN EXCHANGE FOR BEING ABLE TO

2    USE THE CONVENIENCE OF THE MEANS-PLUS-FUNCTION FORMAT --

3          THE COURT:  YEAH.

4          MR. TONKOVICH:  -- YOU GET THE SPECIFIC PHYSICAL

5    STRUCTURE THAT'S DISCLOSED IN THE SPECIFICATION FOR PERFORMING

6    THE CLAIMED FUNCTION.

7       SO HERE WE SEE FIGURE 6, OR FIGURE 3 I SHOULD SAY, AND A

8    DESCRIPTION OF IT.

9       NOW, I THINK FINISAR HAS SAID THAT THERE'S NO DESCRIPTION

10   OF SPATIAL SEPARATION IN REGARD TO THE CBRW.

11      WELL, HERE IT IS.  WE SEE THAT CBRW 130 IS DESCRIBED AS

12   FOLLOWS: "THE NOW POLARIZATION TAGGED BEAMS ENTER THE CBRW 130

13   WHICH IMPARTS AN ANGULAR OFFSET ON THE BEAMS IN ONE

14   POLARIZATION STATE WITH RESPECT TO THE OTHER." THAT ANGULAR

15   OFFSET BEGINS THE SPACIAL SEPARATION.

16      AND THEN THE NEXT SENTENCE IS "THIS ANGULAR OFFSET IS IN

17   THE VERTICAL OR X-DIMENSION AND PROPAGATES THROUGH THE OPTICAL

18   TRAIN TO RESULT IN A SPATIAL SEPARATION BETWEEN BEAMS OF

19   DIFFERENT POLARIZATIONS."

20      THERE IT'S CLEARLY LINKING THE CBRW TO THE SPATIAL

21   SEPARATION.

22         THE COURT:  I DON'T THINK ANYONE DISAGREES WITH THAT.

23         MR. TONKOVICH:  OH, I THOUGHT I SAW A SLIDE THAT SAID

24   THERE'S NOTHING LINKING THE CBRW TO SPATIAL SEPARATION.

25         THE COURT:  I THINK THEY'RE INCLUDING ALL OF THESE

1    THINGS.

2              MR. TONKOVICH:  ALL RIGHT.

3              THE COURT:  THAT WAS MY UNDERSTANDING.

4              MR. TONKOVICH:  SO WE HAVE A SIMILAR DISCLOSURE WITH

5    REGARD TO FIGURE 6.  THE SPECIFICATION SAYS THAT CBRW IN

6    FIGURE 3 IS EQUIVALENT TO THAT IN FIGURE 6.  AND WE SEE AGAIN

7    IT'S DESCRIBED AS "THE NOW POLARIZATION TAGGED BEAMS ENTER THE

8    CBRW 230 TO IMPART AN ANGULAR OFFSET ON THE BEAMS."

9              THE COURT:  UM-HUM.  BUT THE DISCUSSION BEFORE THAT

10   DISCUSSES THE SEPARATION THAT OCCURS AT 215 IN THE WALK-OFF

11   CRYSTAL.

12             MR. TONKOVICH:  YES.

13             THE COURT:  AND YOU DIDN'T IDENTIFY THE WALK-OFF

14   CRYSTAL AS BEING PART OF THE STRUCTURE.

15             MR. TONKOVICH:  WE DID NOT IDENTIFY THE WALK-OFF

16   CRYSTAL AS BEING PART OF THE STRUCTURE.

17             THE COURT:  AND FOR WHAT REASON?

18             MR. TONKOVICH:  WELL, WE SAW IT AS THE CBRW KIND OF

19   BEING THE KEY COMPONENT THAT CAUSES THE SPATIAL SEPARATION THAT

20   RESULTS IN THE BEAMS ENDING AT TWO DIFFERENT --

21             THE COURT:  BUT THE CBRW DOESN'T CAUSE THE INITIAL

22   SEPARATION, DOES IT?  I DON'T THINK THE WEDGE CAN SEPARATE THE

23   BEAM.  IT CAN JUST CHANGE THE ANGLE ONCE IT'S SEPARATED.  I

24   MEAN, MAYBE I'M WRONG, BUT THAT'S WHAT I'M SEEING.

25             MR. TONKOVICH:  YOU KNOW, I BELIEVE THAT'S CORRECT.

1          THE COURT:  OKAY.  SO, IN FACT, YOU ARE -- YOUR

2     PROPOSAL WOULD THEN HAVE TO INCLUDE 215, THE WALK-OFF CRYSTAL?

3          MR. TONKOVICH:  DO YOU MEAN THE WALK-OFF CRYSTAL AND

4     THE CBRW TOGETHER?

5          THE COURT:  YEAH.  YEAH.  DO YOU DISAGREE WITH THAT?

6          MR. TONKOVICH:  I -- I CAN DEFINITELY SEE THE LOGIC

7     IN THAT.

8          THE COURT:  OKAY.

9          MR. TONKOVICH:  I MEAN, OUR KEY POINT IS JUST THAT IT

10    HAS TO INCLUDE THE CBRW.  IT CAN'T BE --

11         THE COURT:  RIGHT.  I ACTUALLY --

12         MR. TONKOVICH:  MY UNDERSTANDING IS THEY PROPOSED

13    COMPONENTS THAT DON'T INCLUDE THE CBRW, A COMBINATION THAT

14    DON'T INCLUDE THE CBRW.

15         THE COURT:  THAT EXCLUDES IT?

16         MR. TONKOVICH:  THAT EXCLUDES IT, YES.  THAT'S MY

17    UNDERSTANDING.  IF THAT'S NOT TRUE, THEY CAN LET US KNOW, BUT

18    THAT'S WHAT MY UNDERSTANDING IS.

19         THE COURT:  OKAY.  YOU KNOW, FRANKLY, BECAUSE IT'S

20    DONE IN ABBREVIATION, I COULDN'T POINT TO IT RIGHT NOW AS TO

21    WHETHER THAT'S INCLUDED, AND I'M SURE MR. RADULESCU WILL BE

22    READY TO DO THAT FOR ME.

23         MR. TONKOVICH:  BUT, YOU KNOW, OUR MAIN POINT IS THAT

24    CBRW IS KIND OF THE KEY TO THIS, AND OTHER COMPONENTS ARE

25    INCLUDED WITH THE CBRW.  THAT'S DEFINITELY POSSIBLE, BUT THE

1      CBRW IS KIND OF THE KEY COMPONENT FOR CAUSING THE SPATIAL

2      SEPARATION.

3              THE COURT:  SURE.  AND THAT'S WHY I STARTED WITH

4      ASKING WHETHER THERE'S ACTUALLY A DIFFERENT INTERPRETATION OF

5      WHAT THE FUNCTION IS AS TO WHETHER IT'S CREATION OF SPATIAL

6      SEPARATION OR WHETHER IT'S CREATION AND MAINTENANCE OF THE

7      SEPARATION.

8              MR. TONKOVICH:  WELL, I MEAN, I WOULD GO BACK TO THE

9      CLAIM LANGUAGE, WHICH IS THIS SET OF SLIDES, WHICH IS THIS

10     SIMULTANEOUSLY SPATIALLY SEPARATING THE FIRST AND SECOND GROUP.

11         THE WAY WE READ THAT IS THAT'S THE CREATION OF THE SPACIAL

12     SEPARATION.

13             THE COURT:  JUST THE CREATION.  SO, YOU SEE, THAT'S

14     WHERE I WAS.  I DO THINK THAT YOU HAVE A DIFFERENT DEFINITION

15     OF "FUNCTION," AND, YET, THAT'S NOT SUBMITTED TO ME.

16             MR. TONKOVICH:  WE WEREN'T AWARE THAT THERE WAS A

17     DISPUTE THERE.  WE THOUGHT THE LANGUAGE WAS CLEAR, BECAUSE IT

18     DOESN'T SAY SIMULTANEOUSLY SEPARATING AND MAINTAINING.

19             THE COURT:  WELL, BUT THE -- MR. RADULESCU MADE IT

20     VERY CLEAR THAT HE INCLUDED BOTH CREATION AND MAINTENANCE OF

21     THE SEPARATION.  IT'S THE ONLY WAY TO GET THE -- FRANKLY, IT

22     SEEMS TO BE THE ONLY WAY TO INCLUDE THE OPTICAL POWER ELEMENTS

23     IN -- FOR FINISAR.  IT'S THE ONLY WAY TO DO IT BECAUSE THE

24     OPTICAL POWER ELEMENTS DON'T BEGIN UNTIL MUCH -- UNTIL AFTER IT

25     EXITS THE CBRW.

1          MR. TONKOVICH:  WELL, YOU KNOW, I MEAN, COMING INTO

2     THE HEARING, OUR UNDERSTANDING WAS THEY WERE PROPOSING ANY

3     OPTICAL POWER ELEMENT OR ANY POLARIZATION MANIPULATION ELEMENT

4     ALONE AS A SPATIAL SEPARATING MEANS.

5          SO WE DID NOT HAVE THAT SAME UNDERSTANDING AS WHAT HE JUST

6     SAID HERE TODAY.

7          THE COURT:  OKAY.

8          MR. TONKOVICH:  IF HE'S SAYING THAT IT HAS TO BE

9     EVERYTHING PICTURED UP THE CYLINDRICAL LENS HERE, THAT'S A

10    DIFFERENT CONSTRUCTION THAN WHAT I'VE HEARD AND IT'S NOT STATED

11    IN THEIR ABBREVIATED CONSTRUCTION.

12         THE COURT:  EVERYTHING IS COMBINED.

13         MR. TONKOVICH:  THEY HAVE THESE UMBRELLA TERMS --

14         THE COURT:  RIGHT.

15         MR. TONKOVICH:  -- THAT CAN DEFINITELY BE -- THAT

16    IT'S UNCLEAR WHAT THE MEANING IS.

17         THE COURT:  I'M NOT SURE I KNOW, EITHER, WHETHER IT'S

18    ALL OF THOSE ITEMS COMBINED OR ANY ONE OF THEM IN ISOLATION OR

19    ANY COMBINATION OF ANY SUBSET.  IT'S PROBABLY ANY COMBINATION

20    OF THE WHOLE OR LESS.

21         MR. TONKOVICH:  IT WAS AS BROAD AS POSSIBLE IS MY

22    UNDERSTANDING.

23         THE COURT:  IT'S BROAD.

24         MR. TONKOVICH:  AND WE DON'T THINK THAT'S

25    APPROPRIATE.  WE THINK IT NEEDS TO AT LEAST INCLUDE THE CBRW.

```
1      THAT'S KIND OF THE LINCHPIN HERE.

2                THE COURT:  WELL, I DON'T DISAGREE WITH YOU ON THAT.

3                MR. TONKOVICH:  OKAY.

4                THE COURT:  I DON'T DISAGREE WITH THAT.

5                MR. TONKOVICH:  GREAT.

6                THE COURT:  BUT THAT DOESN'T GET YOU VERY FAR.  I

7      MEAN, IF YOU WANT THAT IN, BUT THEN EVERYTHING ELSE IS IN, ARE

8      YOU AGREEING TO THAT?

9                MR. TONKOVICH:  I WOULD HAVE TO CONFER, BUT --

10               THE COURT:  I MEAN, IF YOU'RE WILLING TO ACCEPT

11     MR. RADULESCU'S DEFINITION AND JUST CONFIRM THAT THE CBRW IS

12     PART OF IT, THEN WE'RE DONE AND THAT WOULD BE GREAT.

13          BUT I DON'T KNOW THAT THAT'S WHAT YOU'RE SAYING.

14          SO IT WOULD INCLUDE THE OPTICAL POWER ELEMENTS, AS WELL AS

15     THE, AS WELL AS THE POLARIZATION MANIPULATION ELEMENT.

16               MR. TONKOVICH:  I MEAN, MAYBE WE DO HAVE A DIFFERENT

17     UNDERSTANDING OF THE FUNCTION.  I DO THINK IT IS THE CREATION

18     OF THE SPATIAL SEPARATION AND THAT THAT HAS TO INCLUDE THE

19     CBRW.  THAT'S NOT THE MAINTENANCE.

20               THE COURT:  AND IT MAY BE THAT IF THE FUNCTION IS

21     LIMITED TO THE CREATION OF THE SPATIAL SEPARATION, AND WE

22     INCLUDE THESE ELEMENTS THAT LEAVE -- THAT PRECEDE THE CBRW,

23     MAYBE FINISAR DOESN'T DISAGREE WITH THAT.  I DON'T KNOW.  I

24     MEAN, IT JUST -- THAT'S WHY I RAISED IT BECAUSE I SEE A

25     DIFFICULTY THERE.
```

1          MR. TONKOVICH:  YOU KNOW, AND IN CONSTRUING THESE

2    TERMS, WE THINK SPECIFIC STRUCTURES ALSO NEED TO BE NAMED,

3    SOMETHING LIKE OPTICAL POWER ELEMENT, WHICH IS, AS YOU PICKED

4    OUT --

5          THE COURT:  LET ME JUST SAY, I AGREE WITH YOU, IF IT

6    JUST ENDED AT THE WORD "EQUIVALENTS" AND SAID "THE OPTICAL

7    POWER ELEMENT AND POLARIZATION MANIPULATION ELEMENT," I WOULD

8    SAY IT'S MEANINGLESS.  I AGREE.

9          BUT THAT'S NOT WHAT IT SAYS, AND WHAT IT SAYS REALLY -- WE

10   COULD TAKE OUT -- THOSE ARE JUST HEADINGS FOR THESE VERY

11   SPECIFIC CITATIONS.

12         AND, I MEAN, HE MADE A CHART SO HE ABBREVIATED, BUT ONE

13   WOULD HAVE TO ACTUALLY ARTICULATE ALL THAT LANGUAGE THERE AND

14   HAVE A LIST OF WHAT THOSE ELEMENTS ARE.  FOR PURPOSES OF THIS

15   HEARING, THAT WASN'T NECESSARY.  WE CAN ALL GO CROSS-REFERENCE

16   IT.

17         BUT I DON'T THINK -- HE DIDN'T STOP AT THE ELEMENTS.  I

18   DON'T THINK THE WORD "ELEMENTS" WAS INTENDED TO GIVE ANY

19   MEANING.  I THINK IT WAS A LEAD-IN TO WHAT THESE SPECIFIC ITEMS

20   ARE.  THAT'S HOW I SAW IT.

21         MR. TONKOVICH:  OKAY.  I MEAN, I READ IT VERY

22   DIFFERENTLY BECAUSE THE WAY THE LANGUAGE IS WRITTEN IS "AND AS

23   FURTHER DESCRIBED IN," BUT IT DOESN'T SAY "AS LIMITED TO THE

24   SPECIFIC STRUCTURES DISCLOSED" IN THE JCCS.

25         THE COURT:  THAT'S INTERESTING, AND MAYBE THAT NEEDS

1    TO BE WHAT IT SAYS IT'S LIMITED TO.

2         MR. TONKOVICH:  YOU KNOW, OTHERWISE THERE IS -- WHAT

3    WE'RE WORRIED ABOUT IS SOME TIME LATER DOWN THE ROAD, FINISAR

4    IS GOING TO COME IN AND POINT TO SOMETHING THAT'S NOT EVEN IN

5    THE SPEC AND SAY THAT'S AN OPTICAL POWER ELEMENT, SO THAT'S

6    NEEDED OR THAT'S A POLARIZATION MANIPULATION ELEMENT.

7         THE COURT:  WELL, THAT'S AN INTERESTING CONCEPT, AND

8    I WOULD -- AND IT'S WORTHY OF A MOMENT'S CONSULTATION TO

9    DETERMINE IF FINISAR WOULD ACCEPT REPLACING THE WORDS "AS

10   DESCRIBED IN THE '980 PATENT" TO "AS LIMITED TO," THEN WE ARE

11   DONE ON THIS TERM.  I DON'T KNOW IF THAT'S --

12       BUT MR. RADULESCU IS SAYING DON'T BOTHER WASTING MY TIME

13   ON A BREAK.

14        MR. RADULESCU:  I DON'T THINK WE'LL BE DONE.  I

15   JUST -- WHEN HE'S DONE, I'LL RESPOND TO THE QUESTIONS.

16        THE COURT:  OKAY, THAT'S FINE.  THANK YOU.

17      ALL RIGHT.  LET'S GO BACK TO YOUR PRESENTATION.

18        MR. TONKOVICH:  ALL RIGHT.  I WON'T BELABOR THE CBRW

19   POINT BECAUSE I THINK WE AGREE THAT THAT'S PART OF THE

20   STRUCTURE.

21      I WANT TO TALK A LITTLE BIT AGAIN ABOUT THE SAME POINTS.

22   WE GOT A LITTLE AHEAD OF OURSELVES WITH REGARD TO FINISAR'S

23   PROPOSED STRUCTURE.

24        THE COURT:  YES.  I'M SORRY.

25        MR. TONKOVICH:  SO AS I THINK HAS BEEN ALLUDED TO IN

1    YOUR DISCUSSION WITH MR. RADULESCU, THE LANGUAGE "AND AS

2    FURTHER DESCRIBED IN THE INTRINSIC RECORD" IS SOMEWHAT

3    TROUBLESOME BECAUSE THERE'S JUST A LIST OF CITATIONS IN WHAT

4    THEY CITE TO.  THAT'S, YOU KNOW, 250-PLUS LINES OF THE PATENT.

5        AND BECAUSE THESE CONSTRUCTIONS OFTEN END UP BEING PART OF

6    THE JURY INSTRUCTIONS, WE THINK THAT'S GOING TO BE VERY

7    CONFUSING TO HAND THE JURY A LIST OF PATENT CITATIONS.

8        THE COURT:  YOU KNOW, IT'S INTERESTING.  I WAS GOING

9    TO ASK AT THE END, I WOULD THINK THE CONSTRUCTION HAS TO

10   ACTUALLY ARTICULATE WHAT THOSE WORDS ARE AND NOT -- I TOOK THIS

11   AS JUST SHORTHAND FOR TODAY, BUT --

12       MR. TONKOVICH:  I MEAN, PART OF THE PROBLEM IS THAT

13   IT'S UNCLEAR TO US EXACTLY WHAT THEY'RE ALLEGING AND WHAT

14   THEY'RE NOT AS THE STRUCTURES IN THIS KIND OF LANGUAGE.

15       I MEAN, NORMALLY WHEN PEOPLE SUBMIT CONSTRUCTIONS, THEY

16   SAY "THE CORRESPONDING STRUCTURES X, Y, AND Z."

17       THE COURT:  AND DON'T -- OKAY.  WELL --

18       MR. TONKOVICH:  SO, I MEAN, TO THE EXTENT THAT THIS

19   TERM IS CONSTRUED, YOU KNOW, WE PREFER THE CONSTRUCTION TO LIST

20   OUT THE SPECIFIC STRUCTURES OR THE SPECIFIC COMBINATIONS.

21       THE COURT:  WELL, ONE WOULD PRESUME THAT'S NOT A

22   STUMBLING BLOCK HERE.  AND I -- I MEAN, I CERTAINLY -- I'M

23   NOT -- I WOULD NEVER GIVE A JURY THIS, EVEN IF I AGREED,

24   BECAUSE IT WOULD ENSURE THAT IT WAS A USELESS EFFORT, FRANKLY.

25       GO AHEAD.

1      MR. TONKOVICH:  SO PART -- YOU KNOW, THIS GOES BACK

2   TO, YOU KNOW, THEY IDENTIFY THE POLARIZATION MANIPULATION

3   ELEMENT AND THE OPTICAL POWER ELEMENTS IN THE ACTUAL TEXT OF

4   THEIR CONSTRUCTION.  AND AS YOU SAID, THESE ARE UMBRELLA TERMS.

5   "ELEMENT" DOESN'T REALLY -- AN ELEMENT COULD BE -- A

6   POLARIZATION MANIPULATION ELEMENT COULD BE ANYTHING THAT

7   MANIPULATES POLARIZATION, AND THERE ARE A HUGE NUMBER OF

8   STRUCTURES THAT COULD FALL INTO THAT CATEGORY.

9      PART OF THE PROBLEM HERE IS THAT THEY'RE SAYING THAT THE

10  LANGUAGE "PREFERABLY CAN INCLUDE A POLARIZATION MANIPULATION

11  ELEMENT" SHOULD BE CONSTRUED AS "INCLUDING ALL POLARIZATION

12  MANIPULATION ELEMENTS."

13      THE COURT:  LISTED HERE AND BEYOND.

14      MR. TONKOVICH:  YES, THAT IS OUR UNDERSTANDING.

15      AND WE THINK THAT THAT'S WRONG BECAUSE WHAT THEY'RE SAYING

16  IS THE CORRESPONDING STRUCTURE IS ANYTHING THAT CAN MANIPULATE

17  POLARIZATION, REGARDLESS OF ITS ACTUAL STRUCTURE.

18      THE COURT:  WELL, THAT WOULD BE TOO MUCH.

19      MR. TONKOVICH:  YEAH.  AND SO THAT'S WHAT WE'RE

20  READING ON.

21      AND THE SAME THING WITH THE SERIES OF OPTICAL POWER

22  ELEMENTS.  IT'S A VERY BROAD, GENERAL TERM THAT INCLUDES

23  MIRRORS, LENSES OF ALL DIFFERENT TYPES AND -- YOU KNOW, SO WE

24  THINK REGARDLESS OF THE STRUCTURE OF THE OPTICAL POWER ELEMENT,

25  IT'S A SPATIAL SEPARATING MEANS, AND THAT'S NOT RIGHT, AND NOT

1    IN THE CONTEXT PARTICULARLY OF SECTION 112, PARAGRAPH 6.  IT

2    REQUIRES THE DETERMINATION OF THE PHYSICAL STRUCTURE -- THIS IS

3    AN APPARATUS CLAIM -- THE PHYSICAL STRUCTURE THAT PERFORMS THE

4    CLAIMED FUNCTION.

5         THE COURT:  UM-HUM.  IT IS INTERESTING, TOO, THAT

6    I'VE GOT A POLARIZATION MANIPULATION ELEMENT, SINGULAR, AND/OR

7    A SERIES OF OPTICAL POWER ELEMENTS, WHICH WOULD SUGGEST THAT

8    THEY ARE NOT ARGUING THAT ANY ONE IN ISOLATION IS SUFFICIENT.

9         I DON'T KNOW.  I MEAN, I DIDN'T ADDRESS THAT WITH

10   MR. RADULESCU.  I'M JUST LOOKING AT THE LANGUAGE HERE.

11        BECAUSE YOUR CONCERN IS THAT THEY'RE SAYING ANY OPTICAL

12   POWER ITEM AS LISTED OR BEYOND --

13        MR. TONKOVICH:  YES.

14        THE COURT:  -- IN ISOLATION.

15        MR. TONKOVICH:  THAT IS THE CONCERN.

16        THE COURT:  AND IT DOES SAY "SERIES OF," WHICH IS

17   DIFFERENT THAN WHAT THEY SAID FOR POLARIZATION MANIPULATION

18   ELEMENT.

19        MR. TONKOVICH:  YES.

20        THE COURT:  YES.

21        MR. TONKOVICH:  BUT IT STILL HAS THE SAME AMBIGUITY.

22        THE COURT:  IT'S AN AMBIGUITY.

23        OKAY.  SORRY.  AGAIN, I KEEP GETTING OFF TRACK.

24        MR. TONKOVICH:  NO PROBLEM.

25        AND TO TOUCH ON A QUICK LEGAL POINT ON THE TERM "ELEMENT,"

```
1     THE COURTS HAVE FOUND THAT WHEN "ELEMENT" IS IN THE CLAIM

2     LANGUAGE, IT'S INSUFFICIENT STRUCTURE IN AN APPARATUS CLAIM,

3     AND OFTENTIMES YOU END UP CONSTRUING UNDER -- AS A

4     MEANS-PLUS-FUNCTION TERM, AND BASICALLY DOING THE SAME EXERCISE

5     THAT WE'RE DOING HERE.  I'LL GIVE THE EXAMPLE OF A LEVER MOVING

6     ELEMENT IN THE MAS-HAMILTON CASE.

7              THE COURT:  OKAY.

8              MR. TONKOVICH:  SO THE IDEA HERE IS IF THEY HAD

9      WRITTEN "POLARIZATION MANIPULATION ELEMENT" IN THE CLAIM OR "A

10     SERIES OF OPTICAL POWER ELEMENTS" IN THE CLAIM, THOSE WOULD

11     LIKELY END UP BEING CONSTRUED AS MEANS-PLUS-FUNCTION TERMS AND

12     WE'D BE DOING THE SAME EXERCISE WE'RE DOING HERE.

13         SO THE IDEA IS IF THEY WERE IN THE CLAIM AND WEREN'T

14     SUFFICIENT STRUCTURE, THEN HOW CAN THEY BE SUFFICIENT STRUCTURE

15     TO SATISFY SECTION 112, PARAGRAPH 6?

16         NOW, FINISAR POINTED TO THIS -- THIS CITATION IS FROM

17     THEIR BRIEF WHERE THEY SAY THAT THE SPECIAL -- THAT THE

18     SPECIFICATION SETS FORTH OPTICAL POWER ELEMENTS AND

19     POLARIZATION MANIPULATION ELEMENTS.  THEY CITE THIS PASSAGE,

20     BUT THEY LEAVE OUT A FEW PORTIONS THAT ARE ILLUMINATING.

21         SO IF WE LOOK AT WHAT'S LEFT OUT, WHICH IS HIGHLIGHTED IN

22     YELLOW ON THE SCREEN, IT DOES TALK ABOUT A SERIES OF OPTICAL

23     POWER ELEMENTS.  IF WE LOOK AT THE FIRST SECTION, IT SAYS "A

24     SERIES OF OPTICAL POWER ELEMENTS WHICH INCLUDE SPHERICAL

25     MICROLENS ARRAYS."
```

1        HOWEVER, THOSE OPTICAL POWER ELEMENTS ARE PERFORMING A

2    COMPLETELY DIFFERENT AND UNRELATED FUNCTION, WHICH IS ALTERING

3    THE NUMERICAL APERTURE.

4           THE COURT:  IS THIS CLAIM 2?  IS THIS WHAT YOU'RE

5    LOOKING AT?

6           MR. TONKOVICH:  NO, NO.

7           THE COURT:  OKAY.  THIS IS FROM A DIFFERENT --

8           MR. TONKOVICH:  THIS IS WHAT THEY CITED IN THEIR

9    BRIEF AND THEY SHOWED A PORTION OF THIS.  REMEMBER THE FARADAY

10   ROTATOR?

11          THE COURT:  OH.  YOU TOLD ME YOU HADN'T SEEN CLAIMS 2

12   AND 3 CITED.

13          MR. TONKOVICH:  YEAH.  I WILL TALK ABOUT THOSE AS

14   WELL.

15          THE COURT:  OKAY.  SO THIS IS COLUMN 8.

16          MR. TONKOVICH:  AND THEY SHOWED A SLIDE WITH THIS

17   SAME SECTION.  I REMEMBER MR. RADULESCU HAVING TO SPELL FARADAY

18   ROTATORS.

19       SO THEY SHOWED THIS IN THEIR SLIDES AS WELL, AN

20   ABBREVIATED VERSION, BUT I WANT TO SHOW THE FULL VERSION TO SEE

21   WHAT THE SPECIFICATION IS REALLY SAYING THERE.

22       SO THE PARTS HIGHLIGHTED IN YELLOW WERE LEFT OUT OF WHAT

23   THEY QUOTED IN THEIR BRIEF.

24       AND THE POINT HERE IS THAT WHAT THEY CITE TO WHERE

25   SPECIFIC OPTICAL POWER ELEMENTS ARE DISCUSSED, THEY'RE FOR

1     PERFORMING OTHER FUNCTIONS.

2          THE COURT:  OH.

3          MR. TONKOVICH:  SO IT SAYS -- IT POINTS OUT THE

4     SPHERICAL MICROLENS ARRAY FOR ALTERING NUMERICAL APERTURE.

5     THAT'S A COMPLETELY UNRELATED FUNCTION FROM SPATIALLY

6     SEPARATING.

7          IN THE SECOND PARAGRAPH, IT TALKS ABOUT CYLINDRICAL LENS

8     FOR THE OPTICAL POWER ELEMENT, CYLINDRICAL MIRRORS, BUT IT SAYS

9     THOSE ARE FOR REJECTING LIGHTS FROM THE PORTS ON THE OPTICAL

10    PHASED ARRAY COUPLING MEANS.  IT'S NOT FOR SPATIALLY

11    SEPARATING.

12         SO THAT SPECIFICATION MAY MENTION SPECIFIC EXAMPLES OF

13    OPTICAL POWER ELEMENTS.  THOSE ARE REALLY DIRECTED TO

14    PERFORMING OTHER FUNCTIONS THAT AREN'T THE CLAIMED FUNCTION

15    THAT WE'RE TALKING ABOUT, WHICH IS THIS SIMULTANEOUSLY

16    SPATIALLY SEPARATING AT LEAST A FIRST AND SECOND GROUP OF

17    LIGHT.

18         THE COURT:  OKAY.

19         MR. TONKOVICH:  SO, YOU KNOW, A SECTION LIKE THIS IS

20    NOT RELEVANT BECAUSE IT DOESN'T LINK THE CLAIMED FUNCTION TO

21    ANY STRUCTURE.  IT DOESN'T EVEN MENTION THE CLAIMED FUNCTION.

22         THE COURT:  IN FACT, IT SEEMS TO BE LINKED TO

23    SOMETHING QUITE DISTINCT, EXPRESSLY LINKED TO --

24         MR. TONKOVICH:  IT'S EXPRESSLY LINKED TO A COMPLETELY

25    DIFFERENT FUNCTION.

```
 1                THE COURT:  OKAY.

 2                MR. TONKOVICH:  SO THIS GOES BACK TO WHAT OUR CONCERN

 3      WAS, WHICH IS THAT THEY'RE USING POLARIZATION MANIPULATION

 4      ELEMENT AND OPTICAL POWER ELEMENTS AS BIG UMBRELLA TERMS TO

 5      CLAIM ANYTHING THAT WOULD FALL UNDER THERE.

 6                AND, YOU KNOW, THEY -- I HAVE A SECTION IN THE BRIEF WHERE

 7      THEY APPEAR TO DO THAT.  THEY SAY, "EACH OF THE ADDITIONAL

 8      CORRESPONDING STRUCTURAL COMPONENTS SPECIFICALLY DISCLOSED IN

 9      FIGURES 6 AND 7 FOR SPATIAL SEPARATING MEANS (E.G., SPHERICAL

10      MICROLENS ARRAY, WALK-OFF CRYSTAL, POLARIZATION DIVERSITY

11      ELEMENT, CYLINDRICAL MIRROR, AND CYLINDRICAL LENS, BIREFRINGENT

12      WALK-OFF ELEMENT, COMPOSITE WAVEPLATE) IS EITHER A POLARIZATION

13      MANIPULATION ELEMENT OR AN OPTICAL POWER ELEMENT."

14                AND OUR UNDERSTANDING IS THEY'RE ASSERTING THAT ALL OF

15      THESE ARE INDIVIDUALLY SPATIALLY SEPARATING MEANS.  SO TO THE

16      EXTENT THAT THEY'RE SAYING ANY OPTICAL POWER ELEMENT OR ANY

17      POLARIZATION MANIPULATION ELEMENT CAN BE A SPATIALLY SEPARATING

18      MEANS, WE THINK THAT IS THE WRONG CONSTRUCTION UNDER

19      SECTION 112.

20                AND THERE IS NO DISCLOSURE ABOUT HOW EACH ONE OF THESE IS

21      INDIVIDUALLY LINKED TO THE CLAIMED FUNCTION.

22                SO THERE'S NO SPEC CITES FOR THESE IN THE BRIEFS SAYING A

23      SPHERICAL MICROLENS ARRAY PERFORMS THE CLAIMED FUNCTION BY

24      DOING THIS OR THAT.  AND THAT'S PROBLEMATIC, TOO, BECAUSE UNDER

25      112(6), YOU NEED THE SPECIFIC LINKAGE BETWEEN THE CLAIMED
```

1    FUNCTION AND THE ACTUAL STRUCTURE.

2        SO THIS IS A SLIDE THAT I THINK I JUMPED TO A LITTLE

3    EARLIER.  YOU KNOW, IT'S BASED ON THEIR BRIEF THAT THEY'RE

4    ASSERTING AT LEAST THE FOLLOWING ARE INDEPENDENT CORRESPONDING

5    STRUCTURES, WHICH MEANS EACH ONE INDIVIDUALLY, ABSENT ALL THE

6    OTHER COMPONENTS, WOULD BE A SPATIAL SEPARATING MEANS.

7        AND IT'S UNCLEAR -- THESE ARE CLEARLY LAID OUT NOT IN THE

8    TEXT OF THEIR CONSTRUCTION FOR SURE AND NONE OF THESE ARE

9    REALLY LINKED TO THE CLAIMED FUNCTION SPECIFICATION.  WE FOUND

10   NO EVIDENCE THAT THAT'S THE CASE.

11       THE COURT:  BUT CAN YOU ADDRESS HERE THE LANGUAGE IN

12   CLAIMS 2 AND 3?  YOU DO --

13       MR. TONKOVICH:  I WILL ADDRESS IT RIGHT NOW.

14       THE COURT:  ALL RIGHT.

15       MR. TONKOVICH:  I CAN DO THAT RIGHT NOW.

16       SO IF YOU LOOK AT CLAIMS 2 AND 3, AND I DON'T KNOW IF IT'S

17   WORTH PUTTING UP ON THE ELMO OR IF YOU HAVE IT IN FRONT OF

18   YOU --

19       THE COURT:  LET ME JUST -- I HAVE TO FIND IT, BUT I

20   DO HAVE IT HERE.  YEAH, I HAVE IT IN COLUMN 20.

21       MR. TONKOVICH:  SO THIS SAYS "WHEREIN SAID SPATIAL

22   SEPARATING MEANS INCLUDES A POLARIZATION MANIPULATION ELEMENT

23   SEPARATING A FIRST AND SECOND," AND IT GOES ON TO GIVE A

24   FUNCTION.  THIS IS ESSENTIALLY ANOTHER MEANS-PLUS-FUNCTION

25   CLAIM THAT'S PERFORMING A DIFFERENT FUNCTION THAN WHAT WE ARE

1    TALKING ABOUT WITH SPATIAL SEPARATING MEANS.

2         THE COURT:  SO YOU'RE SAYING THIS IS A DIFFERENT --

3    THIS IS JUST DIFFERENT THAN 1 AND IT'S NOT --

4         MR. TONKOVICH:  IT'S DIFFERENT THAN 1.  SO IF WE LOOK

5    AT THE FUNCTION HERE, IT SAYS "SEPARATING A FIRST AND SECOND

6    SERIES OF PREDETERMINED POLARIZATIONS FROM PREDETERMINED ONES

7    OF SAID PORTS."  THAT DOES NOT APPEAR IN THE FUNCTION IN

8    CLAIM 1.

9         THE COURT:  WELL, BUT IT IS A SYSTEM AS CLAIMED.

10   ISN'T THIS A DEPENDENT CLAIM?

11        MR. TONKOVICH:  IT'S A DEPENDENT CLAIM.  IT'S ADDING

12   AN ADDITIONAL LIMITATION PERFORMING A DIFFERENT FUNCTION.

13        THE COURT:  OKAY.

14        MR. TONKOVICH:  AND THAT'S, YOU KNOW, OFTEN HOW

15   DEPENDENT CLAIMS ARE ADDED.  THEY ADD ADDITIONAL LIMITATIONS OR

16   ADDITIONAL FUNCTIONS.

17        AND SIMILARLY WITH 3, THERE'S DIFFERENT FUNCTIONAL

18   LANGUAGE.  IT TALKS ABOUT OPTICAL POWER ELEMENTS OFFSET FROM

19   SAID PORTS, SEPARATING AT LEAST A FIRST AND SECOND SERIES OF

20   PREDETERMINED OPTICAL SIGNALS FROM PREDETERMINED ONES OF SAID

21   PORTS.

22        THE COURT:  SO YOU'RE SAYING THIS IS IRRELEVANT?

23        MR. TONKOVICH:  I'M SAYING THAT -- THERE'S CLAIM 1

24   AND THEY'RE ADDING AN ADDITIONAL MEANS-PLUS-FUNCTION LIMITATION

25   TO DO A DIFFERENT FUNCTION ONTO IT, SO, YES.  THIS IS AN

```
 1        ADDITIONAL STRUCTURE PERFORMING AN ADDITIONAL FUNCTION TO
 2        CLAIM 1.
 3               THE COURT:  OKAY.
 4               MR. TONKOVICH:  AND THIS IS A SLIDE THAT I THINK WE
 5        LOOKED AT EARLIER.  OUR UNDERSTANDING OF THE BRIEFING, JUST TO
 6        SHOW IT VISUALLY, THEY'RE CLAIMING EACH ONE OF THESE
 7        INDIVIDUALLY AND BY ITSELF IS A CORRESPONDING STRUCTURE.
 8               THE COURT:  YOU CIRCLED IN RED 140 AND 160 IN THE
 9        CORRESPONDING, AND MR. RADULESCU SPECIFICALLY SAID 160 AND 260
10        WOULD NOT BE INCLUDED.
11           I DON'T RECALL WHAT HE SAID ABOUT 140 AND 240, WHETHER
12        THEY WERE EXCLUDED.  I DON'T KNOW IF HE -- I DON'T RECALL THAT.
13               MR. TONKOVICH:  ALL RIGHT.  WELL, IT WOULD BE GREAT
14        TO GET CLARIFICATION ON WHAT'S INCLUDED AND WHAT'S NOT.
15               THE COURT:  OKAY.
16               MR. TONKOVICH:  SO IN SUMMARY ON THE SPATIAL
17        SEPARATING MEANS, YOU KNOW, I THINK WE TALKED ABOUT WE THINK
18        THE CBRW IS KIND OF THE KEY ESSENTIAL STRUCTURE.
19               THE COURT:  UM-HUM.
20               MR. TONKOVICH:  ANY CORRESPONDING STRUCTURE SHOULD
21        INCLUDE THE CBRW IN IT.
22               THE COURT:  I DON'T DISAGREE WITH THAT.
23               MR. TONKOVICH:  AND WE HAVE SOME ISSUES WITH THE
24        UNWORKABILITY OF FINISAR'S CONSTRUCTION AS WRITTEN AND, YOU
25        KNOW, WE THINK A CONSTRUCTION SHOULD SET FORTH PARTICULARLY
```

1    WHAT PARTICULAR STRUCTURES OR COMBINATIONS QUALIFY AS A

2    CORRESPONDING STRUCTURE.

3         AS MENTIONED, WE DON'T -- WE THINK POLARIZATION

4    MANIPULATION AND OPTICAL POWER ELEMENTS ARE TOO BROAD, VAGUE

5    TERMS AND DON'T GIVE ANY DEFINITE, PHYSICAL STRUCTURE AS

6    REQUIRED UNDER 112(6).

7              THE COURT:  WELL, IT WOULD -- YES, OKAY.  OKAY.

8    THAT'S HELPFUL.

9              MR. RADULESCU:  CAN YOU FLIP THE SWITCH?

10        LET'S GO TO SLIDE 84.

11             THE COURT:  MR. RADULESCU, LET'S TALK ABOUT

12   WHETHER -- WHAT YOU THINK THE FUNCTION IS HERE THAT IS NOT IN

13   DISPUTE.

14             MR. RADULESCU:  YES.  SO THE -- WE'LL JUST GO TO THE

15   CLAIM ITSELF, AND THE CLAIM IS PRETTY CLEAR THAT IT'S A

16   MEANS -- I'M AT SLIDE 78 -- IT'S A MEANS FOR, AND THEN IT

17   RECITES THE FUNCTION.  AND BOTH PARTIES HAVE RECITED IT

18   CORRECTLY.

19             THE COURT:  UM-HUM.

20             MR. RADULESCU:  AND THEY HAVE NOT ADDED ANY MORE

21   SPECIFICITY.  THEY HAVE NOT CHANGED OR REFOCUSSED THE FUNCTION.

22        THEY HAVE DONE CLAIM INTERPRETATION USING WHAT YOU'RE

23   SUPPOSED TO START WITH IS THE CLAIM, AND THIS PARTICULAR

24   FUNCTION, "SIMULTANEOUSLY SPATIALLY SEPARATING," AND IT GOES ON

25   TO SAY TWO GROUPS OF LIGHT.

1          NOTICE THAT IT DOESN'T SAY BASED ON WHAT.  POLARIZATION?

2     OR BASED ON SOME OTHER TYPE OF SEPARATION?

3          AND THAT'S IMPORTANT AND I WANT TO GO TO THE SUMMARY OF

4     THE INVENTION TO SHOW THE DIFFERENCE BETWEEN THE OPTICAL POWER

5     ELEMENTS AND THE POLARIZATION DIVERSITY ELEMENTS, AND THEN IT

6     ACTUALLY TIES BACK TO EMBODIMENTS 3 AND 6 WHICH ARE TWO

7     DIFFERENT EMBODIMENTS.

8          THE COURT:  UM-HUM.

9          MR. RADULESCU:  AND THE POINT IS THAT THERE'S NO

10     SPECIFICITY IN THIS CLAIM LIMITING IT TO ONLY ONE PARTICULAR

11     TYPE OF SEPARATION MEANS.

12          AND I THINK THE SPECIFICATION IS PRETTY CLEAR THAT THE --

13     YOU KNOW, STARTING WITH THE SUMMARY OF THE INVENTION AT

14     SLIDE 84, THAT WE'RE TALKING ABOUT A NEW DEVICE AND WE'RE

15     TALKING ABOUT WHAT IT MAY INCLUDE, WHAT IT CAN INCLUDE, WHAT IT

16     DOES INCLUDE, AND HE'S DESCRIBING IT.  THEY'RE DESCRIBING IT

17     HERE IN THE SUMMARY.

18          AND IT STARTS WITH "THE SPATIAL SEPARATING MEANS

19     PREFERABLY CAN INCLUDE," PREFERABLY CAN INCLUDE, "A

20     POLARIZATION MANIPULATION ELEMENT."

21          IT DOESN'T SAY IT HAS TO.  IT SAYS "PREFERABLY CAN."  HE'S

22     DESCRIBING HIS INVENTION USING THIS, THIS LANGUAGE THAT SAYS IT

23     PREFERABLY CAN INCLUDE THIS POLARIZATION MANIPULATION ELEMENT,

24     AND IT GOES ON.

25          THE NEXT SENTENCE THEN MOVES ON TO THE OPTICAL POWER

1    ELEMENT SENTENCE, AND THERE IT SAYS "THE SPATIAL SEPARATING

2    MEANS PREFERABLY CAN ALSO INCLUDE," SO IT CAN ALSO INCLUDE, AND

3    IT SAYS HERE "A SERIES OF OPTICAL POWER ELEMENTS."

4        THAT'S WHY YOU SEE "SERIES" IN FINISAR'S PROPOSED

5    CONSTRUCTION, BECAUSE IT JUST TRACKS WHAT THE SPECIFICATION

6    DESCRIBES AS THIS SPATIAL SEPARATING MEANS.  OKAY?

7        NOW, FROM HERE WE GO TO THE EXAMPLES, AND THIS IS WHERE,

8    YOU KNOW, PARTIALLY THE AND/OR COMES INTO PLAY, AND ALSO THE

9    DISCUSSION THAT WE HAD WITH NISTICA ON -- YOU KNOW, THEIR

10   REQUIREMENT WAS, DURING THE MEET AND CONFERS, THAT YOU HAD TO

11   HAVE THE CBRW, YOU HAD TO HAVE IT, WE WENT THROUGH ALL THOSE

12   OTHER ELEMENTS, AND THEY WERE ADAMANT ABOUT THAT'S WHAT IT IS.

13           THE COURT:  YOU DON'T EXCLUDE THAT, DO YOU?

14           MR. RADULESCU:  WE DON'T EXCLUDE IT.

15           THE COURT:  I DIDN'T THINK SO.

16           MR. RADULESCU:  AND ACTUALLY THIS LANGUAGE AT

17   COLUMN 8, LINES 24 TO 27, ALSO HAS AN AND/OR, WHICH IS VERY

18   IMPORTANT.  THESE ARE EXAMPLES OF POLARIZATION MANIPULATION

19   ELEMENTS, COLUMN 8, LINE 24 TO 27.

20       AND WHAT'S IMPORTANT IS THE FACT THAT IT IDENTIFIES THE

21   WALK-OFF CRYSTAL, IT IDENTIFIES THE BIREFRINGENT WEDGE, AND

22   THEN IT SAYS AND/OR FARADAY ROTATORS.

23       THESE ARE EXAMPLES AND, AS A RESULT, FINISAR'S PROPOSED

24   CONSTRUCTION TRACKS THE TEACHING IN THIS SPECIFICATION THAT

25   THESE ARE SOME WAYS OF ACHIEVING POLARIZATION -- HAVING

1    POLARIZATION DIVERSITY ELEMENTS.

2         NOW, I STILL WANT TO STEP BACK AND TALK ABOUT FIGURES 3

3    AND 6 AGAIN BECAUSE THERE'S A DIFFERENCE BETWEEN THEM AND THIS

4    ISSUE OF THE CBRW I THINK BECOMES PRETTY CLEAR AT THAT POINT,

5    TOO.

6         YEAH.  AND I GUESS -- THERE'S A COMMENT THAT I MAY HAVE

7    MISSPOKE -- I DON'T THINK I DID -- BUT IT'S NOT NECESSARY THAT

8    YOU HAVE A CBRW.  IT'S ONLY ONE EXAMPLE, AND THAT'S ACTUALLY --

9              THE COURT:  OKAY.

10             MR. RADULESCU:  THAT PLAYS OUT --

11             THE COURT:  OKAY.  BUT "NOT NECESSARY" IS DIFFERENT

12   THAN EXCLUDING IT.  YOU DON'T EXCLUDE IT.

13             MR. RADULESCU:  IT CAN HAVE.  IT'S ONE EXAMPLE,

14   ABSOLUTELY.

15             THE COURT:  OKAY.  SO YOU'RE SAYING THAT ABOUT

16   EVERYTHING, THAT IT CAN BE THIS.  YOU'RE NOT SAYING ANY ONE

17   THING IS ESSENTIAL, ARE YOU?

18             MR. RADULESCU:  YES, THAT'S CORRECT.

19             THE COURT:  ALL RIGHT.

20             MR. RADULESCU:  OKAY.  THERE'S -- IT HAS TO HAVE A

21   SPATIAL SEPARATING MEANS.  WE KNOW THAT.

22        THERE ARE TWO SPECIFIC UMBRELLA TERMS THAT ARE JUST

23   EXPLICITLY DESCRIBED IN THE SPEC, THE POLARIZATION MANIPULATION

24   ELEMENT, AND THEN IT ALSO DESCRIBES THE SERIES OF OPTICAL POWER

25   ELEMENTS.  WE USE AN "AND/OR" BECAUSE THAT'S WHAT THE SUMMARY

1        OF THE INVENTION DESCRIBES.

2              BUT IT ALSO CARRIES OVER INTO FIGURES 3 AND 6.

3              THE COURT:  SO LET ME ASK YOU A QUESTION.  YOU'RE

4        SAYING THAT THIS COULD WORK BY ALLOWING THE LENSES TO SPATIALLY

5        SEPARATE AND NOT HAVING THE POLARIZATION MANIPULATION ELEMENT?

6              MR. RADULESCU:  THAT IS CORRECT, AND LET ME EXPLAIN

7        HOW THAT IS BORNE OUT IN THE FIGURES.

8              WITH RESPECT TO FIGURE 3 --

9              THE COURT:  OKAY.  I HAVE 6.  LET ME GET THAT.

10             MR. RADULESCU:  WE'VE ALREADY LOOKED AT THE SUMMARY

11       OF THE INVENTION SAYING THAT IT MAY INCLUDE FOR BOTH OF THESE,

12       RIGHT?

13             THE COURT:  YES.

14             MR. RADULESCU:  IT DOESN'T SAY ONE HAS TO BE INCLUDED

15       AND THE OTHER IS OPTIONAL.

16             WE GO TO FIGURE 3, AND I THINK I HAVE IT AT SLIDE --

17             THE COURT:  I HAVE IT FROM THE PATENT.

18             MR. RADULESCU:  THIS IS AN EMBODIMENT WHERE THERE'S A

19       SINGLE FIBER COMING IN AND IT'S SPLITTING IT UP BY

20       POLARIZATIONS.

21             THE COURT:  UM-HUM, YES.

22             MR. RADULESCU:  OKAY.  IT'S TAKING ONE POLARIZATION

23       AND IT'S SENDING IT TO THE UPPER AND TAKING THE OTHER

24       POLARIZATION AND SENDING IT TO THE LOWER.  IT'S A SPATIAL

25       SEPARATING MEANS BASED ON POLARIZATION.

1          THE COURT:  THIS IS ONE EMBODIMENT.

2          MR. RADULESCU:  YES, ONE EXAMPLE.

3      OKAY.  IF WE GO TO FIGURE 6 -- AND WE'RE GOING TO HAVE TO

4  GO INTO FIGURE 7 SHORTLY AND I KNOW YOU COMMENTED EARLIER THAT

5  YOU LOOKED AT IT -- WITH RESPECT TO FIGURE 6, IT TURNS OUT THAT

6  THERE -- YOU CAN LOOK AT THE EIGHT INPUT FIBERS.  WHAT THIS

7  EMBODIMENT DOES IS TAKES THE FIRST, THIRD, FIFTH, AND SEVENTH,

8  SENDS IT TO ONE PART --

9          THE COURT:  YEAH.

10          MR. RADULESCU:  -- AND TAKES THE OTHERS AND SENDS IT

11  TO THE BOTTOM.

12          THE COURT:  RIGHT.

13          MR. RADULESCU:  AND, THEREFORE, NOTICE IT'S NOT SPLIT

14  UP BASED ON THE POLARIZATION.  IT'S NOT SEPARATING BASED ON THE

15  POLARIZATION OF THESE SIGNALS.  IT'S ACTUALLY SEPARATING BASED

16  ON THE FACT THAT THEY'RE DIFFERENT INPUT PORTS.

17          THE COURT:  RIGHT.

18          MR. RADULESCU:  IT'S USING SOME -- IT'S USING THE

19  WEDGE AND IT'S USING THE WALK-OFF CRYSTAL IN ORDER TO SWAP THE

20  POLARIZATIONS SO THAT THE SLM CAN HANDLE IT.

21      BUT THE TEACHING BEHIND THE PATENT IS TO TAKE DIFFERENT

22  PORTS, ALTERNATING PORTS, AND SEND HALF TO THE UPPER, HALF TO

23  THE LOWER.

24      AND WHAT'S SIGNIFICANT IS THERE'S ONE SET OF OPTICS.  IT'S

25  ONE SET OF OPTICS THAT ALLOWS ME TO SEPARATELY MANIPULATE TWO

1      DIFFERENT TYPES OF SIGNALS.  IT'S NOT BASED ON POLARIZATION.

2      IT'S BASED ON THE PHYSICAL LOCATION OF WHERE THOSE FIBERS ARE

3      COMING IN.

4           AND YOU KNOW WHAT'S ACTUALLY BEING USED TO DIRECT THE

5      LIGHT IS LENSES.  LENSES ARE A BIG PART OF THIS.

6           THE OTHER EXAMPLE THAT I WANTED TO --

7             THE COURT:  THIS IS NOT ABOUT DIRECTION OF LIGHT.

8      IT'S ABOUT SEPARATION.

9             MR. RADULESCU:  IT'S ABOUT SEPARATION OF LIGHT.

10          AND SO IN THIS EMBODIMENT, IT'S -- AND THE SPEC DESCRIBES

11     THIS TYPE OF SPATIAL, SPATIAL SEPARATING MEANS AS A SERIES OF

12     OPTICAL -- A SERIES OF OPTICAL LENSES AS ONE EXAMPLE, THAT IT

13     MAY INCLUDE A SERIES OF OPTICAL LENSES.

14          AND IF WE NEED TO GO TO FIGURE 7, WE CAN DO THAT.  WE'LL

15     DO IT SHORTLY.

16          BUT WHAT YOU SEE IS IN FIGURE 7, YOU SEE FIBERS 201, 203,

17     AND 205, THE ODD NUMBERED ONES WHERE THE LIGHT IS GOING UP AT

18     AN ANGLE WHERE -- AS THE EVEN NUMBERED FIBERS ARE GOING

19     STRAIGHT.  SO IT'S SPLITTING THEM UP BASED ON PHYSICAL LOCATION

20     OF THE FIBER AND IT'S USING THE SPATIAL SEPARATING MEANS TO DO

21     IT.

22          THE IDEA THAT THE LENSES CONTRIBUTE TO SPATIAL SEPARATION,

23     I WANTED TO GIVE ONE MORE EXAMPLE --

24             THE COURT:  SO THE LENS HERE IS 215 YOU SAID?

25             MR. RADULESCU:  THERE'S A MICROLENS 210.

```
1              THE COURT:  SO 210 IS THE LENS.

2              MR. RADULESCU:  AND THEN 215 IS THE --

3              THE COURT:  THAT'S THE WALK-OFF --

4              MR. RADULESCU:  THAT'S THE WALK-OFF CRYSTAL.

5              THE COURT:  NO, THAT'S -- YES.

6              MR. RADULESCU:  AND THEN WE HAVE THE WAVEPLATE.

7         BUT MY -- THE COMMENT THAT I WANTED TO MAKE ABOUT THE

8    LENSES PERFORMING SPATIAL SEPARATION --

9              THE COURT:  I DON'T ACTUALLY SEE THAT HERE.  IT'S NOT

10   DRAWN THAT WAY, THAT IT'S PERFORMING.  I DON'T KNOW WHAT IT'S

11   DOING.  I'D HAVE TO GO BACK INTO THE SPECIFICATION TO SEE HOW

12   IT'S DESCRIBED.  IT'S NOT VISUAL HERE.

13             MR. RADULESCU:  YEAH.  215 AND 220 ARE ACTUALLY

14   DEALING WITH THE FACT THAT THERE'S TWO POLARIZATIONS IN A GIVEN

15   FIBER, AND FOR EACH OF THEM WE NEED TO GET THEM --

16             THE COURT:  WELL, I RECOGNIZE THAT IT'S THERE, BUT

17   THE SEPARATION HASN'T -- DOES THE LENS AT 210 BEGIN THE

18   SEPARATION PROCESS?  THAT WASN'T MY READING.

19             MR. RADULESCU:  IT'S FOCUSSING -- IT'S FOCUSSING THE

20   OUTPUT OF THE FIBER INTO THE --

21             THE COURT:  IT'S PART OF THE PROCESS OF SEPARATING.

22             MR. RADULESCU:  -- INTO THIS SYSTEM.  BUT IT'S A

23   SERIES OF, A SERIES OF COMPONENTS.

24             THE COURT:  SO ONE OF THE ARGUMENTS WAS THAT YOUR --

25   THIS IS SO BROAD AS TO MEAN THAT ANY ONE OF THESE, OR ANY OF
```

1      THE MANY COMBINATIONS WOULD BE PART OF THE PATENT.

2          IS THAT WHAT YOU'RE SAYING?

3              MR. RADULESCU:  SO THE PATENT HAS A LONG CLAIM.  THIS

4      CLAIM HAS MULTIPLE ELEMENTS AND IT REQUIRES, OF COURSE, A

5      SPATIAL SEPARATING MEANS.

6          BUT IT ALSO REQUIRES A WAVELENGTH DISPERSIVE ELEMENT AND

7      IT ALSO -- WHICH WE HAVEN'T SPOKEN ABOUT, THAT'S ANOTHER

8      COMPONENT -- AND A WAVELENGTH PROCESSING MEANS.

9          SO YOU NEED TO HAVE ALL THREE OF THOSE TOGETHER.  THAT'S

10     WHAT MAKES IT UNIQUE.

11         THE FACT THAT THE FIRST ELEMENT, A SPATIAL SEPARATING

12     MEANS, IS LISTED FIRST, PRIMARILY BECAUSE THE CONCEPT OF

13     SPLITTING UP OR SPATIALLY SEPARATING THESE TWO GROUPS OF LIGHT,

14     FIRST SEPARATING THESE TWO GROUPS OF LIGHT, IT GOES ON TO SAY

15     THAT THOSE GROUPS OF LIGHT INCLUDE A MULTIPLICITY OF

16     INDEPENDENT WAVELENGTH CHANNELS, AND THEN IT GOES ON AND THEN

17     THE CLAIM CONTINUES TO SAY WHAT WE'RE GOING TO DO WITH THOSE.

18         BUT THE KEY FEATURE IS THE FACT THAT YOU'RE SPATIALLY

19     SEPARATING, AND THE TEACHING IN THE SPECIFICATION, STARTING

20     WITH THE SUMMARY OF THE INVENTION, SAYS THAT THERE'S -- THERE'S

21     COMPONENTS THAT CAN BE USED, LIKE POLARIZATION DIVERSITY

22     ELEMENTS, OR THE OPTICAL POWER ELEMENTS, BUT DOESN'T SAY

23     THEY'RE REQUIRED.

24         AND SO THE TEACHING OF THE SPEC IS SEPARATE THE SIGNALS;

25     AFTER YOU SEPARATE THEM, SEND THEM THROUGH THIS WAVELENGTH

1    DISPERSIVE ELEMENT TO FORM THE RAINBOW; AND THEN FROM THE

2    RAINBOW, HAVE IT IMPINGE ON THE WAVELENGTH PROCESSING MEANS AND

3    NOW I'VE GOT A WAVELENGTH PROCESSOR THAT SEPARATELY PROCESSES

4    THESE TWO SIGNALS, WHETHER THEY WERE SPLIT UP BASED ON

5    POLARIZATION OR WHETHER THEY WERE SPLIT UP BASED ON THE OPTICAL

6    POWER ELEMENTS.

7         SO THAT'S -- THAT IS THE ARGUMENT.  THE CONSTRUCTION

8    ITSELF IN THE JCCS HAS THE TERM "AND/OR" SEPARATING THE TWO

9    UMBRELLA TERMS BECAUSE THAT'S HOW THE SPECIFICATION TEACHES

10   THIS CONCEPT.

11        THE ISSUE OF HOW MUCH FURTHER DETAIL AND WHAT WE'RE GOING

12   TO DO ABOUT SPECIFYING THE DETAIL, IT MAY BE AS SIMPLE AS

13   TAKING THOSE TWO UMBRELLA TERMS AND ADDING EXAMPLES THAT, THAT

14   WOULD THEN JUST SIMPLY TRACK THE EXAMPLES THAT ARE SET FORTH IN

15   THE SPECIFICATION.

16        THE COURT:  WELL, I THINK -- WELL, FIRST OF ALL,

17   REGARDLESS, I THINK THAT IS AN IMPORTANT THING FOR YOU TO DO

18   RATHER THAN THE ABBREVIATION.

19        MR. RADULESCU:  YES.

20        THE COURT:  I THINK THAT THAT -- YOU KNOW, AND THAT'S

21   SOMETHING YOU CAN CERTAINLY GET TO ME NEXT WEEK SO THAT WE CAN

22   ACTUALLY SUBMIT IT THAT WAY IF I AGREE WITH YOU.  I MAY NOT

23   AGREE WITH YOU.

24        BUT I THINK THAT MAY CERTAINLY GIVE MR. TONKOVICH AN

25   OPPORTUNITY TO REALLY SEE IT THE WAY YOU ARE ARTICULATING IT

1    RATHER THAN GUESSING ON WHAT HE IS HAVING TROUBLE WITH.

2         MR. RADULESCU:  WELL, THAT'S THE PURPOSE OF A MEET

3    AND CONFER AND, IN FACT, THIS WAS EXPLICITLY DISCUSSED.  I'M

4    NOT SURE IF HE WAS ON IT.

5         BUT OUR POSITIONS ON THIS HAVE BEEN CLEAR FROM THE

6    BEGINNING, AND THE PROPOSAL SAYS "AND/OR," AND SO THAT'S --

7         THE COURT:  OH, THE PROPOSAL SAYS "AND/OR," BUT YOU

8    THEN HAVE ALL THESE REFERENCES IN ABBREVIATED FORM RATHER THAN

9    IDENTIFYING THEM.

10        MR. RADULESCU:  YES.

11        THE COURT:  THAT'S ALL I'M TALKING ABOUT.

12        MR. RADULESCU:  RIGHT, OKAY.

13        THE COURT:  I MEAN, FRANKLY, I'D LIKE YOU TO SEND ME

14   SOMETHING THAT DOESN'T JUST REFER TO LOCATIONS IN THE PATENT.

15   I NEED TO LOOK AT THOSE.  BUT I'D LIKE TO SEE YOUR CONSTRUCTION

16   THAT HAS WORDS, NOT REFERENCES.

17        MR. RADULESCU:  YES.

18        THE COURT:  AND I'M SURE YOU COULD DO THAT FOR ME

19   EASILY.

20        MR. RADULESCU:  YES, WE CAN.

21        THE COURT:  OKAY.

22        MR. RADULESCU:  SO THAT'S ALL I HAD.

23      ANYTHING ELSE?  NO.

24        THE COURT:  ALL RIGHT.  THANK YOU.

25        MR. RADULESCU:  IS THERE ANY REBUTTAL?

1          MR. KRAMER:  YES, YOUR HONOR.  IF I MAY INDULGE YOU,

2     MAY I HAVE JUST A FEW MOMENTS OF YOUR TIME ON REBUTTAL?

3          THE COURT:  YEAH.

4          MR. KRAMER:  CAN WE SWITCH OVER TO NISTICA'S?  THANK

5     YOU.

6          YOUR HONOR, YOU DID HIT ON AN IMPORTANT POINT THAT I THINK

7     NEITHER OF THE PARTIES REALIZED UNTIL THIS HEARING, WHICH IS

8     THE ISSUE ABOUT DO WE AGREE ON THE FUNCTION?

9          THE FUNCTION, IN MEANS-PLUS-FUNCTION CLAIMING, IS

10    SPECIFIC.  THE FUNCTION CALLED OUT IN THIS PATENT IS CLEAR.

11         THE POINT YOU RAISED WAS, IS THIS ABOUT CREATING SPATIAL

12    SEPARATION OF THE BEAM?  OR IS IT ALSO ABOUT A FUNCTION OF

13    MAINTAINING SPATIAL SEPARATION?

14         THE PATENT CLAIMS THAT WE'RE LOOKING AT DO NOT SAY

15    "MAINTAINING SPATIAL SEPARATION."  THEY SAY "CREATING SPATIAL

16    SEPARATION."  THAT WOULD BE A DIFFERENT FUNCTION, MAINTAINING

17    SPATIAL SEPARATION, WHICH THEY COULD, IF THEY WANTED TO, CALL

18    OUT, CLAIM, AND SO FORTH.

19         NOW, THEY ARE ASKING THAT YOU READ INTO THE CLEAR CLAIM

20    LANGUAGE WHICH SAYS MAINTAINING -- CREATING SPATIAL SEPARATION,

21    THAT THERE ALSO BE ANOTHER FUNCTION OF MAINTAINING IT.

22         FINISAR ARGUED, FOR EXAMPLE, THAT IN FIGURE 3, THE

23    CYLINDRICAL LENS 160, THAT THIS SHOULD BE INCLUDED AS PART OF

24    THE CORRESPONDING STRUCTURE BECAUSE THE LENS -- AND AS WE CAN

25    SEE VERY CLEARLY IN FIGURE 3 OF THE '980 PATENT, IN FIGURE 3,

1    THE SPATIAL SEPARATION, WHICH IS THE CLAIMED FUNCTION, OCCURS

2    WELL BEFORE THE LIGHT BEAMS EVEN APPROACH THE CYLINDRICAL LENS

3    160.

4         160, AT BEST, MAY PERFORM THE FUNCTION OF MAINTAINING

5    INSOFAR AS THE BEAMS DON'T THEN START GOING OFF IN DIFFERENT

6    ANGLES.

7         BUT THERE'S NO WAY THAT'S PART OF THE CREATING SPATIAL

8    SEPARATION, AND THAT'S WHAT THE LANGUAGE OF THE PATENT ACTUALLY

9    CALLS OUT, NOT MAINTAINING IT.

10        THE COURT:  SO THIS IS WHERE I'M VERY FRUSTRATED

11   BECAUSE THIS HEARING IS NOT ABOUT CONSTRUING THE FUNCTION AND

12   NOW -- BUT IT SEEMED IMPOSSIBLE FOR ME TO UNDERSTAND THIS, AND

13   THAT'S WHY I RAISED THE ISSUE.  SO WHAT DO I DO NOW?

14        MR. KRAMER:  FINISAR NEVER RAISED THIS.

15        THE COURT:  I MEAN, YOU'RE NOT -- NO ONE IS ASKING ME

16   TO CONSTRUE THE FUNCTION.  AND, YET, YOU'RE CLEARLY -- YOU EACH

17   THINK YOU KNOW WHAT IT MEANS AND I GUESS YOU EACH THOUGHT THE

18   OTHER ONE AGREED WITH THAT, BUT YOU DON'T AGREE.

19        MR. KRAMER:  THERE HAS NEVER BEEN MENTION THAT

20   MAINTAINING IS PART OF THIS.  IT -- THE LANGUAGE ACTUALLY SAYS

21   SPATIALLY SEPARATING, AND WE LOOKED AT THAT --

22        THE COURT:  AS IN THE ACT OF SEPARATING, THE

23   INITIATION OF SEPARATION?

24        MR. KRAMER:  YES.  IF WE LOOK AT -- FOR EXAMPLE, IF

25   WE STAY WITH FIGURE 3 FOR A MOMENT AND WE SEE WHAT HAPPENS IN

1    THE COMPENSATING BI -- THE CBRW, RIGHT, WHAT'S HAPPENING COMING

2    INTO THAT IS THAT THE BEAMS ARE PARALLEL, RIGHT?  ALL THAT'S

3    HAPPENED BEFORE THAT IS A LENS WAS USED TO FOCUS THE BEAM

4    TOWARDS THE WALK-OFF CRYSTAL, THE MICROLENS ARRAY IS 110, IT

5    HAS BEEN USED TO FOCUS THE LIGHT TOWARDS THE WALK-OFF CRYSTAL

6    115.

7              THE COURT:  UM-HUM.

8              MR. KRAMER:  WHEN THE LIGHT COMES OUT OF 130, THE

9    CBRW, IT IS NOW SPATIALLY SEPARATED.  WHAT HAS HAPPENED IN 130

10   IS THAT AN ANGULAR SEPARATION HAS OCCURRED BECAUSE WHAT IS THE

11   PURPOSE OF THIS INVENTION?  IT'S TO END UP HAVING THE LIGHT HIT

12   180, RIGHT, TO HAVE IT HIT IN TWO DIFFERENT AREAS THERE SO THAT

13   ONE CAN PROCESS EACH OF THOSE SIGNALS SEPARATELY.

14        SO THIS CLAIM IS ABOUT, AND WHAT'S CLAIMED HERE IN THIS

15   MEANS-PLUS-FUNCTION CLAIM IS SIMULTANEOUSLY SPATIALLY

16   SEPARATING AT LEAST A FIRST AND SECOND GROUP OF LIGHT,

17   SEPARATING A FIRST AND SECOND GROUP OF LIGHT.

18        IT'S NOT ABOUT OTHER FUNCTIONS DOWNSTREAM, SUCH AS

19   MAINTAINING THEM OR TWISTING THEM OR DOING ANYTHING ELSE TO

20   THEM.  IN MEANS-PLUS-FUNCTION CLAIM LANGUAGE, THOSE ARE THE

21   OTHER FUNCTIONS THAT COULD OR COULD NOT HAVE BEEN CLAIMED.

22   THEY WEREN'T CLAIMED HERE.

23        WE WERE AS SURPRISED AS YOU WERE, YOUR HONOR, TO NOW HEAR

24   THAT FINISAR IS ARGUING THAT THIS CLAIM, WHICH CALLS OUT THE

25   FUNCTION BEING --

1    THEY AGREED WITH US.  THE FUNCTION IS -- WE ALL AGREED.

2  WE WROTE IT INTO THE STATEMENT, THE JOINT STATEMENT.  WE ALL

3  PUT IT INTO OUR BRIEFS.  IT'S IN ALL OF OUR SLIDES TODAY ON

4  BOTH SIDES THAT THE FUNCTION IS SIMULTANEOUSLY SPATIALLY

5  SEPARATING.

6    I HAVE NEVER HEARD ANYONE IN THIS CASE ARGUE THAT IT ALSO

7  WOULD INCLUDE A FUNCTION OF MAINTAINING.

8    IF WE LOOK AT ANY OF THESE OTHER -- IN NONE OF THESE

9  OTHER -- THE LENSES AND SO FORTH -- I MEAN, I JUST HEARD

10  FINISAR MAKE AN ARGUMENT WITH RESPECT TO FIGURE 7 THAT THE LENS

11  ITSELF, 210, THE MICROLENS, THAT THAT IN SOME WAY CONTRIBUTES

12  TO SIMULTANEOUSLY SPATIALLY SEPARATING.

13    IT DOESN'T.  THE LENS FOCUSES THE BEAM OF LIGHT.  WE SEE

14  IT LEAVES THE MICRO ARRAY 210 IN FIGURE 7.  ONE BEAM CONTINUES

15  ON TO 215.

16    THE COURT:  WELL, YOU KNOW, YOU HEARD MY DISCUSSION

17  WITH MR. RADULESCU.  I HADN'T READ IT THAT WAY, EITHER.  I'M

18  ALWAYS READY TO BE EDUCATED, BUT --

19    MR. KRAMER:  THERE'S NOTHING IN THE PATENT TO SUGGEST

20  THE LENS IN ANY WAY PERFORMS THE FUNCTION OF SIMULTANEOUSLY

21  SPATIALLY SEPARATING THE BEAM OF LIGHT.

22    THE LENS -- IT JUST FOCUSES THE LIGHT IN THE DIRECTION.

23  SO THIS GETS A LITTLE BIT METAPHYSICAL BECAUSE WE COULD SAY,

24  WELL, EVERYTHING IN THE DEVICE HERE CONTRIBUTES IN SOME WAY.

25  IT PERFORMS SOME FUNCTION.

1          BUT IT'S NOT THAT COMPLICATED.  IT'S ACTUALLY MUCH

2     SIMPLER.  FOR 112(6), FOR MEANS-PLUS-FUNCTION CLAIMING, IF ONE

3     CHOOSES TO CLAIM FUNCTIONALLY, THEN THEY HAVE TO LIVE WITH THAT

4     FUNCTION.  THE FUNCTION SAYS SIMULTANEOUSLY SPATIALLY

5     SEPARATING.

6          THE WEDGE, THE CBRW, THAT'S WHAT DOES THE ANGULAR

7     SEPARATION, WHICH WE SEE IN FIGURE 3 OR FIGURE 6, AND PERMITS

8     US TO PROCESS THE SIGNALS IN TWO DIFFERENT TARGETS, TWO

9     DIFFERENT PLACES AT THE END OF THE LINE HERE IN 280, 180.

10          THE COURT:  BUT THE WEDGE DOESN'T ACTUALLY PERFORM

11     THE SEPARATION.  IT ENHANCES THE SEPARATION TO MAKE IT USABLE,

12     RIGHT?

13          MR. KRAMER:  I THINK -- YOUR HONOR, I DON'T WANT

14     TO --

15          THE COURT:  I GUESS WHAT I'M SAYING IS IF YOU

16     REMOVED -- IF YOU REMOVED THE WALK-OFF CRYSTAL AND IT COMES

17     THROUGH 110, FOCUSSING THE BEAM, IS THE -- IS THE WEDGE GOING

18     TO SEPARATE?  I DON'T SEE ANYTHING IN THE PATENT THAT TELLS ME

19     THAT.

20          MR. KRAMER:  I THINK YOU MAKE A GOOD POINT, YOUR

21     HONOR.

22          THE COURT:  OKAY.

23          MR. KRAMER:  I THINK SAYING THE WALK-OFF CRYSTAL

24     CONTRIBUTES TO THE SPATIAL SEPARATION, AS LONG AS IT'S CLEAR

25     THAT THE CORRESPONDING STRUCTURE IN THIS PATENT IS THE CBRW AND

```
 1        SAYING THE TWO OF THEM, PERHAPS TOGETHER, NOT THE WALK-OFF

 2        CRYSTAL BY ITSELF -- LOOK AT THE -- IF WE REMOVED THE CBRW 130

 3        AND IF ALL WE HAD WAS THE WALK-OFF CRYSTAL 115 --

 4                  THE COURT:  RIGHT.

 5                  MR. KRAMER:  -- THE BEAMS ARE PARALLEL.

 6                  THE COURT:  THEY'RE TOO CLOSE.

 7                  MR. KRAMER:  RIGHT.  THEY'RE NOT GOING TO END UP IN

 8        180 --

 9                  THE COURT:  BUT IF WE REMOVE THE WALK-OFF CRYSTAL,

10        THEN THE WEDGE CAN'T DO ITS JOB.

11                  MR. KRAMER:  THAT'S TRUE.  THAT'S TRUE.

12                  THE COURT:  YEAH.

13                  MR. KRAMER:  I AGREE.  YOUR HONOR MADE A GOOD POINT

14        AND THAT'S RIGHT.  THAT IS RIGHT.

15            ONE THING THAT I THINK REALLY HAS NOT BEEN FOCUSSED ON,

16        SEPARATE ARGUMENT FROM SHOULD THEY HAVE CALLED OUT, BECAUSE IT

17        BECOMES UNWORKABLE WHAT THE STRUCTURE IS, PUTTING THAT ASIDE

18        FOR A MOMENT, THAT CAN GET CURED.

19                  THE COURT:  SURE, IT CAN GET DONE.

20                  MR. KRAMER:  THERE'S AN OVERALL AND IMPORTANT POINT

21        HERE THAT REALLY NEEDS TO BE FOCUSSED ON.  I HAVE NEVER SEEN --

22        FINISAR HAS CITED TO NO CASE LAW IN WHICH, WHEN THERE'S 112(6)

23        MEANS-PLUS-FUNCTION CLAIMING WHERE WE KNOW THE RULES OF THE

24        GAME, IF ONE CHOOSES THE CONVENIENCE OF 112(6) CLAIMING, THEY

25        MUST -- WE MUST, AS A MATTER OF CLAIM CONSTRUCTION, IDENTIFY
```

1    WHAT ARE THE CORRESPONDING STRUCTURES THAT SPECIFICALLY PERFORM

2    THE FUNCTION, I'M AWARE OF NO CASE LAW, FINISAR HAS CITED TO

3    NONE, WHERE ONE CAN CATEGORICALLY SAY THAT THE CORRESPONDING

4    STRUCTURE IS A BROAD CLASSIFICATION, A POLARIZATION

5    MANIPULATION ELEMENT AND EVERYTHING THAT FITS INTO THAT

6    CATEGORY; A POWER, OPTICAL POWER ELEMENT WHICH WOULD INCLUDE

7    ALL KINDS OF LENSES, OR ANYTHING ELSE THAT, THAT ACTS ON THE

8    LIGHT BEAM.

9        THERE'S NO SUCH -- THAT'S NOT THE WAY 112(6) WORKS.  THE

10   GOAL HERE OF 112(6) IS ONE HAS TO SAY THIS IS THE CORRESPONDING

11   STRUCTURE, AND NOT JUST CORRESPONDING STRUCTURE, NOT JUST

12   STRUCTURE ONE OF SKILL IN THE ART WOULD KNOW COULD PERFORM THE

13   FUNCTION, BUT IS CALLED OUT IN THE SPECIFICATION AS HERE'S

14   STRUCTURE, IT PERFORMS THIS FUNCTION.

15       TODAY, FOR THIS PATENT, THE FUNCTION IS SPATIALLY

16   SEPARATING, RIGHT?  SO WHERE IS IT IN EACH OF THESE, FOR EACH

17   OF THESE STRUCTURES?

18       IT'S NOT GOOD ENOUGH TO SIMPLY SAY THERE'S A STATEMENT IN

19   THE SPECIFICATION THAT SAYS "THE SPATIAL SEPARATING MEANS CAN

20   PREFERABLY INCLUDE POWER OPTICAL ELEMENTS."  THAT TAKES US

21   HALFWAY THERE.  THAT'S NOT SATISFYING 112(6).

22       WHAT WE NEED IS WHICH POWER OPTICAL ELEMENTS, WHICH ONES

23   ARE SPECIFICALLY NEEDED?

24           THE COURT:  IT MAKES ME WONDER IF WE DON'T WALK RIGHT

25    INTO THE ARMS OF INVALIDITY BY DOING THAT.

```
 1                    MR. KRAMER:  RIGHT.

 2                    THE COURT:  BUT, AGAIN, THAT'S NOT -- I DON'T GET TO

 3         DECIDE THAT.  THAT'S A JURY ISSUE.

 4                    MR. KRAMER:  MAYBE.  YOU'RE LOOKING AT SUMMARY

 5         JUDGMENT, YOUR HONOR, BECAUSE THEY'RE ASKING FOR -- THERE'S

 6         THIS CONCEPT OF HAVING ENABLED AND SO FORTH, AND IF THEY MAKE

 7         THE CLAIM THAT BROAD, YOU'LL SEE IT IN SOME OF THE CASES, WE'RE

 8         NOT SUPPOSED TO INTERPRET CLAIMS SO BROADLY THAT THEY WOULD BE,

 9         THAT THEY WOULD BE INVALID.

10                    THE COURT:  ALL RIGHT.  I THINK THAT'S MY JOB NOT TO

11         CONSTRUE IT SO BROADLY --

12                    MR. KRAMER:  RIGHT.  THANK YOU, YOUR HONOR.

13                    THE COURT:  -- BECAUSE THERE'S A PRESUMPTION OF

14         VALIDITY, OF COURSE.

15                    MR. KRAMER:  THERE IS, A REBUTTABLE PRESUMPTION, BUT

16         THERE IS.

17                YOUR HONOR, THE KEY HERE IS -- I MEAN, THIS IS GETTING

18         TO -- IT'S GOT SOMEWHAT COMPLICATED, SO JUST TO BRING IT BACK

19         TO WHERE --

20                    THE COURT:  SORT OF COMPLICATED?

21                    MR. KRAMER:  SURE.  I MEAN, THE BEGINNING AND ENDING

22         POINT HERE IS APPLICANT -- FINISAR, AGAIN, BOUGHT THIS PATENT,

23         RIGHT?  SO THE APPLICANT DECIDED TO USE THE 112(6) CLAIMING,

24         DIDN'T STATE WHAT STRUCTURE IS GOING TO BE USED TO SEPARATE THE

25         BEAMS, WHERE INSTEAD SAID "MEANS FOR SEPARATING," RIGHT?
```

1    SO WE SAY, OKAY, WE HAVE TO GO IDENTIFY WHICH STRUCTURES

2    IN THE SPECIFICATION DO THAT FUNCTION.

3    AND NOT ONLY THAT SOMEONE WOULD KNOW COULD DO THAT

4    FUNCTION, WHICH ONES ARE SAID IN THE SPECIFICATION DO THAT

5    FUNCTION, NOT OTHER FUNCTIONS OF MAINTAINING, NOT OTHER SORT OF

6    PREPARATORY FUNCTIONS, SUCH AS FOCUSSING THE BEAM SO THAT ONE

7    CAN THEN SEPARATE IT.  WHICH STRUCTURE DOES THE SEPARATING?

8    THAT'S THE KEY HERE.

9    AND I THINK IT'S RELATIVELY SIMPLE.  I THINK IT'S THE

10   WEDGE, AND AS YOUR HONOR POINTED OUT, AND I THINK CORRECTED THE

11   PARTIES, THAT IT WOULD BE THE WALK-OFF CRYSTAL AND THE WEDGE

12   TOGETHER, AND I THINK IT'S REALLY QUITE THAT SIMPLE.

13   THE COURT:  OKAY.  THANK YOU.

14   MR. RADULESCU:  I HAVE A FEW MINUTES TO RESPOND TO A

15   LOT OF THAT.  I JUST WANT TO TAKE THREE.

16   AND THEN I HAVE, I THINK, 10 OR 11 SLIDES ON THE LAST

17   TERM.

18   SO THE POINT OF THE MATTER IS, WITH RESPECT TO THE

19   FUNCTION, THE PARTIES AGREED WHAT IT WOULD BE.  WE ACTUALLY GOT

20   TOGETHER, WE PROPOSED OUR FUNCTIONS, THEY MATCHED UP.  WE BOTH

21   AGREED THIS IS THE FUNCTION THAT THE JURY SHOULD BE INSTRUCTED

22   ON.  THAT'S STEP ONE.

23   NOTICE THAT IT DOESN'T SAY "CREATING SEPARATION," AND

24   NOTICE THAT IT DOESN'T SAY "MAINTAINING SEPARATION."  WE'RE NOT

25   ARGUING THAT THERE'S SOME SPECIFICITY, THAT THERE'S -- THAT IT

```
 1        HAS TO MAINTAIN OR IT CAN MAINTAIN.

 2             IT'S A GENERAL FUNCTION.  IT'S SET FORTH IN THE CLAIM.

 3        IT'S THE WORDS OF THE CLAIM.  AND IT IS WHAT IT IS.

 4             THE FACT THAT IT IS NECESSARILY BROAD OR COVERS DIFFERENT

 5        TYPES OF SEPARATION IS FINE.  THAT'S THE PURPOSE OF CLAIM

 6        DRAFTING.

 7             WITH RESPECT TO THIS PARTICULAR ELEMENT, WHAT DID THEY --

 8        WHAT DID THE INVENTOR DO WHEN HE DRAFTED THIS ELEMENT?  HE

 9        IDENTIFIED TWO UMBRELLA TERMS, RIGHT?  NO PROBLEM WITH THAT.

10        HE IDENTIFIED TWO EMBODIMENTS.  HE IDENTIFIED TWO UMBRELLA

11        TERMS TO PROVIDE SPATIAL SEPARATION.

12             AND THEN HE WENT FURTHER.  HE GAVE THE EXAMPLES.  WE CITED

13        IN THE SLIDES THE EXAMPLES OF THOSE TYPES OF STRUCTURES TO

14        PERFORM THAT FUNCTION.  THEY WERE LISTS OF EXAMPLES SEPARATED

15        BY AN "AND" AND AN "OR," AND ONE OF THE ITEMS ON THAT LIST FOR

16        THE POLARIZATION SEPARATION MEANS WAS THE WEDGE.

17             AND TO TRY TO LIMIT THIS CLAIM, A MEANS-PLUS-FUNCTION

18        CLAIM WHERE WE'RE SUPPOSED TO BE ALLOWED TO RECITE THE FUNCTION

19        AND THEN STATE IN THE SPEC THE STRUCTURE TO SUPPORT IT AND WE

20        PROVIDE A LIST SEPARATED BY AN "AND" AND AN "OR," NOW TO TRY TO

21        LIMIT THE CLAIM TO ONE PARTICULAR EXAMPLE IS AT ODDS WITH THE,

22        ALL OF THE LAW ON HOW TO INTERPRET -- YOU KNOW.

23             THE COURT:  BUT YOUR LIST HAS NO BOUNDS AND I'M

24        TROUBLED BY THAT.  YOUR LIST CAN BE THINGS NEVER -- YOU SAY

25        IT'S JUST AN EXAMPLE.  IT COULD BE ANY OPTICAL FUNCTION.  I'M
```

```
1        TROUBLED BY THAT.
2                MR. RADULESCU:  NO.  THE LIST IS SPECIFIC AND WILL BE
3        TIED TO THE SPECIFIC STRUCTURE THAT'S DESCRIBED IN THE SPEC.
4                THE COURT:  OKAY.  WELL, THAT'S WHY I ASKED YOU.
5                MR. RADULESCU:  IT MAY BE LONG, BUT THERE'S ACTUALLY,
6        YOU KNOW, STRUCTURE THAT'S DESCRIBED IN THE SPEC THAT THIS IS
7        SUMMARIZING.
8                THE COURT:  WELL, LET ME GO BACK, BECAUSE EARLIER
9        THIS AFTERNOON I ASKED IF YOU WOULD MODIFY YOUR PROPOSAL TO
10       TAKE OUT -- INSTEAD OF "AS DESCRIBED IN," TO SAY "AS LIMITED
11       TO," AND THEN INCLUDE THE LIST, AND YOU INDICATED THAT THAT --
12       EITHER THAT YOU WANTED TO THINK ABOUT IT OR THAT WAS NOT --
13               MR. RADULESCU:  THAT WOULD BE CONSISTENT WITH OUR
14       ATTEMPT AT WHAT WE DRAFTED BECAUSE THE INTENT OF THE LONG LIST
15       THAT YOU HAVE IS ACTUALLY THE COMPONENTS IN THE FIGURES,
16       IDENTIFYING THOSE COMPONENTS IN THE FIGURES AND THEN HELPING BY
17       IDENTIFYING WHERE IN THE SPEC ARE THOSE COMPONENTS DESCRIBED.
18               THE COURT:  SO I COULD --
19               MR. RADULESCU:  IT'S NOT EVERYTHING.
20               THE COURT:  SO I COULD CHANGE IT TO "AS LIMITED TO."
21               MR. RADULESCU:  AS FURTHER --
22               THE COURT:  YOU WOULD SAY "THE POLARIZATION
23       MANIPULATION ELEMENT AND/OR SERIES OF OPTICAL POWER ELEMENTS,"
24       YOU SAY "AS DESCRIBED IN," AND I WOULD SAY "AS LIMITED TO," AND
25       THEN WE'LL WORK ON THE -- IT'S A BIG DIFFERENCE BECAUSE, AS
```

1     NISTICA POINTS OUT, IT COULD BE THESE THINGS OR ANYTHING ELSE.

2          MR. RADULESCU:  NO.  IT CAN BE THESE THINGS THAT ARE

3     DESCRIBED IN THE SPEC.

4          THE COURT:  THESE THINGS, OKAY.  THAT'S HELPFUL.

5          MR. RADULESCU:  WE GET THE RIGHT TO LIST THE --

6          THE COURT:  OKAY.

7          MR. RADULESCU:  -- ACTUAL COMPONENTS THAT ARE

8     DESCRIBED IN THE SPEC.

9          THE COURT:  AND WHAT ABOUT SOME OF THESE ITEMS THAT

10    WERE CLEARLY LINKED TO OTHER FUNCTIONS THAT WAS POINTED OUT TO

11    ME?

12         MR. RADULESCU:  NO.  THAT PORTION OF THE SPEC WAS A

13    SUMMARY PORTION OF THE SPEC THAT ACTUALLY WAS A PHYSICAL DEVICE

14    WHERE THEY LISTED 15 DIFFERENT THINGS, THAT THIS THING COULD

15    INCLUDE THESE 15 DIFFERENT THINGS THAT ARE VERY SPECIFIC.

16         THERE'S NO REQUIREMENT THAT WHEN WE'RE DESCRIBING 15

17    DIFFERENT THINGS THAT ARE VERY SPECIFIC THAT WE HAVE LINKING

18    LANGUAGE TO SOME FUNCTION.

19         THE COURT:  ALL RIGHT.

20         MR. RADULESCU:  THIS HAS NOTHING TO DO WITH THE

21    INTERPRETATION OF THE --

22         THE COURT:  SO I'M GOING TO ASK THAT EARLY NEXT WEEK

23    YOU SEND ME A REDRAFT OF A PROPOSAL THAT YOU WOULD ACCEPT THAT

24    USES THIS "AS LIMITED TO" LANGUAGE AND THEN SUBSTITUTES ALL OF

25    THESE REFERENCES FOR THE ACTUAL WORDS.

1        MR. RADULESCU:  YES, YOUR HONOR, WE'LL DO THAT.

2        THE COURT:  THAT WAY I KNOW -- AND THEN I HAVE THIS

3    AS MY ROADMAP AS TO WHERE TO FIND THEM.

4        MR. RADULESCU:  YES.

5        THE COURT:  OKAY.

6        MR. RADULESCU:  GOOD.

7      OKAY.  SO THE FIFTH AND LAST TERM IS ANOTHER

8    MEANS-PLUS-FUNCTION TERM.

9        THE COURT:  EXCUSE ME.  LET ME JUST GET MY PAPERWORK

10   OUT BECAUSE I'VE -- I NEED TO SEE THEM.  AND YOU ARE ON PAGE --

11        MR. RADULESCU:  101.

12        THE COURT:  OKAY.

13        MR. RADULESCU:  OKAY.  SO IT'S THE "WAVELENGTH

14   PROCESSING MEANS FOR SEPARATELY PROCESSING EACH OF THE

15   SEPARATED WAVELENGTHS OF SAID FIRST AND SECOND GROUP."

16      NOW, ON THE FUNCTION ISSUE, WE THOUGHT THERE WAS AGREEMENT

17   UNTIL WE REVIEWED NISTICA'S SLIDES AND APPARENTLY THERE IS NOT

18   AN AGREEMENT ON THE, ON WHAT THE FUNCTION IS.

19      AND THE -- OUR ASSUMPTION WAS THAT THERE WAS AGREEMENT

20   BASED UPON WHAT NISTICA SAID IN ITS BRIEF AT, I GUESS, PAGE 22

21   WHERE THEY SAID THAT IF THE COURT FINDS THAT THIS ADDITIONAL

22   LANGUAGE WHERE WE SAID "OF LIGHT," OR WHAT THEY HAD, "OF LIGHT

23   FROM THE SERIES OF OPTICAL SIGNALS" IS NOT HELPFUL TO THE JURY.

24      SO IF YOU FIND --

25        THE COURT:  RIGHT.

1      MR. RADULESCU:  -- THAT THEIR REFERENCE TO "OF LIGHT

2   FROM THE SERIES OF OPTICAL SIGNALS" IS NOT HELPFUL TO THE

3   JURY -- THEY'RE NOT ARGUING IT'S A LIMITATION.  THEY'RE NOT

4   ARGUING IT'S SOMEHOW PUTTING IN DISPUTE A DIFFERENT FUNCTION

5   BETWEEN THE PARTIES.

6      WE'RE TALKING ABOUT WHAT WILL BE HELPFUL TO THE JURY TO

7   UNDERSTAND THE SCOPE OF THE CLAIM.  THEIR POSITION IS THAT THEY

8   WOULD AGREE TO THE CLAIMED FUNCTION BEING, AND THEN THEY QUOTED

9   IT, AND IT WAS OUR FUNCTION.

10      SO WE'LL LET, I GUESS, NISTICA, YOU KNOW, RESOLVE THAT

11   ISSUE.  BUT OUR UNDERSTANDING IS THAT THIS ADDITIONAL LANGUAGE

12   IS NOT SUBSTANTIVE.  IT IS JUST SIMPLY INCLUDED FOR, FOR

13   GUIDANCE PURPOSES.  WE DON'T THINK THERE'S A SUBSTANTIVE

14   DISPUTE, BUT THEY WERE WILLING TO DELETE IT.

15      THE COURT:  AND IT APPEARS THEY STILL ARE.  I MEAN, I

16   HAVE -- I ASSUME THEY STILL ARE.  THEY PUT IT IN THEIR BRIEF.

17      MR. RADULESCU:  WE'LL, I GUESS --

18      THE COURT:  WE'LL FIND OUT.

19      MR. RADULESCU:  -- WE'LL FIND OUT.

20      THE COURT:  OKAY.  LET'S GO ON.

21      MR. RADULESCU:  SO NOW WE HAVE THE CORRESPONDING

22   STRUCTURE ISSUE, AND THE DISPUTE IS WHETHER IT SHOULD INCLUDE

23   ALL THE STRUCTURES THAT ARE EXPLICITLY DISCLOSED IN THE SPEC AS

24   PERFORMING THE CLAIMED FUNCTION.

25      IT'S THE SAME ISSUE.  YOU KNOW, THAT'S WHY I THINK WE'RE

1      GOING TO BE ABLE TO GO THROUGH THIS FAIRLY QUICKLY.

2           THE COURT:  GOOD.

3           MR. RADULESCU:  OR WHETHER THE CORRESPONDING

4      STRUCTURE SHOULD BE LIMITED TO ONLY A SINGLE EMBODIMENT

5      DISCLOSED AS PERFORMING THE CLAIMED FUNCTION PURSUANT TO

6      NISTICA'S PROPOSAL.

7           WE, OF COURSE, AGAIN, START WITH THE SUMMARY OF THE

8      INVENTION, AND HIGHLIGHTED HERE FROM COLUMN 4, LINE 59, IT SAYS

9      "THE WAVELENGTH PROCESSING MEANS CAN COMPRISE," AND THEN IT

10     SETS OUT "A SPATIAL LIGHT MODULATOR HAVING A PLURALITY OF

11     INDEPENDENTLY ADDRESSABLE PIXELS" AND GOES ON TO SAY THAT THOSE

12     PIXELS CAN BE MANIPULATED IN SOME PREDETERMINED MANNER.

13          NOTE THAT IT'S NOT REFERENCING SOME LIQUID CRYSTAL ON

14     SILICON DEVICE.  NOTE THAT IT'S NOT REFERENCING A PHASE MATRIX

15     COUPLING DEVICE THAT NISTICA WANTS TO LIMIT THIS STRUCTURE TO.

16          THE COURT:  SO IT CAN BE A MEMS?

17          MR. RADULESCU:  IT COULD BE A -- HANG ON ONE SECOND.

18          THE COURT:  THAT WAS ONE OF MY QUESTIONS.

19          MR. RADULESCU:  I THINK, BASED ON THIS OVERALL CLAIM

20     LANGUAGE, THAT WOULD BE AN ISSUE OF WHETHER MEMS WOULD BE

21     EQUIVALENT TO THE STRUCTURE THAT IS DISCLOSED, AND THE

22     STRUCTURE THAT'S DISCLOSED IS "A SPACIAL LIGHT MODULATOR HAVING

23     A PLURALITY OF INDEPENDENTLY ADDRESSABLE PIXELS," SO THE ANSWER

24     WOULD BE YES, IT COULD INCLUDE THIS WITH THIS PARTICULAR

25     ELEMENT.

```
 1              THE COURT:  OKAY.

 2              MR. RADULESCU:  RIGHT?

 3         OKAY.  SO IN ADDITION TO THE SUMMARY OF THE INVENTION, WE

 4    ALSO HAVE OTHER EMBODIMENTS THAT ARE SUMMARIZED ON SLIDE 104.

 5    AT THE TOP IS THE SAME SUMMARY THAT WE PREVIOUSLY LOOKED AT.

 6    AT COLUMN 5, LINE 53 TO 55, IT SAYS "IN ONE EMBODIMENT, THE

 7    WAVELENGTH PROCESSING MEANS CAN COMPRISE A LIQUID CRYSTAL

 8    DEVICE HAVING A SERIES OF LIGHT MODULATING PIXELS FORMED

 9    THEREON."  NOTE THAT IT SAYS "CAN COMPRISE," WHICH MEANS THAT

10    IT DOESN'T NECESSARILY HAVE TO BE LIMITED TO LIQUID CRYSTAL

11    DISPLAY DEVICES, HENCE POSSIBLY MEMS.

12         AND THEN IN ANOTHER EMBODIMENT, AT COLUMN 8, LINE 32, IT

13    IDENTIFIES "AN OPTICAL PHASED MATRIX COUPLING," OR OPMC

14    "MEANS," AND THEN CONTINUES ON TO SAY IT'S PROVIDED BY A LIQUID

15    CRYSTAL ON SILICON SPACIAL LIGHT MODULATOR.  I BELIEVE THAT'S

16    THE LANGUAGE THAT NISTICA IS USING TO LIMIT THE STRUCTURE TO.

17         OKAY?

18              THE COURT:  UM-HUM.

19              MR. RADULESCU:  AND WE NOW COME TO THE FIGURE AND THE

20    FIGURE IS FAIRLY GENERIC IN THE SENSE THAT IT DRAWS AN LCOS

21    SLM.  IT IDENTIFIES -- IT HAS TWO GROUPS OF SPATIALLY SEPARATED

22    WAVELENGTH CHANNELS.  THAT'S, OF COURSE, ONE EXAMPLE OF A

23    WAVELENGTH PROCESSING MEANS THAT'S SHOWN IN FIGURE 3.

24              THE COURT:  UM-HUM.

25              MR. RADULESCU:  FIGURE 6 HAS THE SAME TYPE OF LCOS
```

1      SLM.

2            AGAIN, FINISAR'S PROPOSAL IS INTENDED TO CAPTURE THIS TYPE

3      OF DISCLOSURE.

4            AND THEN WE COME TO NISTICA'S POSITION AND THERE ARE, I

5      GUESS, FOUR ARGUMENTS.  THEY'RE TRYING TO LIMIT THE

6      IDENTIFICATION OF THE STRUCTURE TO A SINGLE EMBODIMENT.

7            THEY ARE MISAPPLYING, OR INCORRECTLY APPLYING THE DOCTRINE

8      OF CLAIM DIFFERENTIATION GIVEN THAT THERE ARE OTHER CLAIMS THAT

9      HAVE SOME OF THE SPECIFICITY THAT NISTICA IS TRYING TO READ

10     INTO THE INDEPENDENT CLAIM.

11           THEY'RE AGAIN ARGUING THAT OUR PROPOSAL IS TOO LONG

12     BECAUSE WE'RE TRACKING THE FIGURES IN THE SPECIFICATION AND THE

13     DESCRIPTION IN THE SPECIFICATION THAT CORRESPONDS TO THE

14     FIGURES.

15           AND WE'LL TAKE YOUR SUGGESTION TO HEART AND, IN CONNECTION

16     WITH THIS LIMITATION AS WELL, WE WILL PROVIDE A MORE

17     STREAMLINED OR SPECIFIC LIST OF STRUCTURE THAT WE'RE PROPOSING

18     THE TERM SHOULD BE LIMITED TO.

19                THE COURT:  OKAY.

20                MR. RADULESCU:  AND THEN THERE IS STILL, AGAIN, THIS

21     ASSERTION THAT OUR PROPOSAL IS NOT CLEARLY LINKED OR ASSOCIATED

22     WITH THE CLAIMED FUNCTION.

23           ON THE FIRST ARGUMENT THAT THEY'RE TRYING TO LIMIT THE

24     STRUCTURE TO ONE PARTICULAR EMBODIMENT, HERE IT IS, IT'S THE

25     OPMC DEVICE THAT'S DIVIDED INTO TWO SERIES OF ELONGATED CELL

1   REGIONS.  THEY'RE OFFERING NO REASON TO THE COURT TO ADOPT THIS

2   PARTICULAR EMBODIMENT TO THE EXCLUSION OF ALL OF THE OTHER

3   CORRESPONDING STRUCTURE, THE MORE GENERAL STATEMENTS OF THE

4   SPATIAL -- OF THE WAVELENGTH SEPARATING MEANS.

5        AND, AGAIN, OUR ASSUMPTION AND OUR UNDERSTANDING IS THAT

6   NISTICA IS AGAIN ATTEMPTING TO LIMIT THE STRUCTURE TO JUST AN

7   EXAMPLE BECAUSE OF SOME NON-INFRINGEMENT POSITION, AND THAT'S

8   FOR A TIME DOWN THE ROAD TO ADDRESS.

9        SECOND ARGUMENT, CLAIM DIFFERENTIATION, THERE IS A CLAIM

10  THAT'S DEPENDENT OFF OF CLAIM 1.  THAT IS CLAIM 8, AND THAT

11  REFERS TO "THE SIGNALS RECEIVED BY THE WAVELENGTH PROCESSING

12  MEANS ARE," AND THEN IT GOES ON TO SAY, "IN THE FORM OF

13  WAVELENGTH SEPARATED ELONGATED BANDS," AND THE POINT IS THAT

14  WITH RESPECT TO THE REFERENCE TO THESE WAVELENGTH BANDS, THAT

15  FEATURE IS A FEATURE THAT'S DESCRIBED IN THIS DEPENDENT

16  CLAIM 8.

17       AND, THEREFORE, THE INTERPRETATION OF THE WAVELENGTH

18  PROCESSING MEANS TO REQUIRE THESE TWO GROUPS OF SPATIALLY

19  SEPARATED WAVELENGTH CHANNELS WOULD CONFLICT WITH THAT CLAIM

20  DIFFERENTIATION DOCUMENT.

21       THE COURT:  IS "ELONGATED CELL REGION" THE SAME AS

22  "AN ELONGATED BAND"?  ARE THOSE INTERCHANGEABLE TERMS?

23       MR. RADULESCU:  THE REFERENCE TO -- THE REFERENCE TO

24  "WAVELENGTH SEPARATED ELONGATED BANDS" IS VERY SIMILAR TO THEIR

25  REFERENCE TO "THE SPATIALLY SEPARATED WAVELENGTH CHANNELS."

1        AND IT WOULD BE OUR POSITION THAT GIVEN THAT WE HAVE

2    THESE --

3              THE COURT:  THAT'S NOT PART OF THEIR PROPOSAL.  THEY

4    USE THE LANGUAGE OF "ELONGATED CELL REGIONS" --

5              MR. RADULESCU:  SO I THINK THAT IS --

6              THE COURT:  -- IF I'VE GOT THAT CORRECT.

7              MR. RADULESCU:  YEAH.  AND I'M TRYING TO -- THERE MAY

8    HAVE BEEN AN AMENDMENT TO THIS ONE.  GIVE ME A SECOND HERE.

9              THE COURT:  IF THAT'S AMENDED AFTER THE JULY 22ND

10   SUBMISSION, I'M NOT --

11             MR. KRAMER:  THERE'S NO CHANGE, YOUR HONOR.

12             THE COURT:  I DIDN'T THINK SO.

13             MR. KRAMER:  IT SAYS SAY "TWO SERIES OF ELONGATED

14   CELL REGIONS."  YOU'RE RIGHT.

15             THE COURT:  THAT'S RIGHT.  OKAY.

16             MR. RADULESCU:  SO OUR SLIDE -- OUR SLIDE THAT SETS

17   FORTH THEIR CORRESPONDING STRUCTURE IS WRONG ON, YOU KNOW, ONE

18   OF THE EARLIER ONES.

19         THE POINT IS THEIR STRUCTURE RECITES TWO SERIES OF

20   ELONGATED CELL REGIONS.

21             THE COURT:  YES.

22             MR. RADULESCU:  THAT'S WHAT THEY'RE PROPOSING.

23             THE COURT:  RIGHT.

24             MR. RADULESCU:  NOTICE THAT WE'VE GOT CLAIM 8 THAT'S

25   REFERRING TO ELONGATED BANDS.  THE ELONGATED FEATURE IS

1      ALREADY -- YOU KNOW, IT'S BEING SET FORTH IN CLAIM 8.

2           WELL, HOW COULD THAT BE IF CLAIM 1 ALREADY HAS THESE

3      ELONGATED BANDS?  AND THAT'S THE CLAIM DIFFERENTIATION ISSUE

4      WHERE IT'S A FEATURE THAT THEY'RE ARGUING BELONGS IN CLAIM 1,

5      WHY WOULD YOU NEED A DEPENDENT CLAIM TO ADD THAT?  IT WOULD BE

6      REDUNDANT OR A DUPLICATIVE LIMITATION.

7           AND THAT'S THE CLAIM DIFFERENTIATION MEANING.  IN OTHER

8      WORDS, YOU KNOW, YOU PRESUME THAT THERE'S A DIFFERENCE BETWEEN

9      CLAIM 1 AND CLAIM 8.  THERE'S NO NEED TO READ "ELONGATED" INTO

10     CLAIM 1 GIVEN THAT IT'S SEPARATELY SET FORTH IN CLAIM 8.

11               THE COURT:  OKAY.

12               MR. RADULESCU:  IT'S NOT A MAJOR POINT --

13               THE COURT:  I UNDERSTAND.

14               MR. RADULESCU:  -- IN TERMS OF OUR ARGUMENTS, BUT

15      IT'S ONE THAT THEY RAISED, AND BECAUSE OF THE, OF THE REFERENCE

16      TO CLAIM DIFFERENTIATION, WE WERE ADDRESSING IT.

17           THE THIRD ARGUMENT IS THE LENGTH ARGUMENT.  AGAIN, WE'RE

18      SORT OF STUCK WITH WHAT WE HAVE.

19           AND THEN THE FOURTH AND FINAL ARGUMENT IS THE CLEARLY

20      LINKING LANGUAGE WHICH I THINK IS, AS WE SHOWED, FROM THE

21      SUMMARY OF THE INVENTION.  THERE CLEARLY IS A DESCRIPTION THAT

22      THIS IS THE -- THAT THIS STRUCTURE IS THE WAVELENGTH PROCESSING

23      MEANS THAT HAS A SPATIAL LIGHT MODULATOR HAVING A PLURALITY OF

24      INDEPENDENTLY ADDRESSABLE PIXELS.

25           AND I THINK THAT, UNLESS YOU HAVE QUESTIONS, THAT'S IT.

1          THE COURT:  I THINK I'M TOO TIRED TO HAVE AN

2     INTELLIGENT QUESTION.

3          OF COURSE, YOU'VE BEEN DOING ALL THE WORK, NOT ME.

4          ALL RIGHT.  WHO IS PRESENTING FOR NISTICA?  MR. TONKOVICH?

5          MR. TONKOVICH:  I AM, YOUR HONOR.

6          ALL RIGHT.  JUST TO START OFF, WE HAVE NOT CHANGED OUR

7     FUNCTION, AND I'M GOING TO START OFF TALKING ABOUT THAT.

8          THE COURT:  I DON'T EVEN THINK YOU DISAGREE WITH THE

9     FUNCTION HERE, EXCEPT -- YOU STILL STAND BY YOUR LANGUAGE IN

10    YOUR BRIEF, THAT IF I CHOOSE -- FIND THE LANGUAGE ISN'T

11    HELPFUL, YOU AGREE TO TAKE IT OUT OF THE FUNCTION?

12          MR. TONKOVICH:  YEAH, YEAH.

13          THE COURT:  GREAT.

14          MR. TONKOVICH:  THE POINT HERE IS -- SO THE LANGUAGE

15    WE'RE ADDING IS "OF LIGHT FROM A SERIES OF OPTICAL SIGNALS."

16          WHERE THIS COMES FROM IS THE PHRASE THAT WE'RE CONSTRUING,

17    THIS "WAVELENGTH PROCESSING MEANS" TERM, IT ENDS WITH THE WORDS

18    "FIRST AND SECOND GROUP."

19          AND IN ORDER TO -- AND IF YOU LOOK IN THE CLAIM LANGUAGE

20    ITSELF, WHAT "FIRST AND SECOND GROUP" REFERS TO, IT REFERS TO

21    "A FIRST AND SECOND GROUP OF LIGHT FROM SAID SERIES OF OPTICAL

22    SIGNALS."

23          SO TO CLARIFY FOR THE JURY WHAT "FIRST AND SECOND GROUP"

24    REFERRED TO, WE SIMPLY ADDED IN AN EXPLANATION OF WHAT IT

25    REFERS TO EARLIER IN THE CLAIM.  THAT'S IT.

1          THE COURT:  OKAY.  THAT'S GREAT.

2          MR. TONKOVICH:  AND THEN AS FOR THE STRUCTURE, AGAIN,

3     THE KEY HERE IS WHAT STRUCTURE IS SPECIFICALLY DISCLOSED IN THE

4     SPECIFICATION AND TIED TO THE CLAIM FUNCTION?  THERE'S LOTS OF

5     STRUCTURE DISCLOSED IN THE SPECIFICATION PERFORMING ALL TYPES

6     OF FUNCTIONS, BUT THE KEY IS TO FOCUS IN ON THE CLAIMED

7     FUNCTION AND ONLY THE CLAIMED FUNCTION.

8          SO THE CLAIMED FUNCTION HERE IS SEPARATELY PROCESSING EACH

9     OF THE SEPARATED WAVELENGTHS IN THE FIRST AND SECOND GROUP OF

10    LIGHT, AND IF WE LOOK AT WHAT THE SPEC SAYS ACTUALLY PERFORMS

11    THAT, WE SEE IT DISCLOSES HERE, IN COLUMN 17 ON THE RIGHT-HAND

12    SIDE, IT DISCLOSES AN OPTICAL PHASED ARRAY COUPLING, OPMC

13    ELEMENT, WHICH IS A LIQUID CRYSTAL ON SILICON DEVICE.

14          IN THAT SAME COLUMN, IT DESCRIBES -- AND YOU SEE THAT

15    PICTURED HERE IN FIGURE 6 AT 280.  YOU SEE THE TWO SERIES OF

16    ELONGATED CELL REGIONS IN NUMBER 280 OF THE OPMC.

17          THE SPECIFICATION ALSO DESCRIBES THIS STRUCTURE AS

18    SEPARATELY PROCESSING EACH OF THE SEPARATED WAVELENGTHS, AND

19    WE'LL SEE THAT IN THE BOTTOM PORTION THERE ON THE RIGHT-HAND

20    SIDE.  THE OPMC 280 IS ABLE TO DIRECT THE IMAGE OF ANY ONE

21    WAVELENGTH CHANNEL INDEPENDENTLY.

22          THE COURT:  THAT'S CLEARLY WHAT THIS EMBODIMENT

23    SHOWS.  THERE'S NO QUESTION ABOUT THAT.

24          BUT WHERE IS THE LIMITATION?  SO, I MEAN, THAT'S WHAT

25    MR. RADULESCU'S ARGUMENT IS, THAT THERE'S NO DOUBT THAT THIS IS

1    AN LCOS FOR AN OPMC.  THERE'S NO DOUBT ABOUT IT.

2        BUT WHY IS THAT THE ONLY STRUCTURE?

3            MR. TONKOVICH:  IT'S THE ONLY STRUCTURE BECAUSE THAT

4    IS THE STRUCTURE THAT APPEARS IN BOTH FIGURES 3 AND 6, AND THE

5    ONLY STRUCTURE THAT'S REALLY LINKED TO THE CLAIMED FUNCTION.

6        AND WE CAN GO THROUGH THE EXAMPLES THAT HE GAVE.  SO HE

7    REFERRED TO, I BELIEVE, THIS SECTION OF COLUMN 5 FROM THE

8    SUMMARY OF THE INVENTION WHICH DISCLOSES A SPACIAL LIGHT

9    MODULATOR HAVING A PLURALITY OF INDEPENDENTLY ADDRESSABLE

10    PIXELS.

11        NOW, AGAIN, THE KEY HERE IS TO FOCUS ON THE CLAIMED

12    FUNCTION, WHICH IS SEPARATELY PROCESSING EACH OF THE SEPARATED

13    WAVELENGTHS WITH A FIRST AND SECOND GROUP OF LIGHT FROM THE

14    SERIES OF OPTICAL SIGNALS.

15        THIS SECTION DOESN'T TALK ABOUT A FIRST AND A SECOND GROUP

16    OF LIGHT.  IT TALKS ABOUT MOVING PHASE FRONTS, BUT IT DOESN'T

17    TALK ABOUT SEPARATELY PROCESSING EACH OF THE SEPARATED

18    WAVELENGTHS OF TWO DIFFERENT GROUPS OF LIGHT.

19        THAT'S NOT WHAT'S DISCUSSED HERE.  THE SPACIAL LIGHT

20    MODULATOR IS DOING SOMETHING ELSE, BUT IT'S NOT TIED

21    SPECIFICALLY TO THE CLAIMED FUNCTION.

22        AND THAT'S WHAT YOU GET IN 112(6).  UNDER THE LAW ON

23    112(6), YOU GET WHAT YOU SPECIFICALLY DISCLOSE IN THE

24    SPECIFICATION AS PERFORMING THE CLAIMED FUNCTION.

25        THAT DOESN'T MEAN THERE'S NOT STRUCTURE IN THE

1    SPECIFICATION THAT PERFORMS OTHER FUNCTIONS, BUT IT'S GOT TO BE

2    THE CLAIMED FUNCTION.

3           AND SIMILARLY, IF YOU TURN TO FINISAR'S SLIDE 104 WHERE HE

4    LISTS OUT A BUNCH OF OTHER DISCLOSED STRUCTURE, NOWHERE IN HERE

5    ARE ANY OF THESE STRUCTURES SPECIFICALLY TIED TO THE CLAIMED

6    FUNCTION.

7           CONSTRUING A MEANS-PLUS-FUNCTION UNDER SECTION 112,

8    PARAGRAPH 6 IS A, A VERY STRICT EXERCISE.  YOU NEED TO LOOK AT

9    THE SPECIFICATION AND WHAT IT TIES SPECIFICALLY TO PERFORMING

10   THE CLAIMED FUNCTION, AND NONE OF THESE ARE SPECIFICALLY TIED

11   TO PERFORMING THE CLAIMED FUNCTION OF SEPARATELY PROCESSING

12   EACH OF THE SEPARATED WAVELENGTHS OF TWO GROUPS OF LIGHT.

13          THE REASON WHY WE FOCUS ON THAT ONE STRUCTURE IS BECAUSE

14   THAT'S THE ONE STRUCTURE THAT DOES ACTUALLY PERFORM THAT

15   CLAIMED FUNCTION.

16          SO I WANT TO TURN TO THE CLAIM DIFFERENTIATION ARGUMENT --

17              THE COURT:  OKAY.

18              MR. TONKOVICH:  -- WHICH IS ACTUALLY AN ARGUMENT THAT

19   FINISAR MADE IN ITS REPLY BRIEF.  IT'S NOT AN ARGUMENT THAT

20   NISTICA MADE.

21          SO UNDER THE DOCTRINE OF CLAIM DIFFERENTIATION, THE IDEA

22   IS THAT TWO CLAIMS ARE PRESUMPTIVELY DIFFERENT IN SCOPE.  YOU

23   CAN'T CONSTRUE -- THERE'S KIND OF A CAUTION AGAINST CONSTRUING

24   THEM TO MEAN THE EXACT SAME THING.

25          SO I PUT AN EXAMPLE IN HERE, IF IT'S HELPFUL, WHICH GIVES

1      KIND OF A SIMPLIFIED CLAIM.  IF YOU HAVE A CLAIM TO A CHAIR,

2      THAT'S A CHAIR COMPRISING FOUR LEGS, A SEAT WITH A CUSHION, AND

3      A BACK SUPPORT, AND AN INDEPENDENT CLAIM THAT SAYS "THE CHAIR

4      OF CLAIM 1 WHEREIN THE CUSHION IS BLUE," WELL, UNDER THOSE

5      CIRCUMSTANCES IF THE PARTY ARGUED, WELL, THE CUSHION IN CLAIM 1

6      MUST BE BLUE, THEN THERE COULD BE A CLAIM DIFFERENTIATION

7      ISSUE.  RIGHT?

8          HOWEVER, IF IT'S CHANGED AND CLAIM 2 REQUIRES "AND THE

9      LEGS ARE COMPRISED OF METAL," WELL, NOW THE CLAIMS WILL DIFFER

10     REGARDLESS OF THE COLOR OF THE CUSHION.  SO IT'S NO LONGER A

11     CLAIM DIFFERENTIATION ISSUE BECAUSE THE CLAIM WILL BE DIFFERENT

12     IN SCOPE.

13         WHAT THE FEDERAL CIRCUIT HAS SAID IS THAT CLAIM

14     DIFFERENTIATION IS NOT APPLIED WHERE THE CLAIMS ARE DIFFERENT

15     IN SCOPE IN AT LEAST ONE LIMITATION.  THEY'VE SAID THAT THE

16     CLAIMS -- THAT THE CLAIMS ARE PRESUMED A DIFFERENT SCOPE DOES

17     NOT MEAN THAT EVERY LIMITATION MUST BE DISTINGUISHED FROM A

18     COUNTERPART IN ANOTHER CLAIM, BUT ONLY THAT AT LEAST ONE

19     LIMITATION MUST DIFFER.

20         SO AS NOTED, THEIR ARGUMENT IS THAT UNDER NISTICA'S

21     CONSTRUCTION, THE "HAVING TWO SERIES OF ELONGATED CELL REGIONS"

22     WOULD SOMEHOW RENDER CLAIMS 1 AND 8 AS HAVING THE SAME SCOPE,

23     SO LET'S LOOK AT CLAIMS 1 AND 8.

24         AND I'M GOING TO READ 8.  IT SAYS, "A SYSTEM AS CLAIMED IN

25     CLAIM 1 WHEREIN THE OPTICAL SIGNALS RECEIVED BY SAID WAVELENGTH

```
 1      PROCESSING MEANS ARE IN THE FORM OF WAVELENGTH SEPARATED

 2      ELONGATED BANDS."

 3           SO WHAT CLAIM 8 IS TALKING ABOUT, IT'S TALKING ABOUT THE

 4      OPTICAL SIGNALS.  CLAIM 8 SAYS NOTHING ABOUT STRUCTURE OF THE

 5      WAVELENGTH PROCESSING MEANS.  IN FACT, IT'S TALKING ABOUT THE

 6      OPTICAL SIGNALS BEFORE THEY EVEN ARRIVE AT THE WAVELENGTH

 7      PROCESSING MEANS.

 8           THUS, CLAIMS 1 AND 8 WILL DIFFER IN SCOPE REGARDLESS OF

 9      WHATEVER STRUCTURE IS GIVEN TO THE WAVELENGTH PROCESSING MEANS.

10           THIS IS A CLEAR CASE WHERE CLAIM DIFFERENTIATION JUST DOES

11      NOT APPLY.  CLAIM 8 IS TALKING ABOUT THE SIGNALS, NOT THE

12      WAVELENGTH PROCESSING MEANS.

13           SO IN SUMMARY, OUR PROPOSED STRUCTURE IS THE ONLY

14      STRUCTURE THAT'S ACTUALLY DISCLOSED FOR PERFORMING SPECIFICALLY

15      THE CLAIMED FUNCTION, WHEREAS THE STRUCTURE THAT FINISAR POINTS

16      TO IN THE SPECIFICATION MAY PERFORM FUNCTIONS, BUT IT DOESN'T

17      PERFORM THE CLAIMED FUNCTION.

18           AND THEY'VE KIND OF GLOSSED OVER THE LINKAGE ISSUE THROUGH

19      OUR DISCUSSION OF MEANS-PLUS-FUNCTION TERMS, BUT IT'S VERY,

20      VERY IMPORTANT.  IT'S GOT TO BE SPECIFICALLY LINKED TO

21      SPECIFICALLY THE CLAIMED FUNCTION.

22              THE COURT:  OKAY.  THANK YOU.

23           IS THERE A REBUTTAL?

24              MR. RADULESCU:  I ONLY HAVE ONE SLIDE FROM, FROM THE

25       FINISAR DECK THAT I WANT TO RESPOND TO ON THE LINKING ISSUE.
```

1    IT'S SLIDE 111.  IT WAS THE LAST ONE IN OUR PRESENTATION, AND

2    IT DEALS WITH THIS LINKING ISSUE.

3        SLIDE 111, THE TOP HALF OF 111 HAS THE NISTICA BRIEF WHERE

4    THEY'RE ALLEGING THAT FINISAR'S PROPOSAL IS NOT CLEARLY LINKED

5    TO THE CLAIMED FUNCTION.

6        AND THEN THEY HAVE A QUOTE FROM THE -- FROM FINISAR'S OWN

7    BRIEF IN TERMS OF CITING ONE PARTICULAR PASSAGE FROM THE

8    PATENT, AND THE POINT IS THAT IF YOU ACTUALLY GO TO THAT

9    PORTION OF THE SPEC AND ACTUALLY GO BACK ONE SENTENCE -- AND

10   THIS IS SHOWN ON THE BOTTOM HALF OF 111 -- YOU'LL SEE THAT

11   THERE IS SOME MORE DISCUSSION OF THE WAVELENGTH PROCESSING

12   MEANS AS "PREFERABLY CAN INCLUDE A SERIES OF ZONES AND THE

13   WAVELENGTH PROCESSING MEANS," AND IT GOES ON TO SAY,

14   "SEPARATELY MANIPULATES THE PHASE FRONT OF LIGHT STRIKING EACH

15   OF THE ZONES IN ORDER TO CONTROL THE OUTPUT," AND IT GOES ON.

16       THAT'S THE LINKING.  THAT'S ALL THE LINKING THAT'S

17   NECESSARY TO TIE FINISAR'S PROPOSAL TO THIS PARTICULAR CLAIM

18   ELEMENT.

19       AND THAT'S ALL I HAD.

20           THE COURT:  THANK YOU.

21           MR. TONKOVICH:  MAY I HAVE 30 SECONDS, YOUR HONOR?

22           THE COURT:  YES, OF COURSE.

23           MR. TONKOVICH:  SO THE COOL THING TO SHOW THAT SLIDE

24   WAS THE SAME QUOTE THAT I SHOWED IN SLIDE 98 OF MY

25   PRESENTATION, AND AGAIN FOCUSSING VERY CLEARLY ON THE LINKAGE

1      ISSUE, THERE'S NO MENTION OF A FIRST AND SECOND GROUP OF LIGHT,

2      AND ALTHOUGH IT SAYS "PHASE FRONT OF LIGHT STRIKING," IT DOES

3      NOT DISCUSS SEPARATELY PROCESSING EACH OF THE SEPARATING

4      WAVELENGTHS.

5           AGAIN, THIS LINKAGE ISSUE IS A VERY SPECIFIC, TECHNICAL

6      ISSUE.  IT'S ALL GOT TO BE THERE, AND IT'S JUST NOT THERE.

7           THE COURT:  OKAY.  ALL RIGHT.  I THINK MAYBE WE'VE

8      COME TO AN END.

9           THAT WAS A LONG FOUR HOURS.  YOU'RE EITHER LUCKY OR CURSED

10     WITH THE FACT THAT I'M NEW AND I DIDN'T RUN THAT CLOCK THE WAY

11     OTHERS WOULD.  MAYBE YOU WOULD HAVE PREFERRED THAT.  I DON'T

12     KNOW.

13          I DO KNOW THAT THERE WAS -- THERE WERE SOME SCHEDULING

14     ISSUES.  I THINK NOW IS NOT THE TIME TO ADDRESS THEM.  IS

15     THAT -- IS THAT GOING TO CAUSE A PROBLEM?

16          MR. RADULESCU:  NO.  I WAS GOING TO SUGGEST THAT

17     GIVEN THAT I THINK WE'RE GOING TO BE DOING A SUBMISSION ON

18     THESE -- SOME OF THESE CLAIM ELEMENTS THAT WE'RE GOING TO BE

19     DOING BY NEXT WEEK, AT A LATER DATE, YOU KNOW, WE CAN PROBABLY

20     HAVE A CALL, JUST A TELEPHONE CALL DEALING WITH THE SCHEDULING

21     ISSUES AT YOUR CONVENIENCE.

22          THE COURT:  I WOULD LIKE THAT, AND I THINK -- IS

23     IT -- I DON'T KNOW HOW LONG IT WILL TAKE ME TO GET THIS ORDER

24     OUT.  I CAN'T TELL.

25          BUT DOES IT MAKE SENSE TO WAIT UNTIL I'M READY TO ISSUE

1    THE ORDER TO HAVE THAT PHONE CALL?  OR WOULD YOU LIKE IT

2    SOONER?

3            MR. KRAMER:  WELL, YOUR HONOR, THE DISPUTE ABOUT THE

4    SCHEDULE, AND UNFORTUNATELY THERE IS A DISPUTE, REALLY RELATES

5    TO HOW MUCH TIME THERE'S GOING TO BE FOR DISCOVERY.

6        SO WE DON'T WANT TO PUT ANY PRESSURE WHATSOEVER ON

7    CHAMBERS.

8            THE COURT:  IT WOULDN'T DO YOU ANY GOOD ANYWAY.

9            MR. KRAMER:  NO, RIGHT.  BUT THAT'S NOT OUR POINT.

10           THE COURT:  THANK YOU.  I APPRECIATE THAT.

11           MR. KRAMER:  WHENEVER YOUR HONOR THINKS IT MAKES

12   SENSE TO SET UP A SCHEDULE, IT MAKES SENSE FOR US.  WE'RE READY

13   TO DO IT RIGHT NOW, LATER, WHATEVER YOU THINK MAKES SENSE.

14       THE COURT:  I JUST THINK AT A QUARTER TO 5:00, AFTER

15   A LONG DAY, THAT I'M NOT GOING TO MAKE GOOD DECISIONS ON IT OR

16   REALLY BE ABLE TO COMPREHEND WHAT YOUR DISAGREEMENTS ARE.

17       I'M GLAD TO DO IT BY PHONE CALL.  YOU PROBABLY DON'T ALL

18   NEED TO BE ON THAT CALL.  THAT'LL HELP AS WELL.

19       IS IT YOUR PREFERENCE THAT WE DO IT IN THE NEXT TWO WEEKS?

20           MR. KRAMER:  IT IS, YOUR HONOR.

21           THE COURT:  OKAY.

22           MR. KRAMER:  A PHONE CALL OR WE'RE GLAD TO COME INTO

23   COURT TO DO THAT, AND IF THEY WANT TO JOIN, THAT'S FINE.

24           THE COURT:  OKAY.  I THINK A PHONE CALL WILL BE FINE.

25   WHY DON'T WE -- WE'LL PROBABLY TELEPHONE EACH OF YOU WITH SOME

1      PROPOSED DATES TO SEE WHAT'S GOING TO WORK, JUST FOR SCHEDULING

2      PURPOSES, AND I HAVE THAT SUBMISSION THAT WE GOT YESTERDAY ON

3      THOSE DATES.

4          I'M HOPING NEXT WEEK, THOUGH, TO GET THE SUBMISSION BY

5      MR. RADULESCU FOR FINISAR, AND THAT WILL HELP US ALL TO LOOK AT

6      THAT LANGUAGE.

7          THANK YOU.  I -- I CAN'T COMPLIMENT YOU ENOUGH ON THE

8      EXTRAORDINARY QUALITY OF YOUR PREPARATION AND YOUR

9      PRESENTATION.  IT WAS EXTRAORDINARILY HELPFUL AND WE CERTAINLY

10     WILL GET TO WORK ON THIS AS QUICKLY AS WE CAN AND I KNOW YOU

11     NEED A DECISION ON THIS, SO WE'LL WORK ON THAT.

12         ALL RIGHT.  THANK YOU ALL VERY MUCH.

13             MR. RADULESCU:  THANK YOU, YOUR HONOR.

14             MR. KRAMER:  THANK YOU, YOUR HONOR.

15         (THE PROCEEDINGS WERE CONCLUDED AT 4:45 P.M.)

16

17

18

19

20

21

22

23

24

25

1

2

3                            CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____

17   LEE-ANNE SHORTRIDGE, CSR, CRR
     CERTIFICATE NUMBER 9595

18        DATED:  AUGUST 21, 2014

19

20

21

22

23

24

25