1

2

3

4                           UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    FINISAR CORPORATION,                    Case No.  13-cv-03345-BLF   (JSC)

          Plaintiff,

8

          v.                                 **ORDER RE DISCOVERY DISPUTES**

9
                                             Re: Dkt. Nos. 223, 225, 230, 231
10   NISTICA, INC.,

          Defendant.

11

12

13        Now pending before the Court in this patent infringement action are three discovery

14   disputes.  Two disputes pertain to the adequacy of Nistica's responses to Finisar's discovery

15   requests, while the third involves Finisar's objection to Nistica's expert witness.  Having

16   considered the parties' letter briefs, the Court concludes that oral argument is unnecessary, *see*

17   Civ. L.R. 7-1(b), and rules as follows.

18                                   **LEGAL STANDARD**

19        The Federal Rules of Civil Procedure provide that parties "may obtain discovery regarding

20   any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).

21   In a motion to compel, the moving party bears the burden of showing why the other party's

22   responses are inadequate or their objections unjustified.  *See Williams v. Gate*, No. 090468, 2011

23   WL 6217378, at *1 (E.D. Cal. Dec. 14, 2011) (the moving party "bears the burden of informing

24   the Court . . . for each disputed response, why [the responding party's] objection is not justified[.]

25   [The moving party] may not simply assert that he has served discovery responses, that he is

26   dissatisfied, and that he wants an order compelling further responses.").  "Once the moving party

27   establishes that the information requested is within the scope of permissible discovery, the burden

28   shifts to the party opposing discovery.  An opposing party can meet its burden by demonstrating

United States District Court
Northern District of California

1   that the information is being sought to delay bringing the case to trial, to embarrass or harass, is

2   irrelevant or privileged, or that the person seeking discovery fails to show need for the

3   information." *Khalilpour v. CELLCO P'ship*, No. 09–02712, 2010 WL 1267749, at \*1 (N.D. Cal.

4   Apr. 1, 2010) (internal quotation marks and citations omitted).

**DISCUSSION**

**A.    Finisar's Request for an Order Compelling Nistica to Produce a 30(b)(6) Witness and Forecast Reports (Dkt. No. 223)**

8       Finisar seeks an order compelling Nistica to provide (1) a person most knowledgeable to

9   testify about Topics 34 (Nistica's communications with third parties regarding Finisar's patents in

10  suit), 36 (Nistica's communications with third parties regarding Finisar's claims of infringement),

11  and 58 (Nistica's expected, projected, or anticipated future sales revenue, costs, and profits from

12  the Accused Products) from Finisar's first Notice of Deposition, and relatedly, (2) forecast report

13  documents responsive to Request for Production ("RFP") No. 46.  The parties have since resolved

14  their dispute regarding forecast reports.  (Dkt. No. 242.)

15      Finisar contends that the two 30(b)(6) witnesses that Nistica has designated thus far have

16  not been adequately prepared to testify on those topics and thus further testimony is required.

17  Nistica contends that it has provided sufficient testimony on these topics from the two 30(b)(6)

18  witnesses and several fact witnesses, and that, while Topics 34 and 36 are overly broad as written,

19  the second 30(b)(6) witness it designated adequately testified to a narrower scope of topics to

20  which the parties agreed.

21      Finisar first noticed the 30(b)(6) deposition of these topics on June 19, 2014.  (Dkt. No.

22  223-2.)  The topics included No. 34 (Nistica's communications with third parties regarding

23  Finisar's patents in suit), 36 (Nistica's communications with third parties regarding Finisar's

24  claims of infringement), and 58 (Nistica's expected, projected, or anticipated future sales revenue,

25  costs, and profits from the Accused Products).  (*Id.*)

26      Nistica initially designated its CEO, Ashish Vengsarkar, to testify on these topics.  After

27  rescheduling at the last minute, Nistica cancelled the Vengsarkar 30(b)(6) deposition altogether,

28  then designated its Vice President of Finance, Joanne Bisconti, as the person most knowledgeable

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1    instead.  (*See* Dkt. Nos. 223-6, 223-7.)  At her June 9, 2015 deposition, Ms. Bisconti was not

2    adequately prepared to testify to the topics at issue, as several times she responded that she had no

3    personal knowledge about Nistica's communications with third parties about the patents-in-suit or

4    the instant litigation—*i.e.*, Topics 34 and 36—and indicated that Mr. Vengsarkar and Nistica's

5    Chief Technology Officer, Thomas Strasser, would have the relevant information and that she was

6    not fully aware of their knowledge.  (*See, e.g.*, Dkt. No. 223-11.)  With respect to Topic 58, Ms.

7    Bisconti testified that she did not have enough detail to discuss Nistica's expected profits without

8    viewing the yearly sales forecast reports that she prepares (*id.*), the most recent of which had not

9    been produced to Finisar.

10         Following the Bisconti deposition, on June 19, 2015 the parties met and conferred about

11   designating a follow-up witness to testify further on these topics.  (Dkt. No. 223-1 ¶ 2.)  Nistica

12   eventually designated its Vice President of Sales & Marketing, Dario Falquier.  The parties

13   dispute the scope of Mr. Falquier's designated topics.  Finisar contends that Nistica noticed Mr.

14   Falquier as 30(b)(6) designee for the topics in their entirety.

15         Nistica, for its part, contends that the agreement was more limited and was part of a quid

16   pro quo for further 30(b)(6) testimony from each party.  During the meet and confer on this issue,

17   counsel for Nistica asked Finisar "to specify what communications within topics 34 and 36 Finisar

18   actually cared about."  (*Id.* ¶ 2.)  Nistica's lawyer avers that, in response, with respect to Topic 34

19   Finisar's counsel represented that it "wanted a witness to testify about the communications, and

20   specifically about a presentation, that NTT/NEL gave Nistica regarding the '599 patent."  (*Id.*)

21   She further avers that, regarding topic 36, "Finisar's counsel represented that Finisar cared only

22   about communications that Mr. Falquier, Mr. Strasser, Mr. Wagener, or Mr. Vengsarkar had with

23   certain customers, and specifically about any conversations about whether the current litigation

24   had settled."  (*Id.* ¶ 3.)  Finisar appears to concede that these representations were made inasmuch

25   as this was the information it was most interested in, but it insists that it did not agree to limit Mr.

26   Falquier's testimony in this manner.

27         In an email following that meet and confer, Nistica agreed to designate a witness "for a

28   limited deposition (no more than 3 hours) to testify regarding the following sub-issues for Topics

3

1    34 and 36:

2              [C]ommunications with NTT/NEL (and Fujikura, if any) about the
              '599 patent and relating to the presentation referencing the '599
3              patent and to testify about communications with certain third parties
              about the lawsuit.  With the understanding that no witness can
4              testify about all Nistica communications with third parties about the
              lawsuit Nistica is willing to designate someone to testify generally
5              about the substance of communications with certain customers,
              including, whether or not Nistica has communicated to customers
6              about the settlement of the lawsuit.

7    (Dkt. No. 223-15 at 2.)  With respect to Topic 58, Nistica agreed to prepare Mr. Falquier to testify

8    only about the 3 sales forecasts that were recently created and therefore not produced until June

9    22, 2015, not all sales forecasts that had been produced well before Ms. Bisconti's deposition.

10   (Dkt. No. 223-16; Dkt. No. 223-1 ¶ 4.)

11         Mr. Falquier's deposition occurred on June 26, 2015—the last day of fact discovery per the

12   scheduling order.  With respect to Topic 34, Mr. Falquier gave substantial testimony about the

13   timing and content of certain meetings between NTT/NEL and Nistica when the intellectual

14   property—including Finisar's '599 Patent—was discussed, but testified that he did not know the

15   number of communications and exact content of Nistica's communications with NEL about the

16   '599 Patent other than the information that appeared on a presentation produced during discovery,

17   nor did he know how many other meetings or conversations there were about that patent or the

18   other patents-in-suit. (Dkt. No. 223-11.)  Mr. Falquier repeatedly responded that Dr. Vengsarkar

19   and Mr. Strasser would be able to answer the patent-specific questions.  With respect to Topic 36,

20   Mr. Falquier responded to most questions about whether Nistica has discussed this lawsuit with

21   certain other customers.  With respect to Topic 58 and the forecast documents, the deposition

22   questions focused on certain portions that appeared in Japanese.  Mr. Falquier provided substantial

23   testimony about the meaning of the forecast spreadsheet.  However, Mr. Falquier was unable to

24   explain what the Japanese commentary meant or to answer whether the financial forecasts are sent

25   to Nistica's auditors with or without the Japanese commentary.  He noted that Ms. Bisconti would

26   be able to answer that question.

27         Notably, Finisar has already deposed Dr. Vengsarkar and Mr. Strasser, both as fact

28   witnesses and Mr. Strasser was a corporate designee for certain other topics.  (*See* Dkt. Nos. 223-

United States District Court
Northern District of California

United States District Court
Northern District of California

1    19, 223-20, 223-21.)  Both were asked about Nistica's communications with customers regarding

2    this patent litigation, including whether Nistica informed customers of its intention to settle.  In his

3    capacity as 30(b)(6) witness, Mr. Strasser testified in detail about Nistica's communications with

4    NEL about the '599 Patent and about Nistica's communications with customers regarding this

5    litigation.

6            The Court concludes that Mr. Falquier was not adequately prepared to testify about Topic

7    34.  It appears that Nistica prepared Mr. Falquier solely to respond to questions about a particular

8    presentation between NTT/NEL and Nistica, rather than preparing him more broadly on the

9    subject of the company's communications with that third party about the '599 Patent or other

10   patents-in-suit more generally.  Falquier was unable to answer questions about when Nistica and

11   NTT/NEL first discussed Finisar's patents, besides generally identifying a 4-month timeframe

12   towards the end of 2012.  Nor could Falquier testify about what NTT/NEL communicated to

13   Nistica about those patents, aside from information contained in the identified presentation.  At

14   bottom, besides echoing the contents of the presentation, Falquier was unable to provide any

15   details about NEL-Nistica communications regarding Finisar's patents or relevant IP protection

16   and how those communications led to the parties' agreement to work together.  The Court

17   accordingly GRANTS Finisar's request with respect to Topic 34.  However, examination on this

18   topic shall be limited to one hour.

19           As for Topic 36, Nistica's corporate designees have sufficiently testified regarding the

20   contents of their communications with third-parties, including customers, about this litigation.

21   Specifically, Mr. Falquier sufficiently testified about his own and others' conversations with

22   certain customers at the inception of this lawsuit and during the course of discovery.  He

23   adequately conveyed the content of those conversations.  Further, the 30(b)(6) testimony of Mr.

24   Strasser, binding on Nistica, discusses at length conversations with a particular Nistica customer

25   regarding this action, including why Mr. Strasser communicated a particular message.  Thus, the

26   Court DENIES Finisar's request as to Topic 36.

27           With respect to Topic 58, there is no reason for Finisar to take another bite at the apple to

28   question a 30(b)(6) witness about financial forecasts it had in its possession prior to the noticed

United States District Court
Northern District of California

1   30(b)(6) depositions.  Thus, while Finisar laments Nistica's attempt to "unilaterally" cabin Mr.

2   Falquier's testimony to the three recently-produced financial forecasts, this is an entirely fair

3   approach.  With respect to the recently-produced forecasts that were the subject of Mr. Falquier's

4   deposition, Finisar laments that he was unable to explain the meaning of and procedures

5   associated with limited amounts of Japanese commentary on those documents.  Nistica urges that

6   the Japanese commentary is minimal and "inconsequential" to the numbers listed in the forecasts,

7   but it does so only in attorney argument without providing any evidentiary basis for this statement.

8   Nevertheless, Finisar has failed to demonstrate why Falquier's inability to answer questions about

9   the Japanese commentary is problematic.  Having failed to do so, the Court cannot conclude that

10  Falquier's substantial testimony about the forecasts is insufficient.  Accordingly, the Court

11  DENIES Finisar's request for an order compelling further 30(b)(6) designee on Topic 58.

12  **B.      Finisar's Request for an Order Compelling Nistica to Supplement its Responses to Discovery Requests to Include Technical Information of Products Still Under**

13  **Development (Dkt. No. 225, 230)**

14          Next, Finisar seeks an order compelling Nistica to provide technical information

15  concerning Accused Products still in early research and development phases.  (Dkt. No. 225.)

16  Finisar's Amended Infringement Contentions identified a number of Nistica's products series—

17  not just a particular product within the series—as infringing Finisar's patents, listing over 120

18  specific product numbers as accused devices but also accusing "all revisions, variations, or custom

19  products based on a substantially similar design" as infringing.  (Dkt. No. 225-1 at 4-5.)  Finisar

20  seeks technical information about all products within the series, including products still in

21  development or only the subject of an offer for sale and including product numbers not

22  specifically identified in its contentions, in response to Interrogatory Nos. 1 and 5, and RFP Nos.

23  11, 19-20, 29-32, 35-37, 39-40, 59-60, 64, and 69-71.

24          Patent Local Rule 3-1 is a discovery device that sets forth the standards for disclosing

25  asserted claims and infringement contentions, and it "takes the place of a series of interrogatories

26  that defendants would likely have propounded had the patent local rules not provided for

27  streamlined discovery." *Intertrust Techs. Corp. v. Microsoft Corp.*, No. 01-1640 SBA, 2003 WL

28  23120174, at *1 (N.D. Cal. Dec. 1, 2003) (internal quotation marks and citation omitted).  The

1    Rule requires that infringement contentions present "'each claim of each patent in suit that is

2    allegedly infringed by each opposing party' and identify for each asserted claim 'each accused

3    apparatus, product, device, process, method, act or instrumentality ("Accused Instrumentality")

4    . . . of which the party is aware.'"  *Bender v. Freescale Semiconductor, Inc.*, No. 09-1156 PJH

5    (MEJ), 2010 WL 1689465, at *2 (N.D. Cal. Apr. 26, 2010) (citation omitted).  The Rule is

6    "designed to require parties to crystallize their theories of the case early in the litigation and to

7    adhere to those theories once they have been disclosed."  *Integrated Circuit Sys., Inc. v. Realtek*

8    *Semiconductor Co.*, 308 F. Supp. 2d 1106, 1107 (N.D. Cal. 2004).

9        The Rules "place the burden of specifically identifying all accused devices on the

10   plaintiff."  *Infineon Techs. AG v. Volterra Semiconductor Corp.*, No. C 11-6239 MMC (DMR),

11   2012 WL 6184394, at *3 (N.D. Cal. Dec. 11, 2012).  This Rule requires "*specific* identification of

12   particular accused products."  *Oracle Am., Inc. v. Google Inc.*, No. C 10-3561 WHA, 2011 WL

13   4479305, at *2 (N.D. Cal. Sept. 26, 2011); *see also Bender v. Maxim Integrated Prods., Inc.*, No.

14   09-1152 SI, 2010 WL 1135762, at *2 (N.D. Cal. Mar. 22, 2010) (noting that the plaintiff must

15   "compare an accused product to its patents on a claim by . . . basis").  If a party wishes to amend

16   contentions to add additional accused products, it may only do so "by order of the Court upon a

17   timely showing of good cause."  Patent L.R. 3-6.

18       Where products are not specifically named in infringement contentions, courts have denied

19   discovery into those other products even where, as here, the contentions include "reasonably

20   similar" products.  *See, e.g.*, *Mediatek, Inc. v. Freescale Semiconductor, Inc.*, No. 11-5341 YGR

21   (JSC), 2013 WL 588760, at *1 (N.D. Cal. Feb. 13, 2013) (denying motion to compel discovery

22   into products that were not specifically identified as accused products under the local rules);

23   *Oracle Am., Inc. v. Google Inc.*, No. C 10—3561 WHA, 2011 WL 4479305, at *2 (N.D. Cal. Sept.

24   26, 2011) (noting that the local patent rules do not "tolerate broad categorical identifications" or

25   "the use of mere representative examples" and rather contentions must disclose "a full list of

26   accused products"); *Kelora Sys., LLC v. Target Corp.*, No. C 11-01548 CW (LB), 2011 WL

27   5444419, at *2 (N.D. Cal. Nov. 9, 2011) (denying discovery as to products not specifically

28   accused in plaintiff's infringement contentions).

United States District Court
Northern District of California

1      Here, Finisar seeks an order compelling Nistica to produce technical specifications

2 ("NSPs") and bills of material ("BOMs") for all products in the Accused Series—including

3 products not specifically listed in Finisar's contentions by name and model number—or, to the

4 extent no such documents exist, to provide a narrative response regarding the technical function of

5 the product in response to a number of RFPs.  Nistica has responded to these discovery requests

6 by producing NSPs and BOMs for a number of Accused Products, but not others.  In December of

7 2014, Nistica represented that it was producing responsive documents, including NSPs, for both

8 commercial products and those still in the research and development phase.  (Dkt. No. 225-3.)  By

9 April 2015, Nistica produced further NSPs and BOMs, including those for products in

10 development; several of these were not produced earlier due to technical issues, while the NSP for

11 a particular newly developed product was not in existence at the time of Nistica's earlier

12 production.  (Dkt. Nos. 225-4, 225-5.)  As of the filing of Nistica's response, it has produced NSPs

13 and BOMs for all product numbers accused in Finisar's contentions and also conducted a

14 reasonable search and produced these documents for other product numbers for materials still in

15 development.  In light of *Mediatek*, *Oracle*, and the Patent Local Rules, Nistica has not only met

16 but exceeded its discovery obligations by producing documents for products not specifically listed

17 in Finisar's contentions.

18      Finisar's arguments to the contrary are unavailing.  First, Finisar laments the scope of

19 Nistica's search, contending that Nistica limited its search to an engineering database—Omnify—

20 that contains information only about products made or sold, and it should have also searched the

21 files of its engineers and product designers for specifications about products that have not yet

22 reached that stage of development.  (See Dkt. No. 230 at 2.)  But Finisar does not seek discovery

23 on "abandoned products not in active development" (*id.*), so its request may be overbroad.

24 Moreover, Nistica has clarified that "[e]very new design or idea, even if only on paper and never

25 made or commercialized," is given a product number in the Omnify database.  (Dkt. No. 230 at 2

26 n.2.)  Thus, a search of the Omnify database is not limited to made or sold products, but rather

27 encompasses all products at every stage of development.

28      Finisar's reliance on *Advanced Micro Devices, Inc. v. Samsung Electronics Co.*, No. 08-

United States District Court
Northern District of California

1    cv-986-SI, 2009 WL 1834147, at \*3 (N.D. Cal. June 24, 2009), is misplaced.  There, the court

2    ordered the defendant to produce discovery on products identified during discovery that were

3    substantially similar to those accused in plaintiff's infringement contentions.  *Id.* at \*3.  But in that

4    case, not only was there a showing that the products were substantially similar, the plaintiff had

5    shown that it only discovered the new products during a recent deposition.  *Id.*  Finisar makes no

6    such showing here.  At bottom, if Finisar wishes to obtain discovery on these other products, it

7    must demonstrate good cause to amend its infringement contentions.  It has not done so, and the

8    Court therefore DENIES Finisar's request for an order compelling Nistica to supplement its

9    responses to requests for production of documents pertaining to technical details of Accused

10   Products.

      The Court reaches the same conclusion with respect to Interrogatory Nos. 1 and 5.

11

12   Nistica's responses to these interrogatories include sufficient responses for all product numbers

13   accused on infringement in Finisar's contentions.  Absent a showing of good cause to amend, the

14   Court DENIES Finisar's request for an order compelling Nistica to supplement its responses to

15   include information about other products not specifically accused therein.

16   **C.    Nistica's Request to Overcome Finisar's Claim that Expert Witness Keren Bergman
     has a Conflict of Interest (Dkt. No. 231)**

17

      Nistica seeks an order overruling Finisar's objection to Professor Keren Bergman,

18

19   Chairman of the Electrical Engineering Department at Columbia University, Nistica's technical

20   expert witness.  (Dkt. No. 231.)

      1.    Background

21

      a.    *Issues in the Case*

22

23         Finisar accuses a number of Nistica products of infringing six of Finisar's patents directed

24   at devices and components used in optical communications networks.  The products that practice

25   the six patents-in-suit include several types of line cards products used in optical devices.  Fact

26   discovery closed on June 26, 2015.  (*See* Dkt. No. 214 at 2.)  The deadline for expert reports is

27   July 27, 2015.  (*Id.*)

28

United States District Court
Northern District of California

b.      *Dr. Bergman's Relationship with Finisar*

The parties dispute the scope of Professor Bergman's discussions with Finisar.  From Nistica's perspective, it was minimal.  Professor Bergman's declaration indicates that she had only a 30-minute introductory phone call regarding whether she had time or interest in serving as Finisar's expert in another case, but she was not hired and did not sign a confidentiality agreement.  (*See* Dkt. No. 231-3 ¶¶ 3-7.)  Professor Bergman avers that Finisar did not provide any confidential information or legal strategy, and while Finisar sent her copies of certain patents, she did not do any analysis of Finisar's products.  (*Id.* ¶ 7.)

Finisar submits that its outside counsel, David Radulescu and Tigran Vardanian, consulted with Dr. Bergman on Finisar's behalf in connection with prior patent litigation involving the same technology at issue in this case—*i.e.*, WSS products.  It is undisputed that Finisar never retained Dr. Bergman as an expert in the cases, *Finisar Corp. v. Cheetah Omni, LLC*, No. 2:11-cv-15526 (E.D. Mich.), and *Cheetah Omni LLC v. Alcatel-Lucent USA Inc.*, No. 6:11-cv-00390 (E.D. Tex.) (together, the "*Cheetah* cases").  However, Mr. Radulescu avers that he had a 42-minute phone call with Dr. Bergman on July 31, 2012 to discuss the expert work needed in the *Cheetah* cases. (Dkt. No. 235-6 ¶ 5.)  Mr. Radulescu avers "[t]o the best of [his] recollection" that he "disclosed attorney work product and confidential Finisar information to Dr. Bergman during this call, including information about Finisar technology and Finisar's invalidity strategy[.]" (*Id.*)  Mr. Radulescu maintains that he discussed Dr. Bergman's possible role as an expert and discussed sending her an engagement agreement.  (*Id.*)  Mr. Radulescu avers that on August 1, 2012, he emailed Dr. Bergman the patents-in-suit in the *Cheetah* cases for her review.  (*Id.* ¶ 6.)  Mr. Radulescu believes that another attorney at his then-law firm drafted a consulting agreement and emailed it to Dr. Bergman.  (*Id.* ¶ 7.)  Mr. Radulescu further avers that he had a second telephone call with Dr. Bergman during which "confidential and attorney work product information was discussed[,]" though he has no record of such call.[1]  (*Id.* ¶ 8.)

_____

[1] In fact, no emails or other records of these discussions are attached to Mr. Radulescu's declaration.  He explains that they took place while he was associated with a different law firm; he has sought the documents from that firm, but has not received any. (Dkt. No. 235-6 ¶ 3.)

1        c.    *Dr. Bergman's Relationship with Nistica*

2     Finisar also seeks to disqualify Dr. Bergman based on her relationship with Nistica,

3 including her friendship with Nistica's CEO, Dr. Vengsarkar, and her "research and consulting

4 ties" with the company. (Dkt. No. 236 at 2.)

5     With respect to the Bergman-Vengsarkar relationship, Finisar cites a 2008 email in which

6 Mr. Vengsarkar described running into Dr. Bergman, noting that he agreed to visit her lab, get an

7 overview of her work, and explore the possibility of collaboration. (Dkt. No. 235-10 at 2.) Finisar

8 also cites emails from 2011 indicating that Dr. Bergman referred students to Nistica for possible

9 jobs or internships. (Dkt. No. 235-12.) In addition, in 2013 Nistica's Director of Sales proposed

10 giving Dr. Bergman a discount on one of Nistica's WSS products for use in her lab because she

11 was Vengsarkar's friend. (Dkt. No. 235-14.) Dr. Bergman, for her part, avers that Dr. Vengsarkar

12 is a professional acquaintance and the two interact at technical conferences. (Dkt. No. 231-3

13 ¶ 12.)

14     With respect to Dr. Bergman's involvement in Nistica's research, Finisar highlights emails

15 that it contends evidence a much deeper relationship based on several examples. First, Finisar

16 points to Dr. Bergman's role as co-leader of the Center for Integrated Access Networks ("CIAN"),

17 of which Nistica is an industry affiliate. (*See* Dkt. No. 235-14.) Second, Finisar highlights Dr.

18 Bergman's "extensive" discussions about Nistica's WSS products with the company's VP of Sales

19 and Marketing, Mr. Falquier. At a CIAN meeting in January 2012, the two discussed Nistica's

20 WSS; Mr. Falquier wrote that Dr. Bergman had expressed interest in learning more about the

21 product. (Dkt. No. 235-16 at 2.) Dr. Bergman further avers that "[t]here was some discussion in

22 the past about joint research, but that did not occur." (*Id.*) Lastly, in 2013 Nistica sold Dr.

23 Bergman's research laboratory certain WSS and WSS-related product. (Dkt. No. 235-14.) Dr.

24 Berman signed a non-disclosure agreement in order to have access to more detailed information

25 from Nistica about the product. (*Id.*)

26        d.    *Nistica's Disclosure of its Expert & the Instant Motion*

27     Nistica disclosed Professor Bergman as one of its experts on June 30, 2015. Pursuant to

28 the parties' Stipulated Protective Order ("Protective Order"), on July 7, 2015 Finisar objected to

United States District Court
Northern District of California

11

1    Professor Bergman having access to Finisar's confidential information.  (*See* Dkt. No. 140 § 8(b).)

2    Under the terms of the Protective Order, Professor Bergman is therefore prohibited from viewing

3    materials marked Confidential—Attorneys' Eyes Only or HIGHLY CONFIDENTIAL—

4    OUTSIDE ATTORNEYS' EYES ONLY "until the matter is resolved by agreement between the

5    parties in question or until decided by the Court."  (*Id.*)  After what appears to be some limited

6    meet-and-confer efforts, Nistica brought the matter to the Court's attention, and Finisar filed an

7    opposition.

8         2.    Legal Standard

9         "Federal courts have the inherent power to disqualify expert witnesses to protect the

10   integrity of the adversary process, protect privileges that otherwise may be breached, and promote

11   public confidence in the legal system."  *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d

12   1087, 1092 (N.D. Cal. Aug. 10, 2004) (citations omitted).  But disqualification is a "drastic

13   measure" that courts should impose only "hesitantly, reluctantly, and rarely."  *Id.* (citation

14   omitted).  There is no brightline rule for determining whether an expert should be disqualified, but

15   courts generally find disqualification warranted "based on a prior relationship with an adversary if

16   (1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed

17   confidential information to the expert that is relevant to the current litigation."  *Id.* (citation

18   omitted); *see also Oracle Corp. v. DrugLogic, Inc.*, No. C-11-00910-JCS, 2012 WL 2244305, at

19   *5 (N.D. Cal. June 15, 2012) (citation omitted).  The party seeking to disqualify the expert bears

20   the burden of establishing these factors.  *Hewlett-Packard*, 330 F. Supp. 2d at 1092.  However, if

21   only one factor is present, disqualification is inappropriate.  *Id.* (citation omitted).  "In addition to

22   these two factors, the Court also should consider whether disqualification would be fair to the

23   affected party and would promote the integrity of the legal process."  *Id.*

24        3.    Discussion

25        Dr. Bergman's alleged relationship with Nistica is not grounds for the drastic measure of

26   disqualification, though it may provide fertile ground for cross-examination at trial on the question

27   of bias. The concern disqualification seeks to address is a potential expert's use of the *adversary*'s

28   confidential information, such as legal strategy—information to which the party that retained the

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1    expert otherwise would not have access.  Thus, that Dr. Bergman signed an NDA with Nistica or

2    has had discussions with Mr. Falquier about Nistica's WSS products is irrelevant to the analysis.

3    Nor has Finisar persuaded the Court that Dr. Bergman's relationship with Dr. Vengsarkar is so

4    close that it will either color her expert testimony in this case or will cause her to share Finisar's

5    highly confidential source code directly with him, as the examples Finisar identifies do not

6    establish anything other than professional courtesy and a successful working relationship—just as

7    Dr. Bergman avers.  In short, no deeper analysis of Dr. Bergman's relationship with Nistica is

8    required; it does not create a conflict that requires prohibiting Dr. Bergman from viewing Finisar's

9    confidential information.  However, the Court will address in detail Finisar's claim that Dr.

10   Bergman should be disqualified due to her prior relationship with Finisar.

11                        a.        *Confidential Relationship*

12           The Court turns to the first factor: whether Finisar maintained a confidential relationship

13   with Dr. Bergman.  "The critical inquiry with regard to this factor is not whether there was a

14   formal agreement between the adversary and the expert, but rather whether there was a

15   relationship such that the adversary would 'reasonably . . . expect that any communication would

16   be maintained in confidence.'"  *CreAgri, Inc. v. Pinnaclife Inc.*, No. 5:11-CV-06635-LHK, 2013

17   WL 6700395, at *3 (N.D. Cal. Dec. 18, 2013) (quoting *Hewlett-Packard*, 330 F. Supp. 2d at

18   1093).  When making this determination, courts consider a number of factors, including the length

19   of the relationship and number of meetings between the adversary and the expert, whether the

20   expert was retained to assist in litigation, whether there was a formal confidentiality agreement in

21   place, whether the expert was paid a fee, and whether the expert derived any of her specific ideas

22   from work done under the direction of the retaining party.  *See CreAgri, Inc.*, 2013 WL 6700395,

23   at *3; *Hewlett-Packard*, 330 F. Supp. 2d at 1093.  No single factor is dispositive.  Thus, there is no

24   per se rule that an expert must be disqualified merely because she signed a confidentiality

25   agreement with the adversary.  *See CreAgri, Inc.*, 2013 WL 6700395, at *3 (citation omitted);

26   *Hewlett-Packard*, 330 F. Supp. 2d at 1094.  Ultimately, disqualification depends not on whether

27   there is a confidentiality agreement in place, but whether the expert actually began reviewing

28   confidential factual information and theories concerning litigation.  *See Hewlett-Packard*, 330 F.

13

United States District Court
Northern District of California

1    Supp. 2d at 1093.  The party seeking to disqualify the expert bears the burden of establishing the

2    existence of a confidential relationship.  *CreAgri, Inc.*, 2013 WL 6700395, at *3 (citing *Mayer v.*

3    *Dell*, 139 F.R.D. 1, 3 (D.D.C. 1991)).

4            While not dispositive, at the time of the alleged disclosures, no formal confidentiality

5    agreement governed the relationship between Finisar and Dr. Bergman, which weighs against

6    finding a confidential relationship here.  While Mr. Radulescu avers that he prepared and sent a

7    consulting agreement to Dr. Bergman, he is unable to state with certainty whether one was even

8    sent to her, and he nowhere declares that she executed one.  (*See* Dkt. No. 235-6.)  Thus, Finisar

9    has not presented evidence to rebut Dr. Bergman's assertion that there was no confidentiality

10   agreement in place.  At bottom, Finisar seeks to disqualify Dr. Bergman based on one 42-minute

11   telephone conversation with Mr. Radulescu about possibly serving as Finisar's expert in the

12   *Cheetah* cases.  At best, this relationship spans two phone calls, which is not the type of

13   continuing relationship that generates a reasonable belief in a confidential relationship.  *Cf.*

14   *CreAgri*, 2013 WL 6700395, at *4; *Oracle*, 2012 WL 2244305.  If anything, it appears that this

15   was a mere introductory call to determine whether Dr. Bergman was interested in serving as

16   Finisar's expert rather than any in-depth, substantive analysis of claims and defenses in the

17   *Cheetah* cases.  Thus, the Court concludes that Finisar has not met its burden of demonstrating

18   that it reasonably believed it had a confidential relationship with Dr. Bergman.

19                              b.       *Confidential Information*

20           Even if the Court were to find a reasonable basis for Finisar to believe it had a confidential

21   relationship with Dr. Bergman, Finisar likewise has not met its burden of showing that it disclosed

22   confidential information relevant to this case during the course of that relationship.  Confidential

23   information for the purposes of expert witness disqualification is information of "particular

24   significance."  *Hewlett-Packard*, 330 F. Supp. 2d at 1094 (citation omitted).  Specifically, "courts

25   inquire whether the adversary disclosed confidential information to the expert that is relevant to

26   the current litigation."  *Kane v. Chobani, Inc.*, No. 12-02425, 2013 WL 399107, at *6 (N.D. Cal.

27   Aug. 2, 2013).  Confidential communications may include discussions related to litigation, such as

28   strategy, types of experts and their planned roles, and the strengths and weaknesses of each side's

14

1    case. *Hewlett-Packard*, 330 F. Supp. 2d at 1094.  However, "[c]ourts have held that technical

2    information as opposed to legal advice is not considered confidential" for the purposes of this

3    analysis. *CreAgri*, 2013 WL 6700395, at *5 (citation omitted).  The party seeking disqualification

4    bears the burden of demonstrating that confidential information was exchanged by "point[ing] to

5    *specific and unambiguous disclosures* that if revealed would prejudice the party." *Hewlett-*

6    *Packard*, 330 F. Supp. 2d at 1094 (emphasis added) (citations omitted).

7            Finisar has not done so here.  Finisar relies exclusively on the Radulescu Declaration's

8    general and conclusory assertion that Mr. Radulescu disclosed "information about Finisar's

9    technology and Finisar's invalidity strategy" during the course of two phone calls with Dr.

10   Bergman.  (Dkt. No. 235-6 ¶¶ 5-6.)  While Mr. Radulescu has sufficiently averred that the

11   products at issue in the *Cheetah* cases also practice the patents-in-suit here (*id.* ¶ 2), he provides no

12   details about what the disclosures about those products were, which is insufficient to meet

13   Finisar's burden.  Indeed, district courts have declined to disqualify experts based on general

14   claims that confidential litigation strategy was disclosed in phone calls without "specific details of

15   such discussion[,]" especially in complex patent cases.  *See, e.g.*, *Hewlett-Packard*, 330 F. Supp.

16   2d at 1096; *see also Mays v. Reassure Am. Life. Ins.*, 293 F. Supp. 2d 954, 957 (D. Ark. 2003)

17   ("[I]n the 60 to 90 minute meeting, it is highly unlikely that there was any detailed or involved

18   discussion concerning litigation strategies, the strengths and weaknesses of each side, the

19   witnesses to be called, the types of experts to be retained and anticipated defenses.").  To the

20   contrary, reading the Radulescu Declaration as a whole supports exactly what Dr. Bergman herself

21   avers: that the phone call was merely meant to inquire into *whether* she was interested or available

22   to serve as Finisar's expert.  While Mr. Radulescu avers that he and Dr. Bergman discussed the

23   scope of a potential consultancy agreement, this does not rise to the level of confidential

24   information that makes disqualification appropriate.  Likewise, that he emailed Finisar patents to

25   Professor Bergman is of no consequence, as the patents are publicly available.  In short, Finisar

26   has not persuaded the Court that Mr. Radauescu and Dr. Bergman had confidential conversations

27   regarding Finisar's products.  Because Finisar has not met its burden of demonstrating that

28   confidential information was disclosed, disqualification is inappropriate.  *See Hewlett-Packard*,

United States District Court
Northern District of California

15

1    330 F. Supp. 2d at 1093.

2                    c.    *Fundamental Fairness & Policy Concerns*

3          The third factor—fundamental fairness and prejudice—compels the same result.  Here, the

4    Court considers whether other experts would be available if the expert at issue were disqualified

5    and whether disqualification at this stage of litigation will likely disrupt judicial proceedings.  *See*

6    *id.* at 1095.  "Consideration of prejudice is especially appropriate at late stages in the litigation, at

7    which time disqualification is more likely to disrupt the judicial proceedings."  *Life Tech. Corp. v.*

8    *Biosearch Tech., Inc.*, No. 12-0852, 2012 WL 1604710, at *10 (N.D. Cal. May 7, 2012).

9          On the one hand, Finisar provided notice of its objection to Dr. Bergman immediately

10   upon learning that Nistica was offering her as an expert.  Thus, although the deadline for expert

11   reports is fast approaching, that Nistica did not disclose Dr. Bergman until weeks of the deadline

12   for expert reports should not count against Finisar.  On the other hand, while Nistica apparently

13   has other experts in its lineup, it clearly seeks to rely on Dr. Bergman for some purpose and would

14   need to search for, retain, and bring up to date a new expert if Dr. Bergman were disqualified;

15   because this likely would require pushing back the deadlines for expert reports (and, like a judicial

16   domino effect, the deadlines for dispositive motions and trial), disqualification would disrupt the

17   judicial proceedings, causing prejudice.  *See Hewlett-Packard*, 330 F. Supp. 2d at 1094; *Life Tech.*

18   *Corp.*, 2012 WL 1604710, at *10.

19         Finally, policy concerns weigh in favor of allowing Professor Bergman to serve as

20   Nistica's expert over Finisar's objection.  *See Ziptronix, Inc. v. Omnivision Techs., Inc.*, No. C-10-

21   05525 SBA (EDL), 2013 WL 146413, at *3 (N.D. Cal. Jan. 14, 2013) (noting that policy concerns

22   are relevant to the analysis to avoid creating "troublesome incentives for both experts and the

23   retaining party" and to "promot[e] public confidence in the legal system" (citations omitted)).

24   What is more, disqualification in this scenario would greatly hamper all experts' ability to serve as

25   expert witnesses because a party could use a mere exploratory phone call that resulted in no

26   contract as a purported conflict.  As other courts have made clear, "[t]his concern is especially

27   important in high-technology patent infringement cases, in which the courts, as well as the public,

28   rely on experts to explain complicated technologies."  *Hewlett-Packard*, 330 F. Supp. 2d at 1098.

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    Public policy therefore dictates that introductory conversations with an adversary's attorneys

2    regarding prior litigation does not create a conflict of interest that warrants the expert's

3    disqualification.

4                                                    *   *   *

5          For each of these reasons, the Court GRANTS Nistica's request to overcome Finisar's

6    claim that Professor Bergman has a conflict of interest.  It follows that Professor Bergman may

7    view Finisar's highly confidential material subject to the Protective Order.

8                                              **CONCLUSION**

9          For the reasons discussed above, the Court GRANTS IN PART and DENIES IN PART

10   Finisar's request for an order compelling further 30(b)(6) testimony.  Specifically, Nistica must

11   identify and make available for a one-hour deposition a corporate designee on Topic 34 as set

12   forth above.  If the parties cannot agree on a location for the deposition, it shall take place in San

13   Francisco.  The Court DENIES Finisar's request for further 30(b)(6) testimony on Topic 36.

14         The Court also DENIES Finisar's request for an order compelling Nistica to supplement its

15   discovery responses to provide technical information about products not specifically accusing in

16   its infringement contentions.  This denial is without prejudice to Finisar renewing the request after

17   demonstrating good cause to amend its contentions to accuse additional products.

18         Finally, the Court GRANTS Nistica's motion to overcome Finisar's claim that Nistica's

19   proposed expert witness, Keren Bergman, has a conflict of interest.

20         This Order disposes of Docket Nos. 223, 225, 230, and 231.

21         **IT IS SO ORDERED.**

22   Dated:  July 21, 2015

23

24                                                                 _____

25                                                                 JACQUELINE SCOTT CORLEY
                                                                   United States Magistrate Judge

26

27

28

17