REDACTED - NON-CONFIDENTAIL VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FINISAR CORPORATION,<br><br>               Plaintiff,<br><br>    v.<br><br>NISTICA, INC.,<br><br>               Defendant. | ) Case No.: 13-cv-03345-BLF<br>)<br>) **CORRECTED REPORT AND**<br>) **RECOMMENDATIONS OF SPECIAL**<br>) **MASTER REGARDING**<br>) **MOTIONS FOR SUMMARY JUDGMENT**<br>)<br>) **DOCUMENT SUBJECT TO MOTION TO**<br>) **SEAL; CONTAINS CONFIDENTIAL-**<br>) **ATTORNEYS' EYES ONLY**<br>) **INFORMATION**<br>) |

1

**TABLE OF CONTENTS**

2

3

I. BACKGROUND .................................................................................................................. 1

A. The Technology and the Asserted Patents ...................................................................... 1

4

B. The Accused Products ..................................................................................................... 2

5

II. LEGAL STANDARDS ...................................................................................................... 3

6

A. Summary Judgment ......................................................................................................... 3

7

B. Infringement .................................................................................................................... 4

C. Anticipation ..................................................................................................................... 4

8

D. Disclosure of Expert Opinions ....................................................................................... 5

9

10

III. THE MOTIONS ................................................................................................................ 6

11

IV. FINISAR'S MOTION ....................................................................................................... 7

12     A.   Finisar's Motion for Summary Judgment That Nistica Literally Infringes Claim 24 of the
       '599 Patent....................................................................................................................... 7
13

14     B.   Finisar's Motion for Summary Judgment That No Patent-in-Suit Is Obvious Based on
       Prior Art Combinations Advanced by Nistica ............................................................... 15
15

16     C.   Finisar's Motion for Summary Judgment That Nistica's Eighteenth Through Twentieth
       Affirmative Defenses (License/Implied License, Estoppel, Release) Do Not Bar Enforcement
       of the Patents-in-Suit .................................................................................................... 21
17

18     D.   Finisar's Motion for Summary Judgment That Nistica's Twenty-First Affirmative Defense
       (Unclean Hands) Does Not Bar Enforcement of the Patents-in-Suit ........................... 21
19

20     E.   Finisar's Motion for Summary Judgment That Nistica's Twenty-Second Affirmative
       Defense (Laches) Does Not Bar Enforcement of the Patents-in-Suit .......................... 24
21

22     F.   Finisar's Motion for Summary Judgment That Nistica's Twenty-Third Affirmative
       Defense (Equitable Estoppel) Does Not Bar Enforcement of the Patents-in-Suit ...................... 25
23

V. NISTICA'S MOTION ....................................................................................................... 28

24     A.   Nistica's Motion for Summary Judgment That It Does Not Infringe Claim 14 of Finisar's
       '599 Patent..................................................................................................................... 28
25

26     B.   Nistica's Motion for Summary Judgment That Claim 24 of Finisar's '599 Patent Is
       Invalid............................................................................................................................ 35
27

28     C.   Nistica's Motion for Summary Judgment That It Does Not Infringe Claims 1, 12 and 14 of
       Finisar's '980 Patent ..................................................................................................... 38

D.  Nistica's Motion for Summary Judgment That It Does Not Infringe Claims 1 and 18 of Finisar's '833 Patent ........................................................................................................... 44

E.  Nistica's Motion for Summary Judgment That Claims 1, 25 and 29 of Finisar's '740 Patent Are Invalid ........................................................................................................................... 48

F.  Nistica's Motion for Summary Judgment That It Does Not Infringe Claim 32 of Finisar's '687 Patent ........................................................................................................................... 54

G.  Nistica's Motion That Claim 32 of the '687 Patent Is Invalid for Lack of Written Description and Enablement .............................................................................................. 57

H.  Nistica's Motion for Summary Judgment That It Does Not Infringe Finisar's '328 Patent ................................................................................................................................... 61

I.  Nistica's Motion for Summary Judgment That Finisar Has No Evidence of Direct Infringement by Accused Products Manufactured, Shipped and Delivered Abroad ................ 61

J.  Nistica's Motion for Summary Judgment That There Is No Indirect Infringement and Infringement Under § 271 (f) Relating to Fujikura, Ltd. and Fujikura Optics of Vietnam, Ltd.65

K.  Nistica's Motion for Summary Judgment That There Is No Indirect Infringement Because There Is No Evidence That Fujikura or FOV Directly Infringe the Patents-in-Suit .................. 66

L.  Nistica's Motion for Summary Judgment That Finisar Cannot Prove Willful Infringement .......................................................................................................................... 66

VI. SUMMARY OF RECOMMENDATIONS ................................................................................. 67

1

**TABLE OF ABBREVIATIONS**

2

| Full Name | Docket Number | Abbreviation in Report |
|---|---|---|
| Order Construing Claims of U.S. Patent Nos. 6,430,328; 6,956,687; 7,126,740; 7,397,980 | 123 | Order Construing Claims |
| Plaintiff Finisar Corporation's Motion for Summary Judgment | 323 | Finisar Motion |
| Plaintiff Finisar Corporation's Supporting Separate Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment | 323-1 | Finisar SUF |
| Declaration of Dr. Katherine L. Hall in Support of Plaintiff Finisar Corporation's Motion for Summary Judgment | 323-2 | Hall Decl. I |
| Declaration of Robin M. Davis in Support of Plaintiff Finisar Corporation's Motion for Summary Judgment | 323-3 | Davis Decl. I |
| Defendant Nistica, Inc.'s Motion for Summary Judgment | 328 | Nistica Motion |
| Defendant Nistica, Inc.'s Statement of Undisputed Facts in Support of Motion for Summary Judgment | 328-1 | Nistica SUF |
| Declaration of Thomas Strasser in Support of Defendant Nistica, Inc.'s Motion for Summary Judgment | 328-2 | Strasser Decl. I |
| Declaration of Dr. Keith Goossen in Support of Nistica, Inc's Motion for Summary Judgment | 328-25 | Goossen Decl. I |
| Order Granting in Part and Denying in Part Motions to Strike Portions of Expert Reports | 344, 367 | Order Striking Portions of Expert Reports |
| Amended Declaration of Jennifer D. Bennett in Support of Nistica, Inc.'s Motion for Summary Judgment | 339 | Bennett Decl. I |
| Defendant Nistica, Inc.'s Opposition to Plaintiff Finisar Corp.'s Motion for Summary Judgment | 357 | Nistica Opposition |
| Defendant Nistica, Inc.'s Response to Finisar's Statement of Undisputed Facts Relating to Finisar's Motion for Summary Judgment | 357-1 | Nistica Responsive SUF |
| Declaration of Jennifer D. Bennett in Opposition to Finisar Corp.'s Motion for Summary Judgment | 357-2 | Bennett Decl. II |
| Declaration of Dr. Keith Goossen in Opposition to Finisar Corp.'s Motion for Summary Judgment | 357-32 | Goossen Decl. II |
| Declaration of Ashih Vengsarkar in Opposition to Finisar Corp.'s Motion for Summary Judgment | 357-35 | Vengsarkar Decl. |
| Plaintiff Finisar Corporation's Opposition to Defendant Nistica, Inc.'s Motion for Summary Judgment | 359 | Finisar Opposition |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Finisar's Responsive Separate Statement to Defendant Nistica, Inc.'s Amended Statement of Undisputed Facts in Support of Motion for Summary Judgment | 359-1 | Finisar Responsive SUF |
|---|---|---|
| Declaration of Dr. Katherine L. Hall in Support of Plaintiff Finisar Corporation's Opposition to Nistica's Motion for Summary Judgment | 359-2 | Hall Decl. II |
| Declaration of Robin M. Davis in support of Plaintiff Finisar Corporation's Opposition to Defendant Nistica, Inc.'s Motion for Summary Judgment | 359-3 | Davis Decl. II |
| Plaintiff Finisar Corporation's Reply in Support of Its Motion for Summary Judgment | 374 | Finisar Reply |
| Declaration of Robin M. Davis in Support of Plaintiff Finisar Corporation's Reply in Support of its Motion for Summary Judgment | 374-1 | Davis Decl. III |
| Defendant Nistica, Inc.'s Reply in Support of its Motions for Summary Judgment | 383 | Nistica Reply |
| Defendant Nistica, Inc.'s Reply Statement of Undisputed Facts in Support Of Motion For Summary Judgment | 383-2 | Nistica Reply SUF |

1    Pursuant to the August 28, 2015, Order Appointing Special Master for Summary Judgment
2  (Dkt. No. 265), the Special Master respectfully submits the following Report and Recommendations
3  to Judge Beth Labson Freeman of the United States District Court for the Northern District of
4  California. The Order provided that "[t]he Special Master shall prepare a report and
5  recommendations regarding the parties' motions for summary judgment." Each party filed Motions
6  for Summary Judgment on November 12, 2015, oppositions to the motions on December 4, 2015,
7  and replies on December 18, 2015. Counsel for each party presented oral argument at a full day
8  hearing on January 11, 2016, and the motions were taken under submission. After careful
9  consideration the Special Master makes the recommendations detailed below.

10  **I. BACKGROUND**

11  **A. The Technology and the Asserted Patents**

12    Finisar asserts six patents against Nistica, all relating to switching and networking
13  equipment for fiber optic transmission.

14    U.S. Patent No. 6,430,328 ("'328 Patent") titled "Optical Switch," tackles the need to more
15  quickly change the direction of an optical beam within an optical network. The optical switch apparatus
16  described in this patent uses phase spatial light modulators ("SLM") comprised of an array of
17  micromirrors to rapidly change the direction of a beam of light. '328 Patent, 1:33-64, Dkt. No. 99-2.
18  The object of the invention is to devise a system that can switch beam directions faster than could be
19  accomplished with a single rotating mirror. *Id.* 1:24-29.[1] Claim 34 is asserted.

20    U.S. Patent No. 6,956,687 ("'687 Patent") titled "Optical Blocking Filter Having An Array
21  of Micro-Mirrors" relates to a tunable optical filter that can selectively delete individual channels,
22  or wavelengths of light, from within an optical signal containing numerous channels—a wavelength
23  division multiplexed (WDM) optical signal. '687 Patent 1:25-31, Dkt. No. 99-3. The invention
24  comprises a pixilated filter having an SLM that includes a micromirror device, where the pixilated
25  filter configuration operates as an easily reconfigurable blocking filter. *Id.* 2:24-41. Claim 32 is
26  asserted.

27

28

---

[1] The descriptions of the '328, '687 and '740 Patents are from the Court's Order Construing Claims, p. 2.

1    U.S. Patent No. 7,092,599 ("'599 Patent") titled "Wavelength Manipulation System and
2   Method" concerns "[a] wavelength selective manipulation device and method including an optical
3   input port for inputting an optical signal, a first wavelength dispersing element for angularly
4   dispersing the wavelength channels of the optical signal into angularly dispersed wavelength
5   signals, an optical power element for focusing the angularly dispersed wavelength signals into a
6   series of elongated spatially separated wavelength bands, and a spatial manipulation element for
7   manipulating the spatial characteristics of the spatially separated wavelength bands to produce a
8   manipulated wavelength bands." '599 Patent, Abstract, Goossen Decl. I, Ex. 5. Claims 14 and 24
9   are asserted.

10    U.S. Patent No. 7,123,833 ("'833 Patent") titled "Dynamically Reconfigurable Optical
11   Smart Node" concerns "wavelength division multiplexed optical communication systems which
12   include smart nodes having dynamic optical signal manipulation devices in combination with
13   sensing devices and processors to provide real time closed and open loop control of various
14   channels of the network." '833 Patent, 1:14-20, Goossen Decl. I, Ex. 5. Claims 1 and 18 are
15   asserted.

16    U.S. Patent No. 7,126,740 ("'740 Patent") titled "Multifunctional Optical Device Having a
17   Spatial Light Modulator With an Array of Micromirrors," describes a reconfigurable optical device
18   that is capable of receiving an optical signal, spreading it into one or more bands or channels, and
19   performing separate optical functions on each signal, in effect processing a number of channels at
20   the same time. '740 Patent, Abstract; 2:49-65, Dkt. No. 99-4. The object of the invention is to
21   accomplish all of this with a single SLM. *Id.* 2:46-48. Claims 1, 25 and 29 are asserted.

22    U.S. Patent No. 7,397,980 ("'980 Patent") titled "Dual Source Optical Wavelength
23   Processor" "relates generally to optical switches, and in particular to a reconfigurable fiber optic
24   wavelength switch that can operate independently on individual wavelength channels contained in
25   optical signals originating from either of two input sources." '980 Patent, 1:6-10, Dkt. No. 99-5.
26   Claims 1, 12 and 14 are asserted.

27   **B. The Accused Products**

28    The accused products are listed on the Summary of Accused Products attached as Exhibit 1

1 | to Bennett Decl. I, and is attached hereto as Exhibit 1 and incorporated herein.

2 | **C. Relevant Procedural History**

3 | The Court held a Markman hearing on July 21, 2014, and construed ten terms in its Order

4 | Construing Claims issued on October 1, 2014. Dkt. No. 123. On November 24, 2015, the Court

5 | issued its Order Denying Plaintiff's Motion to Strike Portions of Defendant's Motion for Summary

6 | Judgment. Dkt No. 336. On December 1, 2015, the Court issued its Order Granting in Part and

7 | Denying in Part Motions to Strike Portions of Expert Reports. Dkt. No. 344, 367.

8 | **II. LEGAL STANDARDS**

9 | **A. Summary Judgment**

10 | Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant

11 | summary judgment if the movant shows that there is no genuine dispute as to any material fact and

12 | the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one

13 | that is relevant and necessary to the proceedings. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

14 | 242, 248 (1986). A genuine dispute exists if sufficient evidence is presented so that a reasonable

15 | fact finder could decide the issue in the nonmoving party's favor. *Id.* However, an asserted issue of

16 | material fact is not "genuine," in the sense of Rule 56, if a reasonable jury could only resolve the

17 | question for the moving party. *Id.* The evidence proffered by the nonmoving party "is to be

18 | believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255. In

19 | determining whether a genuine issue of material fact exists, the court must view the evidence in the

20 | light most favorable to the non-moving party. *In re Western States Wholesale Natural Gas*

21 | *Antitrust Litigation*, 715 F.3d 716, 729 (9th Cir. 2013).

22 | The Federal Circuit has held repeatedly that "summary judgment is as appropriate in a

23 | patent case as any other case." *See*, e.g., *Avia Group Int'l, v. L.A. Gear Cal., Inc.,* 853 F.2d 1557,

24 | 1561 (Fed. Cir. 1988); *Mark I Marketing Corp. v. R.R. Donnelly & Sons Co.*, 55 F.3d 285, 289

25 | (Fed. Cir. 1995). Noninfringement is an issue on which it has "repeatedly upheld a grant of

26 | summary judgment." *Chemical Eng'g Corp. v.Esse/Indus., Inc.,* 795 F.2d 1565, 1571 (Fed. Cir.

27 | 1986).

28 |

1 **B. Infringement**

2       An infringement analysis entails two separate steps: (1) interpreting the meaning and scope

3 of patent claims through claim construction; and (2) determining whether the claims, as construed,

4 read on the accused product. *Markman v. Westview Instruments Inc.*, 52 F.3d 967, 976, 979 (Fed.

5 Cir. 1995) (en banc); *Southwall Techs. Ind. v. Cardinal IG Company,* 54 F.3d 1570, 1575 (Fed. Cir.

6 1995). To establish literal infringement, every limitation set forth in a claim must be found in an

7 accused product, exactly. *Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 796 (Fed. Cir.

8 1990). In the second step of the infringement analysis, the construed claims are compared to the

9 accused devices, using the plain and ordinary meaning to one of ordinary skill in the art of all

10 unconstrued claim terms. *See Philips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).

11       Infringement is a question of fact, but "a court may determine infringement on summary

12 judgment 'when no reasonable jury could find that every limitation recited in the properly construed

13 claim either is or is not found in the accused device.'" *Innovention Toys, LLC v. MGA Entmn't,*

14 *Inc.*, 637 F.3d 1314, 1319 (Fed. Cir. 2011) (quoting *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353

15 (Fed. Cir. 1998).

16 **C. Anticipation**

17       To establish anticipation of a claim, the challenger must prove by clear and convincing

18 evidence that a prior art patent discloses "every limitation of the claimed invention either explicitly

19 or implicitly" and demonstrate that "no genuine issue exists as to any material fact" underlying such

20 proof. *Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962, 970 (Fed. Cir. 2001). "But

21 disclosure of each element is not quite enough — this court has long held that '[a]nticipation

22 requires the presence in a single prior art disclosure of all elements of a claimed invention arranged

23 as in the claim.'" *Finisar Corp. v. The DirecTV Group, Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008).

24 In order for expert testimony to demonstrate anticipation, it must "identify each claim element, state

25 the witnesses' interpretation of the claim element, and explain in detail how each claim element is

26 disclosed in the prior art reference." *Schumer v. Laboratory Computer Systems, Inc.* 308 F.3d 1304,

27 1315 (Fed. Cir. 2002).

28

**D.  Disclosure of Expert Opinions**

Both parties challenge opinions offered by the other's expert as new opinions which should not be considered.  Under Federal Rule of Civil Procedure 26(a)(2)(B) an expert witness must timely provide a written report with "a complete statement of all opinions the witness will express and the basis and reasons for them," and "any exhibits that will be used to summarize or support them."  Fed. R. Civ. P. 26(a)(2)(B).  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The Ninth Circuit discussed the application of Rule 37(c)(1) in *Yeti By Molly, Ltd. v. Deckers Outdoor Corp*., 259 F.3d 1101, 1106 (9th Cir. 2001).  Rule 37(c)(1) "contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule..." and it is a "self-executing," "automatic" sanction to "provide a strong inducement for disclosure of material..." *Id*. (citing *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir.1998) and Fed. R. Civ. P 37 advisory committee's note (1993)).  The Ninth Circuit observed in *Yeti By Molly* that courts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded.  *See Volterra Semiconductor Corp. v. Primarion, Inc.,* 796 F. Supp. 2d 1025, 1042 (N.D. Cal. 2011) (sustaining objection to expert declaration on summary judgment where "[d]efendants have not identified any timely prior testimony that expresses the opinions contained in the [untimely] testimony").

In deciding whether opinions expressed in expert reports are "new," the Special Master has followed Judge Spero's approach in *Volterra*:

> The Court notes that in determining whether an opinion is "new," it does not require that an expert's more recent statement must rigidly adhere to his or her original formulation. Rather, the Court compares the more recently articulated opinions to the opinions that were originally expressed to determine whether the opposing party has been given fair notice, while appreciating that in the course of litigation, the positions of the parties and their experts necessarily evolve somewhat as each attempts to respond to the arguments of the other.

*Id.* at 1040.

**III. THE MOTIONS**

Finisar seeks summary judgment as follows:

A.  Nistica literally infringes claim 24 of the '599 Patent;

B.  No patent-in-suit is obvious based on prior art combinations advanced by Nistica;

C.  Nistica's Eighteenth through Twentieth Affirmative Defenses (license/implied license, estoppel, release) do not bar enforcement of the patents-in-suit;

D.  Nistica's Twenty-First Affirmative Defense (unclean hands) does not bar enforcement of the patents-in-suit;

E.  Nistica's Twenty-Second Affirmative Defense (laches) does not bar enforcement of the patents-in-suit; and

F.  Nistica's Twenty-Third Affirmative Defense (equitable estoppel) does not bar enforcement of the patents-in-suit.

Nistica seeks summary judgment as follows:

A.  Nistica does not infringe claim 14 of Finisar's '599 Patent;

B.  Claim 24 of Finisar's '599 Patent is invalid;

C.  Nistica does not infringe claims 1, 12 and 14 of Finisar's '980 Patent;

D.  Nistica does not infringe claims 1 and 18 of Finisar's '833 Patent;

E.  Claims 1, 25 and 29 of Finisar's '740 Patent are invalid;

F.  Nistica does not infringe claim 32 of Finisar's '687 Patent;

G.  Claim 32 of Finisar's '687 Patent is invalid for lack of written description and enablement;

H.  Nistica does not infringe Finisar's '328 Patent;

I.  Finisar has no evidence of direct infringement by accused products manufactured, shipped and delivered abroad;

J.  There is no indirect infringement or infringement under § 271 (f) relating to Fujikura, Ltd. and Fujikura Optics of Vietnam, Ltd.;

K.  There is no indirect infringement because there is no evidence that Fujikura or Fujikura Optics of Vietnam, Ltd directly infringe the asserted patents; and

1    L.  Finisar cannot prove willful infringement.

2    The motions are addressed *ad seriatim* below.

## IV. FINISAR'S MOTION

### A.  Finisar's Motion for Summary Judgment That Nistica Literally Infringes Claim 24 of the '599 Patent

Finisar moves for summary judgment that Nistica literally infringes claim 24 of the '599 Patent, which provides:

> **[preamble]** 24.  A wavelength selective manipulation device comprising:
>
> **[a]** a at least a first optical input port for inputting an optical signal including a plurality of wavelength channels;
>
> **[b]** polarisation alignment element for aligning the polarization state of said optical signal;
>
> **[c]** a wavelength dispersion element for angularly dispersing the wavelength channels of said optical signal into angularly dispersed wavelength signals;
>
> **[d]** an optical power element for focusing the angularly dispersed wavelength signals into a series of elongated spatially separated wavelength signals; and
>
> **[e]** a spatial manipulation element for selectively spatially manipulating the characteristics of said spatially separated wavelength bands to produce spatially manipulated wavelength bands.

The only construction of terms in the '599 Patent was of "polarization alignment element" from claim 24, stipulated to by the parties and ordered by the Court.  Order Construing Claims at 4-5.  Finisar contends that each limitation of claim 24 is found in the '599 Accused Products (Finisar Motion at 9), while Nistica contends that limitations [d] and [e] are missing.  Nistica Opposition at 16.

***Claim Construction.***  Before turning to the disputed claim limitations, three potential claim construction issues must be addressed.  The parties do not agree on which of them is asking for which claim construction, or even on which claim terms require construction, but they do agree that there are three areas of dispute.  *First*, the parties have a disagreement on the meaning of "focusing" in limitation [d].  *Second,* the parties dispute the construction of "focusing . . . *into* a series of elongated spatially separated wavelength signals" in limitation [d].  *Third,* Nistica argues that prosecution disclaimer limits "spatially separated wavelength signals" to light which is collimated

1    in the switching (port) axis, and that the disclaimer applies to limitation [d] of claim 24.

2          Although it is late in the life of this case, construction of hitherto unconstrued claims may be

3    necessary.  The Federal Circuit has held that "when the parties raise an actual dispute regarding the

4    proper scope of these claims, the court, not the jury, must resolve that dispute."  *O2 Micro Int'l Ltd.*

5    *v. Beyond Innov. Tech. Co.,* 521 F.3d 1351, 1360 (Fed. Cir. 2008).

6          During the initial case management conference in this case Judge Gonzalez-Rogers stated

7    that she would construe up to ten terms, but that the parties could seek additional claim

8    constructions if needed.  Bennett Decl. II, Ex. 3 (12/2/2013 hearing transcript), 6:4-6.  Since Judge

9    Freeman has assumed the case, she apparently has not indicated that there would be no further claim

10   construction.  As the Federal Circuit has put it, "parties in patent cases frequently stipulate to a

11   construction or the court construes a term, only to have their dispute evolve to a point where they

12   realize that further claim construction is necessary."  *G.E. Lighting Sols., LLC v. AgiLight, Inc.*, 750

13   F.3d 1304, 1310 (Fed. Cir. 2014).

14         Even though the Patent Local Rules of the Northern District envision claim construction

15   early in a case, it is not unusual to have further construction as the trial draws near, or in connection

16   with summary judgment motions.  *See Open Text S.A. v. Box, Inc.,* 2015 WL400348 at *1 (N.D.

17   Cal. Jan. 28, 2015) (Further claim construction on "the eve of trial");  *Angioscore, Inc. v. TriReme*

18   *Medical, Inc.,* 50 F. Supp. 3d 1276, 1293-95 (N.D. Cal. 2014) (Claim construction, including

19   consideration of prosecution disclaimer, in connection with summary judgment motions); *Fujifilm*

20   *Corp. v. Motorola Mobility LLC*, W.L. 757575, *19-21 (N.D. Cal. 2015) (Prosecution disclaimer

21   argument not raised in initial claim construction considered in connection with summary judgment

22   motion.).

23         If the present claim construction issues are not resolved before trial**,** the experts might wind

24   up arguing their claim constructions to the jury, which would be improper.  *Cordis Corp. v. Boston*

25   *Scientific Corp.,* 561 F.3d 1319, 1337 (Fed. Cir. 2009).  The Special Master therefore concludes that

26   further claim construction is necessary in this case.  The Court set out the legal standard for claim

27   construction in its Order Construing Claims, which is incorporated by reference and will not be

28   repeated here.  Order Construing Claims at 3-4.

1    *Focusing.*  The first issue of claim construction involves the meaning of the term "focusing"

2    in limitation [d] of Claim 24, "an optical power element for *focusing* the angularly dispersed

3    wavelength signals into a series of elongated spatially separated wavelength signals." (Emphasis

4    added.)  Neither "focusing" nor limitation [d] have been construed by the Court, and so the ordinary

5    and customary meaning of that term to a person of ordinary skill in the art is to be used.  *See*

6    *MediaTek inc. v. Freescale Semiconductor, Inc.,* No. 11-CV-5341 YGR, 2014 WL 971765, at *3

7    (N.D. Cal. Mar. 5, 2014).  The parties and their experts, however, disagree on the ordinary and

8    customary meaning of "focusing."  "A determination that a claim term 'needs no construction' or

9    has the 'plain and ordinary meaning' may be inadequate where the term has more than one

10   'ordinary' meaning or where reliance on a term's 'ordinary' meaning does not resolve the parties'

11   dispute.  *O2 Micro,* 521 F.3d at 1361.

12       Finisar and Dr. Hall, its expert, contend that the plain and ordinary meaning of "focusing" is

13   "to bring to a focus, causing to converge."  Hall Decl. I, ¶ 67; Finisar Motion at 6.  They base their

14   contention on the American Heritage Dictionary of Science where "focus" is defined as "the point

15   at which rays of light, heat, etc., meet, diverge, or seem to diverge after being reflected from a

16   mirror, bent by a lens, etc." (Davis Decl. I, Ex. 8 at 229-230) and on the Wiley Electrical and

17   Electronic Engineering Dictionary, where "focus" is defined as "to make light rays . . . converge"

18   and "to make an adjustment which improves the sharpness of an image."  Davis Decl. I, Ex 58 at

19   294.

20       Nistica and Dr. Goossen, its expert, contend that the plain and ordinary meaning of

21   "focusing" is "to make clearer and more defined."  Nistica Opposition at 5-6; Goossen Decl. II,

22   ¶ 32.  Nistica relies on the Random House College Dictionary which defines "focus" as "the clear

23   and sharply defined condition of an image" (Bennett Decl. II, Ex. 4, at 508) and the Collins Concise

24   Dictionary which defines "focus" as "the state of an optical image when it is distinct and clearly

25   defined."  Bennett Decl. II, Ex. 58 at 548.

26       The definitions of "focusing" advanced by the parties do not reveal the dispute between

27   them underlying the meaning of this term.  Wavelength signals have two dimensions: a frequency

28   (wavelength angular dispersion) dimension and a port dimension.  Finisar contends that if there is

convergence of the signals in at least one dimension, there is "focusing," even if the signals in the other dimension are diverging.  Finisar Oral Argument Slide 35.  Nistica's position is that "an 'optical power element' would not be 'focusing' in the situation where at least one dimension of the wavelength signals is diverging and becoming blurrier, less clear, and less defined."  Nistica Opposition at 7.

The '599 Patent and its prosecution history, while using "focus" and "focusing," do not define those terms, and so it is appropriate to turn to extrinsic sources, as the parties and experts have done.  *Markman,* 52 F.3d at 980-81.  The dictionaries offered by Finisar actually support the definition of "focusing" put forth by Nistica.  The American Heritage Dictionary of Science defines the verb "focus" as "2 to adjust (a lens, the eye, etc.) to make a clear image . . . 3 to make (an image, etc.) clear by adjusting a lens, the eye, etc." (Davis Decl. I, Ex. 8 at 230) and the Wiley Electrical and Electronic Engineering Dictionary defines the verb "focus" as "2. To make an adjustment which improves the sharpness of an image.  Also, to adjust until the sharpest possible image is obtained."  Davis Decl. I, Ex 58 at 294-95.

Taking into account the definitions in all dictionaries cited by the parties, it is clear the definition offered by Finisar/Dr. Hall is too narrow, and that Nistica/Dr. Goossen's definition of "focusing" as "to make clearer and more defined" is correct, and the Special Master recommends that it be adopted by the Court.

Given this definition of "focusing," there remains a fact question as to whether the '599 Accused Products meet limitation [d], and for that reason the Special Master recommends that Finisar's motion for a summary judgment of literal infringement of claim 24 of the '599 Patent be denied.[2]

***Focusing "Into a Series of Elongated Spatially Separated Wavelength Signals."***  Finisar describes the second issue of claim construction as follows:  "Nistica seeks to require that the beams of light corresponding to the 'angularly dispersed wavelength signals' in element (d) are circular in shape."  Finisar Motion at 7.  Finisar then goes on to describe Nistica's argument that a component

---

[2] Were the definition of "focusing" offered by Finisar to be used the same result would be reached, i.e., there would be a fact issue precluding summary judgment.

1  called a █████████████████████████████████████████, and that the focusing of the

2  cylindrical lens assembly is not "focusing the angularly dispersed wavelength signals *into* a series

3  of elongated spatially separated wavelength signals."  *Id.*

4       Nistica responds that there is no claim construction issue, only a dispute about whether the

5  '599 Accused Products focus the "wavelength signals *into*  a series of elongated spatially separated

6  wavelength signals" in order to meet this limitation of claim 24.  Nistica Opposition at 9.  Thus

7  neither party seeks claim construction in connection in regard to this issue.

8       The Special Master agrees that there is no need for claim construction as the issue is one of

9  infringement.  Whether Nistica's '599 Accused Products satisfy this aspect of limitation [d] presents

10  a genuine issue of material fact.

11       ***Prosecution Disclaimer Limiting "Spatially Separated Wavelength Signals."***  The third

12  area of dispute is raised by Nistica's assertion that there was a disclaimer of claim scope during

13  prosecution of the '599 Patent.  An office action issued on September 15, 2005, in which certain

14  pending claims (but not application claim 21, which issued as asserted patent claim 24) were

15  rejected as obvious and unpatentable over U.S. Patent No. 6,766,081 to Weaver et al.  Bennett Decl.

16  II, Ex. 7 ('599 Patent prosecution history), at FinNIS 00001125.

17       In response, applicant filed an amendment on February 3, 2006, in which he amended claims

18  and distinguished his invention from Weaver, stating:

19       The Applicants' invention is directed to manipulation of individual wavelength
         channels contained in an optical signal by angularly dispersing the wavelength
20       channels into angularly dispersed wavelength signals, focusing the angularly
         dispersed wavelength signals in the dimension of the angular dispersion only (*unlike*
21       *Weaver, the beams remain collimated in the switching axis* with a 1/e^2 optical
         intensity diameter of approximately 3 mm) such that each wavelength signal is
22       imaged into a series of elongate spatially separated wavelength signals onto a spatial
         manipulation element (SME) which subsequently manipulates in a complex manner
23       each of the elongate spatially separated wavelength signals individually (please refer
         to Figure 1 attached).

24  *Id.* at FinNIS 00001136, 00001143 (emphasis added).[3]

25

26  _____

27  [3] Consistent with applicant's comments on Weaver, all disclosed embodiments in the '599 Patent involve a beam which
    is focused in the dimension of angular dispersion and collimated in the orthogonal dimension.  Davis Decl.  I, Ex. 5
28  (Goossen Rebuttal Report), ¶¶ 298-299.  *See* '599 Patent 5:16-27; 5:48-58 and 8:51-9:3.  Finisar argues that the '599
    patent contemplates other embodiments, citing '599 Patent 9:37-40.  This reference, however, is to a stock patent

Applicant's comments in response to Weaver were followed on February 13, 2006, by a Supplemental Amendment in which he submitted the Figure 1 referred to in the text quoted above, reinforcing his differentiation of Weaver. *Id.* at FinNIS 00001155, 00001157.  Figure 1 is reproduced below.



Figure 1: Comparison of the optical intensity profile between the invention of Weaver and the Applicant's invention.

Applicant's comments about Weaver were followed on March 31, 2006, by a notice of allowance of

prosecutor's statement that "[m]odifications obvious to those skilled in the art could be made without departing from the scope of the invention" and does not actually suggest other embodiments.

1   all claims.  *Id.* at FinNIS 00001161.

2      The Federal Circuit has said that "'all express representations made by or on behalf of the

3   applicant to the examiner to induce a patent grant' limit the interpretation of the claims 'so as to

4   exclude any interpretation that may have been disclaimed or disavowed during prosecution in order

5   to obtain claim allowance.'" *Ecolab, Inc. v. Envirochem, Inc.,* 264 F.3d 1358, 1368 (Fed. Cir. 2001)

6   (citations omitted).  However, the disclaimer must be clear.  In *Pacing Tech., LLC v. Garmin Int'l,*

7   *Inc.,* 778 F.3d 1021, 1024 (Fed. Cir. 2015) the court stated:

8       The standards for finding lexicography and disavowal are "exacting."  [Citation
        omitted.] . . . Similarly, disavowal requires that "the specification [or prosecution
9       history] make [ ] clear that the invention does not include a particular feature."
        [Citation omitted.]
10
        We have found disavowal or disclaimer based on clear and unmistakable statements
11      by the patentee that limit the claims, such as "the present invention includes…" or
        "the present invention is . . ." or "all embodiments of the present invention are . . ."
12      [Citations omitted.]

13
        The applicant for the '599 Patent both described "[t]he Applicants' invention" as one in
14
    which "the beams remained collimated in the switching axis," and distinguished the prior art on that
15
    basis.  Distinguishing prior art because, in "the Applicants' invention," "the beams remain
16
    collimated in the switching axis" is a clear and unmistakable disclaimer limiting "wavelength
17
    signals" to light that is "collimated in the switching axis."  The applicant clearly and unambiguously
18
    disclaimed any interpretation of "wavelength signals" in which beams in the switching axis are not
19
    collimated.
20
        Finisar argues that any disclaimer which may have been made does not apply to claim 24
21
    because it had already been allowed at the time of the alleged disclaimer.  It is true that pending
22
    claim 21 (issued claim 24) had previously been deemed allowable.  Bennett Decl. II, Ex. 7 ('599
23
    Patent prosecution history), at FinNIST00001124.  However, notwithstanding that pending claim 21
24
    had been deemed allowable, applicant amended that claim in the same amendment in which
25
    applicant made the disclaimer.  The amendment changed "spatially separated wavelengths bands" to
26
    "spatially separated wavelength signals."  Bennett Decl. II, Ex. 7 ('599 Patent prosecution history),
27
    at FinNIST00001136-1147.  Thus, at the time of the amendment, pending claim 21 was still under
28

---

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                    13

1    examination as it had not yet been allowed in its amended form and the disclaimer applies to issued

2    claim 24.

3         Finisar's argument that the disavowal does not apply to claim 24 is incorrect for a second

4    reason.  A claim term "cannot be interpreted differently in different claims because claim terms

5    must be interpreted consistently."  *Southwall Tech., Inc.,* 54 F.3d at 1579.  The court in *Southwall*

6    rejected an argument similar to Finisar's argument here, stating "[a]ccordingly, arguments made

7    during prosecution regarding the meaning of a claim term are relevant to the interpretation of that

8    term in every claim of the patent absent a clear indication to the contrary."  *Id.  See also Watts v. XL*

9    *Sys., Inc.,* 232 F.3d 877, 882-84 (Fed. Cir. 2000).  There is no indication to the contrary in the '599

10   Patent or prosecution history.

11        Finisar cites *Lexion Med., LLC v. Northgate Technologies, Inc.,* 292 F. Appx. 42, 48 (Fed.

12   Cir. 2008) in support of its argument that the disclaimer does not apply to claim 24.  In *Lexion,* the

13   purported disclaimer related specifically to limitations which did not appear in the asserted claims.

14   In this case, however, the disclaimer related to "wavelength signals," which is a limitation in

15   asserted claim 24 (application claim 21) and was added by the same amendment in which the

16   disclaimer was made.  *Lexion* is inapposite to the facts of this case.

17        Finisar's argument that the disclaimer was limited to "an embodiment" (Finisar Motion at 5)

18   is incorrect, for the disclosure referenced "[t]he Applicants' invention" and not a particular

19   embodiment.  Finisar also argues that there is no clear and unambiguous disclaimer because the

20   disclaimer parenthetical continues after the portion relied upon by Nistica.  In the parenthetical,

21   "unlike Weaver, the beams remain collimated in the switching axis" is followed by "with a 1/e^2

22   optical intensity diameter of approximately 3 mm."  Finisar argues that if this were actually a

23   disclaimer, the patent would be limited to a 3 mm spot size, an absurd result.  Finisar Reply at 5, ftn.

24   10.  However, the second part of the parenthetical does not lessen the clarity of applicant's

25   disclaimer of non-collimated beams and remains a disclaimer under the teaching of *Saffran v.*

26   *Johnson & Johnson,* 712 F.3d 549, 559 (Fed. Cir. 2013):

27        "Rather, as we have made clear, an applicant's argument that a prior art reference is
          distinguishable on a particular ground can serve as a disclaimer of claim scope even
28        if the applicant distinguishes the reference on other grounds as well." *Andersen*
          *Corp. v. Fiber Composites, LLC,* 474 F.3d 1361, 1374 (Fed. Cir. 2007).

For the reasons discussed above, the Special Master concludes that there was a disclaimer of claim scope in which applicant disclaimed any interpretation of "wavelength signals" in which light in the switching (port) axis is not collimated, and recommends that the Court reference the disclaimer as part of its claim construction.  Given the prosecution disclaimer, another fact issue is presented as to whether the '599 Accused Products meet the limitations of the '599 Patent claim 24 taking the disclaimer into account.

As discussed above, reviewing the evidence in the light most favorable to Nistica, genuine issues of material fact are presented regarding Nistica's infringement of claim 24 of the '599 Patent. The Special Master accordingly recommends that Finisar's motion for summary judgment that Nistica literally infringes claim 24 of the '599 Patent be denied.

**B. Finisar's Motion for Summary Judgment That No Patent-in-Suit Is Obvious Based on Prior Art Combinations Advanced by Nistica**

Nistica's expert Dr. Goossen has opined that the patents-in-suit are obvious under 35 U.S.C. § 103 based on eleven specific combinations of prior art, and has also opined on single-reference obviousness for each patent-in-suit.  Nistica relies on Dr. Goossen's Report for its contentions that the patents-in-suit are obvious and invalid.  Finisar moves for summary judgment that the patents-in-suit are not invalid as obvious based on Dr. Goossen's combinations of prior art, arguing that Dr. Goossen's Report is not competent evidence of obviousness.  Portions of Dr. Goossen's report can be found as Exhibit 11 to Davis Decl. I, Exhibit 10 to Bennett Decl. I and Exhibit 10 to Bennett Decl. II.

Obviousness under 35 U.S.C. § 103(a) is a question of law based on underlying factual determinations.  *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011).  These factual questions include the factors of *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); (1) the scope and content of the prior art, (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) evidence of secondary factors.  Under *Unigene*, obviousness requires more than a showing that the prior art includes references covering each separate limitation in a claim under examination.  "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and

combined those prior art elements in the normal course of research and development to yield the claimed invention." *Unigene*, 655 F.3d at 1360.

Finisar faults Dr. Goossen's opinions for two reasons.

**First**, Dr. Goossen does not proffer any evidence regarding **how** a person of ordinary skill in the art would combine any of his obviousness combinations, which he was required to do.  **Second,** Dr. Goossen does not proffer any evidence regarding any particular motivation to combine the teachings in his prior art combinations **in a way that achieves the claimed invention.**[4]

Finisar Motion at 18.

The eleven obviousness combinations in the Goossen Report have similar content and format and the first combination, relating to Finisar's '687 Patent, will be analyzed in detail. The Goossen Report addresses obviousness of the only asserted claim of Finisar's '687 Patent, claim 32, in light of the combination of U.S. Patent No. 6,816,640 ("'640 patent") and European Patent Application EP 1 099 966 ("'966 publication").  Dr. Goossen first states:

> 129.  As stated above, it is my opinion that claim 32 of the '687 patent is anticipated by the '640 patent as stated above and in Exhibit E-1.  Further, it is my opinion that claim 32 of the '687 patent is also anticipated by the '966 publication as stated above and in Exhibit E-2.  However, if any limitation is found not to be disclosed by either the '640 patent or the '966 publication, then it is my opinion that the asserted claims of the '687 patent are obvious based on the combination of the '640 patent and the '966 publication as set forth in Exhibit E-4.

Davis Decl. I, Ex. 11 (Goossen Report) ¶ 129.

The E-4 claim chart to which Dr. Goossen refers has two columns, one with the text of '687 Patent claim 32 and the opposing column with quotations and figures from the prior art '640 patent and '966 publication.  The text of claim 32 takes up less than 2 pages of narrow columns in the chart, while the quotes and figures from the '640 patent and '966 publication take up 71 pages of wide columns.  Large chunks of these references are quoted verbatim and many figures are reproduced in these 71 pages, and Dr. Goossen does not comment on, highlight or single out any

---

[4] Nistica faults the analysis in Finisar's motion under *MeadWestVaco Corp. v. Reexam Beauty and Closures, Inc.,* 731 F.3d 1258, 1264 (Fed. Cir. 2013), which held that "[o]bviousness, like other grounds of invalidity, must be analyzed on a claim-by-claim basis."  Nistica Opposition at 17.  In *MeadWestVaco* the unanalyzed claims had important limitations not found in the analyzed claims.  In contrast, each of Dr. Goossen's obviousness combinations follow the same format, with some exceptions noted below.  Finisar's analysis is applicable to all combinations, which it specifically identifies.  Finisar Motion at 16, ftn. 12 and 17, ftn. 13.  Since Finisar's comments are applicable to all of Dr. Goossen's combinations, Finisar has sufficiently analyzed his report on a claim by claim basis.

particular part of his massive incorporation from the prior art, or discuss how a person of ordinary skill in the art would have selected and combined those prior art elements.  He simply quotes text and reproduces figures.[5]

Dr. Goossen next states:

> 130.  It would have been obvious to one of ordinary skill in the art to combine the disclosures of the '640 patent and '966 publication to yield the claimed invention in claim 32.  First, both the '640 patent and '966 publication relate to wavelength selective optical switches using [sic] micromirror device.  Thus, one of ordinary skill in the art would have been motivated to combine the disclosures of the '640 patent and '966 publication as both relate to the same technological field (e.g., wavelength selective optical switches using a micromirror device) and address the same problem (e.g., improving processing of optical signals) in the same manner (e.g., using a micromirror device.).  The similarities of the embodiments in the '640 patent and '966 publication are demonstrated by a simple comparison of Fig. 6 of the '640 patent with Fig. 5 of the '966 publication. . . .

Davis Decl. I, Ex. 11 (Goossen Report), ¶ 130.  Although Dr. Goossen adequately discusses the motivation which one of ordinary skill would have to combine the disclosures in his prior art references,[6] he again does not discuss how a person of ordinary skill in the art would have selected and combined those prior art elements.

Dr. Goossen continues:

> 131. Therefore, given that both the embodiments of the '640 patent and '966 publication relate to the same technological field and aim to solve the same technological problem using the same technology, it would have been obvious to one of ordinary skill in the art to combine both the disclosures of the '640 patent and '966 publication to yield the claimed inventions in the asserted claims.  With regard to the "wherein scattered light from a dropped signal is directed onto the micromirror device to reflect away from the return path," it would have been obvious to one of ordinary skill in the art to combine the disclosures of the '640 patent and '966 publication as set forth in Exhibit E-4 because a goal of such systems is to reduce cross-talk and unwanted light in optical output fibers.  Further, it would have been within the knowledge and ability of one of ordinary skill in the art to combine the disclosures of the '640 patent and '966 publication prior to the alleged invention date of claim 32 the '687 patent as set forth in Exhibit E-4.

---

[5] As an example of the prior art quotations in Dr. Goossen's combination obviousness charts, Finisar states that Dr. Goossen quoted over 75% of the prior art '872 patent in his I-4 and I-6 charts for obviousness of the '980 patent, and has provided a copy of the '872 patent marked to show the portions quoted in the claim chart to make its point.  Finisar Reply at 9; Davis Decl. III, Exhibit 95.

[6] See KSR Int'l, Co. v. Teleflex, Inc., 550 U.S. 398, 420 (2007) ("Under the correct analysis, any need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.") and Dome Patent L.P. v. Lee, 799 F.3d 1372, 1380 (Fed. Cir. 2015) ("Evidence of a motivation to combine prior art references may 'flow from the nature of the problem to be solved.'").

Davis Decl. I, Ex. 11 (Goossen Report), ¶ 131.  Although Dr. Goossen states it would have been obvious to combine the disclosures "as set forth in Exhibit E-4," that exhibit does not set forth anything of the kind, as discussed above.  Again, Dr. Goossen does not discuss how a person of ordinary skill in the art would have selected and combined prior art elements.

Dr. Goossen continues his obviousness analysis:

> 132.  Moreover, because both the '640 patent and '966 publication use known optical components in a predictable manner that was well known in the art, one of ordinary skill in the art would thus have known there was a high likelihood of success and predictable results in combining the disclosures of the '640 patent and '966 publication as set forth in Exhibit E-4, including with regard to the limitation "wherein scattered light from a dropped signal is directed onto the micromirror device to reflect away from the return path."  Thus, it would have been obvious to one of ordinary skill in the art to combine the disclosure of the '640 patent with the disclosure of the '966 publication to yield the claimed invention of claim 32 of the '687 patent.

Davis Decl. I, Ex. 11 (Goossen Report), ¶ 132.

Once again, Dr. Goossen does not discuss how a person of ordinary skill in the art would have selected and combined prior art elements, but only makes a conclusory statement that there would be a high likelihood of success and predictable results.

In ¶ 132 Dr. Goossen refers to the disputed limitation "wherein scattered light from a dropped signal is directed onto the micromirror device to reflect away from the return path."  In ¶ 133 Dr. Goossen tells us where in his Report that limitation can be found:

> However, as shown above in Sections XI(A) and XI(B), the '640 patent and the '966 publication discloses this limitation.  Further, as shown in Exhibit E-4, the combination of the '640 patent and '966 publication disclose this limitation as well.

The reference to XI(A) and XI(B) is to Goossen Report ¶¶ 88-99.  Although those paragraphs and ¶¶ 92-98 and 101-109, discussing anticipation by his prior art references, contain a reasonably detailed comparison of the '640 patent and '966 publication to the limitations of claim 32, they give no information about how a person of ordinary skill in the art would have selected and combined those prior art element to render obvious the '687 invention.

Dr. Goossen states in ¶ 133 that "as shown in Exhibit E-4, the combination of the '640 patent and '966 publication disclose this limitation as well," but in fact he does not show anything of the sort in Exhibit E-4.  As discussed above, Exhibit E-4 is simply a lengthy compilation of text

1    and figures from the prior art.

2          Dr. Goossen's conclusory assertions are not enough to show obviousness.  In *Active Video*

3    *Networks, Inc. v. Verizon Communications, Inc.,* 694 F.3d 1312, 1327 (Fed. Cir. 2012) the court

4    said:

5          We agree with the district court that the obviousness testimony by Verizon's expert
          was conclusory and factually unsupported.  Although Verizon's expert testified that

6          "[t]hese are all components that are modular, and when I add one, it doesn't change
          the way the other one works," J.A. 4709, he never provided any factual basis for his

7          assertions.  The expert failed to explain how specific references could be combined,
          which combination(s) of elements in specific references would yield a predictable

8          result, or how any specific combination would operate or read on the asserted claims.
          Rather, the expert's testimony on obviousness was essentially a conclusory statement

9          that a person of ordinary skill in the art would have known, based on the "modular"
          nature of the claimed components, how to combine any of a number of references to

10         achieve the claimed inventions.  This is not sufficient and is fraught with hindsight
          bias.

11

12         As in *Active Video*, Dr. Goossen does not explain how his references could be combined,

13   which combinations of elements in specific references would yield a predictable result, or how any

14   specific combination would operate or read on the asserted claims.

15         Dr. Goossen's obviousness analysis is similar to the analysis found insufficient in

16   *Innogenetics, N.V. v. Abbott Labs.,* 512 F.3d 1363, 1373-74 (Fed. Cir. 2008):

17         For each of the claims that he analyzes for obviousness, [defendant's expert] merely
          lists a number of prior art references and then concludes with the stock phrase "to

18         one skilled in the art it would have been obvious to perform the genotyping method
          in [claims 1-9 & 12-13] of the '704 patent.  "[T]here must be some articulated

19         reasoning with some rational underpinning to support the legal conclusion of
          obviousness." [Citations omitted.]  Nowhere does [defendant's expert] state how or

20         why a person ordinarily skilled in the art would have found the claims of the '704
          patent obvious in light of some combination of those particular references.  As the

21         district court found: "It is not credible to think that a lay jury could examine the Cha
          application, the Resnick '718 patent that defendant cited as prior art or any of the

22         other references and determine on its own whether there were differences among
          them and the '704 patent."  [Citation omitted.]  Such vague testimony would not

23         have been helpful to a lay jury in avoiding the pitfalls of hindsight that belie a
          determination of obviousness.[7]

24

25
─────────────────────────────

26   [7] Nistica cites *Meyer Intell. Prop. Ltd. v. Bodum, Inc.,* 690 F.3d 1354, 1375-76 (Fed. Cir. 2012) as recognizing the
     limited holding of *Innogenetics.  Meyer,* however, in a case involving simple technology, found that the expert's report

27   contained a sufficiently detailed statement of his opinions "and the bases for his conclusions."  *Id.* at 1375.  Given the
     contents of Dr. Goossen's claim charts and the conclusory portions of his report quoted above, he does not state the

28   bases for his conclusions, i.e., how a person of ordinary skill in the art would have selected and combined the prior art
     elements.

─────────────────────────────

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                    19

1     In short, Dr. Goossen does not discuss any particular combination of the prior art references

2  he cites, or how they should be combined to read on the '687 Patent.  His report does little more

3  than to point to his lengthy claim chart, and conclude that it would be obvious to combine the '640

4  patent and '966 publication with no explanation of how any given combination of elements from the

5  two references would render the patent obvious.  Under *Kioto Manufacturing Co. v. Turn-Key-Tech,*

6  *LLC,* 381 F.3d 1142, 1152 (Fed. Cir. 2004), "general and conclusory testimony…does not suffice as

7  substantial evidence of invalidity."

8     Dr. Goossen's report and claim chart show at most that each element in claim 32 was known

9  in the prior art, which is not enough to prove obviousness.  *See KSR Int'l Co. v. Teleflex Inc.,* 550

10 U.S. 398, 418 (2007) ("A patent composed of several elements is not proved obvious by merely

11 demonstrating that each of its elements was, independently, known in the prior art.")  It would take

12 extensive explanation, not contained in Dr. Goossen's report, to understand how he would combine

13 the '640 patent and '966 publication to yield the invention of claim 32.

14     All obviousness combinations in the Goossen Report for the asserted claims of the '687,

15 '833 and '980 Patents are very similar in content and format to his '687 Patent analysis discussed

16 above and are inadequate for the same reasons.[8]  The Special Master concludes that Nistica has not

17 come forth with evidence of how these specific combinations of references read on the asserted

18 claims of '687, '833 and '980 Patents sufficient to support the decision of a reasonable fact finder in

19 its favor, and that there is no genuine issue of material fact.  For these reasons, the Special Master

20 recommends that Finisar be granted summary judgment that the prior art combinations asserted

21 against the asserted claims of the '687, '833 and '980 Patents do not render them obvious.

22     However, Dr. Goossen has presented sufficient evidence regarding how a person of ordinary

23

24

---

25 [8] These are the (1) combination of the '070 and '966 publications to render claim 32 of the '687 Patent obvious (Bennett
   Decl. I, Ex. 10 (Goossen Report), ¶¶ 136-143 and Exhibit E-5); (2)  combination of the '316 and '937 patents to render
26 claims 1, 18 and 26 of the '833 Patent obvious (¶¶ 307-314 and Exhibit G-3); (3) combination of the '316 and RE29397
   patents to render claims 1, 18 and 26 of the '833 Patent obvious (¶¶ 315-322 and Exhibit G-4); (4) combination of the
27 '316 patent and '070 publication to render claims 1, 18 and 26 of the '833 Patent obvious (¶¶ 323-330 and Exhibit G-5);
   (5) combination of the '872 patent and '769 publication to render claims 1, 10, 12 and 14 of the '980 Patent obvious
28 (¶¶ 540-545 and Exhibit I-4); (6) combination of the '740 patent and '769 publication to render claims 1, 10, 12 and 14
   of the '980 Patent obvious (¶¶ 546-551 and Exhibit I-5) and (7) combination of the '740 and '872 patents to render
   claims 1, 10, 12 and 14 of the '980 Patent obvious (¶¶ 552-557 and Exhibit I-6).

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                    20

skill at the time of the invention would have selected and combined prior art elements to render the claimed inventions obvious sufficient to raise genuine issues of material fact on its allegations that the asserted claims of the '740 and '599 Patents are invalid as obvious.[9]

For the reasons discussed above, the Special Master recommends that Finisar's motion for summary judgment that the asserted claims of the '687, '833 and '980 Patents are not obvious based on the prior art combinations advanced by Nistica be granted, and that Finisar's motion for summary judgment that the asserted claims of the '740 and '599 Patents are not obvious based on the prior art combinations advanced by Nistica be denied.

**C. Finisar's Motion for Summary Judgment That Nistica's Eighteenth Through Twentieth Affirmative Defenses (License/Implied License, Estoppel, Release) Do Not Bar Enforcement of the Patents-in-Suit**

Finisar moves for summary judgment on Nistica's Eighteenth through Twentieth Affirmative Defenses based on license/implied license, estoppel and release.  Nistica in its Opposition states that, in light of Finisar's expert's report on infringement confirming that Finisar is not accusing Nistica's MEMS-based WSS modules of infringing the '980 and '599 Patents, it has notified Finisar that it has withdrawn these affirmative defenses and that the motion is moot. Nistica Opposition at 21.  Nistica has filed a Notice of Withdrawal of Nistica, Inc.'s 18th-20th and 22nd Affirmative Defenses.  Dkt. No. 434.

The Special Master agrees that Finisar's motion for summary judgment on Nistica's Eighteenth through Twentieth Affirmative Defenses is moot, and accordingly recommends that it be denied.

**D. Finisar's Motion for Summary Judgment That Nistica's Twenty-First Affirmative Defense (Unclean Hands) Does Not Bar Enforcement of the Patents-in-Suit**

Finisar moves for summary judgment on Nistica's Twenty-First Affirmative Defense, by which Nistica seeks to bar enforcement of the patents-in-suit because Finisar comes to the litigation

---

[9] These are the (1) combination of the '941 and '123 patents to render claims 1, 25, 28, 39 and 41 of the '740 Patent obvious (Bennett Decl. I, Ex. 10 (Goossen Report) ¶¶ 227-242 and Exhibit F-2, see specific discussion at ¶¶ 228-233); (2) combination of the '511 patent and '769 publication to render claims 14 and 24 of the '599 Patent obvious (¶¶ 430-438 and Exhibit H-4, see specific discussion at ¶ 434); and (3) combination of the '740 patent and '769 publication to render to render claims 14 and 24 of the '599 Patent obvious (¶¶ 439-445 and Exhibit H-5, see specific discussion at ¶ 442).

with unclean hands.  Nistica characterizes its unclean hands defense as follows: ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████  Nistica Opposition at 22.

The Twenty-First Affirmative Defense alleges that Nistica and Finisar entered into a ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████  Dkt. No. 180, Fourth Amended Answer to Complaint and Counterclaims, at

19.

The doctrine of unclean hands potentially includes a broad range of conduct, but only

applies where a defendant can establish an unconscionable act of the plaintiff that has an

"immediate and necessary relation" to the equity sought.  *Keystone Driller Co. v. Gen. Excavator*

*Co.,* 290 U.S. 240, 243, 245 (1933) (paying a witness for a false affidavit and to suppress evidence

in patent litigation); *see also Precision Instruments Manufacturing Co. v. Automotive Maintenance*

*Machinery Co.*, 324 U.S. 806, 816-19 (1945) (suppressing evidence of perjury before the PTO);

*Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238, 240-41, 250 (1944), overruled on

other grounds by *Standard Oil Co. v. United States*, 429 U.S. 17 (1976) (falsifying evidence

submitted to the PTO).  Under *In re Omeprazole Patent Litig.,* 483 F.3d 1364, 1374 (Fed. Cir.

2007), the defense of unclean hands must be proven by clear and convincing evidence.

Nistica argues that "[u]nclean hands applies in any case where a party is attempting to profit

from its own wrong-doing" citing *Princess Cruises, Inc. v. United States,* 397 F.3d 1358, 1368-69

(Fed. Cir. 2005) and *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 814

(1945).  Although the cases often describe the unclean hands doctrine in such broad generalities, the

1  wrong on which use of the doctrine is predicated still must have an "immediate and necessary

2  relation" to the equity sought by the plaintiff.

3        What constitutes an "immediate and necessary relation" to the equity sought, in the context

4  of a patent infringement suit?  Finisar argues that "unclean hands has generally only been

5  recognized in one of three fact patterns in the patent context—none of which are alleged to be

6  present here —(i) inequitable conduct in procuring the patent from the Patent Office; (ii) patent

7  misuse, or (iii) litigation misconduct," citing case law.  Finisar Motion at 20.  Nistica has not cited

8  any case in the patent context which goes beyond the three categories of unclean hands cases

9  suggested by Finisar, or which come close to the facts of this case.  The trademark and copyright

10 cases cited by Nistica each involved misuse of the right sought to be enforced, similar to some

11 unclean hands cases in the patent context, and do not support Nistica's position.[10]

12       In short, the facts alleged by Nistica in its Twenty-First Affirmative defense do not fall into

13 the fact patterns seen in cases finding unclean hands in the patent context, and do not allege acts

14 which have the "immediate and necessary relationship" to the relief sought by Finisar which is

15 required to invoke the doctrine of unclean hands.

16       Even if the alleged facts would support a defense of unclean hands, Nistica has not come

17 forward with evidence which would bring the defense into play.  Nistica states that individuals with

18 access to Nistica's confidential technical information, ███████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████

21 ██████████████████████████████████████████

22 ████████████████████████████████.

23 Nistica Opposition at 23; Bennett Decl. II Exhibits 16-19.  The declaration of Dr. Vengsarkar in

24 support of Nistica's Opposition identifies no specific confidential information received by Finisar in

25 general or ███████████████  specifically.

26 _____

27 [10] *Saxon v. Blann* 968 F.2d 676, 6778-678, 680 (8th Cir.1992) involved a copyright owner's misuse of the work in issue to destroy the commercial value of a similar work which he had conveyed to his distributor to discharge a debt.  *Metro*

28 *Publishing, Ltd. v. San Jose Mercury News, Inc*., 861 F. Supp. 870, 876-877, 880 (N.D. Cal. 1994) involved a trademark owner's misuse of his mark to cause confusion after learning of the accused infringer's plans.

1    Nistica has not offered any evidence to show that ███████████████████

2    ██████████████████████████████████████████████████████████

3    ██████████████████████████████████████████████████████████

4    ███████████████████████████████████████████ And Nistica

5    concedes that there is "no explicit evidence that specific Nistica confidential information was used

6    to obtain the patents-in-suit . . ."  Nistica Opposition at 23.

7         In addition to its argument about confidential Nistica information which Finisar obtained

8    under the ██████ Nistica offers evidence to show that ██████████████████

9    ██████████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████████████

11   ███████████.  Bennett Decl. II, Ex. 16-19.  However, there is no showing that Finisar was

12   *wrongfully* in possession of this information.  Presumably Nistica has access to the details about

13   Dongwon's acquisition of this information, but it has not come forward with any information.

14        Nistica relies on a sentence in a September 8, 2011, ██████████████████

15   ██████████████████████████████████████████████████████████

16   ██████████████████████████████████████████████████████████

17   █████████████████████████  However, this cryptic phrase, while

18   evidencing an aggressive competitive position, does not suggest that Finisar used Nistica

19   confidential information and does not fill in the gaps in Nistica's evidence to support its unclean

20   hands defense.

21        In sum, the Special Master concludes that Nistica has not alleged or come forward with facts

22   sufficient to support the decision of a reasonable fact finder in its favor on its unclean hands

23   defense, drawing all justifiable inferences in its favor, and that there is no genuine dispute as to any

24   material fact.  For these reasons, the Special Master recommends that the motion of Finisar for

25   summary judgment on Nistica's Twenty-First Affirmative Defense (unclean hands) be granted.

26   **E.  Finisar's Motion for Summary Judgment That Nistica's Twenty-Second Affirmative
        Defense (Laches) Does Not Bar Enforcement of the Patents-in-Suit**

27        Finisar moves for summary judgment on Nistica's Twenty-Second Affirmative Defense based

28

on the theory of laches.  Nistica in its Opposition states that, in light of Finisar's expert's report on

infringement confirming that Finisar is not accusing Nistica's MEMS-based WSS modules of

infringing the '980 and '599 Patents, it has notified Finisar that it has withdrawn this affirmative

defense and the motion is therefore moot.  Nistica Opposition at 21.  Nistica has filed a Notice of

Withdrawal of Nistica, Inc.'s 18th-20[th] and 22nd Affirmative Defenses.  Dkt. No. 434.

The Special Master agrees that Finisar's motion for summary judgment on Nistica's Twenty

Second Affirmative Defenses is moot, and accordingly recommends that it be denied.

### F. Finisar's Motion for Summary Judgment That Nistica's Twenty-Third Affirmative Defense (Equitable Estoppel) Does Not Bar Enforcement of the Patents-in-Suit

Finisar moves for summary judgment on Nistica's Twenty-Third Affirmative Defense, by

which Nistica seeks to bar enforcement of the patents-in-suit by equitable estoppel.  The

requirements of an equitable estoppel defense are discussed in *A.C. Aukerman Co. v. R.L. Chaides*

*Const. Co.*, 960 F.2d 1020, 1041-43 (Fed. Cir. 1992) (en banc), where the Federal Circuit first

stated:

> Like laches, equitable estoppel is not limited to a particular factual situation nor
> subject to resolution by simple or hard and fast rules. At most, courts have provided
> general guidelines based on fact patterns which have been litigated, albeit attempting
> to provide a unifying set of principles.
>
> The following statement of the underlying factual elements of equitable estoppel
> which generally are deemed significant reflects a reasonable and fairly complete
> distillation from the case law.

The Federal circuit then proceeded to set out some hard and fast rules:

> The first element of equitable estoppel concerns the statements or conduct of the
> patentee which must "communicate something in a misleading way." The
> "something" with which this case, as well as the vast majority of equitable estoppel
> cases in the patent field is concerned, is that the accused infringer will not be
> disturbed by the plaintiff patentee in the activities in which the former is currently
> engaged.  The patentee's conduct must have supported an inference that the patentee
> did not intend to press an infringement claim against the alleged infringer. It is clear,
> thus, that for equitable estoppel the alleged infringer cannot be unaware — as is
> possible under laches — of the patentee and/or its patent. The alleged infringer also
> must know or reasonably be able to infer that the patentee has known of the former's
> activities for some time.

█████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                                    25

1 conduct, Nistica points to its entire relationship with Finisar under the ████████████████

2 █████████████████████████████████████████████████████████

3 ███████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ███████████████████████████████████████████████

7 Vengsarkar Decl., ¶ 7.

8   Nistica also relies on a statement made when Nistica and Finisar terminated their

9 relationship under the ████████████████████████████████████

10 ██████████████████████████████████████████████████████████

11 ██████████████████████████████████████████████████

12 ███████████████████████  Nistica Opposition at 24; Vengsarkar Decl., ¶ 4, Ex. 2.  Nistica reads

13 this statement in the context of the prior relationship between Finisar and Nistica as inferring that

14 Finisar would not press an infringement claim against Nistica for the Nistica products developed for

15 the ████.  Nistica Opposition at 24.

16   The Special Master disagrees, and does not understand how Finisar's conduct and the joint

17 letter can reasonably support "an inference that the patentee did not intend to press an infringement

18 claim against the alleged infringer."  *A.C. Aukerman Co.* at 1042.  Nistica's defense, in effect, seeks

19 to add a new term to the ████ – an ongoing covenant not to sue – because '██████████████

20 ██████████████████████████████████████████████████████████

21 ████████████████████████████████████████  In a contract

22 situation, such an expectation is not reasonable unless reduced to a contractual term.  ████████████

23 █████████████████████████████████████████████████████

24 █████████████████████████████████████████████████████

25 ███████████████████████████████████████████████.

26   Even if the statement and conduct of Finisar met the first requirement of equitable estoppel,

27 they cannot form the basis of an estoppel for the patents-in-suit.  First, Finisar did not own the three

28 CiDRA patents-in-issue (the '687, '740 and '833 Patents) during the life of the █████████████

1 ███████████████████████████████████████████████████████████████

2 ████████████████████████████████ Bennett Decl. II, Ex 25 (Patent Purchase

3 Agreement between Finisar and CiDRA); Nistica Responsive SUF, Fact 55.  "[F]or equitable

4 estoppel the alleged infringer cannot be unaware . . . of the patentee and/or its patent."  *A.C.*

5 *Aukerman*, 960 F.2d at 1042.  Nistica could not have been aware of Finisar's ownership of the

6 CiDRA patents or its patentee status when the letter was written because Finisar did not own the

7 patents and was not to acquire them or become the patentee for over two years.

8    Although Finisar owned the '599 and '980 Patents during the existence of the ████

9 relationship and when the December 28, 2009, letter was prepared, Nistica was not yet infringing

10 those patents, because it only began its alleged infringing conduct in ████████  Nistica

11 Responsive SUF, Fact 63; Hall Decl. I, Ex. 61 (Expert Report of Michael E. Tate) at ¶ 22.  "[T]he

12 alleged infringer also must know or reasonably be able to infer that the patentee has known of the

13 former's activities for some time."  *A.C. Aukerman,* 960 F.2d at 1042.  Nistica could not have

14 known or inferred that Finisar knew of Nistica's alleged infringing activities for the '599 and '980

15 Patents for "some time" because Nistica is not alleged to have infringed the '599 and '980 Patents

16 until 2013.  Given these facts, Finisar's conduct cannot give rise to equitable estoppel regarding the

17 '599 and '980 Patents.

18    For the second element, reliance, "[t]he accused infringer must show that, in fact, it

19 substantially relied on the misleading conduct of the patentee in connection with taking some

20 action."  *Id.* ████████████████████████████████████████████████████

21 ████████████████████████████████ Bennett Decl. II, Exhibit 16 (Fourth

22 Amended Answer to Complaint and Counterclaims ("FAA")) at 22; Davis Decl. I, Ex.12 (Nistica

23 Response to Interrogatory 12).  However, Nistica has not come forward with any evidence that its

24 expenditures were in *reliance* on Finisar's statement and conduct that it would not sue Nistica, but

25 only that it spent time and resources to take advantage of the commercial opportunity opened up by

26 the MSA.  *See* Vengsarkar Decl., ¶ 6.  Although Dr. Vengsarkar states that Nistica did not believe

27 that Finisar would accuse Nistica's products of patent infringement, he does not state that Nistica

28 took any particular action in reliance on that belief.  Vengsarkar Decl., ¶ 7.

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                27

1      Finally, the accused infringer must establish that it would be materially prejudiced if the

2  patentee is now permitted to proceed.  *A.C. Aukerman*, 960 F.2d at 1043.  The material prejudice

3  "may be either economic or evidentiary.  Economic prejudice . . . arises if a defendant 'will suffer

4  the loss of monetary investments or incur damages which likely would have been prevented by

5  earlier suit.'"  *Gasser Chair Co. Inc. v. Infanti Chair Manufacturing Corp.*, 60 F.3d 770, 774, 776

6  (1995) (citations omitted).  There must be an explicitly proven nexus between the economic

7  prejudice and the patentee's acts.  *Id.*  "It is not enough that the alleged infringer changed his

8  position — i.e., invested in production of the allegedly infringing device.  The change must be

9  because of and as a result of the delay, not simply a business decision to capitalize on a market

10  opportunity."  *Id.*  (citation omitted).

> Prejudice may be shown by a change of economic position flowing from actions taken or not taken by the patentee.  *See ABB Robotics, Inc. V. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1065 (Fed. Cir. 1995).  ("[C]ases in which economic prejudice has been found lacking did not so hold because of a lack of capital investments, but, rather, because the alleged infringer failed to prove that their increased expenditures, i.e., on marketing and development, were in any way related to actions taken by the patentee.")

*Aspex Eyewear Inc. v. Clariti Eyewear, Ind.,* 605 F.3d 1305, 1312-13.

16      Nistica has not come forward with any evidence of specific expenditures or investments it

17  made in reliance on Finisar's alleged misrepresentation, or of a nexus between its expenditures and

18  Finisar's allegedly misleading conduct, except in the most general and conclusory fashion.

19      In light of the above, the Special Master concludes that Nistica has not alleged or come

20  forward with facts sufficient to support the decision of a reasonable fact finder in its favor on its

21  equitable estoppel defense, drawing all justifiable inferences in its favor, and that there is no

22  genuine dispute as to any material fact.  For these reasons, the Special Master recommends that the

23  motion of Finisar for summary judgment on Nistica's Twenty-Third Affirmative Defense (equitable

24  estoppel) be granted.

## V. NISTICA'S MOTION

### A.  Nistica's Motion for Summary Judgment That It Does Not Infringe Claim 14 of Finisar's '599 Patent

27      Nistica moves for a summary judgment of noninfringement on claim 14 of the '599 Patent on

several grounds.  Claim 14 is dependent on claim 1, and together they read:

**[preamble]** 1. A wavelength selective manipulation device comprising:

**[a]** at least a first optical input port for inputting an optical signal including a plurality of wavelength channels;

**[b]** a first wavelength dispersion element for angularly dispersing the wavelength channels of said optical signal into angularly dispersed wavelength signals;

**[c]** an optical power element for focussing in the dimension of the angular dispersion said angularly dispersed wavelength signals such that said wavelength signals have an elongated optical intensity profile in the focal plane of said optical power element so as to form elongated spatially separated wavelength signals; and

**[d]** a spatial manipulation element for selectively spatially manipulating the characteristics of said elongated spatially separated wavelength signals to produce spatially manipulated wavelength signals.

**[e]** 14. A device as claimed in claim 1 wherein the optical intensity profile of each of the elongated spatially separated wavelength signals has an aspect ratio of approximately 35:1 in the plane of the spatial manipulation element.

***Light Beams Collimated in the Port Dimension.***  Limitation [c] of the '599 patent requires "an optical power element for focussing in the dimension of the angular dispersion said angularly dispersed wavelength signals such that said wavelength signals have an elongated optical intensity profile in the focal plane of said optical power element so as to form elongated spatially separated wavelength signals."  Nistica argues that Claim 14 is limited to wavelength selective manipulation devices having light directed to an SLM that is collimated in the port axis due to the applicant's disclaimer during prosecution.  As discussed above, applicant disclaimed during prosecution any interpretation of "wavelength signals" in limitation [c] in which light in the switching (port) axis was not collimated.

Finisar does not dispute that ███████████████████████████
██████████████████████████████████████████████████████████████
███████.  Goossen Decl. I, ¶ 167; Strasser Decl. I, ¶¶ 22-23; Finisar Responsive SUF, Fact 5.

Given the disclaimer, a reasonable fact finder could not find in favor of Finisar on the issue of whether limitation [c] is found in the '599 Accused Products, or that those products literally infringe claim 14, and no genuine issue of material fact is presented on those issues.

***In the Focal Plane.***  Element [c] of claim 14 of the '599 Patent requires an elongated optical



1  intensity profile located "in the focal plane" of the optical power element.  Finisar contends that ███

2  ██████████████████████████████████████.  Davis Decl. II, Ex. 3 (Hall Report),

3  ¶¶ 23-29 (pp.103-111).  ████████████████████████████████████

4  █████████████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ████████████████████████████████████  Goossen Decl. I, ¶¶ 140-148;

7  Strasser Decl. I ¶¶ 25-26.

8       According to Dr. Goossen, ████████████████████████████████

9  █████████████████████████████████████████

10  ██.  Goossen Decl. I, ¶ 147; Strasser Decl. I, ¶ 26. ████████████████

11  █████████████████████████████████████████

12  ██████████████████████████████████████████

13  ████████████████████████████████████████████████

14  █████████████████████████████████████████

15  █████████████████████████████████████████████

16  ████████████████████████████████  Goossen Decl.

17  I, ¶ 148.

18       Finisar criticizes Nistica for concocting a new claim construction, "that the 'in the focal

19  plane' limitation of claim 14 of the '599 patent requires that light must necessarily travel to the

20  straight line focal plane of the optical power element."  Finisar Opposition at 3, citing Nistica

21  Motion at 3 and Nistica SUF, Fact 9.  However, neither of these references support Finisar's

22  position that Nistica seeks a new claim construction.  Rather, Nistica's position is that ████

23  ████████████████████████████████████████████████

24  █████████████████████████████████████████

25  █████████████  Nistica SUF, Fact 9.  This is quite different from the "new claim

26  construction" which Finisar ascribes to Nistica.[11]

27  _____

28  [11] Finisar in its Opposition argues that Nistica's position would improperly read an embodiment of the invention out of the specification, citing *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008), for the proposition that a claim

1       Finisar's expert Dr. Hall did not calculate or offer an opinion in her report or deposition █

2   █████████████████████████████████████████████████████████████████████████████

3   █████████████████████████████████████████████████████████████████████. *See*

4   Davis  Decl. II, Ex. 3 (Hall Report), at ¶¶ 23-29 (pp.103-111); Bennett Decl. I, Ex. 13 (Hall

5   10/21/2015 Dep.), 218:13-225:8.  Dr. Hall offered an opinion in her report that ████████████

6   █████████████████████████████████████████████████████████████████████████

7   ███████████████████████████████████████████████ Davis Decl. II, Ex. 3

8   (Hall Report), at ¶¶ 24-26 (pp. 104-106).

9       Finisar argues that element [c] only requires that wavelength signals be focused "such that

10  they *would be* elongated in the focal plane of the optical power element."  "That the wavelength

11  signals are ultimately directed onto the spatial manipulation element *rather than reaching the focal*

12  *plane is of no moment . . .*"  Finisar Opposition at 3-4 (emphasis added).  In other words, Finisar

13  argues that element [c] does not require an elongated optical intensity profile which is *actually* "in

14  the focal plane."  But element [c] clearly *does* require that the "wavelength signals have an

15  elongated optical intensity profile *in* the focal plane."

16       Finisar in its Opposition also argues that Nistica's '599 Accused Devices ████████████

17  ██████████████████████████████████████████████████████████████

18  ████████████████████ Finisar bases its argument on the analysis in Hall Decl. II, ¶ 54, but Nistica

19  asserts that the theory in Hall Declaration II ¶ 54 was absent in Dr. Hall's Report (Davis Decl. II,

20  Ex. 3, at ¶¶ 23-29 (pp.103-111)) and moves to strike ¶ 54 of Hall Decl. II as outside the scope of the

21  Hall Report.  Nistica Reply at 2-3.

22       As discussed above, an expert witness such as Dr. Hall must timely provide a written report.

23  Fed. R. Civ. P. 26(a)(2)(B).  A party failing to timely provide expert opinions "is not allowed to use

24

25  interpretation that excludes a preferred embodiment is rarely, if ever, correct.  Finisar argues that Fig. 11 of the '599
    Patent shows light that is "folded down by a prism," so that the light beams never reach the straight line focal plane of
26  the optical power element.  But, as discussed, Nistica does not take the position that in the '599 Patent light must
    necessarily travel to the straight ████████████████████████████████████████████████████
27  ██████████████████████████████████████████████████████████████
28  ████████████████████████████████████████████████████████████.

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                                      31

1   that information to supply evidence on a motion, at a hearing, or at a trial, unless the failure was

2   substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

3          A review of the details of Dr. Hall's theories is required to resolve the issue.  In her Opening

4   Expert Report dated July 29, 2015, Dr. Hall states her conclusion that in the '599 Accused Products

5   ███████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████

7   ███████████████  Davis Decl. II, Ex. 3, ¶¶ 24, 26, 29.  Dr. Hall also states that in the '599 Accused

8   Products, ████████████████████████████████████████████

9   ████████████████████████████████████████████

10  ███████████  *Id.,* ¶ 72.

11         In Dr. Goossen's Rebuttal Expert Report dated September 28, 2015, he sets out the

12  calculations referred to above to show that █████████████████████████

13  ██████████████████████████████████████████████

14  ███████████████████████████████████████████████████

15  ██████████████████████████████████████████████

16  ███████████████████████  *Id.,* ¶ 238.

17         The record does not disclose that Dr. Hall submitted any reply to contradict or rebut Dr.

18  Goossen's Rebuttal Expert Report, as she was required to do within 30 days.  Fed. R. Civ. P.

19  26(a)(2)(D)(ii).  But Dr. Hall was deposed on October 21, 2015, and testified that, █████████

20  ███████████████████████████████████████████████

21  ████████████████████████████████████  Davis Decl. II, Ex. 4 (Hall 10/21/2015

22  Dep.) at 166:14-167:1.

23         Dr. Goossen again stated his opinions regarding the focal plane in the '599 Accused

24  Products in his Declaration supporting Nistica's Motion.  Goossen Decl. I, ¶¶ 130-148.  Dr. Hall

25  submitted a Declaration supporting Finisar's Opposition, including the objected-to ¶ 54.  She

26  repeated the opinion she gave in her deposition ███████████████████████████

27  █████████████████████████████████████████████

28  █████████████████████████████████████████

1  ██████████████████████████████████████████████████████████████

2  ██████████████████████████, so that the '599 Accused Products meet limitation [c].

3       This infringement theory did not appear in Dr. Hall's Report and was expressed for the first

4  time in her Declaration, and is untimely under Fed. R. Civ. P. 26(a)(2)(D)(ii).  *See Volterra*

5  *Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 1025, 1040 (N.D. Cal. 2011).  Dr. Goossen's

6  opinion on the ██████ had been known since he prepared his Rebuttal Expert Report on

7  September 28, 2015, and any rebuttal or counter opinion of Dr. Hall should have been made known

8  well before the summary judgment motions were filed.  The new opinions appearing in ¶ 54, lines

9  16-23, and Finisar's argument based thereon will be disregarded.

10       Dr. Hall goes on in her Declaration to state another infringement theory.  She opines that,

11  ████████████████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████████

13  ██████████████████████████████████████████████

14  ██████████████████████████████████████████████

15  ██████████████████ Hall Decl. II, ¶ 56; Finisar Opposition at 3, ftn. 6.

16       This theory of Dr. Hall, however, does not establish infringement, ████████████████

17  ██████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████

19  ██████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ██████████████████████████████████.  *See*  Goossen Decl. III, ¶¶ 37-38.

22       In sum, Finisar has not offered proof to dispute Dr. Goossen's opinion that the Nistica '599

23  Accused Products ████████████████████████████████████████████████

24  ██████████████████████, other than the conclusory statement in the Hall Report.  Conclusory

25  assertions are not enough to defeat a motion for summary judgment, especially where the party has

26  the burden of proof.  "It is well settled that an expert's unsupported conclusion on the ultimate issue

27  of infringement is insufficient to raise a genuine issue of material fact, and that a party may not

28  avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical

1   claim limitation is found in the accused device." *Dynacore Holdings Corp. v. U.S. Phillips Corp.*,

2   363 F.3d 1263, 1278 (2004).

3          Given the above, a reasonable fact finder could not find in favor of Finisar on the issue of

4   whether in the '599 Accused Products meet limitations [c] and [d] of claim 14, or that those

5   products literally infringe claim 14, and no genuine issue of material fact is presented on those

6   issues.

7          ***Aspect Ratio of Approximately 35:1.***  Element [e] in claim 14 of the '599 Patent requires

8   that "the optical intensity profile of each of the elongated spatially separated wavelength signals has

9   an aspect ratio of *approximately* 35:1 in the plane of the spatial manipulation element."  (Emphasis

10  added.)  Nistica seeks summary judgment that the '599 Accused Products do not have the required

11  "aspect ratio of approximately 35:1."  Nistica argues that "approximately" is a common English

12  word and should be accorded its plain and ordinary meaning, and seeks a claim construction that

13  approximately 35:1 means, at most, between 34:1 and 36:1.  Nistica Motion at 4.

14         Dependent claim 14 was added by amendment after the '599 Patent application was filed,

15  and there is no discussion in the '599 Patent or its prosecution history of aspect ratios.  Given that

16  "approximately" is a common English word, the Special Master concludes that the task of

17  determining whether claim limitation [e] is met is part of an infringement analysis, and not a matter

18  for claim construction.  *See Ferring B.V. v. Watson Laboratories, Inc.-Fla.*, 764 F.3d 1382, 1389

19  (Fed. Cir. 2014) ("We affirm the district court's construction of 'about' to mean 'approximately,' as

20  well as its refusal to construe 'about' to represent a particular numerical error rate."); *Thorner v.*

21  *Sony Computer Ent. Am. LLC,* 669 F.3d 1362, 1369 (Fed. Cir. 2012) ("The task of determining the

22  degree of flexibility, the degree of rigidity that amounts to 'semi-rigid,' is part of the infringement

23  analysis, not part of the claim construction.").

24         For these reasons, the Special Master concludes that no claim construction of

25  "approximately" is needed, and that there is a genuine dispute of material fact as to whether the

26  '599 Accused Products meet the limitation of claim 14 "wherein the optical intensity profile of each

27  of the elongated spatially separated wavelength signals has an aspect ratio of approximately 35:1 in

28  the plane of the spatial manipulation element."

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                                    34

1    Given the above, and drawing all justifiable inferences in favor of Finisar, the Special

2   Master concludes that Finisar has not come forward with facts which would be sufficient to support

3   the decision of a reasonable fact finder in its favor on its claim against Nistica for infringement of

4   claim 14 of the '599 Patent and that there is no genuine dispute as to any issue of material fact in

5   this regard.  Accordingly, the Special Master recommends that Nistica's motion for summary

6   judgment of noninfringement of claim 14 of the '599 Patent be granted.

7   **B.   Nistica's Motion for Summary Judgment That Claim 24 of Finisar's '599 Patent Is**

8   **Invalid**

9    Nistica moves for summary judgment that claim 24 of the '599 Patent is anticipated by prior

10   art U.S. patents Nos. 6,750,511 and 7,126,740.  Nistica Motion at 6.  Claim 24 of the '599 Patent

11   provides:

12   **[preamble]** 24.  A wavelength selective manipulation device comprising:

13   **[a]** a at least a first optical input port for inputting an optical signal including a
     plurality of wavelength channels;

14
15   **[b]** polarisation alignment element for aligning the polarization state of said optical
     signal;

16   **[c]** a wavelength dispersion element for angularly dispersing the wavelength
     channels of said optical signal into angularly dispersed wavelength signals;
17
18   **[d]** an optical power element for focusing the angularly dispersed wavelength
     signals into a series of elongated spatially separated wavelength signals; and

19   **[e]** a spatial manipulation element for selectively spatially manipulating the
     characteristics of said spatially separated wavelength bands to produce spatially
20   manipulated wavelength bands.

21    Finisar asserts that neither patent discloses a "spatial manipulation element," "spatially

22   manipulated wavelength band," or "manipulating the characteristics of said elongated spatially

23   separated wavelength bands" as required by element [d] of claim 24.  Finisar Opposition at 6.  As

24   discussed above, in order to establish anticipation of a claim, Nistica must prove by clear and

25   convincing evidence that a prior art patent discloses "every limitation of the claimed invention

26   either explicitly or implicitly" and demonstrate that "no genuine issue exists as to any material fact"

27   underlying such proof.  *Eli Lilly and Co.,* 251 F.3d at 962, 970.  Nistica relies on the declaration of

28

1    Dr. Goossen to provide the needed evidence.

2        ***Evidentiary Objection.***   Before turning to Nistica's proof of anticipation, Finisar's objection

3    to its evidence must be considered.  Finisar objects to Goossen Decl. I, which forms the basis for

4    Nistica's motion, on the grounds that it includes improper new opinions with respect to the '599

5    Patent at ¶¶ 229, 232, 236-242, and 247-268.  Finisar Opposition at 8.

6        As discussed above, an expert witness such as Dr. Goossen must timely provide a written

7    report.  Fed. R. Civ. P. 26(a)(2)(B).  A party failing to timely provide expert opinions "is not

8    allowed to use that information to supply evidence on a motion, at a hearing, or at a trial, unless the

9    failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

10       Dr. Goossen's Report (Bennett Decl. I, Exhibit 10) was signed on July 29, 2015, and his

11   Declaration on November 24, 2015.  Nistica identifies ¶¶ 363-365, 368-371 and Ex. H-2 of Dr.

12   Goossen's Report as corresponding to the objected-to ¶¶ 229, 232, and 236-242 of his Declaration

13   relating to anticipation by the '511 patent.  Bennett Decl. III, Ex. 4.  Those paragraphs of his Report

14   proceed through the limitations of claim 24 one by one, state a conclusion that each is disclosed by

15   the '511 patent, and then set out two or three pages of text and figures from the '511 patent for each

16   claim element without any explanation, commentary, highlighting or color coding.  Exhibit H-2 is a

17   claim chart which sets out large amounts of text and figures from the '511 patent – seventeen pages

18   in all – against the elements of claim 24, again without any explanation, commentary, highlighting

19   or color coding.

20       Dr. Goossen's objected-to Declaration paragraphs on anticipation by the '511 Patent are

21   very different from his Report.  First he provides a new "summary demonstration" of anticipation

22   with a color-coded version of Fig. 7A from the '511 patent annotated to show that it includes all of

23   the elements of claim 24, and then a color-coded version of claim 24 itself and finally brief color-

24   coded excerpts from the '511 patent, all designed to show exactly where each limitation of claim 24

25   is found.  Goossen Decl. I, ¶¶ 229, 232.  In the more detailed element-by-element discussion which

26   follows, the lengthy quotations from the '511 patent which appeared in the Report now have

27   portions in bold, to direct the reader to what is important.

28       Dr. Goossen has identified for the first time specific portions of the '511 patent which

1  disclose specific limitations of claim 24.  No reason appears why the information in the Declaration

2  could not have been included in his earlier Report.  Dr. Goossen's Report did not put Finisar on fair

3  notice of the detailed and specific analysis he was to make in his Declaration, and thus his Report

4  does not give the complete statement of his opinions found in his Declaration required by Rule

5  26(a)(2)(B).

6       Finisar also objects to ¶¶ 247-268 of the Goossen Declaration, which contain his analysis for

7  anticipation of the '599 Patent by the prior art '740 patent.  Nistica cites Dr. Goossen's Report at

8  ¶¶ 380-385 and Exhibit H-3 as "corresponding" but again those sections simply reproduce large

9  portions of the text and the figures of the '740 patent, with no explanation, commentary,

10  highlighting or color coding.  Dr. Goossen's Declaration on the '740 patent, however, again

11  contains a new "summary demonstration" of anticipation with an annotated Fig. 1 from the '740

12  patent, and small highlighted excerpts from the '740 patent with commentary showing precisely

13  where each limitation of claim 24 can be found, followed by the same longer quotations from the

14  '740 patent with portions now put in bold to direct the reader to important parts.  The objected-to

15  portions of Dr. Goossen's Declaration on anticipation by the '740 patent are inadmissible under

16  Rule 37(c)(1) for the reasons discussed above in relation to the '511 patent.

17       The only express exceptions to the application of Rule 37(c)(1) are when the parties' failure

18  to disclose the required information is substantially justified or harmless.  No justification or

19  argument of harmlessness has been offered, and the failure is far from harmless, for, among other

20  things, it prevented Finisar from knowing the specifics of Dr. Goossen's anticipation theories when

21  it deposed him.

22       For the reasons discussed above, the objections of Finisar to ¶¶ 229, 232, 236-242, and 247-

23  268 of Dr. Goossen's Declaration are sustained, and these paragraphs will not be considered.

24  Without that evidentiary support, Nistica has not come forward with clear and convincing evidence

25  that claim 24 of the '599 patent is anticipated by the '511 or '740 patents, because Dr. Goossen's

26  Report does not "state the witnesses' interpretation of the claim element, and explain in detail how

27  each claim element is disclosed in the prior art reference" as required by *Schumer*, 308 F.3d at

28  1315.

Given the above, the Special Master concludes that Nistica has not come forward with facts which would be sufficient to support the decision of a reasonable fact finder in its favor on its defense that claim 24 of the '599 Patent is anticipated by prior art U.S. patents Nos. 6,750,511 and 7,126,740, and that there is no genuine dispute as to any issue of material fact in this regard. Accordingly, the Special Master recommends that Nistica's motion for summary judgment that claim 24 of the '599 Patent is anticipated by prior art U.S. patents Nos. 6,750,511 and 7,126,740 be denied.

## C. Nistica's Motion for Summary Judgment That It Does Not Infringe Claims 1, 12 and 14 of Finisar's '980 Patent

Nistica moves for summary judgment of noninfringement of the asserted claims of the '980 Patent, claims 1, 12 and 14, arguing that the '980 Accused Products do not satisfy the "spatial separating means" limitation of the '980 Patent.  The claims provide:

[preamble] 1. An optical signal manipulation system including:

[a] a series of ports for carrying a series of optical signals to be manipulated;

[b] a spatial separating means for simultaneously spatially separating at least a first and a second group of light from said series of optical signals, each of said first and second group including a multiplicity of independent wavelength channels, with the wavelength channels of the first group having overlapping wavelength ranges of the wavelength channels of the second group;

[c] a wavelength dispersion element subsequently spatially separating the multiplicity of wavelength channels of said first and second group and projecting them onto a wavelength processing means; and

[d] wavelength processing means for separately processing each of the separated wavelengths of said first and second group, with each of wavelength channels of the first and second group being processed independently at a separated spatial location, said wavelength processing means having a series of independent wavelength processing elements, with separate wavelength processing elements simultaneously processing the wavelength channels having overlapping wavelength ranges of the first and second group.

[e] 2. A system as claimed in claim 1 wherein said spatial separating means includes a polarisation manipulation element separating a first and second series of predetermined polarisations from predetermined ones of said ports and projecting said first series in a first angular direction and the second series in a second angular direction.

[f] 8. A system as claimed in claim 1 wherein the optical signals received by said wavelength processing means are in the form of wavelength separated elongated bands.

[g] 12. A system as claimed in claim 8 wherein said first group of wavelength

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                    38

1    channels forms a first row of wavelength separated elongated bands and said second
2    group of wavelength channels forms a second row of wavelength separated
     elongated bands.

3    **[h]** 14. A system as claimed in claim 2 wherein said first series of predetermined
     polarisations is derived from orthogonal polarisations of a first series of optical
4    signals and said second series of predetermined polarisations is derived from
     orthogonal polarisations of a second series of optical signals.

5    The Court construed limitation [b], the spatial separating means limitation, as a means-plus-

6    function limitation under § 112(6) and described its function and structure as follows:

7    Function:  simultaneously spatially separating at least a first and a second group of
8    light from said series of optical signals

9    Structure: walk off crystal (115 or 215) and/or compensating or non-compensating
     birefringent wedge element (130 or 230) or the combination of walk off crystal (115
10   or 215) and/or compensating or noncompensating birefringent wedge element (130
     or 230) and a series of optical power elements . . . and equivalents thereto.

11

12   Order Construing Claims at 18.  The Court further clarified limitation [b] by stating that

13   "simultaneously spatially separating at least a first and second group of light from said series of

14   optical signals" only encompasses "*creating* spatial separation or the combination of *creating* and

15   maintaining spatial separation."  Order Construing Claims at 18-20 (emphasis added).

16   ***Spatial Separation.***  The parties dispute the meaning of the Court's construction.  Nistica

17   characterizes the construction as requiring the creation of spatial separation *between* a first and a

18   second group of light.  Nistica Motion at 7.  Finisar objects that the "between" limitation is neither

19   in the claim nor in the Court's construction, and that Nistica is attempting to rewrite the Court's

20   construction.  Finisar Opposition at 9.  Finisar's infringement theory is that spatial separation in the

21   '980 Accused Products is *within* optical signals by separation of polarizations (*See* '980 Patent

22   4:61-5:9) and it argues that Nistica's "between" improperly reads that theory out of the claims.

23   Finisar Opposition at 10.

24   Nistica's "between" argument is largely based on a comment made in the Court's Order

25   Construing Claims, where the Court stated: "[n]or, within the context of the claim language, does it

26   make sense to interpret 'simultaneously spatially separating' to broadly include within its ambit

27   solely the maintenance of separation in the absence of a preceding act of imparting spatial

28   separation *between* two groups of light."  Order Construing Claims at 20 (emphasis added).  The

1   Court also observed that "Finisar argues that the function of 'simultaneously spatially separating'

2   includes both the function of creating spatial separation *between* the two groups of light and of

3   maintaining that separation." *Id.* at 19 (emphasis added).  Nistica argues that these passages show

4   that at the time of the claim construction hearing both the Court and Finisar understood that the

5   separation was required by the claims to be *between* two groups of light.

6          The Special Master disagrees.  The Court's construction of the spatial separating means

7   makes it clear that the structure for that means can be a walk-off crystal alone, and the Court

8   specifically cited walk-off crystal 215 of Fig. 6 as corresponding structure.  Order Construing

9   Claims at 18.  The '980 patent Summary of the Invention states that a walk-off crystal can be a

10  spatial separating means:  "The spatial separating means preferably can include a polarisation

11  manipulation element separating a first and second series of predetermined polarisations from

12  predetermined ones of the ports and projecting the first series in a first angular direction and the

13  second series in a second angular direction."  '980 Patent 4:61-5:14.  Since the function of a walk-

14  off crystal is to separate polarizations within a light beam, insertion of a "between" requirement into

15  the construction, as urged by Nistica, would potentially read walk-off crystal 215 in Fig. 6 out of the

16  Court's construction.

17         The Special Master concludes the Court's use of "between" in its Order Construing Claims

18  was not part of its claim construction but only a commentary on the process and does not signify

19  that the Court, or Finisar, intended that "between" be part of the claim construction.  Neither the

20  Court nor Finisar used the word "between" in the sense of the above quotations during the claim

21  construction hearing, nor did Finisar in its claim construction briefing.[12]  Transcript of 8/8/2014

22  hearing, Dkt. No. 119.  The use of "between" in the Order occurs in the context of a debate as to

23  whether "simultaneously spatially separating" included both creating separation and maintaining

24  separation.  If the Court had meant to make spatial separation *between* two groups of light part of

25  the claim construction, it would have put that requirement in to the claim construction, and not

26

27  ─────────────────────────

    [12] Nistica argues that Finisar is judicially stopped from contesting Nistica's "between" construction.  Nistica Reply at 7.
    However, a review of the transcript (Dkt. No. 119) shows that Finisar did not take the position at the claim construction

28  hearing that "the function of 'simultaneously spatially separating' includes both the function of creating spatial
    separation *between* the two groups of light and of maintaining that separation," so there is no judicial estoppel.

─────────────────────────

1  merely mentioned it in commentary.

2      ***Linking Spatial Separation and Processing.***  Nistica argues that Finisar's infringement

3  theory is contrary to the claim language and the Court's construction:  "Claim 1 requires a 'spatial

4  separating means' for creating spatial separation between a first and second group of light *so that*

5  the first and second group of light can then be processed separately at different locations when they

6  arrive at the 'wavelength processing means' (which is the spatial light modulator)" (emphasis

7  added).  Nistica Motion at 9.  But Claim 1 contains no such limitation.  Claim 1 requires that both

8  groups be spatially separated, and that both groups be separately processed, but there is no language

9  in claim 1, and Nistica does not point to any language in the '980 Patent, that requires a causal

10  linkage between spatial separation of the groups by the "spatial separating means" and the locations

11  where groups of light are later processed on the "wavelength dispersion means."

12      ***Creating Spatial Separation.***  Dr. Hall identifies ███████████████████████████

13  ███████████████████████████████████' in the '980 Accused Products, and states that

14  "the light in each of these two groups is indeed 'simultaneously spatially separate[ed]' by the walk-

15  off crystal . . ."  Hall Decl. II ¶ 207.  She opines that the ████████████ in the '980 Accused

16  Products is the structure of the spatial separating means of element [b].  Hall Decl. II ¶ 190.  In her

17  report, she puts it this way: '███████████████████████████████████████

18  ███████████████████████████████████████████

19  ███████████████  Bennett Decl. I, Exhibit 2 (Hall Report) ¶ 27, p 166.  As Dr. Hall notes, the

20  Court's claim construction states that a walk-off crystal on its own can meet the requirements for

21  the spatial separating means of claim 1, element [b].  Hall Decl. II, ¶ 205.

22      Nistica contends that in the '980 Accused Products, t████████████████████

23  ███████████████████████████████████████

24  ███████████████████████████████  Goossen Decl. I, ¶¶ 285-

25  287.  Dr. Goossen argues that ███████████████████████████

26  ███████████████████████████████████████

27  ███████████████████████████████████

28  ███████████████████████████████████████

1    of the "spatial separating means," the claim limitation is not met.  *Id.*

2          While Dr. Hall does not disagree with Dr. Goossen's conclusion that ███████

3    ████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████

7    ██████████████████████████████  Hall Decl. II, ¶ 209.

8          Dr. Goossen counters that ████████████████████████████████████

9    ███████████████████████████████████  Goossen Decl. I, ¶ 289 (emphasis

10   added).  Yet the Court's claim construction states that the walk-off crystal alone can serve as the

11   structure of limitation [b].

12         These competing expert opinions create a fact issue as to whether the ████████████ in the

13   '980 Accused Products creates spatial separation and meets limitation [b].  The evidence would

14   support the decision of a reasonable fact finder for either party on this issue, and so a genuine issue

15   of material fact is presented.

16         ***Simultaneously Spatially Separating.***  Nistica also argues that the '980 Accused Products

17   do not infringe claims 1, 12 and 14 of the '980 Patent because the '980 Accused Products do not

18   have "a spatial separating means for *simultaneously* spatially separating at least a first and second

19   group of light."  Nistica Motion at 11 (emphasis added).  Dr. Goossen explains in detail that ████

20   ████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████

22   ███████████████████████████  Goossen Decl. I, ¶¶ 292-293.

23         Under Finisar's theory, the ████████████████████████████████████████

24   ███████████████████████████████████████████████████████

25

26   ──────────────────────

[13] Finisar accuses Nistica and Dr. Goossen of attempting to insert an additional "coordinated" limitation into the claim.
27   Finisar Opposition at 12.  The Special Master understands that Nistica and Dr. Goossen do not argue that the claim
     requires that the signals be coordinated, but are only describing the way the '980 Accused Products work.  In fact, Dr.
28   Goossen has testified that there is nothing in the limitations of the '980 claims with regard to coordination of timing.
     Davis Decl. II, Ex. 1 (Goossen 10/24/20 Dep.), at 294:21-295:10.

1 █████████████████████████████████████████████████████████

2 █████████████████████████████████████████████████████

3 ████████████████████████████.

4      Dr. Hall states in her Report that ████████████████████████

5 █████████████████████████████████████████████" Bennett Decl. I,

6 Exhibit 2 (Hall Report), ¶ 27, p. 166.  Dr. Hall does not explain the reasons or basis for her opinion,

7 but references three sources without explaining how they support her conclusion.  Two references

8 are to slides (Bennett Decl. I, Ex. 2 (Hall Report), ¶ 27, p. 166 and Fig. 3.8; Nistica Motion at 12

9 (copies of the slides referenced by Dr. Hall)).  The third reference is to deposition testimony given

10 by Dr. Strasser: "████████████████████████████████████████████

11 ██████████████████████████████ Davis Decl. II, Ex 20 (Strasser Dep.)

12 at 296:3-6.  As Dr. Goossen correctly points out, these references do not disclose ████████████

13 █████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 █████████████████ Goossen Decl. I, ¶ 293.

16      Dr. Hall concludes "████████████████████████████████████

17 █████████████ Bennett Decl. I, Ex. 2 (Hall Report), ¶ 27, p 167.  Such a conclusory assertion is

18 not enough to defeat a motion for summary judgment, especially where the party has the burden of

19 proof.  "It is well settled that an expert's unsupported conclusion on the ultimate issue of

20 infringement is insufficient to raise a genuine issue of material fact, and that a party may not avoid

21 that rule simply by framing the expert's conclusion as an assertion that a particular critical claim

22 limitation is found in the accused device."  *Dynacore Holdings Corp.*, 363 F.3d at 1278 (2004).

23     Dr. Hall's Declaration is equally conclusory, and she does not further explain her three

24 citations in response to Dr. Goossen's criticism.

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████████████

1  Hall Decl. II, ¶ 211.

2  Finisar also argues that "claim 1 of the '980 Patent is an apparatus claim, which means that

3  so long as the walk-off crystal is configured such that it is reasonably capable of performing the

4  Court-ordered function of 'simultaneously spatially separating at least a first and a second group of

5  light,' this limitation is satisfied," citing *Ericsson, Inc. v. D-Link Sys., Inc.,* 773 F.3d 1201, 1217

6  (Fed. Cir. 2014).  But Finisar has offered no evidence that the '980 Accused Products are

7  reasonably capable of performing the function.  See Bennett I, Ex. 2 (Hall Report), ¶ 27.  *Ericsson*

8  also states that "a device does not infringe simply because it is possible to alter it in a way that

9  would satisfy all the limitations of a patent claim." *Ericsson,* 773 F.3d at 1217.

10  In short, Finisar has not offered any evidence that ██████████████████████████

11  ████████████████████████████████████████████████████████████████████

12  ███████████████████████████████  There is no genuine issue of material fact

13  regarding the absence of the element "a spatial separating means for *simultaneously* spatially

14  separating at least a first and second group of light" in Nistica's '980 Accused Products.

15  Given the above, the Special Master concludes, drawing all reasonable inferences in favor of

16  Finisar, that Finisar has not come forward with facts which would be sufficient to support the

17  decision of a reasonable fact finder in its favor on its claim against Nistica for infringement of

18  claims 1, 12 and 14 of Finisar's '980 Patent and that there is no genuine dispute as to any issue of

19  material fact in this regard.  Accordingly, the Special Master recommends that Nistica's motion for

20  summary judgment of noninfringement of claims 1, 12 and 14 of Finisar's '980 Patent be granted.

21  **D.  Nistica's Motion for Summary Judgment That It Does Not Infringe Claims 1 and 18 of**
    **Finisar's '833 Patent**

22

23  Nistica moves for summary judgment of noninfringement of the asserted claims of Finisar's

    '833 Patent, claims 1 and 18.  Nistica Motion at 12.  The claims provide:

24

25  [preamble] 1. A smart node for use in an optical communications network having
    optical signals, the smart node providing continuous, real time, autonomous feedback
    and correction with closed and/or open loop control of the optical signals in the
    optical communications network, the smart node comprises:

26

27  [a] an equalization filter for filtering the optical signals in response to a feedback
    processor signal;

28

[b] a coupler for coupling filtered optical signals;

**[c]** a channel monitor for monitoring a feedback portion of the filtered optical signals; and

**[d]** a processor for processing a channel monitor signal from the channel monitor, and providing the feedback processor signal to the equalization filter.

**[e]** 2. A smart node according to claim 1, wherein the smart node further comprises: an input/output user interface for receiving input signals from a user and providing user input interface signals to the processor, and for receiving user output signals from the processor and providing user output interface signals to the user.

**[f]** 18. A smart node according to claim 2, wherein the input/output user interface includes an input user interface for receiving inputs from an outside user for dynamically changing the configuration of the smart node, including timing, traffic or other distinct attribute basis.

*Processor.*  Nistica asserts that element [d], "a processor for processing a channel monitor signal . . ."  is not present in the '833 Accused Devices, which are Nistica line cards.  Nistica Motion at 12; Goossen Decl. I, ¶¶ 294-295.

Dr. Hall has offered an opinion that the ████████ processor in the '833 Accused Products is the "processor" meeting limitation [d] of claims 1 and 18.  Bennett Decl. I, Ex. 2 (Hall Report), ¶¶ 28-32, pp. 242-245.  However, Dr. Hall's opinion was struck by the Court on December 1, 2015.  Order re Striking Portions of Expert Reports at 8.

Nistica moves for summary judgment on the basis that Finisar has presented no expert testimony or competent evidence that the '833 Accused Products have a processor that meets the "processor" limitation of claims 1 and 18, and that Finisar cannot meet its burden of proving infringement.  Nistica Motion at 13; Nistica SUF, Facts 34-36.  With Dr. Hall's opinions on limitation [d] gone, Dr. Goossen's opinion that limitation [d] of the asserted claims is not present in the '833 Accused Products is not disputed.  *See* Goossen Decl. I, ¶¶ 294-295.

Unfazed by having its expert's opinion struck, Finisar argues that:

> Summary judgment of non-infringement should not be entered because the Court struck Dr. Hall's expert opinions concerning infringement of the '833 patent.  Finisar is entitled to prove infringement in accordance with its theory in its Operative Infringement Contentions (Ex. R07) through the testimony of fact witnesses and other evidence.  See *Centricut, LLC v. Esab Grp., Inc.,* 390 F.3d 1361, 1370 (Fed. Cir. 2004); Ex. 07.

Finisar Opposition at 14.  Finisar did not further identify witnesses, testimony or other evidence in its Opposition or Responsive Separate Statement.  *See* Finisar Responsive SUF, Fact 36.

1        Finisar's Operative Infringement Contentions allege that limitation [d] is met by a ███████

2    processor.  Davis Decl. II, Ex. 7 (Finisar Amended Preliminary Infringement Contentions), Exhibit

3    B, Parts 1 and 2.  The Contentions consist of "[c]harts that identify where each limitation of each

4    asserted claim of the Patents-in-Suit are found within the Nistica Accused Optical Devices."  Davis

5    Decl. II, Ex. 7, p. 5.  The charts for Nistica's '833 Accused Products include 108 pages of dense

6    Nistica technical information, including quotes and block diagrams from Nistica technical materials

7    and lists of Nistica documents and software, set opposite elements from the asserted claims with no

8    citations to testimony, explanation or commentary.[14]

9        Finisar represented at argument on the motions for summary judgment that additional

10   testimony supporting its position could be found in the depositions of Nistica employees Strasser,

11   Pepsin, Simovitch and Da Silva, but it has not identified any portions of their depositions, as it was

12   required to do in its Responsive Separate Statement under the Court's Standing Order re Civil Cases

13   Rule F.3.c.  *See* Finisar Responsive SUF, Fact 36; Finisar Oral Argument Slide 105.  Thus, Finisar

14   has not come forward with evidence which raises a genuine issue of material fact as to the existence

15   of limitation [d] in the '833 Accused Products.

16       ***Line Cards.***  Nistica separately moves for summary judgment of no direct infringement of

17   '833 Patent claims 1 and 18 "████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████████████

20   to allegedly perform the claimed functionality of the '833 Patent, Nistica cannot directly infringe."

21   Nistica Motion at 13; Nistica SUF, Fact 38.

22       This is explained in the Strasser Declaration:

23
24   
25

---

26   [14] The facts in Finisar's Contentions could not be used to prove infringement without extensive expert testimony.  These
     materials could be viewed as raw technical material waiting to be assembled into an expert opinion.  But Finisar has no

27   expert, in the wake of the ruling striking portions of Dr. Hall's Report.  The Federal Circuit has said "[w]e have also
     noted that 'typically' expert testimony will be necessary in cases involving complex technology," although "[w]e do not

28   state a per se rule that expert testimony is required to prove infringement when the art is complex."  *Centricut, LLC v.
     Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004).  The technology of the present case is highly complex.



Strasser Decl. I, ¶¶ 31-32.

Dr. Goossen expands on Dr. Strasser's statements.  Goossen Decl. I, ¶¶ 296-322.  In particular, Dr. Goossen describes experiments he made on the accused line cards with and without a customer's shelf controller:

Goossen Decl. I, ¶ 299.  *See also* ¶¶ 307-322.

Finisar does not dispute the results of Dr. Goossen's line card experiments, but responds that they don't matter, since Finisar does not rely on "network functionality" or any software or hardware added by third parties to meet any element of the asserted claims of these patents, and that

> The asserted claims are all apparatus claims, which are directly infringed when Nistica makes, uses, sells, offers to sell, or imports to the United States line cards containing the accused WSS with all required components and reasonably capable of performing the claimed function.  See 35 U.S.C. § 271(a); *Ericsson*, 773 F.3d at 1217 ("case law supports finding infringement by a 'reasonably capable' accused device [ . . .where] there is evidence that the accused device is actually used in an infringing manner and can be so used without significant alterations."); Hall Decl. at ¶¶ 217, 223, 229, 234, 241. . . . Also, there is a disputed fact regarding whether connecting the line cards to an optical network is a significant alteration and, therefore, summary judgment is improper.

Finisar Opposition at 13-14.

The evidence in *Ericsson* showed that the accused devices sometimes operated in an

1   infringing manner, and the court affirmed on the basis that infringement may be found if accused

2   devices are "reasonably capable" of infringement.  *Ericsson,* 773 F.3d at 1215, 1217.  Here, the line

3   cards are not functional and will not even boot up without the addition of third party hardware and

4   software and, as sold, are not "reasonably capable" accused devices under *Ericsson.*  Adding third

5   party hardware and software by connecting to a customer optical network is a significant alteration

6   and not at all analogous to simply plugging an accused device in and accessing the network, as

7   suggested by Dr. Hall.  Hall Decl. II, ¶ 242.  Since Nistica's line cards cannot boot up by

8   themselves and are not functional without third party hardware and software, they are not capable of

9   performing any limitation of the asserted claims.  ***See* Goossen Decl. I, ¶ 301.**  A reasonable fact

10  finder could not find in favor of Finisar on the issue of whether the '833 Accused Products literally

11  infringe claims 1 and 18, and no genuine issue of material fact is presented.

12          In light of the discussion above, and after drawing all reasonable inferences in favor of

13  Finisar, the Special Master concludes that Finisar has not come forward with facts which would be

14  sufficient to support the decision of a reasonable fact finder in its favor on its claim against Nistica

15  for infringement of claims 1 and 18 of the '833 Patent, and that there is no genuine dispute as to any

16  issue of material fact in this regard.  Accordingly, the Special Master recommends that Nistica's

17  motion for summary judgment of noninfringement of claims 1 and 18 of the '833 Patent be granted.

18  **E.  Nistica's Motion for Summary Judgment That Claims 1, 25 and 29 of Finisar's '740 Patent
     Are Invalid**

19

20          Nistica moves for summary judgment that the asserted claims of the '740 Patent, claims 1,

21  25 and 29, are anticipated by U.S. Patent No. 6,798,941 ("'941 patent") and invalid.  Nistica Motion

22  at 13.  The priority date of the '740 Patent is January 28, 2003, and so the '941 patent, which issued

23  from an application filed on September 20, 2001, is prior art.  Finisar Opposition at 14, ftn 17.  The

24  claims provide:

25          **[preamble]** 1. A reconfigurable multifunctional optical device comprising:

26          **[a]** an optical arrangement for receiving a first optical input signal and a second
        optical input signal,

27          **[b]** each of the first and second optical input signals having optical bands or
        channels,

28          **[c]** the optical arrangement having a free optics configuration with a light dispersion

---

1    element for spreading each of the first and second optical input signals into
     respective optical bands or channels

2

3    **[d]**on separate portions of a spatial light modulator having an array of micromirrors

4    **[e]** and being programmable to perform separate optical functions on each of the first
     and second optical signals; the spatial light modulator having a first set of
     micromirrors programmed to perform a first overall optical function on the first

5    optical input signal, and having a second set of micromirrors programmed to perform
     a second overall optical function on the second optical input signal, wherein the first

6    overall optical function and second overall optical function are different.

7    **[f]** 17. A reconfigurable multifunctional optical device according to claim 1, wherein
     the optical arrangement includes one or more optical portions that provide the at least

8    two optical input signals to the spatial light modulator, and also provide reflected
     optical signals depending on the first optical function and the second optical

9    function.

10   **[g]** 23. A reconfigurable multifunctional optical device according to claim 17,
     wherein the one or more optical portions include a collimator, a reflective surface,

11   the dispersion element, a bulk lens, or a combination thereof.

12   **[h]** 25. A reconfigurable multifunctional optical device according to claim 23,
     wherein the reflective surface includes a mirror.

13

14   **[i]** 29. A reconfigurable multifunctional optical device according to claim 17,
     wherein the one or more optical portions include one or more optical PDL mitigating
     devices for minimizing polarization dependence loss (PDL).

15

16          As discussed above, in order to establish anticipation of a claim, Nistica must prove by clear

17   and convincing evidence that a prior art patent discloses "every limitation of the claimed invention

18   either explicitly or implicitly" and demonstrate that "no genuine issue exists as to any material fact"

19   underlying such proof. *Eli Lilly and Co.,* 251 F.3d at 962, 970.  Nistica relies on Dr. Goossen's

20   analysis to show that the '941 patent discloses each limitation of claims 1, 25 and 29.  Nistica

21   Motion at 16; Goossen Decl. I, ¶¶ 384-402.  Finisar contends that multiple optical bands or channels

22   spread "on separate portions of a spatial light modulator having an array of micromirrors" required

23   by limitation [d] is missing in the '941 patent. Finisar Opposition at 14, citing Hall Declaration II,

24   ¶¶ 273-280.  Finisar Responsive SUF, Fact 51.

25          Finisar also references a factual dispute regarding the plain and ordinary meaning of the

26   phrase "overall optical function" in the element [e] of the asserted claims.  Finisar Opposition at 14;

27   Finisar Responsive SUF, Fact 51.  *See* Goossen Decl. I, ¶ 393-394; Hall Decl. II, ¶ 292.  Finisar in

28   its Opposition and Separate Statement does not dispute Dr. Goossen's anticipation analysis for any

1    other limitation of the '740 Patent.

2        ***Evidentiary Objections.***   Before turning to the anticipation issues, Finisar's objections to

3    Nistica's evidence must be considered.  Finisar objects to the Goossen Declaration, which forms the

4    basis for Nistica's motion, on the grounds that it includes improper new opinions with respect to the

5    '740 Patent at ¶¶ 384-402.  Finisar Opposition at 8.  After reviewing Dr. Goossen's Report, the

6    Special Master concludes that the challenged opinions in his Declaration were substantially

7    disclosed in his Report, and recommends that the objection be overruled.

8        As discussed above, under Federal Rule of Civil Procedure 26(a)(2)(B) an expert witness

9    such as Dr. Goossen must timely provide a written report with "a complete statement of all opinions

10   the witness will express and the basis and reasons for them," and "any exhibits that will be used to

11   summarize or support them."  Fed. R. Civ. P. 26(a)(2)(B).  Nistica identifies ¶¶ 150-152, 157-161,

12   and 183-196 of Dr. Goossen's Report (Bennett Decl. I, Ex. 10) as corresponding to the objected-to

13   ¶¶ 384-402 of his Declaration relating to anticipation by the '941 patent.  Bennett Decl. III, Ex. 4

14   (Table of Corresponding Paragraphs).

15       Those paragraphs of the Report discuss the background of the art, set out the asserted claims

16   and then proceed through the asserted claims on a limitation-by-limitation basis, stating Dr.

17   Goossen's conclusion that each is disclosed by the '941 patent, together with two or three pages of

18   text and figures from the '941 patent for each claim element.  Unlike Dr. Goossen's Report

19   regarding anticipation of the '511 patent discussed above, his Report on anticipation of the '740

20   Patent provides annotations to the figures of the prior art '941 patent, labeling elements in the

21   figures with various claim elements.

22       The challenged portions of Dr. Goossen's Declaration on anticipation of the '740 Patent by

23   the prior art '941 patent also discuss the background of the art, set out the asserted claims and

24   proceed through the asserted claims on a limitation-by-limitation basis, giving Dr. Goossen's

25   anticipation conclusion for each using substantially the same text and figures from the '941 patent

26   after each limitation as he did his Report.  The major difference is that Dr. Goossen in his

27   Declaration has put portions of the text quoted from the prior art '941 patent – from about one third

28   to one half of each text portion – in bold to focus the reader's attention.

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                                    50

1    Using Judge Spero's approach in *Volterra* discussed above, the Special Master "compares

2    the more recently articulated opinions to the opinions that were originally expressed to determine

3    whether the opposing party has been given fair notice, while appreciating that in the course of

4    litigation, the positions of the parties and their experts necessarily evolve." *Volterra,* 796 F. Supp.

5    2d at 1040.  The Special Master concludes that Dr. Goossen's Report put Finisar on fair notice of

6    the opinions in Dr. Goossen's Declaration and overrules Finisar's objection.

7    Finisar also points out that Nistica included in its Separate Statement only a single fact for

8    anticipation of the '740 Patent – that the '941 patent "discloses all elements of claim 1, 25 and 29 of

9    the '740 patent."  *See* Nistica Separate Statement, Fact 51.  Finisar argues that Nistica was required

10   to explain in its Separate Statement how each claim element is disclosed in the '941 patent, and did

11   not use the proper technical patent terminology to describe anticipation.  Finisar Opposition at 8.

12   Nistica could have broken down each claim into its separate limitations and given evidentiary detail

13   on each in the Separate Statement itself, but given that Nistica was relying on and specifically

14   referred to Dr. Goossen's Declaration and the limitation-by-limitation analysis and text and figures

15   from the '741 Patent therein, it was appropriate and satisfied the Standing Order to cite to Dr.

16   Goossen's Declaration.  Nistica SUF, Fact 51.  Nistica's Separate Statement also sufficiently sets

17   out anticipation, and the Special Master recommends that Finisar's objection to Fact 51 in Nistica's

18   Separate Statement be overruled.

19   ***On Separate Portions of a Spatial Light Modulator Having an Array of Micromirrors.***

20   Limitation [d] of asserted claims 1, 25 and 29 requires "spreading each of the first and second

21   optical input signals into respective optical bands or channels on separate portions of a spatial light

22   modulator having an array of micromirrors." Dr. Hall states "[i]t is my opinion that the '941 patent

23   does not disclose element (d), 'separate portions of a spatial light modulator having an array of

24   micromirrors,' because the '941 patent does not disclose that each optical band or channel is

25   incident on a portion of a spatial light modulator that has a plurality of micromirrors, as required by

26   this element of claim 1 of the '740 Patent."  Hall Decl. II, ¶ 279.  She also states that "[l]ight beams

27   incident on the micromirrors of the '941 patent are not incident on more than one micromirror"

28   (Hall Decl. II, ¶276) and "each wavelength of light [in the '941 Patent disclosure] is incident on a

1   single mirror."  Hall Decl. II, ¶ 279.  As Finisar put it in its Responsive Separate Statement, "[t]he

2   '941 Patent does not disclose any embodiment where a single beam of light is incident on more than

3   one micromirror, as required by two limitations of claim 1 of the '740 patent."  Finisar Responsive

4   SUF, Fact 51.

5         Finisar and Dr. Hall thus interpret "on separate portions of a spatial light modulator having

6   an array of micromirrors" to require that each band or channel be incident on a plurality of

7   micromirrors. But this is not what the claim language requires.  It requires "spreading each of the

8   first and second optical input signals into respective optical bands or channels on separate portions

9   of a spatial light modulator having an array of micromirrors" without any requirement that each

10   band or channel be incident on a plurality of micromirrors.  If "each wavelength of light [in the '941

11   patent disclosure] is incident on a single mirror," as Dr. Hall states, then the bands or channels of

12   the '941 patent are clearly incident on "separate portions of a spatial light modulator having an

13   array of micromirrors" and meet element [d] of the '740 Patent.

14         Given the above, the Special Master concludes that a reasonable fact finder could not find in

15   favor of Finisar on the issue of whether limitation [d] of '740 Patent claims 1, 25 and 29 is found in

16   the '941 patent , and no genuine issue of material fact is presented on this issue.

17         ***Overall Optical Function.***  The second issue raised by Finisar is the meaning of the term

18   "overall optical function."  That term appears in the phrase "the spatial light modulator having a

19   first set of micromirrors programmed to perform a first overall optical function on the first optical

20   input signal, and having a second set of micromirrors programmed to perform a second overall

21   optical function on the second optical input signal" of limitation [e] which the Court construed to

22   have its plain and ordinary meaning.  Order Construing Claims at 14-16.

23         Dr. Goossen and Dr. Hall, however, differ on the plain and ordinary meaning of "overall

24   optical function."  Dr. Goossen opines that overall optical function refers to the type of optical

25   operation performed (Goossen Decl. I, ¶ 393-395), citing '941 patent 2:66-3:14, which describes

26   "optical functions":

27       The separate optical functions include optical switching, conditioning or monitoring
        functions such as either an optical add/drop multiplexer (OADM) function, an optical

28       channel monitor (OCM) function, an optical cross-connect (CC) function, an optical
        interleaver/deinterleaver (INT/DEINT), a dynamic gain equalization filter (DGEF) or

1    dynamic spectral equalizer (DSE), or some combination thereof.

2  '740 Patent 3:1-8.

3        Dr. Hall opines that "[w]henever the overall optical function performed on the first input

4  signal is achieved using different settings for the receiving pixels than the settings needed to

5  perform the desired overall optical function for the second input signal, then the first and second

6  overall optical functions are different, as required by claim 1."  Hall Decl. II, ¶ 292.  She goes on to

7  say:

8        While "optical function" may be as simple as adding or dropping a signal, the
       "overall optical function" depends on the particular settings of the multiple
9        individual pixels that each signal is incident on at the spatial light modulator, and one
       of ordinary skill in the art would understand this to be the plain and ordinary
10       meaning of "overall optical function."

11 Dr. Hall thus interprets "overall optical functions" to be different whenever any mirrors are tilted

12 differently.  Dr. Hall gives no basis for her construction, other than ascribing it to the understanding

13 of one of ordinary skill in the art.

14       During the claim construction hearing, the Court and counsel discussed this issue, but as

15 "overall optical function" was not presented to the Court for construction, it was not resolved.

16 Transcript of 8/8/2014 hearing, Dkt. 119, at 132-165.  "Overall optical function," however, was

17 addressed in the Court's Order Construing Claims, where the Court Stated:

18       The problem with Nistica's argument is that Finisar does not appear to disagree that
       "'overall optical function' encompasses all of the optical functions performed on a
19       particular signal." Id. at 13. At the Markman hearing, Finisar argued that "overall
       optical function" referred to the "net modulation" of each signal by the SLM—which
20       could mean the total effect of multiple optical functions—and that the "overall
       optical functions" are different if the mirror configurations of the respective portions
21       of the SLM are different. Hr'g Tr. 143:6-144:10.  This argument was not advanced
       in Finisar's briefing, but helps to highlight what appears to be the real dispute
22       between the parties: what test to apply in determining that the first overall optical
       function is different from the second overall optical function.  That question is not
23       before the Court, nor is Nistica's proposed construction helpful in resolving that
       dispute.

24       In any event, it is clear that the '941 patent satisfies the "overall optical function" element

25 under either Dr. Hall's or Dr. Goossen's interpretations of the term.  Dr. Goossen quotes the '941

26 patent to show that it discloses a number of optical functions, such as performing switching and

27 power control differently on each signal, which satisfy his definition.  Goossen Decl. I, ¶ 395.

28

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                    53

1   These same functions also satisfy Dr. Hall's interpretation, since they would necessarily involve

2   using different settings for the mirrors for the first and second input signals.  *See* Goossen Decl. I,

3   ¶ 395.

4          Given the above, the Special Master concludes that a reasonable fact finder could not find in

5   favor of Finisar on the issue of whether limitation [e] of '740 Patent claims 1, 25 and 29 is found in

6   the '941 patent, and that no genuine issue of material fact is presented.

7          The Special Master concludes that Finisar has not come forward with facts which would be

8   sufficient to support the decision of a reasonable fact finder in its favor on the question of whether

9   claims 1, 25 and 29 of the '740 Patent are anticipated by U.S. Patent No. 6,798,941 and invalid, and

10  Nistica has produced clear and convincing evidence of anticipation, and there is no genuine dispute

11  as to any issue of material fact in this regard.  Accordingly, the Special Master recommends that

12  Nistica's motion for summary judgment of invalidity of claims 1, 25 and 29 of the '740 Patent be

13  granted.

14  **F.  Nistica's Motion for Summary Judgment That It Does Not Infringe Claim 32 of Finisar's '687 Patent**

15

16         Nistica seeks summary judgment that it does not infringe Finisar's '687 Patent.  Asserted

    claim 32 provides:

17

18       [preamble] 1. An optical blocking filter for receiving an optical signal having one or
         more optical bands or channels,

19       [a] characterized in that the optical blocking filter comprises a spatial light
         modulator having a micro-mirror device with an array of micro-mirrors for
20       selectively deflecting the one or more optical bands or channels

21       [b] so that each optical band or channel is reflected off a respective plurality of
         micro-mirrors to eliminate a selected band or channel or a specified selection of
22       bands or channels from the optical signal provided along an optical return path,

23       [c] wherein scattered light from a dropped signal is directed onto the micromirror
         device to reflect away from the return path.

24
         [d] 30. An optical blocking filter according to claim 1, wherein the spatial light
25       modulator is programmable for reconfiguring the optical blocking filter to eliminate
         each band or channel by changing a switching algorithm that drives the array of
26       micro-mirrors.

27       [e] 32. An optical blocking filter according to claim 30, wherein the switching
         algorithm is based on the wavelength of the optical signal and the one or more
28       optical bands or channels being eliminated.

---

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                                    54

**Return Path.**  Nistica asserts that the '687 Accused Products do not have a "return path" and therefore do not satisfy limitations [b] and [c] (Nistica Motion at 16) and Finisar contends otherwise.  Finisar Opposition at 15.  Their positions flow from different understandings of the meaning of "return path," which was not construed by the Court.  Nistica contends that "return path" means a retroreflective path in which the output signal travels over the same path the input signal traveled.  Nistica Motion at 17.  Finisar does not clearly state its position on the meaning of "return path," but contends that Nistica's evidence supports, at best, a meaning of return path where output signals travel through at least some of the same elements, rather than the exact same path.  Finisar Opposition at 16.

As earlier discussed, construction of hitherto unconstructed claims is required by *O2 Micro*, 521 F.3d at 1360.  "Return path" does not appear to be a term of art, and its ordinary and customary meaning to a person of ordinary skill in the art must be determined.

The asserted claims refer to "the optical signal provided along *an* optical return path," using the indefinite article (emphasis added).  The meaning of the indefinite article "an" was discussed by the Federal Circuit in *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*  512 F.3d 1338, 1342 (Fed. Cir. 2008):

> [T]his court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'  [Citation omitted.]  That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention. The exceptions to this rule are extremely limited: a patentee must "evince[] a clear intent" to limit 'a' or 'an' to 'one.'  [Citation omitted.]

Although claim 1 uses the transitional phrase "characterized by," the rule applies since that phrase, like "comprising," is an open ended transitional phrase.  *Mars Inc. v. H.J. Heinz Co.,* 377 F.3d 1369, 1376 (Fed. Cir. 2004).  Since "an" in the asserted claim means "one or more" the term "return path" cannot be limited to the retroreflective path.[15]

Turning to the '687 Patent specification, "return path" appears numerous times preceded by

---

[15] Dr. Goossen and Nistica both misquote '687 Patent claim 1 in this regard.  Dr Goossen's Declaration states "the language is clear that the optical signal is provided 'along *the* return path.'"  Goossen Decl. I, ¶ 421 (emphasis added).  Nistica refers to "the optical signal provided along *the* optical return path."  Nistica Motion at 18 (emphasis added).  Claim 1 in fact reads "the optical signal provided along *an* optical return path" (emphasis added).

1   the definite article "the," with one significant exception.  When discussing the embodiment of Fig.

2   8, the specification states "[t]he second pigtail **112** receives the through input channels reflected

3   from the micro-mirror device back along *an* optical return path."  '687 Patent, 8:6-7 (emphasis

4   added).  Again, the use of the indefinite article means that there may be one or more return paths.

5   The discussion of Fig. 8 goes on to state "[b]y tilting the spatial light modulator 30, the return path

6   can be displaced to focus at the second pigtail **112**" (*Id.* 8:16-17) and such a displacement is shown

7   in Fig. 8.  Thus the specification of the '687 Patent uses "return path" to refer to paths which are not

8   retroreflective, confirming that "return path" is not limited to retroreflective paths.  The discussion

9   of Fig. 8 in the '687 Patent confirms the conclusion from reading the claims that "return path"

10  cannot be limited to the retroreflective path.

11      The '687 Patent also uses the term "optical output path" to refer to an output path which is

12  entirely different from the path of the input signal.  '687 Patent, 11:65-12:12.  Given this usage by

13  the inventors, "return path" as used in the claims should be construed as not including a path which

14  is entirely different from the input path.

15      In light of the above, the Special Master recommends that "return path" be construed as a

16  path traveled by an output optical signal which may be, but is not limited to, a retroreflective path,

17  and which is not completely different from the input path.

18      Dr. Hall and Dr. Goossen have different opinions on whether a return path exists in the '687

19  Accused Products using the above construction.  Goossen Decl. I, ¶ 422; Hall Decl. II, ¶ 318.  The

20  Special Master concludes that the evidence would support the decision of a reasonable fact finder

21  for either party on this issue, and that a genuine issue of material fact is presented.

22      ***Scattered Light.***  Nistica seeks summary judgment of noninfringement of the asserted claims

23  of the '687 Patent because none of the '687 Accused Products satisfy the limitation "wherein

24  scattered light from a dropped signal is directed onto the micromirror device to reflect away from

25  the return path."  Nistica Motion at 19.  The Court construed this term to mean "light from a

26  dropped signal that is scattered along the edge of the micromirrors used to block that signal is

27  directed onto the micromirror device to reflect away from the return path."  Order Construing

28  Claims at 24.

1    Nistica's Motion is based on Dr. Goossen's opinions (Goossen Decl. I, ¶¶ 424-436), and

2    Finisar's Opposition on the opinions of Dr. Hall.  Finisar Opposition at 16, citing Hall Decl. II,

3    ¶ 331.  Taken together, the declarations of these experts raise a disputed issue of material fact as to

4    whether the '687 Accused Devices meet the limitation "wherein scattered light from a dropped

5    signal is directed onto the micromirror device to reflect away from the return path."  The evidence

6    would support the decision of a reasonable fact finder for either party on this issue, and so a genuine

7    issue of material fact is presented.

8    *Switching Algorithm.*  For the first time in its Reply, Nistica raises the argument that

9    summary judgment of noninfringement of the '687 Patent should be granted because the Court

10   struck Finisar's new infringement theories for Claim 32, including Dr. Hall's opinion regarding the

11   "switching algorithm."  Nistica Reply at 13.  *See* Order Striking Portions of Expert Reports at 13.

12   After the Court struck Finisar's new theories, Nistica sought leave of court to file a supplemental

13   motion for summary judgment of noninfringement of the '687 Patent and the Court denied Nistica's

14   motion on December 16, 2015, stating that no good cause had been shown.  Dkt. No. 369.

15   Nistica in its Motion sought summary judgment on several issues in anticipation of the

16   Court's December 1, 2015, ruling on its motion to strike, but it did not do so on the new

17   infringement theories for the '687 Patent.  It is too late to raise these arguments for the first time in

18   Nistica's Reply, and they will not be considered.

19   Given the above, the Special Master concludes that genuine issues of material fact are

20   presented regarding Nistica's infringement of the claim 32 of the '687 Patent.  Accordingly, the

21   Special Master recommends that Nistica's motion for summary judgment of noninfringement of

22   claim 32 of the '687 Patent be denied.

23   **G. Nistica's Motion That Claim 32 of the '687 Patent Is Invalid for Lack of Written
       Description and Enablement**

24
25   Nistica moves for summary judgment that claim 32 of Finisar's '687 Patent is invalid because

26   limitation [c], "wherein scattered light from a dropped signal is directed onto the micromirror

27   device to reflect away from the return path" has no written description and is not enabled.  Nistica

28   Motion at 20.  For brevity, this limitation will be referred to as the "scattered light" limitation.

---

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                                    57

1    ***Written Description.***  The Court construed the "scattered light" limitation, and found that it

2    means "light from a dropped signal that is scattered along the edge of the micromirrors used to

3    block that signal is directed onto the micromirror device to reflect away from the return path."

4    Order Construing Claims at 10.  Finisar argues that during the construction process, the Court

5    implicitly determined that the inventor had possession of an invention "wherein scattered light from

6    a dropped signal is directed onto the micromirror device to reflect away from the return path."

7         The Special Master disagrees.  During the construction process, the Court focused on the

8    origin and nature of the scattered light, and did not focus on the part of the construed limitation

9    "directed onto the micromirror device to reflect away from the return path" which is under

10   consideration here.  Order Construing Claims at 10-14.  The last part of the Court's construction,

11   "directed onto the micromirror device to reflect away from the return path," was simply taken from

12   portions of the parties' proposed constructions which were identical, and is a quote from claim 1.

13   The Special Master concludes that it would be reading too much into the Court's claim construction

14   to find the implicit determination that there is the written description for which Finisar argues.

15        A patent must contain a written description of the invention under 35 U.S.C. ¶ 112(a).  "[T]he

16   function of the description requirement is to ensure that the inventor had possession, as of the filing

17   date of the application relied on, of the specific subject matter later claimed by him."  *Moba, B.V. v.*

18   *Diamond Automation, In*c., 325 F.3d 1306, 1319 (Fed. Cir. 2003).  Whether a claim complies with

19   the written description requirement is a question of fact.  *Id.*  The "scattered light" limitation was

20   added to the claims over two years after the '687 Patent application was filed.  Goossen Decl. I, Ex.

21   53 ('687 Patent Prosecution Preliminary Amendment of Dec. 19, 2002) at FinNIST00000934.

22        Finisar and Dr. Hall rely on Fig. 24 and column 12, lines 45-65 of the '687 Patent to provide

23   written description.  Finisar Opposition at 18; Hall Decl. II, ¶ 351.

24        In the operation of the blocking filter **600** the micro-mirrors **84** of the spatial light
     modulator **30** are tilted to a first position to delete a desired optical channel(s) from

25        the WEM input signal **12** by directing the deleted channels away from the return path
     **94** and the first optical path **92** as indicated by the arrow **610**.  The micro-mirrors **84**

26        of the spatial light modulator **30** are tilted to a second position to reflect the through
     optical channels **14** of the input signal **12** through the lens **608** to the mirror **606**

27        which then reflects the through channel(s) back along the return path **94** to provide
     the output signal **48** at optical fiber **50**.  While the blocked or deleted channels are
     directed along the optical path **610**, some scattered light of the blocked optical

28        channels propagate along the first optical path **92**. This edge scattering from the

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                    58

micro-mirrors limits the extinction of the blocked channel that can be achieved.

By properly choosing the angle of incidence of the signal light onto the spatial light modulator, the coherent scattering from the blocked channel mirrors can be directed away from the return path **94** and provide the highest blocked channel extinction.

'687 Patent 12:45-65.

Dr. Hall addresses the issue at ¶¶ 345-358 of her Declaration.  She states that "[i]n this section of the patent, at 12:61-65, the 'angle of incidence' refers to the angle of the mirrors receiving the blocked channel on its second 'bounce' at the spatial light modulator—not the first.  This would have been clear to one of ordinary skill in the art reading the '687 Patent specification."  Hall Decl. II, ¶ 353.

A reading of the above passages from the '687 Patent shows that Dr. Hall is mistaken.  The preceding text of the specification makes clear that "[b]y properly choosing the angle of incidence of the *signal light*" refers to the angle of incidence of the *input signal*, i.e., to follow Dr. Hall's terminology, the "first bounce" (emphasis added).  If the specification was referring to an angle of incidence for the blocked channel, as Dr. Hall asserts, it would likely have used some term other than "signal light," such as "blocked" or "deleted" channels, as used in the preceding text.  '687 Patent, 12:45-50.  The only reference to a "second bounce" in the '687 Patent is in the language the scattered light limitation of claims 1 and 32, added by amendment after the application was filed and the subject of this dispute.

In order to prevent scattered light traveling back to the return path and output port, applicants in the passage quoted above chose to change the angle of incidence of the signal light onto the spatial light modulator ("SLM").  This is the only portion of the specification that mentions "scattered light," and it addresses the problem by "properly choosing the angle of incidence of the signal light on to the spatial light modulator" and not by "direct[ing] [scattered light] onto the micromirror device to reflect away from the return path," as the scattered light limitation states.  Under the Court's construction, "'scattered light' is light scattered by the dropping of the signal at the SLM."  Order Construing Claims at 11.  Choosing the "angle of incidence" of the signal light onto the SLM, as taught in the '687 Patent passage quoted above, does not "direct" scattered light

1 onto the micromirror device but away from it, as shown in several figures.  The '687 Patent,

2 including the portions of the specification set out above, does not describe how "scattered light from

3 a dropped signal is directed onto the micromirror device to reflect away from the return path."

4      As discussed above, the "angle of incidence" refers to the angle at which the light strikes the

5 micromirrors of the spatial light modulator on the "first bounce," again using Dr. Hall's

6 terminology.  The "angle of incidence" is thus chosen before the light interacts with the

7 micromirrors of the spatial light modulator, and before the "scattered light" even exists.  Under the

8 Court's construction, "scattered light" is not created until the interaction between the dropped signal

9 and the micromirror array of the SLM.  Order Construing Claims at 11.  Changing the "angle of

10 incidence" thus cannot "direct" scattered light "onto the micromirror device."

11      The Special Master concludes that changing the "angle of incidence of the signal light onto

12 the spatial light modulator" is not a description of the limitation "wherein scattered light from a

13 dropped signal is directed onto the micromirror device to reflect away from the return path," and

14 that the '687 Patent lacks a written description of that claim limitation and does not show that that

15 the inventors were in possession of that limitation when the '687 Patent application was filed.

16      For these reasons, the Special Master concludes that Finisar has not come forward with facts

17 which would be sufficient to support the decision of a reasonable fact finder in its favor on the issue

18 of whether written description exists for the limitation "wherein scattered light from a dropped

19 signal is directed onto the micromirror device to reflect away from the return path" of claim 32 of

20 the '687 Patent, that Nistica has come forward with clear and convincing evidence on that issue, and

21 that there is no genuine dispute as to any issue of material fact in this regard.  Accordingly, the

22 Special Master recommends that Nistica's motion for summary judgment of invalidity of claim 32

23 of the '687 Patent based on lack of written description be granted.

24      ***Enablement.***  Nistica also moves for summary judgment of invalidity of the asserted claims

25 of the '687 Patent on the basis that they are not enabled.  Nistica Motion at 20.  35 U.S.C. ¶ 112(a)

26 requires that the patent enable a person of ordinary skill in the art to make and use the invention as

27 of the time of filing the application without "undue experimentation."  *Moba*, 325 F.3d at 1321.

28 Enablement is a question of law, based on underlying factual determinations including the question

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER      60

1  of undue experimentation.  *Id*.

2       Finisar argues that Nistica's motion based on enablement should be denied because Nistica

3  and Dr. Goossen have provided no evidence on the issue of undue experimentation.  Finisar

4  Opposition at 18.  Finisar is correct that no evidence on undue experimentation has been provided.

5  *See* Goossen Decl. I, ¶¶ 443-444.  It is possible that a claim which has no written description in the

6  original application could be enabled, and for that reason the Special Master recommends that, due

7  to the lack of evidence on undue experimentation, Nistica's motion for summary judgment of

8  invalidity of claim 32 of the '687 Patent based on lack of enablement be denied.

9  **H.  Nistica's Motion for Summary Judgment That It Does Not Infringe Finisar's '328 Patent**

10      Finisar did not include any infringement contentions for the '328 Patent in its second amended

11  infringement contentions (Bennett Decl. I, Ex. 8 ) and Dr. Hall in her report provided no opinion on

12  Nistica's infringement of the '328 Patent.  Bennett Decl. I, Ex. 2 (Hall Report).  Nistica argues that

13  summary judgment of non-infringement of the '328 Patent should be granted because Finisar does

14  not have evidence which would enable it to meet its burden of proof.  Nistica Motion at 21.

15      Finisar does not dispute Nistica's assertions, but responds that "[s]ummary judgment of non-

16  infringement should be granted as to claim 34 of the '328 Patent only," because no other claims in

17  the '328 Patent were asserted, citing *Fox Grp., Inc. v. Cree, Inc.,* 700 F.3d 1300, 1307 (Fed. Cir.

18  2012) which held:

19          In patent cases, "the existence of a case or controversy must be evaluated on a claim-
            by-claim basis." *Jervis B. Webb Co. v. So. Sys., Inc*., 742 F.2d 1388, 1399 (Fed.
20          Cir.1984) (citations omitted).  "[J]urisdiction must exist at all stages of review, not
            merely at the time the complaint [was] filed, ... a counterclaimant must show a
21          continuing case or controversy with respect to withdrawn or otherwise unasserted
            claims."  *Streck, Inc. v. Research & Diagnostic Sys., Inc.,* 665 F.3d 1269, 1282-83
22          (Fed.Cir.2012) (bracket in original) (quotations and citations omitted).

23  Finisar Opposition at 19, ftn. 21.

24      Since Nistica's motion for summary judgment of no infringement of Finisar's '328 Patent is

25  not opposed, the Special Master recommends that it be granted as to claim 34 only.

26  **I.   Nistica's Motion for Summary Judgment That Finisar Has No Evidence of Direct
       Infringement by Accused Products Manufactured, Shipped and Delivered Abroad**
27

28      Nistica moves for summary judgment that products manufactured abroad and shipped to

---

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                    61

1   customers abroad without ever entering the United States do not directly infringe the asserted

2   patents.  The basis for Nistica's motion is that certain of Nistica's products are manufactured in

3   ██████████████████████████████ and shipped directly to third parties outside the United

4   States.  Nistica Motion at 21.

5        The patent statute provides that "whoever without authority makes, uses, offers to sell, or

6   sells any patented invention *within the United States* . . . infringes the patent."  35 U.S.C. § 271(a)

7   (emphasis added).  The Supreme Court has stated "[i]t is the general rule under United States patent

8   law that no infringement occurs when a patented product is made and sold in another country."

9   *Microsoft Corp. v. AT&T Corp.,* 550 U.S. 437, 441 (2007).  The question raised for summary

10  judgment is whether there is sufficient evidence that Nistica either sells or offers for sale accused

11  products in the United States.

12       The Federal Circuit discussed its jurisprudence on the determination of where a sale occurs

13  in *Halo Elecs., Inc. v. Pulse Elecs., Inc.,* 769 F.3d 1371, 1378, where it stated:

14      Although the place of contracting may be one of several possible locations of a sale,
    to confer personal jurisdiction, we have not deemed a sale to have occurred within

15  the United states for purposes of liability under § 271(a) based solely on negotiation
    and contracting activities within the United States when the vast majority of

16  activities underlying the sales transaction occurred wholly outside the United States.
    For such a sale, one must examine whether the activities in the United States are

17  sufficient to constitute a "sale" under § 271(a), recognizing that a strong policy
    against extraterritorial liability exists in the patent law.

18
    And, at 1380:

19

20      Any doubt as to whether Pulse's contracting activities in the United States
    constituted a sale within the United States under § 271(a) is resolved by the
    presumption against extraterritorial application of United States laws.

21

22       In *Halo,* Pulse customers such as Cisco negotiated a general agreement with Pulse within the

23  United States, including pricing, and it was the foreign contract manufacturers who ordered the

24  products from Pulse according to Pulse's customer's requirements.  *Id.* at 1375-76.  Approval of

25  prices quoted to foreign customers when those prices were below certain thresholds was given in

26  the United States.  *Id.*  Pulse also had technical and sales meetings and did post-sale support in the

27  United States.  *Id.*  However, not only were the accused products manufactured and shipped abroad

28  to destinations outside the United States, but all purchase orders were received at defendant Pulse's

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER        62

1    offices abroad, and invoicing was done by Pulse abroad.  *Id.* at 1375, 1377.  Based on these facts,

2    the Federal Circuit held that there was no sale or offer to sell in the United States.

3         The Federal Circuit recently revisited this area in *Carnegie Mellon University v. Marvell*

4    *Technology Group, Ltd.*,  No. 14-1492, 2015 WL 4639309 at *19 (Fed. Cir. Aug. 4, 2015).

5    *Carnegie Mellon Univ.* reiterated that the patent laws are to be understood against a background

6    presumption against extraterritorial reach, both in identifying infringing conduct and assessing

7    damages.  *Id.*  The court went on to say:

8         The standards for determining where a sale may be said to occur do not pinpoint a
          single, universally applicable fact that determines the answer, and it is not even
9         settled whether a sale can have more than one location.  [Citing *Halo.*]  Places of
          seeming relevance include a place of inking the legal commitment to buy and sell
10        and a place of delivery, [citations omitted] and perhaps also a place where other
          "substantial activities of the sales transactions" occurred [Citing *Halo*].  At this
11        point, we do not settle on a legal definition or even to say whether any sale has a
          unique location.

12   *Id.* at *21 and:

13        At present, we do not have a full understanding of, among other things, what a
14        "design win" meant legally and practically, how such a "design win" in the United
          States compares with the activities that occurred in the United States in *Halo* (which
15        were insufficient) and where specific chip orders were negotiated and made final.

16   *Id.*

17        This case has many similarities to *Carnegie Mellon Univ*.  Defendant Marvell's products,

18   like those which are the subject of Nistica's motion, were manufactured, sold and used abroad,

19   without ever entering the United States.  *Id.*  In *Carnegie Mellon Univ.,* the products were

20   customized chips with designs specifically tailored for incorporating into customer products.  *Id.* at

21   *22.  Here, ███████████████████████████████████████████████████

22   ███████████████  Davis Decl. II Ex. 12 (Vengsarkar Dep.) at 274:1-15.  In *Carnegie Mellon Univ.,*

23   there was a lengthy "sales cycle," involving extensive joint work over several years, before a sale is

24   made and chips enter mass production.  *Carnegie Mellon Univ.* at *22.  Here, s█████████████

25   ███████████████████████████████████████████████████████████████████

26   ███████████████████████████████████████████████████████████

27   ███████  Davis Decl. II Ex. 12 (Vengsarkar Dep.) at 278:16-20, 279:6-9; Ex 9 at -874; Ex. 22

28   (Strasser Dep.) at 567:16-569:4.  In *Carnegie Mellon Univ.* defendant Marvell's facilities were in

1  Northern California, and with the exception of manufacturing, all activities related to designing,

2  simulating, testing, evaluating and qualifying the chips by Marvell and its customers occurred in the

3  United States. *Carnegie Mellon Univ.* at *22.  Here, ███████████████████████████████

4  ███████████████████████████  Davis Ex. 11 (Bisconti Dep.) at 97:12-98:23,

5  99:10-100:5.  Marvell provided customers with samples from California.  *Carnegie Mellon Univ.* at

6  *22. ████████████████████████████.  Davis Decl. II, Ex. 21 (Falquier Dep.)

7  217:4-8, 219:1-8.  During the sales cycle, Marvell engineers assisted customers in implementing its

8  solutions into their products. *Carnegie Mellon Univ.* at *22.  Here, N████████████████████

9  ██████████████████████████.  Davis Decl. II, Ex. 10 (Garrett Dep.) 63:11-18,

10  70:2-7; Ex. 21.  In addition, ████████████████████████████████████

11  ███████████████████████████████████████████████████████████

12  █████████████████████████████████  David Decl. II, Ex. 51-59 (invoices).

13       The Federal Circuit concluded in *Carnegie Mellon Univ.* that there was "a substantial level

14  of sales activity . . . within the United States, even for [products] manufactured, delivered, and used

15  entirely abroad" and that Marvell "has not pointed to  . . . significant evidence that would block an

16  inference that sales commitments occurred in the United States."  The court concluded that "we

17  cannot say that a jury could not find the chips to have been sold in the United States" given that "a

18  substantial level of sales activity by Marvell within the United States, even for chips manufactured,

19  delivered and used entirely abroad" and remanded for further development of the legal and factual

20  issues. *Carnegie Mellon Univ* .at *23.  Based on the evidence cited by Finisar, a jury could find the

21  same here.

22       In light of the foregoing, the Special Master concludes that genuine disputes as to material

23  fact exist regarding Nistica's motion for summary judgment of no direct infringement by accused

24  products manufactured, shipped and delivered abroad, and recommends that Nistica's motion be

25  denied.

26

27

28

REPORT AND RECOMMENDATIONS OF SPECIAL MASTER                                          64

**J. Nistica's Motion for Summary Judgment That There Is No Indirect Infringement and Infringement Under § 271 (f) Relating to Fujikura, Ltd. and Fujikura Optics of Vietnam, Ltd.**

Nistica moves in Section VIII of its Motion for Summary Judgment on Finisar's allegations of infringement under § 271 (f) and contributory and induced infringement relating to ███████ ███████████████████████). Nistica's motion was contingent on the outcome of the pending motion to strike portions of the Hall report, and the sole ground for its motion was "[i]f the Court strikes these new Finisar theories (motion pending), it has no expert opinion and summary judgment should be granted on these issues." Nistica Motion at 23; Nistica SUF Fact 77.

The Court struck Dr. Hall's ¶ 271(f) infringement opinions as well as her theories of induced and contributory infringement regarding ████████████ on December 1, 2015. Order Striking Portions of Expert Reports at 9-10. Finisar filed its Reply shortly after, stating:

> However, summary judgment should not be granted on these claims merely because there will be no expert opinion on it. Mot. at 23. This request by Nistica is without any basis in case law—and Nistica cites none. Finisar may and is entitled to prove its case of induced and contributory infringement through fact witnesses at trial in accordance with the theories presented in Finisar's operative infringement contentions.

The "theories presented in Finisar's operative infringement contentions" do not include any theories involving ████████████. They do contain, in the section concerning indirect infringement under Patent Local Rules Rule 3-1(d), indirect infringement theories involving ████████████ and other unnamed companies, referred to here as "old theories." Davis Decl. II, Ex. 7 (Finisar Amended Preliminary Infringement Contentions) at 5.

In stating that it is entitled to prove its case in accordance with its old theories, Finisar has abandoned its § 271(f) and induced and contributory infringement claims regarding ████████ ████. For that reason, the Special Master concludes that Nistica's motion for summary judgment on Finisar's allegations of infringement under § 271 (f) and contributory and induced infringement relating to ████████████ should be granted, and the Special Master so recommends.

In its Reply, Nistica attempts to expand its original motion to include Finisar's old theories, giving a number of reasons. Nistica Reply at 14. However, Nistica's original Section VIII motion was limited to § 271 (f) and contributory and induced infringement relating to ████████████

1    ████  To allow Nistica in its Reply to expand its motion to include all § 271 (f) and contributory

2    and induced infringement would be unfair to Finisar, and would violate the "one motion for

3    summary judgment" rule in the Court's Standing Order re Civil Cases, Rule F.1.  Therefore, the

4    Special Master will not entertain Nistica's expanded motion for summary judgment on all § 271 (f)

5    and contributory and induced infringement theories.

6    **K.  Nistica's Motion for Summary Judgment That There Is No Indirect Infringement Because There Is No Evidence That Fujikura or FOV Directly Infringe the Patents-in-Suit**

7

8    Nistica moves in Section IX of its Motion for Summary Judgment on Finisar's claims that it

9    indirectly infringes the asserted patents through its activities v████████████  Nistica's

10   motion is based on an argument that Finisar had no evidence that ████████, foreign

11   companies, committed the underlying acts of direct infringement needed to establish indirect

12   infringement.  Nistica Motion at 23-24.  Finisar states in its Reply that, "[f]ollowing the Court's

13   decision to strike Finisar's expert opinion supporting the theories of induced and contributory

14   infringement, Finisar is no longer pursuing those theories and Section IX of Nistica's Motion is thus

15   moot."  Finisar Opposition at 23, ftn. 2; *See* Finisar Responsive SUF, Facts 78-80.

16   The Special Master agrees that Nistica's motion for summary judgment that it does not

17   indirectly infringe through its activities with ████████ is moot and for that reason

18   recommends that Nistica's motion for summary judgment on Finisar's claims that it indirectly

19   infringes the asserted patents through its activities with ████████ be denied.

20   **L.  Nistica's Motion for Summary Judgment That Finisar Cannot Prove Willful Infringement**

21   Finally, Nistica moves for summary judgment on Finisar's allegations of willful

22   infringement on the patents-in-suit, asserting that it has reasonable defenses to the allegations of

23   infringement of each patent, and thus cannot be considered objectively reckless under *In re Seagate*

24   *Tech., LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2006) and *Bard Peripheral Vascular, Inc. v W.L. Gore*

25   *& Assocs.,* 682 F.3d 1003, 1006.  Nistica Motion at 24.

26   Having considered the motions for summary judgment, the Special Master concludes that

27   Nistica has objectively reasonable defenses to each claim of infringement.  That conclusion is based

28   on the discussion above as to the asserted patents.  The Special Master therefore recommends that

1  Nistica's motion for summary judgment that it has not willfully infringed any of the asserted patents

2  be granted.

3  **VI. SUMMARY OF RECOMMENDATIONS**

4         In light of the foregoing, the Special Master recommends the following dispositions of

5  Finisar's motion for summary judgment:

6         A.  That Finisar's motion that Nistica literally infringes claim 24 of the '599 Patent be

7              denied;

8         B.  That Finisar's motion that no patent-in-suit is obvious based on prior art combinations

9              advanced by Nistica be granted as to the asserted claims of the '687, '833 and '980

10             Patents and denied as to the asserted claims of the '740 and '599 Patents;

11        C.  That Finisar's motion that Nistica's Eighteenth through Twentieth Affirmative Defenses

12             (license/implied license, estoppel, release) do not bar enforcement of the patents-in-suit

13             be denied as moot;

14        D.  That Finisar's motion that Nistica's Twenty-First Affirmative Defense (unclean hands)

15             does not bar enforcement of the patents-in-suit be granted;

16        E.  That Finisar's motion that Nistica's Twenty-Second Affirmative Defense (laches) does

17             not bar enforcement of the patents-in-suit be denied as moot; and

18        F.  That Finisar's motion that Nistica's Twenty-Third Affirmative Defense (equitable

19             estoppel) does not bar enforcement of the patents-in-suit be granted.

20        In light of the foregoing, the Special Master recommends the following disposition of

21  Nistica's motion for summary judgment:

22        A.  That Nistica's motion that it does not infringe claim 14 of Finisar's '599 Patent be

23             granted;

24        B.  That Nistica's motion that claim 24 of Finisar's '599 Patent is invalid be denied;

25        C.  That Nistica's motion that it does not infringe claims 1, 12 and 14 of Finisar's '980

26             Patent be granted;

27        D.  That Nistica's motion that it does not infringe claims 1 and 18 of Finisar's '833 Patent

28             be granted;

E.   That Nistica's motion that claims 1, 25 and 29 of Finisar's '740 Patent are invalid be granted;

F.   That Nistica's motion that it does not infringe claim 32 of Finisar's '687 Patent be denied;

G.   That Nistica's motion that claim 32 of Finisar's '687 Patent is invalid for lack of written description and enablement be granted, as to lack of written description only;

H.   That Nistica's motion that it does not infringe Finisar's '328 Patent be granted as to claim 34 only;

I.   That Nistica's motion that Finisar has no evidence of direct infringement by accused products manufactured, shipped and delivered abroad be denied;

J.   That Nistica's motion that there is no indirect infringement and infringement under § 271 (f) relating to Fujikura, Ltd. and Fujikura Optics of Vietnam, Ltd. be granted;

K.   That Nistica's motion that there is no indirect infringement because there is no evidence that Fujikura or FOV directly infringe the asserted patents be denied as moot; and

L.   That Nistica's motion that Finisar cannot prove willful infringement be granted.

Pursuant to the Order Appointing Special Master for Summary Judgment, Dkt. No. 265, and the Order Setting Amended Case Schedule, Dkt. No. 302, the parties have until February 22, 2016, to file objections to this Report and Recommendations.

DATED:  March 3, 2016

_____

Robert B. Morrill
Special Master